## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

*In re Grand Canyon Education, Inc.*
*Securities Litigation*

Civil Action No. 20-639-MN-CJB

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

ECF CASE

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................................ 7

III.    THE PARTIES.............................................................................................................. 7

        A.      Lead Plaintiffs.................................................................................................. 7

        B.      Defendants ....................................................................................................... 8

IV.     BACKGROUND ........................................................................................................ 10

        A.      For-Profit Institutions Rely Heavily On Federal Funds....................................... 10

        B.      2014: Grand Canyon's First Failed Non-Profit Conversion ................................. 13

V.      DEFENDANTS' FRAUDULENT SCHEME .................................................................... 15

        A.      2017: Grand Canyon Revives The Conversion In A Changed Regulatory
                Environment.................................................................................................... 15

        B.      January – February 2018: Grand Canyon Announces Its Submission Of A
                Renewed Application To The HLC ...................................................................... 16

                1.      Grand Canyon Touts The Importance Of Non-Profit Status .................... 16

                2.      Defendants Claimed That The Proposed Conversion Closely
                        Followed The Structure Of Other Proposed Conversions ........................ 18

        C.      January 2018: Grand Canyon Submits Pre-Acquisition Review To DOE ........... 20

                1.      Grand Canyon Announces Conversion Will Not Be Completed
                        Until The DOE Grants Its Approval ......................................................... 20

                2.      Unbeknownst To Investors, The DOE Indicates To Defendants
                        That Approval Of The Conversion Would Be Much More Difficult
                        Than Defendants Had Indicated To The Public......................................... 23

                3.      Grand Canyon Reverses Course And Moves Ahead With The
                        Conversion Without DOE Approval In Hand............................................ 24

        D.      Following Completion Of The Conversion, Grand Canyon Announces
                Strong Results And Denies That GCU Is An Off-Balance-Sheet Entity,
                Variable Interest Entity, Or Related Party ............................................................ 30

i

E.   In Reality, Defendants Were Engaging In A Scheme To Inflate Grand Canyon's Results Using GCU, A Captive And Related Party—A Scheme That Would Sabotage The Efforts To Obtain DOE Approval.............................. 32

1.   New GCU Was Not A Non-Profit ............................................................. 33

2.   GCE Was The Primary Beneficiary Of The MSA.................................... 34

3.   New GCU Was Not Independent From GCE ........................................... 37

4.   New GCU Was Captive To GCE............................................................... 39

5.   The Undisclosed Terms Of The Conversion Were Very Different Than Other Non-Profit Conversions That The DOE Approved .............. 40

6.   Traditional Concerns About For-Profit Universities Were Realized By New GCU's Transformation After The Conversion ........................... 44

7.   Grand Canyon Violated GAAP Requirements For Consolidation ........... 47

       a.   New GCU Did Not Fall Within A Scope Exception Because It Was Not A Bona Fide Non-Profit................................ 49

       b.   Grand Canyon Was Required To Consolidate GCE's And GCU's Financial Statements.......................................................... 50

8.   Grand Canyon Violated GAAP Requirements For Related Party Disclosures............................................................................................... 52

VI.   THE TRUTH EMERGES................................................................................... 54

A.   November 6-7, 2019: Grand Canyon Discloses That The DOE Rejected Its Request For Treatment Of New GCU As A Non-Profit....................................... 55

B.   January 28, 2020: Citron Research Exposes Grand Canyon's Scheme To Inflate Its Reported Financial Results By Using New GCU As An Off-Balance-Sheet Entity..................................................................................... 59

VII.   POST-CLASS PERIOD EVENTS .................................................................... 61

VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ......................................................................................... 62

A.   False And Misleading Statements Regarding New GCU's Purported Independence Before The Conversion.................................................................. 62

B.   False And Misleading Statements And Omissions Regarding DOE Approval Of The Conversion................................................................................. 66

|  | C. | False And Misleading Statements Regarding New GCU's Purported Independence After The Conversion .................................................................... 68 |

|  | D. | False And Misleading Statements Regarding The Conversion's Similarity To Other Transactions............................................................................................ 70 |

|  | E. | False And Misleading Statements Regarding Grand Canyon's Accounting And Compliance with GAAP ................................................................................ 73 |

|  | F. | False And Misleading Statements Regarding The Source Of GCE's Success............................................................................................................... 76 |

| IX. | ADDITIONAL ALLEGATIONS OF SCIENTER......................................................... 77 |

| X. | LOSS CAUSATION....................................................................................................... 81 |

| XI. | CLASS ACTION ALLEGATIONS ................................................................................ 83 |

| XII. | PRESUMPTION OF RELIANCE................................................................................... 85 |

| XIII. | THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR............................ 86 |

| XIV. | CAUSES OF ACTION................................................................................................... 87 |

|  | COUNT I ........................................................................................................................87 |

|  | COUNT II .......................................................................................................................88 |

| XV. | PRAYER FOR RELIEF ................................................................................................. 90 |

| XVI. | JURY TRIAL DEMAND ............................................................................................... 90 |

Lead Plaintiffs Fire and Police Pension Association of Colorado, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association Trust ("Lead Plaintiffs") bring this action individually and on behalf of all other persons who purchased the common stock of Grand Canyon Education, Inc. ("Grand Canyon," "GCE" or the "Company") between January 5, 2018 and January 27, 2020, inclusive (the "Class Period"), and were injured thereby (the "Class"). Lead Plaintiffs, by and through their undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.

Lead Plaintiffs' information and belief are based on, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Grand Canyon with the United States Securities Exchange Commission ("SEC"); (ii) conference calls, press releases, and other materials issued and disseminated by Grand Canyon; (iii) analyst reports concerning Grand Canyon; (iv) reports and other materials issued by educational accreditation or regulatory bodies; (v) the November 6, 2019 letter from Michael J. Frola, the Director of Multi-Regional and Foreign Schools Participation Division of the U.S. Department of Education ("DOE") denying Grand Canyon University's ("GCU's") application for non-profit status, which quoted numerous confidential Company documents and analyses of the Conversion; (vi) thousands of pages of documents produced by the DOE in response to a Freedom of Information Act ("FOIA") request; and (vii) other public information regarding Grand Canyon. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This securities class action arises from Defendants' materially false and misleading statements concerning Grand Canyon's conversion (the "Conversion") of the for-profit university

1

it owned and operated, GCU, into a supposedly independent "non-profit" university ("New GCU"). Defendant Mueller repeatedly claimed that the Conversion would enable Grand Canyon to transform into an independent third-party services provider. He also claimed that the Conversion would allow New GCU, as a non-profit, to focus exclusively on its academic mission and to shed the stigma of a for-profit institution. Defendants told investors that Grand Canyon expected the DOE to grant the required blessing to the Conversion, and Grand Canyon closed the transaction in July 2018. Thereafter, Grand Canyon reported extraordinarily strong and growing profit margins based on its contracts with New GCU, while continuing to maintain that New GCU was a completely independent third party.

2.     In reality, none of this was true. As set forth in the DOE's November 2019 letter rejecting New GCU's petition for approval as a non-profit, Grand Canyon's own internal confidential documents demonstrated that the Conversion "violate[d] the most basic tenet of nonprofit status" because New GCU was Grand Canyon's "captive client—potentially in perpetuity." Indeed, the Conversion was simply a scheme to present New GCU as a purportedly independent university and to reap the attendant marketing benefits, all while continuing to funnel an undisclosed 95% of New GCU's revenues to Grand Canyon.

3.     The Class Period begins with the Company's January 5, 2018 announcement that it had applied to regional accreditation body the Higher Learning Commission ("HLC") for approval of GCU as a non-profit and a services agreement with Grand Canyon as a third-party services provider. Grand Canyon stated that the shared services agreement would be "comparable to other shared services agreements" in the marketplace and that its fees would "reflect the level of services" Grand Canyon would provide.

4.      Grand Canyon also submitted a "pre-acquisition" application to the DOE for recognition of New GCU as a non-profit.  The DOE's approval was a separate and critical step in the Conversion since, among other reasons, the DOE controlled the flow of Title IV of the Higher Education Act ("Title IV") funds to New GCU in the form of student loans and Pell Grants, which comprised 75% of New GCU's revenue.  Moreover, Grand Canyon's ability to cast off the stigma of a for-profit university was fundamental to Defendant Mueller's marketing plan to maximize enrollment—and thus revenues to Grand Canyon.  Given that DOE approval was necessary to market New GCU as a non-profit university, Defendants repeatedly told investors that Grand Canyon had no intention of closing the Conversion until the DOE had completed its review and approved the transaction and New GCU's status as a non-profit.

5.      DOE regulations state that no part of the net earnings of a non-profit can benefit any private shareholder or individual.  34 C.F.R. § 600.2.  Defendants knew, but did not disclose, that under the terms of the shared services agreement and because most of New GCU's key management would work for GCE and not New GCU, New GCU was not the entity actually operating the institution and thus did not satisfy the DOE's requirements for non-profit status.  Indeed, as Defendants knew, and the DOE later formally determined, the primary purpose of the Conversion was "to drive shareholder value for GCE with [New] GCU as its captive client—potentially in perpetuity."  Despite this knowledge, Defendants told investors that, notwithstanding the fact that Mueller would act as CEO of Grand Canyon and President of New GCU, New GCU would be "independent" from Grand Canyon, that the relationship between the two entities would "no longer be as owner and operator, but as a third party contract party," and that New GCU was "not a related party" to Grand Canyon.  Defendants also continued to claim that the proposed

Conversion was very similar to the structure of other high-profile conversions that had already obtained DOE approval.

6.    In May 2018, just when Grand Canyon had said the DOE would issue its final decision on the Conversion, the DOE instead propounded a lengthy series of interrogatories and document requests to Grand Canyon.  These demands probed the underlying structure of the Conversion and its financial benefits to Grand Canyon.  Knowing, as Grand Canyon did, that the Conversion was actually constructed primarily to drive revenue to Grand Canyon (not to further GCU's educational mission), Defendants knew that this deeper probe put DOE approval at substantial risk.

7.    Immediately after receiving the DOE's request for additional information about the Conversion and without disclosing them to the public, Grand Canyon unexpectedly announced that it would not wait for DOE pre-acquisition approval and would instead complete the Conversion within weeks.  To assuage any investor concern about the risks of DOE approval, Defendants reassured the market that, "based on ongoing engagement" with the DOE, Grand Canyon would be able to "manage" the results of the DOE approval process.  In statements to the press, Mueller dismissed the delay as simply a matter of "understaffing" at the DOE.

8.    The Conversion closed on July 1, 2018.  Thereafter, Grand Canyon consistently reported enormous profit margins and touted the success of its transition into the role of a third-party services provider, whereby New GCU purportedly focused on the university's academic mission and Grand Canyon handled its back-office services.  Grand Canyon repeatedly attributed its phenomenal profit margins to New GCU's positive and growing enrollment figures.

9.    What Defendants Mueller and Bachus knew, but did not tell investors, was that New GCU functioned as an improper off-balance-sheet entity in which Grand Canyon was able to

4

hide expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results. The contracts between Grand Canyon and New GCU obligated New GCU to funnel to Grand Canyon 95% of its revenue, while Grand Canyon was only expected to cover 28% of the costs of New GCU's operations. This undisclosed and improper structure allowed Grand Canyon—in violation of its disclosure obligations for SEC filings—to publicly report inflated profit margins that far exceeded its purported peers in the third-party services industry.

10. After the Conversion—when New GCU was supposedly acting as a non-profit—Grand Canyon began to drive New GCU to participate in the type of quota-driven enrollment practices that had led to the collapse of numerous other for-profit operators. Former Grand Canyon employees recalled that, directly after the Conversion, Grand Canyon started dramatically escalating its demands for student enrollment—and directing employees to disregard information undermining potential students' qualifications.

11. Grand Canyon was able to exercise this amount of control over New GCU's internal operations not only because it had a stranglehold on the university's revenues, but also because Grand Canyon actually directly managed the university. In addition to Defendant Mueller, who headed both organizations, the DOE found, based on internal Company documents, that "nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision" were actually employed by Grand Canyon, not New GCU. The DOE concluded that, "[g]iven the enormous leverage [Grand Canyon] now has over [New GCU] by virtue of the fact that most of [New GCU]'s key management personnel work for [Grand Canyon], not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* [New GCU]." (emphasis added)

12.     The undisclosed financial arrangement between Grand Canyon and New GCU, as well as the fact that Grand Canyon executives actually operated the university, meant that their relationship was completely different than other shared services agreements in the industry that the DOE had approved—which were marked by complete independence between the parties and proportional exchange of revenue for services.  Defendants' repeated claims that the relationship between Grand Canyon and New GCU was "almost identical to" and "almost an identical replica of" other service provider-university relationships were simply false.

13.     The truth was revealed in two partial corrective disclosures.  First, after market close on November 6, 2019, the Company announced that it had received a letter from the DOE denying its application for designation of New GCU as a non-profit.  Remarkably, the DOE had told New GCU that it could no longer market itself as a non-profit, undermining the ostensible basis for the entire Conversion.  In determining that New GCU did not satisfy the DOE's definition of a non-profit, the DOE stated that the Conversion failed "the most basic tenet of nonprofit status—that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other purpose or entity," because the primary purpose of the Conversion was "to drive shareholder value for GCE with [New] GCU as its captive client—potentially in perpetuity."  In direct response to the news about the DOE's denial, the price of Grand Canyon stock declined approximately 8% over the course of the two days following this disclosure.

14.     Then, on January 28, 2020, Citron Research ("Citron") published a report expanding on the DOE's findings based on hundreds of pages of supporting documentation from Grand Canyon that Citron obtained through a FOIA request.  Citron concluded that Grand Canyon was the "educational Enron," using a "captive non-reporting subsidiary" to "dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to

artificially inflate the stock price." Following this disclosure, Grand Canyon shares declined approximately 8% to close at $84.07 per share on January 28, 2020.

15.     The revelation of the truth through these disclosures erased hundreds of millions of dollars in shareholder value. Lead Plaintiffs bring suit to recover their own losses and those of other investors, who suffered damages when the truth of Grand Canyon's fraud came to light.

## II.    JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c), and (d). Grand Canyon is incorporated in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   THE PARTIES

### A.    Lead Plaintiffs

18.     Lead Plaintiff Fire and Police Pension Association of Colorado ("Colorado FPPA") is a benefit pension plan that provides services and benefits to Colorado firefighters and police officers and their beneficiaries upon retirement, disability, or death. As previously represented to the Court, Lead Plaintiff Colorado FPPA purchased shares of Grand Canyon stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the federal

securities laws alleged herein. *See* Joint Declaration of Kevin B. Lindahl and James VanLeuven in in Support of the Motion of Fire and Police Pension Association of Colorado, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association Trust for Appointment as Lead Plaintiff, Approval of Their Selection of Lead Counsel, and Consolidation of Related Actions, ECF 21-3, Ex. C ¶ 2.

19.    Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust (collectively "Oakland County") provide retirement benefits to employees of Oakland County, Michigan and their beneficiaries. As previously represented to the Court, Lead Plaintiff Oakland County purchased Grand Canyon stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein. *Id* ¶ 4.

**B.    Defendants**

20.    Grand Canyon is a Delaware corporation. The Company went public in an initial public offering ("IPO") in November 2008. At all relevant times alleged herein, Grand Canyon traded on the NASDAQ under the stock symbol "LOPE." From 2004 until July 2018, it was a for-profit Christian university focused primarily on online education for working adults. After July 2018, it became an online program management ("OPM") company that purportedly provided management, back-office and other services to educational institutions.

21.    Defendant Brian E. Mueller ("Mueller") is Grand Canyon's CEO and Chairman. Mueller has been the Company's CEO since July 2008, a director since March 2009, and Chairman since January 2017. From 2012 through the present he has also been the President of Grand Canyon University. From 1987 to 2008, Mueller was employed at Apollo Education Group, Inc. ("Apollo"), a for-profit, postsecondary education company, where he served as CEO of University of Phoenix Online from March 2002 to November 2005. Mueller also served as Apollo's Chief

Operating Officer ("COO") from 2005 to 2006 and University of Phoenix Online's COO from May 1997 until March 2002. For the three years prior to the Class Period, from 2015-2018, the Company paid Mueller a total of $10.8 million in salary compensation. In 2018 and 2019, the Company paid Mueller a total of $4.2 million in salary and incentive compensation.

22.     Defendant Daniel E. Bachus ("Bachus") is Grand Canyon's Chief Financial Officer ("CFO"). Bachus has been the Company's CFO since July 2008. From 2000 to 2006, Bachus served as the chief accounting officer and controller of Apollo. Prior to his employment at Apollo, Bachus was employed as an audit senior manager at Deloitte & Touche LLP. For the three years prior to the Class Period, from 2015-2018, the Company paid Bachus a total of $5.8 million in salary and incentive compensation. In 2018 and 2019, the Company paid Bachus a total of $2.7 million in salary and incentive compensation.

23.     Defendants Mueller and Bachus are collectively referred to herein as the "Individual Defendants," and, with Grand Canyon, as the "Defendants." During their tenures at the Company, the Individual Defendants directly participated in the management of Grand Canyon's operations and, because of their positions at Grand Canyon, were involved in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Grand Canyon's reports to the SEC, press releases, conference calls to investors, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and possession of material, non-public information, each of the Individual Defendants knew that the positive representations and omissions specified herein were then materially false and/or misleading.

## IV.    BACKGROUND

24.    In January 2004, California-based Significant Education, LLC ("Significant") acquired Grand Canyon College, a private college on the verge of bankruptcy. Significant transformed Grand Canyon College into the first for-profit Christian university in the United States, which was focused on online education for working adults. Significant hoped to make the college into a "money-making venture" and to compete with the University of Phoenix and DeVry University.

25.    After almost declaring bankruptcy in 2004, Grand Canyon reported $161.3 million in revenues by 2008. On May 9, 2008, Significant adopted the name Grand Canyon Education, Inc. and launched an IPO.

26.    Shortly after the Company announced in May 2008 its impending IPO, Grand Canyon recruited Brian Mueller, the then-President and Director of Apollo Education Group, Inc., parent company of the University of Phoenix, as its Chief Executive Officer.

### A.    For-Profit Institutions Rely Heavily On Federal Funds

27.    The success of for-profit educational companies like Grand Canyon is fueled by federal funds provided pursuant to Title IV to pay students' tuition and other fees. From 2012 to 2014, the majority of for-profit schools received between 70% and 90% of their total funding from Title IV funds. Similarly, from 2013 to 2016, GCU derived on average 75% of its revenue from Title IV funds. The threat of losing Title IV funds, then, is an existential one for for-profit educational companies; in a February 20, 2017 article, the *New York Times* described the possibility as "cutting off . . . the industry's lifeblood—with the efficiency of a guillotine."

28.    While for-profit education has a troubled history stretching back to the end of the Second World War, in the years leading up to the Class Period, a series of major scandals brought further negative attention to the sector. For instance, in 2004, the DOE issued a report finding that

10

Apollo—Mueller and Bachus's then-employer—had intimidated recruiters that failed to meet targets and encouraged the enrollment of unqualified students. In 2011, Education Management, with enrollment of about 150,000 students, collapsed after it was revealed that the school had been illegally paying recruiters based on how many students they enrolled—a practice that reportedly accounted for nearly all of the school's revenue for the previous eight years. In 2014, Corinthian Colleges, which had enrollment of over 70,000 students, collapsed after a DOE investigation found that the school systematically misled students about its job placement statistics. And in 2016, for-profit educator ITT Technical Institute closed its doors and filed for bankruptcy after the DOE prevented students from using Title IV loans to fund education there. In 2006, Bachus was placed on leave and then resigned from his post as Apollo's chief accounting officer when it was alleged that the school had been engaged in accounting fraud.

29.    As a result of these and other scandals, the federal government imposed more stringent regulations on institutions that the DOE designates as for-profit. These increased regulations included gainful employment regulations (which capped the ratio of graduates' debt to income), the "90/10 rule" (which limits the percentage of revenue a for-profit institution can receive from Title IV funds at 90%), and "borrower defense" regulations (which allows students who prove fraud by for-profit institutions to claw back tuition).

30.    This increased regulatory scrutiny, among other factors, drove a free fall in the number of for-profit colleges in the years leading up to the Class Period. According to the National Center for Education Statistics, there were 425 fewer for-profit institutions in 2017 than there were in 2014—while the number of private non-profit and public universities remained stable over the same period.

31.     In addition to avoiding the regulatory scrutiny that comes with for-profit status, non-profits enjoy a major marketing advantage over for-profits—an area of particular focus for Grand Canyon.  Non-profit universities attract students much more easily than for-profit schools do.  As set forth in a May 19, 2020 Brookings Institute report titled "Commercials for college? Advertising in higher education," on average, for-profit universities spend almost $400 recruiting each student, whereas non-profits spend only $48.  That same report reveals that, in 2017, Grand Canyon spent the second most of any for-profit school in the country on advertising—more than $28 million.

32.     Indeed, Grand Canyon would later celebrate the marketing advantages arising from a non-profit conversion.  Former Employee ("FE") 1 was a University Development Manager at Grand Canyon from July 2014 until the August 2019 and was responsible for overseeing representatives that worked to develop relationships with schools and hospitals as part of Grand Canyon's online division.  FE 1 explained: "It was a big deal.  This was going to be the biggest development for us to get away from the stigma [of for-profit colleges].  [Mueller] said that himself."  FE 1 continued, "We dealt with [the issue of being for profit] on a daily basis.  I had 14 representatives in 5 western states.  The stigma of University of Phoenix was real.  The edict from the President [Mueller] himself was to go out and tell people we're non-profit again.  He was very involved with all of the marketing."

33.     Moreover, some school districts forbade Grand Canyon from marketing to their students because of its for-profit status.  As the *Phoenix Business Journal* would later report, prior to the Conversion, Grand Canyon's "university recruiters were snubbed by some of the largest school districts in the country, including the Los Angeles Unified School District, which has nearly 700,000 students . . . ."  Mueller confirmed in the article that there were "some [school districts]

12

that were definitely keeping us out . . . . [The Los Angeles Unified School District] did not let us be on campus to talk to their students." Consistent with Mueller's statements, FE 1 recalled that the Anchorage school district would not let him in until he could say he was a non-profit school. The same was true of many healthcare and hospital networks. He understood from his counterparts looking after other areas of the US that many of their largest school districts had similar requirements. He said, "As soon as we told people we were non-profit, all those doors flew open."

34.     A return to non-profit status for Grand Canyon thus meant not only reduced regulatory scrutiny, but also a greatly expanded pool of students to target with its substantial marketing budget.

### B.    2014: Grand Canyon's First Failed Non-Profit Conversion

35.     In 2014, Defendants Mueller and Bachus began to explore options to convert GCU into a non-profit while maintaining the profit-seeking enterprise that had earned them millions of dollars a year in compensation—amounts nearly unheard-of in the non-profit space. The Company pursued a restructuring by which it would spin off its educational assets—primarily GCU—as a purported separate, non-profit institution (the "2014 Conversion Proposal"). While the 2014 Conversion Proposal was not successful, its structure closely mirrored that of the Conversion, which the Company ultimately consummated in 2018.

36.     In connection with the 2014 Conversion Proposal, Grand Canyon planned to sell GCU to a newly formed non-profit organization called Gazelle University. After the close of the transaction, Gazelle University would be renamed Grand Canyon University, also referred to as "New GCU." Grand Canyon would remain a for-profit company and provide educational services to New GCU pursuant to a services agreement.

37.     This approach was presaged by GCU's own counsel, Cooley LLP, whose senior counsel Michael Goldstein, wrote a 2010 article entitled "Cracking the Egg: Preserving the College

13

while Protecting the Core." Goldstein predicted that, in response to financial pressures, institutions would begin to move to a "'hybrid' model that allow[ed] them to take advantage of the interest of financial investors in the higher-education market" while preserving "the key attributes of non-profit private or public colleges." He noted that the "key to the hybrid model is the ability of the institution to retain the core academic functions and still maintain control of the non-core functions."

38.     As of late 2014, Grand Canyon planned to finance the 2014 Conversion Proposal primarily using debt raised in public markets. But in early 2015, Mueller indicated that Grand Canyon had abandoned this structure for the 2014 Conversion Proposal because New GCU would have been saddled with unsustainable levels of debt. Grand Canyon instead settled on a transaction structure in which it would loan New GCU the funds required to purchase the university assets in return for a note from New GCU secured by those assets.

39.     In Grand Canyon's 2014 third quarter earnings call, Mueller indicated that the success of the 2014 Conversion Proposal hinged on whether the parties could agree on "a valuation [of New GCU] that makes sense to [Grand Canyon's] shareholders but also doesn't put an extreme debt burden on [New GCU]," saying, "I think that's obviously the biggest piece to ensuring that this transaction happens . . . ."

40.     Grand Canyon applied to its regional accreditation body, HLC, for a Change in Control, Structure or Organization ("Change in Control")—a prerequisite to executing the 2014 Conversion Proposal.

41.     In March 2016, HLC denied Grand Canyon's Change in Control application. The HLC Board concluded that the proposed structure contemplated New GCU "outsourc[ing] all or

14

the majority" of its academic and student support services and curriculum development to Grand Canyon, in contravention of HLC's accreditation guidelines.

42.    HLC's decision was also consistent with the DOE's approach to these types of conversions.  In August 2016, the DOE denied a request by for-profit chain the Center for Excellence in Higher Education ("CEHE") to convert to non-profit status, with U.S. Education Secretary John B. King Jr. announcing in a press release: "This should send a clear message to anyone who thinks converting to non-profit status is a way to avoid oversight while hanging onto the financial benefits: Don't waste your time."

43.    Grand Canyon sharply criticized the HLC Board's decision to reject its request, stating that its "conclusion . . . paints a distorted picture of our proposed transaction" and "simply bears no relationship whatsoever to the proposed relationship between [New GCU] and Grand Canyon Education," and claiming that the HLC had "wronged" Grand Canyon.  However, as the Company admitted, "[a]s a result of that decision, these current efforts [to spin off a non-profit university] must now come to an end."

V.    **DEFENDANTS' FRAUDULENT SCHEME**

   A.    **2017: Grand Canyon Revives The Conversion In A Changed Regulatory Environment**

44.    Just a year later, after the election of President Trump and his appointment of Elizabeth DeVos as Secretary of the DOE, Grand Canyon revived its plan to restructure GCU as a non-profit.  As Grand Canyon's counsel put it, in 2017, for-profit institutions faced a "different regulatory environment" that might lead the DOE to be more favorable to non-profit conversions.

45.    Further, in November 2017, HLC promulgated new guidelines for reviewing "shared services arrangements"—those in which a university would outsource certain services to for-profit service providers.  The new guidelines did not change HLC's "Criteria for

15

Accreditation," but provided guidance to institutions and reviewers regarding which criteria should primarily be applied to shared services arrangements.

**B.     January – February 2018: Grand Canyon Announces Its Submission Of A Renewed Application To The HLC**

46.     On January 5, 2018, the first day of the Class Period, Grand Canyon announced that it had submitted a renewed Change in Control, Structure, or Organization application to the HLC in connection with a renewed plan to take GCU private and turn it into a non-profit university. Grand Canyon presented the proposed Conversion as being structurally identical to the 2014 Conversion Proposal that HLC had previously rejected.

47.     After the Conversion, the Company claimed that it would operate as an OPM company that would provide education-adjacent services—such as recruiting or providing pre-packaged educational materials—to universities.  Unlike the for-profit university sector, the OPM business was booming in 2018.  The previous ten years had seen the sector expand from a few companies to roughly twelve major players, and OPM companies' stock prices had risen dramatically with the expansion of online education.

48.     However, after the Conversion, the Company's only OPM client would be New GCU, making the Company entirely dependent on New GCU for its revenues.  Grand Canyon sought to soft-pedal this risk by assuring the market that it would seek additional clients, stating throughout the Class Period that it was actively looking for partners in addition to New GCU to whom it could provide educational services "potentially, in the future, to other universities" in addition to New GCU.

**1.     Grand Canyon Touts The Importance Of Non-Profit Status**

49.     Although becoming an OPM provider was one of the purported benefits of the Conversion, throughout the Class Period, Defendants repeatedly focused on the conversion of the

16

university into a purportedly independent non-profit as a critically important feature of the restructuring. For example, in the press release announcing the renewed application to HLC (which was filed with the SEC), the Company announced that, "Following the [Conversion], [Grand Canyon] would operate as a for-profit third-party provider of educational and related services to [New] GCU . . . ." The press release also quoted Defendant Mueller as stating: "[T]his return to our historical non-profit status would convey an accurate reflection of who GCU is today and will be in the future . . . ."

50. From the time the Conversion was announced, market analysts focused on the importance of New GCU's independence as the Conversion was being proposed and executed. Accordingly, over the next five months, as the Conversion moved closer to finalization, Grand Canyon reinforced New GCU's independence through regular updates to the market. In the Company's 2017 Annual Report (filed with the SEC on February 21, 2018), Defendants discussed the Conversion at length. The 2017 Annual Report emphasized that, following the consummation of the Conversion, New GCU would be an independent, non-profit entity:

> New GCU would be a separate non-profit entity under the control of an independent board of trustees and independent management. Accordingly, our relationship with New GCU, both pursuant to the shared services arrangement and operationally, would no longer be as owner and operator, but as a third party contract party. While we believe this relationship would remain strong, New GCU's board of trustees and management would have fiduciary and other duties that would require them to focus on the best interests of New GCU and over time those interests could diverge from ours.

51. Analysts particularly liked the fact that New GCU would become a non-profit as a result of the Conversion. For instance, a February 21, 2018 BMO Capital Markets report noted: "Proposed not-for-profit/managed service transaction still on track," which would have "many benefits (e.g., removal from the 'for-profit' world where future risks are unknown)." Barrington Research noted in a February 22, 2018 report that the "return to non-profit status" would "de-risk

LOPE as an investment and position the new entity to trade more in line with other education technology providers."

**2.      Defendants Claimed That The Proposed Conversion Closely Followed The Structure Of Other Proposed Conversions**

52.      Before Grand Canyon announced the proposed Conversion, there had been a handful of successful conversions by for-profit institutions into non-profit universities.  Purdue University announced the most high-profile such conversion to date in 2017, when it announced disclosed plans to acquire for-profit Kaplan University from the educational services firm Kaplan, which would in turn become a separate third-party OPM provider.  Under the terms of that deal, Purdue would incorporate Kaplan programs as Purdue's new online education arm, while Kaplan would provide back-office services pursuant to a services agreement.  The Purdue-Kaplan deal received approval from the DOE in September 2017 and from its accreditor in March 2018.

53.      In public statements to the press, as well as in Company filings and during conference calls with analysts, Grand Canyon and Defendant Mueller consistently maintained that the Conversion tracked the structure of the Purdue-Kaplan deal and other conversions that had achieved regulatory approval.  For example, during a January 5, 2018 press conference, Mueller stated: "This arrangement will be very similar to hundreds of arrangements that already exist in the higher-education landscape today.  And so this is not new.  This is something that already exists in America."  Similarly, in the press release announcing the Conversion, Mueller claimed that "[t]he structure [contemplated by the Conversion] is similar to the proposed structure in which Purdue University hopes to acquire the education assets of Kaplan University (a for-profit university), with Kaplan becoming the service company," and also noted that the structure "would encompass services that are similar to those that are currently provided in outsourcing agreements

18

that well-known service companies have in place with hundreds of regionally accredited universities throughout the country."

