**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 1:20-cv-00639-MN-CJB |

**DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Samuel C. Feldman (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
sam.feldman@alston.com

*Counsel for Defendants*

Dated:  December 21, 2020

# TABLE OF CONTENTS

Preliminary Statement..................................................................................................... 1

Background ...................................................................................................................... 1

    A.    The History of GCE and the University. ................................................. 1

    B.    The Transaction and the University's Tax-Exempt Status. ................................... 2

    C.    The DOE Approves the Transaction. .................................................................. 3

    D.    Plaintiffs' Claims and Allegations. ..................................................................... 4

Legal Standard ................................................................................................................ 5

Argument ........................................................................................................................ 6

I.    The Complaint Fails to Plausibly Allege Scienter. ................................................... 6

    A.    The Alleged Scheme Lacks a Coherent Rational Objective. .................................. 6

    B.    The Complaint Fails to Plead Facts Supporting a Strong Inference of Scienter. .................................................................................................. 9

II.    The Complaint Fails to Plausibly Allege Any Actionable Misstatements. ...................... 13

    A.    The Alleged Misstatements Regarding the Transaction Were Neither False Nor Misleading. ...............................................................................13

    B.    The Complaint Does Not Plausibly Allege That Any of the Remaining Purported Misstatements Were False and Misleading. ......................................... 17

III.    The Complaint Fails to Plausibly Allege Loss Causation. .............................................. 18

Conclusion .................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................5

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013).........................................................................2

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
No. 15-cv-01795-WHO, 2016 U.S. Dist. LEXIS 119194
(N.D. Cal. Sept. 2, 2016) ........................................................................................20

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)......................................................................................7

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009).............................................................6, 9, 10, 20

*Cozzarelli v. Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) ....................................................................................8

*Fain v. United States Techs.*,
707 F. App'x 91 (3d Cir. 2017) ..............................................................................10

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................1, 7

*Hoey v. Insmed, Inc*,
No. 16-4323 (FLW), 2018 U.S. Dist. LEXIS 24907 (D.N.J. Feb. 15, 2018) ............8

*In re 2007 Novastar Fin., Inc.*,
No. 07-0139-W-ODS, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008)....................10

*In re Columbia Labs, Inc.*,
602 F. App'x 80 (3d Cir. 2015) ..............................................................................12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)......................................................................................19

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002)..................................................................................16

*In re Newell Brands, Inc. Sec. Litig.*,
No. 20-1292, 2020 U.S. App. LEXIS 37461 (3d Cir. Dec. 1, 2020)............................5, 15, 16

*In re PolariyTE, Inc. Sec. Litig.*,
No. 2:18-cv-00510, 2020 U.S. Dist. LEXIS 219835 (D. Utah Nov. 22, 2020)......................15

*Jasin v. Vivus, Inc.*,
No. 14-cv-03263-BLF, 2016 U.S. Dist. LEXIS 52388
(N.D. Cal. Apr. 19, 2016) ...........................................................................................11

*Joyce v. Bobcat Oil & Gas, Inc.*,
No. 1:CV-07-1421, 2008 U.S. Dist. LEXIS 27181 (M.D. Pa. Apr. 3, 2008).........................18

*Labib Janbay v. Canadian Solar, Inc.*,
No. 10 Civ. 4430, 2012 U.S. Dist. LEXIS 47125 (S.D.N.Y. Mar. 30, 2012)...........................9

*Martin v. GNC Holdings, Inc.*,
757 F. App'x 151 (3d Cir. 2018) .....................................................................................6

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .....................................................................................20

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
720 F. Supp. 2d 517 (D.N.J. 2010) ...................................................................11, 12, 13, 18

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ..........................................................................................7

*Roofer's Pension Fund v. Papa*,
No. 16-2805, 2018 U.S. Dist. LEXIS 125885 (D.N.J. July 27, 2018)....................................12

*Sapir v. Verback*,
No. 14-7331, 2016 U.S. Dist. LEXIS 15956 (D.N.J. Feb. 10, 2016) ......................................8

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*,
396 F. Supp. 3d 413 (E.D. Pa. 2019) ...............................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................................6

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017)...........................................................................................15

**RULES**

Federal Rule of Civil Procedure 9(b)................................................................................5

Federal Rule of Civil Procedure 12(b)(6) .........................................................................5

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ................................................................................................6

LEGAL02/40251865v18

15 U.S.C. § 78u-4(b)(2) ...............................................................................................................6

15 U.S.C. § 78u-4(b)(4) ...............................................................................................................6

26 U.S.C. § 501(c)(3)....................................................................................................................8

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5.........................................................................................................4, 5, 20

34 C.F.R. § 600.31(a)(3)...............................................................................................................3

34 C.F.R. § 666.28 ........................................................................................................................3

64 Fed. Reg. 58,608 (Oct. 29, 1999).............................................................................................3

LEGAL02/40251865v18

## CITATION CONVENTIONS

"Complaint" or "Compl.":  Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws (DCKT #34)

"Class Period":  January 5, 2018 through January 27, 2020

"Defendants":  Defendants Grand Canyon Education, Inc., Brian E. Mueller and Daniel E. Bachus

"DOE":  United States Department of Education

"Exchange Act":  The Securities Exchange Act of 1934

"FSA Handbook":  DOE Federal Student Aid Handbook (2017-2018 edition), *available at* https://ifap.ed.gov/ilibrary/document-types/federal-student-aid-handbook?award_year=2017-2018&

"GAAP":  Generally Accepted Accounting Principles

"GCE" or the "Company":  Defendant Grand Canyon Education, Inc.

