**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 20-639-MN-CJB |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT FOR
<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman
Jeffrey B. Gittleman (*pro hac vice*)
Chad A. Carder (*pro hac vice*)
Meghan J. Talbot
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com
mtalbot@barrack.com

*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
greg.varallo@blbglaw.com

                      **-**and-

Hannah G. Ross
Katherine M. Sinderson (*pro hac vice*)
Robert F. Kravetz (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
katiem@blbglaw.com
robert.kravetz@blbglaw.com
michael.mathai@blbglaw.com
benjamin.horowitz@blbglaw.com


*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

**Dated: February 19, 2021**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT ................................................................................................................. 6

    I.      Plaintiffs Allege Actionable Misstatements Concerning the Conversion, the DOE's Consideration of Non-Profit Status, and GCE's Financial Results ........... 6

           A.      Defendants Misrepresented that the Conversion Would and Did Result in GCU's Operation as an Independent, Non-Profit Entity ....................... 7

           B.      Defendants Misrepresented the DOE's Review of the Conversion ........... 9

           C.      Defendants Misrepresented the Conversion's Similarity to Other Approvals ........................................................................................... 10

           D.      Defendants Violated GAAP ..................................................................... 11

           E.      Defendants Omitted Material Facts Regarding the Source of GCE's Revenue Growth Following the Conversion ............................................. 12

    II.     The Complaint Adequately Alleges Scienter Against All Defendants ................. 13

    III.    The Complaint Sufficiently Pleads Loss Causation ............................................ 18

CONCLUSION ........................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
 340 F.3d 1083 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003) ........... 16

*Aldridge v. A.T. Cross Corp.*,
 284 F.3d 72 (1st Cir. 2002) ................................................................................................ 12

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988) ............................................................................................................. 7

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
 No. 15-CV-01795-WHO, 2016 WL 4585753 (N.D. Cal. Sep. 2, 2016) .......................... 20

*City of Edinburgh Council v. Pfizer, Inc.*,
 754 F.3d 159 (3d Cir. 2014) ............................................................................................... 18

*City of Sunrise Gen. Employees' Ret. Plan v. Fleetcor Techs., Inc.*,
 No. 1:17-cv-02207, 2018 WL 4293143 (N.D. Ga. May 15, 2018) ................................... 20

*Dura Pharmaceuticals, Inc. v. Broudo*,
 544 U.S. 336 (2005) ........................................................................................................... 18

*EP Medsys., Inc. v. EchoCath, Inc.*,
 235 F.3d 865 (3d Cir. 2000) ............................................................................................... 18

*Frater v. Hemispherx Biopharma, Inc.*,
 996 F. Supp. 2d 335 (E.D. Pa. 2014) ................................................................................. 10

*Gillis v. QRX Pharma Ltd.*,
 197 F. Supp. 3d 557 (S.D.N.Y. 2016) ................................................................................ 18

*Grigsby v. BofI Holding, Inc.*,
 979 F.3d 1198 (9th Cir. 2020) ........................................................................................... 20

*In re Bristol-Myers Squibb Sec. Litig.*,
 No. Civ.A 00–1990(SRC), 2005 WL 2007004 (D.N.J. Aug. 17, 2005) ............................ 19

*In re Burlington Coat Factory Sec. Litig.*,
 114 F.3d 1410 (3d Cir. 1997) ............................................................................................. 12

ii

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ................................................................................. 13

*In re Cognizant Tech. Sol. Corp. Sec. Litig.*,
    No. 16-6509 (ES) (CLW), 2020 WL 3026564 (D.N.J. June 5, 2020) .............................. 14

*In re Electrobas Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) .............................................................................. 14

*In re Enzymotec Sec. Litig.*,
    No. 14-5556, 2015 WL 8784065 (D.N.J. Dec. 15, 2015) ................................................... 7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ....................................................................................... 19, 20

*In re Mattel, Inc. Sec. Litig.*,
    No. 2:19-cv-10860 (C.D. Cal. Jan. 26, 2021) .................................................................. 19

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013) .............................................................................. 17

*In re Sprint Corp. Sec. Litig.*,
    232 F. Supp. 2d 1193 (D. Kan. 2002) .............................................................................. 10

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) ........................................................................... 13, 14

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014) ............................................................................. 12, 19

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ............................................................................... 14, 15, 16

*Jaroslawicz v. M&T Bank*,
    962 F.3d 701 (3d Cir. 2020) ............................................................................................ 10

*Kline v. First W. Gov't Sec., Inc.,*
    24 F.3d 480 (3d Cir. 1994) .............................................................................................. 13

*Lea v. TAL Educ. Grp*.,
    No. 19-3549, 2020 WL 6937475 (2d Cir. Nov. 25, 2020) .................................... 11, 12, 17

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ............................................................................... 3, 17

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ...................................................................................... 20

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ......................................................................................... 19

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ......................................................................................... 18

*Pub. Employees Ret. Sys. of Mississippi v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ......................................................................................... 20

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)........................................................................................... 14

*Roofer's Pension Fund v. Papa*,
    No. CV 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018).................................... 13, 17

*S.E.C. v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ....................................................................................... 14

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)..................................................................................... 18, 19

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992), *as amended* (May 27, 1992).......................................... 8, 10

*Skiadas v. Acer Therapeutics Inc.*,
    No. 1:19-cv-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020).......................... 17

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ......................................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................................... 13

