# Exhibit 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| IN RE MATTEL, INC. SECURITIES LITIGATION | Case No. 2:19-cv-10860-MCS-PLA |
|---|---|
| | **ORDER DENYING MOTIONS TO DISMISS AND GRANTING LEAVE TO FILE SURREPLY [39-41, 67]** |

Before the Court are four motions:

**1.** Defendant PricewaterhouseCoopers LLC's ("PwC") Motion to Dismiss. *See* PwC MTD, ECF No. 39.

**2.** Defendant Joshua Abrahams' Motion to Dismiss and Joinder to PwC's motion. *See* Abrahams MTD, ECF No. 40.

**3.** Defendants Mattel, Inc., Margaret H. Georgiadis, Joseph J. Euteneuer, and Kevin Farr's (the "Mattel Defendants")[1] Motion to Dismiss. *See* Mattel MTD, ECF No. 41.

---

[1] Georgiadis was Mattel's CEO from February 8, 2017 until April 19, 2018; Euteneuer became Mattel's CFO on September 25, 2017; and Farr was Mattel's CFO from February 2000 until September 29, 2017. Am. Compl. ¶¶ 35-37, ECF No. 34.

1

**4.** Lead Plaintiffs Dekalb County Employees Retirement System and New Orleans Employees' Retirement System Employees, and additional named Plaintiff Houston Municipal Employees Pension System's ("Plaintiffs") Motion for Leave to File Surreply. *See* Surreply Mot., ECF No. 67.

Plaintiffs filed an omnibus opposition to the motions to dismiss (Opp., ECF No. 54) and Defendants replied. PwC Reply, ECF No. 64; Abrahams Reply, ECF No. 63; Mattel Reply, ECF No. 65. The Court deemed the matter appropriate for decision without oral argument and vacated the hearing. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. The Court, in its discretion, grants Plaintiffs' Surreply Motion and considers the brief attached thereto. The motions to dismiss are denied.

## I. PLAINTIFFS' ALLEGATIONS

This securities fraud matter stems from "a cover-up of known, material misstatements in Mattel's financial results and known, severe weaknesses in its internal controls" as recounted in large part by Mattel's former tax director, Brett Whitaker. Am. Compl. ¶¶ 1, 66. The fraud relates to deferred tax assets—assets "that a company can use to reduce or eliminate a future tax liability." *Id.* ¶ 81. "The value of deferred tax assets depend on whether the company will, in fact, generate taxable income in the future." *Id.* ¶ 82. Applying Generally Accepted Accounting Principles ("GAAP"), companies must "value deferred tax assets on a quarterly basis and determine the probability that the company will be able to use" them. *Id.* ¶ 83. If "a company determines it likely will not be able to use all or some of its deferred tax assets because" it won't have enough future taxable income, the company must record a "valuation allowance" against the deferred tax assets. *Id.* ¶ 84.

When he joined Mattel in May 2017, Whitaker "shadowed" Mattel's Vice President of Tax, Clara Wong, to familiarize "himself with the company's processes." *Id.* ¶ 67. Whitaker immediately observed problems in Mattel's internal controls for tax and accounting, such as: (1) critical documents stored in unorganized boxes without electronic backups; (2) employees responsible for inputting underlying financial

2

statements could not answer basic questions; and (3) inexplicable accounting blunders. *Id.* ¶¶ 68-70. Wong reported to Euteneuer and frequently discussed these deficiencies with Whitaker. *Id.* ¶ 76. PwC, Mattel's outside auditor, and Abrahams, its lead audit partner, could not "explain how past quarters' numbers were reconciled, and they had been signing off on Mattel's financial statements for years." *Id.* ¶ 71. There was "ineffective communication between the tax department and the Financial Planning and Analysis department," and Mattel "lacked an informal control or formal process for determining, documenting, and confirming its tax valuation allowance." *Id.* ¶ 72. Mattel's audit manager told Whitaker in July 2017 that Mattel's controls for compliance with the Sarbanes-Oxley Act of 2002 "were either non-existent or extremely dated and agreed that the problem needed to be addressed." *Id.* ¶ 78.

On September 30, 2017, Mattel evaluated whether to record a valuation allowance against its $580,000,000 of deferred tax assets. *Id.* ¶ 80. Whitaker reported that "recording a valuation allowance against Mattel's deferred tax assets would have negatively impacted Mattel's earnings," "tanked" Mattel's financial performance, and "tells investors that you do not see the ship turning around any time soon." *Id.* ¶ 86. Following extensive discussion, but without an internal control in place to assess an allowance, Mattel and PwC initially declined a valuation allowance. *Id.* ¶¶ 87-90. But "with approximately one week left in the closing process," Mattel and PwC decided that Mattel "was required to record a valuation allowance," largely because Mattel decided to "write-off approximately $100,000,000 in receivables" from Toys "R" Us, Mattel's biggest customer, following its recent bankruptcy filing. *Id.* ¶¶ 93-94. Given Mattel's control deficiencies and the one-week timeline to calculate the allowance, Whitaker had "little confidence in what [they] were reporting" because, "[t]ypically, there is a trail of documentation that supports what you are reporting, and that just did not exist." *Id.* ¶ 100. Whitaker and his team ultimately calculated a valuation allowance of roughly $175,000,000 to $200,000,000. *Id.* ¶¶ 100-01.

