**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| IN RE GRAND CANYON EDUCATION,<br>INC. SECURITIES LITIGATION | ) )<br>)<br>) ) | Civil Action No. 20-639-MN-CJB<br>Consolidated |

## REPORT AND RECOMMENDATION

In this consolidated securities class action case, Plaintiffs assert claims against

Defendants Grand Canyon Education, Inc. ("GCE"), Brian E. Mueller ("Mueller") and Daniel E.

Bachus ("Bachus") (collectively, "Defendants"), pursuant to Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and

United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.

Presently before the Court is Defendants' motion (the "Motion") to dismiss Plaintiffs'

Consolidated Class Action Complaint (the "CAC"), filed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  (D.I. 36)  For the following reasons, the Court recommends that

Defendants' Motion be GRANTED.

## I.    BACKGROUND

### A.    The Parties

#### 1.    Lead Plaintiffs

The Lead Plaintiffs in this case are Fire and Police Pension Association of Colorado

("Colorado FPPA"), Oakland County Employees' Retirement System ("Oakland County ERS")

and Oakland County Voluntary Employees' Beneficiary Association Trust (collectively with

Oakland County ERS, "Oakland County").  (D.I. 34 at ¶¶ 18-19)  Colorado FPPA is a benefit

pension plan that purchased shares of GCE stock during the Class Period.  (*Id.* at ¶ 18)  Oakland

County are entities that provide retirement benefits to employees of Oakland County, Michigan

and that also purchased GCE stock during the Class Period.  (*Id.* ¶ 19)  These Lead Plaintiffs are

bringing the instant action individually and on behalf of all other persons who purchased the common stock of GCE during the Class Period.  (*Id.* at 1)  The Class Period runs from January 5, 2018 through January 27, 2020.  (*Id.*)

### 2.   Defendants

As noted above, the CAC names GCE, Mueller and Bachus as Defendants.  (*Id.* at ¶¶ 20-23)  GCE, as is discussed more fully below, is a public company and a Delaware corporation. (*Id.* at ¶ 20)  It operated as a "for-profit Christian University" from 2004 until July 2018, when it became an online program management ("OPM") company that "provide[s] management, back-office and other services to educational institutions."  (*Id.*)

Mueller is GCE's Chief Executive Officer ("CEO") and Chairman, and he held those roles throughout the entirety of the Class Period.  (*Id.* at ¶ 21)  Mueller has been GCE's CEO since 2008 and has also served as President of Grand Canyon University since January 2017. (*Id.*)  Before he was employed by GCE, Mueller worked from 1987 to 2008 at Apollo Education Group, Inc. ("Apollo"), a for-profit, postsecondary education company.  (*Id.*)  Bachus is GCE's Chief Financial Officer ("CFO"); he also held that role throughout the entirety of the Class Period.  (*Id.* at ¶ 22)  Bachus has been GCE's CFO since 2008; before that, he served for six years as the chief accounting officer of Apollo, and before that he worked as an audit senior manager at Deloitte & Touche LLP.  (*Id.*)  Plaintiffs allege that "because of their positions at [GCE], [Mueller and Bachus] were involved in drafting, reviewing, publishing[] and/or disseminating the [alleged] false and misleading statements and information [at issue in this case,] . . .  and possessed the power and authority to control the contents of [GCE]'s reports to the SEC, press releases, conference calls to investors, and presentations to securities analysts, money and portfolio managers, and institutional investors."  (*Id.* at ¶ 23)

2

**B.      Key Background Facts Regarding the Litigation**[1]

        **1.      Grand Canyon University, Its Status as a For-profit Entity and the 2014 Conversion**

Grand Canyon University ("GCU" or the "University") is an accredited university that offers undergraduate and graduate degree programs to more than 100,000 students online and at its physical campus in Phoenix, Arizona. (D.I. 48, ex. 8 at 5)[2] GCU was formerly known as Grand Canyon College. (D.I. 34 at ¶ 24) In 2004, Grand Canyon College was on the verge of bankruptcy and was acquired by Significant Education, LLC ("Significant"). (*Id.*) Significant transformed Grand Canyon College into GCU—the first for-profit Christian university in the United States, and one primarily focused on online education for working adults. (*Id.*) In 2008, Significant changed its name to GCE. (*Id.* at ¶ 25)

The CAC alleges that the success of for-profit entities like GCU is fueled by federal funds provided pursuant to Title IV of the Higher Education Act ("Title IV") in order to pay

---

[1]      In this Report and Recommendation, almost every fact of record that the Court cites will be drawn from the text of the CAC itself. The CAC is extremely lengthy, as it spans 91 pages and includes 263 separate numbered paragraphs. (D.I. 34) In light of that, it would not be feasible or sensible for the Court to list every fact contained in the CAC. Instead, the Court below has made a good faith (and still lengthy) effort to summarize the key facts in the CAC that relate to the issues discussed in the parties' briefing and in this Report and Recommendation.

[2]      Here and in a few other instances below, the Court, in addition to citing to the CAC regarding facts of record, has also cited to certain other documents. As to every such cited document, Plaintiffs referred to and described the content of the document in the CAC. (D.I. 48 at 3) Thus, the Court has no difficulty concluding that these documents are integral to the CAC and that their full content may be considered here in resolving the Motion. (*Id.* at 1); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); (Tr. at 54 (Plaintiffs' counsel agreeing that "of course" the Court can take such documents into account)).

However, to the extent that Defendants made reference in their briefing to a document that was not cited the CAC, the Court has not considered the content of those documents in issuing this Report and Recommendation. Thus, for example, the Court has not considered exhibits 9-11 that were attached to Defendants' May 28, 2021 supplemental letter brief. (D.I. 48; *see also* D.I. 49 at 2)

students' tuition and other fees.  (*Id.* at ¶ 27)  For many years, GCU relied on these federal funds for the bulk of its revenue.  For example, from 2013 to 2016, "GCU derived on average 75 [percent] of its revenue from Title IV funds[.]"  (*Id.*)  The United States Department of Education ("DOE") designates universities as "for-profit" or "non-profit" schools.  (*Id.* at ¶¶ 13, 29)

In recent years, a series of major scandals involving other for-profit educational companies brought negative attention to the for-profit sector.  (*Id.* at ¶ 28)  These and other scandals prompted the federal government to impose more stringent regulations on institutions with for-profit designations.  (*Id.* at ¶ 29)  The CAC alleges that these more stringent regulations threatened the existence of for-profit educational companies that received Title IV funds, because if the companies could not meet the requirements, they would lose Title IV funding and would soon be defunct.  (*Id.* at ¶¶ 27, 29)[3]

By 2014, GCU wished to convert from a for-profit to a non-profit institution, in order to distance the school from the stigma around for-profit schools, to benefit from certain marketing advantages that go along with non-profit status and to obtain access to a greater number of possible future students.  (*Id.* at ¶¶ 31-34)  In that year, Mueller and Bachus began to explore such a conversion (referred to herein as the "2014 Conversion").  (*Id.* at ¶ 35)  The CAC alleges that GCE thus "pursued a restructuring by which it would spin off its educational assets" by

---

[3]        These regulations included gainful employment regulations (which capped the ratio of graduates' debt to income), the "90/10" rule (which limits the percentage of revenue that a for-profit institution can receive from Title IV funds at 90%) and "borrower defense" regulations (which allow students who prove fraud by for-profit institutions to claw back tuition).  (D.I. 34 at ¶ 29)  The CAC does not plead facts to suggest that GCU ran afoul (or came close to doing so) of any of these regulations during the Class Period.  Indeed, as noted above, with regard to the 90/10 rule the CAC alleges that the Title IV funds that GCU received comprised only 75% of its revenue.  (*Id.* at ¶ 4)

"sell[ing] GCU to a newly formed [Arizona] non-profit organization called Gazelle University [("Gazelle"), which would then be renamed] Grand Canyon University" at the close of the transaction.  (*Id.* at ¶¶ 35-36)  After the transaction, GCE would remain a for-profit company and would provide educational services to the now non-profit GCU.  (*Id.*)

On October 8, 2015, GCE applied to the United States Internal Revenue Service ("IRS") for recognition of GCU as a tax-exempt non-profit organization.  (*Id.* at ¶ 84)  The IRS granted the requested exemption on November 9, 2015.  (*Id.*)[4]

GCE also applied to its regional accreditation body, the Higher Learning Commission ("HLC"), for a Change in Control, Structure or Organization ("Change in Control")—a prerequisite to executing the 2014 Conversion.  (*Id.* at ¶ 40)  However, in March 2016, the HLC denied GCE's application for a Change in Control.  (*Id.* at ¶ 41)  The HLC's Board concluded that the proposed new structure contemplated by GCE called for outsourcing all or the majority of GCU's academic and student support services and curriculum development to for-profit GCE, which would contravene the HLC's accreditation guidelines.  (*Id.*)  The CAC pleads that "HLC's decision was also consistent with the DOE's approach to these types of conversions."  (*Id.* at ¶ 42)

GCE was sharply critical of the HLC Board's decision, asserting that the HLC had painted a distorted picture of the proposed transaction.  (*Id.* at ¶ 43)  But, at least for a time after the HLC Board's decision, GCE ended its efforts to have GCU transition to non-profit status.  (*Id.*)

---

[4]    The CAC does not include any facts about what types of documents GCE supplied to the IRS regarding the structure of the proposed 2014 Conversion.  (D.I. 34 at ¶ 84)

## 2.      GCE Again Seeks to Convert GCU Into a Non-profit

By late 2017, however, GCE had decided to revive its plan to restructure GCU as a non-profit.[5]  As to what prompted GCU to revert back to this plan, the CAC states only that "after the election of President Trump and his appointment of Elizabeth DeVos as Secretary of the DOE, [GCE] revived its plan to restructure GCU as a non-profit . . . .  As [GCE's] counsel put it, in 2017, for-profit institutions faced a 'different regulatory environment' that might lead the DOE to be more favorable to non-profit conversions."  (*Id*. at ¶ 44)

On January 5, 2018, GCE announced that it had submitted a renewed Change in Control application to the HLC in connection with its renewed plan to convert GCU into a non-profit university; GCE presented this proposed conversion (referred to herein as the "Conversion") as being structurally identical to the 2014 Conversion that the HLC had previously rejected.  (*Id.* at ¶¶ 35, 46)  As part of the Conversion, GCE would sell all of its GCU-related "School Assets" to Gazelle, which would thereafter change its name to GCU.  (*Id*., ex. A at 1)  After the Conversion, GCE again claimed that it would operate as an OPM company providing education-adjacent services (such as "recruiting or providing pre-packaged educational materials") to universities, and particularly to its one initial client:  GCU.  (*Id.* at ¶¶ 47-48)  Although GCE's becoming an OPM provider was one of the purported benefits of the Conversion, Defendants focused most prominently throughout the Class Period on another benefit:  "the conversion of [GCU] into a purportedly independent non-profit[.]"  (*Id*. at ¶ 49)  This non-profit conversion aspect of the

---

[5]      The CAC refers to the this change as one where GCU could be converted "into a supposedly independent 'non-profit' university ('New GCU')" and it goes on to refer to the post-Conversion GCU as "New GCU."  (*See, e.g*., D.I. 34 at ¶ 1)  Below, the Court will sometimes refer to the post-Conversion GCU as "new GCU," and sometimes will simply refer to the post-Conversion entity as "GCU."

Conversion was "a critically important feature of the restructuring[,]" according to the CAC. (*Id.*)

Because the Conversion would amount to a change in ownership of GCU, which would in turn result in a change of control over the university, GCU was statutorily required to obtain DOE approval of the transaction if it wished to continue to participate in Title IV programs post-Conversion. (D.I. 48, ex. 2 at 26); 34 C.F.R. 600.31(a)(3). One option that GCE/GCU had as part of this DOE review process was to seek a voluntary "pre-acquisition review" from the DOE regarding the transaction. Pursuant to this pre-acquisition review, the DOE would "determine whether the institution has answered all the questions on the application completely and accurately, and [would] notify the institution of the results of that review." 64 Fed. Reg. 58,608, 58,611 (Oct. 29, 1999). The pre-acquisition review would not amount to an official approval or denial of GCE/GCU's application for transaction approval. But it would be a means for DOE either to notify GCE/GCU that its application was approvable, or to tell GCE/GCU that its application had significant problems that would need to be addressed before approval was possible. *Id.*

GCE submitted a pre-acquisition review application (the "pre-acquisition application") to the DOE on January 18, 2018. (D.I. 34 at ¶ 59) This application "consisted of, among other things, drafts of the Master Services Agreement [("MSA"), (D.I. 48, ex. 5)], Asset Purchase Agreement [("APA"), (*id.*, ex. 4),] and Credit Agreement ('CA')[ relating to the Conversion.]" (D.I. 34 at ¶ 59) Over subsequent months, GCE would also submit to the DOE certain confidential reports written by Barclays Capital, Inc. ("Barclays") and Deloitte Tax LLP ("Deloitte"); these reports were commissioned by the GCE Board of Directors, and they analyzed various financial and accounting aspects of the Conversion. (*Id.*) With its application,

GCE/GCU not only sought approval of the change of ownership of GCU, but it also requested that the DOE allow GCU to convert to non-profit status for purposes of GCU's participation in Title IV.  (*Id*., ex. A at 1)  The CAC alleges that the DOE pre-acquisition review was to "focus[] on whether [] GCU could be considered a non-profit institution under Title IV and the DOE's regulations promulgated thereunder, which mirrored in relevant respects the same analysis under the [IRS'] rules and tax laws."  (*Id.* at ¶ 60; *see also id*., ex. A at 10)

### 3.    Key Events Occurring Between the Submission of the DOE Pre-approval Application and the Closing of the Conversion

On or about March 6, 2018,[6] the HLC notified GCU that it had approved its Change in Control application.  (*Id*. at ¶ 63; D.I. 48, ex. 3 at 4)[7]  The CAC alleges, however, that the focus of the HLC's review of the Change in Control application was different than the focus of DOE's pre-acquisition application review, in the sense that the HLC was concentrating on "certain educational implications of the Conversion[.]"  (D.I. 34 at ¶ 60)

From March to early May 2018, Mueller made statements to the effect that he expected the DOE's review of the pre-acquisition application to be completed by mid-to-late May 2018.  (*Id*. at ¶¶ 64-65)  Mueller and Bachus also indicated that they planned to proceed forward with the Conversion after the DOE's review was complete (i.e., "by July 1").  (*Id*. at ¶ 64)

However, the DOE did not complete its review of the pre-acquisition application by May 2018.  Instead, in connection with its review process, on May 17, 2018, the DOE propounded a

---

[6]    The CAC alleges that the HLC approved GCU's Change in Control application on March 6, 2018, (D.I. 34 at ¶ 63); however, in an SEC filing, GCE states that the HLC notified it of this approval on March 5, 2018, (D.I. 48, ex. 3 at 4).

[7]    Although the CAC does not allege what documents the HLC reviewed in order to come to this conclusion, it does allege that the HLC did not have the reports issued by Barclays and Deloitte.  (D.I. 34 at ¶¶ 96-97)

8

series of interrogatories to GCE (the "interrogatories" or the "May 2018 interrogatories"), which

contained 25 requests (with subparts) for responses and documents, including:

- "Produce any appraisals, valuations, valuation summaries, or valuation reviews obtained or commissioned *by any party* to the Transaction for purposes of valuing the Transaction."

- "State whether GCE is a company with which [GCU] or the Foundation does 'substantial business' as used in Article III of the Foundation's Bylaws."

- "Describe the due diligence efforts by [GCU] and the Foundation with respect to the Transaction and produce any documents relating thereto."

- "Produce any PowerPoint presentations, summaries, reports, or similar documents presented to the Boards of [GCU], the Foundation, and GCE related to the Transaction."

- "Produce all documents assessing or analyzing the financial impact of the Transaction on [GCU], the Foundation, or GCE, including documents reflecting projected revenue streams/losses as a result of the Transaction, including any pro formas relating to the MSA."

- "Produce board meeting minutes, resolutions or consents relating to the Transaction. This request includes the boards of [GCU], the Foundation, and GCE (and any subcommittees thereof)."

- "Provide the schedule of employees to be transferred to [GCU] as contemplated in APA, § 6.4. Include each employee's current salary and the terms of any other compensation to which the employee is or may be entitled."

- "Identify any GCE employees to be jointly employed by GCE and [GCU] and explain how joint employee compensation has been or will be determined."

- "Produce any Schedules or Exhibits to the APA, MSA, and CA not previously provided and produce any amendments to the draft documents previously provided."

- "Identify all persons or entities that have been engaged to perform any transfer pricing study in connection with the Transaction, their engagement letters, and any studies produced by them."

(*Id.* at ¶¶ 66-67 (emphasis in original, some alteration in original))  The CAC alleges that "the extent of these new interrogatories indicated that the DOE was not inclined to rubber-stamp the Conversion and in fact had serious questions about the independence of [GCU] from [GCE]." (*Id.* at ¶ 68)  However, Defendants did not disclose to the market the fact that the DOE had submitted these interrogatories or had raised these concerns.  (*Id.* at ¶ 72)

Although GCE had not yet received a decision from DOE regarding the pre-acquisition application, GCE nevertheless decided to "reverse[] course" and move forward with the Conversion anyway.  (*Id.* at ¶¶ 69, 75)  Mueller and Bachus now explained to analysts that the Conversion could close without DOE approval and that they viewed the DOE process as "largely procedural[.]"  (*Id.* at ¶ 71)

On July 2, 2018, GCE filed with the SEC a Form 8-K (the "July 2, 2018 8-K"), "announcing that it had closed the Conversion by executing the APA[,] whereby it sold the GCU campus and all academic related operations and assets to [the new] GCU."  (*Id.* at ¶ 75; *see also* D.I. 48, ex. 3)  The July 2, 2018 8-K also stated that GCE and GCU had entered into the MSA, whereby GCE would provide "'identified technological, counseling, marketing, financial aid processing and other support services to [] GCU in return for 60% of [] GCU's tuition and fee revenue[.]'"  (D.I. 34 at ¶ 77; D.I. 48, ex. 3 at Item 1.01)[8]

Since the Conversion had now closed without DOE responding to GCU's pre-acquisition application, GCU moved on to seek DOE's post-closing approval of the Conversion.  Thus,

---

[8]       In the interval between the time of the Conversion and DOE's approval of the transaction, GCU continued to participate in Title IV programs on a month-by-month basis, as a for-profit institution.  (D.I. 34 at ¶ 59)

following the Conversion, GCU timely submitted to the DOE an application and other documentation, in order to satisfy the DOE's change in control regulatory requirements.  (D.I. 34, ex. A at 1).  As part of this application, GCU not only sought DOE's approval for the change in ownership of the institution, but it again asked DOE to recognize the new GCU as a non-profit institution for Title IV purposes.  (*Id.*, ex. A at 1, 16-17)

Additionally, on July 17, 2018, more than two weeks after the close of the Conversion, GCU requested that the IRS re-affirm the new GCU's tax-exempt non-profit status.  (*Id.* at ¶ 84)  The IRS did in fact re-affirm its prior decision; it again granted GCU non-profit status on August 31, 2018.  (*Id.*)[9]  The CAC alleges that the IRS reviewed "[n]o documents" in coming to this decision.  (*Id.* at ¶¶ 84, 97)  The pleading does not allege what type of analysis the IRS *did* do, other than to state that the IRS utilizes the same regulations as does the DOE in determining non-profit status.  (*Id.* at ¶ 60)[10]  The CAC does allege, however, that in general, the IRS has been criticized for "rubber-stamping applications of for-profit institutions attempting to convert to non-profits" and for relying too heavily on declarations and representations made by the applicants as part of its review process.  (*Id.* at ¶ 85)

After the close of the Conversion, the DOE sent the following additional requests to GCE for further information:  (1) on July 3, 2018, the DOE requested audited financial statements and

---

[9]      At some point thereafter, the State of Arizona also treated GCU as a non-profit entity.  (D.I. 34 at ¶ 164; D.I. 48, ex. 7 at 3)  That said, it is unclear from the record what rules or definitions, if any, the State applied in order to come to this determination.  (D.I. 34, ex. A at 10; D.I. 49 at 2 n.4)

[10]      The DOE later suggested that in 2018, the IRS may have analyzed the "'basic structure'" of the Conversion, but suggested that if the IRS did so, it would only have reviewed draft documents provided to it by GCE back when GCE was moving forward with the 2014 Conversion.  (D.I. 34, ex. A at 15)

a copy of GCU's default management plan; (2) on August 24, 2018, the DOE asked GCU for copies of the final Conversion deal documents and an audited same-day balance sheet for GCU; and (3) on September 10, 2018, the DOE requested a "'narrative'" explaining how the structure of the Conversion "'warrant[ed] recognizing the institutions' conversion to non[-]profit status for the purposes of . . . Title IV.'"  (*Id.* at ¶ 86 (some alteration in original))  During the DOE review process, GCE responded to these and other requests by providing the DOE with "numerous non-public documents[,]" including:  (1) the fully unredacted MSA; (2) a report from Barclays dated April 26, 2018 (the "Barclays Report"); (3) a "'follow-on'" Barclays report discussed with GCE's Board of Directors on June 20, 2018 (the "Barclays Update"); and (4) a "Transfer Pricing Report" for 2018 prepared by Deloitte (the "Deloitte Report").  (*Id.* at ¶ 96)

### 4. GCE's Strong Post-Conversion Financial Results, the DOE's Decision and the Aftermath

Between the time period when the Conversion closed in July 2018 and when DOE made a final decision on GCU's application, GCE reported "strong financial results that routinely exceeded market expectations."  (*Id*. at ¶ 87)  For example, GCE's operating profit margins "showed immediate, enormous growth" following the Conversion—growth that continued from the third quarter of 2018 through the third quarter of 2019.  (*Id*. at ¶ 88)  GCE repeatedly attributed its growing revenues and margins to the Conversion and to the fact that GCU was now marketing itself as a non-profit institution and in turn had increased enrollment.  (*Id*. at ¶ 90)[11]

---

[11]    The CAC contains accounts from three confidential witnesses (referred to as "FE 1," "FE2," and "FE3"), each former GCE employees, to the effect that post-Conversion, GCE also began to engage in aggressive and abusive recruitment strategies in order to further increase enrollments.  (D.I. 34 at ¶¶ 128-34)  FE 1 claimed that GCE's recruitment strategies "'went from developing strategic relationships to straight sales[,]'" that "'[i]t was all about getting your numbers up'" and that recruiting for GCU became more about "'just cramming a ton of students into the funnel.'"  (*Id*. at ¶¶ 131-32)  FE 2 is alleged to have said that after the Conversion, "there was a strict adherence to quotas, which were becoming nearly impossible to meet[.]"  (*Id.* at ¶

In November 2019, however, the DOE made its decision on GCU's pending application. On November 6, 2019, the DOE sent a letter (the "DOE Letter") to GCU stating that it had finished its review and that:  (1) it approved the change in ownership application; (2) it approved the new GCU to be designated a for-profit institution for purposes of its continued participation in Title IV programs; but (3) it was denying the new GCU's request for recognition of the institution as a non-profit.  (*Id*. at ¶ 99; *id*., ex. A at 16-17)  On the last point regarding non-profit status, the DOE Letter concluded that the Conversion "'violate[d] the most basic tenet of non[-]profit status—that the non[-]profit be primar[ily] operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity.'"  (*Id*. at ¶ 98 (some alteration in original))  Instead, the DOE concluded that "'the primary purpose of the MSA' was to 'drive shareholder value for GCE with GCU as its captive client—potentially in perpetuity.'"  (*Id.* at ¶ 99)

The DOE came to this conclusion for a number of reasons.  These included:  (1) consideration of certain aspects of the Conversion that related to GCE's future expected income and expenses (including the magnitude of GCE's yearly fees earned from GCU as compared to the cost of GCE's services, and the fact that GCE would incur only 28% of the costs of operating GCU while receiving an extremely high percentage of GCU's profits each year); (2) its view that GCU and GCE were not truly independent from each other (due in part to the fact that Mueller was both President of GCU and the CEO of GCE, and due to the large number of GCE

---

130)  And FE 3, who had been a Financial Aid Specialist at GCE, stated that after the Conversion, processing financial aid requests became "'more of a pump and dump operation[,]'" that FE 3's team was "'told just to keep [their] mouths shut and process stuff'" and that "GCU began to recruit students with lower grades than it had before in addition to students that had outstanding debts[.]"  (*Id*. at ¶¶ 133-34)

executives who were to manage and oversee GCU's work); and (3) the fact that it would be financially onerous for GCU to terminate its services agreement with GCE.  (*Id*. at ¶¶ 96-117; *id.*, ex. A at 12-16)

GCE disclosed the DOE's decision to the market during a November 6, 2019 earnings call and again in a November 7, 2019 SEC filing; thereafter, GCE's stock price "plummeted[,]" dropping $6.99 between November 6-8, 2019.  (*Id*. at ¶¶ 159-61)[12]  Analysts connected this decline to the fact of the DOE's decision.  (*Id*. at ¶ 162)

Thereafter, on January 28, 2020, analyst Citron Research published a nearly 50-page report titled "The Educational Enron:  The Multiple Smoking Guns that Prove [GCE] is Using a Captive Subsidiary to Manipulate Earnings" (the "Citron Report").  (*Id*. at ¶ 167)  The Citron Report concluded that GCE had "'used the private university to dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price.'"  (*Id.*; *see also id.*, ex. B)  The CAC alleges that GCE's stock fell again after this disclosure, falling $7.43 per share from January 27-28, 2019.  (*Id*. at ¶¶ 161, 171)

### C.  Plaintiffs' Allegations Regarding the Alleged Fraudulent Scheme

Having set out the relevant background facts from the CAC above, next the Court will summarize Plaintiffs' description of Defendants' alleged fraudulent scheme.

The CAC alleges that this case arises from Defendants' materially false and misleading statements about the Conversion.  (*Id*. at ¶ 1)  Defendants claimed that the Conversion would enable GCE to transform into an independent third-party services provider, that the Conversion would result in GCU becoming a non-profit institution, and that they expected the DOE to bless

---

[12]     The DOE Letter, which is attached as Exhibit A to the CAC, was not made publicly available until November 12, 2019.  (D.I. 34 at ¶ 166)

the transaction by granting GCU's pre-approval application.  (*Id.*)  In reality, the CAC alleges that the Conversion was simply a scheme to present GCU as an independent university, reap the attendant marketing benefits and funnel nearly all of GCU's revenues to GCE.  (*Id.* at ¶ 2)

The CAC alleges that a "critical step" in the Conversion was for GCE to obtain DOE's recognition of the new GCU as a non-profit entity.  (*Id.* at ¶ 4)  This was because "DOE approval was necessary to market [n]ew GCU as a non-profit university[,]" and only with that approval could GCU "cast off the stigma of a for-profit university" and reap greater profits.  (*Id.*)

However, the CAC alleges that Defendants "knew, but did not disclose," that in light of the structure of the Conversion, the new GCU "was not the entity actually operating the institution" and thus "did not satisfy [] DOE's requirements for non-profit status."  (*Id.* at ¶ 5) Despite this, Defendants sought DOE approval of GCU's non-profit status (via the pre-acquisition application) because Defendants thought that the DOE would "rubber-stamp" the Conversion and grant the non-profit designation anyway.  (*Id.* at ¶ 68; *see also id.* at ¶ 44) Defendants also falsely told the public that:  (1) GCE and GCU were separate entities and (2) that the DOE had approved similar transactions in the past.  (*Id.* at ¶¶ 5, 12)

Yet instead of quickly approving GCU's non-profit status, the DOE propounded the May 2018 interrogatories.  (*Id.* at ¶ 6)  And because these interrogatories "probed the underlying structure of the Conversion[,]" Defendants are alleged to have then realized that "this deeper probe put DOE approval at substantial risk."  (*Id.*)  In response, Defendants decided to push forward with closing the Conversion, instead of waiting for DOE approval first (as they had previously planned to do).  (*Id.* at ¶ 7)  And Defendants misleadingly stated to the public that the DOE's delay in approving the transaction was due to "'understaffing'" issues.  (*Id.*)

15

After the Conversion closed in July 2018, GCE reaped enormous profit margins, which it attributed to GCU's positive and growing enrollment figures.  (*Id*. at ¶ 8)  But what Defendants did not tell investors was that the new GCU "functioned as an improper off-balance-sheet entity" by which GCE was able to hide expenses and costs, in exchange for a disproportionate amount of revenue, thus artificially inflating GCE's financial results.  (*Id*. at ¶ 9)  Defendants also (via their control over GCU and its internal operations) caused GCU to participate in "quota-driven enrollment practices" in a further attempt to boost revenue.  (*Id*. at ¶ 10-11)

Only after DOE issued its November 2019 decision rejecting GCU's non-profit status, which in turn spawned two corrective disclosures, was Defendants' alleged fraud revealed.  (*Id*. at ¶¶ 13-14)  These disclosures led to the erasure of "hundreds of millions of dollars in shareholder value."  (*Id*. at ¶ 15)

At issue in the briefing on the Motion is the nature of Plaintiffs' allegations regarding: (1) the types of false and misleading statements and omissions that allegedly fueled the scheme; (2) facts that demonstrate that Defendants had the requisite scienter; and (3) facts regarding loss causation.  Below the Court summarizes additional allegations in the CAC relating to these issues.

### 1.     False and Misleading Statements and Omissions

Plaintiffs allege that Defendants made six types of actionable false and misleading statements and omissions about "GCU's purported independence from GCE, the DOE's review of GCE's application for non-profit status, the source of GCE's purported success, and GCE's accounting and financial statements post-Conversion[,]" (*id.* at ¶ 175):  (1) Defendants misrepresented GCU's purported independence from GCE before the Conversion, (*id.* at ¶¶ 176-85); (2) Defendants misrepresented DOE's approval of the Conversion, (*id.* at ¶¶ 186-91); (3)

Defendants misrepresented GCU's purported independence from GCE after the Conversion, (*id.*
at ¶¶ 192-200); (4) Defendants misrepresented the Conversion's similarity to other transactions,
(*id.* at ¶¶ 201-10); (5) Defendants misrepresented GCE's accounting and compliance with
Generally Accepted Accounting Principles (or "GAAP"), (*id.* at ¶¶ 211-19); and (6) Defendants
misrepresented the source of GCE's success, (*id.* at ¶¶ 220-26).  These specific allegations, as
found in the CAC, are discussed further below.

### a.      GCU's Purported Independence from GCE Before the Conversion

The CAC alleges that from January 5, 2018 (when GCE announced the Conversion)
through to the Conversion's closing, Defendants falsely and misleadingly claimed that GCE and
GCU would be separate entities, would be operated and controlled by separate management, and
that GCU would be a non-profit entity.  (*Id.* at ¶ 176)  More specifically:

- The CAC alleges that Defendants stated that the new GCU
  would operate as a "non-profit" and a "separate non-profit
  entity[.]"  (*Id.* at ¶¶ 177-78 (internal quotation marks and
  emphasis omitted))  These statements are alleged to have been
  materially false and misleading because "the planned structure
  of [] GCU violated 'the most basic tenet' of a non-profit and
  instead would act to funnel 95% of [GCU's] revenue to GCE,
  while GCE only had to cover 28% of the institution's costs."
  (*Id.* at ¶ 184)

- Additionally, the CAC alleges that Defendants stated that the
  new GCU would be a "separate" entity, that GCE would "no
  longer . . . operate a regulated institution of higher education,"
  that GCE would act as a "third party" to the new GCU, and that
  "GCU's current faculty, academic leadership and related staff
  and other employees . . . would become employed by [the new]
  GCU[.]"  (*Id.* at ¶¶ 177, 181-82 (internal quotation marks and
  emphasis omitted))  These statements are said to have been
  materially false and misleading because they "misstated and
  omitted . . . that 41 members of the university's 58-member
  Executive Leadership Team were employed by GCE and that
  numerous other operationally-significant GCU employees

became employees of GCE while performing the same
responsibilities for [the new] GCU that they had previously[.]"
(*Id.* at ¶ 185).

### b.   DOE Approval of the Conversion

According to Plaintiffs, after GCE received the May 2018 interrogatories, Defendants

took certain acts that concealed the DOE's concerns about the Conversion and that

misrepresented the prospects of DOE approval.  (*Id.* at ¶¶ 69, 186)  Among these were

statements that based on "ongoing engagement" with the DOE about the transaction throughout

the review process, GCE "concluded that . . . any regulatory limitations imposed by [the DOE]

could be managed" and that the DOE approval process was taking longer than usual because the

DOE was "understaffed[.]"  (*Id.* at ¶¶ 187-90 (internal quotation marks and emphasis omitted))

Plaintiffs assert that these statements were materially false and misleading because:  (1) they

omitted the fact that the DOE had propounded the May 2018 interrogatories, which raised

"substantial doubts that the DOE would approve the Conversion"; and (2) they falsely stated that

the DOE's approval had been slowed by a "staffing" issue, when instead, the delay was due to

the DOE's concerns about the Conversion and its requests for further information about the

Conversion.  (*Id.* at ¶¶ 80, 86, 191)

### c.   GCU's Purported Independence from GCE After the Conversion

Plaintiffs contend that after the Conversion, Defendants misleadingly claimed that GCU

was an operationally independent non-profit and that GCE did not control GCU's day-to-day

operations.  (*Id.* at ¶ 192)  More specifically:

- The CAC alleges that Defendants made statements that GCE
  "no longer owns and operates a regulated institution of higher
  education," that its relationship to the new GCU was "no
  longer as owner and operator, but as a third[-]party service
  provider to an independent customer," and that "[a]side from

18

Mr. Mueller, no other employee of [GCU] or [GCE] has a dual role in both organizations." (*Id.* at ¶¶ 193, 195 (internal quotations marks and emphasis omitted))  The CAC alleges that these statements were materially false and misleading because they omitted the facts that "41 members of [GCU]'s 58-member Executive Leadership Team remained employed by GCE and that numerous other . . . GCU employees were employees of GCE while performing the same responsibilities for [] GCU as they had [before the Conversion.]" (*Id.* at ¶ 199)

- Additionally, the CAC alleges that in this time period Defendants made statements that the new GCU would be a "separate non-profit entity[.]" (*Id.* at ¶ 193 (internal quotation marks and emphasis omitted))  This is alleged to have been misleading because "the planned structure of [the new] GCU violated 'the most basic tenets' of a non-profit and instead would act to funnel 95% of its revenue to GCE, while GCE only had to cover 28% of the institution's costs." (*Id.* at ¶ 200)

### d.    The Conversion's Similarity to Other Transactions

Plaintiffs next allege that, throughout the Class Period, Defendants assured investors that the Conversion would be approved by the DOE, and that it was structured similarly to other transactions that DOE had approved—such as a 2017 transaction whereby Purdue University ("Purdue") acquired for-profit Kaplan University from the educational services firm Kaplan, which in turn was to become a separate OPM provider.  (*Id.* at ¶¶ 52, 201)[13]  However, the CAC alleges that in reality, the Conversion's structure was far different from the structure of the Purdue-Kaplan deal, and from other structures with which Defendants sought to claim similarity. (*Id.* at ¶ 201; *see also id.* at ¶¶ 118-27)

More specifically, the CAC alleges that Defendants made statements that:  (1) the Conversion was "mainstream" or "very similar to," "comparable to," "almost identical to," and

---

[13]    The Purdue-Kaplan deal received approval from the DOE in September 2017 and from its accreditor in March 2018.  (D.I. 34 at ¶ 52)

"almost an identical replica of" the Purdue-Kaplan deal or services arrangements at "hundreds" of universities around the country; and (2) that "[GCU] has commissioned studies to ensure that the rates and terms of the services arrangements are consistent with market norms[.]"  (*Id.* at ¶¶ 202-10 (internal quotation marks and emphasis omitted))  These statements are alleged to have been materially false and misleading because:  (1) the terms of the Conversion were "unusually and egregiously favorable to [GCE]," in that GCE was to receive 95% of GCU's revenues, while paying only 28% of its operating costs; and (2) "41 members of [GCU's] 58-member Executive Leadership Team remained employed by GCE" and numerous other operationally significant GCU employees became employees of GCE while performing the same responsibilities they previously had with GCU pre-Conversion.  (*Id.* at ¶ 210)

**e.      GCE's Accounting and Compliance with GAAP**

The CAC explains that because of GCE's control over the new GCU, and the fact that GCE was the primary beneficiary of GCU's operations, GCE was "required to consolidate [the new] GCU into its financial statements [] or at a minimum to identify [it] as a related party[.]" (*Id.* at ¶ 212; *see also id*. at ¶¶ 135-57)  Had GCE done so during the Class Period, this would have "dramatically decreased [GCE's] reported margins" and would have given investors a far less optimistic picture of GCE's operating results than what GCE actually presented in that time period.  (*Id*. at ¶ 135)  Instead, it is alleged that Defendants made a number of materially false statements regarding this subject matter during the Class Period, as follows:

- Defendants stated that the new "GCU is not a related party to [GCE]" and that "GCU is not a related party to [GCE] in accordance with [Accounting Standards Codification, or 'ASC'] Topic 850[.]"  (*Id*. at ¶¶ 212, 214 (internal quotation marks and emphasis omitted))  These statements are alleged to have been materially false or misleading because the new GCU "was not a non-profit" and because GCE "controlled GCU, making them 'affiliates under common control' and thus

related parties for purposes of GAAP." (*Id.* at ¶ 217)  The statements also allegedly omitted the material fact of the composition of GCU's Executive Leadership Team and the number of other operationally significant GCU employees who became employees of GCE while performing the same responsibilities they previously had with GCU pre-Conversion. (*Id.*)

- Defendants stated that GCE did not have "any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on [its] financial condition[.]" (*Id.* at ¶ 213 (internal quotation marks and emphasis omitted))  This statement is alleged to have been false or misleading because GCE used the new GCU "as an off-balance sheet entity to which it funneled expenses while recognizing revenues generated by [the new] GCU." (*Id.* at ¶ 218)

- Additionally, Defendants stated that GCE's "results of operations do not include the operations of GCU but rather reflect the operations of [GCE] as a service/technology provider[.]" (*Id.* at ¶ 194 (internal quotation marks omitted) (alteration in original))  This statement is alleged to have been false and misleading because GCU's operations did not so reflect this reality and instead "reflected the highly unusual and exploitative control relationship that [GCE] had with [the new GCU.]" (*Id.* at ¶ 218)

- Lastly, the CAC alleges that GCE's reported operating margins from the third quarter of 2018 through the third quarter of 2019, which showed that operating margins had "greatly increased year-over-year[,]" (*id.* at ¶ 216), were materially false and misleading because they were "inflated by [GCE's] treatment of [the new GCU] as a separate and unconsolidated entity, which allowed [GCE] to report higher margins . . . than it would have" under consolidation, (*id.* at ¶ 219).

**f.    The Source of GCE's Success**

Finally, the CAC alleges that Defendants made false statements after the Conversion in which they "repeatedly attributed [GCE's] growing service revenues and margins to the fact that [the new] GCU's enrollment was increasing rapidly." (*Id.* at ¶ 220)  These included statements

21

that GCE's revenues were increasing "'primarily'" due to such GCU enrollment growth.  (*Id.* at ¶¶ 221-22, 224-25)  Such statements are alleged to have been materially false and misleading because "they omitted the highly material fact that, in reality, . . . GCE's revenues increased primarily due to the fact that its employees, under the guise of being [n]ew GCU employees, began to engage in abusive recruitment strategies, admitting students that were academically unqualified and students that would be unlikely to repay their student loans to boost revenues." (*Id.* at ¶ 226)

> **2.  Scienter**

The CAC pleads some additional facts (or underscores some facts already pleaded) that are said to go particularly the issue of scienter.  These include the following:

- "The DOE [r]epeatedly [i]ndicated to Defendants Mueller [a]nd Bachus [t]hat [i]t [h]ad [s]ignificant [c]oncerns [a]bout [GCE]'s [a]pplication." (*Id.* at ¶ 228 (emphasis omitted))  With regard to the DOE's expression of those "significant concerns," here the CAC is referencing the May 2018 interrogatories, and the DOE's follow-up July 2018, August 2018 and September 2018 requests for information. (*Id.* at ¶¶ 228-29)  It notes that after these concerns began to be expressed, Mueller and Bachus reversed their previous assertions that GCE/GCU would wait for DOE approval before closing the Conversion, began to describe the pre-acquisition review as "voluntary" and (via Mueller) wrongly attributed the DOE's delay in approving the Conversion to "understaff[ing]" issues. (*Id.* (internal quotation marks omitted))  And the CAC asserts that the "fact[] that [GCE] repeatedly received requests for voluminous amounts of information from a government agency whose blessing of the Conversion was of critical importance . . . and that [GCE] changed its characterization of DOE approval after the receipt of these letters[ as was set out previously above] . . . supports a strong inference that [] Mueller and Bachus knew, or were severely reckless in not knowing, that [GCE] risked the DOE denying its application for non-profit status—thereby making their statements on these subjects knowingly or recklessly false and materially misleading when made." (*Id.* at ¶ 230)

- "The Conversion [w]as [n]egotiated [a]t [t]he [h]ighest [l]evels
  of [GCE]." (*Id.* at ¶ 231 (emphasis omitted))  Here, the CAC
  emphasizes that the terms of the Conversion were negotiated
  by Mueller and Bachus, the highest-level executives at GCE.
  (*Id.*)  It notes that the fact that "Mueller and Bachus repeatedly
  discussed and demonstrated familiarity with the terms of the
  Conversion supports a strong inference that [they] knew, or
  were severely reckless in not knowing, that the Conversion was
  entered into in order to use [n]ew GCU as an off-balance sheet
  entity to which it funneled expenses while recognizing
  revenues generated by [n]ew GCU—thereby making their
  statements on these subjects knowingly or recklessly false and
  materially misleading when made." (*Id.*)

- "Defendants Mueller and Bachus [k]new [t]hat [t]he
  Conversion [p]rimarily [b]enefitted GCE, not GCU—[t]hus
  [v]iolating '[t]he [m]ost [b]asic [t]enet [o]f [n]on-[p]rofit
  [s]tatus.'" (*Id.* at ¶ 232 (emphasis omitted))  The CAC here
  alleges that GCE provided DOE with "copious non-public
  documents . . . including the Barclays Report, the Barclays
  Update, and the Deloitte Report" and that "these documents
  showed that the Conversion plainly failed to meet 'the most
  basic tenet' of non-profit status and that the 'primary purpose
  of the MSA' was to 'drive shareholder value for GCE with
  [n]ew GCU as its captive client—potentially in perpetuity.'"
  (*Id.* (emphasis omitted))  It alleges that because GCE
  "commissioned non-public documents that disclosed that the
  Conversion primarily benefitted GCE, not [n]ew GCU, that []
  Mueller and Bachus reviewed these documents, and that []
  Bachus had particular expertise in the subject matter of the
  documents [due to his prior employment as a financial auditor,
  this] supports a strong inference that [] Mueller and Bachus
  knew, or were severely reckless in not knowing, that the
  Conversion primarily benefitted GCE, not [n]ew GCU, and
  thus that [n]ew GCU was not a non-profit entity[.]" (*Id.*)

- "The Conversion [w]as [f]undamentally [i]mportant [t]o [a]nd
  [t]ransformed [GCE]." (*Id.* at ¶ 233 (emphasis omitted))  Here,
  the CAC explains that the Conversion "went to the core of
  GCE's business and business model" and "fundamentally
  changed the nature of the Company." (*Id.*)  It concludes that
  the "Conversion's centrality to [GCE]'s operations supports a
  strong inference that [] Mueller and Bachus knew, or were
  severely reckless in not knowing, that the Conversion was
  entered into in order to use [n]ew GCU as an off-balance sheet

23

entity to which it funneled expenses while recognizing revenues generated by [n]ew GCU[.]"  (*Id*.)

### 3.    Loss Causation

With regard to loss causation, the CAC pleads that the truth concealed by Defendants' misrepresentations and omissions was disclosed to the market in two stages.  After each disclosure, the price of GCE's common stock "fell precipitously."  (*Id*. at ¶ 234)

The first disclosure came on November 6-7, 2019.  (*Id*.)  After the market closed on November 6, 2019, Defendants (who had just learned from the DOE that it had rejected GCU's application for non-profit status) disclosed that fact on an earnings call.  (*Id*. at ¶¶ 159, 234)  Then, on November 7, 2019, before the market opened, Defendants filed a Form 8-K detailing that the DOE had rejected GCU's application for non-profit status.  (*Id*. at ¶¶ 160, 234)  This disclosure is alleged to have caused GCE's stock price to fall by -7.61% to $84.89.  (*Id*. at ¶ 236)

The second disclosure was on January 28, 2020.  (*Id*. at ¶ 234)  Before the market opened on that date, Citron Research published the Citron Report.  (*Id*. at ¶¶ 167, 236)  The disclosures in that report are alleged to have caused GCE's stock price to fall by -8.12% to $84.07.  (*Id*. at ¶ 236)

The CAC alleges that these declines in GCE's stock price were "a direct and proximate result of Defendants' scheme being revealed to investors and to the market."  (*Id*. at ¶ 237)  And it also asserts that "the timing and magnitude of [GCE's] stock price declines negate[] any inference that the economic losses and damages suffered by [] Plaintiffs . . . were caused by changed market conditions, macroeconomic factors, or even [GCE]-specific facts unrelated to Defendants' fraudulent conduct."  (*Id*.)

**D.    Procedural History of the Case and Defendants' Motion**

This consolidated securities class action arises out of two class action Complaints filed in this Court on May 12, 2020, (D.I. 1), and on June 12, 2020, (Civil Action No. 20-801-MN, D.I. 1), respectively.  On August 13, 2020, United States District Judge Maryellen Noreika consolidated the two cases in the instant action and appointed Colorado FPPA and Oakland County to serve as Lead Plaintiffs in this suit on behalf of themselves and others.[14]  (D.I. 28 at 1-2)

On October 15, 2020, Judge Noreika ordered that the cases be referred to the Court to hear and resolve all pre-trial matters, up to and including the resolution of expert discovery matters.  (D.I. 32)  A few days later, on October 20, 2020, Lead Plaintiffs filed the CAC on behalf of themselves and "all other persons who purchased the common stock of [GCE]" in the Class Period.  (D.I. 34 at 1)

On December 21, 2020, Defendants filed the Motion.  (D.I. 36)  The Motion was not fully briefed, however, until March 22, 2021.  (D.I. 44)  At the parties' request, (D.I. 45; D.I. 46), the Court held oral argument on the Motion on May 26, 2021.  (Docket Item, May 26, 2021 (hereinafter, "Tr."))  Thereafter, on May 28, 2021 and June 2, 2021, the parties filed short, supplemental briefing regarding certain documents that were referenced in Defendants' prior briefing.  (D.I. 48; D.I. 49)

---

[14]    When this Report and Recommendation refers herein to "Plaintiffs" it is thus referring to Lead Plaintiffs and those whom they purport to represent.

## II.     STANDARD OF REVIEW

### A.     Rule 12(b)(6) Motion to Dismiss

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When presented with such a motion, a court typically conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210-11.  Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In assessing the plausibility of a claim, the court must "'construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

### B.     Special Pleading Requirements for Securities Fraud Allegations

#### 1.     Section 10(b)

In connection with the "purchase or sale of any security[,]" Section 10(b) prohibits the "use or employ . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b) ("Section 10(b)").  Pursuant to its statutory authority, the SEC promulgated Rule 10b-5, which "in connection with the purchase or

sale of any security" makes it "unlawful . . . [t]o make any untrue statement of a material fact or

to omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b-5 ("Rule

10b-5").  "The courts have implied from these statutes and Rule [10b-5] a private damages

action, which resembles, but is not identical to, common-law tort actions for deceit and

misrepresentation."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  According to the

Supreme Court of the United States, the elements of a Section 10(b) claim are:

> (1) a material misrepresentation (or omission) . . .[;] (2) scienter,
> i.e., a wrongful state of mind . . .[;] (3) a connection with the
> purchase or sale of a security. . .[;] (4) reliance, often referred to in
> cases involving public securities markets (fraud-on-the-market
> cases) as "transaction causation" . . . [;] (5) economic loss . . . [;]
> and (6) "loss causation," i.e., a causal connection between the
> material misrepresentation and the loss[.]

*Id*. at 341-42 (emphasis and citations omitted); *see also In re Newell Brands, Inc. Sec. Litig.*, 837

F. App'x 869, 874 (3d Cir. 2020).

> ### a.    Heightened pleading requirements for Section 10(b) claims

The analysis of a pleading in a securities fraud action "requires more than mere reference

to the conventional standard applicable to motions under Rule 12(b)(6)."  *In re Rockefeller Ctr.*

*Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002).  For example, in the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), Congress raised the pleading standards for the first

two Section 10(b) elements:  material misrepresentation (or omission) and scienter.  *Institutional*

*Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009).  With regard to a material

misrepresentation or omission, "the complaint shall specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *see also*

*Avaya*, 564 F.3d at 252-53.  With regard to scienter, "the complaint shall . . . state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also Avaya*, 564 F.3d at 253.

### b.      Rule 9(b) considerations

"In addition to the PSLRA [misrepresentation/omission and scienter] requirements,

plaintiffs alleging fraud under the Exchange Act must also comply with the heightened pleading

requirement of Rule 9(b)."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir.

2006) (citation omitted); *see also Newell Brands*, 837 F. App'x at 874.  According to Rule 9(b),

a party alleging fraud or mistake "must state with particularity the circumstances constituting

fraud or mistake."  Fed. R. Civ. P. 9(b).  "Rule 9(b) requires, at a minimum, that plaintiffs

support their allegations of [Section 10(b)] securities fraud with all of the essential factual

background that would accompany 'the first paragraph of any newspaper story'—that is, the

'who, what, when, where and how' of the events at issue."  *In re Rockefeller Ctr. Props., Inc.*

*Sec. Litig.*, 311 F.3d at 217 (citation omitted).

For the most part, the PSLRA's particularity requirement harmonizes with Rule 9(b).

That is, the United States Court of Appeals for the Third Circuit has concluded that "Rule 9(b)'s

particularity requirement 'is comparable to and effectively subsumed by the requirements of . . .

the PSLRA.'"  *Avaya*, 564 F.3d at 253 (citation omitted).

However, the PSLRA's requirement for pleading scienter "marks a sharp break with Rule

9(b)," *id.*, because Rule 9(b) allows plaintiffs to plead scienter generally, Fed. R. Civ. P. 9(b).

Thus, "[t]o the extent that Rule 9(b)'s allowance of general pleading with respect to mental state

conflicts with the PSLRA's requirement that plaintiffs state with particularity facts giving rise to

a strong inference that the defendant acted with scienter . . . the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'"  *Suprema Specialties*, 438 F.3d at 277 (citation omitted); *see also Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, Civil Action No. 09-799, 2011 WL 2444675, at *5 (D. Del. June 14, 2011).

### 2.      Section 20(a)

Section 20(a) of the Exchange Act provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]"  15 U.S.C. § 78t(a) ("Section 20(a)").  This "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, who has committed a [S]ection 10(b) violation."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014) (citation omitted).  "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person."  *Avaya*, 564 F.3d at 252.[15]

## III.   DISCUSSION

Defendants challenge the CAC's allegations on three grounds:  (1) failure to sufficiently plead scienter, (D.I. 37 at 6-12); (2) failure to sufficiently allege actionable false or misleading statements or omissions, (*id.* at 13-18); and (3) failure to sufficiently plead loss causation, (*id.* at 18-20).  Below, the Court need only address the first of these challenges regarding scienter.  In doing so, it concludes that Plaintiffs have failed to meet their required pleading burden.

---

[15]      Thus, because Mueller and Bachus are alleged to have exercised control over GCE during the relevant period, as the parties do, the Court will consider the Section 20(a) allegations to rise and fall with the merit of the Section 10(b) and Rule 10b-5 allegations.  (D.I. 37 at 20 n.22)

In explaining its conclusion in this regard, the Court will first set out additional legal standards that apply to a plaintiff's allegations regarding scienter. Thereafter, the Court will examine the merits.

A.     **Legal Standards Regarding How to Plead Scienter**

With regard to scienter, the CAC, as noted above, must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). And "in determining whether the pleaded facts give rise to [that type of] a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

This inquiry is "inherently comparative" and it requires a court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24. The inference of scienter must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id*. at 324. In the end, a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged[.]" *Id*. The inference that the defendant acted with scienter need not be irrefutable or of the "smoking gun" genre, nor even the most plausible of competing inferences. *Id*. And courts evaluate scienter by examining the totality of the circumstances. *Avaya*, 564 F.3d at 269 ("Accordingly, as with all totality-of-the-circumstances tests, our analysis will be case specific."); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Thus, *Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."); *see also In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448-49 (D. Del. 2014).

30

"Scienter is a mental state embracing intent to deceive, manipulate, or defraud, . . . and requires a knowing or reckless state of mind[.]" *Avaya*, 564 F.3d at 252 (internal quotation marks and citations omitted).  A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)) (internal quotation marks omitted).[16]  One may "state a claim based on recklessness[,]" for example, by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (internal quotation marks and citation omitted); *see also City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 424 (D. Del. 2009) (same).[17]

---

[16]     To plead scienter as to a corporate defendant (here, GCE), the complaint must "identify facts raising a strong inference that false or misleading statements were made or otherwise promoted by an individual acting on behalf of each company and who knew or was reckless in not knowing that the statements were false or misleading at the time they were made." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 426 (D. Del. 2009).  To the extent that the CAC here would serve to sufficiently allege scienter as to Mueller and Bachus, its scienter allegations would suffice as to GCE; were the allegations wanting on this front as to Mueller and Bachus, they would be wanting as to GCE.  (D.I. 37 at 6 n.7)

[17]     In *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), the Third Circuit held that plaintiffs asserting a Section 10(b) claim may "plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *Advanta*, 180 F.3d at 534-35 (internal quotation marks and citations omitted).  In 2009, the Third Circuit addressed this question further; it recognized that after the Supreme Court's 2007 decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), a "showing of motive and opportunity" could no longer amount to independent grounds for demonstrating scienter. *Avaya*, 564 F.3d at 276-77

**B.       Discussion**

In challenging the CAC's scienter-related allegations, Defendants' lead argument is that, as a general matter, the CAC fails to allege a credible theory of scienter.  As stated above, the heart of the scienter inquiry requires the Court to:  (1) understand what is Plaintiffs' pleaded theory regarding scienter; (2) understand what is the opposing inference of non-fraudulent intent that Defendants believe the Court should draw based on the facts pleaded; and (3) then ask, if one accepts the pleaded facts as true, "Would a reasonable person deem the inference of scienter [offered by Plaintiffs] cogent and at least as compelling as any opposing inference one could draw from the facts alleged?"  If the answer to that question is "yes" then the allegations survive; if the answer is "no," then they do not.

Below, the Court will begin by looking at Plaintiffs' theory as to why the facts pleaded allow for an inference that Defendants harbored the requisite state of mind.  Then it will assess Defendants' theory/opposing inference regarding the CAC's allegations.

**1.       Plaintiffs' Theory**

In examining Plaintiffs' theory of scienter, the Court will first address Defendants' criticism of that theory.  The Court finds one aspect of that criticism to be slightly off base, as explained below.

---

& n.50; *see also City of Edinburgh Council*, 754 F.3d at 172 (citing *Advanta* as "abrogated . . . by" *Tellabs* on certain grounds); *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014) (noting that a plaintiff properly pleads scienter by alleging facts that constitute circumstantial evidence of either reckless or conscious behavior, and that motive and opportunity may no longer serve as an independent route to scienter).  Instead, the Third Circuit concluded that "a general rule that motive allegations are sufficient—or necessary—is unsound."  *Avaya*, 564 F.3d at 277.  That said, the Third Circuit also recognized that the Supreme Court left much of the case law "about 'motive and opportunity' undisturbed."  *Id.*  As a result, it concluded that "allegations of motive and opportunity are not entitled to a special, independent status[,]" but "they are to be considered along with all the other allegations in the complaint."  *Id.* (citations omitted).

Defendants are asserting that Plaintiffs' "core scienter allegation" is that "Defendants *knew the DOE* would treat [GCU] as a for-profit university for regulatory purposes after the [Conversion], but nevertheless intentionally sought to mislead the market into believing otherwise by generally stating that [GCU] would operate as a 'separate non-profit entity' following the [Conversion]."  (D.I. 37 at 6-7 (certain emphasis in original, certain emphasis added); *see id.* at 1; Tr. at 20-21)  Defendants argue that this theory is "nonsensical" and cannot be sustained.  (D.I. 37 at 7)  Here, Defendants are asserting that it does not make rational sense to think that they would have falsely represented GCU's non-profit status while knowing that the DOE would eventually disagree with them (as the DOE ultimately did in November 2019), because any such fraudulent scheme would necessarily be "short-lived" (i.e., it would eventually end when DOE publicly announced that Defendants' position on GCU's non-profit status was wrong) and thus not worth trying.  (D.I. 37 at 7)

However, the Court agrees with Plaintiffs, (D.I. 43 at 17; Tr. at 67-68), that Defendants have misstated what Plaintiffs' theory really is.  The CAC does not allege that Defendants *knew that the DOE* would eventually deny GCE/GCU's request for non-profit status.  Were that the CAC's allegations, then they would be more in line with the facts set out in certain cases that Defendants rely on in their briefing as to scienter—cases such as *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) or *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016). (D.I. 37 at 7)  In cases like *Nguyen* and *Gillis*, the allegations were that the defendants had misled the public about the likelihood that the United States Food and Drug Administration ("FDA") would approve their drug or device, all the while knowing that there was no chance that the FDA would actually do so.  In those cases, especially where there was no allegation that the individual defendants sold the company's stock prior to the FDA's ultimate rejection of the drug

33

or device, courts concluded that the alleged schemes did not square with common sense.  This was because in *Nguyen* and *Gillis*, the defendants could not sell their product without first having obtained FDA approval—approval that would surely never come, if the plaintiffs' allegations were correct.  *See, e.g.*, *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 407, 415 (9th Cir. 2020) (affirming the dismissal of securities fraud claims due to the lack of plausible scienter allegations, where the plaintiff claimed that the defendant, a medical device company, had mislead the investing public about whether the FDA would approve the company's new aneurysm sealing product, and where the plaintiff's central theory was that the defendant's executives knew that the device's problems would manifest in U.S. trials and in turn inevitably lead the FDA to deny the device's premarket approval; the court did so in part because "the notion that a company would promise FDA approval that it knew would not materialize does not, without more, create a strong inference of intent to deceive or deliberate recklessness" since it "does not make a whole lot of sense"); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600-01 (S.D.N.Y. 2016) (dismissing securities fraud allegations on lack-of-scienter grounds, where plaintiffs alleged that the defendant intended to inflate its stock price by pretending that the FDA was likely to approve its proposed drug product, when it knew all along that approval would never occur, as such a theory lacks a "coherent rational objective" since it was "implausible" that the defendant would continue to "invest substantial time and resources in clinical studies and [New Drug Application] submissions that it knew were doomed to fail").  In contrast here, as the Court will set out further below, Plaintiffs theory is that when Defendants submitted the pre-acquisition application, they *hoped that the DOE would approve* GCU's non-profit status and *"gambled" that DOE might do so*—not that Defendants knew that DOE would ultimately deny

34

the application.[18]  (D.I. 43 at 17-18 (Plaintiffs confirming that their theory is that "Defendants gambled that the new Administration might rubber-stamp their improper attempt to designate a captive GCU as a non-profit"))

All of that being said, while cases like *Nguyen* and *Gillis* do not help Defendants for exactly the reasons that Defendants say, those cases still do support grant of the Motion—just for a slightly different reason.  Those cases stand for the proposition that if the central premise or theory of scienter put forward by a plaintiff does not "make a whole lot of sense[,]" than such a theory will not be found "cogent" or "'at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Nguyen*, 962 F.3d at 414-15 (quoting *Tellabs*, 551 U.S. at 324).  And here, the Court concludes that Plaintiffs' theory of scienter (at least in terms of how the CAC currently pleads that theory) does not "make a whole lot of sense" and is not a "cogent" theory.

---

[18]      There is at least another way in which the CAC's allegations are a bit different than the scenarios in *Nguyen* and *Gillis*.  Those cases were both cases where the defendants needed the FDA to approve the drug or device at issue, so that the drug or device could eventually be sold in the United States and thus earn income for the defendants.  Here, in contrast, the CAC alleges that in the interval between when Defendants started to make false statements or omissions about the DOE approval process (i.e., in mid-2018) and the time of the DOE's final decision (i.e., in November 2019), GCE "reported strong financial results that routinely exceeded market expectations" and reported "truly remarkable" profit margins—in significant part because Defendants had completed the Conversion and had been marketing GCU as a non-profit in the interval.  (D.I. 34 at ¶¶ 87-90)  So unlike in Defendants' cited cases, there is a way where, even pending a decision from their regulator, Defendants could have earned money by marketing the "product" at issue (i.e., GCU as a non-profit educational institution) in a manner that the *Nguyen* and *Gillis* defendants could not have.  (Tr. at 71-72 (Plaintiffs' counsel noting that in Defendants' cited cases, it did not make sense that the defendants would "talk up the merits of a drug [if an FDA] approval [] was never going to come true" because "[y]ou can't sell more of a drug that you can't sell at all" but that the instant case was "completely different" because GCE "benefit[ted] massively every day that [it] could be out there touting [GCU] as a non[-]profit" and were "breaking records" financially in doing so))

To explain why this is so, the Court takes a step back, in order to really analyze the core of Plaintiffs' theory.  In the Court's view, the following are a few of the CAC's key factual allegations regarding scienter:

- The CAC clearly and repeatedly alleges that when Defendants submitted GCU's pre-acquisition application, Defendants "[k]new" that the Conversion primarily benefited GCE (not GCU) and that it "plainly failed to meet the most basic tenet of non-profit status[.]"  (D.I. 34 at ¶ 232 (internal quotation marks and emphasis omitted); *see also id.* at ¶ 5 ("Defendants *knew*, but did not disclose, that under the terms of the shared services agreement and because most of [n]ew GCU's key management would work for GCE and not [n]ew GCU, [n]ew GCU was not the entity actually operating the institution and thus did not satisfy the DOE's requirements for non-profit status.") (emphasis added))  Put another way, the allegation is that at the time Defendants submitted the application, they *knew for sure* that, under the prevailing regulations that DOE would use in its review process, GCU should not and did not qualify on the merits as a non-profit institution.

- The CAC also repeatedly pleads that all of the facts that one would need to know, in order to come to the conclusion that GCU should not be treated as a non-profit pursuant to DOE regulations, were contained in documents (particularly the Barclays Report, the Barclays Update and the Deloitte Report) that *Defendants provided to DOE* as part of the pre-acquisition application.  (*Id.* at ¶¶ 96, 101, 105, 141, 155, 168, 232)  Indeed, DOE ultimately relied on facts drawn from those very documents in rejecting GCU's non-profit request in November 2019.  (*Id.* at ¶¶ 232 (Defendants alleging in the "Scienter" portion of the CAC that GCE "provided the DOE with copious non-public documents over the course of the DOE's nearly two-year review of GCE's request, including the Barclays Report, the Barclays Update, and the Deloitte Report" and that as "demonstrated by DOE's discussion of these voluminous . . . documents in the DOE Letter and analysis pursuant to IRS regulations, these documents showed that the Conversion plainly failed to meet 'the most basic tenet' of non-profit status") (emphasis omitted))

- The CAC alleges that one of the reasons why Mueller and Bachus knew that the new GCU should not be considered a

36

non-profit entity was because they had a combined five decades of experience in for-profit education.  This meant that Mueller and Bachus should be well familiar with the factors that go into determining whether a university should rightly be considered a non-profit institution.  (*Id*. at ¶¶ 21-22, 232 (noting that Mueller and Bachus had "particular expertise in the subject matter of the documents[,]" as a reason supporting scienter); *see also* D.I. 43 at 14)

- The CAC asserts that while there were other aspects to GCU's DOE application (such as the fact that GCU was seeking the DOE's approval of the transaction itself, and that GCE would go from GCU's owner to being an OPM provider of services to GCU), "the conversion of [GCU] into a purportedly independent non-profit" was "a *critically important feature* of the restructuring."  (*Id*. at ¶ 49 (emphasis added); *see also id*. at ¶ 4 (alleging that GCE's "ability to cast off the stigma of a for-profit university was *fundamental* to [] Mueller's marketing plan to maximize enrollment") (emphasis added))  In fact, the CAC pleads that after DOE ultimately rejected GCU's non-profit status, this "placed in jeopardy" GCU's and GCE's "long-term financial viability[.]"  (*Id*. at ¶ 94; *see also id*. at ¶ 85 (describing the prospect of GCU's non-profit status being revoked as an "'existential risk to [GCE]'"))

When one takes these allegations as true and considers them all together, they establish the following:  (1) *the critical* aspect of the Conversion process was that the DOE agree that the new GCU should be treated as a non-profit entity; (2) if the DOE did not ultimately treat GCU as a non-profit entity, this could threaten the long-term viability of both GCE and GCU; (3) persons experienced in the world of for-profit and non-profit education would understand that, in light of the proposed structure of the Conversion, the new GCU *did not and should not qualify as a non-profit* pursuant to DOE regulations; (4) Defendants freely gave documents to the DOE that demonstrated that GCU did not, in fact, qualify for non-profit status; and (5) Mueller and Bachus, persons with significant experience in the for-profit arena, *knowing that GCU did not*

*qualify as a non-profit*, nevertheless caused GCU to submit its pre-acquisition application to DOE (in which GCU actually sought non-profit status).

Yet if all of that is true, then it begs a number of questions about Plaintiffs' theory that—based on the current content of the CAC—do not seem to have sensible answers. Why would Mueller and Bachus, two experienced executives in the education sector, bet the future of GCU (an entity worth nearly a billion dollars) and their own large company (GCE), on a "gamble" that DOE would treat GCU as a non-profit—when, if the Plaintiffs' theory of scienter is correct, any thinking person with real experience in this sector would *know*, just as Mueller and Bachus are said to have *known*, that GCU clearly and unmistakably *did not qualify* as a non-profit? Why would these men make that incredibly high-stakes gamble with GCU's and GCE's future—a gamble that would seem, absent further explanation, to be surely doomed to fail?[19] After all, presumably the DOE—the entity who would make the final decision here regarding non-profit status—also employs persons who, like Mueller and Bachus, are well experienced with (1) the for-profit and non-profit educational sectors and (2) DOE's own regulations regarding non-profit

_____

[19]     *Cf. Erber v. Williams Cos., Inc.*, Case No. 16-CV-131-JHP-FHM, 2017 WL 930828, at *4 (N.D. Okla. Mar. 8, 2017) (dismissing securities fraud claims on, *inter alia*, scienter grounds, because the plaintiff's allegations were that defendants knew at the time they entered into an acquisition of a company ("WPZ") that defendants' company would later merge with another entity ("ETE"), and that such a merger would doom the WPZ acquisition; these allegations were wanting because the plaintiff "never explains why [d]efendants would have entered into the WPZ [a]cquisition had they thought it would be terminated"); *Dudley v. Haub*, Civ. No. 2:11-cv-05196, 2013 WL 1845519, at *21 (D.N.J. Apr. 30, 2013) (dismissing securities fraud allegations on scienter grounds, where the theory of scienter "ma[de] no sense[,]" in that certain defendants were alleged to have made a $115 million investment in a company so that they could steer the company into a Chapter 11 reorganization, as those defendants "would not be motivated to commit a fraud that would destroy $115 million of their own equity"; the court noted that a "far more compelling inference" is that these defendants sought to assist the company's turnaround efforts by investing substantial capital, but that the company nevertheless became insolvent).

status.  So why would it make any sense that Mueller and Bachus thought that these DOE reviewers would wholly vacate their job responsibilities and simply rubber stamp the Conversion, including as to the requested non-profit designation?  (Tr. at 21 (Defendants' counsel noting that "Plaintiffs are unable to offer any rational theory for why the Defendants would structure a transaction and spend years and significant expense embroiled in regulatory review[] if . . . Defendants knew all along that [GCU] does not meet the most basic tenant of non[-]profit status and, as such, the DOE would deny its application."))

The Court is not sure if Plaintiffs *could* plead facts that would provide this missing "why," and that would make this portion of Plaintiffs' theory seem cogent.  But assume for the moment that Plaintiffs could do so.  The key point here is that in the CAC, Plaintiffs do *not even try to do so*.  Instead, the following paragraph is the entirety of the CAC's allegations about why Defendants supposedly thought this head-scratching "gamble" would result in a DOE non-profit designation:

> Just a year later, after the election of President Trump and his appointment of Elizabeth DeVos as Secretary of the DOE, [GCE] revived its plan to restructure GCU as a non-profit.  As [GCE's] counsel put it, in 2017, for-profit institutions faced a 'different regulatory environment' that might lead the DOE to be more favorable to non-profit conversions.

(*Id*. at ¶ 44)  But this bare-bones paragraph does not answer the Court's questions above.  Instead, it merely begs further questions.  Where are the allegations about *why* the 2016 Presidential Election, or the appointment of Secretary DeVos, would lead Defendants to think that GCU's non-profit status would be "rubber stamped," when it really should not be?  *Why* was the "regulatory environment" now so different with regard to the key issues regarding non-profit status that are addressed in the CAC?  Does the answer have something to do with (1) Secretary

DeVos's viewpoints about the for-profit or non-profit education sectors generally, or (2) statements that Secretary DeVos made about these sectors prior to or after the 2016 election, or (3) actions that DOE took after Secretary DeVos's confirmation (but before Defendants' submission of the pre-acquisition application) regarding these sectors?[20]  And if so, how would the Secretary's viewpoints necessarily cause line DOE employees to make a decision about GCU's non-profit status that cannot reasonably be squared with DOE regulations?  Under the law, Plaintiffs are required to plead *with particularity* facts relating to scienter—facts that would provide the answers to these questions.  But here, they failed to do so.

This failure is even more conspicuous because in the CAC, the only facts pleaded about DOE personnel in the post-November 2016 time period suggest just the *opposite* conclusion.  That is, the pleaded facts suggest that these DOE employees were professionals who rigorously assessed GCU's request for non-profit status in 2018 and 2019, and who would not in fact act as a "rubber stamp."  The CAC repeatedly alleges that, prior to its release of the DOE Letter in November 2019, the DOE made "voluminous and detailed" requests for information of GCE/GCU and engaged in a "thorough" analysis of GCU's application.  (*Id.* at ¶¶ 80, 141, 144)  And the CAC also alleges that—with regard to its approval of the Purdue-Kaplan deal in September 2017 and its review of another proposed non-profit conversion (relating to Ashford University) in March 2018—the DOE imposed pre-approval conditions on the proposed

---

[20]      During oral argument, Plaintiffs' counsel hinted at something along these lines. Counsel stated that "the theory is that [Defendants] gambled, that they took a risk. . . . [T]hey gambled that in the Trump/DeVos administration[, ]the DOE would actually eventually concede and approve the transaction, or wouldn't discover the underlying facts that ultimately led the DOE to reject the transaction."  (Tr. at 67-68)  But counsel did not explain what facts in the CAC would make that gamble seem like it might actually succeed.

transactions that were more rigorous than those imposed by other federal agencies. (*Id.* at ¶¶ 61, 123)  Therefore, based on the facts actually pleaded in the CAC, the reader would be left with the impression that DOE personnel, even post-November 2016, were thoughtful and diligent reviewers of applications for non-profit status.  Such facts would not support the inference that these government employees would blindly rubber stamp a request for non-profit status that clearly did not qualify under DOE's own regulations.[21]

The above is enough to call into serious question the cogency of Plaintiffs' theory of scienter.  But there is also one other aspect of Plaintiffs' core scienter theory that is notable for its strangeness.  This is that the CAC asks the reader to believe that Defendants' plan for fraud yo-yoed haphazardly during the Class Period.

As explained above, the CAC claims that Defendants' plan in January 2018 was to gamble with the future of GCE and GCU, and hope that DOE would approve GCU's request for non-profit status, while knowing that on the merits DOE should never come to such a conclusion.  But the CAC then asserts that just five months later in May 2018—after DOE propounded interrogatories that "probed the underlying structure of the Conversion and its financial benefits to [GCE]"—Defendants now realized "that the DOE was not inclined to

---

[21]   Indeed, as noted above, the CAC does not allege that when the DOE reviewed the Purdue/Kaplan application in 2017 or the Ashford University application in 2018, that DOE personnel "rubber stamped" anything.  Instead, the CAC suggests that the DOE reviewed those applications more rigorously than did the IRS, and that the DOE placed additional restrictions or conditions on the applicants before it would even consider approving a request for non-profit status.  (D.I. 34 at ¶ 61)  With regard to the Purdue/Kaplan deal specifically, the CAC does not allege that the DOE wrongly or blindly approved the request for non-profit status (such that it might make sense for Mueller and Bachus to think that the DOE would similarly rubber stamp GCU's application too).  Instead, the CAC argues that the Purdue/Kaplan transaction was structured differently than the Conversion, and that it was those legitimate differences in structure that led the DOE to approve Purdue and Kaplan's request.  (*Id.* at ¶¶ 118-27)

rubber-stamp the Conversion and in fact had serious questions about the independence of [n]ew GCU from [GCE]." (*Id*. at ¶¶ 6, 66-68)

So as of May 2018, Defendants are now confronted with the fact that their "gamble" (i.e., that the DOE would "rubber stamp" the Conversion) has pretty clearly failed. The DOE is not going to blindly approve GCU's non-profit status, and is now seriously questioning the request. What does the CAC allege that Defendants do now? It asserts that they "reversed course[.]" (*Id*. at ¶ 69) That is, Defendants are now alleged to have pressed "full steam ahead" with the Conversion and simply awaited the DOE's final decision (one that now looked like it would be negative as to non-profit status), all while telling the public that they still remained optimistic about the outcome. (*Id*. at ¶¶ 69, 72, 75, 80-81) When the DOE propounded additional requests for information in July, August and September 2018—requests allegedly demonstrating that the DOE was still "significant[ly] scrutin[izing]" the Conversion—Defendants purportedly kept on with this new plan. (*Id*. at ¶ 86) It is alleged that Defendants did so in order to maximize profit in the interval by touting GCU as a non-profit to potential students. (*See, e.g.*, *id.* at ¶¶ 87-90; Tr. at 67)

The challenge with this type of allegation is that it requires the reader to believe that Defendants knowingly hitched GCE's entire future operational and financial viability *to a plan that they changed radically in mid-stream, within the span of a few months*. Again, the initial plan was the hope that DOE would unquestioningly approve a non-profit status application that the DOE clearly had no business approving. Then shortly thereafter, the Court is asked to believe that Defendants pivoted to an entirely new plan, wherein: (1) they now understood that not only would DOE not rubber stamp the non-profit request, but that the DOE's approval was now very unlikely; (2) they nevertheless decided to just press ahead, making false statements

about the reasons for the DOE's delay in approval, so that the market would be uninformed about where DOE's review was likely headed; and (3) in the meantime (until the DOE's final decision came down) they tried to make as much money as they could for GCE/GCU by touting GCU's "non-profit" status. Is it *possible* that this is what happened? Of course it is possible. But the zig-zagging nature of Defendants' alleged mindset suggests a less-than-cogent narrative. *Cf. City of Brockton Ret. Sys. v. Shaw Grp. Inc*., 540 F. Supp. 2d 464, 475 (S.D.N.Y. Mar. 18, 2008) ("'Cogent' means 'compelling or convincing.'") (quoting Black's Law Dictionary 252 (7th ed. 1999)).

For all of the above reasons, the Court cannot conclude that the current iteration of the CAC pleads a cogent theory of scienter. The core of the CAC's allegations suggests that Defendants, in "gambling" with GCE and GCU's future, acted in a manner that simply does not square with common sense. Because that failing is so core and central to all of the CAC's allegations regarding scienter and to the alleged scheme, it is fatal to Plaintiffs' claims.

## 2.      Defendants' Theory/Opposing Inference

The Court also assesses Defendants' opposing theory regarding lack of scienter. Here, Defendants argue that the pleaded facts can support the inference that they initially proposed and eventually moved forward with the Conversion because, at all times, they "reasonably believed that [GCU] met the DOE's definition of a non[-]profit institution[.]" (D.I. 37 at 8) The Court ultimately agrees that there are facts pleaded that could support this inference and that render it a cogent one. The Court does so for three reasons.

First, the CAC pleads that prior to and during the Class Period, the IRS approved the proposed new GCU as a non-profit organization. More specifically, the CAC alleges that in October 2015, GCE/GCU "applied to the IRS for recognition of GCU as a tax-exempt non-profit

organization" (as part of the proposed 2014 Conversion process), and that the IRS approved the request in November 2015.  (D.I. 34 at ¶ 84)  The CAC also alleges that in July 2018, just after the Conversion closed, Defendants requested that the IRS re-affirm GCU's non-profit status; the IRS quickly did so in August 2018.  (*Id.*)  And the CAC asserts that the IRS's regulations for non-profit status "mirrored in relevant respects" the DOE's regulations in that regard.  (*Id.* at ¶ 60; *id.*, ex. A at 10)  Thus, as Defendants argue, (D.I. 37 at 8; *see also* Tr. at 33-34), it makes sense that they could have legitimately expected that the outcome of DOE's review regarding GCU's non-profit status would be the same as the outcome of the IRS's review on that same subject.

Now, to be sure, the CAC also pleads facts that provide reasons why the DOE's review might not end up in the same place as the IRS's inquiry.  Among those are Plaintiffs' allegations that:  (1) the IRS's approval of a transaction "was no guarantee of DOE approval"; (2) with regard to the Purdue/Kaplan and Ashford University transactions, among others, the DOE took a somewhat harder line in its review than did the IRS; (3) the IRS had been criticized in the past for "rubber-stamping applications of for-profit institutions attempting to convert to non-profits" and for relying too heavily on declarations and representations made by the applicants; and (4) the IRS reviewed "[n]o documents" in approving the Conversion in 2018 (as compared to the DOE, who reviewed, *inter alia*, the Barclays Report, the Barclays Update, the Deloitte Report and various other documents).  (D.I. 34 at ¶¶ 61, 84-85, 124, 141)  Yet none of these factors suggest that it was implausible that the DOE's review might have turned out the same way that the IRS's review did.  Nor could Plaintiffs easily suggest that the fact of the IRS's 2015 and 2018 approval *makes less likely* Defendants' proposed opposing inference.  Again, if one large federal regulator (using certain standards) concluded that new GCU qualified as a non-profit, it

seems reasonable that Defendants might have thought that another large federal regulator (using the same standards) could come to the same conclusion.

Second, the CAC alleges that GCU's accreditor, the HLC, also approved the transaction in March 2018. (*Id*. at ¶ 63; D.I. 48, ex. 3 at 4)  Now here again, the CAC does also state that the DOE's analysis was to be "distinct from the HLC Change in Control application" because "[w]hereas HLC focused on certain educational implications of the Conversion," the DOE pre-acquisition review focused on "whether [n]ew GCU could be considered a non-profit institution under Title IV and the DOE's regulations[.]"[22]  (D.I. 34 at ¶ 60; *see also id*. at ¶ 61 (asserting that approval of a transaction by an institution's accreditor was "no guarantee of DOE approval"))  And it notes that the HLC also was not provided certain documents like the Barclays Report, the Barclays Update or the Deloitte Report.  (*Id.* at ¶ 97)  These asserted differences in the nature of the HLC's review surely could lead to a conclusion that just because the HLC approved the transaction, that did not mean that the DOE would necessarily do the same in all relevant respects.

Importantly, however, the CAC also includes other facts about the HLC's decision that could support Defendants' theory.  For example, the CAC explains that with regard to the 2014 Conversion process, the HLC denied GCU's Change in Control application.  In doing so, the HLC "concluded that the proposed structure contemplated [n]ew GCU's 'outsourc[ing]' all or the majority' of its academic and student support services and curriculum development to [GCE], in

---

[22]    The Court notes that this allegation (i.e., about how the HLC's review was different than the DOE's review, and was focused on "certain educational implications" of the Conversion) is fairly vague.  It would have been helpful, especially in light of what is said in the next paragraph, if Plaintiffs would have provided additional particularized facts to explain *why and how* the HLC's review and the DOE's review differed with regard to consideration of new GCU's asserted non-profit status.

contravention of HLC's accreditation guidelines." (*Id.* at ¶ 41 (some alteration in original))  The

CAC then makes a point to note that this prior HLC decision was "consistent with the DOE's

approach to these types of conversions." (*Id.* at ¶ 42)  It also asserts that by 2018, the HLC's

criteria for accreditation had not changed, and that the Defendants' new 2018 Conversion

proposal to the HLC was structurally the same as that proposed for the 2014 Conversion. (*Id.* at

¶¶ 45-46)  Yet if all of the above is correct, then in the Court's view, these facts can be read to

support Defendants' competing inference.  In other words, if:  (1) GCU's accreditor had

previously denied certification because of concerns about the significant extent to which GCE

was to be intertwined with GCU's provision of University services; and (2) in doing so, took an

approach "similar to" that of the DOE, but (3) then at the outset of the Class Period, the HLC—

reviewing a structurally similar proposed GCE/GCU transaction—*approved* that transaction;

then (4) it seems like Defendants might reasonably have taken this as a positive sign that the

DOE too would now "similar[ly]" approve all aspects of that same transaction. (D.I. 37 at 8)

Third, the CAC alleges that during the Class Period, Defendants publicly made all of the

same arguments about why they thought GCU should be considered a separate, non-profit entity

as they make now to the Court.  For example, the CAC pleads that in early-to-mid 2018,

Defendants were publicly stating that they thought DOE approval of the Conversion was more

likely because the HLC had already approved the transaction, and because the IRS had done the

same. (D.I. 34 at ¶¶ 63, 70, 164-65)  And the CAC alleges that throughout 2018 and 2019,

Defendants publicly (1) disagreed with critics who thought that, pursuant to the Conversion,

GCU was not sufficiently independent from GCE; (2) stated their view that, in light of certain

accounting rules, they did not need to consolidate new GCU's finances with GCE's finances; (3)

noted that they had considered "numerous factors" and concluded that GCE did not have a

related party relationship with GCU; and (4) strongly disputed the DOE's November 2019 conclusion that GCU was not a non-profit. (*Id.* at ¶¶ 74, 92, 154, 164-65)  If Defendants were taking positions in this case about the validity of GCU's non-profit status that *differed* from what Defendants were saying on the topic back during the Class Period, then this would be a red flag as to Defendants' then-state of mind.  But Defendants have not done so.  Instead, they seem to be saying now what they have publicly articulated over the last many years.  That fact strengthens their proposed inference of non-fraudulent intent—as it can suggest that Defendants really believed what they were saying about the Conversion and about the correctness of their accounting treatment of GCE and GCU (even if it later turned out that some or all of those statements were incorrect, or even if entities like the DOE ultimately disagreed on these points).

The Court notes that despite the above-referenced three factors, there are some allegations in the CAC that give it pause as to Defendants' mental state.  Perhaps most significant are the allegations (which the Court must take as true at this stage) regarding Mueller's statements after GCE received the May 2018 interrogatories.  There, the CAC alleges that Mueller "misleadingly" told the public that the DOE's delay in approving the Conversion was due to a "'staffing' issue at the DOE" (i.e., that the review was taking longer than expected because the DOE was "'very understaffed'").  (*Id.* at ¶ 80 (emphasis omitted); *see also id.* at ¶ 7) It is asserted that this was not accurate, as the DOE's analysis was not in fact slowed by a staffing shortage, but instead by DOE's concerns about the structure of the Conversion.  (*Id.* at ¶ 86)  The Court acknowledges that Mueller's provision of misleading information in this regard could be an indicator that he and Bachus also had bad intent regarding their statements about other aspects of the Conversion.  That is, if Mueller purposely misled about this fact, perhaps he

and Bachus also purposefully mislead the public about the correctness of their view that GCU should be considered a non-profit entity.

Yet on the other hand, other explanations are surely possible. It could be, for example that Mueller (as Defendants now assert to the Court) legitimately believed in the legal efficacy of GCU's non-profit application. Mueller might have thus given bad information about the cause of the DOE's delay for some *other* reason (e.g., he was simply mistaken as to the cause of the delay, or he was not mistaken about the cause but he mislead the public in a misguided attempt to buy time until the DOE saw the light regarding the Conversion).

In the end, in light of all the Court has said, these concerns do not alter the Court's conclusion that Defendants' proposed opposing inference is at least a cogent one.

### 3.    Conclusion

None of the Court's analysis above is meant to suggest that it believes that Defendants' assertions about scienter are *correct*. Nor is the Court concluding that Plaintiffs *could not possibly* plead facts demonstrating that their theory about Defendants' knowing or reckless state of mind is cogent (and at least as compelling as Defendants' proposed inference).

Instead, the Court's ruling here is simply that, for the reasons stated above, it does not find Plaintiffs' current scienter allegations to amount to a logically cogent theory. And because it does find Defendants' competing theory to be cogent, it must recommend denial of the Motion. *See Ortiz v. Canopy Growth Corp.*, — F. Supp. 3d —, 2021 WL 1851933, at *41 (D.N.J. May 7, 2021) ("Scienter will not lie, however, if plaintiffs' theory 'does not make sense on the facts alleged,' or 'alone present a cogent or compelling' theory of scienter.") (quoting *In re Adolor Corp.*, 616 F. Supp. 2d 551, 572 (E.D. Pa. 2009))

Because it is not clear to the Court that allowing the opportunity to amend would be a futile act, because this is the first time the Court has found Plaintiffs' claims to be deficiently pleaded, and because leave to amend should be given freely "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court also recommends that dismissal of the claims be without prejudice. (D.I. 43 at 20)  It suggests that, to the extent that the District Court affirms the Court's recommendation, Plaintiffs be given leave to file a further amended complaint addressing the deficiencies outlined above within 14 days.  *TriDiNetworks Ltd. v. Signify N. Am. Corp.*, Civil Action No. 19-1063-CFC-CJB, 2020 WL 2839224, at *5 (D. Del. June 1, 2020).

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends that the District Court GRANT the Motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: August 9, 2021

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE