# **EXHIBIT B**

GRAND CANYON EDUCATION

# The Educational Enron

## The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings


© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com

Citron Research is entering our 19th year of publishing independent research.  In our 19 years we have exposed more corporate fraud than any non-government agency across the globe. With that in mind, we are judicious when we use the "F" word.  In only the rarest of occasions do we have validation of fraud from another government agency who is investigating a public company for its operations and not the accuracy of its financials.

On September 9th, 2019, Citron wrote about Grand Canyon Education ("LOPE") and established a $30 price target.  This target was based on analysis of a highly competitive online education industry and the failure of LOPE to become a successful OPM.  In our presentation we presented a slide that highlighted some red flags that LOPE might already be in violation of securities law and misrepresenting its financials (that slide is in the appendix), but it was somewhat of an afterthought as we had no proof or supporting documentation at the time.

## What happened next is something that we never expected.

On November 6th, 2019 Grand Canyon University disclosed that after a 2-year application process, the Department of Education refused to grant them non-profit status.  At the time of our previous report, we did not believe that an adverse ruling on non-profit status was a potential risk as the company never disclosed it in its risk factors and sell side assumed approval was guaranteed.





© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com

The highly technical and detailed [letter](#) from the DoE did not dispute any of the obvious problems with for profit education (e.g., cohort default, graduation rate, or gainful employment); instead the DoE refused to grant non-profit status because they discovered that the LOPE/GCU transaction was constructed **"to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity".**

> **GCU has become a vehicle for the LOPE executives to commit securities fraud and obfuscate the true financials of Grand Canyon Education.**

**Citron was shocked and immediately submitted a FOIA, through which we received 870 pages of supporting documentation that led to the obvious conclusion that LOPE is in clear violation of SEC rule 10b-5 as they use the private university to dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price.** Citron's finding was validated by the Department of Education which reached the same conclusion.

While we acknowledge that Grand Canyon University has an aesthetically pleasing campus and is providing a Christian education at an affordable price, that has no impact on the securities fraud being perpetrated at LOPE.  For those who forget, Enron owned and operated the largest interstate natural gas pipeline.  But like Enron, the executives are using non-reporting captive subsidiaries to inflate earnings.  The Enron assets (Northern Natural Gas) remain vibrant and a subsidiary of Berkshire Hathaway while the public company crumbled under financial restatements.

In this report, Citron will detail and document the Enron-like fraud at LOPE.  This report contains multiple smoking gun documents that leave no doubt about the numerous securities violations being committed at Grand Canyon Education.



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



Whether it's Enron, Olympus, or LOPE, these companies **used a captive non-reporting subsidiary to hide liabilities.**

This does not mean its core business is fraudulent, but rather that the financials they present to Wall St are fraudulent. While Enron was running one of the largest gas pipelines in US, it created special purpose entities to dump liabilities. In this case, LOPE, the public company, is using Grand Canyon University as a liability dumping ground/cookie jar in order to manipulate earnings and cover up for the headwinds they face due to a challenging environment in for-profit online education.

Through a disjointed <u>**Master Service Agreement ("MSA")**</u> between LOPE/GCU with no proper oversight, <u>**LOPE can quite literally make up any margin or EPS number they wish**</u>. This is not the ramblings of a short seller. The DoE recognized that the unusual power granted in this agreement to one CEO / management team is too troubling to consider GCU a non-profit as the DoE stated that <u>**"nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider (LOPE)."**</u>

LOPE is also clearly violating the rules of the Sarbanes-Oxley Act. The management team then uses the mechanisms built into the <u>**Credit Agreement**</u> to take on additional opaque leverage in order to plug the cash burning hole left at GCU as a result of the improper allocations codified in the MSA.

Moreover, the financials of LOPE have become one massive 10b-5 violation, which involves:

> *"Violations include executives making false statements in order to drive up share prices, <u>a company hiding huge losses or low revenues with creative accounting practices</u>, or actions taken to grant current shareholders a better return on their investments (as long as the deception remains undiscovered). These schemes typically require ongoing, misleading statements in order to perpetuate the fraud."*

> **The DoE's extensive research and knowledge of the LOPE/GCU relationship deemed them to be a related party engaging in an unfair transaction that was designed to benefit shareholders. Those are the words directly from the DoE and not Citron. It would be negligent for their auditors not to acknowledge PCAOB Auditing Standard No. 2410 (AS 2410) under the Sarbanes-Oxley Act of 2002 and not dig deeper into the fraud highlighted by Citron.**



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com

Overlooked by trusting shareholders and with little to no oversight from truly independent advisors, LOPE sold its physical campus to a new entity ("GCU") in a transaction that became a figurative "license to steal". As part of the transaction:

- LOPE and GCU entered into a Master Services Agreement ("MSA")

- LOPE and GCU entered into a Credit Agreement ("CA")

- Brian Mueller, President of LOPE, would hold the same position at GCU

On July 1st, 2018, **without final consent from the Department of Education for non-profit status at GCU,** LOPE spun off its primary physical asset, the university (i.e., GCU) into a private "special purpose entity" (sound familiar?) held off balance sheet.

Investors were enthusiastic as management had been speaking of executing this transaction since late 2014. GCU would become a non-profit and LOPE would transition itself to a high margin Online Program Manager ("OPM"). The story that LOPE pitched to investors was that the management team had become so sophisticated at providing online education that they would soon become the online infrastructure of universities worldwide who can benefit from their scale.

The IRS rubber stamped the transaction for 501(c)(3) purposes. Due to a complete lack of appropriate risk disclosure in its SEC filings, investors assumed the transaction was complete and no outstanding approvals remained. **To be clear, the IRS only took 24 days to approve GCU's application versus the ~2 years of review conducted by the DoE before rejecting GCU's non-profit status.** A FOIA with the IRS would take longer than 24 days!

The DoE highlighted that "the IRS approval was issued three years prior to the Transaction (LOPE/GCU spinoff). Even if the "basic structure" of the transaction and a prior draft of the MSA were provided to the IRS at that time, there is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA".

Amazingly, LOPE management has such hubris that they have not taken any effort to cover up the charade; LOPE has not organically signed up any new OPM clients as promised. More importantly, they did not put in truly independent oversight that could ensure the integrity of the transaction, which would have ultimately led to a successful transition to non-profit but would have never allowed the massive securities fraud that is currently being committed to exist.

**But then the shock ruling came from the Department of Education. "Holy shit," Trace Urdan, a managing director at Tyton Partners and an expert on the for-profit higher education sector, said of the news.**



© Copyright 2020   Citron Research   www.citronresearch.com

All Inquiries: info@citronresearch.com



Through our FOIA request, Citron obtained a copy of LOPE's request for pre-acquisition review of the LOPE/GCU transaction to the DoE dated January 18, 2018. In this letter, LOPE actually tries to rush the DoE into a 30 day decision in the hopes that the DoE would overlook the blatant issues with this transaction.

> **"We would appreciate the Department's efforts to process this application in 30 days even though closing is not expected until April 1."**



January 18, 2018

Michael J. Frola
Director
Multi-Regional and Foreign Schools Participation Division
U.S. Department of Education
830 First Street NE, 7th Floor
Washington, DC 20202

    Re: Grand Canyon University (OPEID 00107400) Request for Pre-Acquisition Review of a Proposed Change in Ownership

Dear Mr. Frola:

Enclosed are documents for your review in connection with Grand Canyon University's ("GCU" or the "University") proposed change of control. As contemplated, this transaction would involve the following:

Regarding Question 1, this is a pre-acquisition application for a change of ownership/conversion transaction that has not yet occurred, but is anticipated to occur on April 1, 2018. We would appreciate the Department's efforts to process this application in 30 days even though closing is not expected until April 1, so that we can provide the Department¿s preacquisition review letter to the Higher Learning Commission before it meets to decide on our HLC application on February 22, 2018. Regarding Questions 2-3, while the institution will continue to operate under the name of Grand Canyon University, please note that Gazelle University has been formed to effect the transaction. Regarding Question 11, upon completion of the transaction the institution will name a new Chief Financial Officer. Regarding Section D, we would like to provide basic information about the non-profit ownership structure after the conversion. The new Level 1 owner will be Gazelle University (EIN 47-2507725) a 501(c)(3) nonprofit organization. The sole and controlling member of Gazelle University will be the Grand Canyon University Foundation (EIN 90-0615520), which is also a 501(c)(3) nonprofit organization. We are providing the audited financial statements of Grand Canyon Foundation under separate cover for the Department's consideration with this application. Regarding Question 25, the current board members would be replaced after the transaction closes. Regarding Question 26 g. Please note we are requesting approval to offer Undergraduate Certificate programs. Three programs have been added to Question 27. These do not need accreditor approval. State approval will be provided shortly. Regarding Question 35, the application would not save the response that this is an application for a conversion to a nonprofit institution. Regarding Question 36, the application would not save the response that the institution has 2 FTE financial aid administrative, counselors, and other professionals, and 0 FTE financial aid clerical personnel. The financial aid function has been outsourced to GCE with GCU personnel providing oversight on the financial aid function. Regarding Question 37, the TEACH grant financial aid program is not listed as an available program; however the institution is currently and will want to continue participation in this program. Regarding Question 38, the application would not save the following responses: the institution does not anticipate an increase of 10% or more in the student population in the next award year, and it anticipates 74,485 eligible students in the remainder of the current award year, 81,473 year for the next award year and 87,646 for the award year

 RESEARCH    © Copyright 2020    Citron Research    www.citronresearch.com    **All Inquiries:** info@citronresearch.com

**Don't Take Our Word For It – The Department Of Education's Conclusion**



Before we delve into this report, we want to highlight that this is not just Citron Research making up a wild conspiracy theory.  The DoE was the first to highlight the many material red flags in its letter denying GCU non-profit status.  We are simply following in their footsteps and supplementing their analysis with other disclosure we received via our own research / FOIA Request.  These following quotes from the DoE should be enough to start an SEC investigation.  This whole transaction was to "juice the stock".

> **"Having reviewed the voluminous materials provided to it, the Department has concluded that the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity"**

> "Although GCE receives 60% of the revenue from all of these revenue generating operations, it does not appear that GCE actually provides services for a significant part of many of these operations – e.g., student housing, food services, operation of the hotel, conference center, golf course, arena, or Canyon Enterprises"

> "When payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue"

> "It is equally concerning that GCU is essentially a captive client… Even if Gazelle wanted to terminate the MSA after July 1, 2025 because it found a more competitive service provider, the required payment of the Senior Secured note [and 50% of trailing twelve-month fee) is an arguably prohibitive fee"





"In regard to the IRS designation of tax-exempt status, and as noted by the October 1 letter, the IRS approval was issued three years prior to the Transaction. Even if the "basic structure" of the transaction and a prior draft of the MSA were provided to the IRS at that time, there is no evidence that the IRS conducted a comprehensive review of the MSA or any of the studies that were later performed to support the MSA"

"Unlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status"

"Not only is Mr. Mueller the President of GCU and the CEO of GCE, he is also a shareholder of GCE… Thus, he is in the dual role of running both the Institution and its managed services provider"

"Relying on the titles used in the Deloitte Report, the Department has determined that the Executive Leadership team had 58 members, not 44 members, assuming that the CEO is also included in the team. Of the 58 executives, only seventeen transferred to Gazelle: the General Counsel, the Chief Academic Officer, eight academic deans of the various colleges, three senior vice presidents and four vice presidents… This means that nearly 75% of the executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider… The Department is skeptical that any nonprofit could outsource the number and type of institutional functions that Gazelle has and still be deemed to operate the Institution"



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com

**Summing Up The Lope Fraud – Flow Chart**

**Don't Panic! This slide summarizes the fraud in its entirety and this presentation will be spent going through each of these mechanisms in detail**

**Other Creditors (UCC Filings)**

**GCU collateralizes more and more assets**

**Creditors loan more money to fund cash burn**

LOPE Transfers Assets To GCU

GCU transfers $870mm Secured Note to LOPE

LOPE provides OPM Services while only recognizing minimal operating costs

GCU pays 60% of revenue for accounting recognition purposes

LOPE funds the cash burn at GCU (due to GCU only receiving 40% of revenue) through a CapEx and AR loan



**LOPE**

**GCU**

**Net Result For LOPE**

**EPS**: Optically elevated due to full accounting recognition of 60% rev split
**FCF Conversion**: Collapsing as more debt floods out through receivables and capex loans
**Balance Sheet**: Accounts Receivables & Secured Note Receivable Balances Rising

**Net Result For GCU**

**Net Income**: GCU mgmt solves to breakeven (in order to salvage DoE Composite Score)
**FCF Burn**: ~$100mm+ per year due to improper expense allocation / revenue split
**Balance Sheet**: Accounts Payable, Secured Note Payable Balance, and Other Debt Balance all rising. Leverage rising fast.

| | |
|---|---|
| —————— | **Balance Sheet Items** |
| – – – – – | **Income Statement Items** |
| – – – – – | **Cash Flow Items** |



© Copyright 2020     Citron Research     www.citronresearch.com

All Inquiries: info@citronresearch.com

In this report Citron will use the letter from the DoE as a framework along with the massive FOIA request to prove out the accounting fraud and massive 10b-5 violations.

<u>**Section I**</u> – Present the MSA, which is the blueprint for the fraud

<u>**Section II**</u> – Present the LOPE/GCU credit agreement, which is the coverup for the fraud

<u>**Section III**</u> – Analyze LOPE's cash flow, which clearly illustrates fraud

<u>**Section IV**</u> – Juxtapose the Zovio / Ashford structure with LOPE / GCU

<u>**Section V**</u> – Present findings of former Deputy Undersecretary of the DoE which validate our conclusions

<u>**Section VI**</u> – Analyze LOPE's response to the DoE

<u>**Section VII**</u> – Examine management's consistent history of fraud and current motivations

<u>**Section VIII**</u> – Summarize Our Conclusions

<u>**Citron believes that the response letter from the DoE, combined with our FOIA documentation and piecing together of the overall puzzle, is about to (if not already has) set off a chain of events that will result in multiple charges of securities fraud, forced restatements, and lead to a significant decline in the share price of Grand Canyon Education.**</u>

 © Copyright 2020   Citron Research   www.citronresearch.com                    **All Inquiries:** info@citronresearch.com

# Section I

## Blueprint For Fraud
## The Master Services Agreement





Citron will now provide a full copy of the MSA, as well as historical drafts, for those who wish to read:

At first glance the agreement seems somewhat standard. LOPE is to provide Exclusive and Non-Exclusive Services to GCU:

**Exclusive Services**     Marketing, Enrollment Services & Budget Consultations, Student Support Services Counseling, and Technology on an exclusive basis (GCU can not insource or contract these out)

**Non-Exclusive Services**     Document Intake, Student Records Management, Curriculum Services, Accounting Services, Financial Aid Services, Procurement Services, Audit Services, Human Resources, Business Analytics Services, Faculty Operations, Compliance Monitoring

But two elements of the MSA stand out and illustrate LOPE crossing the line from GCU being a client, to being a controlled entity / captive subsidiary. This is key. If the SEC identifies GCU as a captive client then in fact they must identify the contract and financials to be nothing short of an "Enron" type transaction.

**The Revenue Split**     First, LOPE is taking a 60% cut of all revenue, not just online tuition revenue.

**The Cookie Jar**     Second, "the University will not contract with any third party for the performance of any Exclusive Services, in each case without the prior written consent of Provider to be granted in Provider's sole discretion. University's determination to seek a third-party provider to provide Services, other than the Exclusive Services, **shall have no effect on University's obligation to pay the Services Fees** as set forth and calculated on Exhibit D to this Agreement"

❖ *This means that GCU must pay the 60% service fee to LOPE, regardless of whether GCU decides to insource or contract with a third-party for certain services that are to be provided*

We will now explore each of these elements in depth.



© Copyright 2020     Citron Research     www.citronresearch.com

**All Inquiries:** info@citronresearch.com



The University and GCE entered into a long-term master services agreement (the "Master Services Agreement") pursuant to which GCE will provide identified technological, counseling, marketing, financial aid processing and other support services to the University <u>in return for 60% of the University's revenue.</u>

- <span style="color:red"><u>LOPE is entitled to 60% of ALL revenue from GCU, NOT just a percentage of online tuition revenue or a flat fee (as every other OPM contract is structured)</u></span>

Let's look at the math:

- <u>In 2018, approximately $465mm of Grand Canyon's ~$1 billion in revenue was NOT related to GCU online</u>

    - ❖ *These are primarily composed of on-campus tuition, housing, the meal plan, Grand Canyon Connect, and the arena ticket sales while LOPE allocates the expenses to support these revenue buckets to the private SPE GCU*

- What this means is that LOPE is recognizing **60% of this $465mm revenue bucket ($280mm)** on its income statement while allocating virtually all of the expenses to support these revenue buckets onto the private off-balance sheet SPE GCU.  <span style="color:red"><u>Note that this is 100% Margin PURE PROFIT to LOPE compared to total EBITDA this year of $300mm</u></span>

- <span style="color:red">**The following tables validate the DoE's conclusion that the entirety of this transaction was not representative of a fair OPM contract but rather a blueprint for securities fraud**</span>

| Revenue Breakdown[1] | 6 Months Ended 6/30/18 | Annualized |
|---|---|---|
| Tuition Revenues | $522 | $1,045 |
| *Of Which On-Campus Tuition Revenue (27%)[2]* | *$141* | *$282* |
| Ancillary Revenues (Housing, Meals, Fees, Golf, Hotel, Arena, Other) | $91 | $182 |
| **Total Revenues** | **$614** | **$1,227** |
| Scholarships | ($101) | ($202) |
| **Net Revenue** | **$512** | **$1,025** |
| **Revenue NOT related to Grand Canyon Online** | **$232** | **$465** |
| Total "Non Online Tuition" Revenue | $232 | $465 |

 RESEARCH     © Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



**So what would LOPE look like if they recognized the same revenue split as every other OPM contract, or ~50% of only the online tuition?**

- If LOPE was to only recognize 60% of online tuition revenue, revenue would fall from ~$700mm in 2019 (ex. Orbis) to $458mm and EBITDA would fall from $307mm to $27mm

- This would put margins at ~6% which, in the **least shocking conclusion** of all time, would put them right in line with OPM comps Pearson & John Wiley Education Services

  - **RED FLAG**:  Again, let's take a step back.  Every other education services provider does ~0% margins.  **LOPE does 45% margins.**  This is the single most obvious case of "too good to be true" that we have ever seen

  - **What on earth could LOPE be doing legally which would lead them to achieve 45% EBITDA margins while every other education / OPM services provider is tightly bunched in the low-single digits?**

| | 2019 |
|---|---|
| Online Tuition Revenues | $763 |
| *Lope Split* | *60%* |
| **LOPE Revenue** | **$458** |
| | |
| **Consensus EBITDA Expectations** | $307 |
| (-) Improperly Recognized 100% Incremental Margin Revenue | ($280) |
| **Pro Forma EBITDA** | **$27** |
| Margins (%) | 5.9% |

| EBITDA Margins (%) | 2019 Consensus |
|---|---|
| **Online Program Management Comps:** | |
| 2U Inc | -4.4% |
| John Wiley Education Services | 3.0% |
| Pearson Education Services | 4.0% |
| Orbis (pre LOPE acquisition) | 0.0% |
| **Average** | **0.7%** |
| | |
| **For Profit Universities:** | |
| Strategic Education Inc. | 26.5% |
| Perdoceo (formerly Career Education) | 18.1% |
| Adtalem Global Education | 22.0% |
| **Average** | **22.2%** |
| | |
| LOPE (Ex. Orbis) Reported | 42.9% |
| LOPE (Ex. Orbis) Proper Recognition | 5.9% |





**In April 2017, Kaplan and Purdue announced a landmark deal:**

- We juxtaposed the terms of the LOPE / GCU MSA to those in the Kaplan / Purdue MSA, the largest OPM / University deal of its kind after LOPE / GCU

- Purdue would acquire the physical assets of Kaplan University and enter into a contract with Kaplan Higher Education to provide educational services in the largest OPM deal of all time

  - This is a **direct parallel** to GCU and LOPE; Purdue is the "GCU" in this relationship and Kaplan Higher Education ("KHE") is the "LOPE"

  - Let's first look at the key details of the Kaplan Transition & Operating Support Agreement ("TOSA"):

    - KHE's primary business operations are providing non-academic operations support services to Purdue Global pursuant to the TOSA and similar services to Purdue University

    - The operations support activities that KHE provides to Purdue Global include technology support, help-desk functions, human resources support for transferred faculty and employees, admissions support, financial aid processing, marketing and advertising, back-office business functions, certain test preparation and domestic and international student recruiting services

    - **Pursuant to the TOSA, KHE is not entitled to receive any reimbursement of costs incurred in providing support functions, or any fee, unless and until Purdue Global (the private entity) has first covered all of its operating costs**

    - **If there are sufficient revenues, KHE may also receive a fee equal to 12.5% of Purdue Global's revenue (which is ~$300mm)**

  - **To summarize:**

    - KHE provides identical services to Purdue / Purdue Global as LOPE provides to GCU

    - **KHE is not even entitled to expense reimbursement or fees until Purdue Global is at break-even**

    - **At most, KHE would be entitled to a 12.5% fee which would equate to ~15% margins on KHE's revenue base**



© Copyright 2020   Citron Research   www.citronresearch.com

**All Inquiries:** info@citronresearch.com



**Now let's compare the financial results:**

- Kaplan Higher Education's financial results can be found in the segment analysis of Graham Holdings 10-Q

- Through the first 9 months of 2019, <u>KHE did ~4% EBIT margins on ~$240mm of revenue (EBITDA margins of 6%)</u>

  - Unsurprisingly, this puts KHE almost right on top of Pearson / John Wiley

- <u>Conversely, in 2019 LOPE will do ~43% EBITDA margins on ~$700mm of revenue</u>

**The bottom line is KHE / Purdue gives us a roadmap for what the largest OPM deal of all time looks like. KHE is providing almost identical services to Purdue Global as LOPE is to GCU.  Similar to every other comp, the end financial result is that KHE falls in that LSD to MSD margin category. LOPE stands alone at 43%**

| EBITDA Margins (%) | 2019 Consensus |
|---|---|
| **Online Program Management Comps:** | |
| 2U Inc | -4.4% |
| John Wiley Education Services | 3.0% |
| Pearson Education Services | 4.0% |
| Orbis (pre LOPE acquisition) | 0.0% |
| Kaplan Higher Education | 6.2% |
| **Average** | **1.8%** |
| | |
| **For Profit Universities:** | |
| Strategic Education Inc. | 26.5% |
| Perdoceo (formerly Career Education) | 18.1% |
| Adtalem Global Education | 22.0% |
| **Average** | **22.2%** |
| | |
| **LOPE (Ex. Orbis) Reported** | **42.9%** |
| **LOPE (Ex. Orbis) Proper Recognition** | **5.9%** |

| | Three Months Ended September 30 | | Nine months ended September 30 | |
|---|---|---|---|---|
| (in thousands) | 2019 | 2018 | 2019 | 2018 |
| **Operating Revenues** | | | | |
| Kaplan international | $  178,169 | $  167,668 | $  552,505 | $  535,553 |
| Higher education | 78,712 | 89,269 | 237,780 | 275,080 |
| Test preparation | 64,710 | 67,749 | 191,533 | 195,504 |
| Professional (U.S.) | 33,820 | 34,302 | 110,181 | 98,715 |
| Kaplan corporate and other | 2,450 | 143 | 7,121 | 870 |
| Intersegment elimination | (542) | (530) | (1,584) | (1,617) |
| | $  357,319 | $  358,601 | $  1,097,536 | $  1,104,105 |
| **Income (Loss) from Operations** | | | | |
| Kaplan international | $  (14,226) | $  8,375 | $  35,596 | $  52,966 |
| Higher education | 5,177 | 6,042 | 9,813 | 18,616 |
| Test preparation | 4,959 | 10,572 | 8,794 | 17,213 |
| Professional (U.S.) | 4,939 | 6,768 | 20,943 | 20,863 |
| Kaplan corporate and other | (8,011) | (9,452) | (30,405) | (27,110) |
| Intersegment elimination | 1 | (43) | (2) | (32) |
| | $  (7,161) | $  22,262 | $  44,739 | $  82,516 |
| **Depreciation of Property, Plant and Equipment** | | | | |



© Copyright 2020   Citron Research   www.citronresearch.com

**All Inquiries:** info@citronresearch.com

**The second element which proves GCU's status as a captive subsidiary is the creation of the Cookie Jar:**

- **Through the MSA, LOPE can quite literally make up any margin or EPS number they wish.**

- How is this not captive?

- "The University will not contract with any third party for the performance of any Exclusive Services, in each case without the prior written consent of Provider to be granted in Provider's sole discretion. University's determination to seek a third-party provider to provide Services, other than the Exclusive Services, **shall have no effect on University's obligation to pay the Services Fees** as set forth and calculated on Exhibit D to this Agreement"

  - **This means that GCU must pay the 60% service fee to LOPE, regardless of if GCU decides to insource or contract with a third-party for certain services that are to be provided**

- If LOPE wants, the obviously independent Mr. Mueller can simply give the word to the private entity (GCU), which he is president of, to take on some of these "**non-exclusive services**" onto its own income statement.  After all, LOPE must only provide three of these services!

- In the DoE's own words:

  - "By way of example only, this would preclude Gazelle from retaining an outside payroll provider if it assumed Accounting Services, despite the fact that GCE performs payroll services through a third-party payroll provider"

- While this would depress the earnings and cash burn further of the private entity, the private entity would still **owe the same level of fees** (per the MSA) to LOPE

- With none of the costs and the entirety of the ~60% fees, LOPE's reported profit and margins would continue to fraudulently rise while stuffing expenses onto the private entity

**The Master Services Agreement is the Blueprint, the mechanism by which GCU is committing fraud, via improper expense allocation and revenue recognition**



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



# Section II

## Coverup For Fraud
## The Credit Agreement





**If  LOPE is hiding all these expenses on this off-balance sheet entity (GCU) while recognizing the revenue at LOPE, wouldn't that mean that GCU's finances would be upside down as the university would burn massive amounts of cash with no profits?**

The answer is **YES,** and it is all covered up via the Credit Agreement, which allows GCU to close the loop and complete the scheme.

GCU would obviously need to receive funding from somewhere in order to fund cash burn or else the entity would go bankrupt.  LOPE therefore structured a Credit Agreement with GCU where GCU would be indebted to LOPE yet **essentially receive an endless line of credit while also allowing LOPE management to conceal the financial results and condition of GCU.**

**Important to note that because this debt is private between LOPE / GCU, LOPE never has to disclose the financials of GCU to the world.**

There is no judge or SEC commissioner who can think of this arrangement as anything other than a "rigged transaction".

The Credit Agreement provides for **three opaque sources of credit** to prop up GCU which management has either not disclosed at all or attempted to explain away through fictitious claims of "one-time in nature":

- **CapEx Loan**

- **Accounts Receivable Loan**

- **Undisclosed additional sources of secured credit**

We will now explore each of these sources of credit in depth.



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com



**The first source of credit that LOPE is providing to GCU is the CapEx Loan:**

- The definition of the CapEx loan (From the Credit Agreement):

  > "Subject to the terms and conditions set forth herein, the Lender agrees to make loans (each such loan, a "CapEx Loan") to the Borrower in Dollars from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the CapEx Commitment [of $200mm]"

- <u>**Management has attempted to explain this away as a one-time loan to GCU to fund new dormitory construction, but the recurring and ever-escalating nature of the loan and management's perpetual "moving of the goal posts" regarding the amount available and term of loan says otherwise:**</u>

  - Through the first 12 months of the separation (period ending 6/30/2019), LOPE's "CapEx Funding" to GCU totaled $200 million. This is despite the following disclosure in the credit agreement and LOPE's Q2'18 10-Q:

    > "Funding expectations for future capital expenditures for New GCU are $65 million for the six months ended December 31, 2018, and $100 million for the year ended December 31, 2019."

    - In other words, LOPE funded $200 million across 12 months relative to its projection of $165 million across 18 months

- <u>**Additionally during Q3'19 earnings, LOPE also announced that:**</u>

  > **"The second amendment to our credit facility, described above, increased the total principal amount that the Company may have outstanding at any one time under its credit agreement with GCU in the form of loans to GCU to finance capital expenditures by GCU <span style="color:red">from $200.0 million to $300.0 million."</span>**



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



**Q1'19 Earnings Transcript:**

- "We funded CapEx on behalf of GCU through the secured notes of approximately $30 million in the first quarter of 2019, and <u>still expect to fund approximately $100 million in 2019</u>"

- "Based on recent conversations with GCU, it continues to be likely that the university will not request us to continue to fund its CapEx after this year as the university anticipates <u>they will be able to fund its own CapEx moving forward</u>"

**Q2'19 Earnings Transcript:**

- "Based on recent conversations with GCU, it continues to be likely that the University will not request us to continue to fund its CapEx after this year as the University anticipates <u>they will be able to fund its own CapEx moving forward</u>"

**Q3'19 Earnings Result:**

- "The second amendment to our credit facility, described above, increased the total principal amount that the Company may have outstanding at any one time under its credit agreement with GCU in the form of loans to GCU to finance capital expenditures by GCU <u>from $200.0 million to $300.0 million</u>"

<span style="color:red"><u>**Brian Mueller, in conversations with himself, thought it was likely that GCU would be able to fund its own CapEx throughout 2018 / 2019. Then Q3'19 comes and the Company increases the CapEx commitment from $200mm to $300mm.**</u></span>

<span style="color:red"><u>**Management has consistently put out targets for the CapEx loan balance and blown past every projection, going so far as to promise self-sufficiency for GCU on CapEx and then two months later turn around and raise the total commitment amount by 50%.**</u></span>



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



**The second source of credit that LOPE is providing to GCU is the Accounts Receivable Loan:**

- At the time of the spin, the Accounts Receivable balance at consolidated LOPE was precisely <u>zero</u>

  - Five quarters later, <u>the Accounts Receivable balance is $83.4mm</u>, entirely composed of cash outflows on LOPE's income statement of $51mm in 2018 and $34mm in 2019 for "Accounts receivable from GCU"

  - This bears worth saying again – GCU literally cannot even afford to pay its 60% fee to LOPE.  LOPE wants to recognize this as income, so they keep the ratio at 60%, but this has been a huge and building drain on FCF as a result

  - This will show up as a rapidly building Accounts Payable and Accounts Receivable balance on GCU and LOPE's financial statements, respectively.  But, it will inflate "operating cash flows" for GCU to allow LOPE management to distort the truth

- **Furthermore, the credit agreement also provides for a clever mechanism by which accrued payables at GCU can build at minimal interest so as not to set off warning bells.  From the Credit Agreement:**

  - "5.2 Delinquent Payments. Services Fees due under this Agreement that are not paid or not reasonably and in good faith disputed by University in writing within thirty (30) days of the date of an invoice therefor, with such written notice detailing why such disputed fees are not due, shall <u>accrue simple interest at the prime rate as quoted in the Wall Street Journal plus one percent (1.0%) per annum</u> or, if lower, the maximum rate permitted by Applicable Law, from the date due until paid in full"

  - What this means that is if GCU, a cash burning significantly levered entity, is delinquent on a payment, they must pay simple interest at the prime rate plus 1%

  - **Think about what you are charged when delinquent on any sort of payment**

  - <span style="color:red">**Citron Takeaway:  LOPE is clearly setting the interest rate as low as possible here because they anticipated GCU being unable to pay its bills on time due to the structure in the MSA.  By setting an artificially low interest rate, LOPE allows the Accounts Receivable line on its balance sheet to not balloon out of control and set off warning bells amongst the investor base**</span>



© Copyright 2020   Citron Research   www.citronresearch.com

**All Inquiries:** info@citronresearch.com

**The third source of credit is undisclosed secured debt which GCU is taking on:**

- **Citron discovered this source after examining the Arizona state's UCC filings**

- **GCU is taking out more and more debt securitized by virtually every asset of the private off-balance sheet entity in order to feign a healthy financial state / ability to repay the CapEx loan to LOPE shareholders**

  - UCC Filings

- Note this specific UCC filing, which was filed for a loan given to GCU in September (conveniently raised directly before GCU was able to "repay" the $60 million in CapEx)

  - TCF National Bank Loan

  - "This debt is collateralized by any and all of the debtor's accounts, money, general intangibles, instruments, documents and chattel paper."

**Q3'19 Earnings Transcript:**

- No additional funding was provided at GCU for capital expenditures in the third quarter of 2019. **GCU repaid $60 million on the outstanding loan during the third quarter of 2019** and another $40 million in October





**So while LOPE is telling shareholders that the financial condition at GCU is healthy because they are repaying its debt, they are concealing that:**

- This is NOT being paid from FCF, it is being paid from raising more and more secured debt from both LOPE (CapEx / AR) and other creditors (UCC Filings)

- GCU itself is burning a <u>significant</u> amount of cash per year and is only being kept afloat by the "CapEx loan", the Accounts Receivable "loan", and continued debt raises securing everything from all property, to intangibles, to the equipment at the University itself (see other UCC filings)

- By our estimate (more on this later), GCU currently has over $1.2 billion of gross debt, a ~$100mm Accounts Payable balance, zero net income, and burning $100mm+ of cash per year!

- **If GCU was a public Company, it would be BANKRUPT**

**The bottom line on the Credit Agreement is it is a vehicle to cover up the unsustainable fraudulent revenue split of the MSA (the Blueprint).**

- By providing GCU with virtually unlimited access to credit from LOPE in the form of Accounts Receivable and CapEx loans (and raising secured debt at GCU without disclosing), LOPE can continue "charging" GCU 60% of total revenue as a fee despite GCU having nowhere near the cash flow to service the fraudulent MSA revenue split. They then recognize this as income and divert Wall Street's attention away from the complete lack of FCF

**A final question: is GCU falsely capitalizing operating expenses as capital expenditures to help inflate its reported net income (a positive net income reported at GCU is necessary for the DoE's Composite Ratio for universities)?**

- While we can not definitely prove this as we can not see detailed financial statements for GCU, the off-balance sheet entity, we will leave this analysis here and let you be the judge

  - In the last full year of consolidated Grand Canyon (2017), the total CapEx of the Company was $124 million

  - In the first full year of two separate entities, the consolidated CapEx has doubled to $226 million

|  | LTM 6/30/2019 | 2017 |
|---|---|---|
| CapEx Spent At GCU | $199.8 | |
| CapEx Spent At Lope | $25.7 | |
| **Total CapEx** | **$225.5** | **$124.0** |

 © Copyright 2020    Citron Research    www.citronresearch.com    **All Inquiries:** info@citronresearch.com



# Section III

## The Cash Doesn't Lie





Through LOPE's fraudulent accounting of allocating significant amounts of expenses to its off-balance sheet entity while recognizing the revenue itself, LOPE management is artificially inflating its earnings, margins, and stock multiple

- In 2012 – 2017 as a consolidated entity, LOPE converted cash at an already low ~30% of net income and its OCF conversion was ~150%
- **Red Flag:** Post separation, LOPE is converting net income to cash at a **FIVE** percent rate and net income to OCF at only ~105%
  - This is due to the money it needs to funnel to the off-balance sheet entity (through AR and CapEx) to keep it afloat
  - Note that normally one would include the repayment by GCU in FCF but since it is being repaid via hidden leverage at the off-balance sheet entity, this would effectively be a pass-through of a cash flow from financing item (i.e. not operational cash flow repayment)

| | 2012-2017 Avg | 2019 YTD |
|---|---|---|
| Net Income | $125.5 | $182.5 |
| | | |
| Cash Flow From Operations | $192.9 | $195.1 |
| CapEx | ($140.3) | ($15.2) |
| Purchases of Land & Buildings | ($17.7) | $0.0 |
| Funding to GCU for CapEx | $0.0 | ($169.8) |
| **Total Free Cash Flow** | **$34.8** | **$10.1** |
| **Cash Conversion (% Of Net Income)** | **27.8%** | **5.6%** |
| Cash Flow From Operations / Net Income | 153.7% | 106.9% |
| Repayment by GCU[1] | $0.0 | $100.0 |

© Copyright 2020   Citron Research   www.citronresearch.com



**All Inquiries:** info@citronresearch.com

# Section IV

## Juxtaposing LOPE / GCU With Zovio / Ashford



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



The sheer insanity of everything from the financial terms of the LOPE / GCU agreement, to the governance and pre-conversion process, is laid bare when compared to another public Company spin-off of a non-profit occurring now: Zovio / Ashford

| LOPE / GCU | | Zovio / Ashford |
|---|---|---|
| LOPE receives 60% of all revenue while providing typical OPM services | **Financial Terms** | Very similar to Kaplan / Purdue; Zovio receives expense reimbursement and a **MAX** of 19.5% of tuition and fees if Ashford achieves financially sustainable metrics. Ensures a maximum operating margin of ~20% |
| Pushed forward with the conversion without counseling the DoE and without asking for any sort of pre approval or permission.  Likely assumed that if they went ahead and completed the transaction, the DoE would relent and allow the transaction to go through by virtue of "the ink being dry" | **Pre-Acquisition Cooperation With DoE** | Worked cooperatively with the DoE to establish parameters that would ensure approval of the transaction.  CEO Clark said Zovio and Ashford would "prefer to have the department's view", provided through its review, before going forward |
| GCU issues an $870mm Secured Credit note directly to LOPE, which ensures it never has to file public financials, while also offering unlimited sources of secured credit (CapEx / Accounts Receivable).  Credit line loaned at a comically low ~6% rate, with delinquent payments charged a simple interest rate of the WSJ prime rate + 1% | **Non-Profit Credit Line** | Securing a syndicated $103mm senior secured term loan facility (with outside investors) to finance a letter of credit the DoE requires.  Ashford (private entity) will have to report financials to holders of this facility.  The interest rate is forecast to be between 18-22% (a realistic market rate) |
| CEO Brian Mueller appointed President of both GCU and LOPE | **Board Independence** | Completely independent board of trustees formed to negotiate on behalf of non-profit Ashford |
| LOPE pro-forma EBITDA margins of ~45% (Ex. Orbis), a 4000bps premium to peers | **Financial Result** | Zovio pro-forma EBITDA margins of ~9%, at high end of OPM peers |



© Copyright 2020   Citron Research   www.citronresearch.com                    All Inquiries: info@citronresearch.com

# Section V

## Former Deputy Undersecretary of the DoE Validates Our Conclusion





- [Bob Shireman](), who has an accomplished track record as:

  - An expert on higher education policy. Served in two presidential administrations, including the former Deputy Undersecretary of the DoE under the Obama administration. Current Senior Fellow at the Century Foundation. Master's in Education From Harvard

- Had this to say about Grand Canyon:


**Bob Shireman**
@Bob_Shireman

Grand Canyon University, which claims to be nonprofit, had a call with its investors (!) and bragged about the "tailwind" that its (seriously corrupted) nonprofit claim has had in its marketing, with a "record 7000 new students."


**Bob Shireman**
@Bob_Shireman

The resulting operating margin for the for-profit is 34.3%, triple the typical. The margin is not required to be plowed back into the university as it would be if a real nonprofit, but instead goes to investors including the CEO, which would be illegal at a real nonprofit.


**Bob Shireman**
@Bob_Shireman

The U.S. Department of Education did the right thing here, refusing to treat an obviously for-profit school as a nonprofit. The law does not allow ED to simply accept an IRS letter, the agency must agree that the school is not structured for profiteering, which GCU obviously is.


**Bob Shireman**
@Bob_Shireman

Federal Student Aid issued a 16-page letter in response to Grand Canyon University's claim to be a nonprofit despite contracting out most of the work to the for-profit company. Summary: it's a sham. Some highlights:

Having reviewed voluminous materials provided to it, the Department has concluded that the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity. Notably, the Executive Summary of the Barclays Report includes the following:

 RESEARCH    © Copyright 2020    Citron Research    www.citronresearch.com    **All Inquiries:** info@citronresearch.com



# Section VI

## LOPE's Response To the DoE Validates Citron's Conclusion of Fraud





**Grand Canyon Education's rebuttal to the DoE contains outright lies and diversions, the most egregious of which are:**

- **LOPE's attempt to deflect the truth by focusing on the school's accolades**

  - *"Perhaps most disappointing, however, is the Department's failure to acknowledge the accomplishments that have occurred at GCU, both before and since the transaction closed – from an institution that was on the verge of closing more than a decade ago, to one that today is extremely important to the City of Phoenix, the State of Arizona and hundreds of thousands of students and alumni across the world"*

  - Enron, Worldcom, and Valeant all had real businesses.  We are not contending that GCU's campus doesn't exist or that they do not have alumni.  We are contending that, like the three previously mentioned companies, they are committing serious financial fraud

- **As stated in the DoE letter, LOPE's claim that Deloitte was hired as an "independent" consultant is as comical as the MSA itself**

  - *"GCU did engage Deloitte to provide the transfer pricing analysis"*

  Let's examine the statements and disclaimers in the Deloitte report and see how "independent" this was:

  - "The first step was to identify the assets and activities of the enterprise that generate revenue. Based on "fact finding discussions with key management personnel" – **which at the time would have consisted solely of GCE [LOPE] management**"

  - **"It also bears mentioning that the main opinions in the Deloitte Report do not appear to be based on information that Deloitte independently tested and analyzed on behalf of Gazelle. Rather, those opinions in key areas appear to have been based on information supplied by GCE management. For example, Deloitte states that it identified revenue-generating activities based on "fact finding discussions with key management personnel," that the classification of fixed costs was made "in conjunction with GCE management", and that the calculation of the share of fixed costs Gazelle and GSA would each pay under the MSA was determined by "Deloitte Tax and GCE"**

  LOPE's response to the fairness of the MSA rests solely on the Deloitte report, which the DoE accurately stated is <span style="color:red">**"devoid of any information that would allow the Department to access the accuracy of reasonableness of this conclusion"**</span>

    © Copyright 2020    Citron Research    www.citronresearch.com          **All Inquiries:** info@citronresearch.com



Grand Canyon Education's rebuttal to the DoE contains outright lies and diversions, the most egregious of which are:

- GCU claims the IRS did extensive diligence on granting the private entity it's tax exempt status and the DoE should therefore defer to them:
  - *"Furthermore, in contrast with the Department's refusal to speak with GCU, during the period when GCU's 501(c)(3) application was under review and thereafter in connection with further efforts to structure the relationship between GCE and GCU, GCU and its tax advisors engaged in multiple discussions with IRS staff...Because the IRS is the agency tasked with determining an entity's 501(c)(3) tax exempt status, GCU believes that the IRS's determination that an institution qualifies as a 501(c)(3) tax exempt entity (and, by definition, satisfies the Operational Test) should be given appropriate deference by the Department in making its decision"*
  - <u>In actuality, the IRS only conducted 24 days of diligence reviewing GCU's application versus the ~2 years of review conducted by the DoE</u>



Bob Shireman @Bob_Shireman · Nov 13, 2019

Why did the IRS approve the nonprofit? We have the application and it appears to have been rubber-stamped by the IRS -- approved 24 days after receipt, an even shorter time than the Remington example we cited four years ago

Dear Applicant,
We are pleased to inform you that upon your review of your tax exempt status we have determined that you are exempt from Federal income tax under section 501 (c)(3) of the Internal Revenue Code.



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com


**Grand Canyon Education's rebuttal to the DoE contains outright lies and diversions, the most egregious of which are:**

- **LOPE claims GCU is in "strong financial health"**

  - *"More broadly, the HLC's analysis has been confirmed in the time since the Transaction closed. GCU's revenue net of expenses and revenue net of expenses after interest for the year ended June 30, 2019, its first fiscal year of operations as a stand-alone tax-exempt educational institution, were $78.8 million and $26.1 million, respectively. In addition, for the year ended June 30, 2019, GCU generated over $123 million in operating cash flows and, as of June 30, 2019, held over $325 million in cash reserves"*

  - As we have illustrated in Section II on the Credit Agreement, this is blatantly misleading for a number of reasons:

    - GCU's operating cash flows are inflated by the Accounts Receivable loan

    - Even GCU's reported / inflated operating cash flows are not even enough to cover its CapEx, which was $200mm in the same 12 month period per GCU disclosures

    - Beyond credit extended to GCU via LOPE (CapEx / AR), the University has also been drawing down on additional unreported / opaque lines of secured credit (UCC Filings)

  - LOPE is attempting to portray a strong financial condition by using a period end cash balance which has been inflated by all these credit lines as well as an operating cash flow metric which is distorted by a working capital loan (and isn't even enough to cover CapEx in any case; notice how they do not mention total cash flow for the 12 month period).  Moreover, this cash balance is a **blatant distortion** because:

    - $60 million of that cash was used to "repay LOPE" in Q3.  More importantly, $100 million of that cash balance is what historically was called "Restricted Cash" when GCU / LOPE were consolidated:

      - Restricted cash and cash equivalents primarily represent amounts received from the federal and state governments under various student aid grant and loan programs, such as Title IV. The University receives these funds subsequent to the completion of the authorization and disbursement process and holds them for the benefit of the student. The U.S. Department of Education ("Department of Education") requires Title IV funds collected in advance of student billings to be restricted until the course begins

    - This cash has an exact matching line item in liabilities called "Student Deposits". This is not real cash – it is essentially a short-term loan from the government



© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



**Through our FOIA, we were able to obtain Grand Canyon University's initial application to the DoE for non-profit status and found it riddled with lies and inconsistencies.  This letter is dated January 10th, 2018:**

> "The revenue share between the two entities remains subject to completion of a transfer pricing study and subsequent negotiation, but is expected to be comparable to other shared services arrangements currently in use in the higher education marketplace"

- This is a clear lie as per our earlier analysis, it is virtually unprecedented for an OPM to take revenue splits on off-line revenues (e.g., meal plan, campus tuition, arena ticket sales, etc.)

**From the GCU response letter to the DoE dated November 12th, 2019, the Company states:**

> "It is also important to note that the decision to employ Mr. Mueller was made independently by both GCU's Board of Trustees and GCE's Board of Directors, each of which is fully independent of the other, with no overlapping members"

- But this is an outright fabrication as in the DoE application, GCU lists its current Board of Trustees which INCLUDED all the current LOPE directors.  Remember the date on the DoE application – January 10th, 2018.  The trustees who were on GCU's board did not resign until June 1st (application says April 1st because that is when it was slated to close, but it was delayed).  It was not until <u>August 2018</u> that three new outside trustees were elected to the GCU Board of Trustees

- **<span style="color:red">This is a very important distinction that lawyers will have a field day with.  The Board of Trustees who elected Brian Mueller to its board in late 2017 had all the current LOPE directors sitting on it at the time</span>**

20. Check here if you have a board of trustees.
    Check here if you have a board of directors.
    Check here if you have more than 10 on your board, list only the board's executive committee, and provide the name of a contact person in Question 21.

| Name | End Date |
|------|----------|
| Mr. Brian E. Mueller | |
| Mr. David Johnson | 04/01/2018 |
| Mr. Jack Henry | 04/01/2018 |
| Mr. Kevin Warren | 04/01/2018 |
| Ms Sara R. Dial | 04/01/2018 |
| Mr. Wilfred Gonzales | |
| Mr. Fred Miller | |
| Mr. James Rice | |
| Mr. Donald Andorfer | |



© Copyright 2020    Citron Research    www.citronresearch.com

All Inquiries: info@citronresearch.com

# Section VII
## Management's History & Motivations





As crazy as it may seem, the management of LOPE, has had a history of SEC violations.  Normally, this would preclude you from you running a public company.  In this instance, we believe management's current violations will end up being criminal.  Below is a brief history of the top LOPE executives who have orchestrated this scheme.

**Brian Mueller – Chief Executive Officer**

- Chief Operating Officer / President of Apollo Group from 1997 to 2008

  - The Company was charged and sued multiple times by federal regulators for a myriad of improprieties committed under Brian Mueller's watch
    - https://www.whistleblowersblog.org/2009/12/articles/false-claims-qui-tam/university-of-phoenix-settles-whistleblowers-fraud-claim/
    - https://www.bizjournals.com/wichita/stories/2004/09/13/daily21.html
    - https://oregonbusinessreport.com/2010/10/oregon-wins-10-million-lawsuit-against-university-of-pheonix/

**Dan Bachus – Chief Financial Officer**

- Chief Accounting Officer and Controller of Apollo Group (owners of University of Phoenix) from 2000 to 2006
  - Forced to resign due to options scandal in 2006, the charges of which Apollo settled in 2008
    - At the time, then **CEO Brian Mueller** stated that the internal probe had found a "flawed" options-granting plan, and "irregularities with regard to the process" of awarding options. "That's why we made the announcement we did today, and announced there were a couple of people who are no longer with us."
    - In March, the company's share price dropped 27 percent in a day following the loss of a class-action lawsuit filed over illegal stock option pricing
- Chief Financial Officer of Loreto Bay Company from 2007 to 2008
  - Company promptly went bankrupt, leaving consumers who had purchased unfinished homes in the to-be-developed community out of luck (lawsuits ensued)
- Chief Financial Officer of LOPE since 2008
  - Amazingly Bachus was rehired by the same person who "fired" him for committing fraud.  A classic. "let's put the gang back together" scheme





**Stan Meyer – Chief Operating Officer**
- Former Executive Vice President at Apollo Group from 2002 to 2008

**Joseph Mildenhall – Chief Information Officer**
- Former Chief Information Officer and Director at Apollo Group from 1998 to 2009

**Dilek Marsh – Chief Data Officer**
- Former Vice President of Business Intelligence at Apollo Group from 1998 to 2006

**Junette West – Chief Financial Officer at GCU**
- Former VP of Finance at Apollo Group from 1998 to 2014

**The bottom line is this is a management team with misleading/deceptive practices as part of their playbook.**



© Copyright 2020   Citron Research   www.citronresearch.com

**All Inquiries:** info@citronresearch.com

**Whenever we suspect a Company of committing fraud, we like to evaluate management's actions within the context of the Fraud Triangle framework to determine whether the three conditions exist which would motivate a Company to commit fraud**



**Pressure**
Motivation or Incentive to Commit Fraud

**Rationalization**
Justification of Dishonest Actions

**FRAUD**

**Opportunity**
The Knowledge and Ability to Carry Out Fraud

**There exists plenty of incentive / pressure for LOPE management to perpetrate this fraud:**

- **Management has gotten very wealthy off this fraud**
  - See following slide for insider sales
  - For context, the highest paid current non-profit University President makes $4mm per year

**Look no further than GCU's response to the DoE letter to see its justification for dishonest actions. Much of the letter is spent touting the virtues of the University, a topic which was never even addressed by the DoE:**

"Perhaps most disappointing, however, is the Department's failure to acknowledge the accomplishments that have occurred at GCU, both before and since the transaction closed – from an institution that was on the verge of closing more than a decade ago, to one that today is extremely important to the City of Phoenix, the State of Arizona and hundreds of thousands of students and alumni across the world."

"Again, perhaps most importantly, GCU's success has been accomplished without the University raising tuition at its ground campus for 12 straight years, with tuition holding at $16,500 per year, and with only nominal 1% tuition increases for its online campus over the last 10 years."

"A tremendous benefit of the University's low cost of attendance is that the University has created one of the most diverse student bodies in the country with its ground campus student body consisting of 47% students of color, including 29% Hispanic and 7% African-American."

**Management has created a opaque closed loop system to execute this fraud:**

- GCU issued the Senior Note directly to LOPE, which enables them to not have to report financials publicly (i.e. no public debt)

- The CEO's are the same and every corporate function at GCU is outsourced to LOPE management, which obviously allows them to allocate all accounting and financial items as they see fit


Citron RESEARCH

© Copyright 2020    Citron Research    www.citronresearch.com

**All Inquiries:** info@citronresearch.com



As LOPE management has been committing this egregious fraud, they have been quickly dumping stock.

**Below is a quick summary of LOPE insider sales over the past 5 years:**

| Insider Name | $ Amount Sold | Average Price |
|---|---|---|
| Chairman/President/CEO and GCU President Brian Mueller | $96 Million | $65.38 |
| COO Stan Meyer | $46 Million | $72.98 |
| CFO Dan Bachus | $37 Million | $76.25 |
| Chief Information Officer Joseph Mildenhall | $21 Million | $71.56 |
| CAO/General Counsel/Secretary Brian Roberts | $3 Million | $48.61 |
| Former Chairman Brent Richardson | $3 Million | $48.04 |
| Chief Data Officer Dilek Marsh | $1 Million | $127.56 |
| Board member Jack Henry | $500 Thousand | $78.41 |

 © Copyright 2020    Citron Research    www.citronresearch.com          **All Inquiries:** info@citronresearch.com

LOPE's latest proxy shows that top management is eligible for a bonus based "on the achievement of company-wide revenue and adjusted EBITDA targets". Given that Mueller is also the President of GCU, this creates a massive conflict of interest as Mueller is being compensated for reporting strong financials at LOPE while being the head of LOPE's captive client GCU.

This odd corporate structure along with greed has fueled the creation of this accounting fraud. LOPE management is aware that this "transaction" is nothing more than an unsustainable scheme to manipulate publicly reported financials in order to juice the stock higher so management can unload stock.

CEO Brian Mueller, COO Stan Meyer, and CFO Dan Bachus have all been with LOPE since the company's IPO in 2008. In October 2014, LOPE publicly announced an effort to convert to non-profit. Since the hype of this "transaction", management has taken the opportunity to dump stock into the market.

**Below is a table with the insider sales of these three top LOPE executives:**

| Insider Name | $ Amount Sold From Oct. 2014 to Present | $ Amount Sold From 2008 to Oct. 2014 |
|---|---|---|
| Chairman/President/CEO and GCU President Brian Mueller | $96 Million | $36 Million |
| COO Stan Meyer | $46 Million | $15 Million |
| CFO Dan Bachus | $37 Million | $17 Million |





# Section VIII

## Conclusion



© Copyright 2020     Citron Research     www.citronresearch.com                    **All Inquiries:** info@citronresearch.com

**Other Creditors (UCC Filings)**

**We told you not to panic! This should make sense now.**

GCU collateralizes more and more assets

Creditors loan more money to fund cash burn

LOPE Transfers Assets To GCU



GCU transfers $870mm Secured Note to LOPE

LOPE provides OPM Services while only recognizing minimal operating costs

GCU pays 60% of revenue for accounting recognition purposes

LOPE funds the cash burn at GCU (due to GCU only receiving 40% of revenue) through a CapEx and AR loan



**Net Result For LOPE**

**EPS**: Optically elevated due to full accounting recognition of 60% rev split
**FCF Conversion**: Collapsing as more debt floods out through receivables and capex loans
**Balance Sheet**: Accounts Receivables & Secured Note Receivable Balances Rising

**Net Result For GCU**

**Net Income** : GCU mgmt solves to breakeven (in order to salvage DoE Composite Score)
**FCF Burn**: ~$100mm+ per year due to improper expense allocation / revenue split
**Balance Sheet**: Accounts Payable, Secured Note Payable Balance, and Other Debt Balance all rising. Leverage rising fast.

——— Balance Sheet Items
– – – Income Statement Items
– – – Cash Flow Items

    © Copyright 2020    Citron Research    www.citronresearch.com    All Inquiries: info@citronresearch.com

**This is a clear violation of SEC rule 10b-5:**

- Rule 10b-5 is a catch-all provision that is perhaps the most important and widely used anti-fraud securities rule

- Violations of the rule include executives making false statements in order to drive up share prices, **a company hiding huge losses or low revenues with creative accounting practices**, or actions taken to grant current shareholders a better return on their investments (as long as the deception remains undiscovered). These schemes typically require ongoing, misleading statements in order to perpetuate the fraud

- Judge Lynch went on to highlight the underpinning for such a claim: "Indeed, the most basic element of all fraud claims is that the victim must be deceived by the perpetrator's words or actions." Judge Lynch recognized "several kinds of cognizable deception," including "misleading statements or material omissions" under Rule 10b-5(b), "market manipulation" under Rule 10b-5(a) and (c) (in which "instead of deceiving investors by making false statements, fraudsters… deceive investors by causing the market to make their false statements for them") and claims that are "inconsistent with a fiduciary duty" (in which case "the fiduciary duty serves as a sort of standing false representation by the fraudster, who deceives the victim by violating the commitment associated with her fiduciary duty").

**The DoE's extensive research and knowledge of the LOPE/GCU relationship deemed them to be a related party engaging in an unfair transaction that was designed to benefit shareholders. Those are the words directly from the DoE and not Citron. It would be negligent for their auditors not to acknowledge PCAOB Auditing Standard No. 2410 (AS 2410) under the Sarbanes-Oxley Act of 2002 and not dig deeper into the fraud highlighted by Citron.**



Citron | RESEARCH     © Copyright 2020     Citron Research     www.citronresearch.com     **All Inquiries:** info@citronresearch.com

**LOPE is grossly overvalued regardless of fraud. Their margins are neither real nor sustainable, therefore, we must value LOPE vs. peers on EV/Sales. On this metric, LOPE trades at a 130% premium to for profit education peers and a 180% premium to industry leading OPM TWOU. Citron expects LOPE to see meaningful multiple contraction.**

**LOPE trades at 5.3x vs. for profit education peer average at 2.3x**

**LOPE trades at 5.3x vs. industry leading OPM TWOU at 1.9x**









Even during our initial take of Grand Canyon Education in September, we suspected that something simply did not add up with the numbers but did not devote much time to it due to a lack of supporting information.  The surprising, but obviously warranted decision, by the Department of Education to deny GCU non-profit status allowed us to dig deeper by submitting an FOIA request for all relevant documents of the transaction between Grand Canyon University and Grand Canyon Education ("LOPE").

The details and extent of the accounting fraud we found were shocking to us – though should not be entirely surprising given the management team's extensive history of fraud and financial improprieties.

**On top of all this, CEO Brian Mueller has sold ~$100mm of stock since the Company began to pursue this transaction, making him the single highest paid "educator" in the country.  COO Stan Meyer and CFO Dan Bachus have sold $46mm and $37mm, respectively.**

Moreover, it is important to note that the Department of Education is not some unreasonable entity that has it out for for-profit institutions.  On the contrary, this administration, if anything, is remarkably lenient under Betsy Devos.  The DoE took ~5 months to approve the Kaplan / Purdue and Zovio / Ashford (pre approval) transactions given proper cooperation from those entities.  The fact that they rejected LOPE / GCU only serves to highlight the extremely egregious nature of the transaction.

The DoE's extensive research and knowledge of the LOPE/GCU relationship deemed them to be a related party engaging in an unfair transaction that was designed to benefit shareholders.  Those are the words directly from the DoE and not Citron.  It would be negligent for their auditors not to acknowledge PCAOB Auditing Standard No. 2410 (AS 2410) under the Sarbanes-Oxley Act of 2002 and not dig deeper into the fraud highlighted by Citron.

If LOPE management disagrees with any of our factually supported allegations in this report, the answer is simple:

- **Release audited financial statements for Grand Canyon University (income, balance sheet, and cash flow).  Show the true financial state of Grand Canyon University through an objective financial picture.  This is what virtually every other non-profit University already does through their annual reports!**

  - To illustrate just how unprecedented it is that GCU does not file an annual report, compare them to Everglades University, Purdue University, Arizona State University, Liberty University, Fayetteville State University; all of which file annual reports

**<span style="color:red">In light of the significant fraud we have uncovered, we are lowering our Price Target from $30 previously to $0</span>**



© Copyright 2020    Citron Research    www.citronresearch.com        All Inquiries: info@citronresearch.com



# Appendix



© Copyright 2020   Citron Research   www.citronresearch.com

**All Inquiries:** info@citronresearch.com



Below is the slide that we presented in September that started our investigation.  At the time, we did not believe that a negative ruling on GCU's non-profit status was a potential risk as LOPE never disclosed it in its risk factors and sell side assumed approval was guaranteed.

# LOPE Might be Dead Already… SEC Should Investigate Immediately!

Moving costs to an off-balance sheet subsidiary is the oldest trick in the book. In a highly unusual move, GCU paid $875 million for the GCU campus and its assets through the issuance of a 7 year senior secured note.

Lope is not in the banking business  kept the note to avoid tapping the public markets to help structure this deal as it would require increased disclosure.

What is GCE hiding?  Citron believes GCE is stuffing GCU with expenses to inflate its own profitability and as a result bankrupting GCU.  After thoroughly reviewing LOPE's filings, we discovered a **MAJOR RED FLAG.**

In LOPE's 10-K filing, the company notes that:  *"Funding expectations for future capital expenditures for GCU are* **$100 million** *for the year ended December 31, 2019."*

However, LOPE's latest 10-Q filing reveals that funding to GCU for CapEx is **$170 million** in just the first 6 months of 2019.

Is GCE taking its own OpEx and booking it as CapEx for GCU?
**If there is not a perfect explanation for these accounting shenanigans, LOPE is going to ZERO!**

| (In thousands) | Six Months Ended June 30, 2019 | 2018 |
|---|---|---|
| Cash flows provided by operating activities: | | |
| Net income | $ 124,355 | $ 119,719 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Share-based compensation | 5,185 | 6,734 |
| Provision for bad debts | | 8,669 |
| Depreciation and amortization | 9,065 | 27,971 |
| Amortization of intangible assets | 3,865 | — |
| Deferred income taxes | 1,373 | 1,246 |
| Loss on transaction, net of costs and asset impairment | 3,966 | 1,990 |
| Other, including fixed asset impairments | (285) | 1,018 |
| Changes in assets and liabilities: | | |
| Accounts receivable and interest receivable from university partners | 41,056 | — |
| Accounts receivable | — | (7,784) |
| Prepaid expenses and other | (2,220) | (78) |
| Right-of-use assets and lease liabilities | 147 | — |
| Accounts payable | (102) | (1,373) |
| Accrued liabilities | 1,746 | 512 |
| Income taxes receivable/payable | (8,812) | (14,365) |
| Deferred rent | — | (189) |
| Deferred revenue | 9,996 | 6,880 |
| Student deposits | — | (7,288) |
| Net cash provided by operating activities | 189,335 | 143,662 |
| Cash flows used in investing activities: | | |
| Capital expenditures | (9,656) | (79,166) |
| Additions of amortizable content | (228) | — |
| Funding to GCU for capital expenditures | (169,819) | — |



These reports have been prepared by either Citron Research ("Citron Research") or Citron Capital, LLC ("Citron Capital"). Citron Research and Citron Capital are referred to collectively as "Citron" and each individually as a "Citron Entity." Each report specifies the publisher and owner of that report. All reports are for informational purposes only and presented "as is" with no warranty of any kind, express or implied. Under no circumstances should any of these reports or any information herein be construed as investment advice, or as an offer to sell or the solicitation of an offer to buy any securities or other financial instruments.

Citron Research produces research reports on publicly traded securities, and Citron Capital is an exempt reporting adviser filed with the California Department of Business Oversight. The reports are the property of the applicable Citron Entity that published that report. The opinions, information and reports set forth herein are solely attributable to the applicable Citron Entity and are not attributable to any Citron Related Person (defined below) (other than the Citron Entity that published the report).

By downloading, accessing, or viewing any research report, you agree to the following Terms of Use. You agree that use of the research presented in any report is at your own risk. You (or any person you are acting as agent for) agree to hold harmless Citron Research, Citron Capital and each of their affiliates and related parties, including, but not limited to any principals, officers, directors, employees, members, clients, investors, consultants and agents (collectively, the "Citron Related Persons") for any direct or indirect losses (including trading losses) attributable to any information in a research report. You further agree to do your own research and due diligence before making any investment decision with respect to securities of the issuers covered herein (each, a "Covered Issuer") or any other financial instruments that reference the Covered Issuer or any securities issued by the Covered Issuer. You represent that you have sufficient investment sophistication to critically assess the information, analysis and opinion presented in any Citron report. You further agree that you will not communicate the contents of reports and other materials made available by Citron to any other person unless that person has agreed to be bound by these Terms of Use. If you access, download or receive the contents of Citron reports or other materials on your own behalf, you agree to and shall be bound by these Terms of Use. If you access, download or receive the contents of Citron reports or other materials as an agent for any other person, you are binding that principal to these same Terms of Use.

As of the publication date of a Citron report, Citron Related Persons (possibly along with or through its members, partners, affiliates, employees, and/or consultants), Citron Related Persons clients and/or investors and/or their clients and/or investors have a position (long or short) in one or more of the securities of a Covered Issuer (and/or options, swaps, and other derivatives related to one or more of these securities), and therefore may realize significant gains in the event that the prices of a Covered Issuer's securities decline or appreciate. Citron Research, Citron Capital and/or the Citron Related Persons may continue to transact in Covered Issuers' securities for an indefinite period after an initial report on a Covered Issuer, and such position(s) may be long, short, or neutral at any time hereafter regardless of their initial position(s) and views as stated in the Citron research. Neither Citron Research nor Citron Capital will update any report or information to reflect changes in positions that may be held by a Citron Related Person.

This is not an offer to sell or a solicitation of an offer to buy any security. Neither Citron Research nor any Citron Related Person (including Citron Capital) are offering, selling or buying any security to or from any person through any Citron research reports. Citron Research is affiliated with Citron Capital. Citron Capital is an exempt reporting adviser filed with the California Department of Business Oversight and is not registered as investment adviser in any other jurisdiction. Citron Capital does not render investment advice to anyone unless it has an investment adviser-client relationship with that person evidenced in writing. You understand and agree that Citron Capital does not have any investment advisory relationship with you or does not owe fiduciary duties to you. Giving investment advice requires knowledge of your financial situation, investment objectives, and risk tolerance, and Citron Capital has no such knowledge about you.

The research and reports made available by Citron reflect express the opinion of the applicable Citron Entity as of the time of the report only. Reports are based on generally available information, field research, inferences and deductions through the applicable Citron Entity's due diligence and analytical process. To the best of the applicable Citron Entity's ability and belief, all information contained herein is accurate and reliable, is not material non-public information, and has been obtained from public sources that the applicable Citron Entity believe to be accurate and reliable, and who are not insiders or connected persons of the Covered Issuers or who may otherwise owe a fiduciary duty, duty of confidentiality or any other duty to the Covered Issuer (directly or indirectly). However, such information is presented "as is," without warranty of any kind, whether express or implied. With respect to their respective research reports, Citron Research and Citron Capital makes no representation, express or

implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. Further, any research report contains a very large measure of analysis and opinion. All expressions of opinion are subject to change without notice, and Citron does not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them.

In no event shall Citron Research, Citron Capital or any Citron Related Persons be liable for any claims, losses, costs or damages of any kind, including direct, indirect, punitive, exemplary, incidental, special or, consequential damages, arising out of or in any way connected with any information presented in any Citron report. This limitation of liability applies regardless of any negligence or gross negligence of Citron Research, Citron Capital or any Citron Related Persons. You accept all risks in relying on the information presented in any report.

You agree that the information in any Citron research report is copyrighted, and you therefore agree not to distribute this information in any manner without the express prior written consent of the applicable Citron Entity. If you have obtained Citron research reports in any manner other than as provided by Citron, you may not read such research without agreeing to these Terms of Use. You further agree that any dispute between you and Citron and their affiliates arising from or related to this report or viewing the material presented herein shall be governed by the laws of the State of California, without regard to any conflict of law provisions. The failure of Citron Research or Citron Capital to exercise or enforce any right or provision of these Terms of Use shall not constitute a waiver of this right or provision. You agree that each Citron Related Person is a third-party beneficiary to these Terms of Use. If any provision of these Terms of Use is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of these Terms of Use remain in full force and effect, in particular as to this governing law and jurisdiction provision. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to Citron report or related material must be filed within one (1) year after the occurrence of the alleged harm that gave rise to such claim or cause of action, or such claim or cause of action be forever barred.



© Copyright 2020　Citron Research　www.citronresearch.com

**All Inquiries:** info@citronresearch.com