54.     Defendant Mueller again compared the Conversion to the Purdue-Kaplan deal during Grand Canyon's Fourth Quarter 2017 Earnings Call (the "4Q17 Call"), noting that "our proposed transaction and structure is almost identical to many others in the industry and is very similar to the Purdue and Kaplan proposal . . . ."  The Company reiterated in a March 6, 2018 press release (also filed with the SEC on Form 8-K) that "[t]he structure is similar to that at hundreds of non-profit universities in the country that outsource services to third-party providers."

55.     Analysts reacted positively to these comparisons.  On January 5, 2018, analysts from BMO Capital Markets issued a report entitled "Grand Canyon University Submits Application to Return to Non-Profit Status," which discussed in detail the Company's statements about the HLC application.  Among other things, the report explained that Grand Canyon "would operate as a for-profit third-party education and related services provider to New GCU . . . in return for a share of the school's tuition and fee revenue," and discussed how that share was "expected to be comparable to other shared services agreements in this sector."  Similarly, in a report issued January 8, 2018 entitled "Economics of Potential Not-For-Profit Conversion," analysts from Piper Jaffray discussed the Conversion, and noted that the proposed structure was "very similar" to the Purdue-Kaplan deal.

56.     Defendants continued to draw these comparisons.  In the Company's 2017 Annual Report, filed February 21, 2018, it explained that the revenue split between Grand Canyon and GCU was "expected to be comparable to other shared services arrangements currently in place in the higher education marketplace" and would "reflect the level of services that the Company would be providing to New GCU."

57.     Defendants Mueller and Bachus repeated these claims that day during the Company's 4Q17 Call.   Mueller stated that the revenue sharing arrangement under the contemplated master services agreement was "expected to be comparable to other shared service arrangements currently in place in the higher education marketplace, and to reflect the level of services that the company would be providing to New GCU."  He also explained that the Company had submitted to HLC an updated application seeking approval of the Conversion, and that Defendants were "encouraged" by the fact that "that our proposed transaction and structure is almost identical to many others in the industry and is very similar to the Purdue and Kaplan proposal."

58.     On the very next day, February 22, 2018, Grand Canyon entered into a non-binding agreement with GCU to execute the Conversion, which Grand Canyon announced publicly when it filed a Form 8-K on February 26, 2018.  In the 8-K, Grand Canyon provided more detail about the expected revenue split provision of the master services agreement, stating that "[t]he revenue share between the two entities remains subject to completion of a transfer pricing study and subsequent negotiation, but it is currently anticipated that New GCU's revenue from tuition and fees, room and board, and certain other sources will be shared approximately 60% in favor of the Company and 40% in favor of New GCU."  In addition, Grand Canyon again claimed the revenue share approach reflected in the master services agreement "would be comparable to other services agreements currently in the marketplace."

**C.      January 2018: Grand Canyon Submits Pre-Acquisition Review To DOE**

**1.      Grand Canyon Announces Conversion Will Not Be Completed Until The DOE Grants Its Approval**

59.     At the same time that the Company applied to HLC for accreditation, the Company applied to the DOE for approval of the Conversion.  To that end, Grand Canyon submitted a "pre-

acquisition review" application to the DOE on January 18, 2018, which consisted of, among other things, drafts of the Master Services Agreement ("MSA"), Asset Purchase Agreement ("APA"), and Credit Agreement ("CA"). As discussed below, over the subsequent months, Grand Canyon also submitted confidential reports written by Barclays Capital, Inc. and Deloitte Tax LLP analyzing various financial and accounting aspects of the Conversion that were commissioned by the GCE Board of Directors. While the DOE reviewed GCE's application for approval of the change in control, GCU participated in the Title IV programs on a provisional, month-to-month basis under a temporary Program Participation Agreement with the DOE.

60. The DOE's analysis of the Conversion was distinct from the HLC Change in Control application. Whereas HLC focused on certain educational implications of the Conversion, the DOE pre-acquisition review focused on whether New GCU could be considered a non-profit institution under Title IV and the DOE's regulations promulgated thereunder, which mirrored in relevant respects the same analysis under the Internal Revenue Service's ("IRS's") rules and tax laws.

61. Moreover, approval of a transaction by an institution's accreditor and even the IRS was no guarantee of DOE approval. For instance, though the Purdue-Kaplan deal was approved wholesale by Purdue's accreditor, the Indiana Commission for Higher Education, the DOE approved the acquisition only with certain conditions, such as both institutions co-signing financial aid agreements with the DOE. In March 2018, when Ashford University sought to convert from a for-profit to a non-profit institution, though the IRS and its accreditor approved the deal with no conditions, the DOE similarly imposed a requirement that the institution secure a letter of credit equal to 25% of the Title IV funding the institution received in the previous year. The Ashford

conversion is still pending.  Finally, though the IRS approved CEHE's non-profit status in 2013, the DOE refused to approve CEHE as a nonprofit in 2016.

62.    In the Company's Annual Report for 2017, filed on February 21, 2018, the Company stated that it "does not expect to execute any definitive agreements until the HLC and Department of Education processes have concluded."  Similarly, Defendant Mueller announced during the Company's earnings conference call that day that Grand Canyon did not expect to complete the Conversion until "any necessary regulatory approvals have been received."

63.    After HLC granted its approval on March 6, 2018, analysts began to treat DOE approval as a foregone conclusion shortly after meetings with Grand Canyon management.  For example, BMO Capital Markets wrote confidently in a March 2018 report (following a "packed day of meetings" with Grand Canyon management days earlier) that "Management expects to complete the transaction by the end of 2Q18.  The transaction still requires approval from the Department of Education (highly likely now that HLC has approved it)."

64.    The Company continued to discuss the DOE approval as imminent.  During Grand Canyon's May 8, 2018 earnings call, Defendant Mueller announced that the Company was "currently awaiting a response" from the DOE.  During the question-and-answer portion of the call, an analyst from BMO Capital Markets asked Mueller and Bachus when they expected the transaction to be completed.  Mueller explained that the timing of the transaction "remains the same.  The [DOE] has told us that they will have their review done some time in the month of May, and we anticipate closing by July 1."

65.    When the analyst pressed further, asking "what are the milestones that we need to follow to make sure . . . that happens by then," Mueller responded: "Mainly the Department of Ed review being completed by the end of May."

> **2.     Unbeknownst To Investors, The DOE Indicates To Defendants That
> Approval Of The Conversion Would Be Much More Difficult Than
> Defendants Had Indicated To The Public**

66.     As summarized above, Defendants Grand Canyon and Mueller consistently
represented to the market that the Conversion application to the DOE was complete and that
Defendants expected approval by the DOE in May 2018.  However, in a communication not
disclosed by Defendants, the DOE propounded new and extensive interrogatories to the Company
on May 17, 2018 concerning the basis for its claim that New GCU would be a non-profit and
probing New GCU's purported independence from Grand Canyon under the Conversion's
proposed structure.

67.     These interrogatories, which Lead Plaintiffs uncovered in their investigation,
numbered over 25 requests for individual "narrative response[s]" and documents when including
subparts, and included:

> (a)     "Produce any appraisals, valuations, valuation summaries, or
> valuation reviews obtained or commissioned *by any party* to the
> Transaction for purposes of valuing the Transaction" (emphasis in
> original).
>
> (b)     "State whether GCE is a company with which [New GCU] or the
> Foundation does 'substantial business' as used in Article III of the
> Foundation's Bylaws."
>
> (c)     "Describe the due diligence efforts by [New GCU] and the
> Foundation with respect to the Transaction and produce any
> documents relating thereto."
>
> (d)     "Produce any PowerPoint presentations, summaries, reports, or
> similar documents presented to the Boards of [New GCU], the
> Foundation, and GCE related to the Transaction."
>
> (e)     "Produce all documents assessing or analyzing the financial impact
> of the Transaction on [New GCU], the Foundation, or GCE,
> including documents reflecting projected revenue streams/losses as
> a result of the Transaction, including any pro formas relating to the
> MSA."

23

(f)  "Produce board meeting minutes, resolutions or consents relating to the Transaction. This request includes the boards of [New GCU], the Foundation, and GCE (and any subcommittees thereof)."

(g)  "Provide the schedule of employees to be transferred to [New GCU] as contemplated in APA, § 6.4. Include each employee's current salary and the terms of any other compensation to which the employee is or may be entitled."

(h)  "Identify any GCE employees to be jointly employed by GCE and [New GCU] and explain how joint employee compensation has been or will be determined."

(i)  "Produce any Schedules or Exhibits to the APA, MSA, and CA not previously provided and produce any amendments to the draft documents previously provided."

(j)  "Identify all persons or entities that have been engaged to perform any transfer pricing study in connection with the Transaction, their engagement letters, and any studies produced by them."

68.    The extent of these new interrogatories indicated that the DOE was not inclined to rubber-stamp the Conversion and in fact had serious questions about the independence of New GCU from the Company.

### 3.    Grand Canyon Reverses Course And Moves Ahead With The Conversion Without DOE Approval In Hand

69.    Defendants did not disclose to the market either the extensive interrogatories sent by the DOE on May 17, 2018, or that the DOE had raised any serious questions targeting the foundation for the Conversion—questions that, as discussed below, unveiled the fact that New GCU's purported "non-profit" status was pure fiction.  Instead, now knowing that the DOE had serious doubts about the Conversion, Defendants reversed course and declared that DOE approval was not necessary before the Conversion.

70.    On June 11, 2018, Piper Jaffray published an analyst report detailing conversations with Grand Canyon management at a PJC Investor Conference.  In the report, Piper Jaffray

reported that the Conversion was "on track for a July/August close," and said: "Accreditor and IRS approval is in place, with DOE approval still pending."

71.     Piper Jaffray also noted—for the first time—that, based on conversations with Defendants Mueller and Bachus, "[t]he deal can close before final DOE approval is received (we view the DOE process as largely procedural), with the company currently focused on operational logistics." The report further emphasized:

> We met with CEO Brian Mueller, CFO Dan Bachus, and COO Stan Meyer.
>
> DOE approval is NOT required in advance to close the transaction. Accreditor approval (already received) was the primary regulatory hurdle. DOE will be focused on GCU's financial viability post-transaction and may require a letter of credit to be posted given the University's initial debt burden.

72.     Defendants did not inform Piper Jaffray or any investors about the heightened risk of DOE disapproval in light of the confidential communications it had received.

73.     Around the same time, scholars were raising questions in front of the DOE about the structure of the Conversion. On May 24, 2018, the National Advisory Council on Institutional Quality and Integrity ("NACIQI"), a DOE advisory group, held hearings on the topic of "Oversight of For-Profit Institutions' Conversions to Non-Profit Entities." During the hearings, a Georgetown University Law Center professor who specializes in tax law challenged the structure of the Conversion, and concluded that, under its terms of, "there is no reason to believe that new GCU will behave as a non-profit organization" because "[i]t is financially and practically beholden to a for-profit partner" and "is operated by a group of individuals who serve two masters."

74.     The Company and GCU both vociferously and repeatedly rejected any implication that New GCU would be anything but totally independent after the Conversion. Five days after the NACIQI hearing, GCU issued a scathing response to the professor's testimony, claiming that it was "rife with inaccuracies." Among other things, GCU stated that the professor's testimony

that GCU "is operated by a group of individuals who serve two masters" "<u>is false</u>" because Defendant Mueller "<u>may</u> continue to serve [as both Grand Canyon's CEO and New GCU's President] if selected to do so by the respective independent boards and at no additional compensation," and "[o]ther than potentially Mr. Mueller, however, <u>there will be no overlapping management or employees between the two entities</u>." GCU also claimed that the professor's "role is to attack the business model whereby the non-profit University will receive services from Grand Canyon Education in return for a share of the University's revenue," and stated that "<u>the third party services model was and is a model deeply embedded throughout the higher education world</u>" and GCU had "<u>commissioned studies to ensure that the rates and terms of the services arrangement are consistent with market norms</u>." GCU also claimed that the professor's testimony that the proposed Conversion "'fails the control test' under IRS rules" was "<u>false</u>."

75.    Notwithstanding the criticism, the Company proceeded full steam ahead with the Conversion and, on July 2, 2018, Grand Canyon filed with the SEC a Form 8-K (the "July 2, 2018 8-K") announcing that it had closed the Conversion by executing the APA whereby it sold the GCU campus and all academic and related operations and assets to New GCU.

76.    The July 2, 2018 8-K explained that New GCU had paid Grand Canyon $853.1 million at closing, and that, with adjustments, the purchase price was expected to rise to $875 million. According to the July 2, 2018 8-K, New GCU financed the purchase by issuing the Company a senior secured note, secured by the assets it had just purchased, which provided for 6.0% annual interest to be paid monthly, and with a maturity date of June 30, 2025. Under the terms of the secured note, New GCU would make interest-only payments during the term, with a balloon payment of the principal and any unpaid interest due at maturity.

77.     The July 2, 2018 8-K also stated that, in connection with the closing of the Conversion, the Company and New GCU had entered into the MSA, whereby the Company would provide "identified technological, counseling, marketing, financial aid processing and other support services to New GCU in return for 60% of New GCU's tuition and fee revenue."

78.     The MSA was not filed publicly until February 2019.  At that time, it was filed as an exhibit to the Company's Form 10-K for 2018.  Even then, however, it was only filed in significantly redacted form.  Among other things, the services provided by GCE to New GCU were completely redacted, as were the revenue sources that were included in GCE's 60% Services Fee revenue share.

79.     The July 2, 2018 8-K also discussed the Company's pre-acquisition review application to the DOE, which was still not complete.  In direct contrast to Defendant Mueller's and the Company's prior statements, Grand Canyon attempted to downplay the significance of the DOE review.  For instance, Grand Canyon characterized the DOE review as "voluntar[y]," and stated that based on its "ongoing engagement" with the DOE, the Company had decided that "any regulatory limitations imposed by [the DOE] could be managed."

80.     That same day, Defendant Mueller misleadingly dismissed the delay in receiving DOE approval as a "staffing" issue at the DOE.  Specifically, Mueller told *The Chronicle of Higher Education* that the DOE "pre-approval" process normally takes forty-five days, but that it was taking longer in the Company's case because "[the DOE is] very understaffed."  Nowhere did Mueller disclose the highly material fact that the DOE had about six weeks earlier requested voluminous and detailed documentation justifying the Conversion.

81.     Indeed, as reported by *Azcentral* on July 2, 2018, Defendant Mueller strongly expressed confidence in the outcome of the DOE review—explaining that, while Grand Canyon

27

had not yet "got their letter that says there are no restrictions" in connection with the Conversion, Defendants "would be very surprised, based on our discussions with them, if there were."

82.     In a speech given that same day, which was reported on by the *Phoenix New Times* on July 7, 2018, Defendant Mueller again reiterated that the arrangements between Grand Canyon and New GCU were "very mainstream in higher education today" and stated: "Hundreds of universities are doing it, and <u>our model is almost an identical replica of that</u>, so we're in the mainstream of what's happening."

83.     On July 9, 2018, BMO Capital Markets published an analyst report updating its model to reflect the Conversion, and raising its price target.  In describing the transaction in detail, the BMO Capital Markets analysts explained, among other things, that "New GCU has adopted a conflict of interest policy that prohibits any trustee from having a financial interest in, or role with, GCE," and that "[a]side from Mr. Mueller, <u>no other employee of New GCU or GCE has a dual role in both organizations.</u>"

84.     On July 17, 2018—more than two weeks after the close of the Conversion—GCU requested that the IRS re-affirm its tax-exempt status, which the IRS did on August 31, 2018.  The Company had initially applied to the IRS for recognition of GCU as a tax-exempt non-profit organization on October 8, 2015 in connection with the 2014 Conversion Proposal.  It received the requested exemption one month later on November 9, 2015.  The IRS, of course, could not have reviewed the documents setting forth the structure of the Conversion in 2015, because they were not negotiated and finalized until 2018.  No documents were reviewed by the IRS in 2018.

85.     Notably, the IRS has been criticized for rubber-stamping applications of for-profit institutions attempting to convert to non-profits.  In a report titled "The Covert For-Profit: How College Owners Escape Oversight through a Regulatory Blind Spot," issued September 22, 2015,

former Deputy Undersecretary of Education Robert Shireman—now a senior director at the Century Foundation—observed that the IRS relies on the declarations and representations of the 1.6 million non-profits in the United Stated in determining non-profit status, which amounts to, in essence, "an honor system." In April of 2018, a group of U.S. Senators sent a letter to the Government Accountability Office ("GAO") requesting information on "how attempts to convert from for-profit to not-for-profit status are evaluated and decided." Capstone, a Washington, D.C. based policy and regulatory analysis firm, noted that the GAO review could result in the IRS revoking GCU's non-profit status, which Capstone described as "an existential risk to [the Company]."

86.     Unbeknownst to investors, the DOE's analysis was not slowed by a "staffing" shortage. Instead, the DOE continued to actively scrutinize and seek substantive information about the Conversion in the months following the deal's closing and following their extensive May 17, 2018 requests. For example, on July 3, 2018, two days after the Conversion closed, the DOE served further requests for information, including requests for audited financial statements and a copy of New GCU's default management plan. On August 24, 2018, the DOE sent an email to New GCU requesting copies of the final Conversion deal documents and an audited same-day balance sheet for New GCU. And on September 10, 2018, the DOE requested a "narrative" explaining how the structure of the Conversion "warrant[ed] recognizing the institutions' conversion to nonprofit status for the purposes of . . . Title IV." Although Defendants provided detailed responses to each of these requests, they gave no indication to the market that the DOE was engaging in continued, significant scrutiny of the deal and its terms.

**D.** **Following Completion Of The Conversion, Grand Canyon Announces Strong Results And Denies That GCU Is An Off-Balance-Sheet Entity, Variable Interest Entity, Or Related Party**

87.     Following the close of the Conversion, quarter after quarter, Grand Canyon reported strong financial results that routinely exceeded market expectations and bolstered the market's faith in the Company's profitability and long-term prospects.

88.     In particular, Grand Canyon's operating profit margins showed immediate, enormous growth following the Conversion:

| Quarter | Operating Margin | Change Year-Over-Year |
|---|---|---|
| 3Q18 | 35.6%[1] | +41% |
| 4Q18 | 45.1% | +34% |
| 1Q19 | 36.7% | +12% |
| 2Q19 | 29.2% | +18% |
| 3Q19 | 30.9% | -13% |

89.     Investors pay close attention to operating margins, because they reflect a business's operational profitability.  Compared to Grand Canyon's purported OPM peers, many of whom reported profit margins in the range of 3-4% or lower, Grand Canyon's margins were truly remarkable.

90.     The Company repeatedly attributed its growing revenues and margins to the Conversion and GCU's strong growth.  For instance, during Grand Canyon's 2018 fourth quarter earnings call in February 2019, Mueller explained that the 9% increase in revenues—calculated in comparable terms, as if the Conversion had occurred on July 1, 2017—"was due to an increase in [New] GCU's enrollment and an increase in [New] GCU's ancillary revenue resulting from

---

[1] The Company reported an adjusted margin figure for third-quarter 2018 that accounted for one-time costs related to the Conversion, which is reflected on this Table.

increased traditional student enrollment." Mueller further noted that New GCU's non-profit credential was an invaluable tool for attracting students, boasting about the record enrollment of new students at the 80,000-student New GCU. He further reported that GCE's operating margin—a measure of profit—was a whopping 34 percent. He went on to explain that the Company's rising fortunes could be attributed to the marketing of the school as a non-profit*:* "Being out there a million times a day saying 'we're nonprofit' has had an impact." During the Company's 2019 first quarter earnings call, Mueller also represented that the 19.3 percent year-over-year increase in services revenue (after comparability adjustments) "was primarily due to [among other things] the increase in [New] GCU enrollments between years." Mueller made similar attributions during the Company's 2019 second and third quarter earnings calls.

91.     Mueller's representations about the growth in enrollment were particularly reassuring to investors in light of the terms of the loan Grand Canyon had extended to New GCU. As reported in *The Chronicle of Higher Education* on July 2, 2018, New GCU needed "enrollment to grow by at least 7 percent annually for the next several years to have enough money on hand to pay down the $875 million debt" it took on in connection with the Conversion.

92.     In addition, in the 3Q 2018 10-Q and subsequent disclosures, Grand Canyon made significant accounting-related disclosures. Grand Canyon claimed that New GCU fell within a "not-for-profit entity carve out" to accounting rules that would otherwise require Grand Canyon to consolidate New GCU's finances with its own (showing investors a comprehensive financial picture of both entities, including their assets and liabilities). By claiming that New GCU fell within this "not-for-profit carve out," Grand Canyon avoided reporting the full financial position of the entities together. Grand Canyon further claimed that "[New] GCU is not a related party to the Company in accordance with ASC Topic 850." The 3Q 2018 10-Q was signed by Defendant

31

Bachus, and Mueller and Bachus each signed a certification pursuant to the Sarbanes-Oxley Act of 2002 attesting that the 3Q 2018 10-Q "fairly present[ed], in all material respects, the financial condition and results of operations of the University [sic]." Defendants continued to repeat these representations in quarterly and annual SEC filings for the remainder of the Class Period.

93.    Analysts heaped praise on the Company and Defendants Mueller and Bachus in response to these disclosures. On November 9, 2018, BMO Capital Markets reported that "LOPE reported a solid EPS 'beat' driven by better-than-expected revenues and margins," assigning the stock an "Outperform" rating and predicting its price would increase. On February 22, 2019, BMO Capital Markets reported that "Despite its size, [New] GCU online enrollment should still continue . . . . Revenue per online student is roughly $9,920 (GCE gets 60% of this) with these students generating margins in excess of 40%." On August 7, 2019, BMO Capital Markets noted that "LOPE reported 2Q19 adjusted EPS of $1.09, well above the $0.94 consensus . . . . About half the 'beat' was below the line . . . with the rest mostly margin driven." Similarly, in response to Grand Canyon's first-quarter 2019 results, announced on May 7, 2019, analysts from BMO Capital Markets noted that Grand Canyon's "revenues and margins beat guidance," and raised its 2019 estimates. And when Grand Canyon reported strong second-quarter 2019 results after market close on August 6, 2019, analysts from Barrington Research explained that Grand Canyon's "Q2/19 top[ped] expectations," including because its revenues came in above consensus (growing 23% year-over-year in comparable terms) and its EPS came in well above expectations, and raised their price targets to $145, a "more than 20% upside from current levels."

E.    **In Reality, Defendants Were Engaging In A Scheme To Inflate Grand Canyon's Results Using GCU, A Captive And Related Party—A Scheme That Would Sabotage The Efforts To Obtain DOE Approval**

94.    As investors would later learn, GCU's supposed conversion into a non-profit was a sham. New GCU was not constructed as a non-profit at all—it was, instead, simply a "captive

client" that existed to drive greater and greater amounts of revenue to GCE. By claiming that New GCU was a non-profit, Grand Canyon could offload the expenses to drive that revenue onto New GCU, where it would be hidden from investors and send Grand Canyon's profit margins skyrocketing. Positioning New GCU as a non-profit served to reassure the market about GCE's own operating and financial viability, as GCE received the bulk of its revenues and profits from New GCU payments, and further received regular loan interest payments (and an expected balloon payment in 2025), while off-loading to New GCU many of its previous expenses—including tens of millions in tax payments (publicly estimated by Defendant Mueller at $85 million in 2014). In truth, however, after the DOE rejected New GCU's non-profit status, both New GCU's and GCE's long-term financial viability and previously expected growth have been placed in jeopardy.

95.     Defendants' undisclosed conduct misled investors about New GCU's profit-seeking nature, which significantly heightened the risk of DOE disapproval and increased the regulatory risk to the Company's future revenue stream. This conduct also violated applicable financial reporting requirements. As set forth below, GAAP required Grand Canyon to present consolidated financial reporting including New GCU as a controlled entity, and, at minimum, to identify New GCU as a related party by virtue of Grand Canyon and New GCU's arrangements.

### 1.     New GCU Was Not A Non-Profit

96.     As discussed above, pursuant to the DOE's demands, the Company provided the DOE with numerous non-public documents over the course of the DOE's nearly two-year review of GCE's request. These documents included, among many others, (1) the fully unredacted MSA; (2) a report from Barclays (the "Barclays Report") dated April 26, 2018; (3) a "follow-on" Barclays report discussed with the Company's Board of Directors on June 20, 2018; (4) and a "Transfer Pricing Report" for 2018 prepared by Deloitte (the "Deloitte Report").

97.    The DOE was the only regulator or outside entity to receive and review these critical internal documents.  Neither the IRS nor HLC were provided these documents before issuing their respective approvals.

98.    After carefully and thoroughly "review[ing] [the] materials provided to it," the DOE determined that the Conversion "violate[d] the most basic tenet of nonprofit status—that the nonprofit be primary operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity."

### 2.    GCE Was The Primary Beneficiary Of The MSA

99.    The DOE carefully reviewed the materials Grand Canyon submitted and determined, in a November 6, 2019 letter (the "DOE Letter") that the "primary purpose of the MSA" was to "drive shareholder value for GCE with GCU as its captive client—potentially in perpetuity."

100.    First, the DOE Letter divulges that, unbeknownst to investors, GCE's Services Fee (which Defendants had disclosed would consist of 60% of New GCU's revenue from tuition and fees and other sources "comparable to other service agreements currently in the marketplace") included far more than simply tuition and fees.  In an arrangement that was apparently unique to the proposed Conversion (and that Grand Canyon specifically marked as "Confidential" in its submission to the DOE), revenue for purposes of the Services Fee included:

> (a)    Tuition (including tuition funded by third party sources and charitable contributions);
>
> (b)    Fee revenue from students for use of the online communications portal ("the Platform");
>
> (c)    Fee revenue from students and their related activities;
>
> (d)    Fee revenue from students for use of the Canyon Connect learning resources platform;

(e)     Fee revenue from students for student housing;

(f)     Fee revenue from students for meal plans and other food services; and

(g)     Other revenue including revenue from: (i) sales of athletic tickets; (ii) the operation of the Grand Canyon University Hotel and Conference Center; (iii) the operation of the Maryvale Golf Course; (iv) the operation of the Grand Canyon University Arena; and (v) the operation of Canyon Enterprises (apparel sales and other businesses).

101.     According to the DOE Letter, the Barclays Report indicated that GCE's estimated Services Fee for fiscal year 2019 (of $697 million) would far exceed GCE's $416 million expected costs of performance.  In other words, GCE expected to receive a 67% markup on the costs of its services, simply through the Services Fee.

102.     In addition to the Services Fee, New GCU also owed GCE $854 million pursuant to the Senior Secured Note and Credit Agreement for the physical assets comprising the New GCU campus.  When payments related to the loan were included, GCE was expected to receive 95% of New GCU's revenue.

103.     Second, notwithstanding the fact that GCE expected to siphon off virtually all of New GCU's revenue, New GCU was expected to continue to incur substantial operating expenses. The Company's internal documents demonstrate the crippling impact on New GCU of this usurious agreement.  The Barclays Report—which was presented to the GCE Board, including Defendant Mueller—demonstrated that the costs to operate New GCU after the Conversion would increase by nearly 85%, from $810 million to $1.496 billion, for fiscal year 2019.

104.     Notably, the Barclays Report assumed that GCE's Services Fee would be based on both a lower revenue split and fewer sources of revenue than was ultimately imposed by GCE.  As the DOE noted, incorporating correct assumptions "would seem to only exacerbate Barclay's assessment that the separation of the servicing functions from [GCU] will result in a significant

35

increased cost for the operation of New GCU, with those increased funds flowing to the benefit of its prior owner, GCE."

105.     As set forth in the Barclays Report, even with more favorable (to New GCU) assumptions than were ultimately used, GCE would incur only 28% of the total expenses for operating New GCU post-Conversion, while New GCU would incur 72% of the total expenses.

106.     In sum, New GCU would incur 72% of the expense of operating the institution, while receiving 5% of the institution's revenues.  The Company would incur just 28% of the total costs while receiving 95% of the institution's revenues.

107.     Third, according to the DOE Letter, "[p]erhaps trying to circumvent the somewhat obvious conclusion that under the MSA [New GCU] costs an additional $697 Million to operate in the first fiscal year," Grand Canyon also provided the DOE with the Deloitte Report, which concluded that the 60%/40% revenue split was reasonable given what each party would contribute to the revenue-generating activities.

108.     However, the DOE's analysis demonstrates that the Deloitte Report was facially shoddy and incomplete.  Among other things:

> (a)     Deloitte was working from an outdated version of the MSA, which did not include sources of revenue from the arena, athletic tickets, etc., meaning that the entire Deloitte Report was based on "fundamentally flawed assumptions."

> (b)     Deloitte did not include New GCU's physical campus (owned by New GCU) as a revenue-generating asset, "which is at odds with statements made by GCE to its shareholders," in which GCE had identified its physical campus as "one of the primary factors for its revenue increase in 2017."

> (c)     Deloitte failed to assess which party assumed risks to revenue, a "failure [which] render[ed] Deloitte's. . . analysis 'incomplete'" as stated in the Deloitte Report itself.

109.    Finally, the DOE emphasized that the Deloitte Report did not "appear to be based on information that Deloitte independently tested and analyzed on behalf of [New GCU].  Rather, these opinions in key areas appear to have been based on information supplied by GCE management."

### 3.    New GCU Was Not Independent From GCE

110.    As the DOE and Citron concluded, New GCU and the Company were not, in truth, independent after the Conversion.

111.    First, the vast majority of the executives and employees that controlled New GCU's day-to-day operations were employed by the Company.  Despite the fact that the Company identified Mueller as the only joint employee of the Company and New GCU, the DOE concluded (by cross-referencing the Company's confidential report commissioned from Deloitte with the APA's Disclosure Schedule) that this was far from true.

112.    Of the university's 58-person "Executive Leadership" Team that was "responsible for managing and overseeing the [New GCU]," 41 executives stayed with GCE to manage GCU after the Conversion.  As the DOE concluded, "nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider."  The DOE noted that these overlapping employees, as employees of the Company, had a fiduciary responsibility to the shareholders of the Company while at the same time "providing significant management and oversight" of New GCU.  The DOE concluded that, "[g]iven the enormous leverage GCE now has over [New GCU] by virtue of the fact that most of [New GCU]'s key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* [New GCU]."  Indeed, many of GCE's current academic executives held the same high-level roles on New GCU's behalf as they did at GCU before the Conversion, simply continuing the same function as they had

37

before—only this time, with loyalty to GCE, not GCU's academic mission.  For instance, old GCU's Director of Faculty Services became GCE's Executive Director of Faculty Services.  Similarly, GCE's Vice President of Learning and Development held that same role with old GCU before the Conversion.

113.    Second, the reports evaluating the financial implications of the Conversion were commissioned by the Company for the benefit of the Company's Board of Directors—not New GCU.  The "Barclays Report" that the Company submitted to the DOE in support of its pre-acquisition review non-profit application was commissioned by the Company for the benefit of its Board of Directors.  The DOE noted that New GCU's board minutes do not reflect any discussion of the Barclays Report, and it "is not clear whether the Barclays Report was provided to the [New GCU] board prior to the approval of the [Conversion]."  The DOE further noted that New GCU did not receive the Barclays Update until after the close of the Conversion.  While New GCU may have commissioned the defective Transfer Pricing Report from Deloitte, as discussed above, that report was (1) facially inadequate and (2) relied exclusively on conversations with GCE management for the information supporting its conclusions.

114.    Finally, former employees of the Company recall that, following the Conversion, the Company and New GCU were separate in name only.  For example, former employees recall that, after the Conversion, it was the Company's policy that GCE employees use GCE email addresses for internal communications but use their former email addresses indicating their affiliation with GCU for all outward-facing communications.  FE 2 was a University Business Development Executive at Grand Canyon from April 2017 to October 2019 and was responsible for recruiting students to the New GCU's graduate programs.  As noted above, FE 1 was a University Development Manager at Grand Canyon from July 2014 until the August 2019 and was

responsible for overseeing representatives that worked to develop relationships with schools and hospitals as part of Grand Canyon's online division. FEs 1 and 2 each independently confirmed that it was the Company's policy that employees use their GCE email addresses for internal communications but never for outward-facing communications and that the Company was extremely strict about enforcing this policy. FE 2 recalled that the Company made it clear the above policy was created to ensure students and strategic partners believed that he and the other executives worked for GCU. FEs 1 and 2 further independently recalled that they and their colleagues had business cards and voicemails identifying them as New GCU employees.

115.    GCE employees also were instructed to and did routinely represent themselves as university employees to prospective students in attempting to recruit them. FEs 1 and 2 each independently confirmed that, after the Conversion, even though they remained employees of GCE, they represented themselves to prospective students as employees of New GCU. When asked if his strategic partners and students had any idea that he was with GCE, FE 2 said, "None at all. I don't think they knew what GCE was. They absolutely still thought I was with GCU." Similarly, FE 1 recalled that he and his team tried to convince superintendents of secondary school districts to enroll their support staff workers into New GCU's teaching college as a way to boost their ranks of teachers, and that, during these interactions, "As far as students and superintendents were aware, there was no [GCE]."

### 4.    New GCU Was Captive To GCE

116.    By analyzing the MSA and the other contractual arrangements between GCE and New GCU, the DOE concluded that the terms of the Conversion rendered New GCU effectively trapped in the services arrangement with GCE. As the DOE noted, the MSA provided for an Initial Term of 15 years, with "automatic renewals thereafter for successive five year terms . . . apparently in perpetuity." Although New GCU technically had a right not to renew the contract at the end of

the Initial Term, to do so it would have to "pay GCE a Non-Renewal Fee" of "50% of the aggregate Services Fees paid or payable for the trailing twelve month period just ended."

117.   Moreover, New GCU had to pay the Secured Note in full to terminate the deal during the Initial Term, and in any event was prohibited from terminating until at least seven years had passed.  If it elected to terminate the deal, it would have to pay the Company "an Early Termination Fee" of "50% of the aggregate Services Fees paid or payable for the trailing twelve-month period just ended."  The DOE concluded that the fact that New GCU was "locked in" to the deal for at least seven years and, to extricate itself from the deal, it would have to first pay the Secured Note—an "arguably prohibitive termination fee"—made New GCU the Company's captive client.

### 5.   The Undisclosed Terms Of The Conversion Were Very Different Than Other Non-Profit Conversions That The DOE Approved

118.   While Defendants repeatedly stated that the Conversion was very similar to other conversions that had been approved by the DOE—and thus was similarly likely to be approved— in reality, the Company's internal documents demonstrate that the Conversion was very different and far more exploitative of the purported non-profit than those transactions to which the Company compared the Conversion.  In repeatedly comparing the Conversion to the Purdue-Kaplan deal, Grand Canyon sought to align itself with a transaction that the market viewed as innocuous and that had received DOE approval.  Purdue, a public institution, purchased Kaplan University, a formerly for-profit institution, and converted it into a non-profit public benefit corporation (called "NewU").  As part of the deal, Purdue agreed to purchase services from Kaplan, which remained a for-profit provider of educational services.  The deal between Purdue and Kaplan contained several key terms.

119. First, Kaplan would be paid for its services only after NewU had generated enough revenue to cover its operating costs—in other words, until NewU broke even. This was a "key provision" in the deal according to those following the higher education sector. In addition, Kaplan would be paid nothing until NewU generated $10 million in revenue, which Kaplan would have to pay to NewU in the event the university could not generate the money. After that point, Kaplan would be paid for the services it provided plus 12.5% of NewU's revenue.

120. Second, Kaplan received payment only for the services it provided to NewU.

121. Finally, Kaplan and Purdue contained no overlapping executives or directors.

122. These terms figured prominently in the DOE's decision to approve the Purdue-Kaplan deal. For instance, in its September 13, 2017 letter preliminarily approving the deal, the DOE focused on the fact that the proposed non-profit school (NewU) would be controlled by a public entity (Purdue) and not by a private services provider (Kaplan or ICA, Kaplan's parent company): "Purdue . . . controls NewU . . . . Based on its preliminary review of the supporting documents submitted by Purdue . . . the Department has concluded that control of NewU will not be retained by any entity or persons who controls [Kaplan] or ICA."

123. Similarly, the DOE highlighted the fact that "the distribution of revenues" was structured "to provide financial protection and certain financial incentives to New University, while compensating [Kaplan] fairly for its original contribution of the Institutional Assets." In particular, "the Department note[d] that . . . except as expressly provided [in the transfer agreement governing the transaction], none of the [non-profit educational institutions] will be assuming any liabilities of the [for-profit service provider]" and that a requirement of the DOE's approval of the deal was that, "[w]ithin 10 days after the transmission of this pre-acquisition letter, Purdue shall submit a detailed description of the 12.5% . . . payment to [Kaplan]/ICA . . . which demonstrates

the plan for ensuring <u>that students will be served first, and that all educational and operational expenses are being covered prior to any portion of the [fee] being paid to [Kaplan]/ICA</u>."

124.    Conversely, the DOE demonstrated its willingness to reject deals that deviated materially from the Purdue-Kaplan deal and others like it.  On August 11, 2016, the DOE denied CEHE's application for approval of a change in ownership or structure for several of its for-profit colleges, which CEHE was attempting to convert to non-profit status while funneling its revenue to a third party, the Carl Barney Living Trust.  The DOE noted at the beginning of its analysis that an "<u>IRS determination do[es] not . . . confer nonprofit status for Title IV purposes</u>," but that the DOE would make its own "independent determination" of non-profit status.  The DOE denied CEHE's application due in part to "particular concern" that the transaction would "result in "financial benefit which inures to" the Carl Barney Living Trust that "retained control of the Colleges" through those colleges' post-transaction governance structure.

125.    The DOE also rejected CEHE's application because it concluded that the CEHE transaction was "structured in such a way that [the] income stream [generated from the colleges] . . . was intended to continue to flow to the Carl Barney Living Trust . . . just as an income stream flowed to the Trust while the Colleges operated in a for-profit status."  The transaction was financed by CEHE executing two Notes to the colleges.  The payments on the Notes in turn accrued to the benefit of the Carl Barney Living Trust.  The DOE noted that "[p]ayments to the Trust under the Notes are essentially based on the excess of revenues over expenses – the same way as net income in a for-profit entity.  Instead of this excess being retained and allocated to CEHE's mission as would be expected in a nonprofit, the excess is distributed to the Trust under guise of Note payments."

126.    As was known to Defendants throughout but only later revealed to investors, the Conversion contained terms that were much more similar to those that the DOE rejected in the CEHE application than those that it accepted in the Purdue-Kaplan application.  As discussed above in Section V.E, the DOE concluded based on the Company's internal analyses that Conversion's financial terms were structured to primarily benefit the Company, not New GCU. Unlike the Purdue-Kaplan deal, in which the services provider would be paid only after the non-profit university broke even, which called for payment only for services rendered, and which in any event only called for a payment of 12% of the non-profit university's revenues after it had broken even, the Conversion contemplated New GCU paying the Company even for services it did not render, had no provision to ensure the financial health of New GCU prior to its beginning payments, called for New GCU to pay 60% of its revenue to the Company, and in reality meant that New GCU would effectively be paying about 95% of its revenues to the Company while incurring about 72% of New GCU's expenses.  Such an arrangement was much more similar to the CEHE transaction, which was "structured in such a way that [the] income stream [generated from the colleges]" flowed to the private entity.

127.    Second, from a control perspective, unlike the Purdue-Kaplan deal, where the DOE concluded control of the non-profit institution would "not be retained by any entity or persons who controls [the service provider]," the Conversion resulted in an arrangement in which 75% of the executives controlling the day-to-day operations were in fact employees of the Company.  Such an arrangement was much more similar to the CEHE transaction, in which key directors "continue[d] to exert significant control over CEHE's management and operations."  As with the CEHE transaction, the Conversion was structured such that the Company retained control of New

43

GCU, with the DOE even going so far as to call New GCU the Company's "captive entity" under the structure of the Conversion.

**6.      Traditional Concerns About For-Profit Universities Were Realized By New GCU's Transformation After The Conversion**

128.    Remarkably, after the Conversion, when New GCU was supposedly acting as a non-profit, Grand Canyon began to escalate the very practices that led to the downfall of for-profit universities in the past.  Because New GCU was in fact a captive profit-seeking entity acting on GCE's behalf, it changed its admissions and academic standards in an attempt to maximize GCE's profits.  Specifically, Grand Canyon dramatically intensified pressure on recruiter employees to admit unqualified students.  The effect of these practices was to increase student debt and enrollment—and associated tuition and other revenues—significantly, while exacerbating the abusive practices so often prevalent at for-profit institutions.

129.    The Company began aggressively recruiting students even if they were academically unqualified or unlikely to be able to repay their loans.  This was recognized as a common practice condemned at for-profit institutions.  As a Senate Subcommittee found in a comprehensive 2012 report, "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," "[b]ecause continual enrollment growth is so critical to their business success, most for-profit colleges' first priority is to enroll as many students as possible . . . . Recruiters' job security depends on meeting a quota of new enrollments . . . . The boiler-room atmosphere leads to a lax ethical environment, with little room for considering whether a particular student is a good fit for the college or whether attending the college is in that person's best interest."

130.    This same "boiler-room atmosphere" took over Grand Canyon and New GCU directly after the Conversion.  FE 2 recalled that, after the Conversion, there was an increased

44

focus on recruiting new students. He indicated that, after the Conversion, his team's focus shifted more to fulfilling student quotas than on forging strategic, long-term partnerships with school districts and hospitals. He further recalled that there was strict adherence to quotas, which were becoming nearly impossible to meet, and that, of the thirteen business development employees he trained with when he was hired, only one remained with the Company at the time FE 2 was laid off.

131. FE 1 recalled that, after the Conversion, the Company began to engage in aggressive recruitment strategies. For instance, he recalled, "Starting at the end of 2018 . . . it began to be less about outside consulting to solve problems and became more about getting your numbers up and your [representatives'] numbers up. It went from developing strategic relationships to straight sales. Anyone that could get funding would get enrolled even if they didn't deserve to be a student. It was all about getting your numbers up to support [New GCU] in that last year." FE 1 confirmed that, as long as financial aid could secure Title IV funding for a student, their job was to enroll the student, even if the student was unqualified or it was clear the student would not succeed academically. Although he never personally enrolled a student that he did not believe could succeed, he confirmed that at least 25 to 35% of New GCU enrollments after the Conversion were not suitable students.

132. FE 1 further explained: "When we started, it was first and second course completions we were measured on. After [the Conversion] they changed it so now we're only measured on first course completion. If the student finishes that first course, they're on the hook for at least three classes. So what if they drop out after that?" This had the impact that recruitment employees, desperately seeking to meet their new strict quotas for new students, no longer had to worry about students meeting their long-term goals. As long as they could get a student to enroll

who would last one semester, that would be adequate for GCE's compensation targets. FE 1 explained that his counselors used to hold parties and celebrations for their students after they completed semesters, up to and including their graduation from the program. That changed after the Conversion. He said, after the Conversion, "[t]hat relationship piece became way less important than just cramming a ton of students into the funnel." FE 1 indicated that, when he raised concerns to his supervisors, he was told it "wasn't [his] position to ask" despite the fact that he was personally overseeing 16,000 school districts.

133.    FE 3, who was an Executive Financial Aid Specialist at the Company from May 2012 until February 2020, was responsible for processing financial aid requests. FE 3 recalled that, after the Conversion, the Company became less customer-service oriented and "way more of a pump and dump operation." FE 3's team dealt with the end result of recruiting efforts as they processed financial aid applications. FE 3 said that, after the Conversion, the university began engaging in practices that they had never engaged in before, such as allowing balances to remain on students' accounts for longer than they previously had, which "was always a big no-no before [the Conversion]." FE 3 recalled that he and his team began to decline some financial aid applications, but he and his colleagues were "told just to keep our mouths shut and process stuff." FE 3 estimated that, towards the end of his employment at the Company, approximately 10% of applications had problems or were close to missing deadlines, whereas before the Conversion such problems were extremely rare.

134.    FE 3 further recalled that, after the Conversion, there was a noticeable shift in the Company's recruitment strategies. For instance, he recalled that the quality of New GCU's students declined, and New GCU began to recruit students with lower grades than it had before in addition to students that had outstanding debts—a telltale sign that they should not be taking out

further student loans.  FE 3 recalled that he would see students "that already have six figures in loans and we're out there getting them more."  Prior to the Conversion, FE 3 recalled that recruitment of prospective students seemed to be focused on their best interests, but there was no such focus after the Conversion, when it became "just about processing as [many applications] as fast as possible."

### 7.    Grand Canyon Violated GAAP Requirements For Consolidation

135.    During the Class Period, Grand Canyon's claim that New GCU was a non-profit allowed the Company to avoid accounting rules, enacted after Enron misled the nation by parking liabilities in off-balance entities, that would have required the Company to consolidate New GCU's expenses into its income statement—a step that would have dramatically decreased Grand Canyon's reported margins given that Grand Canyon took 95% of New GCU's revenues while paying only 28% of New GCU's expenses.  Grand Canyon's manipulation of the charitable designation allowed GCE to present significantly better profit margins than its OPM competitors could muster, and gave investors a far more optimistic picture of the Company's operating results than what was accurate—exactly what the accounting rules were designed to prevent.

136.    As Grand Canyon recognized in its SEC filings during the Class Period, GAAP requirements for consolidation are set forth in ASC 810.  ASC 810-10-10-1 explains that "[t]he purpose of consolidated financial statements is to present, primarily for the benefit of the owners and creditors of the parent, the results of operations and the financial position of a parent and all its subsidiaries as if the consolidated group were a single economic entity."  ASC 810 requires a reporting entity to consolidate other entities in order to offer investors a "fair presentation" of a reporting entity's financial information when it "directly or indirectly has a controlling financial interest in [those] other entities."  ASC 810-10-10-1 further explains that GAAP requirements for

consolidation reflect a "presumption that consolidated financial statements are more meaningful than separate financial statements and that they are usually necessary[.]"

137.    ASC 810 requires reporting entities to consolidate "variable interest entities" ("VIE")—those organizations (here, New GCU) for which a reporting entity (here, GCE) has interests reflecting the VIE's economic success or failure.  As *The New York Times* explained in a January 16, 2003 article entitled "Accounting Rules Changed to Bar Tactics Used by Enron," the Financial Accounting Standards Board ("FASB") adopted rules requiring VIE consolidation "to make it harder for companies to hide debts and assets from their shareholders."  The article explained: "Enron's collapse gave special-purpose entities such a bad name that the new rule even comes up with a new term, variable interest entity, or V.I.E., to describe such vehicles.  They get that name because different investors in them have interests that will vary with the success of the enterprise."

138.    ASC 810 sets forth a two-step analysis to determine whether a reporting entity must consolidate another legal entity under its provisions.  First, a threshold analysis is conducted to determine whether the Variable Interest Model is even applicable to the legal entity.  GCE claimed that New GCU fell into a "scope exception" for this analysis, which include a "not-for-profit entity carve-out."  In other words, GCE claimed that the VIE analysis should stop at the beginning, because New GCU, as a supposed non-profit, was not covered by the VIE consolidation rules.

139.    Second, in the event the threshold analysis shows the legal entity should be evaluated under the Variable Interest Model, the reporting entity should consolidate a VIE if it has "power" and the obligation to receive benefits or absorb losses "that could potentially be significant to the VIE."

140.    As set forth below, under ASC 810, New GCU did not fall within a scope exception and its financial statements should have been consolidated with GCE's.

### a.    New GCU Did Not Fall Within A Scope Exception Because It Was Not A Bona Fide Non-Profit

141.    As discussed above in Section V.E, the DOE found, after a thorough review of Grand Canyon's internal documents (including the analyses provided to Defendant Mueller and Bachus by Barclays and Deloitte, which were not presented to the IRS), that New GCU's operations "violate[d] the most basic tenet of nonprofit status" under the IRS Code and the Higher Education Act, because New GCU was operated by and for the benefit of Grand Canyon.

142.    While this suffices to independently establish that Grand Canyon was not a non-profit, the facts analyzed by the DOE show that Grand Canyon also failed to meet the definition of a non-profit embodied in ASC 810.  ASC 810-10-20 distinguishes a non-profit from other organizational forms on grounds that non-profits receive "[c]ontributions of significant amounts of resources from resource providers who do not expect commensurate or proportionate pecuniary return" and have "[o]perating purposes other than to provide goods or services at a profit."

143.    Each of these characteristics shows that GCU was not a non-profit under ASC 810's definition.  As the DOE recognized, the overwhelming majority of New GCU's resources came from Grand Canyon, which received pecuniary return to the tune of 95% of New GCU's revenue. In addition, because of the financial burden imposed on New GCU through the Credit Agreement and MSA, and because the majority of New GCU's management was affiliated with or employed by Grand Canyon, New GCU was forced to operate primarily for the purpose of providing its services for profits—which disproportionately inured to Grand Canyon.  Indeed, as set forth above in Section V.E.6, several former GCU and Grand Canyon employees confirmed that, following the Conversion and faced with New GCU's heavy obligations to Grand Canyon under the Credit

49

Agreement and MSA, New GCU's management changed the university's operations precisely in ways designed to increase the profits to remitted to Grand Canyon—such as by pushing to increase the number of students enrolled, even if they were unqualified.

144.    In addition, even if New GCU was considered a non-profit (which, given the DOE's thorough analysis, it cannot be), the non-profit entity exemption has what Grand Canyon's auditor, KPMG, calls an "anti-abuse provision": under ASC 810-10-15-17, the exemption does not apply if the not-profit is being "used by business reporting entities in a manner similar to a VIE in an effort to circumvent the provisions of the Variable Interest Entities Subsections."  The extremely asymmetric revenue and expense splits as a result of the conversion, which allowed Grand Canyon to report market-leading margins far in excess of those enjoyed by its peers precisely because it did not consolidate New GCU's financial results, strongly suggests that Grand Canyon used the non-profit exemption in an effort to avoid consolidation.

145.    Thus, under both the Internal Revenue Code and the Accounting Standards Codification, New GCU was not a true not-for-profit entity, and the VIE subsection scope exception for not-for-profits was inapplicable.

### b.    Grand Canyon Was Required To Consolidate GCE's And GCU's Financial Statements

146.    Given that the non-profit exception did not apply to New GCU for the reasons set forth above, the remaining steps in the threshold VIE consolidation analysis are to determine (1) whether GCE has a variable interest in New GCU, and (2) whether New GCU is a VIE.  Then, if the threshold requirements are met, the relationship between GCE and New GCU is required to be evaluated under the VIE Consolidation Model, for potential consolidation. These analyses demonstrate that Grand Canyon was required to consolidate New GCU under ASC 810.

147.    Grand Canyon's interests in New GCU were variable interests, because Grand Canyon "share[d] in [New GCU]'s economic risks and rewards" by virtue of its Services Fee and Credit Agreement.  Specifically, as Deloitte explains in its "Consolidation Handbook," "[a] legal entity's debt obligations – including the obligation to pay the related interest – are always variable interests."  Moreover, the service fees paid by New GCU to Grand Canyon were also variable interests.  Per Deloitte, service fees are variable interests unless several conditions are met, including that the "fees are commensurate and customary for the services performed" and the service provider's "aggregate other variable interests . . . absorb only an insignificant amount of the legal entity's variability."  As explained above (*see* Section V.E), Grand Canyon's fees were neither customary nor commensurate with the services it provided to New GCU—and in any event Grand Canyon held a significant variable interest in New GCU by means of the debt it issued to New GCU.

148.    Moreover, New GCU was a VIE within the meaning of ASC 810. Subsection 810-10-15-14 provides alternative conditions under which an entity like New GCU is considered a VIE for the purposes of evaluation under the VIE Consolidation Model.  Among other things, an entity is considered a VIE if it is undercapitalized such that its "total equity investment" is "not sufficient to permit [it] to finance its activities without additional subordinated financial support."  But New GCU had no equity investment at all, and—as would be revealed at the end of the Class Period— was in any event unable to finance its activities without additional support from Grand Canyon in the form of so-called CapEx-related loans.  Accordingly, New GCU was a VIE, triggering evaluation under the VIE Consolidation Model.

149.    Evaluation of New GCU under that model shows that New GCU should have been consolidated.  Under the VIE Consolidation Model, a reporting entity is required to consolidate a

VIE if (i) it has the power to direct a VIE's most significant activities and (ii) the right to receive benefits that could potentially be significant to the VIE.

150.    Here, both criteria were readily met.  First, as to the power to direct activities, as the DOE explained, Grand Canyon controlled the most significant operations of New GCU:

> [N]early 75% of the executive team members responsible for managing and overseeing [New] GCU and developing its strategic vision are employed by its service provider. As employees of [Grand Canyon], these executive leaders have a primary fiduciary duty to the shareholders of GCE . . . while at the same time providing significant management and oversight of [New GCU]. This is particularly so given the scope of the activities [Grand Canyon] is providing under the MSA . . . . Given the enormous leverage GCE now has over [New GCU] by virtue of the fact that most of [New GCU]'s key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* [New GCU] as is required.

(emphasis in original)

151.    Second, as to the right to receive benefits, as the DOE concluded based on the materials Grand Canyon provided in connection with its review, "[Grand Canyon] and its shareholders – rather than [New GCU] – are the primary beneficiaries of the operation of [New] GCU under the terms of the MSA," including because Grand Canyon would receive "approximately 95% of [New GCU]'s revenue" and could, in fact, "be paid even significantly higher amounts over the costs of the services it provides" if New GCU's revenues grew.

152.    Accordingly, had Grand Canyon properly evaluated New GCU under the terms of ASC 810, it would have been required to consolidate it as a VIE.

### 8.    Grand Canyon Violated GAAP Requirements For Related Party Disclosures

153.    In addition to failing to consolidate New GCU as a VIE as required, Grand Canyon also failed to properly recognize New GCU as a related party.  ASC 850-10-10-1, which explains the objectives of related-party disclosures, provides: "[ASC 850] establishes requirements to disclose certain significant related party transactions and control relationships.   Relevant

52

information is omitted if the disclosures required by [ASC 850] are not made." ASC 850-10-05-3 explains that related party transactions include those between "Affiliates," which are defined at ASC 850-10-20 as parties that control, are controlled by, or are under common control with one another.

154. During the Class Period, Grand Canyon represented that it "considered" numerous factors to determine that it did not have a related party relationship with New GCU, including that (1) Grand Canyon did not have voting interests or ownership rights in New GCU; (2) New GCU had an independent board of trustees, and had purportedly established certain governance controls attempting to address conflicts of interest; (3) Defendant Mueller's involvement in overseeing New GCU was limited, particularly in connection with the MSA, and "no other employee of [New] GCU or GCE has a dual role in both organizations"; (4) under the MSA, New GCU and its board of trustees purportedly had "full control over decision making related to the day-to-day operations of [New] GCU"; (5) in the event of a default under the Credit Agreement, Grand Canyon would not become the owner or operator of New GCU; (6) there was no parent or subsidiary relationship between the Grand Canyon and New GCU; and (7) Grand Canyon and New GCU engaged supposedly independent counsel and advisors in connection with the transaction.

155. However, as set forth above, as the DOE determined in rejecting New GCU's application for non-profit treatment after reviewing detailed nonpublic analyses prepared by Barclays and Deloitte, numerous facts demonstrate that Grand Canyon actually controlled New GCU. These included the facts that: New GCU was essentially captive; Grand Canyon – and not New GCU – was the primary beneficiary of New GCU's operations under the MSA; Defendant Mueller's dual role afforded him significant control over New GCU's operations, with respect to the MSA; and "nearly 75% of the executive team members responsible for managing and

overseeing [New] GCU and developing its strategic vision are employed by" Grand Canyon, a point made even more salient in light of "the scope of the activities [Grand Canyon] is performing under the MSA." These factors establish that Grand Canyon and GCU are, at minimum, affiliates warranting related party disclosure.

156. This concern is not merely formalistic. ASC 850-10-05-2 explains that "[i]nformation about transactions with related parties is useful in comparing an entity's results of operations and financial position with those of prior periods and with those of other entities. It helps users of financials statements to detect and explain possible differences." Similarly, the Public Company Accounting Oversight Board has explained that "[a] company's related party transactions could pose increased risks of material misstatement, as their substance might differ materially from their form."

157. Here, Defendants repeatedly represented that Grand Canyon was becoming a servicing company and expected to sign on additional customers imminently. Defendants' failure to provide appropriate related-party disclosures, in conjunction with their repeated false assurances that the terms of the arrangement with New GCU were industry-standard, gave investors the false impression that Grand Canyon's arrangements with New GCU were negotiated at arms-length and represented terms that were generally available in the marketplace. By failing to identify Grand Canyon's transactions with New GCU as related party transactions, Defendants improperly denied investors the opportunity to "compar[e] [New GCU]'s results of operations and financial position with those of prior periods and with those of other entities" and to "detect and explain possible differences" as they evaluated the Company's prospects.

## VI.   THE TRUTH EMERGES

158. Defendants' materially false and misleading statements, and failure to disclose material facts necessary to prevent their statements from being misleading, artificially inflated the

price of Grand Canyon's shares during the Class Period.  The truth about Grand Canyon's scheme to artificially inflate its reported financial results by improperly designating New GCU as a non-profit, and thereby failing to disclose Grand Canyon's actual less favorable financial performance, was revealed to the market through two partial corrective disclosures in November 2019 and January 2020.  Each of these partial corrective disclosures partially removed artificial inflation in the price of Grand Canyon's stock.  As such, Defendants' wrongful conduct alleged herein directly and proximately caused the economic losses suffered by Lead Plaintiffs and the Class.

### A.   November 6-7, 2019: Grand Canyon Discloses That The DOE Rejected Its Request For Treatment Of New GCU As A Non-Profit

159.   On November 6, 2019, after the market close, Defendants Mueller and Bachus hosted Grand Canyon's third-quarter fiscal 2019 earnings call (the "3Q 2019 Earnings Call").  During the call, Defendants announced strong results, including a revenue beat and increased full-year revenue, margin, and EPS guidance.  However, at the tail end of the call, after the portion of the call allocated to analyst questions had ended, Defendant Mueller announced that New GCU had informed Grand Canyon "approximately 1 hour ago" that it had received correspondence from the DOE concerning its approval of the New GCU non-profit Conversion.  Defendant Mueller stated that the DOE had determined that New GCU "d[id] not satisfy the department's definition of a non-profit entity, and as a result, [would] continue to be treated as a for-profit entity for purposes of its participation in Title IV HEA programs."

160.   The following day, November 7, 2019, Grand Canyon filed with the SEC a Form 8-K concerning the DOE's correspondence (the "November 7, 2019 8-K").  The November 7, 2019 8-K explained that "the [DOE] has taken the position that Grand Canyon University does not satisfy the Department's definition of a non-profit entity and, as a result, that the Department will

continue to treat the University as a for-profit institution for purposes of its continued participation in Title IV, HEA programs."

161.    These revelations shocked the market, and Grand Canyon's stock price plummeted as a result. Even though Grand Canyon announced strong results for third quarter 2019, and materially raised its full-year guidance for several key financial metrics, Grand Canyon's stock declined by a statistically significant amount in response to the disclosure of the DOE's decision. From a close of $91.88 on November 6, 2019, Grand Canyon's stock price dropped by $3.80, or 4.14%, to close at $88.08 on November 7, 2019, on extraordinary volume. On November 8, 2019, Grand Canyon's stock price decline continued: it dropped a further $3.19, or 3.62%, closing that day at $84.89.

162.    Analysts and the news media connected the declines in Grand Canyon's stock price to the revelation of the DOE decision. For example, in a report issued before the market opened on November 7, 2019 titled "3Q19 Takeaways: Quarter and Guidance Fine, But New ED Disclosures," analysts from BMO Capital Markets explained:

> LOPE reported a solid EPS "beat" and raised 2019 guidance by that amount. Unfortunately at the end of the call, management noted that "about an hour ago" it had been notified by the Dept. of Education (ED) that in approving GCU's program participation agreement (allows Title IV eligibility), it still considers [New] GCU to be a proprietary (for-profit) institution.

The Motley Fool published an article that same day titled "Why Grand Canyon Education Stock Dropped Today," which explained:

> Grand Canyon Education's revenue rose 24% year over year to $193.3 million . . . [and] [t]he company's profits also increased at a solid clip.
>
> . . .
>
> However, investors appear to be focusing more on news that Grand Canyon University (GCU), for which Grand Canyon Education provides support services, will continue to be treated as a for-profit entity for purposes of its participation in federal financial aid programs by the U.S. Department of Education. As a result,

Grand Canyon University will be subject to regulations that require it to meet stricter standards for financial aid and graduate employment.

Grand Canyon Education Chairman and CEO Brian Mueller said during a conference call with analysts that he hasn't yet had time to review the Education Department's reasoning for treating [New] GCU as a for-profit entity but that the university would likely challenge the decision. Mueller also said that the stricter for-profit regulations would likely have little impact on the university's operations.

Investors, however, appear to be somewhat concerned with the Education Department's ruling, and some are choosing to sell their shares of Grand Canyon Education today.

Similarly, in a report issued on November 8, 2019, analyst Barrington Research explained:

While the transaction was approved as expected, ED said [New] GCU does not satisfy its definition of a non-profit entity and, as a result, will continue to be treated as a for-profit entity for regulatory purposes. Despite the better-than-expected Q3 results and guidance, the stock, which was down as much at $15 (or 17%) at one point, closed down $3.80 (or 4%) to $88.08.

163.    Defendants' announcements concerning the DOE decision on November 6-7, 2019 partially revealed the truth about Defendants' fraudulent scheme, by revealing that the DOE had rejected Defendants' improper attempt to characterize New GCU as a legitimate non-profit institution.

164.    However, for several reasons, these disclosures did not reveal the full truth to investors. Among other things, during the 3Q 2019 Earnings Call, rather than reveal the information and underlying documents that GCE had provided to the DOE pursuant to the DOE's interrogatories discussed above, or even the existence of the interrogatories, Defendants strongly disputed the DOE's findings, claiming to "believe that Grand Canyon University meets all the requirements to be treated as a non-profit entity for Title IV HEA program purposes" and that they "expect[ed] that the university will initiate appropriate measures to challenge this decision." Defendants also attempted to undermine the DOE's finding by claiming that "the federal government in the form of the IRS has independently determined that Grand Canyon University

is a 501(c)(3) tax-exempt organization" and that "the university is treated as a non-profit entity by the state of Arizona." They further claimed that the Conversion was undertaken for legitimate purposes, stating:

> [W]e would like to strongly emphasize the following. As discussed many times over the past several years, we did not undergo the transaction for the purpose of avoiding the various regulations. . . .

165. In the November 7, 2019 Form 8-K, while continuing to conceal the information provided to the DOE or the existence of the interrogatories sent by the DOE in May 2018, Defendants similarly attempted to delegitimize the DOE's findings, stating:

> The Department's determination appears to be based principally on the Department's analysis of Internal Revenue Code provisions, decisions of the United States Tax Court, and IRS private letter rulings. Insofar as the IRS has already concluded in [New] GCU's favor on the exact same issues purportedly analyzed by the Department and granted [New] GCU status as a 501(c)(3) tax-exempt organization, the Department would appear to be substituting its judgment regarding the application of the Internal Revenue Code for that of the United States federal agency responsible for administering the Internal Revenue Code.

It also repeated and expanded on Defendants' claims during the 3Q 2019 Earnings Call that GCE's purpose in executing the Conversion was legitimate, claiming that, "[a]s disclosed multiple times previously, the Company and [New] GCU did not undertake the transaction for the purposes of avoiding the various regulations . . . that apply solely or predominantly to for-profit entities." Defendants further claimed that the DOE's determination was largely irrelevant to Grand Canyon's and [New] GCU's performance, stating that they expected "that the Department's decision to continue to treat the University as a for-profit institution, if it withstands challenge, will have no material impact on the University's operations or its compliance with the applicable regulatory requirements, or on the Company's financial condition or results of operations."

166. On November 12, 2019, the DOE Letter was made publicly available. The DOE Letter is attached to this Complaint as Exhibit A. That letter explained in detail, as discussed above

in Section V.E.1, that the Conversion violated "the most basic tenet of non-profit status – that the non-profit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity."

**B.    January 28, 2020: Citron Research Exposes Grand Canyon's Scheme To Inflate Its Reported Financial Results By Using New GCU As An Off-Balance-Sheet Entity**

167.    Investors learned the truth about Grand Canyon's fraudulent scheme on January 28, 2020 when, prior to market open, financial analyst Citron published a nearly 50-page analyst report titled "The Educational Enron: The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings."  The report is attached to this Complaint as Exhibit B.  In the report, Citron explained that it had submitted a FOIA request to the DOE after reviewing the DOE Letter.  In response, Citron "received 870 pages of supporting documentation that led to the obvious conclusion that LOPE is in clear violation of SEC rule 10b-5 as they use the private university to dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price."

168.    In the report, Citron cited to documents submitted by Grand Canyon to the DOE in connection with its application for non-profit treatment (which, as noted above, Citron said it obtained via a FOIA request).  To start, Citron noted that Grand Canyon's extraordinary margins—45%, as compared to approximately 6% margins from peers—were in large part a function of MSA terms which permitted Grand Canyon to obtain revenues at nearly 100% profit margins from areas of GCU's business for which Grand Canyon booked no expenses.  Specifically, Citron revealed that Grand Canyon received 60% of all of New GCU's revenues, while expenses related to several categories of those revenues—those unrelated to the provision of online services—were located solely on the non-public balance sheet of New GCU.  Citron calculated that Grand Canyon was recognizing approximately $280 million of "pure profit" from such revenue sources, while

reporting approximately $300 million EBITDA overall—and that, if the MSA was structured like "every other OPM contract," whereby Grand Canyon would receive approximately 50% of New GCU's online tuition revenue, Grand Canyon's EBITDA would fall from $307 million to $27 million. This, in turn, would take Grand Canyon's margins down from approximately 45% to approximately 6%—putting it in line with its OPM peers, including Pearson, John Wiley, and Kaplan.

169.     Citron further stated that the terms of the MSA permitted Grand Canyon to manipulate its results to achieve financial targets. Specifically, under the terms of the MSA, New GCU owed to Grand Canyon an approximately 60% service fee regardless of whether it obtained services from Grand Canyon or insourced them. Accordingly, Citron noted, Grand Canyon could inflate its financial results by forcing New GCU to contract separately with third-party services providers—thereby moving the costs of providing such services off Grand Canyon's books and onto New GCU's private books, but leaving unchanged Grand Canyon's revenues from those very services. As Citron explained:

> If LOPE wants . . . Mr. Mueller can simply give the word to the private entity ([New] GCU), which he is president of, to take on some of these "non-exclusive services" onto its own income statement. . . . While this would depress the earnings and cash burn further of the private entity, the private entity would still owe the same level of fees (per the MSA) to LOPE[.] With none of the costs and the entirety of the ~60% fees, LOPE's reported profit and margins would continue to fraudulently rise while stuffing expenses onto the private entity[.]

170.     Citron further reported that New GCU was able to fund these arrangements via various private credit arrangements, which were largely undisclosed. Specifically, Citron noted that Grand Canyon was consistently funding significantly higher amounts of CapEx at New GCU than was projected, that Grand Canyon's accounts receivable (and New GCU's accounts payable) was similarly growing rapidly, and that New GCU was taking on increasing amounts of secured debt.

171.    These revelations shocked the market, and Grand Canyon's stock price declined dramatically in response. From a close of $91.50 on January 27, 2020, Grand Canyon's stock price dropped by $7.43, or 8.12%, to close at $84.07 on January 28, 2020, on extraordinary volume.

## VII.    POST-CLASS PERIOD EVENTS

172.    On February 20, 2020, Grand Canyon filed with the SEC its Annual Report on Form 10-K for fiscal-year 2019 (the "2019 10-K"). The 2019 10-K included several substantive changes to the Company's risk disclosures related to the Conversion and the DOE's denial of New GCU's application for nonprofit status—risks of which the Company was already well aware, but did not disclose throughout the Class Period.

173.    First, the Company acknowledged for the first time that the DOE's rejection of New GCU's application for nonprofit status could severely harm the Company's marketing efforts. Grand Canyon prominently featured an entirely new risk disclosure admitting that the DOE's denial of New GCU's nonprofit could have a material, adverse effect on New GCU's enrollment and, accordingly, on Grand Canyon's financial results:

> ***ED's determination to treat GCU as a proprietary institution for Title IV, HEA purposes could adversely impact GCU's enrollment.***
>
> On November 6, 2019, in connection with its approval of the Transaction, ED also informed GCU that GCU does not satisfy ED's definition of a nonprofit entity and, as a result, that ED will continue to treat GCU as a proprietary institution for purposes of its continued participation in Title IV programs. While the Company does not believe that ED's determination will impact GCU's ability to meet all regulatory requirements applicable to proprietary institutions, <u>the determination, if upheld, would have the impact of limiting GCU's ability to identify itself as a nonprofit university in its advertising or other materials.</u> <u>Such a limitation could harm GCU's ability to compete against other nonprofit universities for students and could have a material adverse effect on its enrollment and, consequently, on its and our financial condition, results of operations and cash flows.</u>

In addition, Grand Canyon specifically identified the "ED's determination to treat GCU as a proprietary institution for Title IV purposes, which could impact our ability to recruit students to

GCU" as a "factor that could prevent us from successfully recruiting, enrolling, and retaining students."

174.    Second, Grand Canyon admitted that the governance arrangements under the terms of the Conversion risked conflict-of-interest issues, and specifically walked back Defendants' prior claims that Defendant Mueller was the "only" employee with dual roles at the Company and New GCU. For the first time, Grand Canyon specifically highlighted as a risk that its "Chief Executive Officer's role as President of GCU may adversely affect his ability to run the Company," explaining that "Mr. Mueller's dual role could raise conflict of interest issues." In addition, and tellingly in light of the DOE's determination that "nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider," Grand Canyon deleted from the 2019 10-K its oft-repeated statement that "[a]side from Mr. Mueller, no other employee of GCU or GCE has a dual role in these organizations."

## VIII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

175.    Throughout the Class Period, Defendants Mueller, Bachus, and Grand Canyon issued false and misleading statements concerning New GCU's purported independence from GCE, the DOE's review of GCE's application for non-profit status, the source of GCE's purported success, and GCE's accounting and financial statements post-Conversion.

### A.    False And Misleading Statements Regarding New GCU's Purported Independence Before The Conversion

176.    Beginning January 5, 2018, when GCE announced the Conversion, Defendants falsely and misleadingly claimed that the Company and New GCU would be separate, operated and controlled by separate management, and that New GCU would be a non-profit entity.

177.    The Class Period begins on January 5, 2018, when Grand Canyon issued a press release, also filed with the SEC on Form 8-K, announcing its renewed plan to pursue the Conversion and reporting that it had applied to HLC for approval of non-profit status for GCU (the "January 5, 2018 8-K"). The January 5, 2018 8-K was signed by Defendant Bachus. In the press release, the Company stated, "Following the [Conversion], [Grand Canyon] would operate as a for-profit third-party provider of educational and related services to GCU . . . ." Defendant Mueller further stated, "[T]his return to our historical non-profit status would convey an accurate reflection of who GCU is today and will be in the future[.]"

178.    On February 21, 2018, Grand Canyon filed its Annual Report on Form 10-K with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Mueller and Bachus. In the 2017 10-K, Grand Canyon stated, "New GCU would be a separate non-profit entity under the control of an independent board of trustees and independent management. Accordingly, our relationship with New GCU, both pursuant to the shared services arrangement and operationally, would no longer be as owner and operator, but as a third party contract party . . . . GCU's current faculty, academic leadership and related staff and other employees . . . would become employed by New GCU and New GCU would be governed by the current institutional board of trustees of GCU."

179.    On February 26, 2018, the Company filed with the SEC on Form 8-K that it had entered into a non-binding letter of intent with New GCU to effectuate the Conversion (the "February 26, 2018 8-K"). The February 26, 2018 8-K was signed by Defendant Bachus. In the 8-K, the Company stated: "GCU's current faculty, academic leadership and related staff would become employed by New GCU and New GCU would be governed by a board of trustees comprised of the persons who currently serve on the institutional board of trustees of GCU."

180.     On March 6, 2018, the Company issued a press release, also filed with the SEC on Form 8-K, announcing that HLC had approved its portion of the Conversion (the "March 6, 2018 8-K"). The March 6, 2018 8-K was signed by Defendant Bachus. In the March 6, 2018 8-K, the Company stated: "Following the [Conversion], [Grand Canyon] will operate as a third-party provider of education and related services to [New] GCU."

181.     On May 2, 2018, the Company filed its Quarterly Report on Form 10-Q with the SEC (the "Q1 2018 10-Q"). Defendants Mueller and Bachus signed the Form Q1 2018 10-Q. In the Q1 2018 10-Q, the Company stated: "[T]he University submitted to the Higher Learning Commission an application for approval to effect the sale of the University's academic-related assets . . . as a means of enabling New GCU to conduct itself as a traditional non-profit university . . . . The University's current faculty, academic leadership and related staff would become employed by New GCU and New GCU would be governed by a board of trustees comprised of the persons who currently serve on the institutional board of trustees to the University."

182.     On May 2, 2018, the Company held its first quarter of 2018 earnings call. On the earnings call, Defendant Mueller stated:

> Following the [Conversion], we would no longer own and operate a regulated institution of higher education, but would instead provide a bundle of services in support of New GCU's operations. This is a very common practice in higher education today . . . . New GCU would be a separate non-profit entity under the control of an independent board of trustees and independent management. Accordingly, our relationship with new GCU, both pursuant to the shared-services arrangement and operationally, would no longer be as owner and operator, but as a third-party contract provider. While we believe this relationship would remain strong, new GCU's board of trustees and management would have to fiduciary and other duties that would require them to focus on the best interest of new GCU.

183.     On May 29, 2018, Grand Canyon published on its website a statement entitled "GCU refutes testimony at NACIQI meeting" (the "NACIQI Testimony Response"). In the NACIQI Testimony Response, Grand Canyon purported to refute testimony provided by a

64

professor of taxation at Georgetown University Law Center to the NACIQI.  Among other things, Grand Canyon stated that the professor's testimony that Grand Canyon and GCU were "operated by a group of individuals who serve two masters" was "false" because, other than Defendant Mueller, "there will be no overlapping management or employees between the two entities." Grand Canyon also stated that the professor's statement that "'GCU's proposal fails the control test' under IRS rules" was "false" and "based on . . . misinformation and faulty conclusions," and that the professor's "purported legal conclusion is simply [the professor's] personal opinion — and [the professor's] attempt to substitute that opinion for the conclusions of those bodies that actually have access to full information and have fully vetted the proposal — should not be taken seriously."

184.    These statements were materially false and misleading.  The statements that New GCU would operate as a "non-profit" and a "separate non-profit entity" were false and misleading because, among other things, the planned structure of New GCU violated "the most basic tenet" of a non-profit and instead would act to funnel 95% of its revenue to GCE, while GCE only had to cover 28% of the institution's costs.  *See* Section V.E.2.

185.    The statements that New GCU would be a "separate" entity," that GCE would "no longer . . . operate a regulated institution of higher education," that GCE would act as a "third party" to New GCU, and that "GCU's current faculty, academic leadership and related staff and other employees . . . would become employed by New GCU" were each materially false and misleading because they misstated and omitted the highly material facts that 41 members of the university's 58-member Executive Leadership Team were employed by GCE and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for New GCU as they had previously.  Indeed, the DOE noted that it was

"skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original). *See* Section V.E.3.

## B. False And Misleading Statements And Omissions Regarding DOE Approval Of The Conversion

186. After the Company received extensive interrogatories from the DOE raising substantial doubts about whether the DOE would approve New GCU as a non-profit, Defendants concealed this highly material information and made a series of false and misleading statements about its prospects of DOE approval and the likely effect of a potential DOE denial on the Company's condition and operations.

187. On July 2, 2018, the Company filed on Form 8-K with the SEC an announcement that it had entered into an agreement to consummate the Conversion (the "July 2, 2018 8-K"). The July 2, 2018 8-K was signed by Defendant Bachus. In the July 2, 2018 8-K, the Company stated:

> On January 18, 2018, GCU voluntarily filed a request for pre-acquisition review of the transaction with the U.S. Department of Education ('ED') seeking ED's review of the proposed transaction and input as to any regulatory limitations, such as a letter of credit or growth restrictions, that ED may choose to impose on New GCU following the closing of the transaction . . . . <u>GCU has had ongoing engagement with ED about the transaction throughout the review process . . . and, based on this engagement . . . the Board of directors of the Company and the board of trustees of New GCU concluded that the benefits of consummating the transaction at this time were numerous and any regulatory limitations imposed by ED could be managed.</u>

188. The Company subsequently repeated its these statements in their entirety in its August 18, 2018 Quarterly Report on Form 10-Q (the "Q2 2018 10-Q") and its Form 8-K filed with the SEC on November 7, 2019 announcing the DOE's denial of its application for non-profit

status (the "November 7, 2019 8-K").  Defendant Mueller repeated substantially the same statements on the Company's November 6, 2019 third quarter earnings call.

189.    Also on July 2, 2018, Defendant Mueller stated, in an article in *The Chronicle of Higher Education*, that the DOE "pre-approval" process normally takes forty-five days, but that it was taking longer in the Company's case because "[the DOE is] very understaffed."

190.    As reported by *Azcentral* on July 2, 2018, Defendant Mueller stated, with respect to the DOE's review of the Conversion, that while Defendants had not yet "got their letter that says there are no restrictions" in connection with the Conversion, Defendants "would be very surprised, based on our discussions with them, if there were."

191.    These statements were materially false and misleading.  The statements that "based on ongoing engagement" with the DOE, the Company "concluded that . . . any regulatory limitations imposed by ED could be managed," and that the DOE approval process was taking longer than usual because the DOE was "understaffed" were misleading because they omitted the highly material fact that, on May 17, 2018, the Company received extensive interrogatories from the DOE about the structure of the Conversion, the agreements between GCE and New GCU, internal reports and other information known by GCE officers and directors, and New GCU's independence under the proposed structure of the Conversion, raising substantial doubts that the DOE would approve the Conversion.  The Company received three sets of additional requests for information from the DOE before it denied the Company's application, none of which was disclosed to investors.

C.      **False And Misleading Statements Regarding New GCU's Purported Independence After The Conversion**

192.    After the Conversion, Defendants falsely and misleadingly continued to claim that New GCU was an operationally independent non-profit institution and that the Company did not have "authority over decision making related to day-today-operations of New GCU."

193.    In the July 2, 2018 8-K, the Company stated:

The Company no longer owns and operates a regulated institution of higher education, but instead provides a bundle of services in support of New GCU's operations . . . . New GCU is a separate non-profit entity under the control of an independent board of trustees, none of whose members have ever served in a management or corporate board role at the Company . . . . Accordingly, the Company's relationship with New GCU, both pursuant to the Master Services Agreement and operationally, is no longer as owner and operator, but as a third party service provider to an independent customer.

Defendants repeated the statements that it "no longer owns and operates a regulated institution of higher education," that "New GCU is a separate non-profit entity," and that its relationship to New GCU was "no longer as owner and operator, but as a third party service provider to an independent customer" throughout the Class Period. The statements appeared in the Company's Q2 2018 10-Q, November 8, 2018 Quarterly Report on Form 10-Q (the "3Q 2018 10-Q"), and February 20, 2019 Annual Report on Form 10-K (the "2018 10-K").

194.    In the 3Q 2018 10-Q, Defendants also stated that, after the Conversion, Grand Canyon's "results of operations do not include the operations of GCU but rather reflect the operations of the Company as a service/technology provider[.]" Defendants substantively repeated this statement in the 2018 10-K, the May 7, 2019 Quarterly Report on Form 10-Q (the "Q1 2019 10-Q"), the August 6, 2019 Quarterly Report on Form 10-Q (the "Q2 2019 10-Q"), and the November 6, 2019 Quarterly Report on Form 10-Q (the "Q3 2019 10-Q"). Defendants also substantively repeated this statement in the Company's Form 8-Ks filed with the SEC on February 20, 2019, May 7, 2019, August 6, 2019, and November 6, 2019, and Defendant Mueller

substantively repeated this statement during the Company's earnings conference calls on November 8, 2018, February 20, 2019, May 7, 2019, and August 6, 2019.

195.    In the July 2, 2018 8-K, the Company further stated: "Aside from Mr. Mueller, no other employee of [GCU] or [Grand Canyon] has a dual role in both organizations."

196.    On the Company's August 8, 2018 earnings call, Defendant Mueller stated: "As a result of this transaction, various aspects of GCE's operations have changed in important ways. These changes include, but are not limited to the following: GCE no longer owns and operates a regulated institution of higher education, but instead provides a bundle of services in support of New GCU's operations."

197.    On the Company's February 20, 2019 earnings call, Defendant Mueller stated: "Grand Canyon University is now a non-profit institution, with its own board and mission."

198.    In the Q1 2019 10-Q, the Company stated: "As a result of the Transaction and Acquisition, the Company no longer owns and operates an institution of higher education, but instead provides a bundle of services in support of its 18 university partners."  This statement was substantially repeated in the Company's Q2 2019 10-Q.

199.    These statements were materially false and misleading.  The statements that the Company "no longer owns and operates a regulated institution of higher education," that its relationship to New GCU was "no longer as owner and operator, but as a third party service provider to an independent customer," and that "[a]side from Mr. Mueller, no other employee of [GCU] or [Grand Canyon] has a dual role in both organizations" were false and misleading because, among other things, they misstated and omitted the highly material facts that 41 members of the university's 58-member Executive Leadership Team remained employed by GCE and that numerous other operationally-significant GCU employees were employees of GCE while

69

performing the same responsibilities for New GCU as they had previously. Indeed, the DOE noted that it was "skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original).

200.    The statements that New GCU would be a "separate non-profit entity" were each materially false and misleading because the planned structure of New GCU violated "the most basic tenets" of a non-profit and instead would act to funnel 95% of its revenue to GCE, while GCE only had to cover 28% of the institution's costs. *See* Section V.E.2.

## D.    False And Misleading Statements Regarding The Conversion's Similarity To Other Transactions

201.    Throughout the Class Period, Defendants sought to reassure investors that the Conversion would be approved by the DOE and that it was a familiar structure for analysts to review. In reality, however, the GCE-New GCU relationship was far different from the Purdue-Kaplan structure and the other such structures with which Defendants sought to claim similarity.

202.    In the January 5, 2018 8-K, the Company stated:

The revenue share between the two entities remains subject to completion of a transfer pricing study and subsequent negotiation, but is expected to be comparable to other shared services arrangements currently in place in the higher education marketplace and to reflect the level of services that the Company would be providing to new GCU.

This statement was repeated in the Company's 2017 10-K. Defendant Mueller also repeated the statements on the Company's February 21, 2018 earnings call.

203.    The Company also stated in the January 5, 2018 8-K that "[t]he structure [of the Conversion] . . . is similar to the proposed structure in which Purdue University hopes to acquire the education assets of Kaplan University . . . with Kaplan becoming the service company . . . ."

204.    During a press conference on January 5, 2018, Defendant Mueller stated, with respect to the arrangement between Grand Canyon and GCU contemplated under the Conversion: "This arrangement will be very similar to hundreds of arrangements that already exist in the higher-education landscape today. And so this is not new. This is something that already exists in America."

205.    On the Company's February 21, 2018 earnings call, Defendant Mueller stated that "our proposed transaction and structure is almost identical to many others in the industry and is very similar to the Purdue and Kaplan proposal . . . ."

206.    In the March 6, 2018 8-K the Company stated: "The structure [of the Conversion] is similar to that at hundreds of non-profit universities in the country that outsource services to third-party providers."

207.    In the NACIQI Testimony Response, published on May 29, 2018, Grand Canyon stated that "the third party services model was and is a model deeply embedded throughout the higher education world" and "the University has commissioned studies to ensure that the rates and terms of the services arrangement are consistent with market norms."

208.    In the July 2, 2018 8-K Grand Canyon stated: "The shared services arrangement is similar to that at hundreds of non-profit universities in the country that outsource services to for-profit third-party providers."

209.    Also on July 2, 2018, during a speech, Defendant Mueller stated, with respect to the arrangements under the Conversion: "This is very mainstream in higher education today.

Hundreds of universities are doing it, and our model is almost an identical replica of that, so we're in the mainstream of what's happening."

210.    The statements were materially false and misleading.  Statements that (1) the Conversion was "mainstream" or "very mainstream," (2) the Conversion was "similar to," "very similar to," "comparable to," "almost identical to," and "almost an identical replica of" the Purdue-Kaplan deal or services arrangements at "hundreds" of universities around the country, and (3) "the University has commissioned studies to ensure that the rates and terms of the services arrangement are consistent with market norms" were each materially false and misleading because the terms of the Conversion were unusually and egregiously favorable to Grand Canyon, including because it received 95% of New GCU's revenues, including revenues from sources unrelated to the services Grand Canyon provided to New GCU, while paying only 28% of the costs required to run New GCU.  These statements were further each materially misleading because they misstated and omitted the highly material facts that 41 members of the university's 58-member Executive Leadership Team remained employed by GCE and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for New GCU as they had previously.  Indeed, the DOE noted that it was "skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original).

E.     **False And Misleading Statements Regarding Grand Canyon's Accounting And Compliance with GAAP**

211.    As discussed above, by virtue of Grand Canyon's control over New GCU and the fact that Grand Canyon was the primary beneficiary of New GCU's operations, Grand Canyon was required to consolidate New GCU into its financial statements pursuant to ASC 810, or at minimum to identify New GCU as a related party pursuant to ASC 850. *See* Section V.E.7.

212.    In the Q2 2018 10-Q, Defendants stated: "New GCU is not a related party to the Company in accordance with ASC Topic 850."

213.    In the Q3 2018 10-Q, Defendants stated: "We do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources."  Defendants repeated this statement in Grand Canyon's 2018 10-K, as well as in each of Grand Canyon's Q1 2019 10-Q, Q2 2019 10-Q, and Q3 2019 10-Q.  Each of these filings was signed by Defendants Mueller and Bachus.

214.    In addition, in the Q3 2018 10-Q, Defendants failed to consolidate GCU's results or identify GCU as a related party, stating: "ASC 810-10-15-17 provides scope exceptions to the variable interest entity analysis that include a not-for profit entity carve out. GCU is not a related party to the Company in accordance with ASC Topic 850."  Defendants repeated this statement in Grand Canyon's 2018 10-K, and failed to consolidate GCU's results in Grand Canyon's 2018 10-K, as well as in the 1Q 2019 10-Q, the 2Q 2019 10-Q, and the 3Q 2019 10-Q.

215.    Further, the Q3 2018 10-Q, 2018 10-K, Q1 2019 10-Q, Q2 2019 10-Q, and Q3 2019 10-Q each contained Sarbanes-Oxley certifications signed by Defendants Mueller and Bachus.  In the certifications, Mueller and Bachus attested, with respect to the report to which the certification was attached, that "this report does not contain any untrue statement of a material fact or omit to

73

state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

216.    Throughout the Class Period, the Company reported operating margins that had greatly increased year-over-year.  The following chart details the Company's reported operating margins as reported in Forms 8-K filed on November 8, 2018, February 20, 2019, May 7, 2019, and November 6, 2019.

| Quarter | Operating Margin |
|---------|------------------|
| 3Q18 | 35.6%[2] |
| 4Q18 | 45.1% |
| 1Q19 | 36.7% |
| 2Q19 | 29.2% |
| 3Q19 | 30.9% |

217.    These statements were materially false and misleading.  The statements that "New GCU is not a related party to the Company" and that "GCU is not a related party to the Company in accordance with ASC Topic 850" because New GCU was a non-profit entity were each false and misleading because the Company controlled New GCU, making them "affiliates under common control" and thus related parties for purposes of GAAP.  The statement omitted the highly material fact that 41 members of the university's 58-member Executive Leadership Team remained employed by GCE and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for New GCU as they had previously.  Indeed, the DOE noted that it was "skeptical that any nonprofit could outsource the

---

[2]The Company reported an adjusted margin figure for third-quarter 2018 that accounted for one-time costs related to the Conversion, which is reflected on this Table.

number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original). These statements were each false and misleading because New GCU was not a non-profit.  As the DOE found, the planned structure of New GCU violated "the most basic tenets" of a non-profit and instead would act to funnel 95% of its revenue to GCE, while GCE only had to cover 28% of the institution's costs. *See* Section V.E.2.

218.    The statements that the Company did "not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition" were false and misleading because the Company used New GCU as an off-balance sheet entity to which it funneled expenses while recognizing revenues generated by New GCU. As the DOE found, the Conversion would act to funnel 95% of New GCU's revenue to GCE, while GCE only had to cover 28% of the institution's costs. *See id*.  The statement that the Company's "results of operations do not include the operations of GCU but rather reflect the operations of the Company as a service/technology provider" was false and misleading because, Grand Canyon's operations did <u>not</u> "reflect the operations of the Company as a service/technology provider," but rather reflected the highly unusual and exploitative control relationship that Grand Canyon had with New GCU, as the Conversion would act to funnel 95% of New GCU's revenue to GCE, while GCE only had to cover 28% of the institution's costs . *See id*.

219.    The Company's reported operating margins were also materially false and misleading.  Grand Canyon's margins were inflated by Grand Canyon's treatment of New GCU

as a separate and unconsolidated entity, which allowed Grand Canyon to report higher margins—based on Grand Canyon's receipt of the overwhelming majority of university-related revenues while bearing only a fraction of university-related costs—than it would have under consolidation. However, as set forth above in Section V.E.7, Grand Canyon was required to consolidate New GCU under GAAP. In addition, even if Grand Canyon's margins were considered to be literally accurate, they were nonetheless misleading (i) because they were obtained by improperly failing to consolidate New GCU, and (ii) in light of Defendants' improper failure to identify New GCU as a related party in violation of GAAP requirements.

## F.    False And Misleading Statements Regarding The Source Of GCE's Success

220.    After the Conversion, the Company repeatedly attributed its growing service revenues and margins to the fact that New GCU's enrollment was increasing rapidly.

221.    During the Company's August 8, 2018 earnings call, Defendant Bachus stated: "Revenue exceeded our expectations in the second quarter of 2018 primarily due to higher enrollment [at New GCU] and higher ancillary revenues."

222.    In the Company's Q2 2018 10-Q, the Company stated that "Net revenues increased … primarily due to the enrollment growth [at New GCU] and due to an increase in ancillary revenues resulting from the increased traditional student enrollment at [New] GCU." This statement was substantially repeated in the Company's Q3 2018 10-Q and its 2018 10-K.

223.    During the Company's November 8, 2018 earnings call, Defendant Mueller stated: "The increase year-over-year in comparable service fee revenue was due to an increase in [New] GCU's enrollment and an increase in GCU's ancillary revenue resulting from increased traditional student enrollment." Defendant Mueller substantially repeated his statements that GCE's "increase . . . in . . . service fee revenue was due to an increase in [New] GCU's enrollment" in the Company's February 20, 2019 earnings call.

224.     During the Company's May 7, 2019 earnings call, Defendant Mueller stated: "The increase year-over-year in comparable and as adjusted revenue was primarily due to our Orbis acquisition on January 22, 2019, and the increase in [New] GCU enrollments between years." Defendant Mueller substantially repeated this statement during the Company's August 6, 2019 and November 6, 2019 earnings calls.

225.     In the Company's Q1 2019 10-Q, the Company stated: "The . . . increase year over year in comparable service fee revenue was primarily due to our Orbis Education acquisition on January 22, 2019 and an increase in [New] GCU enrollments between years . . . ."  The Company substantially repeated this statement in its Q2 2019 10-Q and its Q3 2019 10-Q.

226.     The statements that GCE's revenues were increasing "primarily" due to enrollment growth at New GCU were false and misleading because they omitted the highly material fact that, in reality, as discussed above in Section V.E.6, GCE's revenues increased primarily due to the fact that its employees, under the guise of being New GCU employees, began to engage in abusive recruitment strategies, admitting students that were academically unqualified and students that would be unlikely to be able to repay their student loans to boost revenues.

## IX.    ADDITIONAL ALLEGATIONS OF SCIENTER

227.     A host of facts, including and in addition to those discussed above, support a strong inference that Defendants Mueller and Bachus knew, or, at minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false or misleading representations to investors.

228.     The DOE Repeatedly Indicated To Defendants Mueller And Bachus That It Had Significant Concerns About The Company's Application.  On May 17, 2018, Donna Mangold from the DOE's Office of the General Counsel wrote to the Company's counsel with "additional requests for information regarding the Department's pre-acquisition review on the [Conversion]."

The letter requested information regarding "any appraisals, valuations, valuation summaries, or valuation reviews obtained or commissioned by any party to the Transaction for purposes of valuing the Transaction," "the "members of [New GCU's] Board from incorporation to present," "all personal or business relationships among any member of [New GCU's] Board and … *any* executive officer of GCE" (emphasis in original), among other information.  After the Company received these communications, Defendants Mueller and Bachus met with analysts on June 11, 2018, and informed them (without disclosing the new substantive communications with the DOE) that, contrary to the Company's previous statements that it would await DOE approval before closing the Conversion, "DOE approval is NOT required in advance to close the transaction. Accreditor approval (already received) was the primary regulatory hurdle."  Defendant Mueller attributed the DOE's delay instead to his claim that the DOE was "understaffed."

229.    On July 3, 2018, the DOE again requested information from the Company in connection with the Conversion, including requests for "[a]udited financial statements for the two most recently completed fiscal years for both the institution and the new owner" and "a copy of the default management plan."  Defendant Mueller responded to this letter on July 10, 2018.  On August 24, 2018, the DOE propounded sixteen additional requests regarding the Conversion to the Company, including requests for an "audited same-day balance sheet," "a copy of the final agreement by which the [Conversion] was consummated," and "all valuation relating to the transaction . . . ."  On August 31, 2018, Defendant Mueller responded to this letter.  On September 10, 2018, the DOE again propounded requests for information to the Company, including requesting a "narrative" explaining how the structure of the Conversion "warrants recognizing the institution's conversion to nonprofit status for purposes of . . . Title IV . . . ."  The Company's counsel responded to the letter on October 1, 2018.

230.    Beginning in July of 2018, the Company in its filings with the SEC—which were certified by Defendants Mueller and Bachus—began to describe the pre-acquisition review as "voluntary."  The facts that the Company repeatedly received requests for voluminous amounts of information from a government agency whose blessing of the Conversion was of critical importance, that Defendant Mueller responded to these letters, and that the Company changed its characterization of DOE approval after the receipt of these letters, each supports a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that the Company risked the DOE denying its application for non-profit status—thereby making their statements on these subjects knowingly or recklessly false and materially misleading when made.

231.    <u>The Conversion Was Negotiated At The Highest Levels Of The Company</u>.  The terms of the Conversion were negotiated by and known to the highest-level executives at the Company, including Defendants Mueller and Bachus.  In announcing the Company's renewed pursuit of the Conversion on January 5, 2018, the Company filed with the SEC on Form 8-K the basic terms of the transaction, including that "[t]he Company and New GCU would enter into a long-term master services agreement."  The 8-K was signed and certified by Defendant Bachus.  Similarly, on the fourth quarter 2017 earnings call on February 21, 2018, Defendant Mueller indicated that the Conversion contemplated "[New] GCU to enter into a shared services agreement with the company . . . .  [T]he proposed transaction would involve . . . the company … sell[ing] to new GCU academic and related operations and assets sufficient for new GCU to achieve status as an HLC accredited institution."  Defendant Mueller further noted, among other details of the Conversion, that the "revenue share between the 2 entities remains subject to completion of a transfer placing study and subsequent negotiation."  That Defendants Mueller and Bachus repeatedly discussed and demonstrated familiarity with the terms of the Conversion supports a

strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that the Conversion was entered into in order to use New GCU as an off-balance sheet entity to which it funneled expenses while recognizing revenues generated by New GCU—thereby making their statements on these subjects knowingly or recklessly false and materially misleading when made.

232.   Defendants Mueller And Bachus Knew That The Conversion Primarily Benefited GCE, Not GCU—Thus Violating "The Most Basic Tenet Of Non-Profit Status."  Pursuant to the DOE's demands, the Company provided the DOE with copious non-public documents over the course of the DOE's nearly two-year review of GCE's request, including the Barclays Report, the Barclays Update, and the Deloitte Report.  Each of these reports was reviewed by GCE's Board of Directors, on which Defendant Mueller sat.  Defendant Bachus had particular expertise in and understanding of these non-public reports given his prior employment as a financial auditor at Deloitte & Touche LLP.  As demonstrated by the DOE's discussion of these voluminous, non-public documents in the DOE Letter and analysis pursuant to IRS regulations, these documents showed that the Conversion plainly failed to meet "the most basic tenet" of non-profit status and that the "primary purpose of the MSA" was to "drive shareholder value for GCE with [New] GCU as its captive client—potentially in perpetuity."  That the Company commissioned non-public documents that disclosed that the Conversion primarily benefited GCE, not New GCU, that Defendants Mueller and Bachus reviewed these documents, and that Defendant Bachus had particular expertise in the subject matter of the documents supports a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that the Conversion primarily benefited GCE, not New GCU, and thus that New GCU was not a non-profit

entity—thereby making their statements on these (and related) subjects knowingly or recklessly false and materially misleading when made.

233.    The Conversion Was Fundamentally Important To And Transformed The Company.  The Conversion went to the core of GCE's business and business model.  The MSA and other contractual arrangements between GCE and New GCU fundamentally changed the nature of the Company.  Indeed, in the Company's 2018 10-K, which it filed with the SEC on February 20, 2019, the Company specifically explained that "[o]ur business and structure have changed in important ways" and that "[a]s a result of the [Conversion], various aspects of the Company's operations have changed in important ways," stating: "The Company no longer owns and operates a regulated institution of higher education, but instead provides a bundle of services in support of university clients."  Given its importance to the fundamental nature of GCE, its revenue sources (current and projected), its profit margins, its liabilities, and its CapEx budget, the Conversion was discussed in every major filing the Company made with the SEC from its announcement until its consummation.  Moreover, updates regarding the Conversion—including the Company's renewed pursuit of the Conversion and the consummation of the transaction—were discussed in filings with the SEC on Form 8-K.  The Conversion's centrality to the Company's operations supports a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that the Conversion was entered into in order to use New GCU as an off-balance sheet entity to which it funneled expenses while recognizing revenues generated by New GCU—thereby making their statements on these subjects knowingly or recklessly false and materially misleading when made.

## X.    LOSS CAUSATION

234.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This

artificially inflated the price of Grand Canyon common stock and operated as a fraud or deceit on the Class. When the truth concealed by Defendants' prior misrepresentations and omissions was disclosed to the market on November 6-7, 2019, and January 28, 2020, the price of Grand Canyon common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Grand Canyon common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws

235.    Neither of the individual revelations discussed above was individually sufficient to fully remove the artificial inflation from Grand Canyon's stock price, because each only partially revealed the risks and conditions that were concealed from or misrepresented to investors. Moreover, as explained above, the corrective impact of the November 6, 2019 disclosure was tempered by Defendants' continued reassuring statements and failure to fully disclose the truth.

236.    The disclosures that corrected the market prices of the Company's securities to reduce the artificial inflation caused by Defendants' materially false and misleading statements and omissions are detailed below and summarized in the following chart, which identifies each corrective disclosure event, the price declines in the Company's common stock resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on each event date:

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 11/06/19 (11/07– 11/08) | After market close, Defendants disclosed that DOE has rejected their application for non-profit status of GCU. Then, on November 7, 2019, before market open, Defendants filed a Form 8-K detailing that | $84.89 | -7.61% | +.60% |

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| | the DOE had rejected New GCU's application for non-profit status. | | | |
| 01/28/20 (1/28) | Before market open, Citron Research published its report on the Company, "The Educational Enron: The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings." | $84.07 | -8.12% | +1.01% |
| *Date of stock price drop in parentheses* | | | | |

237.    The declines in Grand Canyon's stock price were a direct and proximate result of Defendants' scheme being revealed to investors and to the market.  The timing and magnitude of Grand Canyon's stock price declines negates any inference that the economic losses and damages suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Grand Canyon-specific facts unrelated to Defendants' fraudulent conduct.

## XI.    CLASS ACTION ALLEGATIONS

238.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Grand Canyon during the Class Period.  Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Grand Canyon and their families and affiliates.

239.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 14, 2020, Grand Canyon had 48,165,704 shares of common stock outstanding.

240.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants misrepresented and/or omitted material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)    Whether the price of Grand Canyon common stock was artificially inflated;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

241.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

242.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

243.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## XII.    PRESUMPTION OF RELIANCE

244.    At all relevant times, the market for Grand Canyon common stock was an efficient

market for the following reasons, among others:

(a)    Grand Canyon met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Grand Canyon filed periodic public reports with the SEC;

(c)    Grand Canyon's average weekly turnover as a percentage of shares outstanding was approximately 4.19%;

(d)    On average, approximately 2 million Grand Canyon shares were traded each week during the Class Period;

(e)    Grand Canyon was eligible to utilize Form S-3 throughout the Class Period;

(f)    Grand Canyon regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(g)    Grand Canyon was followed by several securities analysts employed by major brokerage firms, including BMO Capital Markets, Piper Jaffray, Barrington Research Associates, and Baird and Co, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

245.    As a result of the foregoing, the market for Grand Canyon common stock promptly

digested current information regarding Grand Canyon from all publicly available sources and

reflected such information in the price of Grand Canyon stock.  Under these circumstances, all

purchasers of Grand Canyon common stock during the Class Period suffered similar injury through

their purchase of Grand Canyon common stock at artificially inflated prices and the presumption

of reliance applies.

246.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' withholding of material information regarding Grand Canyon's relationship with New GCU as a purported non-profit and independent entity, including critical information that was requested by the DOE during its review process, and Grand Canyon's subsequent revenue and earnings growth as a third-party service provider, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Conversion of New GCU and Grand Canyon's revenue and earnings as a third-party service provider, as demonstrated above, that requirement is met here.

## XIII.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

247.    Grand Canyon's "Safe Harbor" warning accompanying its forward-looking statements made during the Class Period were ineffective to shield those statements from liability.

248.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Grand Canyon who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XIV.   CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5
### Against All Defendants

249.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if
fully set forth herein.

250.    During the Class Period, Defendants carried out a plan, scheme, and course of
conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing
public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead
Plaintiffs and other members of the Class to purchase Grand Canyon common stock at artificially
inflated prices.

251.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made
untrue statements of material fact and/or omitted to state material facts necessary to make the
statements not misleading; and (iii) engaged in acts, practices, and a course of business which
operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort
to maintain artificially high market prices for Grand Canyon common stock in violation of Section
10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

252.    Defendants, individually and in concert, directly and indirectly, by the use, means,
or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a
continuous course of conduct to conceal adverse material information about the Company's
financial well-being, operations, and prospects.

253.    During the Class Period, Defendants made the false statements specified above,
which they knew to be or recklessly disregarded the truth that they were false and misleading in
that they contained misrepresentations and failed to disclose material facts necessary in order to

87

make the statements made, in light of the circumstances under which they were made, not misleading.

254.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Grand Canyon's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

255.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Grand Canyon common stock. Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Grand Canyon common stock had been artificially inflated by Defendants' fraudulent course of conduct.

256.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

257.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

258.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

259.    Defendants Mueller and Bachus acted as controlling persons of Grand Canyon within the meaning of Section 20(a) of the Exchange Act.

260.     By virtue of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Grand Canyon's day-to-day operations during the Class Period, Defendants Mueller and Bachus had the power to and did control and influence the decision-making of the Company and the conduct of Grand Canyon's business, including the wrongful conduct complained of herein. Defendants Mueller and Bachus were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Lead Plaintiffs allege to be materially false and misleading.  Moreover, these Defendants had a duty to disseminate accurate and truthful information regarding Grand Canyon's operations to correct any previously issued statements that had become untrue so that the market price of Grand Canyon securities would be based upon truthful and accurate information.

261.     In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Mueller and Bachus had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations as alleged herein. Defendants Mueller and Bachus were also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Grand Canyon during the Class Period.  Further, as detailed above, Defendants Mueller and Bachus had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.  As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Grand Canyon within the meaning Section 20(a) of the Exchange Act.

262.    As a direct and proximate cause of Defendants Mueller's and Bachus's wrongful conduct as set forth in this Count, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Grand Canyon common stock during the Class Period.

263.    By virtue of their positions as controlling persons of Grand Canyon and as a result of their own aforementioned conduct, Defendants Mueller and Bachus, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVI.    JURY TRIAL DEMAND

264.    Lead Plaintiffs demand a trial by jury.

DATED:    October 20, 2020

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Hannah G. Ross
Katherine M. Sinderson (pro hac vice)
Michael M. Mathai (pro hac vice)
Benjamin W. Horowitz (pro hac vice)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
katiem@blbglaw.com
michael.mathai@blbglaw.com
benjamin.horowitz@blbglaw.com

*Counsel for Lead Plaintiffs*
*and the Lead Counsel for the Class*

**BARRACK, RODOS & BACINE**

Jeffrey W. Golan (pro hac vice)
Jeffrey B. Gittleman (pro hac vice)
Chad A. Carder (pro hac vice)
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
jgittleman@barrack.com
ccarder@barrack.com

*Counsel for Lead Plaintiffs*
*and Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

        /s/ Gregory V. Varallo
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
greg.varallo@blbglaw.com

*Counsel for Lead Plaintiffs*
*and the Lead Counsel for the Class*

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**

Aaron L. Castle (pro hac vice pending)
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Lead Plaintiffs*
*Oakland County Employees' Retirement*
*System and Oakland County Voluntary*
*Employees' Beneficiary Association Trust*

# Exhibit A



November 6, 2019

<u>UPS Tracking #</u>
1ZA879640294525311

Mr. Brian Mueller
President
Grand Canyon University
3300 West Camelback Road
Phoenix, AZ  85017

**Re:    Review of the Change in Ownership and Conversion to Nonprofit Status of Grand Canyon University (OPE ID 00107400)**

Dear Mr. Mueller:

At your request, the U.S. Department of Education ("Department"), Federal Student Aid has conducted a review of the change in ownership application for Grand Canyon University, OPEID 00107400 ("Institution" or "GCU").

Prior to July 1, 2018, GCU was owned and operated by Grand Canyon Education, Inc. ("GCE"), a Delaware publicly traded corporation.  By way of a July 1, 2018 Asset Purchase Agreement ("APA"), GCE sold its School Assets (as set forth in APA at Recital B and as defined in APA §2.1) to Gazelle University ("Gazelle"), an Arizona nonprofit corporation ("the Transaction"). Gazelle and GCE are hereinafter collectively referred to as the "APA Parties."[1]  Prior to the Transaction, Gazelle was granted tax-exempt status by the Internal Revenue Service.  GCU seeks approval of its change in ownership and request to convert to nonprofit status for purposes of its participation in Title IV, HEA programs.  Although the parties had requested the Department to conduct a pre-acquisition review, the Transaction closed on or about July 1, 2018, prior to completion of the Department's pre-acquisition review.   This letter constitutes the Department's post-closing decision on the change in ownership ("CIO") and requested change of status from proprietary to nonprofit.

Following the closing of the Transaction, GCU timely submitted a materially complete application and other documentation to satisfy the regulatory requirements set forth at 34 C.F.R. § 600.20(g) and (h).  GCU has also submitted additional documentation and information as

---

[1] After the Transaction, Gazelle changed its name to Grand Canyon University.  In documents submitted to the Department, Gazelle has also been referred to as "GCU" and the "New GCU."  To avoid confusion, the Department will refer to the APA Parties as "Gazelle" and "GCE," based on the names used in the introductory paragraph of the APA: "Gazelle University" (the purchasing entity) and "Grand Canyon Education, Inc." (the selling entity).  The sole member of Gazelle is Grand Canyon Foundation.

Federal **Student** Aid
An OFFICE of the U.S. DEPARTMENT of EDUCATION
Federal Student Aid, Multi-Regional and Foreign School Participation Division
830 First Street NE, Union Center Plaza, 7th Floor, Washington, DC 20202-5340
www.FederalStudentAid.ed.gov

Grand Canyon University (OPE ID 00107400)
Page 2 of 18

requested by the Department during its review.[2]  A temporary provisional program participation
agreement ("TPPPA") was issued to GCU on August 20, 2018, and GCU has been participating
on a month to month basis since September 1, 2018.

## I.    BACKGROUND ON THE TRANSACTION

### A. Overview of the APA

Pursuant to the APA, Gazelle purchased the School Assets,[3] which included Campus Property,
certain Personal Property, Assumed Contracts, Course Materials and intellectual property
embodied in the Course Materials and other identified intellectual property, and other assets, as
listed in APA §2.1.  Under APA §2.2, Services Assets remained the property of GCE, and
include assets not listed in APA §2.1 or the related schedules, Retained Property (including
GCE's headquarters building at 2600 West Camelback Road), and other assets (including cash
and cash equivalents) as further described in APA §2.2.

APA §2.3 identifies the liabilities assumed by Gazelle ("Assumed Liabilities") and APA §2.4
identifies the liabilities that are not assumed by Gazelle ("Excluded Liabilities").  Significantly,
the APA purports to insulate Gazelle from assuming Liabilities arising under Educational Laws.

The Purchase Price for the Transaction includes the assumption of the Assumed Liabilities, and
payment of the Base Purchase Price ($853,068,386.00 "plus []$1.00") and the Invested Amount.[4]
APA §3.1. The Base Purchase Price was paid by Gazelle's delivery of the Senior Secured Note
and Credit Agreement ("CA").  APA §3.2. Notably, the lender for the Transaction is GCE.  The
loan is secured by a first lien on all of Gazelle's property and the property of all of Gazelle's
subsidiaries, which are also guarantors of the loan.  CA § 7.12, CA § 7.13.  GCE also provides
funding for Gazelle's operations under the Credit Agreement.  CA § 2.01.

### B. Overview of the Master Services Agreement

As part of the Transaction, the APA Parties also entered into a Master Services Agreement
("MSA") pursuant to which GCE provides Services to Gazelle/GCU and Gazelle/GCU pays a
part of its revenues to GCE.  Exhibit B to the MSA describes the Services that GCE provides to
Gazelle.  Gazelle further agreed that GCE is the exclusive provider (during the Term of the
MSA) of certain services, identified in the MSA as "Exclusive Services," for which Gazelle
agrees it will not contract with any third party absent GCE's approval (which is subject to GCE's
sole discretion).  MSA §3.1. The Exclusive Services are the following:  Marketing (MSA Exh. B

---

[2] Some information in this letter is shaded in grey as a result of the APA Parties' designation of that
information as confidential, consistent with the Department's directions when it requested documents
from the APA Parties.

[3] Words capitalized herein but not defined have the meaning set forth in the APA and/or the Master Services
Agreement entered into as part of the Transaction.

[4] At closing, Gazelle paid an additional $17 million, rounded, representing amounts contributed to, or paid
by, GCE in connection with GCU in the two months prior to the closing of the Transaction. *See* Purchase
Price Adjustment Certificate.

Grand Canyon University (OPE ID 00107400)
Page 3 of 18

§1); Enrollment Services and Budget Consultations (MSA Exh. B §2); Student Support Services Counseling (MSA Exh. B §3); and Technology (MSA Exh. B §12). The non-exclusive services are the following: Document Intake (MSA Exh. B §4); Student Records Management (MSA Exh. B §5); Curriculum Services (MSA Exh. B §6); Accounting Services (MSA Exh. B §7); Financial Aid Services (MSA Exh. B §8); Procurement Services (MSA Exh. B §9); Audit Services (MSA Exh. B §10); Human Resources (MSA Exh. B §11); Business Analytics Services (MSA Exh. B §13); Faculty Operations (MSA Exh. B §14); and Compliance Monitoring and Audits (MSA Exh. B §15). The MSA provides that GCE shall at all times provide at least three services in addition to Enrollment Services. MSA Exh. B (introductory paragraph). However, even if services are provided by a third party, Gazelle is still obligated to pay GCE its Services Fees described in MSA §5. *See* MSA §3.1. GCE also has the right to subcontract any of the services, as described in MSA §3.2.

Pursuant to MSA §5.1, the Services Fee is determined and paid in accordance with MSA Exhibit D which provides that Gazelle is required to pay GCE a fee that is equal to 60% of Gazelle's Adjusted Gross Revenue (excluding charitable contributions or other gifts used for purposes other than payment of tuition and fees for students).[5] Adjusted Gross Revenue consists of all revenue (net of refunds and scholarships accounted for as a discount to tuition) received by Gazelle or its Affiliates from the following sources:

  (a) Tuition (including tuition funded by third party sources and charitable contributions;
  (b) Fee revenue from students for use of the online communications portal ("the Platform");
  (c) Fee revenue from students and their related activities
  (d) Fee revenue from students for use of the Canyon Connect learning resources platform;
  (e) Fee revenue from students for student housing;
  (f) Fee revenue from students for meal plans and other food services; and
  (g) Other revenue including revenue from: (i) sales of athletic tickets; (ii)the operation of the Grand Canyon University Hotel and Conference Center; (iii) the operation of the Maryvale Golf Course; (iv) the operation of the Grand Canyon University Arena; and (v) the operation of Canyon Enterprises (apparel sales and other businesses).

MSA Exh. D §1. The MSA does not provide any cap on the total amount of the Services Fee that must be paid to GCE in any year or cumulatively over the years.

Although the Services Fee is subject to review and adjustment pursuant to Exh. D §2(b), the first Optional Adjustment Date does not occur until the tenth anniversary of the Effective Date, and thereafter occurs on the first date of each Renewal Term (*i.e.,* at five-year increments thereafter). Exh. D at 2(b) and (c), and MSA §6.1. The Initial Term of the MSA is 15 years, with automatic renewals thereafter for successive five years terms ("Renewal Term") apparently in perpetuity. MSA §6.1. Either party can elect not to renew at the end of the Initial Term or any Renewal Term, but if Gazelle exercises that right, on the last day of such term it must pay GCE a Non-Renewal Fee equal to 50% of the aggregate Services Fees paid or payable for the trailing twelve month period ended as of the end of the immediately preceding month. MSA §6.2 and MSA

---

[5] The Services Fee is exclusive of all Tax, such that Gazelle must "pay and be liable for any and all Tax imposed on, sustained, incurred, levied and measured by the cost, value or price of the Services" provided under the MSA. MSA §7.1.

Grand Canyon University (OPE ID 00107400)
Page 4 of 18

Exh. A at A-5 (definition of Non-Renewal Fee).  Although Gazelle has the right to terminate the MSA during the Initial Term, it must give notice 18 months in advance, and cannot elect do so before July 1, 2025 (seventh anniversary) or the date by which the Senior Secured Note is paid in full – whichever is later.  MSA §6.3.  If Gazelle exercises that right, on the effective date of termination it must pay GCE an Early Termination Fee equal to 50% of the aggregate Services Fees paid or payable for the trailing twelve-month period ended as of the end of the immediately preceding month.  MSA §6.3 and MSA Exh. A at A-3 (definition of Early Termination Fee).  The MSA may be terminated as a result of a Performance Failure (subject to notice and cure) only if the breach in performance has a materially adverse effect on the Non-Defaulting Party or its business.  MSA §6.4.[6]

The MSA provides Gazelle with the right to assume Back Office Services (defined in MSA Exh. A at A-2 as Accounting Services, Financial Aid Services, Human Resources and Technology[7]), and if it does, Gazelle and GCE agree to negotiate an adjustment to the Services Fee to account for any transfer of costs.  MSA §6.9.  But the MSA requires Gazelle to assume those Back Office Services directly, so that it cannot retain any other service provider to perform the Back Office Services.  MSA §6.9.  By way of example only, this would preclude Gazelle from retaining an outside payroll provider if it assumed Accounting Services, despite the fact that GCE performs payroll services through a third-party payroll provider.  *See* MSA Exhibit B §7.1.

## II.    REPORTS

The Department has also been provided with several reports and valuations that were commissioned to support the Transaction, including reports from Barclays Capital Inc. ("Barclays") and Deloitte Tax, LLP ("Deloitte).

### A.  Barclays

The report from Barclays ("the Barclays Report") is dated April 26, 2018 and entitled "Project Gazelle."  It is marked "Preliminary/Subject to further review, diligence and revision."  The Barclays Report describes the contents of the report as containing "material that was provided to the Board of Directors … of Gazelle [identified as 'the Company']."[8]  On August 29, 2019,

---

[6] The MSA limits GCE's liability for any claim (other than one related to Confidentiality or Intellectual Property Rights, or based on GCE's gross negligence or willful misconduct) to the amount paid by Gazelle to GCE in the most recently completed three month period, and Gazelle "releases and waives any claim against GCE in excess of such amount, to the extent permitted by Applicable Law." MSA §11.

[7] "Technology" is designated as both a Back Office Service (MSA Exhibit A at A-2) and one of several Exclusive Services (MSA Exhibit B §12, identified with an *).

[8] While the Barclays Report states that it was prepared for/ provided to the Board of Directors of Gazelle (cover and at 1), Barclays was engaged by GCE and provided its analysis to the GCE Board as set forth in various places in GCE's board minutes.  For example, both the November 21, 2017 and December 6, 2017 board minutes note the engagement of Barclays as GCE's "financial advisor." On February 21, 2018 the GCE Board and representatives of Barclays discussed how Barclays could best help the Board, and the potential merits and risks of the Transaction or "remaining as a for profit education company."  *See*

4

Grand Canyon University (OPE ID 00107400)
Page 5 of 18

Jonathon Glass, (counsel for GCU) provided the Department with a "follow-on" report from Barclays which was provided to the board of GCE "to confirm certain information in the final days before the transaction closed ("Barclays Update")."[9]

The Barclays Report reviews the strategic options available to GCE, including separation of the Institution and GCE, with GCE as the services provider as an alternative to the status quo. One of the considerations Barclays notes in regard to separation is "significant concentration of revenue for GCE and reduced influence over University." Barclays Report at 14. The Barclays Report provides a side-by-side comparison of the Institution's operating costs in 2019 based on two different assumptions – (1) GCE continues to own the Institution and incurs the costs to operate the Institution or (2) the Transaction closes, and Gazelle is required to hire GCE to perform some of the operational activities. *See* Barclays Report at 33. The comparison shows that under the planned separation (and as effectuated on July 1, 2018) the costs to operate the separated Institution increase from $810 Million to $1.496 Billion for fiscal year 2019, solely as a result of the Service Fees paid to GCE. Barclays Report at 33. The increase is not because GCE will be providing new or additional services, but solely because the MSA requires Gazelle to pay GCE the Services Fee.[10]

Although the Barclays Report (dated April 26, 2018) assumes a 65%/35% revenue split on most items, and a different split on housing (20%/80%), meals (5%/95%) and Canyon Connect (5%/95%), the executed MSA provides for a straight 60%/40% split and includes sources of revenue that are not included in the Barclays Report, including revenue from Gazelle Arena. These differences would seem to only exacerbate Barclays' assessment that the separation of the servicing functions from the Institution will result in a significant increased cost for the operation of the Institution, with those increased funds flowing to the benefit of its prior owner, GCE. Under the assumptions in the Barclays Report, the Services Fees under the MSA (estimated at $697 million for fiscal year 2019), *see* Barclays Report at 33, are a 67% markup on GCE's $416 million costs of performance. No evidence has been presented to the Department that would suggest that the services provided post-Transaction would be markedly different or more

---

February 21, 2018 GCE Board Minutes at 2. The Barclays Report was provided to the GCE Board and discussed at the meeting held on April 26, 2018. *See* April 25-26, 2018 Minutes at 3. This is consistent with references in the Barclays Report to the Company's "shareholders." By contrast, the Gazelle board minutes do not reflect any discussion of the Barclays Report, and it is not clear whether the Barclays Report was provided to the Gazelle board prior to the approval of the Transaction.

[9] In his August 29th e-mail transmitting the Barclays Update, Mr. Glass explained that the Gazelle/GCU board "did not see or receive the [Barclays Update] until following up with GCE re [the Department's August 26, 2019] request." The Barclays Update was discussed with the GCE Board at its June 20, 2018 meeting. *See* June 20, 2018 GCE Board Minutes at 3-4.

[10] The cost for GCE's services is particularly high considering that GCE is not even performing the entirety of the operational activities that were previously performed at a cost of $810 million. Some services are performed by Gazelle.

Grand Canyon University (OPE ID 00107400)
Page 6 of 18

expensive to provide.[11]  Once the Services Fees are added, GCE will incur 28% of total expenses ($416,000,000 of $1,496,000,000) and Gazelle will incur 72% of total expenses ($1,080,000,000 of $1,496,000,000), as can be extrapolated from the information contained in the report:

| OPERATING EXPENSE SPLIT POST-TRANSACTION | | | |
|---|---|---|---|
| Expenses in Millions $ | Total | GCE Share under MSA | Gazelle Share as Owner under MSA |
| Instructional | 476 | 105 | 371 |
| Marketing & Promotional | 125 | 125 | 0 |
| Admissions Advisory | 149 | 149 | 0 |
| General & Administrative | 49 | 37 | 12 |
| **Subtotal** | **799** | **416** | **383** |
| **Share %** | **100%** | **52%** | **48%** |
| Gazelle Fees under MSA Agreement | 697 | 0 | 697 |
| **Total** | **1496** | **416** | **1080** |
| **Share %** | **100%** | **28%** | **72%** |

*See* Barclays Report at 33 (source of information for the above chart).

### B. Deloitte

Perhaps trying to circumvent the somewhat obvious conclusion that under the MSA the Institution costs an additional $697 Million to operate in the first fiscal year, the parties have also provided the Department with a Transfer Pricing Report for the Fiscal year ending December 31, 2018, which was prepared by Deloitte ("Deloitte Report").  Deloitte performed an "Economic Profit Split" ("EPS") analysis in connection with the services provided by GCE to Gazelle during the 15 year period "beginning with fiscal year ending December 31, 2018," and the transfer of certain intangible assets and license of the technology platform from GCE to Gazelle during FY 2018.  Deloitte Report at 1.  An EPS is an analysis of what each party to a common economic enterprise contributes to revenue-generating activities.  Deloitte Report at 1.  The Department was provided with two Deloitte Reports, one clearly marked "Draft" and a virtually identical version.  Neither version is signed, identifies the person(s) responsible for the report's conclusions, nor provides an affirmation from an appropriate person that the report has been prepared according to the applicable standards.  However, the Department has confirmed with counsel for GCU that the version of the Deloitte Report that is not marked as a draft is the final version of the report.

---

[11] For purposes of this analysis, the Department assumes that the payments owed to GCE under the Credit Agreement are fair value.  When those payments are included in the analysis, GCE receives 95% of Gazelle's revenue.

Grand Canyon University (OPE ID 00107400)
Page 7 of 18

The first step in Deloitte's EPS analysis was to identify the "assets and activities" of the enterprise that generate revenue. *Id.* at 1. Based "on fact finding discussions with key management personnel" – which at the time would have consisted solely of GCE's management – Deloitte found that the Institution generates revenue from seven activities.[12] Deloitte concluded that virtually all of the Institution's revenue-generating activities are those that will be wholly or partially performed by GCE under the MSA. *Id.* at 19-30. Because Deloitte was working from a prior draft of the MSA, its conclusion in this regard is not accurate. *See* discussion below regarding revenue from the arena, athletic tickets, etc.

Significantly, Deloitte did not identify the Institution's physical campus as revenue-generating, which is at odds with statements made by GCE to its shareholders. Notwithstanding the campus facilities' undeniable contribution to revenue, Deloitte did not consider it as a revenue-generating asset. According to GCE's 2017 Annual Report to shareholders, one of the competitive factors in the post-secondary education market is "the quality of the ground campus facilities." GCE 2017 Annual Report at 15. In fact, GCE told its shareholders that one of the primary factors for its revenue increase in 2017 was due to "ancillary revenues resulting from the increased traditional student enrollment (e.g. housing, food, etc.)" and that a higher percentage of its students were residing on campus. *Id.* at 48. GCE noted that its campus was also valuable to "provide our online students, faculty, and staff with a sense of connection to a traditional university." *Id.* at 14. To continue increasing revenues, GCE planned to enhance the reputation of the ground campus by expanding campus infrastructure. *Id.* at 14. According to the figures provided in the Barclays Report, over 27% of the Institution's tuition revenue is from on-campus students. *See* Barclays Report at 33.

According to Deloitte, the next step in the EPS analysis was to identify risks associated with the revenue-generating activities and assets and determine which party: contractually assumes the risk; encounters upside or downside consequences of the risk; controls the risk; mitigates the risk; and has the financial capacity to assume the risk. Deloitte Report at 5-6. Deloitte identified several risks associated with the seven revenue-generating activities it considered. Those risks include negative perception of marketing campaigns, failure to develop course content that will prepare students to complete the course work, failure to attract prospective students, software bugs, inability to recruit and hire effective faculty, and workplace injuries, among others. *Id.* at 26-30. In each instance, the Deloitte Report simply notes that the fixed costs are borne by both GCE and the Institution, and that both face risks related to the various functions. However, the Deloitte Report wholly fails to assess which party assumes these risks, encounters upside or downside consequences of these risks, controls these risks, mitigates these risks, or has the financial capacity to assume these risks. As the Deloitte Report states, this failure renders Deloitte's EPS analysis "incomplete." *Id.* at 5.

The principal focus of the Deloitte Report is the risk of fixed costs, defined as costs that do not vary with the quantity of services provided. *Id.* at 1, 33-35. Deloitte claims that the party assuming fixed costs assumes greater risk justifying a greater share of profits. *Id.* at 5. Although this information is not detailed in the report, Deloitte apparently determined which costs

---

[12] Based on discussion with "key management personnel," Deloitte concluded that the following functions constituted the "key value creating drivers": marketing; curriculum development; admissions advisory; IT and technology; back-office support; faculty services; and Executive Leadership. Deloitte Report at 19.

Grand Canyon University (OPE ID 00107400)
Page 8 of 18

associated with the seven revenue-generating activities were fixed costs and what share of fixed costs Gazelle and GCE were contractually obligated to pay. *Id.* at 33. Nowhere does the Deloitte Report identify the specific costs Deloitte deemed fixed, let alone provide any analysis supporting the conclusion as to which party is responsible for paying such costs. Instead, the Deloitte Report simply states that GCE is responsible for paying approximately $270 million in fixed costs for the seven revenue-generating activities and that Gazelle is responsible for paying approximately $164 million. Deloitte Report at 36. The Deloitte Report is wholly devoid of any information that would allow the Department to assess the accuracy or reasonableness of this conclusion.

The Deloitte Report also appears to give significant weight in its determination of fixed costs to its consideration of off-balance sheet assets ("OBSA"). Deloitte apparently considered historic trial balance sheet financial data (from FY 2013 through FY 2017) to "capture any fixed costs incurred in the past accounting period that are tied to the revenue generated in FY 2017. These are the costs that generate OBSAs." Deloitte Report at 32. Presumably, because all of those earlier costs were incurred during the years prior to the separation, Deloitte's calculation of fixed costs gives GCE – and not Gazelle – the benefit of those historical costs that were incurred before the services function was separated on July 1, 2018.

GCE has recognized that an important competitive factor in the post-secondary education market is "qualified and experienced faculty." 2017 Annual Report at 15. As GCE described it, the high quality of the Institution's faculty contributed to student retention and was "critical" to the Institution's success. *Id.* at 6, 9. Although Deloitte included "faculty services" as one of the seven "key value driving factors," it is unclear how it evaluated the faculty's contribution to revenue generation or risks related thereto, given that Gazelle is responsible for most of the costs of "Instructional Cost and Services" (i.e.,. $371 Million for Gazelle and $105 Million for GCE). *See* Barclays Report at 33. The Deloitte Report does not include any discussion of whether or not Gazelle was responsible for fixed-cost risk in connection with the Institution's faculty.

In addition, because the Deloitte Report failed to identify the Institution's campus as a revenue-generating asset, it failed to consider the fact that Gazelle is incurring significant fixed-cost risk in connection with the campus. Gazelle owes a lump sum payment to GCE on July 1, 2025 of $853,068,386, which represents the purchase price for the campus. CA §1.01 (defining "Term Loan Commitment" and "Maturity Date") and §2.07(c). Gazelle also owes GCE a monthly interest payment of approximately $4.2 million. *Id.* §1.01 (defining "Applicable Rate" and "Interest Payment Date") and §§2.08 (a) and (f) (interest is payable at the Applicable Rate on each Interest Payment Date).

Despite the fact that the purpose of the Deloitte Report was to determine a reasonable range of remuneration by Gazelle to GCE as a percentage of Gazelle's Adjusted Gross Revenue, the Deloitte Report was premised on the inaccurate assumption that Adjusted Gross Revenue for calculating the Services Fees excluded sales of athletic tickets, operations of Gazelle's hotel and conference center, the operation of the Maryvale golf course, and the operation of Grand Canyon University Arena. *See* Deloitte Report at 3, and at n.4, and at 6. Apparently without considering these sources of revenue and the risks/costs related thereto, Deloitte concluded that the reasonable split is 62%/38% or 63%/37%. Under the executed MSA, all of those sources of revenue are included in calculating the 60% Services Fees. MSA at Exhibit D. In short, the

Grand Canyon University (OPE ID 00107400)
Page 9 of 18

revenue sources Deloitte uses to calculate each parties' percentage contribution to the seven revenue-generating activities identified is based on fundamentally flawed assumptions.

It also bears mentioning that the main opinions in the Deloitte Report do not appear to be based on information that Deloitte independently tested and analyzed on behalf of Gazelle. Rather, those opinions in key areas appear to have been based on information supplied by GCE management.[13] For example, Deloitte states that it identified revenue-generating activities based on "fact finding discussions with key management personnel," that the classification of fixed costs was made "in conjunction with GCE management," and that the calculation of the share of fixed costs Gazelle and GSA would each pay under the MSA was determined by "Deloitte Tax and GCE." *See, e.g.,* Deloitte Report at 19, 33.

## III.    THE DEPARTMENT'S REQUIREMENTS FOR NONPROFIT STATUS

The Department regulations identify certain covered transactions for an instituton that constitute a change in ownership which require the institution to apply for and obtain approval from the Department to continue participating in Title IV, HEA programs. These include instances where an institution is sold, is merged with one or more eligible institutions, experiences a change in the ownership of the controlling stock, has a transfer of assets that comprise a substantial portion of the education business of the institution, or has a change in status as a for-profit, nonprofit, or public institution. 34 C.F.R. § 600.31(d).

To establish eligibility and to continue participation in Title IV, HEA programs, an institution must demonstrate to the Department that, after the change, the institution qualifies to be certified to participate under 34 C.F.R. Part 668, Subpart B pursuant to 34 C.F.R. § 600.31(a)(3)(ii). *See also* 34 C.F.R. § 600.20(g) and (h) (requirements for temporary provisional certification following a change in ownership which results in a change of control).

Because Gazelle seeks to participate in Title IV, HEA programs as a nonprofit institution, it must meet the Department's requirements for that status. The Higher Education Act ("HEA") defines an institution of higher education as "a public or other nonprofit institution." HEA §101(a)(4), 20 U.S.C. §1001(a)(4); HEA §102(a)(1), 20 U.S.C. §1002(a)(1). The Department regulations define a nonprofit institution as an institution that:

  (i)    Is owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual; and

  (ii)   Is legally authorized to operate as a nonprofit organization by each State in which it is physically located; and

---

[13] Although the Deloitte Report indicates at p. 19 that it conducted interviews with "University personnel," it appears to be referring to "management" which it describes as "GCE management."

Grand Canyon University (OPE ID 00107400)
Page 10 of 18

> (iii) Is determined by the Internal Revenue Service to be an organization to which contributions are tax deductible under 26 U.S.C. §501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)).

34 C.F.R. §600.2.[14]

Gazelle, an Arizona nonprofit corporation, now owns GCU, satisfying the "owned by one or more nonprofit" entity requirement of the Department's definition of a nonprofit. Gazelle is also legally authorized to operate a private postsecondary degree-granting institution in Arizona, the only location where GCU is located. Arizona law does not require separate approval to operate as a nonprofit, so GCU meets the requirement of legal authority to operate under subsection (ii) of the Department's definition. *See* April 27, 2018 Letter from the Arizona State Board for Private Postsecondary Education and Arizona Secretary of State Website on Veteran's Charity Organizations (explaining that only Veteran's Charities are required to register). Gazelle has been granted 501(c)(3) status by the IRS, meeting the requirement of subsection (iii) of the definition. *See* November 9, 2015 IRS Letter 947 for EIN 47-2507725.

The remaining issue (*i.e*, whether GCU is operated by a nonprofit and whether its net earnings benefit any private shareholder or individual) requires a review of relevant authority under the Internal Revenue Code and an analysis of the impact of the MSA on the regulatory requirements.

## IV. AUTHORITY UNDER THE INTERNAL REVENUE CODE

The Department's definition of a nonprofit institution mirrors the statutory language for tax exempt organizations found in 26 U.S.C. § 501(c)(3). Under Treasury regulations, the taxpayer has the burden to demonstrate that it is entitled to tax-exempt status pursuant to section 501(c)(3).[15] This includes the requirement for tax exempt entities to meet both an organizational test and an operational test. 26 C.F.R. § 1.501(c)(3)-1(a)(1).

The organizational test requires a nonprofit organization to be organized exclusively for one or more exempt purposes and its articles of organization must: "(a) Limit the purposes of such organization to one or more exempt purposes; and (b) Do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes." 26 C.F.R. § 1.501(c)(3)-1(b). Gazelle's First Amended and Restated Articles of Incorporation are consistent with these limitations.

---

[14] Similarly, the HEA defines a nonprofit entity as having "no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." HEA § 103(13), 20 U.S.C.A. § 1003(13) (West).

[15] 501(c)(3). Rule 142(a)(1), *Tax Court Rules of Practice and Procedure*; *Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 670 F.2d 104, 106 (9th Cir.1981).

Grand Canyon University (OPE ID 00107400)
Page 11 of 18

The focus of the operational test is on the prohibition against private benefit and private inurement, and the related Treasury regulations examine both the primary activities of the organization and its distribution of earnings.[16] *See* 26 C.F.R. § 1.501(c)(3)-1(c)(1)(primary activities) and 26 C.F.R. § 1.501(c)(3)-1(c)(2)(distribution of earnings).  Although there is significant overlap in the analysis of prohibited substantial private benefit under the primary activities test and private inurement under the distribution of earnings test,[17] the prohibition on private benefit encompasses a greater range of activities. *See Am. Campaign Acad. v. C.I.R.,* 92 T.C. 1053, 1068–69 (Tax 1989)("while the private inurement prohibition may arguably be subsumed within the private benefit analysis of the operational test, the reverse is not true. Accordingly, when the Court concludes that no prohibited inurement of earnings exists, it cannot stop there but must inquire further and determine whether a prohibited private benefit is conferred").   Unlike private inurement, private benefit does not necessarily involve the flow of funds from an exempt organization to a related private party, it can also include other benefits from the activities of the exempt organization *to an unrelated party. See P.L.R. 200914063*, 2009 WL 889714 (IRS PLR Apr. 3, 2009) (citing Rev. Rul. 76-206, 1976-1 C.B. 154 which found that an organization formed to promote broadcasting and classical music in the community created a substantial financial benefit to an unrelated for-profit radio station); see also *Capital Gymnastics Booster Club, Inc. v. C.I.R.,* 106 T.C.M. (CCH) 154 (Tax 2013) ("Impermissible benefit to 'private interests' thus encompasses not only benefit to insiders but also benefits that an organization may confer on unrelated or even disinterested persons, *i.e.,* outsiders").

Under the primary activities test, the existence of even one non-exempt purpose, such as creating a private benefit, if substantial in nature, will destroy the organization's exempt status. *See Intl. Postgraduate Med. Foundation v. C.I.R.*, 56 T.C.M. (CCH) 1140, 1989 WL 3808 (Tax 1989)(the existence of a "single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes") (*citing Better Business Bureau of Washington D.C., Inc. v. United States*, 326 U.S. 279 (1945); *Nat. Assn. of American Churches v. Commissioner*, 82 T.C. 18, 28-29 (1984)). As the United States Tax Court stated in *Intl. Postgraduate Foundation,* "[w]hen a for-profit organization benefits substantially from the manner in which the activities of a related organization are carried on, the latter organization is not operated exclusively for exempt purposes within the meaning of section 501(c)(3), even if it furthers other exempt purposes." *Id.*  In concluding that the IRS had properly revoked the petitioner's exempt status, one of the significant findings of the Tax Court was that the owner of the for-profit business "formed the [nonprofit entity] to obtain customers for his tour business."

In looking at payments to a related for-profit enterprise, the focus is on whether "the entire enterprise is carried on in such a manner that the for-profit organization benefits substantially from the operation of the [nonprofit entity]." *Church By Mail, Inc. v. C.I.R.*, 765 F.2d 1387, 1392 (9th Cir. 1985)(citing *Est of Hawaii v. Commr. of Internal Revenue*, 71 T.C. 1067, 1080-81 (Tax

---

[16] The final element prohibits the organization from being involved in political or lobbying activities. 26 C.F.R. § 1.501(c)(3)-1(c)(3).

[17] *See Canada v. Commr. of Internal Revenue*, 82 T.C. 973, 981 (Tax 1984) ("In determining whether these conditions are satisfied, the 'operated exclusively for exempt purposes' and the 'private inurement' requirements often substantially overlap").

Grand Canyon University (OPE ID 00107400)
Page 12 of 18

1979)). Thus, "the purpose and objective to which the income of the [nonprofit entity] is
devoted is the ultimate test in determining whether it is operated exclusively for an exempt
purpose." *Church By Mail*, 765 F.2d at 1392. In *Church by Mail*, the Ninth Circuit found that
the tax court did not err in determining that the church was operated "for a substantial non-
exempt purpose of providing a market" for the printing and mailing services provided by the for-
profit entity, where the employees of the for-profit spent a considerable portion of their time
working on services provided to the church, and where the majority of the church's income was
paid to the for-profit for payments on loan principal, interest, and commissions. 765 F.2d 1391-
92.

Percentage of revenue contractual arrangements can lead to prohibited private benefit, and the
scrutiny is heightened in arrangements where the compensation is based on an uncapped
percentage of revenue. *See* P.L.R. 201235021, 2012 WL 3764677 (IRS PLR Aug. 31, 2012)
("This lack of cap limit entails that [the for profit company] can receive unlimited income that
will more than compensate [the for profit company] for the services [it] renders to you. Thus,
rather than devoting substantially all your income towards a purpose tax-exempt under §
501(c)(3), your income will be inuring to the benefit of [the for profit company]"). An uncapped
percentage as low as 5% of donation receipts has been held to be a prohibited inurement to
private shareholders and individuals. *Id.*; *see Spokane Motorcycle Club v. U.S., 222 F. Supp.*
151, 153-54 (E.D. Wash. 1963)(even a de minimis amount can be an impermissible private
inurement).

## V.    THE DEPARTMENT'S DETERMINATION ON THE REQUESTED CHANGE TO NONPROFIT STATUS

### A. The Impact of the MSA

Having reviewed voluminous materials provided to it, the Department has concluded that the
primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value
for GCE with GCU as its captive client – potentially in perpetuity. Notably, the Executive
Summary of the Barclays Report includes the following:

- The Company's strong balance sheet and track record of performance position it to
  consider a broad range of strategic alternatives to continue to drive share price
  performance

    - However, perceived and tangible limitations on the Company's ability to
      aggressively pursue select alternatives as a for profit postsecondary provider must
      be considered

- Project Gazelle provides an attractive alternative for the Company ***and its shareholders***
  to position the Company to:

    - Continue to provide an attractive (and enhanced), competitive offering, and
      therefore, grow its student population

    - Mitigate the potential risk (perceived or real) posed by its for profit status

Grand Canyon University (OPE ID 00107400)
Page 13 of 18

> o  Pursue additional growth vectors to ***drive incremental value for shareholders***

Barclays Report at 2 (emphasis added).

The Barclays Update, provided to the GCE board days prior to the July 1, 2018 closing on the Transaction contains similar language in an updated Executive Summary:

- Investors recognize the Company's pursuit of Project Gazelle, and have continued to show support and interest in the stock, reflecting a positive expected outlook for the Company

- Project Gazelle provides an attractive alternative for the Company ***and its shareholders*** to position the Company to: …. Pursue additional growth vectors ***to drive incremental value for shareholders***

Barclays Update at 1 (emphasis added). The Barclays Update also includes a "Preliminary Discounted Cash Flow Analysis -Implied Value Transfer" analysis which notes that following the Transaction, "current shareholders ***retain ownership*** of GCE cash flows." Barclays Update at 7 (emphasis added). Of course, the primary (if not sole) source of those cash flows is revenue generated from Gazelle/GCU pursuant to the MSA. As explained in the Barclays Update, "following the transaction GCE, Inc. will have a single client, and as a result, a highly concentrated source of revenues," and further, "GCE, Inc.'s performance will be closely tied to that of Gazelle University – should Gazelle University's performance (or regulatory standing) be impacted in any way by (or following) the transaction, GCE, Inc. could also be negatively impacted." *See* Barclays Update at 9.

Similarly, the November 21, 2017 GCE board minutes reflect that the Board engaged in an extensive discussion about "Project Gazelle" including "the benefit to [GCE] and its stockholders." Board Minutes at 1. And at a GCE board meeting immediately prior to the closing of the Transaction, Mr. Bachus (GCE Chief Financial Officer) explained that a post-closing appraisal might result in a higher fair value for the assets transferred, and although GCE would not benefit from that, the higher valuation would benefit GCU in connection with its composite score, and he further explained why a good composite score for GCU "ultimately benefited the Company," meaning GCE. GCE June 28, 2018 Board Minutes at 2-3.

Not only was the Transaction structured so that the revenues generated by GCU are transferred to and retained by GCE for the benefit of its shareholders, the implementation of operations under the MSA results in an additional $697 Million to operate in the first fiscal year, solely resulting from the Services Fee paid to GCE. *See* Barclays Report at 33.

As described above the Services Fee is paid on a variety of revenue generating items:
- tuition
- student use of the online platform
- "students and their related activities"
- Canyon Connect

Grand Canyon University (OPE ID 00107400)
Page 14 of 18

- student housing
- meal plans and other food services
- athletic tickets
- Grand Canyon University Hotel and Conference Center
- Maryvale Golf Course
- Grand Canyon University Arena
- Canyon Enterprises (apparel sales and other businesses)

MSA Exh. D §1. Although GCE receives 60% of the revenue from all of these revenue generating operations, it does not appear that GCE actually provides services for a significant part of many of these operations – e.g., student housing, food services, operation of the hotel, conference center, golf course, arena or Canyon Enterprises.

Despite GCE only taking on the responsibilities of 28% of the operating costs, 60% of the gross adjusted revenue from the Institution will be paid to GCE under the MSA. When payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue. It is also worth noting that if revenue increases at a rate faster than operating costs, GCE has the potential to be paid even significantly higher amounts over the costs of the services it provides. Therefore, instead of the increased revenue being used for GCU's exempt purpose of providing education, the additional revenues would primarily benefit the shareholders of GCE.

It is equally concerning that GCU is essentially a captive client. As described above, the Initial Term of the MSA is 15 years, with automatic renewals thereafter for successive five years terms apparently in perpetuity. MSA §6.1. Although either party can elect not to renew at the end of the Initial Term or any Renewal Term, if Gazelle exercises that right, it has to pay GCE a Non-Renewal Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve month period just ended). MSA §6.2 and MSA Exh. A at A-5. Gazelle has the right to terminate the MSA during the Initial Term, but it cannot elect do so before July 1, 2025 (seventh anniversary) or the date by which the Senior Secured Note is paid in full – whichever is later. MSA §6.3. If Gazelle exercises that right, it must pay GCE an Early Termination Fee (50% of the aggregate Services Fees paid or payable for the trailing twelve-month period just ended). MSA §6.3 and MSA Exh. A at A-3. Thus, Gazelle is locked into the agreement for at least seven years. And even if Gazelle wanted to terminate the MSA after July 1, 2025 because it found a more competitive service provider, the required payment of the Senior Secured note is an arguably prohibitive termination fee.

On October 1, 2018, Mr. Glass (counsel for GCU) wrote to the Department, providing various documents and responding to a September 10, 2018 letter from the Department seeking further information on GCU's request to convert to nonprofit status. ("October 1 Letter"). In part, the October 1 Letter described the approvals from the Higher Learning Commission ("HLC"), the IRS, the State of Arizona and other bodies, including the National Collegiate Athletic Association. As described above however, the Department makes its own determination of nonprofit status for a school's participation in Title IV. Although state and IRS approvals are required for nonprofit status under the Department's regulations, those approvals are not the sole determining factors, nor does the Department need to defer to those determinations. In regard to

Grand Canyon University (OPE ID 00107400)
Page 15 of 18

the IRS designation of tax-exempt status, and as noted by the October 1 Letter, the IRS approval was issued three years prior to the Transaction. Even if the "basic structure" of the Transaction and a prior draft of the MSA were provided to the IRS at that time, there is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA. Unlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status, and seeks to ensure that a nonprofit institution's revenues – a good portion of which are generated from Title IV funds – are primarily devoted to the mission of the school and not to other parties, including (as here) the shareholders of the prior owner.

Based on the tax authority cited above, the Department has determined that GCU does not meet the operational test's requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself. Rather, the materials that the Department has reviewed demonstrate that GCE and its shareholders – rather than Gazelle/GCU -- are the primary beneficiaries of the operation of GCU under the terms of the MSA. This violates the most basic tenet of nonprofit status – that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity.

### B. Other Factors

The Department has identified other factors related to the MSA that provide additional support for the Department's determination that granting nonprofit status to GCU is not warranted.

#### 1. Mr. Mueller's Dual Roles

The October 1 Letter explains that the GCE and Gazelle boards have adopted independent structures, and that the boards of GCE and Gazelle made independent decisions to retain Mr. Mueller in his positions as President of GCU and Chief Executive Officer of GCE. The October 1 Letter further notes that the terms of the MSA and Gazelle's bylaws "limit Mr. Mueller's direct involvement in the day to day oversight of the relationship with GCE" because direct oversight is vested in a Designee (*see* MSA §3.11), and because from Gazelle's side, management oversight is vested in a standing committee of the independent members of the board of trustees ("MSA Committee"). But not only is Mr. Mueller the President of GCU and the CEO of GCE, he is also a shareholder of GCE (even if he holds a de minimis percentage of stock). Thus, he is in the dual role of running both the Institution and its managed services provider – the major recipient of the Institution's revenues – and one of its shareholders. GCE's only client is GCU. Thus, as the CEO of GCE, he is the key executive responsible for providing the services under the MSA, with duties of loyalty to shareholders of GCE. Yet, as the Institution's President he will have responsibility to manage matters large and small with its primary service provider, notwithstanding the appointment of a Designee and the independent trustees who comprise the MSA Committee. Given those obviously conflicting loyalties, and the breadth of the services provided under the MSA, the Department is not satisfied that these structures are sufficient to ensure that Mr. Mueller's undivided loyalty is to the Institution.

Grand Canyon University (OPE ID 00107400)
Page 16 of 18

## 2. GCE's "Management and Oversight" of GCU

According to GCE's statements to Deloitte, GCE's 44-person "Executive Leadership is responsible for managing and overseeing the University." Deloitte Report at 26 ("the majority of their time relate [sic] to strategic activities that generate future benefits for the University"). Relying on the titles used in the Deloitte Report, the Department has determined that the Executive Leadership team (as of the date the Transaction closed) had 58 members, not 44 members, assuming that the CEO is also included in the team.[18] Upon closing of the Transaction, a significant number of these executives remained employed by GCE – they did not transition to become Gazelle/GCU employees. *See* APA Disclosure Schedules at Schedule 6.3(a)-2. Of the 58 executives, only seventeen transferred to Gazelle: the General Counsel, the Chief Academic Officer, eight academic deans of the various colleges, three senior vice presidents and four vice presidents. Brian Mueller, the CEO of GCE and the President of GCU, is identified in Schedule 6.3(a)-3 as the sole "Joint Employee." This means that nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider. As employees of GCE, these executive leaders have a primary fiduciary responsibility to the shareholders of GCE[19], a for-profit publicly traded corporation, while at the same time providing significant management and oversight of the Institution. This is particularly so given the scope of the activities GCE is performing under the MSA, including: marketing, enrollment services and budget consultations, student support services counseling, document intake, student records management, curriculum services, accounting services (payroll, accounts payable, general ledger, etc.), financial aid services, procurement services, audit services, human resources, technology, business analytics services, faculty operations, and compliance monitoring and audits. MSA at Ex. B §§1-15.

The Department is skeptical that any nonprofit could outsource the number and type of institutional functions that Gazelle has and still be deemed to operate the Institution. Given the enormous leverage GCE now has over Gazelle by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not Gazelle/GCU, the Department concludes that, as a practical matter, Gazelle is not the entity *actually operating* the Institution as is required under the Department's regulations. *See* 34 C.F.R. § 600.2 (definition of nonprofit at (1)(i)).

## VI. CONCLUSION

For the reasons discussed above, the Institution does not satisfy the Department's definition of a nonprofit. The Department approves the change in ownership application of the Institution from GCE to Gazelle (now known as Grand Canyon University) and approves the Institution as a for-

---

[18] While the Deloitte Report does not identify the Executive Leadership Team members by name, it states that the Team consists of those with the title of CFO, CIO, COO, CTO, Chief Academic Officer, General Counsel, EVP, SVP, VP, Director, and Dean. In regard to the designation of "Director," the Department only counted personnel with the title of "Executive Director," not all personnel with the designation "Director" in their titles.

[19] And at least some of these executives are GCE shareholders themselves.

Grand Canyon University (OPE ID 00107400)
Page 17 of 18

profit institution for purposes of its continued participation in the Title IV, HEA Programs. The Department denies the request for recognition of the Institution as a nonprofit.

The for-profit status of the Institution is for purposes of its participation in the Title IV, HEA programs. The Department does not take a position with respect to Gazelle's non-profit 501(c)(3) status with the Internal Revenue Service. However, GCU must cease any advertising or notices that refer to its "nonprofit status." Such statements are confusing to students and the public, who may interpret such statements to mean that the Department considers GCU a nonprofit under its regulations. The Department does not take a position regarding statements that GCU may make about its IRS status as a 501(c)(3) tax exempt organization.

The TPPPA under which the Institution has been operating since the CIO continued the prior approval for the Institution to participate under a for-profit status. The for-profit status for the continued participation of the Institution is therefore unchanged. The Institution is reminded that the Institution must meet the Title IV, HEA programs reporting and program eligibility requirements applicable to for-profit institutions, including the 90/10 eligibility requirements described in 34 C.F.R. §668.28 and any applicable gainful employment program requirements set out in 34 C.F.R. Subpart Q.

Under APA § 2.4, Gazelle does not assume any liabilities arising under Educational Laws related to or based on the conduct of the Institution prior to closing. The Department's approval of the CIO does not include the exclusion of liabilities arising under the Title IV, HEA programs, and the approval of the CIO is expressly conditioned on Gazelle/GCU's responsibility for both pre-closing and post-closing liabilities arising under Title IV. Notwithstanding this condition, GCE also retains responsibility for pre-closing liabilities arising under Title IV. The parties are not foreclosed from requiring GCE to indemnify Gazelle/GCU for any losses resulting from pre-closing Title IV liabilities.

The TPPPA will expire at the end of this month. The Department has included with this letter the provisional program participation agreement ("PPPA") for the Institution. The PPPA includes the approval of the new programs requested by GCU. If the Institution wants to continue to participate in Title IV programs without interruption, the PPPA should be signed and returned to the Department no later than November 25, 2019 (given the Thanksgiving holiday) for countersignature.

The APA Parties also previously inquired (through counsel) about whether GCE is considered an "unaffiliated third party" for purposes of the March 17, 2011 Dear Colleague Letter (GEN-11-05) that addressed the implementation of the program integrity regulations and the incentive compensation ban. That question is currently under review, and the Department will provide the parties with a separate response on that issue.

If the Institution has additional factual information or documents that it believes the Department should consider relating to the decisions set forth in this letter, GCU should submit a request for reconsideration. That request should be submitted to Jane Eldred (Jane.Eldred@ED.Gov) within 10 calendar days of the date of this letter. Please note that a request for reconsideration will not stay the expiration of the TPPPA which expires on November 30, 2019.

Sincerely,

Michael J. Frola
Director,
Multi-Regional and Foreign Schools Participation
Division


cc:    The Higher Learning Commission (*email: Barbara Gellman-Danley, President -*
       *president@hlcommission.org, Anthea Sweeney, VP for Legal and Governmental Affairs -*
       *asweeney@hlcommission.org*)

       AZ State Board for Private Postsecondary Education (*email: Terr Stanfill, Executive*
       *Director - teri.stanfill@azppse.gov*)

       New Mexico Higher Education Department (*email: exec.admin@state.nm.us*)

       IRS
       Attn: EO Classification
       MC 4910 DAL
       1100 Commerce Street
       Dallas, TX  75242
       eoclass@IRS.gov

# Exhibit B



# The Educational Enron

## The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings

 RESEARCH     © Copyright 2020   Citron Research   www.citronresearch.com     All Inquiries: info@citronresearch.com

Citron Research is entering our 19th year of publishing independent research.  In our 19 years we have exposed more corporate fraud than any non-government agency across the globe.  With that in mind, we are judicious when we use the "F" word.  In only the rarest of occasions do we have validation of fraud from another government agency who is investigating a public company for its operations and not the accuracy of its financials.

On September 9th, 2019, Citron wrote about Grand Canyon Education ("LOPE") and established a $30 price target.  This target was based on analysis of a highly competitive online education industry and the failure of LOPE to become a successful OPM.  In our presentation we presented a slide that highlighted some red flags that LOPE might already be in violation of securities law and misrepresenting its financials (that slide is in the appendix), but it was somewhat of an afterthought as we had no proof or supporting documentation at the time.

## What happened next is something that we never expected.

On November 6th, 2019 Grand Canyon University disclosed that after a 2-year application process, the Department of Education refused to grant them non-profit status.  At the time of our previous report, we did not believe that an adverse ruling on non-profit status was a potential risk as the company never disclosed it in its risk factors and sell side assumed approval was guaranteed.



 © Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



The highly technical and detailed [letter](#) from the DoE did not dispute any of the obvious problems with for profit education (e.g., cohort default, graduation rate, or gainful employment); instead the DoE refused to grant non-profit status because they discovered that the LOPE/GCU transaction was constructed **"to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity".**

> **GCU has become a vehicle for the LOPE executives to commit securities fraud and obfuscate the true financials of Grand Canyon Education.**

**Citron was shocked and immediately submitted a FOIA, through which we received 870 pages of supporting documentation that led to the obvious conclusion that LOPE is in clear violation of SEC rule 10b-5 as they use the private university to dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price.** Citron's finding was validated by the Department of Education which reached the same conclusion.

While we acknowledge that Grand Canyon University has an aesthetically pleasing campus and is providing a Christian education at an affordable price, that has no impact on the securities fraud being perpetrated at LOPE. For those who forget, Enron owned and operated the largest interstate natural gas pipeline. But like Enron, the executives are using non-reporting captive subsidiaries to inflate earnings. The Enron assets (Northern Natural Gas) remain vibrant and a subsidiary of Berkshire Hathaway while the public company crumbled under financial restatements.

In this report, Citron will detail and document the Enron-like fraud at LOPE. This report contains multiple smoking gun documents that leave no doubt about the numerous securities violations being committed at Grand Canyon Education.





Whether it's Enron, Olympus, or LOPE,  these companies **used a captive non-reporting subsidiary to hide liabilities.**

This does not mean its core business is fraudulent, but rather that the financials they present to Wall St are fraudulent.  While Enron was running one of the largest gas pipelines in US, it created special purpose entities to dump liabilities.  In this case, LOPE, the public company, is using Grand Canyon University as a liability dumping ground/cookie jar in order to manipulate earnings and cover up for the headwinds they face due to a challenging environment in for-profit online education.

Through a disjointed **Master Service Agreement ("MSA")** between LOPE/GCU with no proper oversight, **LOPE can quite literally make up any margin or EPS number they wish**.  This is not the ramblings of a short seller.  The DoE recognized that the unusual power granted in this agreement to one CEO / management team is too troubling to consider GCU a non-profit as the DoE stated that **"nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider (LOPE)."**

LOPE is also clearly violating the rules of the Sarbanes-Oxley Act.  The management team then uses the mechanisms built into the **Credit Agreement** to take on additional opaque leverage in order to plug the cash burning hole left at GCU as a result of the improper allocations codified in the MSA.

Moreover, the financials of LOPE have become one massive 10b-5 violation, which involves:

> *"Violations include executives making false statements in order to drive up share prices, a company hiding huge losses or low revenues with creative accounting practices, or actions taken to grant current shareholders a better return on their investments (as long as the deception remains undiscovered). These schemes typically require ongoing, misleading statements in order to perpetuate the fraud."*

**The DoE's extensive research and knowledge of the LOPE/GCU relationship deemed them to be a related party engaging in an unfair transaction that was designed to benefit shareholders.  Those are the words directly from the DoE and not Citron.  It would be negligent for their auditors not to acknowledge PCAOB Auditing Standard No. 2410 (AS 2410) under the Sarbanes-Oxley Act of 2002 and not dig deeper into the fraud highlighted by Citron.**



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



Overlooked by trusting shareholders and with little to no oversight from truly independent advisors, LOPE sold its physical campus to a new entity ("GCU") in a transaction that became a figurative "license to steal". As part of the transaction:

- LOPE and GCU entered into a Master Services Agreement ("MSA")

- LOPE and GCU entered into a Credit Agreement ("CA")

- Brian Mueller, President of LOPE, would hold the same position at GCU

On July 1st, 2018, **without final consent from the Department of Education for non-profit status at GCU,** LOPE spun off its primary physical asset, the university (i.e., GCU) into a private "special purpose entity" (sound familiar?) held off balance sheet.

Investors were enthusiastic as management had been speaking of executing this transaction since late 2014. GCU would become a non-profit and LOPE would transition itself to a high margin Online Program Manager ("OPM"). The story that LOPE pitched to investors was that the management team had become so sophisticated at providing online education that they would soon become the online infrastructure of universities worldwide who can benefit from their scale.

The IRS rubber stamped the transaction for 501(c)(3) purposes. Due to a complete lack of appropriate risk disclosure in its SEC filings, investors assumed the transaction was complete and no outstanding approvals remained. **To be clear, the IRS only took 24 days to approve GCU's**

**application versus the ~2 years of review conducted by the DoE before rejecting GCU's non-profit status.** A FOIA with the IRS would take longer than 24 days!

The DoE highlighted that "the IRS approval was issued three years prior to the Transaction (LOPE/GCU spinoff). Even if the "basic structure" of the transaction and a prior draft of the MSA were provided to the IRS at that time, there is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA".

Amazingly, LOPE management has such hubris that they have not taken any effort to cover up the charade; LOPE has not organically signed up any new OPM clients as promised. More importantly, they did not put in truly independent oversight that could ensure the integrity of the transaction, which would have ultimately led to a successful transition to non-profit but would have never allowed the massive securities fraud that is currently being committed to exist.

**But then the shock ruling came from the Department of Education. "Holy shit," Trace Urdan, a managing director at Tyton Partners and an expert on the for-profit higher education sector, said of the news.**





Through our FOIA request, Citron obtained a copy of LOPE's request for pre-acquisition review of the LOPE/GCU transaction to the DoE dated January 18, 2018. In this letter, LOPE actually tries to rush the DoE into a 30 day decision in the hopes that the DoE would overlook the blatant issues with this transaction.

> **"We would appreciate the Department's efforts to process this application in 30 days even though closing is not expected until April 1."**



January 18, 2018

Michael J. Frola
Director
Multi-Regional and Foreign Schools Participation Division
U.S. Department of Education
830 First Street NE, 7th Floor
Washington, DC  20202

    Re:  Grand Canyon University (OPEID 00107400) Request for Pre-Acquisition Review
of a Proposed Change in Ownership

Dear Mr. Frola:

Enclosed are documents for your review in connection with Grand Canyon University's ("GCU" or the "University") proposed change of control. As contemplated, this transaction would involve the following:

Regarding Question 1, this is a pre-acquisition application for a change of ownership/conversion transaction that has not yet occurred, but is anticipated to occur on April 1, 2018. We would appreciate the Department's efforts to process this application in 30 days even though closing is not expected until April 1, so that we can provide the Department¿s preacquisition review letter to the Higher Learning Commission before it meets to decide on our HLC application on February 22, 2018. Regarding Questions 2-3, while the institution will continue to operate under the name of Grand Canyon University, please note that Gazelle University has been formed to effect the transaction. Regarding Question 11, upon completion of the transaction the institution will name a new Chief Financial Officer. Regarding Section D, we would like to provide basic information about the non-profit ownership structure after the conversion. The new Level 1 owner will be Gazelle University (EIN 47-2507725) a 501(c)(3) nonprofit organization. The sole and controlling member of Gazelle University will be the Grand Canyon University Foundation (EIN 90-0615520), which is also a 501(c)(3) nonprofit organization. We are providing the audited financial statements of Grand Canyon Foundation under separate cover for the Department's consideration with this application. Regarding Question 25, the current board members would be replaced after the transaction closes. Regarding Question 26 g. Please note we are requesting approval to offer Undergraduate Certificate programs. Three programs have been added to Question 27. These do not need accreditor approval. State approval will be provided shortly. Regarding Question 35, the application would not save the response that this is an application for a conversion to a nonprofit institution. Regarding Question 36, the application would not save the response that the institution has 2 FTE financial aid administrative, counselors, and other professionals, and 0 FTE financial aid clerical personnel. The financial aid function has been outsourced to GCE with GCU personnel providing oversight on the financial aid function. Regarding Question 37, the TEACH grant financial aid program is not listed as an available program; however the institution is currently and will want to continue participation in this program. Regarding Question 38, the application would not save the following responses: the institution does not anticipate an increase of 10% or more in the student population in the next award year, and it anticipates 74,485 eligible students in the remainder of the current award year, 81,473 year for the next award year and 87,646 for the award year



**Don't Take Our Word For It – The Department Of Education's Conclusion**



Before we delve into this report, we want to highlight that this is not just Citron Research making up a wild conspiracy theory.  The DoE was the first to highlight the many material red flags in its letter denying GCU non-profit status.  We are simply following in their footsteps and supplementing their analysis with other disclosure we received via our own research / FOIA Request.  These following quotes from the DoE should be enough to start an SEC investigation.  This whole transaction was to "juice the stock".

"Having reviewed the voluminous materials provided to it, the Department has concluded that the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity"

"Although GCE receives 60% of the revenue from all of these revenue generating operations, it does not appear that GCE actually provides services for a significant part of many of these operations – e.g., student housing, food services, operation of the hotel, conference center, golf course, arena, or Canyon Enterprises"

"When payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue"

"It is equally concerning that GCU is essentially a captive client… Even if Gazelle wanted to terminate the MSA after July 1, 2025 because it found a more competitive service provider, the required payment of the Senior Secured note [and 50% of trailing twelve-month fee) is an arguably prohibitive fee"

 © Copyright 2020   Citron Research   www.citronresearch.com                    All Inquiries: info@citronresearch.com



"In regard to the IRS designation of tax-exempt status, and as noted by the October 1 letter, the IRS approval was issued three years prior to the Transaction. Even if the "basic structure" of the transaction and a prior draft of the MSA were provided to the IRS at that time, there is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA"

"Unlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status"

"Not only is Mr. Mueller the President of GCU and the CEO of GCE, he is also a shareholder of GCE… Thus, he is in the dual role of running both the Institution and its managed services provider"

"Relying on the titles used in the Deloitte Report, the Department has determined that the Executive Leadership team had 58 members, not 44 members, assuming that the CEO is also included in the team. Of the 58 executives, only seventeen transferred to Gazelle: the General Counsel, the Chief Academic Officer, eight academic deans of the various colleges, three senior vice presidents and four vice presidents… This means that nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider… The Department is skeptical that any nonprofit could outsource the number and type of institutional functions that Gazelle has and still be deemed to operate the Institution"



**Other Creditors (UCC Filings)**

**Don't Panic! This slide summarizes the fraud in its entirety and this presentation will be spent going through each of these mechanisms in detail**

GCU collateralizes more and more assets

Creditors loan more money to fund cash burn

LOPE Transfers Assets To GCU

GCU transfers $870mm Secured Note to LOPE

LOPE provides OPM Services while only recognizing minimal operating costs

GCU pays 60% of revenue for accounting recognition purposes

LOPE funds the cash burn at GCU (due to GCU only receiving 40% of revenue) through a CapEx and AR loan



**Net Result For LOPE**

**EPS**: Optically elevated due to full accounting recognition of 60% rev split
**FCF Conversion**: Collapsing as more debt floods out through receivables and capex loans
**Balance Sheet**: Accounts Receivables & Secured Note Receivable Balances Rising

**Net Result For GCU**

**Net Income** : GCU mgmt solves to breakeven (in order to salvage DoE Composite Score)
**FCF Burn**: ~$100mm+ per year due to improper expense allocation / revenue split
**Balance Sheet**: Accounts Payable, Secured Note Payable Balance, and Other Debt Balance all rising. Leverage rising fast.

| | |
|---|---|
| —— | **Balance Sheet Items** |
| – – – | **Income Statement Items** |
| – – – | **Cash Flow Items** |


© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



In this report Citron will use the letter from the DoE as a framework along with the massive FOIA request to prove out the accounting fraud and massive 10b-5 violations.

<u>Section I</u> – Present the MSA, which is the blueprint for the fraud

<u>Section II</u> – Present the LOPE/GCU credit agreement, which is the coverup for the fraud

<u>Section III</u> – Analyze LOPE's cash flow, which clearly illustrates fraud

<u>Section IV</u> – Juxtapose the Zovio / Ashford structure with LOPE / GCU

<u>Section V</u> – Present findings of former Deputy Undersecretary of the DoE which validate our conclusions

<u>Section VI</u> – Analyze LOPE's response to the DoE

<u>Section VII</u> – Examine management's consistent history of fraud and current motivations

<u>Section VIII</u> – Summarize Our Conclusions

<u>**Citron believes that the response letter from the DoE, combined with our FOIA documentation and piecing together of the overall puzzle, is about to (if not already has) set off a chain of events that will result in multiple charges of securities fraud, forced restatements, and lead to a significant decline in the share price of Grand Canyon Education.**</u>

     © Copyright 2020    Citron Research    www.citronresearch.com                    **All Inquiries:** info@citronresearch.com



# Section I

## Blueprint For Fraud
## The Master Services Agreement





Citron will now provide a full copy of the MSA, as well as historical drafts, for those who wish to read:

At first glance the agreement seems somewhat standard.  LOPE is to provide Exclusive and Non-Exclusive Services to GCU:

**Exclusive Services**    Marketing, Enrollment Services & Budget Consultations, Student Support Services Counseling, and Technology on an exclusive basis (GCU can not insource or contract these out)

**Non-Exclusive Services**    Document Intake, Student Records Management, Curriculum Services, Accounting Services, Financial Aid Services, Procurement Services, Audit Services, Human Resources, Business Analytics Services, Faculty Operations, Compliance Monitoring

But <u>two elements</u> of the MSA stand out and illustrate LOPE crossing the line from GCU being a client, to being a controlled entity / captive subsidiary.  This is key.  If the SEC identifies GCU as a captive client then in fact they must identify the contract and financials to be nothing short of an "Enron" type transaction.

**The Revenue Split**    First, LOPE is taking a 60% cut of all revenue, not just online tuition revenue.

**The Cookie Jar**    Second, "the University will not contract with any third party for the performance of any Exclusive Services, in each case without the prior written consent of Provider to be granted in Provider's sole discretion.  University's determination to seek a third-party provider to provide Services, other than the Exclusive Services, <u>shall have no effect on University's obligation to pay the Services Fees</u> as set forth and calculated on Exhibit D to this Agreement"

❖ <u>*This means that GCU must pay the 60% service fee to LOPE, regardless of whether GCU decides to insource or contract with a third-party for certain services that are to be provided*</u>

We will now explore each of these elements in depth.



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



The University and GCE entered into a long-term master services agreement (the "Master Services Agreement") pursuant to which GCE will provide identified technological, counseling, marketing, financial aid processing and other support services to the University __in return for 60% of the University's revenue.__

- <span style="color:red">__LOPE is entitled to 60% of ALL revenue from GCU, NOT just a percentage of online tuition revenue or a flat fee (as every other OPM contract is structured)__</span>

Let's look at the math:

- __In 2018, approximately $465mm of Grand Canyon's ~$1 billion in revenue was NOT related to GCU online__

  - ❖ *These are primarily composed of on-campus tuition, housing, the meal plan, Grand Canyon Connect, and the arena ticket sales while LOPE allocates the expenses to support these revenue buckets to the private SPE GCU*

- What this means is that LOPE is recognizing __60% of this $465mm revenue bucket ($280mm)__ on its income statement while allocating virtually all of the expenses to support these revenue buckets onto the private off-balance sheet SPE GCU. <span style="color:red">__Note that this is 100% Margin PURE PROFIT to LOPE compared to total EBITDA this year of $300mm__</span>

- <span style="color:red">__The following tables validate the DoE's conclusion that the entirety of this transaction was not representative of a fair OPM contract but rather a blueprint for securities fraud__</span>

| Revenue Breakdown[1] | 6 Months Ended 6/30/18 | Annualized |
|---|---|---|
| Tuition Revenues | $522 | $1,045 |
| *Of Which On-Campus Tuition Revenue (27%)[2]* | *$141* | *$282* |
| Ancillary Revenues (Housing, Meals, Fees, Golf, Hotel, Arena, Other) | $91 | $182 |
| __Total Revenues__ | __$614__ | __$1,227__ |
| Scholarships | <span style="color:red">($101)</span> | <span style="color:red">($202)</span> |
| __Net Revenue__ | __$512__ | __$1,025__ |
| __Revenue NOT related to Grand Canyon Online__ | __$232__ | __$465__ |
| Total "Non Online Tuition" Revenue | $232 | $465 |



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



**So what would LOPE look like if they recognized the same revenue split as every other OPM contract, or ~50% of only the online tuition?**

- If LOPE was to only recognize 60% of online tuition revenue, revenue would fall from ~$700mm in 2019 (ex. Orbis) to $458mm and EBITDA would fall from $307mm to $27mm

- This would put margins at ~6% which, in the **least shocking conclusion** of all time, would put them right in line with OPM comps Pearson & John Wiley Education Services

  - **RED FLAG**: Again, let's take a step back. Every other education services provider does ~0% margins. **LOPE does 45% margins.** This is the single most obvious case of "too good to be true" that we have ever seen

  - **What on earth could LOPE be doing legally which would lead them to achieve 45% EBITDA margins while every other education / OPM services provider is tightly bunched in the low-single digits?**

|  | 2019 |
|---|---|
| Online Tuition Revenues | $763 |
| *Lope Split* | *60%* |
| **LOPE Revenue** | **$458** |
|  |  |
| **Consensus EBITDA Expectations** | $307 |
| (-) Improperly Recognized 100% Incremental Margin Revenue | ($280) |
| **Pro Forma EBITDA** | **$27** |
| Margins (%) | 5.9% |

| EBITDA Margins (%) | 2019 Consensus |
|---|---|
| **Online Program Management Comps:** | |
| 2U Inc | -4.4% |
| John Wiley Education Services | 3.0% |
| Pearson Education Services | 4.0% |
| Orbis (pre LOPE acquisition) | 0.0% |
| **Average** | **0.7%** |
|  | |
| **For Profit Universities:** | |
| Strategic Education Inc. | 26.5% |
| Perdoceo (formerly Career Education) | 18.1% |
| Adtalem Global Education | 22.0% |
| **Average** | **22.2%** |
|  | |
| LOPE (Ex. Orbis) Reported | 42.9% |
| LOPE (Ex. Orbis) Proper Recognition | 5.9% |





**In April 2017, Kaplan and Purdue announced a landmark deal:**

- We juxtaposed the terms of the LOPE / GCU MSA to those in the Kaplan / Purdue MSA, the largest OPM / University deal of its kind after LOPE / GCU

- Purdue would acquire the physical assets of Kaplan University and enter into a contract with Kaplan Higher Education to provide educational services in the largest OPM deal of all time

  - This is a **direct parallel** to GCU and LOPE; Purdue is the "GCU" in this relationship and Kaplan Higher Education ("KHE") is the "LOPE"

  - Let's first look at the key details of the Kaplan Transition & Operating Support Agreement ("TOSA"):

    - KHE's primary business operations are providing non-academic operations support services to Purdue Global pursuant to the TOSA and similar services to Purdue University

    - The operations support activities that KHE provides to Purdue Global include technology support, help-desk functions, human resources support for transferred faculty and employees, admissions support, financial aid processing, marketing and advertising, back-office business functions, certain test preparation and domestic and international student recruiting services

    - **Pursuant to the TOSA, KHE is not entitled to receive any reimbursement of costs incurred in providing support functions, or any fee, unless and until Purdue Global (the private entity) has first covered all of its operating costs**

    - **If there are sufficient revenues, KHE may also receive a fee equal to 12.5% of Purdue Global's revenue (which is ~$300mm)**

  - **To summarize:**

    - KHE provides identical services to Purdue / Purdue Global as LOPE provides to GCU

    - **KHE is not even entitled to expense reimbursement or fees until Purdue Global is at break-even**

    - <span style="color:red">**At most, KHE would be entitled to a 12.5% fee which would equate to ~15% margins on KHE's revenue base**</span>

 © Copyright 2020   Citron Research   www.citronresearch.com     **All Inquiries:** info@citronresearch.com



**Analyzing The Revenue Split Through The Lens of Kaplan / Purdue**

<u>Now let's compare the financial results:</u>

- Kaplan Higher Education's financial results can be found in the segment analysis of Graham Holdings 10-Q

- Through the first 9 months of 2019, <u>KHE did ~4% EBIT margins on ~$240mm of revenue (EBITDA margins of 6%)</u>

  - Unsurprisingly, this puts KHE almost right on top of Pearson / John Wiley

- <u>Conversely, in 2019 LOPE will do ~43% EBITDA margins on ~$700mm of revenue</u>

**The bottom line is KHE / Purdue gives us a roadmap for what the largest OPM deal of all time looks like. KHE is providing almost identical services to Purdue Global as LOPE is to GCU.  Similar to every other comp, the end financial result is that KHE falls in that LSD to MSD margin category. LOPE stands alone at 43%**

| EBITDA Margins (%) | 2019 Consensus |
|---|---|
| **Online Program Management Comps:** | |
| 2U Inc | -4.4% |
| John Wiley Education Services | 3.0% |
| Pearson Education Services | 4.0% |
| Orbis (pre LOPE acquisition) | 0.0% |
| Kaplan Higher Education | 6.2% |
| **Average** | **1.8%** |
| | |
| **For Profit Universities:** | |
| Strategic Education Inc. | 26.5% |
| Perdoceo (formerly Career Education) | 18.1% |
| Adtalem Global Education | 22.0% |
| **Average** | **22.2%** |
| | |
| LOPE (Ex. Orbis) Reported | 42.9% |
| LOPE (Ex. Orbis) Proper Recognition | 5.9% |

| (in thousands) | Three Months Ended September 30 | | Nine months ended September 30 | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **Operating Revenues** | | | | |
| Kaplan international | $ 178,169 | $ 167,668 | $ 552,505 | $ 535,553 |
| Higher education | 78,712 | 89,269 | 237,780 | 275,080 |
| Test preparation | 64,710 | 67,749 | 191,533 | 195,504 |
| Professional (U.S.) | 33,820 | 34,302 | 110,181 | 98,715 |
| Kaplan corporate and other | 2,450 | 143 | 7,121 | 870 |
| Intersegment elimination | (542) | (530) | (1,584) | (1,617) |
| | $ 357,319 | $ 358,601 | $ 1,097,536 | $ 1,104,105 |
| **Income (Loss) from Operations** | | | | |
| Kaplan international | $ (14,226) | $ 8,375 | $ 35,596 | $ 52,966 |
| Higher education | 5,177 | 6,042 | 9,813 | 18,616 |
| Test preparation | 4,959 | 10,572 | 8,794 | 17,213 |
| Professional (U.S.) | 4,939 | 6,768 | 20,943 | 20,863 |
| Kaplan corporate and other | (8,011) | (9,452) | (30,405) | (27,110) |
| Intersegment elimination | 1 | (43) | (2) | (32) |
| | $ (7,161) | $ 22,262 | $ 44,739 | $ 82,516 |

**Depreciation of Property, Plant and Equipment**


© Copyright 2020   Citron Research   www.citronresearch.com    All Inquiries: info@citronresearch.com


**The second element which proves GCU's status as a captive subsidiary is the creation of the Cookie Jar:**

- **Through the MSA, LOPE can quite literally make up any margin or EPS number they wish.**

- How is this not captive?

- "The University will not contract with any third party for the performance of any Exclusive Services, in each case without the prior written consent of Provider to be granted in Provider's sole discretion. University's determination to seek a third-party provider to provide Services, other than the Exclusive Services, **shall have no effect on University's obligation to pay the Services Fees** as set forth and calculated on Exhibit D to this Agreement"

  - **This means that GCU must pay the 60% service fee to LOPE, regardless of if GCU decides to insource or contract with a third-party for certain services that are to be provided**

- If LOPE wants, the obviously independent Mr. Mueller can simply give the word to the private entity (GCU), which he is president of, to take on some of these "**non-exclusive services**" onto its own income statement.  After all, LOPE must only provide three of these services!

- In the DoE's own words:

  - "By way of example only, this would preclude Gazelle from retaining an outside payroll provider if it assumed Accounting Services, despite the fact that GCE performs payroll services through a third-party payroll provider"

- While this would depress the earnings and cash burn further of the private entity, the private entity would still **owe the same level of fees** (per the MSA) to LOPE

- With none of the costs and the entirety of the ~60% fees, LOPE's reported profit and margins would continue to fraudulently rise while stuffing expenses onto the private entity

**The Master Services Agreement is the Blueprint, the mechanism by which GCU is committing fraud, via improper expense allocation and revenue recognition**


© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



# Section II

## Coverup For Fraud
## The Credit Agreement





**If LOPE is hiding all these expenses on this off-balance sheet entity (GCU) while recognizing the revenue at LOPE, wouldn't that mean that GCU's finances would be upside down as the university would burn massive amounts of cash with no profits?**

**The answer is YES,** and it is all covered up via the Credit Agreement, which allows GCU to close the loop and complete the scheme.

GCU would obviously need to receive funding from somewhere in order to fund cash burn or else the entity would go bankrupt. LOPE therefore structured a Credit Agreement with GCU where GCU would be indebted to LOPE yet **essentially receive an endless line of credit while also allowing LOPE management to conceal the financial results and condition of GCU.**

**Important to note that because this debt is private between LOPE / GCU, LOPE never has to disclose the financials of GCU to the world.**

There is no judge or SEC commissioner who can think of this arrangement as anything other than a "rigged transaction".

The Credit Agreement provides for **three opaque sources of credit** to prop up GCU which management has either not disclosed at all or attempted to explain away through fictitious claims of "one-time in nature":

- **CapEx Loan**

- **Accounts Receivable Loan**

- **Undisclosed additional sources of secured credit**

We will now explore each of these sources of credit in depth.



**The first source of credit that LOPE is providing to GCU is the CapEx Loan:**

- The definition of the CapEx loan (From the Credit Agreement):

  "Subject to the terms and conditions set forth herein, the Lender agrees to make loans (each such loan, a "CapEx Loan") to the Borrower in Dollars from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the CapEx Commitment [of $200mm]"

- **Management has attempted to explain this away as a one-time loan to GCU to fund new dormitory construction, but the recurring and ever-escalating nature of the loan and management's perpetual "moving of the goal posts" regarding the amount available and term of loan says otherwise:**

  - Through the first 12 months of the separation (period ending 6/30/2019), LOPE's "CapEx Funding" to GCU totaled $200 million. This is despite the following disclosure in the credit agreement and LOPE's Q2'18 10-Q:

    "Funding expectations for future capital expenditures for New GCU are $65 million for the six months ended December 31, 2018, and $100 million for the year ended December 31, 2019."

    - In other words, LOPE funded $200 million across 12 months relative to its projection of $165 million across 18 months

- **Additionally during Q3'19 earnings, LOPE also announced that:**

  **"The second amendment to our credit facility, described above, increased the total principal amount that the Company may have outstanding at any one time under its credit agreement with GCU in the form of loans to GCU to finance capital expenditures by GCU <span style="color:red">from $200.0 million to $300.0 million."</span>**



**Q1'19 Earnings Transcript:**

- "We funded CapEx on behalf of GCU through the secured notes of approximately $30 million in the first quarter of 2019, and **still expect to fund approximately $100 million in 2019**"

- "Based on recent conversations with GCU, it continues to be likely that the university will not request us to continue to fund its CapEx after this year as the university anticipates **they will be able to fund its own CapEx moving forward**"

**Q2'19 Earnings Transcript:**

- "Based on recent conversations with GCU, it continues to be likely that the University will not request us to continue to fund its CapEx after this year as the University anticipates **they will be able to fund its own CapEx moving forward**"

**Q3'19 Earnings Result:**

- "The second amendment to our credit facility, described above, increased the total principal amount that the Company may have outstanding at any one time under its credit agreement with GCU in the form of loans to GCU to finance capital expenditures by GCU **from $200.0 million to $300.0 million**"

**Brian Mueller, in conversations with himself, thought it was likely that GCU would be able to fund its own CapEx throughout 2018 / 2019.  Then Q3'19 comes and the Company increases the CapEx commitment from $200mm to $300mm.**

**Management has consistently put out targets for the CapEx loan balance and blown past every projection, going so far as to promise self-sufficiency for GCU on CapEx and then two months later turn around and raise the total commitment amount by 50%.**


Citron RESEARCH    © Copyright 2020    Citron Research    www.citronresearch.com    All Inquiries: info@citronresearch.com



**The second source of credit that LOPE is providing to GCU is the Accounts Receivable Loan:**

- At the time of the spin, the Accounts Receivable balance at consolidated LOPE was precisely <u>zero</u>

  - Five quarters later, <u>the Accounts Receivable balance is $83.4mm</u>, entirely composed of cash outflows on LOPE's income statement of $51mm in 2018 and $34mm in 2019 for "Accounts receivable from GCU"

  - This bears worth saying again – GCU literally cannot even afford to pay its 60% fee to LOPE.  LOPE wants to recognize this as income, so they keep the ratio at 60%, but this has been a huge and building drain on FCF as a result

  - This will show up as a rapidly building Accounts Payable and Accounts Receivable balance on GCU and LOPE's financial statements, respectively.  But, it will inflate "operating cash flows" for GCU to allow LOPE management to distort the truth

- <u>Furthermore, the credit agreement also provides for a clever mechanism by which accrued payables at GCU can build at minimal interest so as not to set off warning bells.  From the Credit Agreement:</u>

  - "5.2 Delinquent Payments. Services Fees due under this Agreement that are not paid or not reasonably and in good faith disputed by University in writing within thirty (30) days of the date of an invoice therefor, with such written notice detailing why such disputed fees are not due, shall <u>accrue simple interest at the prime rate as quoted in the Wall Street Journal plus one percent (1.0%) per annum</u> or, if lower, the maximum rate permitted by Applicable Law, from the date due until paid in full"

  - What this means that is if GCU, a cash burning significantly levered entity, is delinquent on a payment, they must pay simple interest at the prime rate plus 1%

  - **Think about what you are charged when delinquent on any sort of payment**

  - <span style="color:red">**Citron Takeaway:  LOPE is clearly setting the interest rate as low as possible here because they anticipated GCU being unable to pay its bills on time due to the structure in the MSA.  By setting an artificially low interest rate, LOPE allows the Accounts Receivable line on its balance sheet to not balloon out of control and set off warning bells amongst the investor base**</span>



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com

**The third source of credit is underlined undisclosed secured debt which GCU is taking on:**

- Citron discovered this source after examining the Arizona state's UCC filings

- GCU is taking out more and more debt securitized by virtually every asset of the private off-balance sheet entity in order to feign a healthy financial state / ability to repay the CapEx loan to LOPE shareholders

    - [UCC Filings](#)

- Note this specific UCC filing, which was filed for a loan given to GCU in September (conveniently raised directly before GCU was able to "repay" the $60 million in CapEx)

    - [TCF National Bank Loan](#)

    - "This debt is collateralized by any and all of the debtor's accounts, money, general intangibles, instruments, documents and chattel paper."

**Q3'19 Earnings Transcript:**

- No additional funding was provided at GCU for capital expenditures in the third quarter of 2019. **GCU repaid $60 million on the outstanding loan during the third quarter of 2019** and another $40 million in October



Results from this search contain all UCC records filed on or prior to Monday, December 23, 2019

| | File Number | Organization | Type | Orig. Date | Expires Date |
|---|---|---|---|---|---|
| | Organization: GRAND CANYON UNIVERSITY | | | | |
| | 201800288860 | GRAND CANYON UNIVERSITY | Standard | Jul, 17, 2018 | Jul, 17, 2023 |
| | 201900327138 | GRAND CANYON UNIVERSITY | Standard | Aug, 06, 2019 | Aug, 06, 2024 |
| | 201900398644 | GRAND CANYON UNIVERSITY | Standard | Sep, 24, 2019 | Sep, 24, 2024 |
| | 201900519508 | GRAND CANYON UNIVERSITY | Standard | Dec, 10, 2019 | Dec, 10, 2024 |



So while LOPE is telling shareholders that the financial condition at GCU is healthy because they are repaying its debt, they are concealing that:

- This is NOT being paid from FCF, it is being paid from raising more and more secured debt from both LOPE (CapEx / AR) and other creditors (UCC Filings)

- GCU itself is burning a <u>**significant**</u> amount of cash per year and is only being kept afloat by the "CapEx loan", the Accounts Receivable "loan", and continued debt raises securing everything from all property, to intangibles, to the equipment at the University itself (see other UCC filings)

- By our estimate (more on this later), GCU currently has over $1.2 billion of gross debt, a ~$100mm Accounts Payable balance, zero net income, and burning $100mm+ of cash per year!

- <span style="color:red">**If GCU was a public Company, it would be BANKRUPT**</span>

<span style="color:red">**The bottom line on the Credit Agreement is it is a vehicle to cover up the unsustainable fraudulent revenue split of the MSA (the Blueprint).**</span>

- By providing GCU with virtually unlimited access to credit from LOPE in the form of Accounts Receivable and CapEx loans (and raising secured debt at GCU without disclosing), LOPE can continue "charging" GCU 60% of total revenue as a fee despite GCU having nowhere near the cash flow to service the fraudulent MSA revenue split. They then recognize this as income and divert Wall Street's attention away from the complete lack of FCF

<u>A final question: is GCU falsely capitalizing operating expenses as capital expenditures to help inflate its reported net income (a positive net income reported at GCU is necessary for the DoE's Composite Ratio for universities)?</u>

- While we can not definitely prove this as we can not see detailed financial statements for GCU, the off-balance sheet entity, we will leave this analysis here and let you be the judge

    - In the last full year of consolidated Grand Canyon (2017), the total CapEx of the Company was $124 million

    - In the first full year of two separate entities, the consolidated CapEx has doubled to $226 million

| | LTM 6/30/2019 | 2017 |
|---|---|---|
| CapEx Spent At GCU | $199.8 | |
| CapEx Spent At Lope | $25.7 | |
| **Total CapEx** | **$225.5** | **$124.0** |



© Copyright 2020   Citron Research   www.citronresearch.com          All Inquiries: info@citronresearch.com



# Section III
## The Cash Doesn't Lie





Through LOPE's fraudulent accounting of allocating significant amounts of expenses to its off-balance sheet entity while recognizing the revenue itself, LOPE management is artificially inflating its earnings, margins, and stock multiple

- In 2012 – 2017 as a consolidated entity, LOPE converted cash at an already low ~30% of net income and its OCF conversion was ~150%
- <span style="color:red">**Red Flag:**</span> Post separation, LOPE is converting net income to cash at a <span style="color:red">**FIVE**</span> percent rate and net income to OCF at only ~105%
    - This is due to the money it needs to funnel to the off-balance sheet entity (through AR and CapEx) to keep it afloat
    - Note that normally one would include the repayment by GCU in FCF but since it is being repaid via hidden leverage at the off-balance sheet entity, this would effectively be a pass-through of a cash flow from financing item (i.e. not operational cash flow repayment)

| | 2012-2017 Avg | 2019 YTD |
|---|---|---|
| Net Income | $125.5 | $182.5 |
| | | |
| Cash Flow From Operations | $192.9 | $195.1 |
| CapEx | ($140.3) | ($15.2) |
| Purchases of Land & Buildings | ($17.7) | $0.0 |
| Funding to GCU for CapEx | $0.0 | ($169.8) |
| **Total Free Cash Flow** | **$34.8** | **$10.1** |
| **Cash Conversion (% Of Net Income)** | **27.8%** | **5.6%** |
| Cash Flow From Operations / Net Income | 153.7% | 106.9% |
| Repayment by GCU[1] | $0.0 | $100.0 |



© Copyright 2020   Citron Research   www.citronresearch.com

**All Inquiries:** info@citronresearch.com



# Section IV

## Juxtaposing LOPE / GCU With Zovio / Ashford



# Comparing LOPE / GCU to Zovio / Ashford



The sheer insanity of everything from the financial terms of the LOPE / GCU agreement, to the governance and pre-conversion process, is laid bare when compared to another public Company spin-off of a non-profit occurring now: Zovio / Ashford

| LOPE / GCU | | Zovio / Ashford |
|---|---|---|
| LOPE receives 60% of all revenue while providing typical OPM services | **Financial Terms** | Very similar to Kaplan / Purdue; Zovio receives expense reimbursement and a **MAX** of 19.5% of tuition and fees if Ashford achieves financially sustainable metrics. Ensures a maximum operating margin of ~20% |
| Pushed forward with the conversion without counseling the DoE and without asking for any sort of pre approval or permission. Likely assumed that if they went ahead and completed the transaction, the DoE would relent and allow the transaction to go through by virtue of "the ink being dry" | **Pre-Acquisition Cooperation With DoE** | Worked cooperatively with the DoE to establish parameters that would ensure approval of the transaction. CEO Clark said Zovio and Ashford would "prefer to have the department's view", provided through its review, before going forward |
| GCU issues an $870mm Secured Credit note directly to LOPE, which ensures it never has to file public financials, while also offering unlimited sources of secured credit (CapEx / Accounts Receivable). Credit line loaned at a comically low ~6% rate, with delinquent payments charged a simple interest rate of the WSJ prime rate + 1% | **Non-Profit Credit Line** | Securing a syndicated $103mm senior secured term loan facility (with outside investors) to finance a letter of credit the DoE requires. Ashford (private entity) will have to report financials to holders of this facility. The interest rate is forecast to be between 18-22% (a realistic market rate) |
| CEO Brian Mueller appointed President of both GCU and LOPE | **Board Independence** | Completely independent board of trustees formed to negotiate on behalf of non-profit Ashford |
| LOPE pro-forma EBITDA margins of ~45% (Ex. Orbis), a 4000bps premium to peers | **Financial Result** | Zovio pro-forma EBITDA margins of ~9%, at high end of OPM peers |



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com

# Section V

## Former Deputy Undersecretary of the DoE Validates Our Conclusion





- [Bob Shireman](), who has an accomplished track record as:

  - An expert on higher education policy. Served in two presidential administrations, including the former Deputy Undersecretary of the DoE under the Obama administration. Current Senior Fellow at the Century Foundation. Master's in Education From Harvard

- Had this to say about Grand Canyon:


**Bob Shireman**
@Bob_Shireman

Grand Canyon University, which claims to be nonprofit, had a call with its investors (!) and bragged about the "tailwind" that its (seriously corrupted) nonprofit claim has had in its marketing, with a "record 7000 new students."


**Bob Shireman**
@Bob_Shireman

The resulting operating margin for the for-profit is 34.3%, triple the typical. The margin is not required to be plowed back into the university as it would be if a real nonprofit, but instead goes to investors including the CEO, which would be illegal at a real nonprofit.


**Bob Shireman**
@Bob_Shireman

The U.S. Department of Education did the right thing here, refusing to treat an obviously for-profit school as a nonprofit. The law does not allow ED to simply accept an IRS letter, the agency must agree that the school is not structured for profiteering, which GCU obviously is.


**Bob Shireman**
@Bob_Shireman

Federal Student Aid issued a 16-page letter in response to Grand Canyon University's claim to be a nonprofit despite contracting out most of the work to the for-profit company. Summary: it's a sham. Some highlights:

> Having reviewed voluminous materials provided to it, the Department has concluded that the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity. Notably, the Executive Summary of the Barclays Report includes the following:

**Citron** | RESEARCH    © Copyright 2020    Citron Research    www.citronresearch.com    **All Inquiries:** info@citronresearch.com

# Section VI

## LOPE's Response To the DoE Validates Citron's Conclusion of Fraud



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



**Grand Canyon Education's rebuttal to the DoE contains outright lies and diversions, the most egregious of which are:**

- **LOPE's attempt to deflect the truth by focusing on the school's accolades**

  - *"Perhaps most disappointing, however, is the Department's failure to acknowledge the accomplishments that have occurred at GCU, both before and since the transaction closed – from an institution that was on the verge of closing more than a decade ago, to one that today is extremely important to the City of Phoenix, the State of Arizona and hundreds of thousands of students and alumni across the world"*

  - Enron, Worldcom, and Valeant all had real businesses.  We are not contending that GCU's campus doesn't exist or that they do not have alumni.  We are contending that, like the three previously mentioned companies, they are committing serious financial fraud

- **As stated in the DoE letter, LOPE's claim that Deloitte was hired as an "independent" consultant is as comical as the MSA itself**

  - *"GCU did engage Deloitte to provide the transfer pricing analysis"*

  Let's examine the statements and disclaimers in the Deloitte report and see how "independent" this was:

    - "The first step was to identify the assets and activities of the enterprise that generate revenue. Based on "fact finding discussions with key management personnel" – **which at the time would have consisted solely of GCE [LOPE] management**"

    - **"It also bears mentioning that the main opinions in the Deloitte Report do not appear to be based on information that Deloitte independently tested and analyzed on behalf of Gazelle. Rather, those opinions in key areas appear to have been based on information supplied by GCE management. For example, Deloitte states that it identified revenue-generating activities based on "fact finding discussions with key management personnel," that the classification of fixed costs was made "in conjunction with GCE management", and that the calculation of the share of fixed costs Gazelle and GSA would each pay under the MSA was determined by "Deloitte Tax and GCE"**

  LOPE's response to the fairness of the MSA rests solely on the Deloitte report, which the DoE accurately stated is <span style="color:red">**"devoid of any information that would allow the Department to access the accuracy of reasonableness of this conclusion"**</span>



**Grand Canyon Education's rebuttal to the DoE contains outright lies and diversions, the most egregious of which are:**

- **GCU claims the IRS did extensive diligence on granting the private entity it's tax exempt status and the DoE should therefore defer to them:**
  - *"Furthermore, in contrast with the Department's refusal to speak with GCU, during the period when GCU's 501(c)(3) application was under review and thereafter in connection with further efforts to structure the relationship between GCE and GCU, GCU and its tax advisors engaged in multiple discussions with IRS staff...Because the IRS is the agency tasked with determining an entity's 501(c)(3) tax exempt status, GCU believes that the IRS's determination that an institution qualifies as a 501(c)(3) tax exempt entity (and, by definition, satisfies the Operational Test) should be given appropriate deference by the Department in making its decision"*
  - **In actuality, the IRS only conducted 24 days of diligence reviewing GCU's application versus the ~2 years of review conducted by the DoE**



**Bob Shireman** @Bob_Shireman · Nov 13, 2019

Why did the IRS approve the nonprofit? We have the application and it appears to have been rubber-stamped by the IRS -- approved 24 days after receipt, an even shorter time than the Remington example we cited four years ago

> Dear Applicant,
> We are pleased to inform you that upon your review of your tax exempt status we have determined that you are exempt from Federal income tax under section 501 (c)(3) of the Internal Revenue Code.

 RESEARCH     © Copyright 2020     Citron Research     www.citronresearch.com     **All Inquiries:** info@citronresearch.com



**Grand Canyon Education's rebuttal to the DoE contains outright lies and diversions, the most egregious of which are:**

- **LOPE claims GCU is in "strong financial health"**

  - *"More broadly, the HLC's analysis has been confirmed in the time since the Transaction closed. GCU's revenue net of expenses and revenue net of expenses after interest for the year ended June 30, 2019, its first fiscal year of operations as a stand-alone tax-exempt educational institution, were $78.8 million and $26.1 million, respectively. In addition, for the year ended June 30, 2019, GCU generated over $123 million in operating cash flows and, as of June 30, 2019, held over $325 million in cash reserves"*

  - As we have illustrated in Section II on the Credit Agreement, this is blatantly misleading for a number of reasons:

    - GCU's operating cash flows are inflated by the Accounts Receivable loan

    - Even GCU's reported / inflated operating cash flows are not even enough to cover its CapEx, which was $200mm in the same 12 month period per GCU disclosures

    - Beyond credit extended to GCU via LOPE (CapEx / AR), the University has also been drawing down on additional unreported / opaque lines of secured credit (UCC Filings)

  - LOPE is attempting to portray a strong financial condition by using a period end cash balance which has been inflated by all these credit lines as well as an operating cash flow metric which is distorted by a working capital loan (and isn't even enough to cover CapEx in any case; notice how they do not mention total cash flow for the 12 month period).  Moreover, this cash balance is a **blatant distortion** because:

    - $60 million of that cash was used to "repay LOPE" in Q3.  More importantly, $100 million of that cash balance is what historically was called "Restricted Cash" when GCU / LOPE were consolidated:

      - Restricted cash and cash equivalents primarily represent amounts received from the federal and state governments under various student aid grant and loan programs, such as Title IV. The University receives these funds subsequent to the completion of the authorization and disbursement process and holds them for the benefit of the student. The U.S. Department of Education ("Department of Education") requires Title IV funds collected in advance of student billings to be restricted until the course begins

    - This cash has an exact matching line item in liabilities called "Student Deposits". This is not real cash – it is essentially a short-term loan from the government



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



**LOPE's Correspondence with the DoE has been Riddled with Lies**

**Through our FOIA, we were able to obtain Grand Canyon University's initial application to the DoE for non-profit status and found it riddled with lies and inconsistencies. This letter is dated January 10th, 2018:**

> "The revenue share between the two entities remains subject to completion of a transfer pricing study and subsequent negotiation, but is expected to be comparable to other shared services arrangements currently in use in the higher education marketplace"

- This is a clear lie as per our earlier analysis, it is virtually unprecedented for an OPM to take revenue splits on off-line revenues (e.g., meal plan, campus tuition, arena ticket sales, etc.)

**From the GCU response letter to the DoE dated November 12th, 2019, the Company states:**

> "It is also important to note that the decision to employ Mr. Mueller was made independently by both GCU's Board of Trustees and GCE's Board of Directors, each of which is fully independent of the other, with no overlapping members"

- But this is an outright fabrication as in the DoE application, GCU lists its current Board of Trustees which INCLUDED all the current LOPE directors. Remember the date on the DoE application – January 10th, 2018. The trustees who were on GCU's board did not resign until June 1st (application says April 1st because that is when it was slated to close, but it was delayed). It was not until <u>August 2018</u> that three new outside trustees were elected to the GCU Board of Trustees

- <span style="color:red">**This is a very important distinction that lawyers will have a field day with. The Board of Trustees who elected Brian Mueller to its board in late 2017 had all the current LOPE directors sitting on it at the time**</span>

20. Check here if you have a board of trustees.
    Check here if you have a board of directors.
    Check here if you have more than 10 on your board, list only the board's executive committee, and provide the name of a contact person in Question 21.

| Name | End Date |
|------|----------|
| Mr. Brian E. Mueller | |
| Mr. David Johnson | 04/01/2018 |
| Mr. Jack Henry | 04/01/2018 |
| Mr. Kevin Warren | 04/01/2018 |
| Ms Sara R. Dial | 04/01/2018 |
| Mr. Wilfred Gonzales | |
| Mr. Fred Miller | |
| Mr. James Rice | |
| Mr. Donald Andorfer | |



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



# Section VII

## Management's History & Motivations





As crazy as it may seem, the management of LOPE, has had a history of SEC violations.  Normally, this would preclude you from you running a public company.  In this instance, we believe management's current violations will end up being criminal.  Below is a brief history of the top LOPE executives who have orchestrated this scheme.

**Brian Mueller – Chief Executive Officer**

- Chief Operating Officer / President of Apollo Group from 1997 to 2008

    - The Company was charged and sued multiple times by federal regulators for a myriad of improprieties committed under Brian Mueller's watch
        - https://www.whistleblowersblog.org/2009/12/articles/false-claims-qui-tam/university-of-phoenix-settles-whistleblowers-fraud-claim/
        - https://www.bizjournals.com/wichita/stories/2004/09/13/daily21.html
        - https://oregonbusinessreport.com/2010/10/oregon-wins-10-million-lawsuit-against-university-of-pheonix/

**Dan Bachus – Chief Financial Officer**

- Chief Accounting Officer and Controller of Apollo Group (owners of University of Phoenix) from 2000 to 2006
    - Forced to resign due to options scandal in 2006, the charges of which Apollo settled in 2008
        - At the time, then **CEO Brian Mueller** stated that the internal probe had found a "flawed" options-granting plan, and "irregularities with regard to the process" of awarding options. "That's why we made the announcement we did today, and announced there were a couple of people who are no longer with us."
        - In March, the company's share price dropped 27 percent in a day following the loss of a class-action lawsuit filed over illegal stock option pricing
- Chief Financial Officer of Loreto Bay Company from 2007 to 2008
    - Company promptly went bankrupt, leaving consumers who had purchased unfinished homes in the to-be-developed community out of luck (lawsuits ensued)
- Chief Financial Officer of LOPE since 2008
    - Amazingly Bachus was rehired by the same person who "fired" him for committing fraud.  A classic. "let's put the gang back together" scheme



© Copyright 2020   Citron Research   www.citronresearch.com

All Inquiries: info@citronresearch.com



**Stan Meyer – Chief Operating Officer**

- Former Executive Vice President at Apollo Group from 2002 to 2008

**Joseph Mildenhall – Chief Information Officer**

- Former Chief Information Officer and Director at Apollo Group from 1998 to 2009

**Dilek Marsh – Chief Data Officer**

- Former Vice President of Business Intelligence at Apollo Group from 1998 to 2006

**Junette West – Chief Financial Officer at GCU**

- Former VP of Finance at Apollo Group from 1998 to 2014

**The bottom line is this is a management team with misleading/deceptive practices as part of their playbook.**



© Copyright 2020   Citron Research   www.citronresearch.com

**All Inquiries:** info@citronresearch.com

**Whenever we suspect a Company of committing fraud, we like to evaluate management's actions within the context of the Fraud Triangle framework to determine whether the three conditions exist which would motivate a Company to commit fraud**



**Pressure**
Motivation or Incentive to Commit Fraud

**Rationalization**
Justification of Dishonest Actions

**FRAUD**

**Opportunity**
The Knowledge and Ability to Carry Out Fraud

**There exists plenty of incentive / pressure for LOPE management to perpetrate this fraud:**

- **Management has gotten very wealthy off this fraud**
  - See following slide for insider sales
  - For context, the highest paid current non-profit University President makes $4mm per year

**Look no further than GCU's response to the DoE letter to see its justification for dishonest actions. Much of the letter is spent touting the virtues of the University, a topic which was never even addressed by the DoE:**

"Perhaps most disappointing, however, is the Department's failure to acknowledge the accomplishments that have occurred at GCU, both before and since the transaction closed – from an institution that was on the verge of closing more than a decade ago, to one that today is extremely important to the City of Phoenix, the State of Arizona and hundreds of thousands of students and alumni across the world."

"Again, perhaps most importantly, GCU's success has been accomplished without the University raising tuition at its ground campus for 12 straight years, with tuition holding at $16,500 per year, and with only nominal 1% tuition increases for its online campus over the last 10 years."

"A tremendous benefit of the University's low cost of attendance is that the University has created one of the most diverse student bodies in the country with its ground campus student body consisting of 47% students of color, including 29% Hispanic and 7% African-American."

**Management has created a opaque closed loop system to execute this fraud:**

- GCU issued the Senior Note directly to LOPE, which enables them to not have to report financials publicly (i.e. no public debt)

- The CEO's are the same and every corporate function at GCU is outsourced to LOPE management, which obviously allows them to allocate all accounting and financial items as they see fit





As LOPE management has been committing this egregious fraud, they have been quickly dumping stock.

**Below is a quick summary of LOPE insider sales over the past 5 years:**

| Insider Name | $ Amount Sold | Average Price |
| --- | --- | --- |
| Chairman/President/CEO and GCU President Brian Mueller | $96 Million | $65.38 |
| COO Stan Meyer | $46 Million | $72.98 |
| CFO Dan Bachus | $37 Million | $76.25 |
| Chief Information Officer Joseph Mildenhall | $21 Million | $71.56 |
| CAO/General Counsel/Secretary Brian Roberts | $3 Million | $48.61 |
| Former Chairman Brent Richardson | $3 Million | $48.04 |
| Chief Data Officer Dilek Marsh | $1 Million | $127.56 |
| Board member Jack Henry | $500 Thousand | $78.41 |



GRAND CANYON EDUCATION

LOPE's latest proxy shows that top management is eligible for a bonus based "on the achievement of company-wide revenue and adjusted EBITDA targets".  Given that Mueller is also the President of GCU, this creates a massive conflict of interest as Mueller is being compensated for reporting strong financials at LOPE while being the head of LOPE's captive client GCU.

This odd corporate structure along with greed has fueled the creation of this accounting fraud.  LOPE management is aware that this "transaction" is nothing more than an unsustainable scheme to manipulate publicly reported financials in order to juice the stock higher so management can unload stock.

CEO Brian Mueller, COO Stan Meyer, and CFO Dan Bachus have all been with LOPE since the company's IPO in 2008.  In October 2014, LOPE publicly announced an effort to convert to non-profit.  Since the hype of this "transaction", management has taken the opportunity to dump stock into the market.

**Below is a table with the insider sales of these three top LOPE executives:**

| Insider Name | $ Amount Sold From Oct. 2014 to Present | $ Amount Sold From 2008 to Oct. 2014 |
| --- | --- | --- |
| Chairman/President/CEO and GCU President Brian Mueller | $96 Million | $36 Million |
| COO Stan Meyer | $46 Million | $15 Million |
| CFO Dan Bachus | $37 Million | $17 Million |



© Copyright 2020     Citron Research     www.citronresearch.com

**All Inquiries:** info@citronresearch.com



# Section VIII

## Conclusion



**Other Creditors (UCC Filings)**

**We told you not to panic! This should make sense now.**

GCU collateralizes more and more assets

Creditors loan more money to fund cash burn

LOPE Transfers Assets To GCU

GCU transfers $870mm Secured Note to LOPE

LOPE provides OPM Services while only recognizing minimal operating costs

GCU pays 60% of revenue for accounting recognition purposes

LOPE funds the cash burn at GCU (due to GCU only receiving 40% of revenue) through a CapEx and AR loan





**Net Result For LOPE**

**EPS**: Optically elevated due to full accounting recognition of 60% rev split
**FCF Conversion**: Collapsing as more debt floods out through receivables and capex loans
**Balance Sheet**: Accounts Receivables & Secured Note Receivable Balances Rising

**Net Result For GCU**

**Net Income** : GCU mgmt solves to breakeven (in order to salvage DoE Composite Score)
**FCF Burn**: ~$100mm+ per year due to improper expense allocation / revenue split
**Balance Sheet**: Accounts Payable, Secured Note Payable Balance, and Other Debt Balance all rising. Leverage rising fast.

| | |
|---|---|
| —————— | **Balance Sheet Items** |
| – – – – – | **Income Statement Items** |
| – – – – – | **Cash Flow Items** |

 RESEARCH    © Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



**This is a clear violation of SEC rule 10b-5:**

- Rule 10b-5 is a catch-all provision that is perhaps the most important and widely used anti-fraud securities rule

- Violations of the rule include executives making false statements in order to drive up share prices, <u>a company hiding huge losses or low revenues with creative accounting practices</u>, or actions taken to grant current shareholders a better return on their investments (as long as the deception remains undiscovered). These schemes typically require ongoing, misleading statements in order to perpetuate the fraud

- Judge Lynch went on to highlight the underpinning for such a claim: "Indeed, the most basic element of all fraud claims is that the victim must be deceived by the perpetrator's words or actions." Judge Lynch recognized "several kinds of cognizable deception," including "misleading statements or material omissions" under Rule 10b-5(b), "market manipulation" under Rule 10b-5(a) and (c) (in which "instead of deceiving investors by making false statements, fraudsters… deceive investors by causing the market to make their false statements for them") and claims that are "inconsistent with a fiduciary duty" (in which case "the fiduciary duty serves as a sort of standing false representation by the fraudster, who deceives the victim by violating the commitment associated with her fiduciary duty").

**The DoE's extensive research and knowledge of the LOPE/GCU relationship deemed them to be a related party engaging in an unfair transaction that was designed to benefit shareholders. Those are the words directly from the DoE and not Citron. It would be negligent for their auditors not to acknowledge PCAOB Auditing Standard No. 2410 (AS 2410) under the Sarbanes-Oxley Act of 2002 and not dig deeper into the fraud highlighted by Citron.**



**LOPE is grossly overvalued regardless of fraud.  Their margins are neither real nor sustainable, therefore, we must value LOPE vs. peers on EV/Sales.  On this metric, LOPE trades at a 130% premium to for profit education peers and a 180% premium to industry leading OPM TWOU.  Citron expects LOPE to see meaningful multiple contraction.**

**LOPE trades at 5.3x vs. for profit education peer average at 2.3x**

**LOPE trades at 5.3x vs. industry leading OPM TWOU at 1.9x**





 | RESEARCH    © Copyright 2020    Citron Research    www.citronresearch.com    All Inquiries: info@citronresearch.com

Even during our initial take of Grand Canyon Education in September, we suspected that something simply did not add up with the numbers but did not devote much time to it due to a lack of supporting information.  The surprising, but obviously warranted decision, by the Department of Education to deny GCU non-profit status allowed us to dig deeper by submitting an FOIA request for all relevant documents of the transaction between Grand Canyon University and Grand Canyon Education ("LOPE").

The details and extent of the accounting fraud we found were shocking to us – though should not be entirely surprising given the management team's extensive history of fraud and financial improprieties.

**On top of all this, CEO Brian Mueller has sold ~$100mm of stock since the Company began to pursue this transaction, making him the single highest paid "educator" in the country.  COO Stan Meyer and CFO Dan Bachus have sold $46mm and $37mm, respectively.**

Moreover, it is important to note that the Department of Education is not some unreasonable entity that has it out for for-profit institutions.  On the contrary, this administration, if anything, is remarkably lenient under Betsy Devos.  The DoE took ~5 months to approve the Kaplan / Purdue and Zovio / Ashford (pre approval) transactions given proper cooperation from those entities.  The fact that they rejected LOPE / GCU only serves to highlight the extremely egregious nature of the transaction.

The DoE's extensive research and knowledge of the LOPE/GCU relationship deemed them to be a related party engaging in an unfair transaction that was designed to benefit shareholders.  Those are the words directly from the DoE and not Citron.  It would be negligent for their auditors not to acknowledge PCAOB Auditing Standard No. 2410 (AS 2410) under the Sarbanes-Oxley Act of 2002 and not dig deeper into the fraud highlighted by Citron.

If LOPE management disagrees with any of our factually supported allegations in this report, the answer is simple:

- **Release audited financial statements for Grand Canyon University (income, balance sheet, and cash flow).  Show the true financial state of Grand Canyon University through an objective financial picture.  This is what virtually every other non-profit University already does through their annual reports!**

  - To illustrate just how unprecedented it is that GCU does not file an annual report, compare them to Everglades University, Purdue University, Arizona State University, Liberty University, Fayetteville State University; all of which file annual reports

**<span style="color:red">In light of the significant fraud we have uncovered, we are lowering our Price Target from $30 previously to $0</span>**



Citron | RESEARCH    © Copyright 2020    Citron Research    www.citronresearch.com    **All Inquiries:** info@citronresearch.com

# Appendix



Below is the slide that we presented in September that started our investigation. At the time, we did not believe that a negative ruling on GCU's non-profit status was a potential risk as LOPE never disclosed it in its risk factors and sell side assumed approval was guaranteed.

## LOPE Might be Dead Already... SEC Should Investigate Immediately!

Moving costs to an off-balance sheet subsidiary is the oldest trick in the book. In a highly unusual move, GCU paid $875 million for the GCU campus and its assets through the issuance of a 7 year senior secured note.

Lope is not in the banking business kept the note to avoid tapping the public markets to help structure this deal as it would require increased disclosure.

What is GCE hiding? Citron believes GCE is stuffing GCU with expenses to inflate its own profitability and as a result bankrupting GCU. After thoroughly reviewing LOPE's filings, we discovered a **MAJOR RED FLAG.**

In LOPE's 10-K filing, the company notes that: *"Funding expectations for future capital expenditures for GCU are* **$100 million** *for the year ended December 31, 2019."*

However, LOPE's latest 10-Q filing reveals that funding to GCU for CapEx is **$170 million** in just the first 6 months of 2019.

Is GCE taking its own OpEx and booking it as CapEx for GCU?

**If there is not a perfect explanation for these accounting shenanigans, LOPE is going to ZERO!**

| (In thousands) | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Cash flows provided by operating activities:** | | |
| Net income | $ 124,355 | $ 119,719 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Share-based compensation | 5,185 | 6,734 |
| Provision for bad debts | | 8,669 |
| Depreciation and amortization | 9,065 | 27,971 |
| Amortization of intangible assets | 3,865 | — |
| Deferred income taxes | 1,373 | 1,246 |
| Loss on transaction, net of costs and asset impairment | 3,966 | 1,990 |
| Other, including fixed asset impairments | (285) | 1,018 |
| Changes in assets and liabilities: | | |
| Accounts receivable and interest receivable from university partners | 41,056 | — |
| Accounts receivable | — | (7,784) |
| Prepaid expenses and other | (2,220) | (78) |
| Right-of-use assets and lease liabilities | 147 | — |
| Accounts payable | (102) | (1,373) |
| Accrued liabilities | 1,746 | 512 |
| Income taxes receivable/payable | (8,812) | (14,365) |
| Deferred rent | — | (189) |
| Deferred revenue | 9,996 | 6,880 |
| Student deposits | — | (7,288) |
| Net cash provided by operating activities | 189,335 | 143,662 |
| **Cash flows used in investing activities:** | | |
| Capital expenditures | (9,656) | (79,166) |
| Additions of amortizable content | (228) | — |
| Funding to GCU for capital expenditures | (169,819) | — |



These reports have been prepared by either Citron Research ("Citron Research") or Citron Capital, LLC ("Citron Capital"). Citron Research and Citron Capital are referred to collectively as "Citron" and each individually as a "Citron Entity." Each report specifies the publisher and owner of that report. All reports are for informational purposes only and presented "as is" with no warranty of any kind, express or implied. Under no circumstances should any of these reports or any information herein be construed as investment advice, or as an offer to sell or the solicitation of an offer to buy any securities or other financial instruments.

Citron Research produces research reports on publicly traded securities, and Citron Capital is an exempt reporting adviser filed with the California Department of Business Oversight. The reports are the property of the applicable Citron Entity that published that report. The opinions, information and reports set forth herein are solely attributable to the applicable Citron Entity and are not attributable to any Citron Related Person (defined below) (other than the Citron Entity that published the report).

By downloading, accessing, or viewing any research report, you agree to the following Terms of Use. You agree that use of the research presented in any report is at your own risk. You (or any person you are acting as agent for) agree to hold harmless Citron, Citron Capital and each of their affiliates and related parties, including, but not limited to any principals, officers, directors, employees, members, clients, investors, consultants and agents (collectively, the "Citron Related Persons") for any direct or indirect losses (including trading losses) attributable to any information in a research report. You further agree to do your own research and due diligence before making any investment decision with respect to securities of the issuers covered herein (each, a "Covered Issuer") or any other financial instruments that reference the Covered Issuer or any securities issued by the Covered Issuer. You represent that you have sufficient investment sophistication to critically assess the information, analysis and opinion presented in any Citron report. You further agree that you will not communicate the contents of reports and other materials made available by Citron to any other person unless that person has agreed to be bound by these Terms of Use. If you access, download or receive the contents of Citron reports or other materials on your own behalf, you agree to and shall be bound by these Terms of Use. If you access, download or receive the contents of Citron reports or other materials as an agent for any other person, you are binding your principal to these same Terms of Use.

As of the publication date of a Citron report, Citron Related Persons (possibly along with or through its members, partners, affiliates, employees, and/or consultants, Citron Related Persons clients and/or investors and/or their clients and/or investors have a position (long or short) in one or more of the securities of a Covered Issuer (and/or options, swaps, and other derivatives related to one or more of these securities), and therefore may realize significant gains in the event that the prices of a Covered Issuer's securities decline or appreciate. Citron Research, Citron Capital and/or the Citron Related Persons may continue to transact in Covered Issuers' securities for an indefinite period after an initial report on a Covered Issuer, and such position(s) may be long, short, or neutral at any time hereafter regardless of their initial position(s) and views as stated in the Citron research. Neither Citron Research nor Citron Capital will update any report or information to reflect changes in positions that may be held by a Citron Related Person.

This is not an offer to sell or a solicitation of an offer to buy any security. Neither Citron Research nor any Citron Related Person (including Citron Capital) are offering, selling or buying any security to or from any person through any Citron research reports. Citron Research is affiliated with Citron Capital. Citron Capital is an exempt reporting adviser filed with the California Department of Business Oversight and is not registered as investment adviser in any other jurisdiction. Citron Capital does not render investment advice to anyone unless it has an investment adviser-client relationship with that person evidenced in writing. You understand and agree that Citron Capital does not have any investment advisory relationship with you or does not owe fiduciary duties to you. Giving investment advice requires knowledge of your financial situation, investment objectives, and risk tolerance, and Citron Capital has no such knowledge about you.

The research and reports made available by Citron reflect express the opinion of the applicable Citron Entity as of the time of the report only. Reports are based on generally available information, field research, inferences and deductions through the applicable Citron Entity's due diligence and analytical process. To the best of the applicable Citron Entity's ability and belief, all information contained herein is accurate and reliable, is not material non-public information, and has been obtained from public sources that the applicable Citron Entity believe to be accurate and reliable, and who are not insiders or connected persons of the Covered Issuers or who may otherwise owe a fiduciary duty, duty of confidentiality or other duty to the Covered Issuer (directly or indirectly). However, such information is presented "as is," without warranty of any kind, whether express or implied. With respect to their respective research reports, Citron Research and Citron Capital makes no representation, express or

implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. Further, any research report contains a very large measure of analysis and opinion. All expressions of opinion are subject to change without notice, and Citron does not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them.

In no event shall Citron Research, Citron Capital or any Citron Related Persons be liable for any claims, losses, costs or damages of any kind, including direct, indirect, punitive, exemplary, incidental, special or, consequential damages, arising out of or in any way connected with any information presented in any Citron report. This limitation of liability applies regardless of any negligence or gross negligence of Citron Research, Citron Capital or any Citron Related Persons. You accept all risks in relying on the information presented in any report.

You agree that the information in any Citron research report is copyrighted, and you therefore agree not to distribute this information in any manner without the express prior written consent of the applicable Citron Entity. If you have obtained Citron research reports in any manner other than as provided by Citron, you may not read such research without agreeing to these Terms of Use. You further agree that any dispute between you and Citron and their affiliates arising from or related to this report or viewing the material presented herein shall be governed by the laws of the State of California, without regard to any conflict of law provisions. The failure of Citron Research or Citron Capital to exercise or enforce any right or provision of these Terms of Use shall not constitute a waiver of this right or provision. You agree that each Citron Related Person is a third-party beneficiary to these Terms of Use. If any provision of these Terms of Use is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of these Terms of Use remain in full force and effect, in particular as to this governing law and jurisdiction provision. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to Citron report or related material must be filed within one (1) year after the occurrence of the alleged harm that gave rise to such claim or cause of action, or such claim or cause of action be forever barred.