"GCU" or the "University":  Non-Party Grand Canyon University

"HLC":  The Higher Learning Commission, GCU's institutional accreditor

"Individual Defendants":  Defendants Brian E. Mueller and Daniel E. Bachus

"IRS":  Internal Revenue Service

"Plaintiffs":  Lead Plaintiffs Fire and Police Pension Association of Colorado, Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust

"PSLRA":  Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, *et seq.*

"Rule 10b-5":  SEC Rule 10b-5, 17 C.F.R. § 240.10b-5

"SEC":  United States Securities and Exchange Commission

"Section 10(b)":  Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)

"Section 20(a)":  Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)

"Title IV":  Title IV of The Higher Education Act of 1965, 20 U.S.C. § 1070, *eq seq.*

## PRELIMINARY STATEMENT

This case arises out of the DOE's determination that it would continue to treat Grand Canyon University ("GCU" or the "University") as a for-profit university for regulatory purposes, even though it had been sold to and is operated by a nonprofit entity.  Plaintiffs seek to convert the DOE's decision into a securities fraud claim against Grand Canyon Education, Inc. ("GCE")— a service provider to and the former owner of the University—and two of GCE's executives. At its core, the Complaint alleges that Defendants *knew* the DOE would treat GCU as a for-profit university for regulatory purposes, but nevertheless intentionally misled the market into believing otherwise.

Plaintiffs' implausible theory of Defendants' purportedly fraudulent scheme, however, fails to establish the requisite element of scienter because it lacks "any coherent rational objective."[1]  Moreover, while the Complaint attempts to distort the DOE application process and Defendants' statements regarding the same, after peeling back the Complaint's numerous inaccuracies, Plaintiffs do not plead that any of Defendants' alleged misstatements were, in fact, false or misleading.  The Complaint should be dismissed accordingly.

## BACKGROUND

### A.    The History of GCE and the University.

GCE is a publicly-traded educational services company based in Phoenix, Arizona. (Compl. ¶ 20.)  It develops and provides technological solutions and operational processes to over 20 university partners across the country, including GCU, an accredited university that offers undergraduate and graduate degree programs to more than 100,000 students online and at its 275-acre Phoenix campus.  (GCE, Annual Report (Form 10-K), at 5 (Feb. 19, 2020).)[2]  The

---

[1] *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600-602 (S.D.N.Y. 2016).

[2] "This Court may consider on a motion to dismiss documents integral to or explicitly relied

University was founded in 1949 as a private, nonprofit college.  GCE acquired the University in 2004 and thereafter operated it as a for-profit institution of higher education.  (Compl. ¶¶ 24-25.)

### B.      The Transaction and the University's Tax-Exempt Status.

In January 2018, GCE announced that the University had applied to HLC, its institutional accreditor, for approval of a transaction whereby GCE would sell the University to an independent entity organized as an Arizona nonprofit corporation (the "Buyer"), enabling the University to return to its roots as a nonprofit institution (the "Transaction").  (GCE, Current Report (Form 8-K) (Jan. 5, 2018).)   HLC and the Arizona State Board for Private Postsecondary Education ("AZPPSE") approved the Transaction in the spring of 2018. (GCE, Current Report (Form 8-K) (July 2, 2018).)

The Transaction closed on July 1, 2018, and – pursuant to an Asset Purchase Agreement between GCE and the Buyer (the "APA") – the Buyer acquired certain of the University's assets, including the Phoenix campus.  (*Id.*)  The parties simultaneously entered into a Master Services Agreement (the "MSA"), pursuant to which GCE agreed to provide technological, marketing, financial aid processing and other services to the University in exchange for 60% of the University's tuition and fee revenue.  (*Id.*)  GCE publicly filed those agreements with the SEC. (GCE, Annual Report (Form 10-K) (Feb. 20, 2019), at Exs. 2.1, 10.13.)

Upon the closing of the Transaction, the University became owned and operated by the nonprofit Buyer and overseen and managed by an independent Board of Trustees.  (Compl. ¶ 50.) The IRS and the Arizona tax authorities have each confirmed the University's nonprofit status,[3] as

---

upon in the complaint, documents filed with the SEC, and matters of public record . . . ." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 505 n. 1 (D. Del. 2013) (quotations and citation omitted).

[3] *See also Details About Grand Canyon University*, IRS, https://apps.irs.gov/app/eos/ detailsPage?ein=472507725&name=Grand%20Canyon%20University&city=Phoenix&state=AZ &countryAbbr=US&dba=&type=CHARITIES,%20DETERMINATIONLETTERS,%20EPOST CARD&orgTags=CHARITIES&orgTags=DETERMINATIONLETTERS&orgTags=EPOSTCA

has the HLC, AZPPSE and the National Collegiate Athletic Association ("NCAA").   (*See* Grand Canyon Education, Inc., Current Report (Form 8-K) (Nov. 6, 2019).)

## C.      The DOE Approves the Transaction.

Prior to the Transaction, GCU participated in federal student aid programs as a for-profit university pursuant to a Program Participation Agreement ("PPA") with the DOE.   (*See* GCE, Annual Report (Form 10-K) (Feb. 21, 2018) at 26.)[4]   DOE regulations, however, provide that if a university "undergoes a change in ownership that results in a change in control," then, following the consummation of such change in ownership, the university must apply to the DOE for approval of the transaction and a new PPA.   34 C.F.R. § 600.31(a)(3).   A university may elect to seek a voluntary "preacquisition review" of the application, pursuant to which the DOE will "determine whether the institution has answered all the questions on the application completely and accurately."   64 Fed. Reg. 58,608, 58,611 (Oct. 29, 1999).   Through the preacquisition review process in effect at the time, the DOE could also signal that it would impose certain regulatory restrictions, such as an irrevocable letter of credit or growth limitations, in connection with the transaction.   The DOE's response to a preacquisition review, however, "will not be an official approval or denial of the application." *Id.*

In January 2018, prior to the Transaction, the University – then owned and operated by GCE – submitted a voluntary preacquisition review request to the DOE.   (Compl. ¶ 59.)   As set forth above, the University's preacquisition review request did not and could not seek (i) final approval of the Transaction or (ii) a new PPA.

---

RD (last visited Dec. 21, 2020); *Grand Canyon University Entity Information*, The Arizona Corporation Commission, https://ecorp.azcc.gov/BusinessSearch/BusinessInfo?entityNumber= 19665600 (last visited Dec. 21, 2020).

[4] For-profit institutions participating in Title IV are subject to certain requirements that do not apply to nonprofit institutions, such as the "90/10" rule, which prohibits a for-profit institution from deriving more than 90% of its revenue from federal student aid funds.   34 C.F.R. § 666.28.

3

Nearly six months later, the DOE still had not acted on the University's request.  (Compl. ¶¶ 66, 187.)  Based on the University's "engagement" with the DOE, however, the GCE Board and the University's Board of Trustees "concluded that the benefits of consummating the transaction" prior to receiving the DOE's response "were numerous, and any regulatory limitations imposed" by the DOE "could be managed."  (*Id*. ¶ 187.)  Accordingly, the parties moved forward with the Transaction, which closed on July 1, 2018.  (GCE, Current Report (Form 8-K) (July 2, 2018).)  After the Transaction closed, GCU submitted its application to the DOE for approval of the Transaction.  (Compl., Ex. A at 1-2.)

On November 6, 2019, the DOE approved the Transaction without imposing any regulatory restrictions and also determined that the University would continue to participate in federal student aid programs as a for-profit institution, but not as a nonprofit university.  (*Id*., Ex. A.)[5]  GCE disclosed the news that afternoon during a previously-scheduled analyst call and, the following day, filed a Current Report on Form 8-K and related press release with the SEC regarding the DOE's decision.  (*Id.* ¶ 160.)

### D.      Plaintiffs' Claims and Allegations.[6]

The Complaint alleges that Defendants GCE, Brian E. Mueller (GCE's CEO) and Daniel E. Bachus (GCE's CFO) violated Section 10(b) and Rule 10b-5, and that the Individual Defendants violated Section 20(a).  (Compl., Count I-II.)  In support of these claims, the Complaint alleges that, during the Class Period, Defendants made false or misleading statements regarding (i) GCE's relationship with the University following the Transaction, (ii) the University's nonprofit status,

---

[5] In the sixteen months between the University's application and the DOE's approval of the Transaction, the University continued to participate in federal student aid programs as a for-profit university pursuant to a temporary month-to-month PPA with the DOE.  (Compl. ¶ 59.)

[6] The Complaint is riddled with demonstrably inaccurate allegations.  Defendants' correction of select inaccuracies that are material to their Motion to Dismiss is not an admission of the many other false allegations in the Complaint.

4

(iii) the University's preacquisition review request, (iv) the similarity of the Transaction to shared service arrangements at other institutions, (v) GCE's compliance with GAAP and (vi) the "source of GCE's success," after the Transaction, which Plaintiffs allege was due to purportedly "abusive recruiting strategies." (*Id.* ¶¶ 175-226.) The Complaint further alleges that the Individual Defendants "knew, or, at a minimum, were severely reckless in not knowing, the true undisclosed facts when they made the[se] [alleged] false and misleading representations to investors," and that Plaintiffs' purported losses "were a direct and proximate result of Defendants' scheme being revealed." (*Id.* ¶¶ 227, 237.) Plaintiffs' unsubstantiated claims should be dismissed for the reasons set forth below.

## LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citation omitted). This requires more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do." *Id.* (quotations and citation omitted).

"To state a claim under Rule 10b-5, a plaintiff must demonstrate: (1) A material misrepresentation (or omission); (2) scienter (a wrongful state of mind); (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation." *In re Newell Brands, Inc. Sec. Litig.*, No. 20-1292, 2020 U.S. App. LEXIS 37461, at \*8-9 (3d Cir. Dec. 1, 2020) (quotations and citation omitted). A plaintiff also must satisfy the particularity requirements for a fraud claim under Federal Rule of Civil Procedure 9(b) and the PSLRA, which established "heightened pleading requirements . . . to ensure that private securities actions do not become 'a partial downside insurance policy' against the vicissitudes of the market." *Id.* (citation omitted). In particular, the PSLRA requires a plaintiff

5

to "specify each statement alleged to have been misleading" as well as "the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2). In addition, a plaintiff must plausibly allege that "the act or omission . . . alleged to violate" the Exchange Act "caused the loss for which the plaintiff seeks to recover damages." *Id.* § 78u-4(b)(4).

**ARGUMENT**

## I.     The Complaint Fails to Plausibly Allege Scienter.

 "Scienter is a mental state embracing intent to deceive, manipulate, or defraud," and "[a] plaintiff alleging scienter must assert facts giving rise to a ***strong inference*** of reckless or conscious behavior." *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153 (3d Cir. 2018) (quotations and citation omitted) (emphasis added). An inference of scienter is plausible "only if a reasonable person would deem the inference . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Here, the Complaint fails to plausibly allege any facts supporting a strong inference of scienter.[7]

### A.     The Alleged Scheme Lacks a Coherent Rational Objective.

The Complaint's core scienter allegation is that Defendants *knew* the DOE would treat the University as a for-profit university for regulatory purposes after the Transaction, but nevertheless intentionally sought to mislead the market into believing otherwise by generally stating that the

---

[7] "[T]o plead scienter against the corporate defendant[]," GCE, the Complaint "must identify facts raising a strong inference that false or misleading statements were made . . . by an individual acting on behalf of [the] company and who knew or was reckless in not knowing that the statements were false or misleading at the time they were made." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 426 (D. Del. 2009). The Complaint fails to plausibly allege scienter as to the Individual Defendants, and, thus, it also fails to plausibly allege scienter as to GCE.

6

University would operate as a "separate non-profit entity" following the Transaction.  (Compl. ¶¶ 5, 184.)

Plaintiffs' theory is nonsensical.  "[B]y its nature, [Defendants'] purported scheme could not have continued in perpetuity," and necessarily "would be revealed, in relatively short order," upon the announcement of the DOE's determination.  *Gillis* v. *QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600-602 (S.D.N.Y. 2016).  Plaintiffs offer no "coherent rational objective" on the part of Defendants for engaging in an alleged short-lived fraud which – according to Plaintiffs' own allegations – they knew would soon come to light.  *Id.* at 600.  "Courts regularly refuse to infer scienter . . . when confronted with [such] illogical allegations."  *Id*. at 601 (quotations and citation omitted).

In *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014), for example, the Third Circuit affirmed the dismissal of a securities class action, finding that it was "improbable" that defendants would have initiated a clinical drug trial "if they thought the drug was a complete failure," as plaintiff alleged.  754 F.3d at 170.  Likewise, in *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), the Ninth Circuit affirmed the dismissal of securities claims alleging that "defendants knew the FDA would not approve" a new drug, and questioned why defendants would "promise the market that the FDA would approve [the drug] if defendants knew the FDA would eventually figure out that [it] could not be approved due to 'intractable' and 'unresolvable' [] problems? ***The theory does not make a whole lot of sense***."  962 F.3d at 415 (emphasis added).  As the Ninth Circuit explained, "the notion that a company would promise [regulatory] approval that it knew would not materialize does not, without more, create a strong inference of intent to deceive or deliberate recklessness."  *Id.*  That type of scienter "allegation does not resonate in

7

common experience," and "the PSLRA neither allows nor requires" courts "to check [their] disbelief at the door." *Id.*[8]

Plaintiffs' theory of scienter is particularly specious here, where the IRS, Arizona state and local tax authorities as well as the University's accreditors all approved its nonprofit status. The IRS's qualification of the University as a tax-exempt nonprofit organization under 26 U.S.C. § 501(c)(3) is especially critical because the DOE's "definition of a nonprofit institution mirrors the statutory language for tax exempt organizations found in 26 U.S.C. § 501(c)(3)." (*Id.*, Ex. A, at 10; *see also id.* ¶ 60 (alleging that the DOE's regulations "mirrored in relevant respects the same analysis under the [IRS's] rules and tax laws").) Defendants thus would have no reasonable basis to expect that the DOE – applying the same statutory language and legal test as the IRS – would reach a different conclusion. Clearly, therefore, "when comparing the competing inferences, the opposing inference of non-fraudulent intent" – that Defendants reasonably believed that the University met the DOE's definition of a nonprofit institution – is significantly "more compelling than an inference of scienter." *Sapir v. Verback*, No. 14-7331, 2016 U.S. Dist. LEXIS 15956, at *31 (D.N.J. Feb. 10, 2016).

Finally, the "implausibility" of the alleged scheme "is further heightened by Plaintiff's failure to allege *why* [defendants purportedly] engaged in a scheme to defraud investors despite

---

[8] Federal courts within the Third Circuit and around the country have reached the same conclusion in cases alleging similarly implausible theories of scienter. *See, e.g., Sapir v. Verback*, No. 14-7331, 2016 U.S. Dist. LEXIS 15956, at *31 (D.N.J. Feb. 10, 2016) (dismissing claims that defendants "knew all along that" a clinical drug trial was unlikely to succeed because "when comparing the competing inferences, the opposing inference of non-fraudulent intent is more compelling than an inference of scienter"); *accord Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) ("It is improbable that [the defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure. Plaintiffs' inference of fraud based on the supposed impossibility" of FDA approval "is thus not even plausible, much less convincing.").

the high risks associated with such an activity." *Hoey v. Insmed, Inc*, No. 16-4323 (FLW), 2018 U.S. Dist. LEXIS 24907, at *61 (D.N.J. Feb. 15, 2018) (emphasis added). Most notably, Plaintiffs do not (because they could not) allege that the Individual Defendants made any improper stock sales in an attempt to profit from their alleged scheme to artificially inflate GCE's stock price. Plaintiffs otherwise offer no cogent rationale for the purported short-term fraud, and their claims must fail accordingly.[9]

### B.    The Complaint Fails to Plead Facts Supporting a Strong Inference of Scienter.

Even if the Complaint alleged a credible *theory* of scienter (and it does not), the Complaint nevertheless fails to "plead with particularity facts giving rise to a strong inference that defendants acted with scienter." *Roseville*, 686 F. Supp. 2d at 420; *see also Labib Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 U.S. Dist. LEXIS 47125, at *25 (S.D.N.Y. Mar. 30, 2012) ("The PSLRA requires the pleading of particularized facts that give rise to a strong inference that each defendant made each challenged statement with scienter.").

The Complaint generally attempts to plead scienter based on allegations that the Transaction was "negotiated by and known to the highest-level executives at the Company, including Defendants Mueller and Bachus," and that the Individual Defendants therefore must have known that the that the transaction "was entered into in order to use [the University] as an off-balance sheet entity" in which to improperly funnel expenses while recognizing the

---

[9] To the extent Plaintiffs insinuate that the University sought to participate in federal student aid programs as a nonprofit because it risked non-compliance with the regulatory requirements specific to for-profit entities, Plaintiffs are mistaken. When GCE announced the proposed Transaction in January 2018, only 72.3% of the University's revenue was derived from federal student aid funds, well below the 90% threshold applicable to for-profits, and the University's federal loan default rate was an estimated 6.5% — better than the 9.7% national average across all institutions of higher education, and significantly below the 30% rate that may jeopardize continued participation in Title IV. (GCE, Current Report (Form 8-K) (Jan. 5, 2018) at 7); *see also* "Official Cohort Default Rates for Schools," *available at https://www2.ed.gov/offices/OSFAP/defaultmanagement/cdr.html*.

University's revenues. (Compl. ¶¶ 231, 233.)[10] It is, however, "well established that[] allegations that a securities-fraud defendant, because of his position in the company, 'must have known' a statement was false or misleading are . . . inadequate." *Roseville*, 686 F. Supp. 2d at 422 (citation omitted). Rather, Plaintiffs must plead that "the danger of misleading investors was either actually 'known' by Defendants or '*so obvious* that [they] must have been aware of it.'" *Fain v. United States Techs.*, 707 F. App'x 91, 96 (3d Cir. 2017) (citation omitted). Plaintiffs have not made such a showing here, where "nobody—the SEC, [the] auditors, or anyone else—has suggested" that Defendants engaged in any impropriety or that they "should or must restate [the company's] financials" to differently account for GCE's relationship with the University. *In re 2007 Novastar Fin., Inc.*, No. 07-0139-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *12 (W.D. Mo. June 4, 2008).[11]

The Complaint next attempts to plead scienter by alleging that the DOE's limited inquiries regarding the University's preacquisition review request and post-closing application for approval of the Transaction "support[] a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that the Company risked the DOE denying [the University's] application for non-profit status—thereby making their statements on these subjects knowingly or recklessly false and materially misleading when made." (Compl. ¶ 230.) The Complaint, however, fails to support these allegations with "clear facts verifying plaintiff's

---

[10] Plaintiffs relatedly assert that the Transaction's "centrality to the Company's operations support a strong inference" that the Defendants knew the transaction was entered into for these improper purposes. (Compl. ¶ 233.) To the extent Plaintiffs attempt to plead a "core operations inference" of scienter, their attempt must likewise fail because Plaintiffs cannot escape their burden of pleading "particularized allegations showing that defendants had ample reason to know of the falsity of their statements." *Roseville*, 686 F. Supp 2d at 423.

[11] And, of course, Plaintiffs do not allege that the IRS, the University's state or local tax authorities, the University's accreditors, the State of Arizona or anyone other than Plaintiffs and a self-interested short-seller have suggested that Defendants engaged in any impropriety related to the Transaction.

deductions with respect to defendant's state of mind." *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 553 (D.N.J. 2010). The Complaint does not, for example, plead any facts plausibly alleging that the DOE's requests were in any way unusual or out of the ordinary course, or that the DOE indicated at any time that it was likely to continue to treat the University as a for-profit university for regulatory purposes even though it had been sold to, and is operated by, a nonprofit entity. Moreover, as discussed above, since every other regulator confirmed the University's nonprofit status, there is no plausible basis to conclude that the Individual Defendants knew or should have known that the DOE's ordinary course requests for information presaged the DOE's ultimate determination.

Relatedly, the Complaint alleges that "the DOE's discussion" of certain third-party reports commissioned by GCE and the University demonstrate that "Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that the Conversion primarily benefitted GCE, not [the University], and thus that [the University] was not a non-profit entity." (Compl. ¶ 232.) These allegations, however, "do not give rise to a cogent inference of scienter" because Plaintiffs can offer no rational explanation for why Defendants would voluntarily commission and ultimately submit to the DOE reports that they *knew* demonstrated that the University did not qualify as a non-profit entity. *Jasin v. Vivus, Inc.*, No. 14-cv-03263-BLF, 2016 U.S. Dist. LEXIS 52388, at *66 (N.D. Cal. Apr. 19, 2016). The theory must fail for the additional and independent reason that, whatever "Plaintiffs may now be able to say, with the benefit of hindsight" about the reports, "Plaintiffs have failed to allege facts to demonstrate that Defendants knew any of this at the time of their challenged statements."[12] *Id.* That is, setting aside *post hoc* inferences drawn from the

---

[12] Indeed, some of the alleged misstatements were made *before* the referenced reports were even created. (Compl. ¶ 96 (alleging two reports from Barclay's were created in April and June 2018, respectively); *id.* ¶¶ 177-180, 202-206 (alleged misstatements in January, February and

DOE's November 2019 decision letter, the Complaint does not allege how Defendants knew or should have known *at the time of the alleged misstatements* that the DOE would decide to continue to treat the University as a for-profit university for regulatory purposes.  There are no allegations, for example, that any DOE regulations or interpretive guidance demonstrated to Defendants that the University could not participate in federal student aid programs as a nonprofit, based on the information set forth in the referenced reports.  *See In re Columbia Labs, Inc.*, 602 F. App'x 80, 82 (3d Cir. 2015) (affirming dismissal of claims regarding drug trial results rejected by the FDA because "the facts alleged . . . do not create a strong inference that [defendants] even knew that the alleged benchmarks would be required by the FDA, let alone that these parties intended to deceive, manipulate, and defraud investors by failing to disclose that [results] had not reached them").

Finally, the Complaint fails to plead scienter as to the remaining alleged misstatements regarding (i) the similarity of the Transaction to shared service arrangements at other institutions (Compl. ¶¶ 201-210), (ii) GCE's compliance with GAAP (*id.* ¶¶ 211-219) and (iii) the "source of GCE's success," which Plaintiffs allege was due to purportedly "abusive recruiting strategies" following the Transaction (*id.* ¶¶ 220-226).  The Complaint is devoid of allegations that Defendants (i) knew or recklessly disregarded the alleged differences between the Transaction and similar transactions, (ii) "knew that their alleged . . . practices violated GAAP but ignored it," *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 557,[13] or (iii) had any knowledge of purported "abusive recruiting strategies"—allegations GCE strongly denies.  (Compl. ¶¶ 220-226.)[14]

---

March 2018).)

[13] The unqualified opinions of GCE's auditor, which covers the GCE-University contractual relationship and the accounting of same, "raise[] a strong inference that any [accounting] errors were not so obvious that their publication demonstrates an intent to defraud investors." *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 U.S. Dist. LEXIS 125885, at \*54 (D.N.J. July 27, 2018) (quotations and citation omitted).

[14] The Complaint's allegations based on statements from alleged former GCE employees

12

II.     **The Complaint Fails to Plausibly Allege Any Actionable Misstatements.**

A.     **The Alleged Misstatements Regarding the Transaction Were Neither False Nor Misleading.**

The Complaint alleges that Defendants made material misstatements regarding GCE's relationship with the University and the University's nonprofit status following the Transaction, as well as the DOE's review of the preacquisition review request. The statements that serve as the basis of Plaintiffs' claims, however, were neither false nor misleading.

**GCE's Relationship with the University.** The Complaint alleges that it was false and misleading for Defendants to state that, following the Transaction, (i) the University would be a "separate" entity from GCE, (ii) GCE's relationship with GCU, both pursuant to the shared services arrangement and operationally, would no longer be as owner and operator, and (iii) GCE would act as a third-party service provider to the University. (*Id.* ¶¶ 185, 200.) The Complaint additionally alleges that GCE falsely stated that GCE's "current faculty, academic leadership and related staff and employees" would become employees of the University, and that Defendant Mueller would thereafter be the only individual simultaneously employed by both GCE and the University. (*Id.* ¶ 200.)[15]

It is indisputably *true*, however, that (a) pursuant to the Transaction, Buyer, an Arizona nonprofit corporation, purchased the University in July 2018 (GCE, Current Report (Form 8-K) (July 2, 2018)); (b) the University now owns the Phoenix campus and the other assets set forth in the parties' APA (GCE, Annual Report (Form 10-K) (Feb. 20, 2019), at Ex. 2.1); (c) GCE acts as a third-party service provider pursuant to the parties' publicly-filed MSA (*id.*, at Ex. 10.13); and,

_____

cannot support an inference of scienter because "not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants" about the alleged misstatements. *See Nat'l Junior Baseball League*, 720 F. Supp. 2d at 555-56.

[15] Notably, Plaintiffs do not dispute that an independent Board of Trustees oversees and manages the University, nor could they. (*See* Compl. ¶ 50.)

13

critically (d) *the DOE reviewed and approved the Transaction in November 2019*. (Compl., Ex. A at 16). Plaintiffs do not and cannot dispute that the MSA and the APA are valid and enforceable contracts governing the relationship between the University and GCE, or that the parties have been operating pursuant to the terms of those agreements since July 2018. Instead, Plaintiffs' allegation that the two parties are not separate entities relies exclusively on the DOE's finding that the University "outsource[s]" a significant number of "institutional functions" to GCE. (Compl. ¶ 210.) But the DOE's determination in this respect does not render false any statement by GCE that it operates as a third-party service provider to the University, and, indeed, only *confirms* the nature of the parties' relationship. (*See* Compl., Ex. A at 15 (noting that Mr. Mueller "is in the role of running both the [University] and *its managed service provider* [GCE]") (emphasis added).)

Moreover, Plaintiffs do not and cannot allege that any member of the University's faculty or academic leadership is employed by GCE or that any individual other than Defendant Mueller is an employee of both GCE and the University, and the DOE made no findings to that effect in its review of the Transaction. Rather, as the Complaint concedes, the DOE asserted only that a number of the "executive team members responsible for managing and overseeing GCU . . . *are employed by its service provider.*" (Compl. ¶ 112). Thus, the DOE found that certain individuals tasked with managing the University prior to the Transaction remained as employees of GCE; it did not find that they were simultaneously employed by the University following the Transaction. Plaintiffs offer no allegations to the contrary, nor could they.[16]

---

[16] Upon the close of the Transaction, "GCU's faculty, academic leadership and related staff, which includes approximately 35%, or 1,400, of the Company's full-time employees and substantially all of the Company's 6,000 part-time and adjunct employees and student workers, transferred their employment from the Company to" GCU. (*See* GCE, Current Report (Form 8-K) (July 2, 2018).) Plaintiff does not allege that this statement is false.

14

**The University's Nonprofit Status.**  The Complaint next alleges that it was false and misleading for Defendants to state that the University would and did operate as a "non-profit entity" following the Transaction, because the DOE determined ***more than 16 months after the Transaction closed*** that it would continue to treat the University as a for-profit institution for regulatory purposes.  (Compl. ¶¶ 184, 200.)  Defendants' statements, however, were demonstrably true.  The University is a nonprofit entity, as was recognized by its institutional accreditors; state licensing authorities; federal, state and local tax authorities; the State of Arizona; and the NCAA.  (*See* GCE, Annual Report (Form 10-K) (Feb. 21, 2018) at 26; *see also supra* n.3.)  The Complaint does not and cannot allege otherwise, and the DOE's decision to treat GCU as a for-profit university for regulatory purposes does not change its status as a nonprofit entity.[17]  On this basis alone, the Complaint's allegations fail to state a claim.  *In re PolariyTE, Inc. Sec. Litig.*, No. 2:18-cv-00510, 2020 U.S. Dist. LEXIS 219835, at *21-22 (D. Utah Nov. 22, 2020) (the alleged misstatements "were true" and "thus do not constitute material misrepresentations").

Moreover, in their attempt to plead the purported falsity of Defendants' statements, Plaintiffs point *solely* to the DOE's November 2019 letter setting forth its determination to continue to treat GCU as a for-profit university for regulatory purposes.  (Compl. ¶ 184.)  The DOE's letter, however, cannot demonstrate the falsity of statements made up to 21 months prior because falsity cannot be "based on subsequent events."  *In re Newell Brands*, 2020 U.S. App. LEXIS 37461, at *11 (quotations and citation omitted).  Rather, falsity "allegations must be sufficient to show that the challenged statements were actionably unsound when made."  *Id.*[18]

---

[17] Moreover, the DOE noted that it did "not take a position with respect to [the University's] non-profit 501(c)(3) status" with the IRS.  (Compl., Ex. A at 17.)  Plaintiffs likewise have no authority to second-guess the IRS's determination in this regard.

[18] *See also Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) ("[I]nstead of citing contemporaneous sources" to plead falsity, "plaintiffs rely on conjecture based on

15

Where, as here, "allegations fail to refer to contemporaneous sources showing that Defendants' statements were false or misleading" when made, the plaintiff has failed to plausibly allege falsity. *Id*.

**The University's Preacquisition Review Request.** In support of their fraud claim, Plaintiffs rely on the following purported misstatements made on July 2, 2018 regarding the University's request for preacquisition review of the transaction: (a) based on the University's engagement with the DOE, the parties "concluded that the benefits of consummating the transaction at this time were numerous and any regulatory limitations imposed by [the DOE] could be managed" (Compl. ¶ 187);[19] (b) the preacquisition review request was taking longer than expected because the DOE was "very understaffed" (Compl. ¶ 189); and (c) "We haven't got [the DOE's] letter that says there are no restrictions, but we would be very surprised, based on discussions with them, if there were." (Compl. ¶ 190.)

Plaintiffs baselessly allege that the statements "were misleading because they omitted" that in May 2018 GCE received a request for information from the DOE, which, according to Plaintiffs, "rais[ed] substantial doubts that the DOE would approve" the University's request to participate in federal student aid programs as a nonprofit. (Compl. ¶ 191; *see also id.* ¶¶ 186-190.) Nowhere, however, do Plaintiffs point to *anything* in the DOE's May 2018 information request suggesting that the DOE indicated it would continue to treat GCU as a for-profit university for regulatory purposes, nor even that the request for information spoke to that issue. Thus, there is no credible basis for Plaintiffs' conclusory allegation that the DOE's May 2018 request "rais[ed] substantial

---

subsequent events," which "is insufficient"); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

[19] The Complaint alleges that GCE repeated this statement again on August 18, 2018, November 6, 2019 and November 7, 2019. (Compl. ¶ 188.)

16

doubts that the DOE would approve" the University's request to participate in federal student aid programs as a nonprofit and the Complaint cannot, therefore, plausibly allege falsity based on that request.  (Compl. ¶ 191; *see also id.* ¶¶ 186-190.)

### B.  The Complaint Does Not Plausibly Allege That Any of the Remaining Purported Misstatements Were False and Misleading.

Plaintiffs additionally allege that Defendants made false and misleading statements comparing the "structure" of the Transaction to the "structure" of a transaction pursuant to which Purdue University sought to acquire the "education assets" of a for-profit university, with the for-profit entity then "becoming the service company" for Purdue's online platform.  (Compl. ¶ 202.)  While the Complaint attempts to nitpick certain details of the Purdue transaction that it asserts differed from the Transaction, it does not and cannot allege that the "structures" of the two transactions were materially different, and therefore does not plead with particularity how Defendants' statements in this regard were materially false and misleading.

Plaintiffs next allege that Defendants made false and misleading statements regarding the "source of GCE's success" by intentionally omitting that GCE employees began to "engage in abusive recruitment strategies" in order to drive up enrollments following the Transaction.  (*Id*. ¶ 226.)  Plaintiffs theorize that "[b]ecause New GCU was in fact a captive profit-seeking entity acting on GCE's behalf, it changed its admissions and academic standards in an attempt to maximize GCE's profits."  (*Id*. ¶ 128).[20]  Plaintiffs' allegations in this respect are nothing more than a transparent attempt to malign GCE and the University.  In any event, Plaintiffs'

---

[20] While Defendants must accept Plaintiffs' allegations for purposes of the present Motion, they vehemently deny that GCE engaged in "abusive" recruiting practices and further note that the University has at all times remained in compliance with the DOE's heightened regulatory requirements applicable to for-profit universities. *See, e.g*., GCE Annual Report (Form 10-K), at 17 (Feb. 19, 2020) (GCU "derived approximately 73.0% of its 90/10 Rule revenue from Title IV program funds for the fiscal year ended June 30, 2019.").  Plaintiffs do not allege otherwise.

inflammatory and offensive allegations make little sense; the University was owned and operated by GCE prior to the Transaction, and Plaintiffs offer no coherent rationale for any purported change in admissions standards or recruiting strategies *after* the University became an independent entity.  Even accepting *arguendo* Plaintiffs' incendiary allegations, Plaintiffs do not and cannot demonstrate how or why these allegations render false and misleading GCE's statements that an increase in its revenues was attributable in part to a growth in the University's enrollments. Plaintiffs' claims in this respect must fail accordingly.  *See Joyce v. Bobcat Oil & Gas, Inc.*, No. 1:CV-07-1421, 2008 U.S. Dist. LEXIS 27181, at *27 (M.D. Pa. Apr. 3, 2008) (dismissing Rule 10b-5 claims where plaintiff failed to "'specify' why the statements were misleading").

Finally, Plaintiffs baselessly allege that Defendants made false and misleading statements regarding GCE's accounting treatment of its relationship with the University under GAAP. Plaintiffs' claims fail because – as set forth above – the University was and is an independent entity following the Transaction, and was properly treated as such for purposes of GCE's financials.  (*See supra*, at 13-14.)  In any event, Plaintiffs do not and cannot allege that either GCE's auditors or the SEC have raised any concerns in this respect, and Plaintiffs' unsubstantiated opinions should not replace the sound judgment of these authorities.

## III.    The Complaint Fails to Plausibly Allege Loss Causation.

To plausibly allege loss causation, "the plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud."  *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 559.  "Typically, a plaintiff shows loss causation by pleading that a company's stock price dropped in response to a 'corrective disclosure' of ***new information*** that ***directly demonstrates that the defendant's representations were false***."  *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 477 n. 43 (E.D. Pa. 2019) (emphasis

18

added).   Here, the Complaint alleges that "the truth concealed by Defendants' prior misrepresentations and omissions was disclosed to the market" by purported corrective disclosures on November 6-7, 2019, when GCE disclosed that the DOE had determined to continue to treat the University as a for-profit institution for regulatory purposes even though it had been sold to, and is operated by, a nonprofit entity, and on January 28, 2020, when Citron Research, a short-seller that stood to profit from a drop in GCE's stock price, published a "report" about GCE. (Compl. ¶ 234.)   As a matter of law, however, neither of these announcements are corrective disclosures.[21]

GCE's November 6-7, 2019 announcements regarding the DOE's determination cannot be corrective disclosures, for two reasons.   *First*, they did not reveal the falsity of any alleged misstatements.   Indeed, the Complaint alleges that information disclosed for the first time *in the DOE decision letter itself* purportedly revealed the falsity of the alleged misstatements.   (*Id.* ¶¶ 184-185, 191, 199-200, 210, 218.)   That letter, however, did not become public until November 12, 2019, and the Complaint does not allege that it was a corrective disclosure.   (*Id.* ¶ 166.)   *Second*, the Complaint alleges that GCE's November 6-7, 2019 announcements were somehow both corrective *and* misleading.   (*Id.* ¶¶ 188, 194, 234.)   The Complaint, however, "cannot have it both ways" and "simultaneously argue that [a] misstatement itself constituted a corrective disclosure." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009).

Likewise, Citron's self-serving "report" about GCE did not reveal any new information to the market, and expressly stated that "all information contained herein . . . has been obtained from

---

[21] The Complaint additionally fails to plead loss causation as to the alleged misstatements "regarding the source of GCE's success" because the Complaint does not allege that *any* corrective disclosure revealed the falsity of these purported misstatements, which are based solely on statements by alleged former employees revealed for the first time in the Complaint. (Compl. ¶¶ 220-226.)

19

public sources." (DCKT #34, at 164.)  Accordingly, it is not a corrective disclosure.  *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (analyst report was not a corrective disclosure because it "contained a disclaimer . . . stating that all of the information in the presentation was 'obtained from publicly available sources'") (quotations and citation omitted); *see also Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-cv-01795-WHO, 2016 U.S. Dist. LEXIS 119194, at *12-13 (N.D. Cal. Sept. 2, 2016) (a report which "only collected and opined on already public information . . . does not constitute a disclosure of 'the truth' as required for a corrective disclosure").

## CONCLUSION

For the reasons set forth above, the Complaint alleges a wholly implausible claim of wrongdoing.  Accordingly, it fails to state a claim and it should be dismissed, in its entirety.[22]

---

[22] Having failed to state a claim under Section 10(b) of the Exchange Act or SEC Rule 10b-5, the Complaint's Section 20(a) claims fail as a matter of law.  *Roseville*, 686 F. Supp. 2d at 428.

Respectfully submitted this 21st day of December, 2020.

*/s/ Ronald N. Brown, III*
Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Samuel C. Feldman (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
sam.feldman@alston.com

*Counsel for Defendants*

21