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011)............................................................................................... 6

iv

**INTRODUCTION**

Defendants Grand Canyon Education, Inc. ("GCE"), Brian E. Mueller and Daniel E. Bachus ("Defendants") committed securities fraud in connection with GCE's failed attempt to convert its for-profit subsidiary, Grand Canyon University ("GCU"), into a supposedly independent, non-profit educational institution.[1]

GCE implemented the Conversion to shed the stigma and regulatory constraints GCU faced as a for-profit educational institution, which inhibited GCU's enrollment growth and GCE's profits. Defendants, however, structured the Conversion in a manner that "violate[d] the most basic tenet of nonprofit status": that a non-profit cannot be operated "substantially for the benefit" of another entity. Although GCU was purportedly "independent" on paper, in reality it was a captive entity that funneled an undisclosed 95% of its revenues to GCE. Moreover, Defendant Mueller remained CEO of GCE **and** president of GCU, and nearly 75% of GCU's Executive Leadership Team were actually GCE employees. At the end of the Class Period, the U.S. Department of Education (the "DOE"), after a close review of GCU's non-profit application (including non-public documents it requested from Defendants), refused to recognize GCU as a non-profit, and prohibited GCU from marketing itself as such.

During the Class Period, Defendants misled investors about all of this. They claimed that GCU would act as a "traditional non-profit University" with an "independent management" and "no overlapping management or employees," all of which they knew to be false. They also emphasized that the GCU Conversion was virtually "identical" to other, successful conversions— yet knew that those other conversions were fundamentally dissimilar to the one they had personally

---

[1] Defined terms are the same as in the Consolidated Complaint (the "Complaint") (D.I. 34). Unless otherwise noted, "¶__" refers to Complaint paragraphs, "Exh. __" refers to an exhibit to the Complaint, "Mot." refers to Defendants' Motion to Dismiss ("Motion") (D.I. 37), all emphasis has been added, and internal quotes and citations are omitted.

engineered.  And Defendants failed to disclose to investors that, just months into the Class Period, the DOE served Defendants with a series of interrogatories demonstrating a substantial risk that the DOE would deny GCU's request for non-profit status; instead, they affirmatively misrepresented that "based on [their] discussions" with the DOE, they would be "very surprised" if any restrictions were placed on GCU after the Conversion and falsely attributed approval delays to the DOE being "very understaffed."  For the rest of the Class Period, Defendants also misrepresented GCU's captive role to GCE and violated GAAP to conceal the relationship, which vastly inflated GCE's reported operating margins in comparison to its competitors.

In November 2019, investors began to learn the truth when the DOE rejected GCU's request for non-profit treatment because the Conversion "violate[d] the most basic tenet of nonprofit status."  Then, in January 2020, Citron Research ("Citron") published an extensive report exposing the extent of GCE's exploitation of GCU and its GAAP violations.  Each of these revelations resulted in immediate and dramatic declines in GCE's stock price, causing hundreds of millions of dollars in shareholder losses.

In response, Defendants wrongly argue that their alleged misstatements were technically true.  Mot. 13-14.  But, even if this were correct (which it is not), having chosen to speak on these issues to investors, Defendants had the obligation to tell the ***whole truth*** and not to omit any material facts that rendered their disclosures misleading.  Time and again, they failed to do so.

Moreover, the Complaint adequately alleges scienter.  Defendants had nonpublic information that directly contradicted numerous misleading statements they made about the Conversion and its impact on GCE's operations and financial performance, which was an issue of central importance to the Company.  Having been in the industry for a combined five decades, they understood the regulatory landscape and the precise contours of successful non-profit

2

conversions—and misled investors about these very topics, all while trying to manipulate the DOE in what they perceived to be a favorable regulatory setting. Indeed, as the DOE recognized, Defendants withheld key information from third-party consultants to procure favorable reports that were shoddy, "incomplete," and based on false and deficient "information supplied by GCE management." Defendants were thus intimately involved with designing the Conversion strategy and had actual knowledge of the shortcomings of their proposal and its substantial regulatory risk —none of which they revealed to the market when they chose to speak on these issues.

That the request for DOE non-profit status ultimately failed does not somehow defeat Defendants' scienter or motivation to engage in fraud. Plaintiffs seek to hold Defendants responsible for knowingly downplaying the *risk* of the DOE rejecting GCU's application for non-profit status—not for the DOE's ultimate decision to do so. This type of knowing (but unsuccessful) "gamble" is a well-recognized theory of scienter. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs II*").

Finally, the Complaint sufficiently alleges loss causation. When the truth of Defendants' fraud was revealed, GCE's stock price dropped precipitously. Nothing more is required.

As fully set forth below, Plaintiffs respectfully request that this Court deny the Motion.

## FACTUAL BACKGROUND

Given the extensive history of scandals in for-profit education, for-profit institutions faced significant regulatory, marketing, and financial hurdles to increase student enrollment, and thus profits. ¶¶27-34. To avoid these hurdles, Defendants first attempted to convert GCU into a non-profit starting in 2014, but were stymied by regulators. ¶¶35-43. In 2017, Defendants revived that effort in what was perceived to be a more favorable regulatory environment. ¶¶44-45.

Defendants claimed that the Conversion would enable GCE to transform from GCU's owner and operator into an independent educational services provider, while reaping substantial

3

benefits resulting from GCU's non-profit status.  ¶¶1, 4, 46-51, 59, 176-183, 192-198.  Defendants assured investors that the Conversion tracked the structure of other successful conversions that had received regulatory approval, including the closely-watched 2017 transaction between Purdue University and educational services firm Kaplan.  ¶¶52-58, 118-127, 201-209.  Analysts reacted positively, as non-profit status would allow GCU to shed regulatory risks and more effectively compete for students, and therefore "de-risk" GCE as an investment.  ¶¶4, 27-34, 51, 55.

As DOE approval was necessary to market GCU as a non-profit, investors closely followed GCU's DOE application.  ¶¶64-65.  Initially, Defendants repeatedly assured the market that they would not close the Conversion until DOE approval was granted, which they led analysts to believe was a foregone conclusion.  ¶¶4, 62-65.  However, in May 2018, Defendants received a lengthy series of interrogatories from the DOE, which closely probed the structure of the Conversion and post-closing arrangements and signaled a significant risk that the DOE would reject GCU's request for non-profit status.  ¶¶6, 66-68.  Defendants knew these requests materially changed the risk profile of the DOE's review, casting doubt as to whether GCU would be able to market itself as a non-profit—and therefore increasing risk to one of the deal's key components for investors—but did not disclose them to the market.  ¶¶6, 68-69, 72, 228-230.

Instead, knowing that the Conversion had to close before GCE could benefit from its exploitative arrangement with GCU, and that they had publicly targeted a mid-summer closing in prior statements, Defendants abandoned plans to wait for DOE approval to close the transaction. ¶¶7, 69.  Within weeks, following meetings with Defendants, analysts reported that DOE approval was "NOT required" for the Conversion to close and that the "DOE process [was] largely procedural," while Defendants vociferously denied suggestions that GCU would not be independent following the Conversion.  ¶¶69-74, 228-230.

4

Defendants closed the Conversion on schedule, on July 1, 2018, so that GCE could begin reaping the significant financial benefits under its terms. ¶¶7-8, 75-77, 99-109, 187, 232. As the corrective disclosures at the end of the Class Period would later reveal, the actual terms of the Conversion were vastly different from what Defendants described publicly:

- GCU was not an independent non-profit, but rather operated as GCE's captive client—absorbing expenses and remitting most of its revenues to GCE, ¶¶2, 5, 9-12, 94, 184-185, 199-200, 210, 231-232; [2]

- The vast majority of GCU's management was controlled by GCE, the entity that actually operated GCU, ¶¶110-115, 127, 185, 199; and

- These undisclosed terms of the Conversion made it fundamentally different from other conversions that the DOE had approved, and it more closely resembled conversions that the DOE had rejected. ¶¶5, 9-12, 96-127, 184-185, 199-200, 210, 231-232.

In fact, a day after closing the Conversion, Defendants lied about the reasons for the delay in obtaining DOE approval—attributing it to DOE "understaff[ing]," rather than revealing that the DOE's scrutiny had intensified. ¶¶7-8, 79-82, 86, 186-191, 228-230. In the following months, the DOE further probed GCU's application, issuing additional requests for information in July, August, and September of 2018. ¶¶86, 191, 228-230. But while Defendants provided detailed responses to these requests (with Defendant Mueller personally involved), they gave no public indication that the DOE was closely scrutinizing the terms of the deal—let alone that there was reason to believe that the DOE might reject GCU's request for non-profit status. *Id.*

Instead, Defendants immediately began marketing GCU as a non-profit and touted GCE's improved results as a result of the Conversion—attributing GCE's growing revenues to GCU's non-profit status, while continuing to conceal (1) the heightened risk that the DOE would deny non-profit status to GCU; (2) GCU's lack of independence and illicit recruitment practices; and

---

[2] Undisclosed documents provided by GCE to the DOE show that GCE would incur just 28% of the expense of operating GCU while receiving 95% of the total revenue—far from the reported 60% GCE/40% GCU revenue split. ¶¶99-109, 210.

(3) GCE's failure to consolidate GCU's finances into GCE's financial statements, as GAAP requires.  ¶¶8-12, 87-93, 128-157, 191, 211-226.  In response, and unaware of these hidden facts, analysts heaped praise on Defendants for GCE's strong results.  ¶93.

The truth about Defendants' scheme was revealed to the market through two corrective disclosures.  On November 6, 2019, during an earnings call after market close, Defendants announced that the DOE had determined that GCU "d[id] not satisfy the department's definition of a non-profit entity" and would continue to treat GCU as a for-profit.  ¶¶13, 159.  The market was stunned by the news, and GCE's stock price plummeted despite GCE posting better-than-expected results: over the following two days, GCE's stock price dropped $6.99, a decline of nearly 8%.  ¶¶13, 161-162, 236.  Analysts connected these declines to the DOE decision.  ¶162.

Then, on January 28, 2020, analyst Citron Research published a nearly 50-page report titled "The Educational Enron: The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings," which was based on 870 pages of non-public documentation Citron received in response to a FOIA request.  ¶¶14, 167-170; Exh. B.  Citron concluded that GCE was using GCU as a "captive non-reporting subsidiary" to "dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price."  ¶¶14, 167.  GCE's stock price declined just over 8% as a result of the report, falling $7.43 per share to close at $84.07 on January 28, 2020.  ¶¶14, 171, 236.

## ARGUMENT

**I.      Plaintiffs Allege Actionable Misstatements Concerning the Conversion, the DOE's Consideration of Non-Profit Status, and GCE's Financial Results**

On a Rule 12(b)(6) motion, the Court accepts all factual allegations as true and construes the complaint in the light most favorable to the plaintiff.  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).  To plead actionable statements under the PSLRA and Rule 9(b), a

6

plaintiff need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *In re Enzymotec Sec. Litig.*, No. 14-5556, 2015 WL 8784065 (D.N.J. Dec. 15, 2015). An omission is actionable if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). As set forth below, Defendants made numerous fraudulent misrepresentations and omissions. ¶¶175-226.

### A.    Defendants Misrepresented that the Conversion Would and Did Result in GCU's Operation as an Independent, Non-Profit Entity

Throughout the Class Period, Defendants made numerous false and misleading statements attesting that GCU would be independent of GCE—a key prerequisite to non-profit status:

- GCE claimed that "GCU would be a *separate non-profit entity under the control of… independent management*," and GCE "*would no longer be . . . [GCU's] owner and operator*" but rather its "*third-party contract provider*." ¶¶180-182.

- Faced with concerns that GCU was "operated by a group of individuals who serve two masters," GCE called the claim "false," stating: "*[T]here will be no overlapping management or employees between the two entities*" and that contrary assertions "should not be taken seriously." ¶183.

- Following the Conversion, Defendants stated that "[a]side from Mr. Mueller, *no other employee of [GCU] or [GCE] has a dual role in both organizations*," and that GCU "is now a non-profit institution, with its own board and mission." ¶¶195, 197.

*See also* ¶¶1-2, 49-51, 94-127, 176-179, 193.

Defendants' statements were materially false and misleading because GCU's purported "independence" was illusory. The non-public documents Defendants provided to the DOE, including the unredacted Master Services Agreement ("MSA"), showed that GCU was a "captive client" of GCE because the "primary purpose of the MSA" was to "drive shareholder value for GCE." ¶¶96, 99. Indeed, under the MSA, GCE would receive 95% of the revenues generated by GCU, while incurring just 28% of total costs. ¶106. Moreover, GCU was effectively "locked in"

7

to the deal for seven years and could not exit it without paying an "arguably prohibitive termination fee." ¶117; Exh. A at 14. And of GCU's 58-person "Executive Leadership team" that was "responsible for managing and overseeing [GCU]," *41 of the executives remained with GCE following the Conversion*. ¶¶11, 111-112, 185, 199; Exh. A at 16.

Defendants claim that GCU was an independent entity on paper, and thus all of the alleged false statements were literally true. Mot. 13-15. But, as the DOE correctly determined, GCE's attempt to elevate form over substance is misplaced—GCU was, in reality, a captive entity of for-profit GCE. And Defendants' statements were unequivocal that, beyond Mr. Mueller, "*no other employee*" of GCE "has a dual role" with GCU, and that GCU would be controlled by "independent" management—statements that are false given that a majority of GCU's Executive Team (the university's "key management personnel") were actually GCE employees, demonstrating that "as a practical matter, [GCU] is not the entity actually operating the Institution as is required" under DOE regulations. ¶199 (emphasis in original). Having made representations about GCU's supposed independence, Defendants had a duty to provide accurate and complete information: "[b]y addressing [a subject], a defendant declares [it] to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *as amended* (May 27, 1992).

Defendants' attempt to rely on GCU's tax-exempt status to claim that GCU was technically a non-profit (Mot. 15) fails. In context, Defendants' statements celebrating GCU's purported return to its "historical non-profit status" (¶177) and to being a "traditional non-profit" (¶181) were intended to portray GCU as a "non-profit college" under Title IV—not merely as a tax-exempt entity, which designation offers none of the marketing benefits Defendants enthusiastically touted. Indeed, in its November 2019 letter, the DOE ordered GCU to cease marketing itself as a non-

8

profit, notwithstanding the IRS's determination.  ¶¶159-160; Exh. A at 17.

Finally, Defendants argue that the Complaint relies exclusively on a subsequent event—the DOE's denial—to allege that Defendants' statements that GCU was a non-profit were misleading. Mot. at 15.  Not so.  Rather, the Complaint exhaustively details that Defendants chose to make misrepresentations while knowing the very underlying facts that led to the DOE's ultimate determination—including those contained in non-public documents that Defendants shared confidentially with the DOE.  *See, e.g.*, ¶¶96-127; Exh. A at 2 n.2, 3, 4-5, 7-8, 13-14.

### B.        Defendants Misrepresented the DOE's Review of the Conversion

The Complaint also adequately alleges that Defendants misrepresented the scope and risks of the DOE review.  On May 17, 2018, the DOE propounded extensive and probing interrogatories to Defendants concerning the basis for their claims that GCU would be an independent non-profit after the Conversion.  ¶¶66-68.  The substance and extent of these requests indicated, at a minimum, that the DOE would not rubber-stamp the Conversion based on other regulators' approvals (as Defendants hoped) and that the DOE in fact had serious questions about GCU's status as a *bona fide* non-profit.  *Id.*

Defendants never disclosed these requests, or revealed that they signaled a significant risk GCU's request for non-profit status would be denied.  ¶¶86, 191.  Instead, they closed the Conversion and repeatedly represented that there was little to worry about from the DOE review. For example, a July 2, 2018 article quoted Mueller as misleadingly saying that, while GCE had not yet "got their letter [from the DOE] that says there are no restrictions," Defendants "would be very surprised, based on our discussions with them, if there were."  ¶190; *see also* ¶¶187-188 (based on "ongoing engagement" with DOE, "any regulatory limitations imposed by [the DOE] could be managed").  Perhaps most egregiously, Mueller also claimed that same day that DOE approval was taking longer in GCE's case because the DOE was "very understaffed." ¶189. These

9

statements are actionably false and misleading. *See Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 348-49 (E.D. Pa. 2014) (finding actionable statements predicting FDA approval when company "systemically misled investors about . . . the nature of FDA feedback while presenting predictions about FDA approval of [a drug] that it should have known were unreasonable under the circumstances" due in part to "FDA feedback"); *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1219, 1226 (D. Kan. 2002) (optimistic statements about regulatory approval of a merger were misleading when defendants failed to disclose negative developments, including that one regulator had "serious concerns").

Defendants' argument that the interrogatories did not bear on GCU's non-profit status or indicate any concerns on the DOE's part (Mot. 16-17) is plainly incorrect. The interrogatories sought, among other things, (i) valuation, due-diligence, and financial information related to the Conversion, and (ii) information about employee transfers from GCE to GCU in connection with the Conversion. This very information contradicted Defendants' public statements regarding GCU's independence, and in fact featured prominently in the DOE's decision to deny GCU non-profit status. *See* ¶67; Exh. A at 4-9, 12-16. Further, the detailed interrogatories obviously revealed an enhanced *risk* of such a denial. Given that Defendants specifically downplayed that very risk, they were obliged (but failed) to provide accurate and complete information about the DOE investigation so as not to render their statements false and misleading. *See Shapiro, supra; Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 716-17 (3d Cir. 2020) (risk to merger posed by regulatory inspection triggered disclosure obligation).

### C.       Defendants Misrepresented the Conversion's Similarity to Other Approvals

While Defendants said that the Conversion was virtually "identical" to the Purdue-Kaplan deal and comparable to other DOE-approved transactions, it was in fact materially different in several key ways. ¶¶5, 12, 52-58, 82, 118-127, 201-210. The differences include that:

- From the start, GCE would receive approximately 95% of GCU's revenues, including revenues entirely unrelated to services GCE rendered, while paying only 28% of GCU's expenses—while under the Purdue-Kaplan deal, the services provider would be paid only when the non-profit university broke even and would receive only 12% of the non-profit university's revenue thereafter (¶126); and

- GCE directly employed 75% of GCU's Executive Leadership Team and Defendant Mueller headed both GCE and GCU—while in the Purdue-Kaplan deal, no "entity or persons" controlled the non-profit, and Kaplan and Purdue shared no overlapping executives or directors.  ¶¶121, 127.[3]

Defendants' only response is that these two essential distinctions are "nitpicking" and do not relate to the transactions' "structures."  Mot. 17.  But Defendants specifically held out the Purdue-Kaplan deal as a benchmark (*e.g.* ¶¶53-54), and the Conversion's terms—particularly the one-sided revenue terms and GCE's control over GCU—establish that the Conversion was fundamentally different than the Purdue-Kaplan deal and other DOE-approved transactions (as the DOE found).

### D.     Defendants Violated GAAP

The Complaint also adequately alleges that GCE violated GAAP requirements by failing (a) to consolidate GCU as a "variable interest entity" ("VIE"), ¶¶135-152, and (b) to recognize GCU as a related party.  ¶¶153-157.  Such allegations are actionable.  *See*, *e.g.*, *Lea v. TAL Educ. Grp.*, No. 19-3549, 2020 WL 6937475, at *4 (2d Cir. Nov. 25, 2020) (vacating dismissal of a complaint alleging misuse of a VIE by an educational services company).

Defendants first challenge the GAAP falsity allegations on the ground that the University was independent on paper (Mot. 18), which fails for the reasons set forth above.  Moreover, the Complaint sets forth in detail how GCE violated GAAP by failing to consolidate GCU's results into GCE's financial statements, and why GCU was a "related party" under GAAP, ¶¶135-157—

---

[3] Conversely, the DOE had not granted applications for non-profit status, including one by the Center for Excellence in Higher Education, where the conversion was structured to create an income stream for a third-party, rather than being retained for the benefit of the educational institution.  ¶¶124-125.

none of which Defendants otherwise challenge in the Motion.

Defendants' only other argument is that, absent allegations that GCE's auditors or the SEC "raised any concerns" regarding GCE's accounting, the GAAP-related claims must be dismissed. Mot. 18. That is not the law. There is no requirement that a plaintiff must plead an outside auditor or regulator's "concerns" to allege a GAAP violation—especially where, as here, numerous pleaded facts (which Defendants largely do not challenge) show GCE's reporting violated GAAP. Imposing such a requirement "would shift to accountants the responsibility that belongs to the courts." *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).[4] Regardless, disagreements over GAAP compliance raise issues of fact that cannot be resolved at this stage. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997).

### E.      Defendants Omitted Material Facts Regarding the Source of GCE's Revenue Growth Following the Conversion

After the Conversion, Defendants represented that GCE's revenues were increasing "primarily" due to enrollment growth at GCU, which Defendants attributed to the marketing of GCU as a non-profit. ¶90. These statements were false and misleading. They concealed the true benefits received by GCE and GCU's captive status, which gave rise to a likelihood that the DOE would deny it non-profit status. Critically, they also failed to disclose that GCE employees, under the guise of being GCU employees, engaged in the type of abusive recruitment strategies that have plagued other for-profit educators to drive further revenue to GCE. ¶¶21, 26, 28, 128-134.

Defendants' argument that their statements are technically true (Mot. 18) misses the point.

---

[4] Auditors frequently raise private criticisms and concerns that later emerge in discovery and, indeed, private litigants routinely identify and adequately allege GAAP violations without public criticism by auditors. *See*, *e.g., TAL Educ. Grp.*, 2020 WL 6937475, at *4-*5; *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 449 (D. Del. 2014) (auditor issued numerous private warnings concerning potential GAAP violations but never made their concerns public).

Statements describing the sources of a company's financial success that omit unfavorable or illicit facts related to those sources are actionable. *See Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018) (citing *Kline v. First W. Gov't Sec.*, *Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994)).

## II.      The Complaint Adequately Alleges Scienter Against All Defendants

In *Tellabs I*, the Supreme Court held that a court "must . . . accept all factual allegations in the complaint as true," and, considering "*all* of the facts alleged, taken collectively," determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007) (*Tellabs I*) (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324. Moreover, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts *or access to information* contradicting their public statements." *In re Campbell Soup Co. Sec. Litig*., 145 F. Supp. 2d 574, 599 (D.N.J. 2001). Therefore, scienter is adequately pled where a complaint alleges facts showing that "defendants knew or, more importantly, should have known that they were misrepresenting material facts." *Id*.

The Complaint readily alleges scienter under these standards. As set forth in detail, *supra*, Defendants had access to (and actually reviewed) material, non-public information that *directly* contradicted statements they made regarding the "independence" of GCU and GCE; the inevitability of, and reasons for delay in, DOE approval of the Conversion; the similarity between the Conversion and other transactions that had been approved; and GCE's true financial state given its use of GCU as a captive entity to enhance revenues and offload expenses. Such evidence adequately pleads scienter. *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa.

13

2014) (defendants had access to information directly contradicting public statements).[5]

Defendants' arguments in response fail.  First, Defendants claim that Plaintiffs rely ***solely*** on Defendants' positions to establish scienter.  Mot. 9-10.  But that is incorrect, as the Complaint pleads myriad other facts supporting the scienter inference.  *See Institutional Inv'rs Grp. v.  Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir. 2009).  Mueller and Bachus were the architects of the Conversion and were intimately familiar with its structure and terms—as demonstrated by their repeated statements to investors.  *E.g.*, ¶¶177-182, 193-198, 202-209.  They had a combined five decades of experience in for-profit education, which they emphasized gave them the knowledge and experience to successfully shepherd GCU through the Conversion—an issue they knew was of central importance to the Company and its investors.  ¶¶21-22, 50-51; *see Avaya, Inc*, 564 F.3d at 271 (the "perceived importance of [a topic to the market] supports an inference that [an executive officer] was paying close attention to" it).  Yet knowing the shortcomings of their proposal and its dissimilarity to other conversions, they attempted to manipulate the application process ***by withholding key information from third-party consultants*** they hired to prepare reports in support of the Conversion.  ¶¶104, 108-09, 113.  But for the DOE's diligence, Defendants' scheme might have succeeded; instead, the DOE revealed that Defendants sought to push through the Conversion based on analyses that were shoddy, "incomplete," and founded upon knowingly flawed assumptions supplied by management.  *Id.*; *see, e.g., S.E.C. v. Todd*, 642 F.3d 1207, 1217-18 (9th Cir. 2011) (inference of scienter where defendant instructed employee to withhold information

---

[5] Because the Complaint adequately alleges the scienter of the Individual Defendants, it therefore sufficiently alleges scienter against GCE itself.  *In re Electrobas Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017); *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) (discussing potential viability of a corporate scienter doctrine in the Third Circuit even if scienter of corporate agents is not established); *In re Cognizant Tech. Sol. Corp. Sec. Litig.*, No. 16-6509 (ES) (CLW), 2020 WL 3026564, at *24-*32 (D.N.J. June 5, 2020) (imputing scienter to the corporate defendant under the Sixth Circuit's approach).

from auditing firm).[6]

Second, Defendants' argument that the Complaint fails to allege that the DOE's review was "in any way unusual or out of the ordinary course" (Mot. 11) is equally misplaced. Defendants' own statements show that the DOE review took far longer than they or the DOE had expected (*see* ¶64)—yet they told the market that approval was delayed due to DOE understaffing (which was false), and that there was essentially no risk that the DOE's decision would have an impact on the Company's operations (when there was significant risk). These "confident, unhedged" claims were false, and carried an obvious risk of misleading investors. *Avaya, Inc.*, 564 F.3d at 270 & n.43 (the making of such claims may satisfy scienter even if defendant was "not aware of the full extent" of facts contradicting his statements).

Third, Defendants are wrong to argue that they had no reason to believe that the DOE would reject GCU's application at any time during the Class Period because the DOE review did not have cognizable benchmarks the Conversion failed to meet. Mot. 11-12. Defendants knew (or should have known) from the beginning of the Class Period that the Conversion was structured "substantially for the benefit" of GCE, and thus failed the *"most basic tenet of nonprofit status."* ¶¶ 199-200. And once the DOE indicated it was conducting an independent, thorough review, and would not just rubber-stamp the application based on the IRS's conclusion, Defendants certainly knew that DOE approval was in doubt.

Fourth, Defendants *ipse dixit* contend that the Complaint does not allege sufficient evidence of scienter as to Defendants' remaining statements, including regarding the Conversion's similarity to other transactions, abusive recruiting strategies, and GAAP violations. Mot. 12. But

---

[6] Given such conduct, Defendants' argument that the Court should draw an inference in their favor for commissioning third parties in connection with the Conversion (Mot. 11-12) is illogical.

15

Defendants repeatedly represented that the Conversion was "very similar" and "almost identical" to other well-known, successful transactions, which they invoked by name. *See, e.g.*, ¶¶53-54, 56-58.  These statements were, at a minimum, reckless—regardless of whether Defendants knew facts that "made obvious the risk" of misleading investors, or "simply had no idea whether" their statements were accurate.  *Avaya*, 564 F.3d at 270 & n.43.  And Defendants' knowledge or recklessness about the reasons for increased admissions post-Conversion is demonstrated by the accounts of former employees, including two high-level management executives, who described how GCU engaged in notorious abusive recruitment practices in admitting unqualified students post-Conversion to boost admissions numbers.  *See, e.g.*, ¶¶128-134.

With respect to GAAP violations, the Complaint contains numerous allegations establishing that Defendants were on notice that GCU's results had to be consolidated with GCE's public financial reports and that GCU was a related party to GCE.  ¶¶143, 147-151, 155, 214.  In addition, GCE's post-Conversion operating margins (a key profitability metric) were substantially inflated, and indeed multiples higher than those of its educational services-sector competitors— which strengthens an inference of scienter.  *See* ¶¶87-93, 141-157, 168; *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105–06 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003) (scienter pleaded where alleged GAAP violations "c[a]me on top of other particularized facts" relating to a "key operation of the company" that were known to defendant).  Moreover, Defendant Bachus had significant experience with financial reporting, having served as GCE's CFO since 2008, a controller for another for-profit institution, and a senior audit manager for a major accounting firm before that.  ¶22.  Considered in their totality (as they must be), these allegations adequately plead Defendants' scienter as to the GAAP violations.  *See Avaya*, 564 F.3d at 272 (defendant's position as CFO supported strong scienter inference as to his statements regarding

financial subjects); *TAL Educ. Grp.*, 2020 WL 6937475, at \*4-\*5 (defendants' positions, coupled with control structure embodied in significant transaction, supported scienter as to GAAP violations related to that transaction.).[7]

Finally, Defendants incorrectly contend that the Complaint's scienter allegations as to the DOE review process are "nonsensical" because they supposedly amount to a theory that Defendants committed fraud while knowing their scheme would fail.  Mot. 6-9.  That argument is a pure strawman.  The Complaint's scienter allegations embody a longstanding and widely recognized theory of scienter: Defendants "gambled" by misrepresenting that DOE approval of GCU's non-profit status was virtually certain (and stalled only by purported "staffing" issues) when they knew facts suggesting the outcome of that process was far from guaranteed.  As the Seventh Circuit recognized in *Tellabs II*:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.  It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Tellabs II*, 513 F.3d at 710.[8]  Here, Defendants gambled that the new Administration might rubber-

---

[7] Defendants are wrong that clean audit opinions undermine their scienter because "'any [accounting] errors were not so obvious that their publication demonstrates an intent to defraud investors.'"  Mot. 12 n.13 (quoting *Roofer's Pension Fund*, 2018 WL 3601229 at \*19).  As set forth above, the Complaint alleges numerous facts beyond the GAAP violations themselves establishing scienter.  That inference is strengthened by the DOE's finding that Defendants manipulated material information they provided to other third-party professional firms relating to the Conversion.  *See supra* at 14-15.  Regardless, "reliance on an independent accountant cannot completely absolve the defendants of their obligation to ensure" the accuracy of their financial statements, and in any event such a defense raises fact-intensive issues incapable of resolution on a motion to dismiss.  *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (rejecting argument that "no inference of scienter is warranted because their independent auditors continued to certify New Oriental's financials").

[8] *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014) (quoting *Tellabs II*); *Skiadas v. Acer Therapeutics Inc.,* No. 1:19-cv-6137-GHW, 2020 WL 4208442, \*7 (S.D.N.Y. July 21, 2020) (finding that the plaintiffs' allegations "support the inference that *(continued on next page)*

stamp their improper attempt to designate a captive GCU as a non-profit. In the process, they knowingly or recklessly misrepresented *specific* material facts about the status and scope of the DOE review process. ¶¶64-65, 69-72, 75, 79-81. That their gamble failed does not undermine a scienter theory consistent with longstanding case law.[9]

## III.     The Complaint Sufficiently Pleads Loss Causation

Loss causation is alleged by pleading that the security's price was inflated "due to an alleged misrepresentation," and that the revelation of the truth "proximately caused the decline in the security's value." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184-85 (3d Cir. 2000). It is subject to Rule 8's notice pleading standard (*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (pleading loss causation is "not meant to impose a great burden upon a plaintiff")) and "is usually reserved for the trier of fact." *EP Medsys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) (reversing dismissal on loss causation grounds). The Complaint easily exceeds these standards. *See* ¶¶161-162, 171.

**November 6, 2019 Corrective Disclosure**. Defendants repeatedly concealed and downplayed the substantial risk that the DOE would deny GCU's application for non-profit status. *See*, *e.g.*, ¶¶176-210. On November 6, 2019, that risk materialized when investors learned the DOE had rejected GCU's application. GCE's stock price plummeted in response, falling $6.99

---

Defendants rationally (though recklessly) gambled that the FDA would ultimately approve EDSIVO, even though the FDA had never 'agreed'" to do so).

[9] For this reason, Defendants' cases are entirely inapposite, as they all involved allegations that defendants **knew** their alleged schemes **could not** succeed. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600-02 (S.D.N.Y. 2016) (allegation that defendants "knew for years" that a drug "could not clear" regulatory hurdles contradicted allegation that they "continued to invest substantial time and resources in clinical studies and NDA submissions" they "knew were doomed to fail"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (allegation that defendants knew drug was a "complete failure" contradicted allegation that they spent "millions of dollars" to test it); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (in light of allegation "that defendants knew the FDA would not approve [a drug]," allegation they "promise[d] the market that the FDA would approve" it "does not make a whole lot of sense.").

per share (or 7.61%) over the next two trading days.  ¶¶161, 236.  This adequately pleads loss causation.  *See In re Wilmington Tr.*, 29 F. Supp. 3d at 450 (loss causation pled by "alleging . . . the materialization of a concealed risk that causes a stock price decline").

Defendants respond that some corrective information was contained in the DOE's letter, which only became public on November 12, 2019.  Mot. 19. But the November 6, 2019 announcement drove investors' losses, and post-disclosure events (such as the publication of the DOE letter) can demonstrate falsity or scienter in connection with an earlier, incomplete corrective disclosure.  *See In re Bristol-Myers Squibb Sec. Litig.*, No. Civ.A 00–1990(SRC), 2005 WL 2007004, at *21 (D.N.J. Aug. 17, 2005) (that "the stock price fell without a more complete and detailed disclosure, if anything, only goes to show that the tip of the iceberg was enough to cause the loss").[10]  Even if the announcement of the DOE's decision did not reveal the full extent of Defendants' fraud, the Complaint adequately pleads loss causation.  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (loss causation "may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss").

Defendants also dispute that the November 6 disclosure was a corrective disclosure because Plaintiffs also allege that misstatements were made on the same and subsequent days.  Mot. 19; *see also* ¶¶164-165.   But courts routinely uphold loss causation allegations where defendants continue to mislead the market after a partial corrective disclosure.  *See, e.g., Semerenko,* 223 F.3d at 171 (after corrective disclosure, "the market price of [a company's] common stock was 'buoyed' by" continued false statements).[11]

---

[10] *See also In re Mattel, Inc. Sec. Litig.,* No. 2:19-cv-10860, Dkt. 74 at 25 (C.D. Cal. Jan. 26, 2021) (attached hereto as Exhibit 1) (rejecting argument that "companies may announce the *fact* of a whistleblower letter . . . but not its contents, and avoid liability") (emphasis in original).

[11] *In re Flag Telecom Holdings, Ltd. Sec. Litig.* (Mot. 19) is inapposite.   There, the Second Circuit rejected allegations that the ***very same statement*** was both corrective and misleading.  *See* *(continued on next page)*

19

**January 28, 2020 Corrective Disclosure.**  On January 28, 2020, Citron published a report revealing, *inter alia*, that GCE was receiving nearly 100% profit margins from areas of GCU's business for which it booked no expenses.  ¶¶167-170.  With these and other revelations, GCE's stock price declined that day by $7.43 per share, or 8.12%, to close at $84.07.  ¶¶167-171, 236. Analyst reports revealing previously non-public facts, accompanied by price declines, are actionable disclosures.  *See Pub. Employees Ret. Sys. of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) (Citron report constituted partial corrective disclosure); *City of Sunrise Gen. Employees' Ret. Plan v. Fleetcor Techs., Inc.*, No. 1:17-cv-02207, 2018 WL 4293143, at *14 (N.D. Ga. May 15, 2018) (same).  Defendants argue that the Citron report disclosure cannot be corrective because it was "obtained from public sources," Mot. 19-20, but the report was based on 870 pages of previously undisclosed information Citron had received via its FOIA request.  ¶167; Exh. B at 3.  Loss causation is adequately pled in these circumstances.  *See Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1202-06 (9th Cir. 2020) (plaintiffs may rely on a corrective disclosure derived from a FOIA response).[12]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motion. Should the Court dismiss the Complaint in whole or in part, Plaintiffs respectfully request that the dismissal be without prejudice so that Plaintiffs may seek leave to replead.

---

574 F.3d 29, 41 (2d Cir. 2009).  It did not hold that false statements could not be uttered contemporaneously with partially corrective ones, as Defendants argue here.

[12] Defendants' cases are inapposite, as both involved corrective disclosures based on information that had already been publicly *disclosed*.  *See Meyer v. Greene*, 710 F.3d 1189, 1198 & n.9 (11th Cir. 2013) ("the material portions of the [corrective disclosure document] were gleaned entirely from public filings and other publicly available information," and any information gleaned through FOIA requests was "immaterial"); *Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-CV-01795-WHO, 2016 WL 4585753, at *5 (N.D. Cal. Sep. 2, 2016) (allegedly corrective report "only collected and opined on already public information," *i.e.*, various public websites).

20

DATED:   February 19, 2021

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
Hannah G. Ross
Katherine M. Sinderson (*pro hac vice*)
Robert Kravetz (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
katiem@blbglaw.com
robert.kravetz@blbglaw.com
michael.mathai@blbglaw.com
benjamin.horowitz@blbglaw.com

*Counsel for Lead Plaintiffs*
*and the Lead Counsel for the Class*

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman
Jeffrey B. Gittleman (*pro hac vice*)
Chad A. Carder (*pro hac vice*)
Meghan J. Talbot
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com
mtalbot@barrack.com

*Counsel for Lead Plaintiffs*
*and Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
/s/ Gregory V. Varallo
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
greg.varallo@blbglaw.com

*Counsel for Lead Plaintiffs*
*and the Lead Counsel for the Class*

**VANOVERBEKE, MICHAUD**
   **& TIMMONY, P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Lead Plaintiffs*
*Oakland County Employees' Retirement*
*System and Oakland County Voluntary*
*Employees' Beneficiary Association Trust*

21