"Days before Mattel was to report third quarter earnings on October 26, 2017,

3

PwC discovered a material error in the way the valuation allowance was calculated that required Whitaker and his team to quickly and haphazardly redo the entire tax entry." *Id.* ¶ 103. The error arose because Mattel wrongly offset its deferred tax assets by netting out the value of certain deferred tax liabilities. *Id.* ¶ 105. The recalculation increased the tax valuation allowance to $562,000,000 and reduced Mattel's income by the same amount. *Id.* ¶ 107. Throughout this process, "draft financial statements were regularly shared with senior Mattel executives" and those statements "varied significantly by hundreds of millions of dollars." *Id.* ¶ 108. Despite the error's severity, "PwC did not require the disclosure of any material weakness, and nothing was done to repair the Company's[2] internal  controls." *Id.* ¶ 112. Mattel filed its third quarter Form 10-Q on October 26, 2017, reporting the $562,000,000 valuation allowance, a $603,000,000 quarterly loss, and Euteneuer and Georgiadis certified that "Mattel's internal controls were effective as of September 30, 2017." *Id.* ¶ 113.

In January 2018, Whitaker and another Mattel tax executive, Dermot Martin, "set up a meeting to review all existing documentation relating to the netting issue and the classification of Mattel's intangible assets." *Id.* ¶ 116. "It was concerning to Whitaker that Mattel had just published its third quarter 2017 financials and relied on a solitary spreadsheet to calculate a $562 million entry for which Martin did not even know where the supporting documentation was." *Id.* ¶ 117. Whitaker eventually found a chart "with numbers and values listed on it that referenced the intellectual property assets and values that were set forth on the spreadsheet that Martin had supplied to support the recalculation of the third quarter valuation allowance." *Id.* ¶ 118. The chart described Mattel's HiT Entertainment Ltd. Asset ("HiT IP"), valued at $311,000,000, which Mattel treated in the third quarter "as having a finite life (i.e., amortizing over a fixed period)" and "therefore netted the deferred tax liability resulting from the HiT IP against Mattel's deferred tax assets, thereby reducing its valuation allowance." *Id.* ¶ 119.

---

[2] The Amended Complaint often refers to Mattel as the "Company."

"Whitaker noticed that the HiT IP was listed on the [chart] as having no amortization," meaning that "the deferred tax liability related to this asset should not have been used to reduce/net against Mattel's deferred tax assets or the Company's allowance in the third quarter." *Id.* ¶ 120. This error meant that Mattel's valuation allowance and third quarter loss were understated by roughly $109,00,000. *Id.* ¶¶ 122, 125.

Whitaker "immediately called Wong to walk her through the error" and scheduled a meeting with Mattel executives, who all "agreed that this was a serious error in Mattel's financial statements." *Id.* ¶¶ 124-25. Even so, Mattel's Senior Vice President of Accounting stated, "We cannot have a material weakness. That would be the kiss of death." *Id.* ¶ 130. The "team was holding out a thin sliver of hope that perhaps Mattel might be able to find a way to characterize it differently." *Id.* ¶ 132. After a later meeting, Mattel leadership determined that "Mattel's third quarter financials would have to be restated, and Mattel would have to disclose a material weakness." *Id.* ¶ 136. This determination was reaffirmed in a subsequent meeting with Mattel's legal team. *Id.* ¶¶ 136-37. "The meeting participants decided to communicate this conclusion to CFO Euteneuer, and then set up a meeting with PwC to communicate the findings to them." *Id.* ¶ 138. Wong later told "Whitaker that during the meeting with PwC, 'Josh Abrahams' immediate response, to everyone's surprise, was that we cannot have a material weakness and we need to figure out a way for that not to be the result.'" *Id.* ¶ 141. "The mandate from Abrahams was for everyone to see what kind of a technical argument we could make to avoid a restatement and avoid reporting a material weakness." *Id.* (internal quotations omitted). Wong later "communicated to Whitaker that PwC had manufactured a plan to avoid a restatement"—to "change the classification of the HiT IP asset from an indefinite-lived asset to a finite-lived asset retroactively as of" October 1, 2017. *Id.* ¶ 143.

"Although both Mattel and PwC concluded that Mattel's third quarter 2017 financial statements contained a material misstatement, none of the senior Mattel executives involved in this determination… informed Mattel's Audit Committee of the

5

misstatement." *Id.* ¶ 149. Moreover, "Euteneuer and PwC audit partners failed to report the known errors and material weaknesses to the Audit Committee despite the fact that they met with the Audit Committee specifically to discuss the accuracy of the Company's 2017 financial statements, including the existence of any material weaknesses, so that the Audit Committee could approve their filing with the SEC." *Id.* ¶ 151.

Before Mattel filed its 2017 Form 10-K, "Martin discovered a third error" valued at roughly $20,000,000 stemming from Mattel wrongly netting "certain deferred tax liabilities related to indefinite-lived assets." *Id.* ¶ 153. PWC netted "other, immaterial errors against this one to take it below the materiality threshold and avoid having to report it." *Id.* ¶ 154. "When the issue was resolved and the audit was completed," a primary PwC partner "walked through the halls of Mattel high-fiving people to celebrate the fact that there would be no restatement and the 2017 audit was finally signed off on." *Id.* ¶ 155. Mattel's 2017 Form 10-K did not disclose "the material weaknesses in internal controls from which it suffered," that "it had concocted a plan to avoid restating its third quarter results," or other inadequacies. *Id.* ¶ 157.

On August 6, 2019, two days before a $250,000,000 offering of its corporate debt was scheduled to close, Mattel learned that PwC received a whistleblower letter detailing the erroneous accounting and deficiencies described above, among other things. *Id.* ¶ 164. After the market closed on August 8, 2019, Mattel filed a Form 8-K "disclosing that the Company 'was made aware of an anonymous whistleblower letter' and would investigate the 'matters set forth in the letter.'" *Id.* ¶ 161. The Form 8-K further disclosed that to "provide the Company with an opportunity to investigate the matters set forth in the letter," Mattel was terminating the bond offering scheduled to close that day. *Id.* ¶ 162. "In response to Mattel's disclosure, Mattel's stock price declined 16% in a single day." *Id.* ¶ 168.

On October 29, 2019, "Mattel filed a Form 8-K with the SEC addressing the findings from the whistleblower investigation" and "announced that the Company

would be restating its quarterly financial data" for the three and nine-month periods ended September 30, 2017, the three-month period ended December 31, 2017, and that these results "should no longer be relied upon due to material misstatements." *Id.* ¶ 172. The Form 8-K stated that Mattel "has reassessed its conclusions regarding the effectiveness of its internal control over financial reporting as of December 31, 2018" and " has determined that certain material weaknesses existed as of December 31, 2017 and subsequently, and therefore the Company has concluded that its internal control over financial reporting as of December 31, 2018 was not effective and that Management's Report on Internal Control on Financial Reporting as of December 31, 2018 should also no longer be relied upon." *Id.* ¶ 174.

Mattel further reported that the "investigation determined that income tax expense was understated by $109 million in the third quarter of 2017 and overstated by $109 million in the fourth quarter of 2017, with no impact on for the full year" and that "lapses in judgment by management," plus other factors, "contributed to these failures." *Id.* ¶¶ 175, 177; *see also* Request for Judicial Notice ("RJN," ECF No. 42) Ex. 5 278-79. Mattel continued that the investigation "found errors in publicly-filed Mattel financial statements for the last two quarters of 2017, failure to properly consider and disclose such errors… to the Audit Committee once they became known, and violations of auditor independence rules." Am. Compl. ¶ 175. Finally, Mattel stated that Euteneuer "would be departing the Company after a six-month transition period" and he was informed of this plan "less than a week before the release of the October 29, 2019 Form 8-K…" *Id.* ¶ 179. Mattel announced it would replace Abrahams and members of his audit team for violating auditor independence rules. *Id.* ¶ 181. Mattel's stock price rose 14% on October 30, 2019. RJN Ex. 21 551.

Mattel filed its amended 2018 Form 10-K/A with restated financials (the "Restatement") on November 12, 2019. Am. Compl. ¶ 187. Along with other disclosures, the Restatement: (1) confirms that Mattel's accounting suffered from material weaknesses despite Mattel's prior contrary representations; (2) admits that

Mattel's internal controls were "ineffective" when the financial statements were prepared; and (3) acknowledges the control certification's falsity. *Id.* ¶¶ 188-191; *see also* RJN Ex. 6 308, 409-10. Mattel disclosed that it received a subpoena from the SEC "seeking documents related to the whistleblower letter and subsequent investigation" and another subpoena from the U.S. Attorney's Office for the Southern District of New York. Am. Compl. ¶¶ 197-98.

Based on these allegations, Plaintiffs bring claims against the Mattel Defendants and PwC for violations of section 10(b) of the Exchange Act and SEC Rule 10b-5, as well as violations of section 20(a) of the Exchange Act against Georgiadis, Farr, Euteneuer, and Abrahams. *Id.* ¶¶ 451-482. The Amended Complaint is brought on behalf of Plaintiffs and a putative class "of all persons or entities who purchased, or otherwise acquired, the common stock of Mattel from August 2, 2017 to August 8, 2019," subject to enumerated exclusions. *Id.*

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

"[C]laims under section 10(b) and Rule 10b-5 must not only meet the

8

requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act" ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action, including loss causation."). Under Rule 9(b), Plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct, "as well as what is false or misleading about" it, and "why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted).

Importantly, "to state a claim for securities fraud that complies with the dictates of the PSLRA, the complaint must raise a 'strong inference' of scienter – *i.e.*, a strong inference that the defendant acted with an intent to deceive, manipulate or defraud." *Metzler Invest. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1061 (9th Cir. 2008). As to pleading loss causation with particularity, "[t]hat effort 'should not prove burdensome,' for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (citations omitted).

## III. EXTRANEOUS INFORMATION

There are two instances in which courts may consider information outside of the complaint without converting a Rule 12(b)(6) motion into one for summary judgment: judicial notice and incorporation by reference. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Judicial notice allows courts to consider a fact that is not subject to reasonable dispute because it is generally known within the territory or can be determined from sources of unquestionable accuracy. Fed. R. Evid. 201. Incorporation by reference allows a court to consider documents which are (1) referenced in the complaint, (2) central to the plaintiff's claim, and (3) of unquestioned authenticity by

either party. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). In the context of a securities fraud action, the Ninth Circuit has instructed courts to cautiously approach overreliance on extraneous materials at the pleading stage:

> The overuse and improper application of judicial notice and the incorporation-by-reference doctrine, however, can lead to unintended and harmful results. Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage. Yet the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access.

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citations omitted).

The RJN accompanying the Mattel MTD, which PwC and Abrahams join, asks the Court to consider the following 21 exhibits, consisting of more than 500 pages:

- **Exhibit 1:** 2017 SEC Form 10-K (filed February 27, 2018)
- **Exhibit 2:** 2018 SEC Form 10-K (filed February 22, 2019)
- **Exhibit 3:** SEC Form 4 (filed February 25, 2019)
- **Exhibit 4:** SEC Form 8-K (filed August 8, 2019)
- **Exhibit 5:** SEC Form 8-K (filed October 29, 2019)
- **Exhibit 6:** The Restatement (filed November 12, 2019)
- **Exhibit 7:** August 9, 2019 article, "Mattel Shares sink on whistleblower letter"
- **Exhibit 8:** August 9, 2019 article, "Mattel stock craters after pulling bond sale over anonymous whistleblower letter"
- **Exhibit 9:** August 9, 2019 article, "Mattel Sinks After Yanking Bond Sale on Whistleblower Letter"
- **Exhibit 10**: August 8, 2019 analyst report, "Thesis Update: Debt Deal Terminated Due to Whistleblower Letter"

- **Exhibit 11**: August 9, 2019 analyst report, "Thoughts on Bond Termination"
- **Exhibit 12**: August 9, 2019 analyst report, "MAT: Pulls Bond Deal Amid Revealed Whistleblower Letter"
- **Exhibit 13:** August 14, 2019 analyst report, "We wait…"
- **Exhibit 14:** October 29, 2019 analyst report "Mattel 3Q19 Quick Take"
- **Exhibit 15:** October 29, 2019 analyst report, "3Q Defies Tariff Concerns/W'blower saga Resolved"
- **Exhibit 16**: October 30, 2019 analyst report, "Too Soon to Declare Victory"
- **Exhibit 17**: October 30, 2019 analyst report, "Lowering 4Q19E EBITDA by 19%; Maintaining $11.50 PT"
- **Exhibit 18**: October 30, 2019 analyst report, " Model Update: Whistleblower Resolved; Progress on Sales & Costs But Q4 Giveback"
- **Exhibit 19:** October 30, 2019 analyst report, "Making Progress Toward Profit Restoration; Whistleblower Resolution Removes Big Overhang"
- **Exhibit 20:** November 12, 2019 analyst report, "MAT: 3Q19 Recap; Reiterate SW Rating"
- **Exhibit 21:** Stock price data from Yahoo! Finance

*See* RJN Exs. 1-21.

Defendants ask that the Court consider exhibits 1, 2, 4-9, and 14 under the incorporation by reference doctrine, and take judicial notice of the remaining exhibits. RJN 1-6. Plaintiff opposed the RJN and Defendants replied. RJN Opp., ECF No. 55; RJN Reply, ECF No. 66.

The Court takes judicial notice of exhibits 1-6, but not disputed facts within them. *Khoja*, 899 F.3d at 999 (observing that a "court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment," but "a court cannot take judicial notice of disputed facts contained in such public records.") (internal quotations and citations omitted). The Court considers Exhibits 7-9 and 14 under the incorporation by reference doctrine, but not to the extent

they are proffered to "resolve factual disputes against the plaintiff's well-plead allegations in the complaint." *Id.*; Am. Compl. ¶¶ 163-65 (identifying and paraphrasing Exhibits 7-9);  RJN Opp. 4 (conceding the Amended Complaint cites Exhibit 14).

The Court may consider exhibits 10-13 and 15-20 to determine "whether and when certain information was provided to the market," but not for the truth of the matters asserted. *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. 2008); Fed. R. Evid. 201(a) and (b) advisory committee's notes (noting that a "high degree of indisputability is the essential prerequisite" to taking judicial notice and "the tradition has been one of caution in requiring that the matter be beyond reasonable controversy."). Finally, the Court takes judicial notice of Exhibit 21 because it consists of undisputed stock price data germane to the motions. *In re Finisar Corp. Derivative Litig.*, 542 F. Supp. 2d 980, 989 n.4 (N.D. Cal. 2008) ("[C]losing stock price is public information capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") (internal quotations and citation omitted).

## IV.  DISCUSSION

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security… [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements section 10(b) by declaring it unlawful:

a.  To employ any device, scheme, or artifice to defraud,

b.  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

c.  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must adequately allege, *inter alia*: (1) scienter, i.e., a wrongful state of mind, and (2) loss causation, i.e., a causal connection between the material misrepresentation and the loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). To state a claim under section 20(a), a plaintiff must adequately allege: (1) a primary violation of federal securities laws, and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Defendants argue that Plaintiffs' claims under section 10(b) and Rule 10b-5 fail because they include no allegations of scienter or loss causation that satisfy heightened pleading requirements and that Plaintiffs' claims under section 20(a) do not plead a primary violation of the securities laws. Abrahams argues that the section 20(a) claim against him is deficient for the additional reason that Plaintiffs do not sufficiently allege he was a "controlling person."

### A. Scienter

A plaintiff can establish scienter "by showing deliberate recklessness or 'some degree of intentional or conscious misconduct.'" *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). "'Deliberate recklessness is an *extreme* departure from the standards of ordinary care which presents a danger of misleading… that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Webb v. SolarCity Corp.*, 884 F.3d 844, 857, 885 (9th Cir. 2018) (citations omitted). The PSLRA requires that the inference of scienter be "strong," and that the Court "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegation holistically.").

13

### *1. The Mattel Defendants*

The Amended Complaint and suitable extrinsic evidence demonstrate that Mattel misstated its third and fourth quarter 2017 financial results and the effectiveness of its internal control. *Compare* RJN Ex. 1, 2017 Form 10-K 55 ("Mattel's management, including [Georgiadis and Euteneuer], evaluated the effectiveness of Mattel's internal control over financial reporting" and "concluded that Mattel's internal control over financial reporting was effective as of December 31, 2017.") *with* Restatement 125 (Mattel "re-evaluated the effectiveness of the design and operation of Mattel's disclosure controls and procedures and concluded that, because of the material weakness in Mattel's internal control over financial reporting related to the failure to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action…, Mattel's disclosure controls and procedures were not effective as of December 31, 2018."). Twenty months and one whistleblower letter after filing its 2017 Form 10-K, Mattel publicly attributed these "failures" in part to "lapses in judgment by management" and confirmed "there were material weaknesses in" Mattel's "internal control over financial reporting at the time of the preparation of the financial statements…" *See* Form 8-K, RJN Ex. 5. These undisputed facts alone support at least some degree of scienter. *See, e.g., Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016) ("Accounting errors that prove to have a significant impact on core business operations…, sometimes give rise to a compelling inference of scienter… This is particularly so where the magnitude of the accounting error is great, the GAAP provisions that were violated are relatively straightforward or basic, or the mistake is pervasive over a long period of time.") (internal quotations and citations omitted).

The inference is bolstered by Mattel's admitted GAAP violations, the alleged concealment's duration in light of Mattel's then-concerning financial outlook, and Plaintiffs' well-pled facts supporting that the late-disclosed deficiencies were obvious

14

well before receipt of the whistleblower letter. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1138, 1145 (9th Cir. 2017) (finding of scienter affirmed where "defendants were aware in real time of QSI's financial information, and knew that their statements… were inconsistent with this information"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that is was false is via contemporaneous reports or data, available to the party, which contradict the statement."); *In re McKesson HBOC, Inc. Securities Litigation,* 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves."). It is further strengthened by particularized details illustrating the severity of Mattel's internal control weakness throughout the class period. *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017) ("Internal controls over *financial* reporting fell squarely within [the CFO's] oversight" and the "admission that *material* weaknesses and an improper tone at the top existed… suggests it would be 'absurd' for CFO Dolan to have been blind to these weaknesses and improprieties when the company assured investors its controls performed adequately and effectively.") (citing *S. Ferry*, 542 F.3d at 786).

Plaintiffs provide additional allegations to support a strong inference that the Mattel Defendants' purported "lapses in judgment" concerning the financial results amounted to deliberate recklessness or intent. For example, draft financial statements provided to Georgiadis and Euteneuer days before results issued "varied significantly by hundreds of millions of dollars," yet those results were given to investors without delay or disclaimer. Am. Compl. ¶¶ 92-102, 108; *Thomas*, 167 F. Supp. 3d at 1042 ("These were not minor accounting errors. To the contrary, they dramatically affected Magnachip's financial results, and in ways that strongly suggest a typical corporate executive should have noticed them."). Plaintiffs provide particularized allegations

15

about meetings involving Mattel's leadership, legal team, and PwC resulting in a supposed consensus "that Mattel's third quarter 2017 financial statements contained a material misstatement" and "would have to be restated," yet decisionmakers "failed to report the known errors and material weaknesses to the Audit Committee despite the fact that they met with the Audit Committee specifically to discuss the accuracy of the Company's 2017 financial statements, including the existence of any material weaknesses, so that the Audit Committee could approve their filing with the SEC." *Id.* ¶¶ 136-38, 149-51; *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *7 (N.D. Cal. June 1, 2020) ("[F]ailure to communicate information… does suggest deliberate recklessness because it indicates that senior management possessed information that, had it been communicated, would have indicated that the financial reporting was false.") (citing *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (finding deliberate recklessness where defendants "had reasonable grounds to believe material facts existed that were misstated or omitted" but "failed to obtain and disclose such facts although he could have done so without extraordinary effort.")). The timing and nature of Euteneuer's departure from Mattel further supports a scienter inference, as Mattel informed him of the transition "less than a week before the release of the October 29, 2019 Form 8-K…" Am. Compl. ¶ 179; *Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) ("Based on the timing of Kelly's termination and PPG's announcement of remedial measures, the Court finds that these allegations add to the inference of scienter.").

The Mattel Defendants spill much ink contending that certain allegations cannot independently give rise to the required scienter inference. Mattel MTD 9-20. They aver, for example, that "merely restating financials" and "mere allegations that a company had deficient internal controls" does not establish scienter. *Id.* 10 (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) ("a failure to follow GAAP, without more, does not establish scienter"); *Brown v. InnerWorkings, Inc.*, 2019 WL 4187385, at *4 (C.D. Cal. Mar. 27,

16

2019) ("Without specific factual allegations, the mere existence of deficient internal controls is 'insufficient to give rise to a strong inference of scienter.'"). And that PwC's advice and lack of stock sales "undercut" the possibility of the Mattel Defendants' scienter. *Id.* 15-16 (citing *Webb*, 884 F.3d at 857, 885 ("[T]he accounting error was so subtle that … professional auditors missed it" and "lack of stock sales can detract from a scienter finding")). Yet Plaintiffs' 234-page Amended Complaint, supplemented by numerous extrinsic materials, provides more than "mere" allegations with respect to these fact-intensive theories, and the Mattel Defendants arguing that contrary evidence "undercuts" these theories only highlights Plaintiffs' entitlement to discovery. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.") (citation omitted); *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) ("[M]any courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors and had never restated their financial statements.") (citations omitted). That certain theories alone might be insufficient to plead scienter is of little import against the backdrop of multi-faceted allegations of deliberate recklessness and intent offered by a knowledgeable Mattel tax executive. *S. Ferry,* 542 F.3d at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement").

The Mattel Defendants question Whitaker's reliability, claiming he was far removed from relevant events and likening him to an undependable confidential witness. Mattel MTD 11-13 (citing *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014) (rejecting "impressions of witnesses who lacked direct access to the executives" and "lack first hand knowledge regarding what the individual defendants knew or did not know"); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948-49 (N.D. Cal. 2010) ("opinions and observations" of witnesses

17

who "had no personal interactions with" executives cannot show "what these individual Defendants knew or did not know")). Yet Whitaker's reliability ostensibly exceeds that of *confidential* sources other courts find sufficiently reputable due to his disclosed identity, elevated position, and first-hand knowledge of many pertinent events. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("The statements reported by the COO were specific in time, context, and details, and involved important communications from a chief executive officer to his Board. They are sufficiently reliable for pleading purposes."); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10–11 (N.D. Cal. Apr. 28, 2020) (denying motion to dismiss based in part on confidential witnesses' lack of "personal knowledge or direct contact with defendants"). A review of Whitaker's account channeled through the Amended Complaint makes clear that the Mattel Defendants' proposed reliability standard—disregarding a senior tax executive's detailed narrative of accounting deficiencies he personally observed or surmised through dependable sources—is untenable. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.4 (9th Cir. 2009) ("[U]nder the Court's test in *Tellabs,* which explicitly rejected any standard which would 'transpose to the pleading stage the test that is used at the summary judgment and judgment-as-a-matter-of-law stages,' the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus.") (citations omitted). For this reason, the Mattel Defendants' authority is distinguishable and the Court declines their invitation to discredit Whitaker's thorough account at the pleading stage. *Id.*

In sum, Plaintiffs' comprehensive allegations and other material properly before the Court read holistically and in Plaintiffs' favor provide robust factual content to support a strong inference of the Mattel Defendants' scienter under Rule 9(b) and the PSLRA. *In re VeriFone Holdings Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("[W]hen we consider the allegations holistically… the inference that [defendants] were deliberately reckless as to the truth of their financial reports and related public statements is 'at least as compelling as any opposing inference.'").

18

### 2. PwC

"To plead scienter allegations against an auditor, the Ninth Circuit has held that a plaintiff must show 'more than a misapplication of accounting principles,' and allege with particularity that the auditor's 'accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that… no reasonable accountant would have made the same decisions [.]'" *In re New Century*, 588 F. Supp. 2d 1206, 1233 (C.D. Cal. 2008) (citations omitted). "[P]leading sufficient facts to support a strong inference of scienter by an outside auditor is difficult because outsider auditors have more limited information than, for example, the company executives who oversee the audit." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1097 (9th Cir. 2011). In general, "the more facts alleged that should cause a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes." *Id.* at 1098 (citations omitted).

Plaintiffs' scienter theory against PwC is premised on the claim that Abrahams and his audit team conspired with Mattel to cover up Mattel's material misstatement. *See, e.g.,* Am. Compl. ¶ 202 (alleging PwC "instructed Mattel that they would need to find a technical argument to avoid admitting a material weakness and issue a restatement," resulting in PwC and Mattel "scaveng[ing] the earth to try to find a technical argument that could be made to say there was no material weakness."); *see* Opp. 34 ("In contrast to the normal auditor case, here, PwC unquestionably knew of the material misstatement and played a key role in concealing it."). The Court therefore disregards PwC's arguments concerning "shoddy accounting," mere GAAP violations, and general negligence because these are not grounds advanced by Plaintiffs. *See* PwC MTD 14-20.

Allegations to support that PwC knew about Mattel's alleged fraud but tried to conceal it include:

- PwC knew about material deficiencies in Mattel's accounting and disclosure controls before third quarter 2017 results issued, but did not require Mattel to disclose them. Am. Compl. ¶¶ 108-12.

- PwC acknowledged Mattel had no internal control to assess a valuation allowance by recommending the development of one *after* the filing. *Id.* ¶ 115.

- Even after this acknowledgement, and despite the continued severity of control weakness, PwC never required Mattel to report deficiencies in its internal controls during the class period. *See generally id.*

- PwC knew of the material misstatement and Abrahams mandated that Mattel and his team "see what kind of a technical argument we could make to avoid a restatement and avoid reporting a material weakness." *Id.* ¶ 141.

- Acting on Abrahams' mandate, PwC "manufactured a plan to avoid a restatement"—to "change the classification of the HiT IP asset from an indefinite-lived asset to a finite-lived asset retroactively." *Id.* ¶ 143.

- "PwC audit partners failed to report the known errors and material weaknesses to the Audit Committee despite the fact that they met with the Audit Committee specifically to discuss the accuracy of the Company's 2017 financial statements, including the existence of any material weaknesses, so that the Audit Committee could approve their filing with the SEC." *Id.* ¶ 151.

- A primary PwC partner "walked through the halls of Mattel high-fiving people to celebrate the fact that there would be no restatement and the 2017 audit was finally signed off on." *Id.* ¶ 155.

- Mattel replaced Abrahams and members of his audit team for violating auditor independence rules and Abrahams left PwC. *Id.* ¶ 181.

The severity of Mattel's control weakness as recounted above, and its persistence well after PwC's involvement, supports scienter. *New Century*, 588 F. Supp. 2d at 1231 ("The allegations support an awareness on the part of [the] audit team that internal controls were problematic, but the team nevertheless accepted incomplete

documentation in reaching its determinations. The allegations, therefore, suggest more than a simple mistake—willful ignorance of a company's valuation methods may support a strong inference of scienter."). So too does the contention that PwC's top brass for Mattel acknowledged the gravity of the misstatement, but strenuously worked to avoid disclosures and a restatement. *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1044 (C.D. Cal. 2003) (finding that where PwC likely "knew that the transaction and accounting of them were improper…, that it also allowed some of them to be reported… without proper valuation shows that PwC acted with deliberate recklessness"). Abrahams' departure from PwC may also be considered one piece of the scienter puzzle given its proximity to his removal from Mattel's audit team, albeit not a prominent one in view of Plaintiffs' present allegations. *Zucco*, 552 F.3d at 1002.

As to most of the scienter allegations, Plaintiffs allege Mattel and PwC worked in tandem to conceal material data by, for example, illegitimately reclassifying assets to avoid a restatement. *See generally* Am. Compl. For reasons discussed above, these shared allegations also support PwC's scienter, though perhaps to a lesser extent given PwC's role. *New Mexico State Inv. Council*, 641 F.3d at 1095 ("Contrary to the district court's comment that scienter allegations against accountants or auditors carry 'a little bit of a heavier burden,' this Court has previously advised against developing 'separate[] rules of thumb for each type of scienter allegation.'"). The Court also determines that allegations of PwC's scienter—like those leveled at Mattel—are sufficiently specific, and thus satisfy Rule 9(b) and the PSLRA. *New Mexico State Inv. Council*, 641 F.3d at 1102 (finding a strong inference of scienter where the "Complaint is loaded with specific allegations of how and why EY should have investigated deficient or missing documentation. Even after being alerted to potential problems during the 2003 corrective reforms, EY's behavior,… its unqualified audit opinions, did not change. These red flags further support a strong inference of scienter.").

As PwC notes, the chief shortcoming of Plaintiffs' theory is PwC's motive to collude with Mattel, as courts often presume that auditors "lack [] a rational economic

21

incentive… to participate in fraud" with their clients. *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000), *aff'd sub nom. DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002). Yet courts "have been especially ready to find motive pleading adequate to survive 12(b)(6) motions in cases where the auditing company plays a dual role with respect to the client" because "an auditor may take on a vested interest in the performance and profitability of its client, and consequently weaken its ability to rely on its reputation in countering as 'irrational' allegations that it participated in a client's fraud." *In re Silver Wheaton*, 2019 WL 1512269, at *13 (citations omitted).

For motive, Plaintiffs allege PwC's dual role as Mattel's consultant and auditor compromised its independence, especially given considerable fees paid by Mattel to PwC: nearly $10,000,000 in 2018, $11,000,000 in 2019, and $9,400,000 in 2017. Am. Compl. ¶ 323. Plaintiffs further identify recent SEC charges and press about PwC's frequent restatements, suggesting that PwC and its partners want to evade added scandal and safeguard their reputations by avoiding restatements and concealing errors. *Id.* ¶¶ 317-21. Mattel's uncertain financial position and legal difficulties at the time are also tenable, though suspect, incentives for a dual consultant-auditor to avoid disclosure of accounting mistakes. *Id.* ¶ 131 ("Our company [was] tanking. To then go out and say we have no sufficient controls, as an investor, you would read that and say, what else don't you have control over?"); *see also id.* (Mattel "was a defendant in a securities class action suit at the time, and Martin expressed the view that these types of admission would 'add fuel to the fire'"). The Court concludes that Plaintiffs' motive allegations, while dubious, are not fatal. *Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *6 (C.D. Cal. Dec. 21, 2018) ("But, even though facts showing a lack of motive are relevant, failure to allege motive is not fatal. Therefore, while the Court is skeptical of Plaintiffs' motive allegations, this is simply a factor that weighs against a finding of scienter.") (citation omitted).

PwC offers a competing inference that its decision to retroactively recharacterize

22

the HiT IP asset was based on "legitimate professional judgment" and argues that the Amended Complaint undermines Plaintiffs' contrary theory. PwC MTD 15-16. But as discussed, Plaintiffs adequately allege concealment of misstatements and deficiencies, and PwC's interpretation improperly attempts to rewrite these allegations. *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011) ("Defendants' generic and misplaced characterization of Plaintiffs' complaint does not in any way rebut the allegations that Defendants' statements were made with deliberate recklessness as to their veracity."); *In re Silver Wheaton*, 2019 WL 1512269, at *14 ("Deloitte's arguments to the contrary—which are largely based on its contention that its actions and opinions were reasonable—are unavailing as they rely on facts that are not before the Court and are nonetheless unpersuasive given the strength of plaintiffs' allegations."). PwC contending that the financial data was complex, and that the alleged information asymmetry between Mattel and PwC warrants a charitable reading of PwC's intent, understates the error's scope, the deficiencies' prolonged conspicuousness, and that "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5." *In re VeriFone,* 704 F.3d at 708.

PwC's arguments may have merit at the summary judgment stage—when the Court addresses evidence, not allegations—but its proposed pleading standard finds no support in binding precedent requiring this Court to accept Plaintiffs' well-pled scienter allegations as true. *Tellabs*, 551 U.S. at 309-10 ("[C]ourts must, as with any motion to dismiss…, accept all factual allegations in the complaint as true."). After review of the pleadings and briefing on scienter, the Court has weighed Plaintiffs' allegations, the competing inferences, and innocent explanations. And construing the record properly before the Court in Plaintiffs' favor, Plaintiffs' allegations holistically infer a strong inference that PwC acted with scienter with respect to Mattel's misstatements and internal controls. PwC's piecemeal alternative request to "dismiss allegations" concerning its audit opinions is denied in light of this holistic determination. PwC MTD 20-21; *Tellabs*, 551 U.S. at 310-11.

23

## B. Loss Causation

"[L]oss causation is the 'causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharm.*, 544 U.S. at 342). "A complaint fails to allege loss causation if it does not 'provide[ ] [a defendant] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]' Stated in the affirmative, the complaint must allege that the defendant's share price fell significantly after the truth became known.'" *Id.* (quoting *Dura Pharm.*, 544 U.S. at 347). "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd*, 811 F.3d at 1209–10 (citation omitted). "Typically, 'to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) (citation omitted). Loss causation was adequately alleged, for example, where plaintiffs stated that a company had engaged in improper accounting practices and that the "stock fell precipitously after [the company] began to reveal figures showing the company's true financial condition." *Id.* at 1119-20 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005)). Importantly, "[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citation omitted). Indeed, "loss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Id.* (citations omitted).

PwC and the Mattel Defendants argue that the Amended Complaint fails to identify a corrective disclosure that resulted in a stock price decline. PwC MTD 9-13;

24

Mattel MTD 20-25. This argument centers on the contention that events preceding the decline—announcing investigation into a whistleblower letter and cancelling Mattel's $250,000,000 debt offering—do not constitute "truth" revealed to the market. *BofI*, 977 F.3d at 791 ("[T]o prove loss causation by relying on one or more corrective disclosures, a plaintiff must show that: (1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate."). It is undisputed that Mattel's August 8, 2019 announcement did not reveal the substance of the whistleblower letter, but also that the letter recounted the fraud at issue in this lawsuit. According to the Mattel Defendants and PwC, that the disclosure did not reveal the letter's contents or the audit opinion's falsity, respectively, means the market reacted to conjecture, not fraud, and loss causation is therefore absent as a matter of law. Defendants thus advocate for a categorical rule whereby companies may announce the *fact* of a whistleblower letter (the accuracy of which is later confirmed), but not its contents, and avoid liability if the market's immediate reaction overestimates the eventual impact of the letter's then-withheld details.

Neither *BofI* nor earlier precedent stand for inflexible application of such an unqualified rule, let alone at the pleading stage. 977 F.3d at 1002 ("Courts have likened [the loss causation] requirement to the showing of proximate causation required in ordinary tort actions") (citing *Dura Pharm.*, 544 U.S. at 346; *Lloyd*, 811 F.3d at 1210); *see also First Solar*, 881 F.3d 750 ("But our approval of one theory should not imply our rejection of others. A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss."). The alleged corrective disclosure in *BofI* was a whistleblower lawsuit that "if accepted as true, unquestionably revealed to the market that at least some of BofI's alleged misstatements were false." 977 F.3d at 788. The district court "held that allegations in a lawsuit, standing alone can never

25

qualify as a corrective disclosure because they are just that—allegations as opposed to 'truth'" and "concluded that to adequately plead loss causation, the shareholders had to identify an additional disclosure that confirmed the truth of" the lawsuit's allegations. *Id.* at 792. The Ninth Circuit reversed, rejecting a "categorical" requirement that an "additional disclosure" corroborate the lawsuit, insofar as the lawsuit's allegations are found credible. *Id.* ("If the market treats allegations in a lawsuit as sufficiently credible to be acted upon as truth, and the inflation in the stock price attributable to the defendant's misstatements is dissipated as a result, then the allegations can serve as a corrective disclosure.").

*BofI* is a fact-specific holding that does not control the distinguishable contents and timeline of the corrective disclosure alleged here. Unlike in *BofI*, Mattel issued multiple "additional disclosures" corroborating the whistleblower's allegations. And because Mattel initially withheld the contents of whistleblower letter, there is no credibility determination for this Court to make. To be sure, merely announcing an investigation or disclosing uncorroborated allegations that precede a stock price drop do not establish loss causation. *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014). But allegations here exceed non-actionable speculation: Defendants engaged in fraud they did not disclose until a whistleblower letter—quickly corroborated by Defendants—forced their hand, resulting in the decline. *Thomas*, 167 F. Supp. 3d at 1046 ("Any particular corrective disclosure is relevant only insofar as it may provide a data point regarding the market's reaction to information about a defendant's alleged misconduct. The fundamental inquiry before the Court remains whether there is 'a causal connection between the material misrepresentation and the loss.'") (quoting *Dura Pharm.*, 544 U.S. at 342).

It is not dispositive that Defendants withheld the letter's contents, leaving the market to guess why Mattel pulled an already-priced bond offering. *First Solar*, 881 F.3d at 754 ("That a stock price drop comes immediately after the revelation of fraud

26

can help to rule out alternative causes. But that sequence is not a condition of loss causation. This rule makes sense because it is the underlying facts concealed by fraud that affect the stock price."). The market's apparent deduction that Mattel's drastic response stemmed from something more than accounting fraud does not cancel liability for that fraud, nor is it logical to suggest a company could foreclose loss causation by manipulating disclosure of non-public whistleblower complaints. *In re Herbalife, Ltd. Secs. Litig.*, 2015 WL 1245191, at *3 (C.D. Cal. Mar. 16, 2015) ("Either a single event or a 'series of disclosures' can establish loss causation."); *Dura Pharm*, 455 U.S. at 342 (recognizing that loss may occur as "relevant truth begins to leak out" or "after the truth makes its way to the marketplace"). In any event, conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal. *Khoja*, 899 F.3d at 999 (noting the "concerning pattern in securities cases" of "exploiting" extrinsic materials to "improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage."); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.").

Construing the Amended Complaint and appropriate extrinsic materials in a light most favorable to Plaintiffs, the Court concludes that Plaintiffs have sufficiently alleged loss causation. Defendants' motions to dismiss Plaintiffs' claims under section 10(b) and Rule 10b-5 are denied.

### C. Section 20(a)

Section 20(a) extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1572 (9th Cir. 1990). "'Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate

27

actions.'" *Howard*, 228 F.3d at 1065 (citation omitted). Plaintiffs "need not show" the controlling person's scienter or that he or she "culpably participated" in the alleged wrongdoing." *Id.* (citation omitted). Because the Court has determined that Plaintiffs plead a primary violation, it addresses only whether Plaintiffs have failed to plead that Abrahams is a controlling person.

Abrahams argues that Plaintiffs' control allegations are boilerplate and amount to an observation that he is one of thousands of partners at PwC. *See* Abrahams MTD 2-4. But the Amended Complaint sufficiently alleges that Abrahams, as lead partner of PwC's audit team at Mattel, exercised control over the false statements and audit opinions at issue. *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *17 (C.D. Cal. July 13, 2015) ("[C]ontrol person liability claims can generally only be dismissed at the pleading stage if a plaintiff fails to adequately plead a primary violation.") (citation omitted). In fact, it was Abrahams' alleged "mandate" that led Mattel to reclassify the HiT IP asset "to avoid a restatement and avoid reporting a material weakness." *Id.* ¶¶ 141-43. Mattel's disclosure even stated that its "investigation revealed that… management's reliance on the accounting advice sought and received from the lead audit engagement partner of Mattel's outside auditor," i.e., Abrahams, "contributed to these failures." *Id.* ¶ 177. These allegations are enough to state a section 20(a) claim. *Howard*, 228 F.3d at 1065.

Defendants' motions to dismiss Plaintiffs' section 20(a) claims are denied.

## V. CONCLUSION

Defendants' motions to dismiss (ECF Nos. 39-41) are denied.

**IT IS SO ORDERED.**

Dated: January 26, 2021

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE