**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

*In re Grand Canyon Education, Inc. Securities Litigation*

Civil Action No. 20-639-MN-CJB

**SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

ECF CASE

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 10

III. THE PARTIES .......... 11

A. Lead Plaintiffs .......... 11

B. Defendants .......... 11

IV. BACKGROUND .......... 13

A. For-Profit Education Companies Earned A Reputation For Exploitation .......... 13

B. 2014: Grand Canyon's First Failed Non-Profit Conversion .......... 15

V. DEFENDANTS' FRAUDULENT SCHEME .......... 20

A. The Trump Administration Enacts Favorable Policies and Positions Toward For-Profit Educational Institutions .......... 20

B. The Trump Administration Reverses Course on For-Profit Conversions .......... 22

C. Grand Canyon Submits A Renewed Application To HLC .......... 26

i. HLC's Review Was Unusually Short And Abridged .......... 29

ii. Grand Canyon Filed Its DOE Application Late And Pressured HLC to Violate Its Own Requirement Of DOE Pre-Acquisition Review .......... 30

E. Grand Canyon Touts The Importance Of Non-Profit Status .......... 34

F. Defendants Claimed That The Proposed Conversion Closely Followed The Structure Of Other Proposed Conversions .......... 36

G. January 2018: Grand Canyon Submits Pre-Acquisition Review To DOE .......... 39

i. Grand Canyon Announces Conversion Will Not Be Completed Until The DOE Grants Its Approval .......... 39

ii. For-Profit Conversions Invite Public and Political Scrutiny and Lead to Failures .......... 40

iii. Unbeknownst To Investors, The DOE Indicates To Defendants That Approval Of The Conversion Would Be Much More Difficult Than Defendants Had Indicated To The Public .......... 41

iv. Grand Canyon Reverses Course And Moves Ahead With The Conversion Without DOE Approval In Hand .......... 44

v. The IRS Rubber-stamps New GCU's Tax-Exempt Status Without Substantive Review .......... 50

H. As A Purported Non-Profit Institution, New GCU Enjoyed Vast Marketing Benefits Over For-Profit Institutions Following The Conversion .......... 53

I. Following Completion Of The Conversion, Grand Canyon Announces Strong Results That Far Surpass Any Of Its Purported Peers .......... 57

J. In Reality, Defendants Lied About Their Business Model And Concealed The Risks of DOE Disapproval .......... 60

i. New GCU Was Not Independent From GCE .......... 61

ii. The Undisclosed Terms Of The Conversion Were Not "Mainstream" Or "Very Similar" To The Purdue-Kaplan Deal— They Overwhelmingly Benefited GCE at GCU's Expense .......... 64

iii. GCE Misled GCU's Transfer Pricing Advisor .......... 70

iv. Traditional Concerns About For-Profit Universities Were Realized By New GCU's Transformation After The Conversion .......... 71

K. Grand Canyon Violated GAAP .......... 75

i. Grand Canyon Was Required To Consolidate New GCU's Results .......... 75

a. New GCU Did Not Fall Within A Scope Exception Because It Was Not A Bona Fide Non-Profit .......... 77

b. Grand Canyon Was Required To Consolidate GCE's And New GCU's Financial Statements .......... 79

ii. Grand Canyon Violated GAAP Requirements For Related Party Disclosures .......... 81

VI. THE TRUTH EMERGES .......... 82

A. November 6-7, 2019: Grand Canyon Discloses That New GCU Failed To Meet The DOE's Definition Of A Non-profit .......... 83

B. January 28, 2020: Citron Research Exposes Grand Canyon's Scheme To Inflate Its Reported Financial Results By Using New GCU As An Off-Balance-Sheet Entity .......... 89

VII. POST-CLASS PERIOD EVENTS .......... 91

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 94

A. False And Misleading Statements Regarding New GCU's Purported Independence Made Before The Conversion..... 94

B. False And Misleading Statements And Omissions Regarding The Risks of DOE Denial Of The Conversion..... 98

C. False And Misleading Statements Regarding New GCU's Purported Independence Made After The Conversion ..... 100

D. False And Misleading Statements Regarding The Conversion's Similarity To Other Transactions..... 103

E. False And Misleading Statements Regarding Grand Canyon's Accounting And Compliance with GAAP ..... 107

IX. ADDITIONAL ALLEGATIONS OF SCIENTER..... 110

X. LOSS CAUSATION..... 123

XI. CLASS ACTION ALLEGATIONS ..... 125

XII. PRESUMPTION OF RELIANCE..... 126

XIII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR..... 128

XIV. CAUSES OF ACTION ..... 129

COUNT I ..... 129

COUNT II..... 130

XV. PRAYER FOR RELIEF ..... 132

XVI. JURY TRIAL DEMAND ..... 132

Lead Plaintiffs Fire and Police Pension Association of Colorado, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association Trust (collectively, "Lead Plaintiffs") bring this action individually and on behalf of all other persons who purchased the common stock of Grand Canyon Education, Inc. ("Grand Canyon," "GCE," or the "Company") between January 5, 2018 and January 27, 2020, inclusive (the "Class Period"), and were injured thereby (the "Class"). Lead Plaintiffs, by and through their undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.

Lead Plaintiffs' information and belief are based on, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Grand Canyon with the United States Securities and Exchange Commission ("SEC"); (ii) conference calls, press releases, and other materials issued and disseminated by Grand Canyon; (iii) analyst reports concerning Grand Canyon; (iv) reports and other materials issued by educational accreditation or regulatory bodies; (v) the November 6, 2019 letter from Michael J. Frola, the Director of Multi-Regional and Foreign Schools Participation Division of the U.S. Department of Education ("DOE"), denying Grand Canyon University's ("GCU") application for non-profit status, which quoted numerous confidential Company documents and analyses; (vi) thousands of pages of documents produced by the DOE in response to Lead Counsel's Freedom of Information Act ("FOIA") request; (vii) interviews conducted by Lead Counsel; (viii) one document selected by Grand Canyon from its files and provided to Lead Counsel; (ix) documents and electronically stored information provided by Karen Solinski, a former supervisory employee of the Higher Learning Commission ("HLC"); and (x) other public information regarding Grand Canyon. Lead Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a classic securities fraud. The CEO and CFO of for-profit education company Grand Canyon Education—Defendants Mueller and Bachus—misrepresented specific facts about their plan to spin off Grand Canyon University as a "non-profit" university ("New GCU"). They repeatedly claimed that the spinoff (the "Conversion") was virtually identical to other approved transactions, that the university would be independent and under separate management, and that GCE would simply act as a third-party services provider to the university.

2. These claims allowed GCE to evade the "stigma" of the for-profit education industry and successfully market New GCU as a non-profit institution of higher education for 18 months during the Class Period, driving higher enrollment and boosting GCE's profit margins. The market reacted positively to Defendants' claims because, as one market commentator on higher education noted, by the beginning of the Class Period, "the for-profit brand [was] completely destroyed." Grand Canyon's rebranding drove GCE's stock price to shoot up nearly 50% over the course of the Class Period.

3. Defendants' representations were false. During the Class Period, Defendants intentionally misstated fundamental facts about the relationship between GCE and New GCU, which prevented investors from having complete and accurate information to evaluate the risk that New GCU was not, in fact, a non-profit university. As the Department of Education ("DOE") later stated, New GCU violated "the most basic tenet of nonprofit status": independence from a profit-seeking enterprise like GCE. Although Defendants repeatedly claimed that no employees (besides Mueller) had a "a dual role in both organizations," the vast majority of the GCE executive team indeed held a "dual role" in managing New GCU. Further, while Defendants claimed that the

Conversion was simply a replica of other contractual relationships between a for-profit company and a non-profit university, the relationship between GCE and New GCU differed in key, undisclosed ways that Grand Canyon concealed from its shareholders, the DOE, and its own internal advisors.

4. The Class Period begins with the Company's January 5, 2018 announcement that Grand Canyon had applied to its regional accreditation body, HLC, for accreditation of New GCU as an independent entity from GCE. Grand Canyon also submitted a "pre-acquisition" application to the DOE for recognition of New GCU as a non-profit.

5. While for-profit institutions had increasingly sought to pursue non-profit conversions to avoid the negative perceptions of the industry that arose following numerous for-profit scandals, before the Class Period, the DOE had made it clear that it would exercise independent scrutiny of such applications. The DOE publicly proclaimed that, "[i]f the primary beneficiary of the conversion is the owner of the for-profit school, that doesn't meet the bar [of non-profit status]. It's not even close." That policy position was consistent with criticisms of conversions by industry analysts, who had characterized the colleges as "covert for-profits"—that is, "schools [that] obtain the nonprofit label yet continue operating like for-profit institutions."

6. Indeed, Grand Canyon tried and failed before the Class Period to push through a non-profit Conversion of GCU in 2016, which was met with a resounding rejection by HLC. To add insult to injury, DOE staff told Grand Canyon at the time that, even if HLC had accredited GCU, the structure of the conversion would have run into serious headwinds at the DOE. As a result, in a private meeting with HLC staff in 2016, Defendant Mueller announced that Grand Canyon would not reattempt a conversion application with a modified proposal.

7. But the election of President Donald J. Trump and the confirmation of Education Secretary Elisabeth "Betsy" DeVos ushered in a potentially more favorable regulatory environment for for-profit institutions. As described below, Secretary DeVos was a supporter of for-profit institutions and installed for-profit veterans, who were more open to the "hybrid" model of non-profit conversions, as key members of her senior staff. This potentially shifting political landscape spurred Defendants to try to revive the Conversion that had dramatically failed in 2016. Defendants, however, did not tell Grand Canyon's shareholders material facts about the Conversion—facts that significantly altered the total mix of information available to investors regarding the severe risks facing the Conversion.

8. Defendants knew—but investors did not—that the distinctive terms of Grand Canyon's Conversion were far afield of any other conversion transaction approved by the DOE, <u>including</u> under the Trump Administration. For example, while Defendants reassured investors that the Conversion was very similar to the DOE-approved relationship between public non-profit Purdue University and for-profit Kaplan University, in reality, the deals were starkly different. For example, the Purdue-Kaplan transaction was structured so that for-profit service company Kaplan Higher Education would only be paid for services it actually provided to the public university and only after non-profit Purdue-Kaplan (later known as "Purdue Global") broke even on its expenses. Further, those payments were capped at approximately 12% of Purdue Global's tuition and fees.

9. Under the undisclosed terms of Grand Canyon's shared services agreement, by contrast, for-profit GCE would receive <u>95%</u> of supposed non-profit New GCU's revenues, including revenues wholly unrelated to educational services, such as revenue earned from stadium tickets and merchandising fees. New GCU, on the other hand, would incur 72% of the total expenses of operating the institution, while receiving only <u>5%</u> of the institution's revenues.

Because Grand Canyon misrepresented the actual financial arrangement between the parties, Defendants also failed to disclose that the one-sided revenue split made termination of the relationship between New GCU and GCE—which required an enormous one-time payment to execute—virtually impossible. Indeed, the onerous arrangement between GCE and New GCU later caused the DOE to conclude that the "primary purpose" of the services agreement was to "drive shareholder value for [Grand Canyon] with GCU as its captive client—potentially in perpetuity."

10. As set forth below, Karen Solinski, HLC's former Executive Vice President for Legal and Governmental Affairs, who had first-hand non-public knowledge of both transactions, told Defendant Bachus personally—before Bachus started making contrary representations publicly—that Bachus was incorrect to claim that the Grand Canyon Conversion was like the Purdue-Kaplan transaction based on the publicly-disclosed details of that transaction. In fact, Solinski informed Bachus that the two proposals were different in multiple "key respects." As set forth below, Bachus knew that Solinski was a highly credible source for this information as HLC's lead reviewer for both the Purdue-Kaplan conversion application and the initial Grand Canyon conversion application.

11. Defendants also knew, contrary to their public statements, that New GCU and Grand Canyon were not actually independent. Defendants claimed that, notwithstanding the remarkable fact that Defendant Mueller acted as both President of New GCU and CEO of Grand Canyon, "[a]side from Mr. Mueller, no other employee of New GCU or GCE has a dual role in both organizations." Defendants concealed that nearly 75% of Defendant Mueller's Executive Team as President of New GCU—whose sole job was to manage New GCU—were actually employed by <u>GCE</u> following the Conversion. This undisclosed arrangement led the DOE to

announce at the end of the Class Period that New GCU was "not the entity *actually operating*" the educational institution (emphasis in original).[1]

12. Although Defendants had repeatedly told investors that Grand Canyon had no intention of concluding the transaction until the DOE completed its review, Defendants reversed course and closed the Conversion on July 1, 2018—while the DOE's review was still ongoing.

13. Defendants concealed from investors that, several weeks earlier, in May 2018, DOE staff had served GCE and New GCU with a series of unusual interrogatories demonstrating a substantial risk that the DOE would deny New GCU's request for non-profit status. Defendant Mueller fully understood the importance of these interrogatories and blatantly lied about the status of the DOE review. Under questioning concerning the DOE's delay by the press, Mueller falsely stated it was because the DOE was "very understaffed."

14. In response to these document demands, the Company submitted numerous non-public documents to the DOE marked "Confidential." These non-public documents, which were not provided to the IRS or HLC before those agencies issued their respective approvals, nor to investors during the Class Period, revealed the actual terms of the Conversion transaction. As a result of these material undisclosed facts (the true nature of the Conversion, the DOE's prior pushback, and the DOE's unwelcome scrutiny), Defendants knew that the DOE's approval was at substantially higher risk than investors understood. As GCU later disclosed in a post-Class Period suit against the DOE, however, GCE determined to move forward with the Conversion purportedly because of the "sunk costs" that GCE and New GCU had <u>already</u> invested in the Conversion.

15. Moreover, Defendants claimed that if they delayed the Conversion, it would jeopardize the approval that the Company had already received from its accreditor, HLC—an

[1] Throughout this Complaint, emphasis is added unless otherwise noted.

accreditation that, as discussed below, was achieved through a highly unusual process that was marked by a departure from HLC requirements and guidelines and gained through Defendants Mueller's and Bachus's personal involvement. For example, Lead Counsel obtained through their investigation a voicemail recording of Defendant Bachus in which he implored Karen Solinski to intervene on Grand Canyon's behalf just days before the HLC Board was to review the application in order to obtain a special exemption for Grand Canyon from HLC's application requirements. Solinski declined to intervene.

16. Finally, Defendants knew that there was a potentially narrow window of time in which Secretary DeVos's DOE would be in place to squeeze through the Conversion—but there would be no chance of approval if the political climate shifted again.

17. In any event, moving forward with the Conversion would have immediate and tangible financial benefits for Grand Canyon, even in the (now more likely) event that the DOE declined to approve New GCU as a non-profit. Since Grand Canyon received 95% of New GCU's revenue, any revenue increases resulting from increased enrollment at New GCU flowed directly to Grand Canyon's bottom line. Upon completing the Conversion, as a purported non-profit, New GCU immediately had access to a universe of school districts to recruit new students where it had previously been barred as a for-profit. New GCU quickly pivoted to a marketing campaign that, among other things, pitched New GCU as: "Private. Christian. Affordable. Nonprofit." Defendant Mueller touted that GCE and New GCU were "out there now a million times a day saying, we're non-profit[.]" In speaking with the investment press, Defendant Mueller hyped the success of New GCU's purported "non-profit" status and repeatedly attributed Grand Canyon's phenomenal profit margins to the "tailwinds" of marketing New GCU as a non-profit.

18. But in addition to misrepresenting the structure of the Conversion, Defendants also misrepresented Grand Canyon's financial performance: they engaged in an accounting fraud. Defendants falsely claimed that New GCU was a non-profit, despite their knowledge that the Company did not provide the IRS and HLC with full information regarding the structure of the Conversion transaction, which the DOE used to determine that New GCU "violate[d] the most basic tenet of nonprofit status." By so doing, GCE was able to treat New GCU as an improper off-balance-sheet entity—which Grand Canyon then used to hide expenses and costs while retaining a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results. This undisclosed and improper structure allowed Grand Canyon—in violation of its disclosure obligations for SEC filings—to publicly report inflated profit margins that far exceeded its purported peers in the third-party services industry.

19. Grand Canyon's shareholders learned the true risk of their investment over two separate events. First, after the market closed on November 6, 2019, the Company announced that it had received a letter from the DOE denying its application for designation of New GCU as a non-profit. The DOE had told New GCU that it could no longer market itself as a non-profit, undermining the ostensible basis for the entire Conversion. In determining that New GCU did not satisfy the DOE's definition of a non-profit, the DOE stated that the Conversion failed "the most basic tenet of nonprofit status—that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other purpose or entity." In direct response to the news about the DOE's denial, the price of Grand Canyon stock declined approximately 8%.

20. Then, on January 28, 2020, Citron Research ("Citron") published a report expanding on the DOE's findings, including based on hundreds of pages of previously undisclosed Grand Canyon documents that Citron obtained from the DOE through a FOIA request. Citron

concluded that Grand Canyon was the "educational Enron," using a "captive non-reporting subsidiary" to "dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price." Following this disclosure, Grand Canyon shares declined approximately 8% to close at $84.07 per share on January 28, 2020.

21. In sum, Defendants were bound by the federal securities laws to provide accurate, truthful, and non-misleading information surrounding the facts and circumstances of the Conversion and GCE's financial and operating results to investors. They failed to do so. To the contrary, Defendants knowingly or, at the least, recklessly made false and misleading statements about facts and developments that were unquestionably material to investors, including:

(a) ***The claimed independence of GCE's and New GCU's management teams***: While Defendants said that GCE's and New GCU's managements would have only one person—Defendant Mueller—in common, the truth was that nearly 75% of New GCU's Executive Leadership Team (41 members of the 58-person Team) responsible for managing and overseeing GCU and developing its strategic vision were employed by GCE.

(b) ***How the Conversion matched up with other conversions that had obtained DOE approval, including the Purdue-Kaplan transaction***: While Defendants—who knew of all of the terms of the Master Services Agreement ("MSA") between GCE and New GCU, including terms that were redacted from its public SEC filings and not otherwise known to the market—stated that the Conversion was "almost identical to many others in the industry," "very similar to the Purdue and Kaplan proposal," and "almost an identical replica" of what "hundreds of universities are doing," the truth was that the MSA was materially different from the service agreements in other conversions, both in terms of the percentage of revenues that GCE would obtain from New GCU, other significant payment and termination terms, and the level of control that GCE management would have over New GCU.

(c) ***The financial results that GCE reported after entering into the MSA on July 2, 2018***: While Defendants stated that New GCU "is not a related party to the Company in accordance with ASC Topic 850" and that GCE did "not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition," and reported its results (including operating margins that were multiples higher than the operating margins reported by GCE's peers) without consolidating New GCU's financial results, those statements and the results that GCE reported were materially false and

misleading because, among other reasons, nearly 75% of New GCU's Executive Leadership Team was comprised of GCE executives, and GCE was reaping massive financial benefits from its services and other agreements with New GCU.

(d) ***The status of the DOE's review of the Conversion application***: While Defendants said that the review was being delayed because the DOE was "very understaffed," in truth, on May 17, 2018, the DOE had sent an extensive set of requests for information regarding the DOE's pre-acquisition review on the Conversion, which the DOE followed up with additional information requests on July 3, 2018, August 24, 2018, and September 10, 2018, indicating that the DOE was staffing and responding to Defendants' Conversion Application.

22. As a result of Defendants' misrepresentations and omissions, investors were deprived of their ability to independently assess the likelihood of DOE approval and were deceived about the Company's actual financial and operational results.

23. Grand Canyon's investors and New GCU's students—who were completely unaware of New GCU's true nature as a "covert for-profit," or that the DOE's approval was at much higher risk than Defendants had conveyed—bore all of the risk of GCE moving forward with the Conversion, while GCE received immediate and substantial financial rewards. To date, only Grand Canyon's investors and New GCU's students have suffered any consequences for Defendants' duplicitous gamble. This Action seeks to hold Defendants accountable.

## II. JURISDICTION AND VENUE

24. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c), and (d). Grand Canyon is incorporated in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

### A. Lead Plaintiffs

26. Lead Plaintiff Fire and Police Pension Association of Colorado ("Colorado FPPA") is a benefit pension plan that provides services and benefits to Colorado firefighters and police officers and their beneficiaries upon retirement, disability, or death. As previously represented to the Court, Lead Plaintiff Colorado FPPA purchased shares of Grand Canyon stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein. *See* ECF No. 34 ¶18.

27. Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust (collectively, "Oakland County") provide retirement benefits to employees of Oakland County, Michigan and their beneficiaries. As previously represented to the Court, Lead Plaintiff Oakland County purchased Grand Canyon stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein. *Id.* ¶ 19.

### B. Defendants

28. GCE is a Delaware corporation. The Company went public in an initial public offering ("IPO") in November 2008. At all relevant times alleged in this Complaint, Grand Canyon traded on the NASDAQ under the stock symbol "LOPE." From 2004 until July 2018, it was a for-profit Christian university. After July 2018, it purportedly became an online program management ("OPM") company that provided management, back-office, and other services to educational institutions.

29. Defendant Brian E. Mueller ("Mueller") is Grand Canyon's CEO and Chairman and New GCU's President. Mueller has been the Company's CEO since July 2008, a director since March 2009, and Chairman since January 2017. He has been President of Grand Canyon University since 2012. From 1987 to 2008, Mueller was employed at Apollo Education Group, Inc. ("Apollo"), a for-profit, postsecondary education company, where he served as CEO of University of Phoenix Online from March 2002 to November 2005. Mueller also served as Apollo's Chief Operating Officer ("COO") from 2005 to 2006 and University of Phoenix Online's COO from May 1997 until March 2002. During the Class Period, the Company paid Mueller a total of $4.2 million in salary and incentive compensation.

30. Defendant Daniel E. Bachus ("Bachus") is Grand Canyon's Chief Financial Officer ("CFO"). Bachus has been the Company's CFO since July 2008. From 2000 to 2006, Bachus served as the chief accounting officer and controller of Apollo. Prior to his employment at Apollo, Bachus was employed as an audit senior manager at Deloitte & Touche LLP. In November 2006, Bachus was placed on leave from his position as Chief Accounting Officer of Apollo in connection with an options backdating scandal that caused the company to restate financial results going back to 2001. Bachus ultimately resigned from Apollo in connection with the scandal. During the Class Period, the Company paid Bachus a total of $2.7 million in salary and incentive compensation.

31. Defendants Mueller and Bachus are collectively referred to in this Complaint as the "Individual Defendants," and, with Grand Canyon, as the "Defendants." During their tenures at the Company, the Individual Defendants directly participated in the management of Grand Canyon's operations and, because of their positions at Grand Canyon, were involved in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged in this Complaint, and possessed the power and authority to control the contents of Grand

Canyon's reports to the SEC, press releases, conference calls to investors, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and possession of material, non-public information, each of the Individual Defendants knew that the positive representations and omissions specified in this Complaint were then materially false and/or misleading.

## IV. BACKGROUND

32. In January 2004, California-based Significant Education, LLC ("Significant") acquired Grand Canyon College, a private college on the verge of bankruptcy. Significant transformed Grand Canyon College into the first for-profit Christian university in the United States, which was focused on online education for working adults. Significant hoped to make the college into a "money-making venture" and to compete with the University of Phoenix and DeVry University.

33. On May 9, 2008, Significant adopted the name Grand Canyon Education, Inc. and launched an IPO. Shortly after the Company announced its IPO, Grand Canyon recruited Mueller, the then-President and Director of Apollo Education Group, Inc., parent company of the University of Phoenix, as Grand Canyon's CEO, and Bachus, who had been working for a real estate developer following his resignation at Apollo, as the Company's CFO.

### A. For-Profit Education Companies Earned A Reputation For Exploitation

34. While for-profit education has a troubled history stretching back to the end of the Second World War, in the years leading up to the Class Period, a series of major scandals brought further negative attention to the sector, including multiple fraud scandals at Apollo, where Mueller and Bachus were leading executives.

35. For instance, in 2004, the DOE issued a report finding that the University of Phoenix—where Mueller was then CEO of the online campus—had intimidated recruiters that

failed to meet targets and encouraged the enrollment of unqualified students. The recruiting scandal required Apollo (the University of Phoenix's parent company)—where Bachus was Chief Accounting Officer and Controller—to pay hundreds of millions of dollars to resolve multiple lawsuits. In 2008, a unanimous federal jury found Apollo liable for fraudulently misleading investors about its recruitment practices and awarded the full amount of damages that a class of investors sought from Apollo, a verdict ultimately upheld by the United States Court of Appeals for the Ninth Circuit. The parties eventually settled the case in November 2011 for $145 million. In 2009, Apollo entered into a $78.5 million settlement agreement to resolve a separate False Claims Act lawsuit based on the illegal recruitment practices highlighted by the DOE in its 2004 report.

36. In November 2006, another Apollo scandal emerged. Defendant Mueller, who was President of Apollo at the time, admitted that a company investigation had identified various "deficiencies" in its options-granting practices, including "inaccurate documentation" about option grant dates. Apollo stated that it expected to restate financial results going to back to 2001 to account for unstated expenses. In connection with the investigation, Apollo's CFO resigned, and Bachus, as Chief Accounting Officer, was placed on leave and ultimately resigned.

37. Additional scandals in the for-profit education space ensued over the next several years. For example, in 2011, the Department of Justice and four states filed a multibillion-dollar fraud suit against Education Management Corporation, a for-profit college company with an enrollment of about 150,000 students, alleging that the school had been illegally paying recruiters based on how many students they enrolled—a practice that reportedly accounted for nearly all of the school's revenue for the previous eight years. In 2014, Corinthian Colleges collapsed after a DOE investigation found that the school systematically misled students about its job placement

statistics. And in 2016, for-profit educator ITT Technical Institute filed for bankruptcy after the DOE prevented students from using Title IV loans to fund education there. As *Bloomberg* noted in a March 2018 article: "The image of the for-profit schools has been badly battered in recent years, thanks to the bankruptcies of major chains Corinthian Colleges and ITT Technical Institute and Obama administration regulations that denied funding to for-profit programs that left students with degrees that some employer viewed as worthless deeply in debt."

38. As the reputation of openly for-profit institutions declined in the face of these myriad scandals, prominent figures in the field began to assess alternate approaches that could give educational companies access to the public stock markets while discarding the "for-profit" label. The law firm Cooley LLP—which specializes in representing for-profit educational companies, including Grand Canyon—was an early proponent of a "'hybrid' model" that "allow[ed] [companies] to take advantage of the interest of financial investors in the higher-education market" while purportedly preserving "the key attributes of non-profit private or public colleges."

39. This hybrid model was later pursued by a wave of for-profit educational companies—including Grand Canyon—seeking to exploit the marketing and regulatory advantages of the "non-profit" moniker.

**B. 2014: Grand Canyon's First Failed Non-Profit Conversion**

40. In 2014, Defendants Mueller and Bachus began to explore options to convert GCU into a non-profit. At the time, Mueller explained that one of the motivations for such a conversion was to leave behind the "stigma" of a for-profit education company. The Company ultimately pursued a restructuring whereby it would spin off its educational assets—GCU—as a purportedly separate, non-profit institution (the "2014 Conversion Proposal"). While the 2014 Conversion Proposal was not successful, its structure closely mirrored that of the Conversion, which the Company ultimately consummated in 2018.

41. In connection with the 2014 Conversion Proposal, Grand Canyon planned to sell GCU to a newly formed non-profit organization called Gazelle University. After the close of the transaction, Gazelle University would be renamed Grand Canyon University, also referred to as "New GCU." Grand Canyon would remain a for-profit company and purportedly provide services to New GCU pursuant to a services agreement, and Mueller would remain at the helm of both institutions.

42. Grand Canyon applied to its regional accreditation body, HLC, for a Change of Control, Structure or Organization ("Change of Control")—a prerequisite to executing the 2014 Conversion Proposal. The HLC approval process considered whether New GCU met HLC's longstanding guidelines for a Change of Control transaction. In performing these evaluations, HLC does not analyze, or opine on, whether universities should be considered non-profit institutions. Indeed, HLC's criteria for evaluating a Change of Control transaction nowhere mention an institution's for-profit or non-profit status. Instead, they focus on five factors related to the proposed transaction: (1) the "extension of [the institution's] mission, educational programs, student body and faculty," (2) "the on-going continuation and maintenance of the institution . . . with regard to its mission, objectives, outreach, scope, structure, and related factors," (3) the "substantial likelihood that the institution . . . will continue to meet [HLC's] Eligibility Requirements," (4) the "sufficiency of financial support for the transaction," and (5) the new owners', Board's, and other key individuals' "previous experience in higher education . . . qualifications, and resources . . . ."

43. Karen Solinski chaired HLC's Fact-Finding Evaluation Team that analyzed the Change of Control application for Grand Canyon University in 2015-2016. Solinski is a highly seasoned regulatory lawyer and is among the most experienced practitioners in this field in the

United States. She served in her position at HLC for approximately twenty years, wrote HLC's Change of Control, Structure and Organization policy, and handled the review of all Change of Control transactions for HLC. She led more than 50 Change of Control evaluations, including acting as the lead reviewer on the high-profile Purdue-Kaplan transaction. According to a letter regarding Solinski's career at HLC from HLC's human resources department, Solinski had numerous responsibilities as Executive Vice President for Legal and Governmental Affairs, including:

- "Leading HLC's preparation for recognition reviews related to the [DOE] and the Council for Higher Education Accreditation and appearing before or responding to these groups";
- "Participating in policy discussions at a regional or national level as requested by HLC and working with others to prepare written published materials on behalf of the organization";
- "Overseeing and managing HLC's Change of Control process";
- "Advising the agency, including the Board of Trustees, regarding numerous policy matters and individual institutional cases"; and
- "Managing staff in the legal and governmental affairs department."

44. HLC's review of GCU's Change of Control application in 2015-2016 was consistent with HLC practices and timing for such reviews. GCU's application was submitted six months before the deadline for the HLC fact-finding report on the proposal. Solinski and two additional experienced HLC reviewers, including a financial expert, conducted a multi-day site visit, interviewed key personnel, and reviewed documentation concerning various aspects of the 2014 Conversion Proposal over the course of six months.

45. In considering GCU's 2014 Conversion Proposal, HLC published a 2016 Staff Summary Report and Fact-Finding Visit Report (together the "HLC Reports") to evaluate the 2014 Conversion Proposal against HLC's Change of Control Factors and related guidelines. The HLC

Reports identified several issues with the 2014 Conversion Proposal including, but not limited to, the following issues. *First,* the HLC Reports identified the multiple overlapping roles of Defendant Mueller at Grand Canyon and New GCU as a red flag. However, the HLC team evaluating the transaction learned from Defendants Mueller and Bachus that this element of the transaction was "non-negotiable." *Second*, the HLC Reports noted that the 2014 Conversion Proposal would result in significant debt for New GCU, estimated by Defendant Bachus to the HLC team to be roughly $1.5 to 2 billion including interest and fees. *Third,* the HLC Reports noted that practices reviewed by HLC, such as curriculum development, learning management, and student support services such as recruiting, advising and tutoring would be undertaken, wholly or in part, by GCE, rather than the accredited institution, New GCU. *Finally*, the HLC Reports noted the extreme dependence of New GCU on GCE, as New GCU lacked a meaningful alternative under the 2014 Conversion Proposal's structure were it to seek another service provider.

46. According to Solinski, after receiving the HLC Reports in January 2016, GCE executives did not ask for a meeting with HLC staff to discuss the findings or present additional information. Further, in a February 2016 written response, GCE executives did not significantly challenge any of the findings and declined to present any significant additional information to the Board.

47. On February 25, 2016, HLC denied Grand Canyon University's Change of Control application. The HLC Board concluded in part that the proposed structure contemplated New GCU "outsourc[ing] all or the majority" of its academic and student support services and curriculum development to Grand Canyon, in contravention of HLC's existing accreditation requirements.

48. Defendant Mueller was furious that HLC rejected his request for approval. According to Solinski, during a May 2016 "fence-mending" meeting in Phoenix between Solinski, another HLC official, Mueller, Bachus, and approximately 20 other senior GCE employees to discuss HLC's decision, Mueller's demeanor was "angry and sullen," and "oddly threatening," including toward Arizona State University President Michael Crow, who was not present but whom Mueller accused of sabotaging GCU's application. Mueller's emotional response echoed the Company's previous press release reporting HLC's decision, claiming that HLC had "wronged" the Company in denying its application for approval of the extension of accreditation after the transaction.

49. Solinski recalled that, even after GCE had announced publicly that it would no longer be pursuing the non-profit conversion due to HLC's rejection of its request, the DOE and members of the U.S. Senate were still interested in the structure of Grand Canyon's proposal. On or about May 4, 2016, Michael Frola, a DOE Division Director, and in a subsequent call Beth Stein, a lawyer for the ranking member of the United States Senate Committee on Health, Education, Labor and Pensions, requested that Solinski provide copies of Grand Canyon's University's 2014 Conversion Proposal, the HLC Reports, and the HLC letter denying the 2014 Conversion Proposal. Solinski sent the requested materials to Frola and Stein and informed Brian Roberts, GCE's general counsel, of the transmission. Roberts indicated his intention to contact Frola and Stein to answer any questions they might have regarding the 2014 Conversion Proposal.

50. Later that month, according to Solinski, Grand Canyon learned from Frola and Stein that the DOE was unlikely to approve Grand Canyon University's conversion proposal even if HLC had not rejected the accreditation application. During her meetings at the November 2015 Fact-Finding Visit with Grand Canyon's counsel, Solinski had learned that the Company's lawyers

had already met with the DOE to try to persuade the DOE to approve the structure of the 2014 Conversion Proposal. The Company's outreach to the DOE to sell the conversion had not gone well. Indeed, Frola and other lawyers from the DOE Office of General Counsel informed Grand Canyon that the transaction would result in the DOE, HLC, and other regulatory bodies being unable to regulate significant portions of New GCU's operations and would likely improperly benefit the newly formed for-profit company.

51. Notably, it was Frola who later authored the DOE's November 6, 2019 letter rejecting Grand Canyon's attempt to convert the university to non-profit status, as discussed in detail below. The letter highlighted several of the concerns that Frola previously raised with Grand Canyon, including that New GCU was being operated "substantially for the benefit of [another] person or entity."

52. Defendant Mueller was aware of and personally involved in the Company's outreach to the DOE. At the "fence-mending" meeting in May 2016 between HLC staff and Defendant Mueller, which Defendant Bachus also attended, Mueller complained that the DOE had given him pushback on the 2014 Conversion Proposal and that he did not believe the DOE or HLC would bless it in the future. As a result, Defendant Mueller announced that the Company would not be reapplying to convert GCU to non-profit status.

## V. DEFENDANTS' FRAUDULENT SCHEME

### A. The Trump Administration Enacts Favorable Policies and Positions Toward For-Profit Educational Institutions

53. On November 9, 2016, Donald J. Trump, himself the former owner of a failed for-profit institution, was elected President of the United States. Two weeks later, on November 23, 2016, President-elect Trump announced his intent to nominate Betsy DeVos as Secretary of Education. On February 7, 2017, the Senate confirmed Ms. DeVos as Secretary of Education.

54. Following the inauguration of President Trump and the confirmation of DOE Secretary DeVos, for-profit educational institutions experienced a much different regulatory environment that quickly transformed in their favor. As POLITICO reported in August 2017, just five months into DeVos's tenure, "For-profit colleges are winning their battle to dismantle Obama-era restrictions as Education Secretary Betsy DeVos rolls back regulations, grants reprieves to schools at risk of losing their federal funding and stocks her agency with industry insiders."

55. Upon Secretary DeVos's confirmation, the Trump Administration began installing veterans of for-profit education companies into DOE and White House leadership roles.

56. Diane Auer Jones, who joined the DOE as a senior policy advisor to Secretary DeVos, later became Principal Deputy Under Secretary, a role in which she supervised for-profit postsecondary institutions. Prior to joining DOE, Jones served, from 2010 until 2015, as Senior Vice President and Chief External Affairs Officer at Career Education Corporation ("CEC"), a for-profit education company whose schools entered into multiple settlements with students and state regulators relating to allegedly fraudulent practices.

57. Robert Eitel, who joined the DOE as senior counsel, previously worked at CEC, as well as at for-profit Bridgepoint Education ("Bridgepoint"). Eitel worked at the DOE for two months while on unpaid leave from Bridgepoint, until he was hired on a permanent basis by Secretary DeVos in April 2017.

58. The Senate also confirmed President Trump's nomination of Carlos G. Muniz, a former consultant to CEC, to become the DOE's general counsel.

59. Julian Schmoke Jr., who joined the DOE to lead the team charged with policing fraud in higher education, was the former dean at for-profit DeVry University.

60. In addition, the leading for-profit trade association group, Career Education Colleges and Universities, hired former Speaker Newt Gingrich as a chief lobbyist. Speaker Gingrich served as vice-chair of President Trump's transition team, and his wife, Callista, later joined the Administration as Ambassador to The Holy See.

61. President Trump also named Mercedes Schlapp, a former outside consultant for for-profit Bridgepoint, as his director of strategic communications at the White House. Bridgepoint continued to retain Ms. Schlapp's husband, Matt Schlapp, after Ms. Schlapp joined the White House.

62. The installation of for-profit industry insiders coincided with the rolling-back of several DOE protections against student abuses. For example, in June 2017, Secretary DeVos announced plans to dismantle two key Obama-era rules enacted in 2016: the Gainful Employment Rule, which measured "gainful employment" through a formula that assessed the employment status of graduates of for-profit institutions; and the Borrower Defense Rule, which enabled students who were the victims of certain types of institutional misconduct to obtain federal student loan forgiveness. The DeVos DOE also dismantled the main DOE unit that investigated fraudulent practices at for-profit institutions. Indeed, in a May 2018 article, the *New York Times* reported that the primary team at the DOE "that had been investigating widespread abuses by for-profit colleges [had] been marginalized, reassigned or instructed to focus on other matters," and in fact had its headcount slashed by 75%. These reductions "effectively killed investigations into possibly fraudulent activities at several large for-profit colleges where top hires of Betsy DeVos, the education secretary, had previously worked."

**B. The Trump Administration Reverses Course on For-Profit Conversions**

63. The start of the Trump Administration also signaled a shift in how strictly the federal government might scrutinize large-scale, for-profit to non-profit conversions.

64. The Obama Administration had broadcast a skeptical view of applications by for-profit institutions for conversion to non-profit status. In August 2016, the DOE rejected an application filed by multiple for-profit colleges owned by the Center for Excellence in Higher Education ("CEHE") for a change of ownership and change to non-profit status. The DOE determined that the proposed conversion appeared to benefit the owner of the for-profit chain rather than its students. In announcing the decision, U.S. Education Secretary John B. King, Jr. stated in a press release: "This should send a clear message to anyone who thinks converting to non-profit status is a way to avoid oversight while hanging onto the financial benefits: Don't waste your time." Under Secretary of Education Ted Mitchell explained that "Schools that want to convert to non-profit status need to benefit the public," and that "[i]f the primary beneficiary of the conversion is the owner of the for-profit school, that doesn't meet the bar. It's not even close."

65. Thus, once it became clear that Donald Trump would assume the presidency, for-profit education companies deliberately delayed plans to apply to the DOE for approval of non-profit conversions. As Grand Canyon's counsel put it, in 2017, for-profit institutions now faced a "different regulatory environment" that might lead the DOE to be more favorable to non-profit conversions. Consistent with this publicly stated view, Solinski recalled that Grand Canyon's outside counsel informed her, in or about the summer of 2017, that he had advised his clients to wait until the Trump Administration fully took power at DOE to initiate new conversions.

66. The perceived favorable regulatory environment led for-profit institutions to commence large-scale conversions almost immediately after the Trump Administration took power. In January 2017, in or around the time of President Trump's inauguration, Dream Center Educational Holdings, Inc. ("Dream Center") entered into an agreement with Education Management Corporation ("EDMC") to purchase thirteen for-profit postsecondary institutions

from EDMC and convert them to non-profit status. In April 2017, Purdue University announced its acquisition of for-profit institution Kaplan University, Inc., to create a new public non-profit online university that would later be named "Purdue Global."

67. In September 2017, the DOE sent pre-acquisition review letters in connection with both the Dream Center/EDMC and Purdue/Kaplan acquisitions, stating that the DOE's "Preliminary Determination" was that it "does not see any impediment" to the respective requests for approval for a change in ownership and conversion into non-profit status.

68. And in January 2018, the Trump Administration took a new and very different position than the Obama Administration had toward the attempted conversion of CEHE to non-profit status, referenced in ¶64, *supra*. On August 30, 2016, after the DOE rejected CEHE's petition to convert to non-profit status, CEHE filed suit against the DOE in the United States District Court for the District of Utah. On October 31, 2016, the Obama Administration moved to dismiss the complaint, which ultimately led CEHE to file an amended complaint in May 2017. By that time, Secretary DeVos had been confirmed by the Senate. Secretary DeVos had also installed Diane Auer Jones, referenced in ¶56, *supra*, whom CEHE previously retained as an expert witness in other litigation, as her Acting Under Secretary of Education.

69. Unlike under the Obama Administration, Secretary DeVos's DOE did not file a motion to dismiss the amended complaint. Instead, in January 2018, the parties in the CEHE action filed a joint motion to stay the case, reporting to the court that "both parties agree that the possibility of resolving this case outside the context of litigation is significant based on concrete discussions."

70. The DOE's reversal did not go unnoticed in the press. On January 24, 2018, POLITICO filed an article with the headline "*DeVos may reverse Obama ruling on for-profit*

*college conversions*," in which it noted the developments in the CEHE case and explained that "Betsy DeVos has already proved to be friendlier to for-profit college conversions":

> **DEVOS MAY REVERSE OBAMA RULING ON FOR-PROFIT COLLEGE CONVERSIONS:** The Trump administration is *considering undoing a landmark ruling by the Obama-era Education Department* regarding colleges that seek to convert from for-profit schools into nonprofit institutions. The Center for Excellence in Higher Education, which is based in Utah and owns a chain of career colleges, *is in negotiations with Education Department attorneys over reversing the Obama administration's rejection of the school's nonprofit status, according to court filings made last week.*
>
> ***
>
> **Eric Juhlin, chief executive officer of the Center for Excellence in Higher Education,** said in an email to Morning Education that "we have had some constructive discussions about the possibility of a mutually agreeable resolution to this matter and the previous August 2016 decision."
>
> — **The Obama administration billed the CEHE case as a warning that the Education Department planned to get tough** on conversions of colleges from for-profit to nonprofit, transactions that critics say are designed to skirt federal regulations. The rejection of CEHE's case was unprecedented because it was the first time that officials rejected a college's request to be a nonprofit school under federal education law even though the IRS recognizes the school as a nonprofit for tax purposes. Then-Education Secretary John B. King Jr. said at the time that the decision "should send a clear message to anyone who thinks converting to nonprofit status is a way to avoid oversight while hanging onto financial benefits," adding "don't waste your time."
>
> — **The possibility that the Trump administration may soon reverse the Obama-era decision,** which for-profit college advocates blasted at the time as politically motivated, comes as Education Secretary Betsy DeVos has already proved to be friendlier to for-profit college conversions. DeVos signed off on the conversion of campuses owned by Education Management Corporation to nonprofit schools and the conversion of Kaplan University to a public institution run by Purdue University.

71. In March 2018, the higher-education non-profit website, *The Republic Report*, published an article entitled "Betsy DeVos Facilitates For-Profit Colleges' Conversion Therapy." The article noted an upcoming educational conference that would focus, in part, on recent for-profit conversions, such as Purdue/Kaplan: "As the conference website highlights, one key

phenomenon that intersects with the growth of higher education public-private partnerships is the rush of efforts to convert for-profit colleges to non-profit status in recent years. Those efforts are now being blessed by the for-profit friendly Trump-DeVos team at the Department of Education." The article further referenced the Obama Administration's stand against CEHE's conversion attempt but explained that the landscape changed when "the president of Trump University became president of the United States, and installed at the Department of Education Betsy DeVos, a lover of all things privatized and an investor in for-profit education companies."

72. In January 2018, in a confidential internal presentation that was later made public as part of a lawsuit against Dream Center for "false and misleading" statements to students, a Dream Center regulatory lawyer commented on the perceived changes in higher education regulation with the Trump Administration. The presentation included a song he wrote titled, "You've Got a Friend in Trump," to the tune of Randy Newman's "You've Got a Friend in Me," used in the movie "Toy Story":

*We've got a friend in Trump*

*He's lifting us out of our slump*

*We were down — and life was rough*

*Too many regs, were way too tough*

*After so many years*

*We'd just had enough, but*

*Now, we've got a friend in Trump.*

**C. Grand Canyon Submits A Renewed Application To HLC**

73. Given the changed regulatory environment, Grand Canyon made plans in early-2017 to submit a renewed Change of Control application to HLC.

74. Bachus informed Solinski of Grand Canyon's intent to resubmit its conversion application in or around May 2017. During a phone call, Bachus claimed that the proposed transaction was similar to the Purdue/Kaplan deal, which had just received pre-acquisition review from the DOE in April 2017. Solinski—who also led HLC's review of the Purdue/Kaplan deal and was thus familiar with both transactions—pushed back on Bachus's characterization that the two transactions were similar. Citing publicly available information about the Purdue/Kaplan deal, she told Bachus that there were "real" and "key" differences between the two deal structures and sent him articles clarifying the differences. She pointed him to publicly available filings about the Purdue/Kaplan transaction that demonstrated these "key" differences when compared to the non-public information that both Bachus and Solinski had about Grand Canyon's proposed transaction. Indeed, as set forth below, the transactions were materially different.

75. HLC had a general practice that a reviewer would not consider another application from or engage in another evaluation of the same institution within a 7-10 year period, so Solinski would not be assigned as the lead reviewer for the renewed Grand Canyon application. Solinski also established that she would not act in any evaluation or decision-making capacity given not only her role in the previous evaluation, but also the negative communications afterward with Mueller and her business friendship with Bachus.

76. However, as HLC's expert on Change of Control applications and as head of the Legal and Governmental Affairs Group, Solinski continued to provide administrative oversight within HLC over the conversion application, which was filed in December 2017 (the "Conversion Application"). As author of the Change of Control policy, Solinski was a critical resource within HLC to answer questions concerning appropriate procedure and process for Change of Control applications. HLC President Barbara Gellman-Danley testified to the U.S. House of

Representatives Education and Labor Committee staff on February 19, 2020, that Solinski "was very active in not only constructing [Change of Control] policies but interpreting policies, and helping people understand policies and advising individuals, and she had a lot of background in that."

77. In addition, Solinski's research associate and direct report, Robert Rucker, was responsible for managing the Grand Canyon application process and ensuring that the Grand Canyon materials for the HLC Board were complete. From December 2017 to February 2018, Gellman-Danley and Rucker both periodically visited Solinski's office to ask her questions concerning the processing of the Conversion Application, such as whether the HLC Board could defer its decision pending the DOE's pre-acquisition letter, about the timing of the evaluation, and other procedural questions. Further, on or about February 10, 2018, Gellman-Danley called Solinski to ask her to speak with a member of HLC's Board of Trustees about procedures related to the review of the Conversion Application, which Solinski did.

78. Grand Canyon executives were aware of Solinski's continued administrative oversight over the Conversion Application and occasionally updated her concerning the progress of the application. For example, Defendant Bachus contacted Solinski on or about January 2, 2018, to inform her of the upcoming January 5 SEC filing in which Grand Canyon would disclose the Conversion Application. As discussed below, on or about February 18, 2018, Bachus left Solinski a voicemail asking for "some advice" or her "help" and to "provide some guidance to Robert [Rucker]" regarding Grand Canyon's Conversion Application before the HLC Board, notwithstanding the fact that the DOE had not yet issued its pre-acquisition letter.

79. On January 5, 2018, the first day of the Class Period, Grand Canyon announced that it had submitted the Conversion Application to HLC. As Grand Canyon described it in SEC

filings, the Conversion Application was an "application for the similar transaction that was made in 2015-2016[.]"

80. In its review, HLC did not receive any of the third-party analyses that the Company subsequently submitted to the DOE (at the DOE's demand) in connection with that agency's review of the Conversion (discussed *infra* at Section V.J). Instead, the Company's Conversion Application contained similar information to its previously rejected application.

81. Throughout the application process, Grand Canyon pressured HLC to provide the Company with several highly unusual accommodations which, in Solinski's experience, were inconsistent with HLC's Change of Control review process.

**i. HLC's Review Was Unusually Short And Abridged**

82. Contrary to its usual practice, HLC limited its evaluation of the renewed Conversion Application to a document review of the Conversion Application and follow-up calls with Grand Canyon executives.

83. The fact that HLC curtailed its review of the Conversion Application was even more unusual given that the Conversion Application differed from the 2014 Conversion Proposal in certain respects that further indicated that New GCU would not be independent from GCE. For instance, while the 2014 Conversion Proposal contemplated GCU securing traditional financing for the transaction—and therefore subjecting the deal's financial structure to the scrutiny of third parties—the Conversion Application contemplated GCE acting as the lender to New GCU, with the loan secured by the assets New GCU would purchase. Moreover, Mueller had become chair of the Board at the Company in January 2017, which should have prompted further analysis of Mueller's anticipated overlapping roles between GCE and New GCU, an important consideration regarding HLC's requirements related to governance.

84. While the HLC lead reviewer had the option to determine that a "desk review" was appropriate, HLC staff typically reserved desk reviews for simple transactions involving straightforward questions regarding custody and control. This was not that type of simple transaction. HLC had already considered and rejected the 2014 Conversion Proposal, which was a complex transaction that did not satisfy HLC requirements. Particularly given the intervening circumstances discussed above, according to Solinski, HLC would typically have required an extensive evaluation of these complex facts, including consulting with a financial expert to evaluate the terms of the massive loan provided by GCE to New GCU. HLC instead performed a simple desk review of the Conversion Application, without site visits or consultations with experts.

**ii. Grand Canyon Filed Its DOE Application Late And Pressured HLC to Violate Its Own Requirement Of DOE Pre-Acquisition Review**

85. HLC had adopted a policy change in February 2017 that required that any Change of Control applicant provide a DOE pre-acquisition letter to the HLC Board before the Board could act on their application. Specifically, the HLC policy stated that:

> If the U.S. Department of Education conducted a pre-acquisition review of the proposed transaction, the Board will not act on the proposed change until it has reviewed the letter issued by the Department after it completes its pre-acquisition review, the institution's response to the Department's letter, and any additional information requested by the Department in its letter

86. Here, however, the Company did not request a pre-acquisition review until January 18, 2018. The DOE's guidelines state that reviews take at least 45 days to complete. HLC acts upon Change of Control applications three times a year, and the first HLC meeting of 2018 was scheduled for February 22, 2018. Therefore, Defendants knew that it was virtually impossible that the DOE would complete its review and issue a pre-acquisition letter by the time of the February 22, 2018 HLC meeting.

87. Both Rucker and Gellman-Danley consulted with Solinski regarding the fact that Grand Canyon needed to receive a pre-acquisition letter from the DOE prior to HLC acting on the application, but that Grand Canyon was very unlikely to do so. Indeed, Solinski's staff specifically reminded Grand Canyon of HLC's requirement multiple times. Following further consultation with Solinski, on or about February 1, 2018, Rucker sent a formal memorandum to Grand Canyon indicating that the deadline had arrived for submission of the pre-acquisition review letter prior to the HLC Board meeting on February 22, 2018. The memo explained that if Grand Canyon could not provide the DOE letter immediately, the Company could ask that the Conversion Application remain on the agenda (risking denial) or temporarily withdraw the Conversion Application and request consideration at the next meeting in June 2018. Absent this required document, the HLC Board could exercise its discretion to defer or even deny the Conversion Application. Solinski, who was copied on the memo, reviewed the memo before Rucker sent it to Grand Canyon.

88. Mueller and Bachus were unable to provide the pre-acquisition review letter but refused to request delayed consideration of the Conversion Application until the HLC's next Board meeting, as HLC had indicated was possible. Solinski learned from Rucker that Defendant Mueller "exploded" at Rucker and demanded that HLC keep the Conversion Application on the Board's agenda on February 22, 2018.

89. According to Solinski, both Rucker and Gellman-Danley informed her that Mueller also insisted that Gellman-Danley remove Solinski from oversight of the processing of the Conversion Application. In an unprecedented move, Gellman-Danley agreed to Mueller's demand and asked Solinski to step back from providing any further procedural guidance for the application. Gellman-Danley agreed further to keep the Conversion Application on the agenda for the HLC's meeting on February 22, 2018, even without the DOE's pre-acquisition letter (despite HLC's

requirements). Gellman-Danley told Solinski, without further explanation, that she had been "persuaded" that it was in HLC's best interest to approve the Conversion, despite her previously-stated skepticism about it.

90. Notwithstanding Gellman-Danley's instructions to Solinski, on February 10, 2018, Gellman-Danley asked Solinski to speak with a member of HLC's Board of Trustees about procedures related to the review of Grand Canyon's Conversion Application. During that conversation, Solinski understood that others within HLC had misunderstood her role regarding the Conversion Application. Accordingly, on February 19, Solinski submitted a memo to HLC explaining that, throughout the Conversion Application, she had not been involved in reviewing the Conversion Application as a decision-maker and that others had performed the substantive evaluation on HLC's behalf. Her February 19 letter established that, due in part to a limited friendship/business acquaintance with "a GCU senior staff member" (which she has confirmed refers to Bachus), Solinski had made it clear to other staff members from mid-2017 that she would not be the staff member reviewing the next Conversion Application or ensuring that the application was complete. (Although not directly referenced in the letter, Solinski's abstention was also driven by her previous role in the 2014 Conversion Proposal, which had resulted in a well-publicized HLC denial.) Solinski's letter (and correspondence attached to it) makes clear that, instead, Rucker would "be doing the heavy lifting on this one, and he will keep me posted as appropriate"—which, as discussed above, he had done. Solinski viewed this February 19 formal letter as necessary to clarify the record on Grand Canyon's Conversion Application.[2]

---

[2] Shortly after submitting this letter, Solinski submitted her resignation to the HLC for reasons unrelated to the GCU evaluation. Solinski subsequently filed a federal lawsuit against Gellman-Danley and HLC in the United States District Court for the Northern District of Illinois alleging sexual harassment and retaliation. After the District Court denied the defendants' motion to

91. As the HLC meeting date approached, Mueller and Bachus became concerned that the HLC Board might stand by its own policy and require Grand Canyon to obtain the DOE pre-acquisition letter before approving the 2017 Conversion Application.

92. On February 20, 2018, Defendant Bachus called Solinski to request her personal intervention with HLC staff to ensure that the Conversion Application would be reviewed by the HLC Board. In a voicemail he left with Solinski, Bachus claimed—falsely—that the DOE had not yet acted on the Conversion Application due to its "own challenges" rather than Grand Canyon's late application. As set forth in the transcription of the message below, Bachus also stressed that the Company would "do whatever" to get HLC review immediately, even without the required DOE pre-acquisition review letter:

> Hi Karen, it's Dan Bachus, hope you're doing well. Hey, we need some advice or some help from you. We, as you know, filed our pre-approval [pre-acquisition review application] with the Department of Ed thinking it was plenty of time to get a response before the HLC board meeting but because of their own challenges it doesn't look like that's gonna happen.
>
> We understand that you have a new policy that says if you get a pre-approval that you have to see it before you'll make your decision, but it doesn't say universities have to get pre-approval before you make your decision. So we can do a couple of things. We could pull our pre-approval from the Department of Ed before your meeting so we don't have a pre-approval out there, or we can continue until, you know, we'll give you the letter as soon as we get it. But we absolutely want to be on the board agenda along with Purdue this week, so we are willing to do whatever.
>
> I know Dennis has been talking to Robert [Rucker] and they agreed that if we got a letter from the DOE saying it wasn't required to get pre-approval and if we said we would send you a letter saying something about that that that would be sufficient to keep us on the agenda. But now we're being told this morning that you're gonna push it to June so again we're happy to pull our pre-approval from the DOE but we absolutely want to be on the board agenda this week. So call me back and let me

---

dismiss, the parties entered mediation and her suit was terminated by stipulation of the parties shortly thereafter, though the parties are prohibited by private agreement from disclosing the nature of that termination or further referencing the basis for her claim.

Solinski has confirmed that she holds no animus against any of the Defendants that drives her recollection of events as recounted in this Complaint.

> know or hopefully you can provide some guidance to Robert [Rucker] …. We've done exactly what he's asked and we feel like things have now been changed, so thanks. Bye.[3]

93. Solinski responded to Bachus that his request was improper. She also did not provide the requested "guidance" to Rucker.

**D. HLC Approves the Conversion Application**

94. The Conversion Application remained on HLC's meeting agenda on February 22, 2018. Even though GCE's application was virtually identical to the previous rejected application in many relevant respects (and arguably more challenging in others), and GCE had not obtained a pre-acquisition review letter from the DOE as required by HLC policy, HLC's Board approved the Conversion Application. The unusual accommodations provided to Grand Canyon and the about-face by HLC in its decision to approve the transaction followed substantial personal intervention by Mueller and Bachus with President Gellman-Danley, Robert Rucker, and Solinski—at a minimum.

95. According to Solinski, Defendants Mueller and Bachus enjoyed a longstanding personal friendship with Gellman-Danley. Indeed, according to Solinski, Defendant Mueller personally wrote a recommendation to HLC's Board to support Gellman-Danley's selection as President of HLC.

**E. Grand Canyon Touts The Importance Of Non-Profit Status**

96. Throughout the Class Period, Defendants repeatedly touted the importance of the conversion of the university into a purportedly independent non-profit. For example, in the press release announcing Grand Canyon University's renewed application to HLC (which was filed with the SEC), the Company announced that, "Following the [Conversion], [Grand Canyon] would

[3] Plaintiffs' counsel transcribed this recording and edited it only for readability.

operate as a for-profit third-party provider of educational and related services to [New] GCU . . . ." The press release also quoted Defendant Mueller as stating: "[T]his return to our historical non-profit status would convey an accurate reflection of who GCU is today and will be in the future . . . ."

97. From the time the Conversion was announced, market analysts focused on the importance of New GCU's independence as the Conversion was being proposed and executed. Accordingly, over the next five months, as the Conversion moved closer to finalization, Grand Canyon reinforced New GCU's independence through regular updates to the market. In the Company's 2017 Annual Report (filed with the SEC on February 21, 2018), Defendants discussed the Conversion at length. The 2017 Annual Report emphasized that, following the consummation of the Conversion, New GCU would be an independent, non-profit entity:

> New GCU would be a separate non-profit entity under the control of an independent board of trustees and independent management. Accordingly, our relationship with New GCU, both pursuant to the shared services arrangement and operationally, would no longer be as owner and operator, but as a third party contract party. While we believe this relationship would remain strong, New GCU's board of trustees and management would have fiduciary and other duties that would require them to focus on the best interests of New GCU and over time those interests could diverge from ours.

98. Analysts particularly liked the fact that New GCU would become a non-profit as a result of the Conversion. For instance, a February 21, 2018 BMO Capital Markets report noted: "Proposed not-for-profit/managed service transaction still on track," which would have "many benefits (e.g., removal from the 'for-profit' world where future risks are unknown)." Barrington Research noted in a February 22, 2018 report that the "return to non-profit status" would "de-risk LOPE as an investment and position the new entity to trade more in line with other education technology providers."

### F. Defendants Claimed That The Proposed Conversion Closely Followed The Structure Of Other Proposed Conversions

99. Before Grand Canyon announced the proposed Conversion, there had been a handful of successful conversions by for-profit institutions into non-profit universities. As referenced in ¶66, *supra*, Purdue University embarked on the most high-profile such conversion to date in 2017, when it announced plans to acquire for-profit Kaplan University from the educational services firm Kaplan, which would in turn become a separate third-party OPM provider. Under the terms of that deal, Purdue would incorporate Kaplan programs as Purdue's new online education arm, while Kaplan would provide back-office services pursuant to a services agreement. The Purdue-Kaplan deal received approval from the DOE in September 2017 and from its accreditor in March 2018.

100. In public statements to the press, as well as in Company filings and during conference calls with analysts, Defendants consistently maintained that the Conversion tracked the structure of the Purdue-Kaplan deal and other conversions that had achieved regulatory approval. For example, during a January 5, 2018 press conference, Mueller stated: "This arrangement will be very similar to hundreds of arrangements that already exist in the higher-education landscape today. And so this is not new. This is something that already exists in America." Similarly, in the press release announcing the Conversion, Mueller claimed that "[t]he structure [contemplated by the Conversion] is similar to the proposed structure in which Purdue University hopes to acquire the education assets of Kaplan University (a for-profit university), with Kaplan becoming the service company," and also noted that the structure "would encompass services that are similar to those that are currently provided in outsourcing agreements that well-known service companies have in place with hundreds of regionally accredited universities throughout the country."

101. Defendant Mueller again compared the Conversion to the Purdue-Kaplan deal during Grand Canyon's Fourth Quarter 2017 Earnings Call (the "4Q17 Call"), noting that "our proposed transaction and structure is almost identical to many others in the industry and is very similar to the Purdue and Kaplan proposal . . . ." The Company reiterated in a March 6, 2018 press release (also filed with the SEC on Form 8-K, signed by Defendant Bachus) that "[t]he structure is similar to that at hundreds of non-profit universities in the country that outsource services to third-party providers."

102. Analysts reacted positively to these comparisons. On January 5, 2018, analysts from BMO Capital Markets issued a report entitled "Grand Canyon University Submits Application to Return to Non-Profit Status," which discussed in detail the Company's statements about the HLC application. Among other things, the report explained that Grand Canyon "would operate as a for-profit third-party education and related services provider to New GCU . . . in return for a share of the school's tuition and fee revenue," and discussed how that share was "expected to be comparable to other shared services agreements in this sector." Similarly, in a report issued January 8, 2018 entitled "Economics of Potential Not-For-Profit Conversion," analysts from Piper Jaffray discussed the Conversion, and noted that the proposed structure was "very similar" to the Purdue-Kaplan deal.

103. Defendants continued to draw these comparisons. In the Company's 2017 Annual Report, filed February 21, 2018, it explained that the revenue split between Grand Canyon and New GCU was "expected to be comparable to other shared services arrangements currently in place in the higher education marketplace" and would "reflect the level of services that the Company would be providing to New GCU."

104. Defendants Mueller and Bachus repeated these claims that day during the Company's 4Q17 Call. Mueller stated that the revenue sharing arrangement under the contemplated MSA was "expected to be comparable to other shared service arrangements currently in place in the higher education marketplace, and to reflect the level of services that the company would be providing to New GCU." He also explained that the Company had submitted to HLC an updated application seeking approval of the Conversion, and that Defendants were "encouraged" by the fact that "that our proposed transaction and structure is almost identical to many others in the industry and is very similar to the Purdue and Kaplan proposal."

105. On February 26, 2018, Grand Canyon filed an 8-K (signed by Bachus) which provided more detail about the expected revenue split provision of the MSA, stating that "[t]he revenue share between the two entities remains subject to completion of a transfer pricing study and subsequent negotiation, but it is currently anticipated that New GCU's revenue from tuition and fees, room and board, and certain other sources will be shared approximately 60% in favor of the Company and 40% in favor of New GCU." Grand Canyon also stated the revenue share approach reflected in the master services agreement "would be comparable to other services agreements currently in the marketplace."

106. As set forth below, these statements were untrue. Indeed, Solinski—who was responsible for reviewing the Purdue-Kaplan transaction and was thus very familiar with its structure—had personally informed Defendant Bachus in May 2017, well in advance of each of the false and misleading statements, that the proposed Conversion and the Purdue-Kaplan transaction were very different in key respects.

### G. January 2018: Grand Canyon Submits Pre-Acquisition Review To DOE

#### i. Grand Canyon Announces Conversion Will Not Be Completed Until The DOE Grants Its Approval

107. As referenced in ¶86, Grand Canyon submitted its "pre-acquisition review" application to the DOE on January 18, 2018, which consisted of, among other things, drafts of the MSA, Asset Purchase Agreement ("APA"), and Credit Agreement ("CA"). While the DOE reviewed GCE's application for approval of the Change of Control, GCU participated in the Title IV programs on a provisional, month-to-month basis under a temporary Program Participation Agreement with the DOE. While operating under provisional approval, New GCU marketed itself as a non-profit university during the DOE's review of the Conversion—as discussed below, a significant marketing benefit.

108. The DOE's analysis of the Conversion was distinct from the HLC Change of Control application. While, as discussed above at ¶42, HLC focused on certain educational implications of the Conversion, the DOE pre-acquisition review focused on whether New GCU could be considered a non-profit institution under Title IV and the DOE's regulations promulgated thereunder.

109. Moreover, approval of a transaction by an institution's accreditor and/or the IRS allowing the entity a tax-exempt status was no guarantee of DOE approval. For instance, though the IRS approved CEHE's tax-exempt status in 2013, the Obama DOE refused to approve CEHE as a non-profit in 2016.

110. In the Company's Annual Report for 2017, filed on February 21, 2018, the Company stated that it "does not expect to execute any definitive agreements until HLC and Department of Education processes have concluded." Defendant Mueller similarly stated during

the Company's earnings conference call that day that Grand Canyon did not expect to complete the Conversion until "any necessary regulatory approvals have been received."

111. After HLC conveyed its February 22 approval on March 6, 2018, analysts began to treat DOE approval as a foregone conclusion based on meetings with Grand Canyon management. For example, BMO Capital Markets wrote confidently in a March 2018 report (following a "packed day of meetings" with Grand Canyon management days earlier) that "Management expects to complete the transaction by the end of 2Q18. The transaction still requires approval from the Department of Education (highly likely now that HLC has approved it)."

112. The Company continued to discuss the DOE approval as imminent. During Grand Canyon's May 8, 2018 earnings call, Defendant Mueller announced that the Company was "currently awaiting a response" from the DOE. During the question-and-answer portion of the call, an analyst from BMO Capital Markets asked Mueller and Bachus when they expected the transaction to be completed. Mueller explained that the timing of the transaction "remains the same. The [DOE] has told us that they will have their review done some time in the month of May, and we anticipate closing by July 1."

113. When the analyst pressed further, asking "what are the milestones that we need to follow to make sure . . . that happens by then," Mueller responded: "Mainly the Department of Ed review being completed by the end of May."

### ii. For-Profit Conversions Invite Public and Political Scrutiny and Lead to Failures

114. The increase in for-profit conversions did not escape public scrutiny. On April 2, 2018, three United States Senators and a United States Congressman formally requested that the Government Accountability Office ("GAO") conduct a review of recent non-profit conversions, stating: "We are concerned these for-profit colleges may use these conversions to shield

themselves from scrutiny and continue to put profits over students' best interests, even as not-for-profit institutions."

115. On May 4, 2018, thirty organizations representing students, consumers, veterans, and service members wrote to Secretary DeVos raising questions about the EDMC/Dream Center transaction. The letter indicated that the Dream Center may not actually qualify for non-profit status: "The Dream Center plans to operate the schools through a partnership run by one of the financiers, with an employment contract that has not been disclosed, answerable to seven board members who have not been disclosed. The arrangement may well violate the Department's requirement that nonprofit schools be 'owned and operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual.'"

116. Those concerns were well-founded. By June 2018, it emerged that the Dream Center acquisition of EDMC colleges effectively failed. The *Pittsburgh Post-Gazette* reported that HLC had removed accreditation status from four schools previously owned by EDMC in January 2018, yet the colleges failed to report such information to the public. On June 26, 2018, Senator Dick Durbin requested that HLC "immediately investigate" the accreditation issue.

117. Days later, on June 29, 2018, EDMC filed for Chapter 7 liquidation in the United States Bankruptcy Court for the District of Delaware. That same day, the Dream Center submitted a campus closure plan to the DOE stating its intention to close 30 locations of EDMC colleges it had acquired.

**iii. Unbeknownst To Investors, The DOE Indicates To Defendants That Approval Of The Conversion Would Be Much More Difficult Than Defendants Had Indicated To The Public**

118. As summarized above, Defendants Grand Canyon and Mueller consistently represented to potential and actual investors that the Conversion application to the DOE was

complete and that Defendants expected approval by the DOE in May 2018. They did so despite their undisclosed conversation with DOE Division Director Michael Frola in 2016, who, as discussed above, had indicated that the DOE would have objections to the Conversion's structure if Grand Canyon ever submitted it to the DOE. Mr. Frola held the same position at the DOE at the time of the Conversion in 2018.

119. Significantly, in a communication not disclosed by Defendants, the DOE propounded new and extensive interrogatories to the Company on May 17, 2018 concerning the basis for its claim that New GCU would be a non-profit. The interrogatories specifically probed New GCU's purported independence from Grand Canyon under the Conversion's proposed structure.

120. These interrogatories, which Lead Plaintiffs uncovered in their investigation, numbered over 25 requests for individual "narrative response[s]" and documents when including subparts, and included:

(a) "Produce any appraisals, valuations, valuation summaries, or valuation reviews obtained or commissioned ***by any party*** to the Transaction for purposes of valuing the Transaction" (emphasis in original).

(b) "State whether GCE is a company with which [New GCU] or the Foundation does 'substantial business' as used in Article III of the Foundation's Bylaws."

(c) "Describe the due diligence efforts by [New GCU] and the Foundation with respect to the Transaction and produce any documents relating thereto."

(d) "Produce any PowerPoint presentations, summaries, reports, or similar documents presented to the Boards of [New GCU], the Foundation, and GCE related to the Transaction."

(e) "Produce all documents assessing or analyzing the financial impact of the Transaction on [New GCU], the Foundation, or GCE, including documents reflecting projected revenue streams/losses as

a result of the Transaction, including any pro formas relating to the MSA."

(f) "Produce board meeting minutes, resolutions or consents relating to the Transaction. This request includes the boards of [New GCU], the Foundation, and GCE (and any subcommittees thereof)."

(g) "Provide the schedule of employees to be transferred to [New GCU] as contemplated in APA, § 6.4. Include each employee's current salary and the terms of any other compensation to which the employee is or may be entitled."

(h) "Identify any GCE employees to be jointly employed by GCE and [New GCU] and explain how joint employee compensation has been or will be determined."

(i) "Produce any Schedules or Exhibits to the APA, MSA, and CA not previously provided and produce any amendments to the draft documents previously provided."

(j) "Identify all persons or entities that have been engaged to perform any transfer pricing study in connection with the Transaction, their engagement letters, and any studies produced by them."

121. The extent of these new interrogatories indicated that the DOE was not inclined to rubber-stamp the Conversion and, in fact, had serious questions about the independence of New GCU from the Company. Contrary to Defendants' later public claims, the DOE did not inform Defendants of any "understaffing" issues relating to its review.

122. The DOE's heightened review was a material setback to Grand Canyon. The seriousness and scope of the interrogatories indicated that, notwithstanding the approach of the senior leaders of the DOE to the for-profit industry, the staff at the DOE would still approach these conversions with significant scrutiny. Given the undisclosed facts about Grand Canyon's unprecedented Conversion (discussed in detail in the Complaint), this put DOE approval at serious risk.

123. Moreover, even if Defendants hoped that New GCU might eventually receive DOE approval as a non-profit, the additional time the DOE promised to take with its heightened scrutiny

put the entire Conversion at risk. New GCU later stated in a lawsuit it brought against the DOE for refusing to approve New GCU's non-profit status that there was a rush to close the Conversion due to the sunk costs already incurred in preparing its application. These considerations included "the significant costs already incurred, the additional costs that would be incurred if the [Conversion] were further delayed, and the monumental efforts already undertaken." They also included "the risk of placing in jeopardy previously received approvals from HLC and other agencies if the [DOE's] delay persisted," which would have "delayed [the Conversion] for several more months after GCU received a response from the Department of Education."

124. Time was not on Defendants' side. As Trace Urdan, a longtime analyst of the for-profit sector put it in an October 31, 2017 article in Inside Higher Ed, "There's a window of opportunity for transactions," going on to add that colleges and their holding companies can "get deals done that may not be available to them if a Democrat gets elected in 2020." Similarly, as one commentator noted in a March 7, 2018 article in *Inside Higher Ed* titled "Purdue Global's Arrival": "People will try to finish [non-profit conversions] up because there's a limited political window . . . . The political winds will change again."

**iv. Grand Canyon Reverses Course And Moves Ahead With The Conversion Without DOE Approval In Hand**

125. Defendants did not disclose to the market either the extensive interrogatories sent by the DOE on May 17, 2018, or that the DOE had raised any serious questions targeting the foundation for the Conversion—questions that, as discussed below, ultimately revealed the unusual nature of New GCU's attempted conversion and underscored the significant (and undisclosed) risk that the DOE would decline to treat New GCU as a "non-profit," thus eliminating the significant marketing and regulatory advantage that New GCU desired. Instead, now knowing that the DOE had demanded extensive new information from Grand Canyon about the

Conversion—after DOE staff had previously told Defendants that the Conversion would face serious problems getting approval at the DOE—Defendants reversed course and declared that DOE approval was not necessary before the Conversion. Notably, Grand Canyon's decision to move forward without DOE approval was inconsistent with other large conversions approved by the Trump DOE, such as Purdue/Kaplan and Dream Center/EDMC.

126. On June 11, 2018, Piper Jaffray published an analyst report detailing conversations with Grand Canyon management at a PJC Investor Conference. In the report, Piper Jaffray reported that the Conversion was "on track for a July/August close," and said: "Accreditor and IRS approval is in place, with DOE approval still pending."

127. Piper Jaffray also noted—for the first time—that, based on conversations with Defendants Mueller and Bachus, "[t]he deal can close before final DOE approval is received (we view the DOE process as largely procedural), with the company currently focused on operational logistics." The report further emphasized:

> We met with CEO Brian Mueller, CFO Dan Bachus, and COO Stan Meyer.
>
> DOE approval is NOT required in advance to close the transaction. Accreditor approval (already received) was the primary regulatory hurdle. DOE will be focused on GCU's financial viability post-transaction and may require a letter of credit to be posted given the University's initial debt burden.

128. Around the same time, scholars were raising questions about the structure of the Conversion before the National Advisory Council on Institutional Quality and Integrity ("NACIQI"), the advisory body that provides recommendations to the Secretary of Education on the recognition of accreditation organizations (including HLC). On May 24, 2018, NACIQI held hearings on the topic of "Oversight of For-Profit Institutions' Conversions to Non-Profit Entities." During the hearings, Professor Brian Galle, a Georgetown University Law Center professor who specializes in tax law challenged the structure of the Grand Canyon Conversion, concluding that,

under its terms, "there is no reason to believe that new GCU will behave as a non-profit organization" because "[i]t is financially and practically beholden to a for-profit partner" and "is operated by a group of individuals who serve two masters."

129. The Company and New GCU both vociferously and repeatedly rejected any implication that New GCU would be anything but totally independent after the Conversion. Five days after the NACIQI hearing, New GCU issued a scathing response to the professor's testimony, claiming that it was "rife with inaccuracies." Among other things, New GCU stated that the professor's testimony that GCU "is operated by a group of individuals who serve two masters" "is false" because Defendant Mueller "may continue to serve [as both Grand Canyon's CEO and New GCU's President]," and "[o]ther than potentially Mr. Mueller, however, there will be no overlapping management or employees between the two entities." New GCU also claimed that the professor's "role is to attack the business model whereby the non-profit University will receive services from Grand Canyon Education in return for a share of the University's revenue," and stated that "the third party services model was and is a model deeply embedded throughout the higher education world" and New GCU had "commissioned studies to ensure that the rates and terms of the services arrangement are consistent with market norms." New GCU also claimed that the professor's testimony that the proposed Conversion "'fails the control test' under IRS rules" was "false."

130. Despite the criticism, the Company proceeded full steam ahead with the Conversion and, on July 2, 2018, Grand Canyon filed with the SEC a Form 8-K (the "July 2, 2018 8-K") announcing that it had closed the Conversion by executing the APA whereby it sold the GCU campus and all academic and related operations and assets to New GCU. By this time, Defendants' confident claims of regulatory approval had driven GCE's stock price up nearly 30%.

131. The July 2, 2018 8-K explained that New GCU had paid Grand Canyon $853.1 million at closing, and that, with adjustments, the purchase price was expected to rise to $875 million. According to the July 2, 2018 8-K, New GCU financed the purchase by issuing the Company a senior secured note, secured by the assets it had just purchased, which provided for 6.0% annual interest to be paid monthly, and with a maturity date of June 30, 2025. Under the terms of the secured note, New GCU would make interest-only payments during the term, with a balloon payment of the principal and any unpaid interest due at maturity.

132. The July 2, 2018 8-K also stated that, in connection with the closing of the Conversion, the Company and New GCU had entered into the MSA, whereby the Company would provide "identified technological, counseling, marketing, financial aid processing and other support services to New GCU in return for 60% of New GCU's tuition and fee revenue." This filing did not provide a copy of the MSA to investors.

133. The MSA was not filed publicly until February 2019. At that time, it was filed as an exhibit to the Company's Form 10-K for 2018. Notably, the MSA was filed in significantly redacted form. Among other things, the services provided by GCE to New GCU were completely redacted, as were the revenue sources that were included in GCE's 60% Services Fee revenue share.

134. The July 2, 2018 8-K also discussed the Company's pre-acquisition review by the DOE, which was still not complete. In direct contrast to Defendant Mueller's and the Company's prior statements, Grand Canyon attempted to downplay the significance of the DOE review. For instance, Grand Canyon stated that based on its "ongoing engagement" with the DOE, the Company had decided that "any regulatory limitations imposed by [the DOE] could be managed."

135. That same day, Defendant Mueller misleadingly dismissed the delay in receiving DOE approval as a "staffing" issue at the DOE. Specifically, Mueller told *The Chronicle of Higher Education* that the DOE "pre-approval" process normally takes forty-five days, but that it was taking longer in the Company's case because "[the DOE is] very understaffed."

136. Nowhere did Mueller disclose the highly material fact that the DOE had about six weeks earlier requested voluminous and detailed documentation justifying the Conversion—or that DOE staff had previously expressed skepticism about the Conversion to Defendants, without mentioning any issues regarding "staffing."

137. As reported by *Azcentral* on July 2, 2018, Defendant Mueller strongly expressed confidence in the outcome of the DOE review—explaining that, while Grand Canyon had not yet "got their letter that says there are no restrictions" in connection with the Conversion, Defendants "would be very surprised, based on our discussions with them, if there were."

138. In a speech given that same day, which was reported on by the *Phoenix New Times* on July 7, 2018, Defendant Mueller again reiterated that the arrangements between Grand Canyon and New GCU were "very mainstream in higher education today" and stated: "Hundreds of universities are doing it, and our model is almost an identical replica of that, so we're in the mainstream of what's happening."

139. Analysts credited Defendants' claims. On July 9, 2018, BMO Capital Markets published an analyst report updating its model to reflect the Conversion and raising its price target. In describing the transaction in detail, the BMO Capital Markets analysts explained, among other things, that "New GCU has adopted a conflict of interest policy that prohibits any trustee from having a financial interest in, or role with, GCE," and that "[a]side from Mr. Mueller, no other employee of New GCU or GCE has a dual role in both organizations."

140. Unbeknownst to investors, the DOE's analysis was not slowed by a "staffing" shortage. Instead, the DOE continued to actively scrutinize and require substantive information about the Conversion in the months following the deal's closing and following their extensive May 17, 2018 requests. For example, on July 3, 2018, two days after the Conversion closed, the DOE served further interrogatories, including requests for audited financial statements and a copy of New GCU's default management plan. On August 24, 2018, the DOE sent an email to New GCU demanding copies of the final Conversion deal documents and an audited same-day balance sheet for New GCU. And on September 10, 2018, the DOE demanded a "narrative" explaining how the structure of the Conversion "warrant[ed] recognizing the institutions' conversion to nonprofit status for the purposes of . . . Title IV." Although Defendants responded to each of these demands as the DOE required, they gave no indication to the market that the DOE was engaging in continued, significant scrutiny of the deal and its terms.

141. During the period of DOE review of the Conversion, public and political pressures continued to grow around for-profit institutions, further placing the DOE's approval of the Conversion at significant risk, since Defendants were counting on an extraordinarily loosened regulatory environment for the review to succeed.

142. In September 2018, a federal district court held that Secretary DeVos and the DOE had acted in an "arbitrary and capricious" manner in postponing the Borrower Defense Rule, in violation of federal law.

143. On November 7, 2018, the Democratic party retook control of the House of Representatives. An *Inside Higher Ed* article that day, headlined "What a Divided Congress Means for Higher Education," stated that "Democrats' takeover of the U.S. House promises tougher scrutiny of DeVos and the Education Department." Similarly, the *New York Times*

reported on February 19, 2019, that "House Democrats Prepare to Scrutinize DeVos's Education Department." As the *Times* article stated: "[House Democrats'] appetite for oversight of the Education Department appears limitless." Both articles specifically mentioned that House Democrats would begin investigations regarding for-profit companies.

144. Additional for-profit failures spurred further investigation and reproach of for-profit institutions. Multiple former EDMC schools and campuses now affiliated with the Dream Center closed in the first quarter of 2019. The closures spawned a Congressional outcry and an investigation. *US News and World Report* reported that documents released as part of the Congressional investigation "appear to show that Dream Center executives [misrepresented the accreditation of their schools] with the understanding that the Education Department, which under DeVos has prioritized unburdening the for-profit sector from the increased scrutiny placed on it by the previous administration, was working on its behalf to secure the schools a retroactive accreditation."[4]

**v. The IRS Rubber-stamps New GCU's Tax-Exempt Status Without Substantive Review**

145. On July 17, 2018—more than two weeks after the close of the Conversion—New GCU requested that the IRS re-affirm its tax-exempt status, which the IRS did on August 31, 2018. The Company had initially applied to the IRS for recognition of GCU as a tax-exempt organization on October 8, 2015 in connection with the 2014 Conversion Proposal. It received the requested exemption one month later on November 9, 2015. The IRS, of course, could not have reviewed the documents setting forth the final structure of the Conversion in 2015, because they were not negotiated and finalized until 2018. No additional documents were reviewed by the IRS in 2018.

[4] Later, in October 2019, the House Committee expanded its investigation to include a review of HLC's role in the accreditation process.

146. Notably, the IRS has been criticized for rubber-stamping applications of for-profit institutions attempting to convert to tax-exempt institutions. In a report titled "The Covert For-Profit: How College Owners Escape Oversight through a Regulatory Blind Spot," issued September 22, 2015, former Deputy Undersecretary of Education Robert Shireman—now a senior director at the Century Foundation—observed that the IRS relies on the declarations and representations of the 1.6 million non-profits in the United Stated in determining non-profit status, which amounts to, in essence, "an honor system."

147. In an October 7, 2020 report entitled "How For-Profits Masquerade as Nonprofit Colleges," Shireman noted that "[t]he IRS tax-exempt division has become an unreliable enforcer of nonprofit integrity." Shireman attributed this fact in part to dramatic budget cuts to the agency, as well as a tendency for lawyers in the industry to represent both for-profits and non-profits, giving them an incentive to elide the differences between the two.

148. Shireman specifically cited Grand Canyon's 2015 IRS tax-exempt application as an example of this trend. He noted that the nearly 600-page application was approved in three weeks, that it "included descriptions of financial arrangements that typically can invite detailed examination by the IRS" and yet the IRS "raised no issues and asked no questions" about the application, and that the attorney who submitted the application on Grand Canyon's behalf had previously worked in the IRS chief counsel's office.

149. As referenced in ¶114, *supra*, in April of 2018, a group of U.S. Senators sent a letter to the GAO requesting information on "how attempts to convert from for-profit to not-for-profit status are evaluated and decided." Capstone, a Washington, D.C. based policy and regulatory analysis firm, noted that the GAO review could result in the IRS revoking GCU's non-profit status, which Capstone described as "an existential risk to [the Company]."

150. The resulting GAO report, published December 31, 2020 and titled "Higher Education: IRS and Education Could Better Address Risks Associated with Some For-Profit College Conversions" (the "GAO Report"), corroborated the conclusion that the IRS insufficiently polices transactions such as the Conversion. The GAO Report found, in a section titled "IRS Has Not Consistently Identified and Responded to Risks That Insiders May Improperly Benefit from Previously For-Profit Colleges," that in several conversions of for-profit universities into non-profits that could benefit insiders of the for-profit entity, the "IRS approved the application[s] without certain information, such as the college's planned purchase price or an appraisal report estimating the college's value," which may have resulted in the IRS "miss[ing] indications of improper benefit." Like the Conversion, Each of these conversions criticized by the GAO Report involved "organizations [that] were created expressly to purchase the college" as well as "plans for the newly tax-exempt college to purchase extensive services through contractual agreements with its former owners."

151. The GAO Report also confirmed that the IRS lacks the resources to sufficiently police these transactions; when interviewed for the report, "IRS officials . . . noted that for-profit conversions can raise complex technical issues with which even veteran staff may have limited experience." IRS managers further told the GAO Report's writers that "the depth of their reviews can vary greatly—from cursory to in-depth—depending on factors such as the complexity of the case, a manager's confidence in the staff member's abilities, and the staff members' level of experience." Ultimately, IRS officials themselves told the GAO that "they have not assessed whether the agency's internal controls are sufficient to provide reasonable assurance that staff consistently follow guidance to evaluate the risk of improper benefit associated with for-profit college applications for tax-exempt status."

152. In prepared testimony to the House Education and Labor Committee for an April 20, 2021 Congressional hearing titled "For-Profit College Conversions: Examining Ways to Improve Accountability and Prevent Fraud," Mr. Shireman testified that the GAO Report confirms that "the IRS hasn't closely examined a lot of these conversions," and "[s]ome of them it hasn't even known about." He further noted that the fact that the IRS has not denied tax-exempt status to a single for-profit university seeking to convert to a non-profit "should signal that [the DOE] needs to conduct its own independent review." This is especially true, Mr. Shireman testified, because "IRS doesn't have the resources" to properly scrutinize these transactions. "Even if that agency got another $1 billion a year, there's still 1.5 million charities for them to monitor every year."

**H. As A Purported Non-Profit Institution, New GCU Enjoyed Vast Marketing Benefits Over For-Profit Institutions Following The Conversion**

153. After the Conversion, New GCU's recruiting and enrollment prospects improved tremendously. As an open for-profit college, GCU had previously suffered significant disadvantages in reaching potential recruits. Given for-profit colleges' reputation for exploitation, both school districts and prospective students were extremely wary of recruitment by for-profit institutions. As Trace Urdan said in a March 2, 2018 *Bloomberg Government* article titled "Conflicts of Interest Seen as For-Profit Schools Eye Nonprofit Status": "***The for-profit brand, the for-profit sector, is completely destroyed*** . . . . For-profit has come to mean bad and not in the student's best interest and nonprofit has come to mean good."

154. As a result, certain school districts had forbidden Grand Canyon from marketing to their students because of its for-profit status. As the *Phoenix Business Journal* reported, prior to the Conversion, Grand Canyon's "university recruiters were snubbed by some of the largest school districts in the country, including the Los Angeles Unified School District, which has nearly

700,000 students . . . ." Mueller confirmed in the article that there were "some [school districts] that were definitely keeping us out . . . . [The Los Angeles Unified School District] did not let us be on campus to talk to their students." Consistent with Mueller's statements, Former Employee ("FE") 1, a University Development Manager at Grand Canyon from July 2014 until August 2019 responsible for overseeing representatives that worked to develop relationships with schools and hospitals, recalled that the Anchorage school district would not let him in until he could say he was with a non-profit school. The same was true of many healthcare and hospital networks. He understood from his counterparts looking after other areas of the U.S. that many of their largest school districts had similar requirements.

155. Both to overcome these marketing disadvantages and because for-profit companies were financially incentivized to drive up enrollment numbers, for-profit colleges spent vastly more to recruit new students than did non-profit colleges. As set forth in a May 19, 2020 Brookings Institute report titled "Commercials for college? Advertising in higher education," on average, for-profit universities spend almost $400 recruiting each student, whereas non-profits spend only $48. That same report reveals that, in 2017, Grand Canyon spent the second-most of any for-profit school in the country on advertising—more than $28 million.

156. The marketing disadvantages of for-profit colleges are well-known. In prepared testimony to the House Education and Labor Committee for an April 20, 2021 Congressional hearing titled "For-Profit College Conversions: Examining Ways to Improve Accountability and Prevent Fraud," one expert witness opined:

> For predatory institutions, retaining revenue-extraction power while evading for-profit college oversight is already a neat trick. But ***there is a third, added benefit that makes disingenuous conversions even more enticing to predatory schools: the ability to market themselves to students as if they were truly charitable nonprofits***.

> After waves of fraud, abuse, and sudden closures in the for-profit sector, students have become wary of for-profit schools. That is why schools like Grand Canyon University brag to their shareholders about the stock-boosting benefits of advertising as a nonprofit.

157. Indeed, after New GCU purportedly converted into a non-profit, the university immediately exploited the marketing benefits of its new supposed non-profit status to the maximum extent. New GCU changed its marketing tagline to: "Private. Christian. Affordable. Nonprofit," creating numerous videos and marketing materials trumpeting its supposed new non-profit status.

158. In a December 2018 interview at a member event for the investment site *The Motley Fool*, Mueller touted that "Investors were very excited about us getting out of the for-profit university space, which, if there's a change in administration, could be problematic. We're now a non-profit university and have all the privileges of that." In response to a question as to whether "the separation of Grand Canyon Education and Grand Canyon University help distance you from a for-profit world that might be under more regulatory focus," Mueller answered, "the University now being not-for-profit is a tremendous advantage. That stigma now is gone. We can recruit in high schools that would not let us in in the past . . . . We're just 90 days into this, but we're experiencing, we believe, a tailwind already just because of how many students didn't pick up the phone because we were for-profit."

159. One of the reasons prospective students were more likely to "pick up the phone" after the Conversion is because of their belief that non-profit institutions are more likely to have a student's best interests at heart. As a July 7, 2018 *Phoenix New Times* article explained, "when prospective students see GCU's new non-profit label, they may think they are enrolling in a certain kind of school even though the incentives of the old, for-profit institution have not changed." The article quoted Professor Galle, the Georgetown University Law Center tax law professor and

expert in the for-profit education sector, who observed that there is strong "evidence that consumers believe nonprofits act differently than for-profits . . . . [Consumers] believe that nonprofits are not looking out for their bottom line—that they're not going to cut quality to make money." Indeed, Grand Canyon's former employees corroborated that the supposed change to a "nonprofit" university was a major recruiting benefit that drove escalating enrollment—and thus tuition dollars to GCE.

160. FE 1 explained: "It was a big deal. People were waiting for July 1st to come around so we could say non-profit again. This was going to be the biggest development for us to get away from the stigma [of for profit colleges]. [Mueller] said that himself." FE 1 continued, "We dealt with [the issue of being for profit] on a daily basis. I had 14 representatives in 5 western states. The stigma of University of Phoenix was real. The edict from the President [Mueller] himself was to go out and tell people we're non-profit again. He was very involved with all of the marketing."

161. FE 1, who recalled that numerous school districts had barred the door to a for-profit Grand Canyon University as discussed above, said, "As soon as we told people we were non-profit, all those doors flew open."

162. Grand Canyon vigorously pursued this marketing strategy notwithstanding the fact that the DOE's review was still pending. Later, the GAO Report noted that this type of marketing can result in giving prospective students "a mistaken understanding about whether they were pursuing a degree from a college recognized by [the DOE] as a nonprofit."

163. The Company repeatedly attributed its growing revenues and margins to New GCU's ability to market itself as a non-profit. For instance, during Grand Canyon's 2018 fourth quarter earnings call in February 2019, Mueller boasted that New GCU's non-profit credential was an invaluable tool for attracting students. Mueller explained that the Company's rising fortunes

could be attributed to the marketing of the school as a non-profit: "***Being out there now a million times a day saying 'we're nonprofit' has had an impact.***"

164. New GCU's resulting increase in enrollment directly contributed to GCE's bottom line. On the February 2019 call, Mueller explained that the 9% increase in revenues—calculated in comparable terms, as if the Conversion had occurred on July 1, 2017—"was due to an increase in [New] GCU's enrollment and an increase in [New] GCU's ancillary revenue, resulting from increased traditional student enrollment." During the Company's 2019 first quarter earnings call, Mueller also represented that the 19.3 percent year-over-year increase in services revenue (after comparability adjustments) "was primarily due to [among other things] the increase in [New] GCU enrollments between years."

165. Mueller made similar attributions during the Company's 2019 second and third quarter earnings calls, during a period in which Congress had ramped up scrutiny of the for-profit sector and other for-profit conversions resulted in failure (Dream Center) or increased headwinds and the imposition of stringent conditions (Ashford). Given the then-existing for-profit environment, Defendants' false marketing of New GCU as a non-profit educational institution was crucial to its financial performance.

**I. Following Completion Of The Conversion, Grand Canyon Announces Strong Results That Far Surpass Any Of Its Purported Peers**

166. Following the close of the Conversion, quarter after quarter, Grand Canyon reported strong financial results that routinely exceeded market expectations and bolstered the market's faith in the Company's profitability and long-term prospects.

167. In particular, Grand Canyon's operating profit margins showed immediate, enormous growth following the Conversion:

| Quarter | Operating Margin | Change Year-Over-Year |
|---|---|---|
| 3Q18 | 35.6%[5] | +41% |
| 4Q18 | 45.1% | +34% |
| 1Q19 | 36.7% | +12% |
| 2Q19 | 29.2% | +18% |
| 3Q19 | 30.9% | -13% |

168. Investors pay close attention to operating margins because they reflect a business's operational profitability. Compared to Grand Canyon's purported OPM peers, many of whom reported profit margins in the range of 3-4% or lower, Grand Canyon's margins were truly remarkable.

169. Mueller's representations about the growth in enrollment were particularly reassuring to investors in light of the terms of the loan Grand Canyon had extended to New GCU. As reported in *The Chronicle of Higher Education* on July 2, 2018, New GCU needed "enrollment to grow by at least 7 percent annually for the next several years to have enough money on hand to pay down the $875 million debt" it took on in connection with the Conversion.

170. In addition, in the 3Q 2018 10-Q and subsequent disclosures, Grand Canyon made significant accounting-related disclosures. Grand Canyon claimed that New GCU fell within a "not-for-profit entity carve out" to accounting rules that would otherwise require Grand Canyon to consolidate New GCU's finances with its own (showing investors a comprehensive financial picture of both entities, including their assets and liabilities). By claiming that New GCU fell within this "not-for-profit carve out," Grand Canyon avoided reporting the full financial position of the entities together. Grand Canyon further claimed that "[New] GCU is not a related party to

[5] The Company reported an adjusted margin figure for third-quarter 2018 that accounted for one-time costs related to the Conversion, which is reflected on this Table.

the Company in accordance with ASC Topic 850." The 3Q 2018 10-Q was signed by Defendant Bachus, and Mueller and Bachus each signed a certification pursuant to the Sarbanes-Oxley Act of 2002 attesting that the 3Q 2018 10-Q "fairly present[ed], in all material respects, the financial condition and results of operations of the University [sic]." Defendants continued to repeat these representations in quarterly and annual SEC filings for the remainder of the Class Period.

171. Analysts heaped praise on the Company and Defendants Mueller and Bachus in response to these disclosures. On November 9, 2018, BMO Capital Markets reported that "LOPE reported a solid EPS 'beat' driven by better-than-expected revenues and margins," assigning the stock an "Outperform" rating and predicting its price would increase. On February 22, 2019, BMO Capital Markets reported that "Despite its size, [New] GCU online enrollment should still continue . . . . Revenue per online student is roughly $9,920 (GCE gets 60% of this) with these students generating margins in excess of 40%." On August 7, 2019, BMO Capital Markets noted that "LOPE reported 2Q19 adjusted EPS of $1.09, well above the $0.94 consensus . . . . About half the 'beat' was below the line . . . with the rest mostly margin driven." Similarly, in response to Grand Canyon's first-quarter 2019 results, announced on May 7, 2019, analysts from BMO Capital Markets noted that Grand Canyon's "revenues and margins beat guidance," and raised its 2019 estimates. And when Grand Canyon reported strong second-quarter 2019 results after market close on August 6, 2019, analysts from Barrington Research explained that Grand Canyon's "Q2/19 top[ped] expectations," including because its revenues came in above consensus (growing 23% year-over-year in comparable terms) and its EPS came in well above expectations, and raised their price targets to $145, a "more than 20% upside from current levels."

### J. In Reality, Defendants Lied About Their Business Model And Concealed The Risks of DOE Disapproval

172. As discussed above, Grand Canyon reaped enormous benefits from marketing GCU as a non-profit entity (and thereby avoiding the stigma associated with for-profit educational entities). However, as investors would later learn, undisclosed facts showed that New GCU's post-Conversion non-profit status was a sham, and Defendants' representations about the Conversion—including their claims about New GCU's post-Conversion independence, the similarity of the Conversion to other transactions, and the risks of DOE approval and reasons for the DOE's delay in approving the transaction—were materially false and misleading.

173. The falsity of Defendants' representations about the Conversion began to come to light when the DOE announced that it would not approve New GCU's application for treatment as a non-profit. As discussed above, in response to the DOE's issuance of extensive document demands probing the structure of the Conversion beginning in May 2018, the Company provided the DOE with numerous non-public documents that it marked "Confidential," including (1) the fully unredacted MSA; (2) a report from Barclays (the "Barclays Report") dated April 26, 2018; (3) a "follow-on" Barclays report discussed with the Company's Board of Directors on June 20, 2018; (4) and a "Transfer Pricing Report" for 2018 prepared by Deloitte (the "Deloitte Report"). After carefully and thoroughly "review[ing] [the] materials provided to it," the DOE determined that the Conversion "violate[d] the most basic tenet of nonprofit status—that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity."

174. The DOE was the only regulator or outside entity to demand, receive, and review these critical internal documents. Neither the IRS nor HLC were provided these documents before issuing their respective approvals.

175. The facts in these documents were also actively concealed from investors. Defendants never provided investors with the Barclays Report, the follow-on report, or the Deloitte Report. And while Grand Canyon attached the MSA to a public filing during the Class Period, it redacted key information from the publicly-filed version of the document, including information showing the sources of revenues that GCE shared in as a result of the MSA and other material terms.

**i. New GCU Was Not Independent From GCE**

176. Prior to the closing of the Conversion, Defendants repeatedly told investors that, once the Conversion was complete, GCE "would operate as a for-profit third-party provider of educational and related services to GCU," while New GCU "would return to [its] historical non-profit status." Defendants also represented that GCE would "no longer . . . operate" New GCU, that New GCU would become a "separate" and independently-managed non-profit entity, and that claims that Grand Canyon and New GCU would be "operated by a group of individuals who serve two masters" were "false" because, other than Defendant Mueller, "there will be no overlapping management or employees between the two entities." After the Conversion closed, Defendants continued to characterize the relationship between GCE and New GCU in a similar fashion, explaining, for example, that "the Company's relationship with New GCU, both pursuant to the Master Services Agreement and operationally, is no longer as owner and operator, but as a third party service provider to an independent customer" and that "[a]side from Mr. Mueller, no other employee of [GCU] or [Grand Canyon] has a dual role in both organizations." But as demonstrated by the non-public information the DOE forced Defendants to provide, these statements were materially false and misleading.

177. First, entirely undisclosed to investors, Grand Canyon continued to effectively "operate" New GCU after the Conversion, because the vast majority of the executives and

employees that controlled New GCU's day-to-day operations were employed by Grand Canyon—not New GCU. Although Grand Canyon claimed, prior to the Conversion, that "no . . . employee of [New GCU] or [Grand Canyon]" aside from Mueller would have "a dual role in both organizations," the opposite was true: of university President Mueller's 58-person "Executive Leadership" Team that was "responsible for managing and overseeing the [New GCU]" prior to the Conversion, 41 executives—nearly 75% of the executive team—stayed with GCE to manage New GCU after the Conversion. As the DOE observed, these overlapping employees, as employees of the Company, had a fiduciary responsibility to the shareholders of the Company while at the same time "providing significant management and oversight" of New GCU. Based on these undisclosed facts, the DOE concluded that, "[g]iven the enormous leverage GCE now has over [New GCU] by virtue of the fact that most of [New GCU]'s key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* [New GCU]."

178. Indeed, many of GCE's current academic executives held the same high-level roles on New GCU's behalf as they did at GCU before the Conversion, simply continuing the same function as they had before—only this time, with loyalty to GCE, not New GCU's academic mission. For instance, old GCU's Director of Faculty Services became GCE's Executive Director of Faculty Services. Similarly, GCE's Vice President of Learning and Development held that same role with old GCU before the Conversion.

179. Second, the reports evaluating the financial implications of the Conversion were commissioned by the Company for the benefit of the Company's Board of Directors—not New GCU. The DOE noted that New GCU's Board minutes do not reflect any discussion of the Barclays Report, and it "is not clear whether the Barclays Report was provided to the [New GCU]

board prior to the approval of the [Conversion]." The DOE further noted that New GCU did not receive the Barclays Update until after the close of the Conversion. While New GCU may have commissioned the defective Transfer Pricing Report from Deloitte, as discussed above, that report was (1) facially inadequate and (2) relied exclusively on conversations with GCE management for the information supporting its conclusions.

180. Finally, former employees of the Company recall that, following the Conversion, the Company and New GCU were separate in name only. For example, former employees recall that, after the Conversion, it was the Company's policy that GCE employees use GCE email addresses for internal communications but use their former email addresses indicating their affiliation with New GCU for all outward-facing communications. FE 2 was a University Business Development Executive at Grand Canyon from April 2017 to October 2019 and was responsible for recruiting students to the New GCU's graduate programs. As noted above, FE 1 was a University Development Manager at Grand Canyon from July 2014 until August 2019 and was responsible for overseeing representatives that worked to develop relationships with schools and hospitals as part of Grand Canyon's online division. FEs 1 and 2 each independently confirmed that it was the Company's policy that employees use their GCE email addresses for internal communications but never for outward-facing communications and that the Company was extremely strict about enforcing this policy. FE 2 recalled that the Company made it clear the above policy was created to ensure students and strategic partners believed that he and the other executives worked for GCU. FEs 1 and 2 further independently recalled that they and their colleagues had business cards and voicemails identifying them as New GCU employees.

181. GCE employees also were instructed to and did routinely represent themselves as university employees to prospective students in attempting to recruit them. FEs 1 and 2 each

independently confirmed that, after the Conversion, even though they remained employees of GCE, they represented themselves to prospective students as employees of New GCU. When asked if his strategic partners and students had any idea that he was with GCE, FE 2 said, "None at all. I don't think they knew what GCE was. They absolutely still thought I was with GCU." Similarly, FE 1 recalled that he and his team tried to convince superintendents of secondary school districts to enroll their support staff workers into New GCU's teaching college as a way to boost their ranks of teachers, and that, during these interactions, "As far as students and superintendents were aware, there was no [GCE]."

#### ii. The Undisclosed Terms Of The Conversion Were Not "Mainstream" Or "Very Similar" To The Purdue-Kaplan Deal—They Overwhelmingly Benefited GCE at GCU's Expense

182. In discussing the Conversion with investors, Defendants repeatedly represented that the Conversion was "mainstream" and "very similar" and "almost identical to" the Purdue-Kaplan deal and others that the DOE had previously approved. As set forth below, however, the two transactions were starkly different in material ways that were hidden from investors. After carefully reviewing the materials Grand Canyon submitted, including extensive information Grand Canyon concealed from investors, the DOE determined, as reflected in its November 6, 2019 letter (the "DOE Letter"), that—entirely unlike other conversion transactions—the "primary purpose [] of the MSA" was to "drive shareholder value for GCE with GCU as its captive client—potentially in perpetuity."

183. By repeatedly comparing the Conversion to the Purdue-Kaplan deal, Grand Canyon sought to portray the Conversion as similar to one that the market viewed as "safe," in that it had already received DOE approval. As discussed above, Purdue, a public institution, purchased Kaplan University, a formerly for-profit institution, and converted it into a non-profit public benefit corporation ("NewU"). As part of the deal, Purdue agreed to purchase services from

Kaplan Higher Education ("Kaplan"), which remained a for-profit provider of educational services.

184. The deal between Purdue and Kaplan contained several key terms:

(a) Kaplan sold Kaplan University to Purdue for just $1;

(b) A "key provision" of the Purdue-Kaplan transaction was that Kaplan would be paid for its services only after NewU had generated enough revenue to cover its operating costs—in other words, until NewU broke even;

(c) Kaplan would be paid nothing until NewU generated $10 million in revenue, which Kaplan would have to pay to NewU in the event the university could not generate the money;

(d) After that point, Kaplan would be paid for the expenses of the services it provided plus 12.5% of NewU's online tuition and fee revenue—revenue arising from the services Kaplan actually provided to NewU;

(e) Kaplan and Purdue contained no overlapping executives or directors; and

(f) The Purdue/Kaplan transaction permitted either party to terminate the services agreement after the sixth year for a termination fee of 1.25 times the total revenue of the NewU in the preceding year, payable by a promissory note.

185. These terms were critically important to NewU's independence and ability to prioritize its educational mission. Indeed, in its September 13, 2017 letter preliminarily approving the deal, the DOE highlighted the fact that NewU would be controlled by Purdue—a public entity—and not by a private for-profit services provider: "Purdue . . . controls NewU . . . . Based on its preliminary review of the supporting documents submitted by Purdue . . . the Department has concluded that control of NewU will not be retained by any entity or persons who controls [Kaplan] or ICA." Similarly, the DOE observed that "the distribution of revenues" was structured "to provide financial protection and certain financial incentives to New University, while compensating [Kaplan] fairly for its original contribution of the Institutional Assets." Notably,

the DOE nonetheless required Purdue to "submit a detailed description of the 12.5% . . . payment to [Kaplan]/ICA . . . which demonstrates the plan for ensuring that students will be served first, and that all educational and operational expenses are being covered prior to any portion of the [fee] being paid to [Kaplan]/ICA."

186. These features of the Purdue-Kaplan deal were worlds away from the arrangements between Grand Canyon and New GCU as contemplated under the Conversion, thus rendering Defendants' repeated comparisons materially misleading.

187. First, Purdue and Kaplan had no overlapping executives or management as a result of their transaction. This was entirely unlike the arrangement between Grand Canyon and New GCU as a result of the Conversion, whereby—in addition to Defendant Mueller acting as New GCU President and GCE CEO—nearly 75% of Mueller's "Executive Leadership" team managing New GCU were actually Grand Canyon employees.

188. Second, the financial terms of Conversion were entirely unlike the terms of the Purdue-Kaplan deal. As noted above, in connection with the Purdue-Kaplan deal, Kaplan received a 12.5% share of those Purdue revenues, tuition and fees, that were related to the services Kaplan actually provided to Purdue—and then only after Purdue had first broken even.

189. With respect to the Grand Canyon Conversion, Defendants went to great lengths to conceal the sources of GCE's Services Fee. In public filings, Defendants only disclosed that the Services Fee would consist of a share of New GCU's revenue from tuition and fees and other sources "comparable to other service agreements currently in the marketplace."

190. Tellingly, Defendants specifically concealed the makeup of the Services Fee from investors during the Class Period, by redacting it from Grand Canyon's public filings:

**EXHIBIT D**

**PRICING AND PAYMENT TERMS; OTHER AGREEMENTS**

**1. University Adjusted Gross Revenue.**

For purposes of this Agreement, University adjusted gross revenue (***University Adjusted Gross Revenue***) consists of all revenue received by University or its Affiliates in respect of the following (in each case net of refunds and scholarships actually granted by University to its students to the extent accounted for as a discount to tuition):

[***]

As Grand Canyon explained:

Confidential Treatment has been requested for the redacted portions of this agreement. The redactions are indicated with three asterisks [***]. A complete version of this agreement has been filed separately with the Securities and Exchange Commission.

191. As the DOE later disclosed, the Services Fee included far more than simply tuition and fee revenue related to the services Grand Canyon provided to New GCU. In an arrangement that was apparently unique to Grand Canyon's proposed Conversion, revenue for purposes of the Services Fee included numerous sources other than those related to the services Grand Canyon provided:

(a) Tuition (including tuition funded by third party sources and charitable contributions);

(b) Fee revenue from students for use of the online communications portal ("the Platform");

(c) Fee revenue from students and their related activities;

(d) Fee revenue from students for use of the Canyon Connect learning resources platform;

(e) Fee revenue from students for student housing;

(f) Fee revenue from students for meal plans and other food services; and

(g) Other revenue including revenue from: (i) sales of athletic tickets; (ii) the operation of the Grand Canyon University Hotel and Conference Center; (iii) the operation of the Maryvale Golf Course; (iv) the operation of the Grand Canyon University Arena; and (v) the operation of Canyon Enterprises (apparel sales and other businesses).

192. As discussed below, Defendants concealed these extensive—and unrelated-to-GCE—sources of revenue not only from Grand Canyon's investors, but also from Grand Canyon's internal advisors opining on the fairness of the Conversion.

193. The financial terms of the deals materially differed in other ways as well. As reflected in the undisclosed Barclays Report, GCE's estimated Services Fee for fiscal year 2019 was approximately $697 million—far exceeding GCE's $416 million expected costs of performance, and amounting to an approximately 67% markup on those costs. But under the terms of the Conversion, New GCU also owed GCE $854 million pursuant to the Senior Secured Note and Credit Agreement for the physical assets comprising the New GCU campus. Considering both the Services Fee and loan-related payments, GCE was expected to receive 95% of New GCU's revenue.

194. Moreover, notwithstanding the fact that GCE expected to siphon off virtually all of New GCU's revenue, New GCU was expected to continue to incur substantial operating expenses. According to the Barclays report, the costs to operate New GCU after the Conversion were expected to increase by nearly 85%, from $810 million to $1.496 billion, for fiscal year 2019.

195. The net result of these arrangements was that, according to the undisclosed analysis in the Barclays report, New GCU would incur 72% of the expense of operating the institution, while receiving 5% of the institution's revenues, while the Company would incur just 28% of the total costs and receive 95% of the institution's revenues. Notably, the Barclays Report assumed that GCE's Services Fee would be based on both a lower revenue split and fewer sources of revenue than was ultimately imposed by GCE. As the DOE noted, incorporating correct assumptions "would seem to only exacerbate Barclay's assessment that the separation of the

servicing functions from [New GCU] will result in a significant increased cost for the operation of New GCU, with those increased funds flowing to the benefit of its prior owner, GCE."

196. This state of affairs was entirely unlike the arrangement resulting from the Purdue-Kaplan deal, whereby Kaplan would receive merely 12.5% of tuition and fee revenue only after Purdue had reached breakeven.

197. Moreover, these crucial, undisclosed financial details of the deal meant that, even if New GCU were independently operated (which it was not), it was financially captive to Grand Canyon for the foreseeable future. As the DOE noted, the MSA provided for an Initial Term of 15 years, with "automatic renewals thereafter for successive five year terms . . . apparently in perpetuity." As set forth in the MSA, New GCU could only exit the arrangement after seven years, and then only by fully satisfying the $854 million Secured Note and paying a fee. If New GCU terminated the arrangement prior to the end of the Initial Term, it would owe an "Early Termination Fee" of "one-hundred percent (100%) of the aggregate Services Fees paid or payable by University to Provider for the trailing twelve (12) month period"; and if it declined to renew the arrangement, it would owe a "Non-Renewal Fee" of "fifty (50%) of the aggregate Services Fees paid or payable by University to Provider for the trailing twelve (12) month period." Each of these fees was to be paid "by wire transfer of immediately available funds."

198. Given the lopsided revenue share imposed by the arrangement between Grand Canyon and New GCU, paying off the Secured Note and the fees was effectively impossible, and New GCU was thus prevented from exiting its arrangement with GCE.

199. In contrast, the Purdue/Kaplan transaction permitted either party to terminate the services agreement after the sixth year for a termination fee of 1.25 times the total revenue of Purdue Global in the preceding year—a fee "payable by a promissory note, rather than cash."

200. In addition to the myriad critical distinctions between the Conversion and the Purdue/Kaplan deal that are clear from the transaction documents themselves, Defendants were specifically informed in 2017 that the Conversion differed significantly from the Purdue/Kaplan transaction in the eyes of regulators. Indeed, when the Company determined in May 2017 to renew its attempt to complete the Conversion, Solinski spoke on the phone with Defendant Bachus about the Company's interest in filing a reapplication. During that call, when Defendant Bachus urged that the proposed transaction was similar to the Purdue/Kaplan deal, Solinski—who also led HLC's review of the Purdue/Kaplan deal—pushed back on this characterization. Indeed, citing only publicly available information about the Purdue/Kaplan deal, she told Defendant Bachus that there were "real" and "key" differences between the two deal structures, sent him articles clarifying the differences, and pointed him to publicly available filings about the Purdue/Kaplan transaction that demonstrated the differences when compared to the non-public information Bachus and Solinski had about Grand Canyon's proposed transaction.

**iii. GCE Misled GCU's Transfer Pricing Advisor**

201. As noted above, in connection with the approval of the Conversion, GCU commissioned a "transfer pricing" report from Deloitte. In connection with non-arms-length transactions like the Conversion, such reports can help to assess the fairness of deal pricing and inform tax issues. Indeed, Defendant Mueller explained during Grand Canyon's February 2018 earnings call that determining "[t]he revenue share between the two entities" was "subject to completion of a transfer pricing study and subsequent negotiation."

202. This Deloitte Report purported to justify the terms of the Conversion and, as the DOE noted in the DOE Letter, it concluded that the 60%/40% revenue split was reasonable given what each party would contribute to the revenue-generating activities. In response to an interrogatory from the DOE specifically demanding any transfer pricing reports created in

connection with the Conversion, and "[p]erhaps trying to circumvent the somewhat obvious conclusion that under the MSA [New GCU] costs an additional $697 Million to operate in the first fiscal year," Grand Canyon provided the Deloitte Report to the DOE in connection with its review.

203. However, as was made clear by the DOE's analysis, the Deloitte Report was facially shoddy and incomplete. Among other things:

(a) Deloitte was working from an outdated version of the MSA, which did not include sources of revenue from the arena, athletic tickets, etc., meaning that the entire Deloitte Report was based on "fundamentally flawed assumptions."

(b) Deloitte did not include New GCU's physical campus (owned by New GCU) as a revenue-generating asset, "which is at odds with statements made by GCE to its shareholders," in which GCE had identified its physical campus as "one of the primary factors for its revenue increase in 2017."

(c) Deloitte failed to assess which party assumed the contractual risks associated with revenue-generating activities, a "failure [which] render[ed] Deloitte's. . . analysis 'incomplete'" as stated in the Deloitte Report itself.

204. The DOE emphasized that the Deloitte Report did not "appear to be based on information that Deloitte independently tested and analyzed on behalf of [New GCU]. Rather, these opinions in key areas appear to have been based on information supplied by GCE management."

205. In other words, while the Company provided the Deloitte Report as required by the DOE, it corrupted the data underlying that report to make the Conversion appear fair—when it was anything but.

### iv. Traditional Concerns About For-Profit Universities Were Realized By New GCU's Transformation After The Conversion

206. Remarkably, after the Conversion, when New GCU was supposedly acting as a non-profit, Grand Canyon began to escalate the very practices that led to the downfall of for-profit

universities in the past. Because New GCU was in fact a captive profit-seeking entity acting on GCE's behalf, it changed its admissions and academic standards in an attempt to maximize GCE's profits. Grand Canyon also dramatically intensified pressure on recruiter employees to admit unqualified students. The effect of these practices was to increase student debt and enrollment—and associated tuition and other revenues—significantly, while exacerbating the abusive practices so often prevalent at for-profit institutions.

207. The Company began aggressively recruiting students even if they were academically unqualified or unlikely to be able to repay their loans. This was recognized as a common practice condemned at for-profit institutions. As a Senate Subcommittee found in a comprehensive 2012 report, "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," "[b]ecause continual enrollment growth is so critical to their business success, <u>most for-profit colleges' first priority is to enroll as many students as possible</u> . . . . Recruiters' job security depends on meeting a quota of new enrollments . . . . The boiler-room atmosphere leads to a lax ethical environment, with little room for considering whether a particular student is a good fit for the college or whether attending the college is in that person's best interest."

208. This same "boiler-room atmosphere" took over Grand Canyon and New GCU directly after the Conversion. FE 2 recalled that, after the Conversion, there was an increased focus on recruiting new students. He indicated that, after the Conversion, his team's focus shifted more to fulfilling student quotas than on forging strategic, long-term partnerships with school districts and hospitals. He further recalled that there was strict adherence to quotas, which were becoming nearly impossible to meet, and that, of the thirteen business development employees he

trained with when he was hired, only one remained with the Company at the time FE 2 was laid off.

209. FE 1 recalled that, after the Conversion, the Company began to engage in aggressive recruitment strategies. For instance, he recalled, "Starting at the end of 2018 . . . it began to be less about outside consulting to solve problems and became more about getting your numbers up and your [representatives'] numbers up. It went from developing strategic relationships to straight sales. Anyone that could get funding would get enrolled even if they didn't deserve to be a student. It was all about getting your numbers up to support [New GCU] in that last year." FE 1 confirmed that, as long as financial aid could secure Title IV funding for a student, their job was to enroll the student, even if the student was unqualified or it was clear the student would not succeed academically. Although he never personally enrolled a student that he did not believe could succeed, he confirmed that at least 25 to 35% of New GCU enrollments after the Conversion were not suitable students.

210. FE 1 further explained: "When we started, it was first and second course completions we were measured on. After [the Conversion] they changed it so now we're only measured on first course completion. If the student finishes that first course, they're on the hook for at least three classes. So what if they drop out after that?" This had the impact that recruitment employees, desperately seeking to meet their new strict quotas for new students, no longer had to worry about students meeting their long-term goals. As long as they could get a student to enroll who would last one semester, that would be adequate for GCE's compensation targets. FE 1 explained that his counselors used to hold parties and celebrations for their students after they completed semesters, up to and including their graduation from the program. That changed after the Conversion. He said, after the Conversion, "[t]hat relationship piece became way less

important than just cramming a ton of students into the funnel." FE 1 indicated that, when he raised concerns to his supervisors, he was told it "wasn't [his] position to ask" despite the fact that he was personally overseeing 16,000 school districts.

211. FE 3, who was an Executive Financial Aid Specialist at the Company from May 2012 until February 2020, was responsible for processing financial aid requests. FE 3 recalled that, after the Conversion, the Company became less customer-service oriented and "way more of a pump and dump operation." FE 3's team dealt with the end result of recruiting efforts as they processed financial aid applications. FE 3 said that, after the Conversion, the university began engaging in practices that they had never engaged in before, such as allowing balances to remain on students' accounts for longer than they previously had, which "was always a big no-no before [the Conversion]." FE 3 recalled that he and his team began to decline some financial aid applications, but he and his colleagues were "told just to keep our mouths shut and process stuff." FE 3 estimated that, towards the end of his employment at the Company, approximately 10% of applications had problems or were close to missing deadlines, whereas before the Conversion such problems were extremely rare.

212. FE 3 further recalled that, after the Conversion, there was a noticeable shift in the Company's recruitment strategies. For instance, he recalled that the quality of New GCU's students declined, and New GCU began to recruit students with lower grades than it had before in addition to students that had outstanding debts—a telltale sign that they should not be taking out further student loans. FE 3 recalled that he would see students "that already have six figures in loans and we're out there getting them more." Prior to the Conversion, FE 3 recalled that recruitment of prospective students seemed to be focused on their best interests, but there was no

such focus after the Conversion, when it became "just about processing as [many applications] as fast as possible."

### K. Grand Canyon Violated GAAP

213. As set forth above, once the Conversion was completed, Grand Canyon began to report financial results as a purportedly stand-alone entity, including margin results that had grown dramatically year-over-year, and that far exceeded the margins obtained by its peers. Grand Canyon also denied having any off-balance sheet arrangements requiring consolidation under GAAP, and asserted that New GCU was not a related party within the meaning of GAAP. But as would later be revealed, Grand Canyon's margins and statements about consolidation and relatedness under GAAP were materially false and misleading, because Grand Canyon was required by GAAP to consolidate New GCU's results onto Grand Canyon's financial statements and to identify New GCU as a related party, and its failure to do so inflated its reported margins.

#### i. Grand Canyon Was Required To Consolidate New GCU's Results

214. During the Class Period, Grand Canyon repeatedly claimed that New GCU was exempted from consolidation requirements because it was purportedly a non-profit. This supposedly allowed the Company to avoid accounting rules, enacted after Enron misled the nation by parking liabilities in off-balance entities, that would have otherwise required the Company to consolidate New GCU's expenses into its income statement—a step that would have dramatically decreased Grand Canyon's reported margins, given that Grand Canyon took 95% of New GCU's revenues while paying only 28% of New GCU's expenses. This in turn allowed GCE to present significantly better profit margins than its OPM competitors could muster, and gave investors a far more optimistic picture of the Company's operating results than what was accurate—exactly what the accounting rules were designed to prevent.

215. GAAP requirements for consolidation are set forth in ASC 810. ASC 810-10-10-1 explains that "[t]he purpose of consolidated financial statements is to present, primarily for the benefit of the owners and creditors of the parent, the results of operations and the financial position of a parent and all its subsidiaries as if the consolidated group were a single economic entity." ASC 810 requires a reporting entity to consolidate other entities in order to offer investors a "fair presentation" of a reporting entity's financial information when it "directly or indirectly has a controlling financial interest in [those] other entities," explaining that GAAP requirements for consolidation reflect a "presumption that consolidated financial statements are more meaningful than separate financial statements and that they are usually necessary[.]"

216. ASC 810 requires reporting entities to consolidate "variable interest entities" ("VIE")—those organizations (here, New GCU) for which a reporting entity (here, GCE) has interests reflecting the VIE's economic success or failure. As *The New York Times* explained in a January 16, 2003 article entitled "Accounting Rules Changed to Bar Tactics Used by Enron," the Financial Accounting Standards Board ("FASB") adopted rules requiring VIE consolidation "to make it harder for companies to hide debts and assets from their shareholders." The article explained: "Enron's collapse gave special-purpose entities such a bad name that the new rule even comes up with a new term, variable interest entity, or V.I.E., to describe such vehicles. They get that name because different investors in them have interests that will vary with the success of the enterprise."

217. ASC 810 sets forth a two-step analysis to determine whether a reporting entity must consolidate another legal entity under its provisions. First, a threshold analysis is conducted to determine whether a legal entity like New GCU need even be evaluated for consolidation. Second, in the event the threshold analysis shows the legal entity should be evaluated for consolidation, the

reporting entity should consolidate a VIE if it has "power" and the obligation to receive benefits or absorb losses "that could potentially be significant to the VIE."

218. Grand Canyon claimed that New GCU did not need to be consolidated because it was a non-profit, and the threshold analysis above included a "not-for-profit entity carve-out." In other words, GCE claimed that New GCU did not need to be consolidated because, as a purported non-profit, it fell outside the scope of the VIE consolidation rules entirely.

219. As set forth below, under ASC 810, New GCU did not fall within a scope exception, and its financial statements should have been consolidated with GCE's.

**a. New GCU Did Not Fall Within A Scope Exception Because It Was Not A Bona Fide Non-Profit**

220. As discussed above in Section V.J, Grand Canyon's internal documents (including the analyses provided to Defendants Mueller and Bachus by Barclays and Deloitte, which were not presented to the IRS) showed that New GCU's operations "violate[d] the most basic tenet of nonprofit status" under the IRS Code and the Higher Education Act, because New GCU was operated by and for the benefit of Grand Canyon. These same facts, withheld from the IRS, show that Grand Canyon also failed to meet the definition of a non-profit embodied in ASC 810.

221. ASC 810-10-20 distinguishes a non-profit from other organizational forms on grounds that non-profits receive "[c]ontributions of significant amounts of resources from resource providers who do not expect commensurate or proportionate pecuniary return" and have "[o]perating purposes other than to provide goods or services at a profit."

222. Each of these characteristics shows that GCU was not a non-profit under ASC 810's definition. As the DOE recognized in its decision, the overwhelming majority of New GCU's resources came from Grand Canyon, which received pecuniary return to the tune of 95% of New GCU's revenue. In addition, because of the financial burden imposed on New GCU through the

Credit Agreement and MSA, and because the majority of New GCU's management was affiliated with or employed by Grand Canyon, New GCU was effectively forced to operate for the purpose of providing its services for profits—profits which disproportionately inured to Grand Canyon. Indeed, as set forth above in Section V.J.iv, several former GCU and Grand Canyon employees confirmed that, following the Conversion and faced with New GCU's heavy obligations to Grand Canyon under the Credit Agreement and MSA, New GCU's management changed the university's operations precisely in ways designed to increase the profits to remitted to Grand Canyon—such as by pushing to increase the number of students enrolled, even if they were unqualified.

223. In addition, even if New GCU was considered a non-profit—which, given the facts in the undisclosed Barclays and Deloitte Reports (which were not presented to the IRS), it could not have been—the non-profit entity exemption has what Grand Canyon's auditor, KPMG, calls an "anti-abuse provision": under ASC 810-10-15-17, the exemption <u>does not apply</u> if the not-profit is being "used by business reporting entities in a manner similar to a VIE in an effort to circumvent the provisions of the Variable Interest Entities Subsections." The extremely asymmetric revenue and expense splits as a result of the conversion, which allowed Grand Canyon to report market-leading margins far in excess of those enjoyed by its peers precisely because it did not consolidate New GCU's financial results, strongly suggest that Grand Canyon used the non-profit exemption in an effort to avoid consolidation.

224. Thus, under both the Internal Revenue Code and the Accounting Standards Codification, New GCU was not a true not-for-profit entity, and the VIE subsection scope exception for not-for-profits was inapplicable.

### b. Grand Canyon Was Required To Consolidate GCE's And New GCU's Financial Statements

225. Given that the non-profit exception did not apply to New GCU for the reasons set forth above, the remaining steps in the threshold analysis are to determine (1) whether GCE has a variable interest in New GCU, and (2) whether New GCU itself counted as a Variable Interest Entity. If those threshold requirements were met, GCE was required to then evaluate its relationship with New GCU according to certain factors, to determine whether consolidation was required. These analyses demonstrate that Grand Canyon was required to consolidate New GCU under ASC 810.

226. To start, Grand Canyon's interests in New GCU were variable interests, because Grand Canyon "share[d] in [New GCU]'s economic risks and rewards" by virtue of its Services Fee and Credit Agreement. Specifically, as Deloitte explains in its "Consolidation Handbook," "[a] legal entity's debt obligations – including the obligation to pay the related interest – are always variable interests." Here, New GCU plainly had significant debt obligations to Grand Canyon. Moreover, the service fees paid by New GCU to Grand Canyon were also variable interests. Per Deloitte, fees charged by service providers are variable interests unless several conditions are met, including that the "fees are commensurate and customary for the services performed" and the service provider's "aggregate <u>other</u> variable interests . . . absorb only an insignificant amount of the legal entity's variability" (emphasis added). As explained above (*see* Section V.J.ii), Grand Canyon's fees were neither customary nor commensurate with the services it provided to New GCU—and Grand Canyon held a significant "other variable interest" by means of the debt it issued to New GCU anyway.

227. Moreover, New GCU was a VIE within the meaning of ASC 810. Subsection 810-10-15-14 provides alternative conditions under which an entity like New GCU is considered a VIE

for the purposes of consolidation. Among other things, an entity is considered a VIE if its "total equity investment" is "not sufficient to permit [it] to finance its activities without additional subordinated financial support." But New GCU had no equity investment at all, and—as would be revealed at the end of the Class Period—it was unable to finance its activities without additional support from Grand Canyon in the form of so-called CapEx-related loans. Accordingly, New GCU was a VIE.

228. Given the results of the threshold analysis above, Grand Canyon was next required to determine whether it had the power to direct New GCU's most significant activities and the right to receive benefits that could potentially be significant to New GCU, and to consolidate New GCU's results if those criteria were met. Both were.

229. First, Grand Canyon plainly controlled the most significant operations of New GCU—as evidenced by facts reviewed in the DOE Letter, which Grand Canyon specifically misled the market about:

> [N]early 75% of the executive team members responsible for managing and overseeing [New] GCU and developing its strategic vision are employed by its service provider. As employees of [Grand Canyon], these executive leaders have a primary fiduciary duty to the shareholders of GCE . . . while at the same time providing significant management and oversight of [New GCU]. This is particularly so given the scope of the activities [Grand Canyon] is providing under the MSA . . . . Given the enormous leverage GCE now has over [New GCU] by virtue of the fact that most of [New GCU]'s key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* [New GCU] as is required.

(emphasis in original).

230. Second, as to the right to receive benefits, as the DOE concluded based on the materials Grand Canyon provided in connection with its review but concealed from investors, "[Grand Canyon] and its shareholders – rather than [New GCU] – are the primary beneficiaries of the operation of [New] GCU under the terms of the MSA," including because Grand Canyon would

receive "approximately 95% of [New GCU]'s revenue" and could, in fact, "be paid even significantly higher amounts over the costs of the services it provides" if New GCU's revenues grew.

231. Accordingly, had Grand Canyon properly evaluated New GCU under the terms of ASC 810, it would have been required to consolidate it as a VIE.

**ii. Grand Canyon Violated GAAP Requirements For Related Party Disclosures**

232. In addition to failing to consolidate New GCU as a VIE as required, Grand Canyon also failed to properly recognize New GCU as a related party. ASC 850-10-10-1, which explains the objectives of related-party disclosures, provides: "[ASC 850] establishes requirements to disclose certain significant related party transactions and control relationships. Relevant information is omitted if the disclosures required by [ASC 850] are not made." ASC 850-10-05-3 explains that related party transactions include those between "Affiliates," which are defined at ASC 850-10-20 as parties that control, are controlled by, or are under common control with one another.

233. As set forth above, the numerous facts set forth in the detailed nonpublic analyses prepared by Barclays and Deloitte demonstrated that Grand Canyon actually controlled New GCU. These included the facts that: New GCU was essentially captive; Grand Canyon—and not New GCU—was the primary beneficiary of New GCU's operations under the MSA; Defendant Mueller's dual role afforded him significant control over New GCU's operations, with respect to the MSA; and "nearly 75% of the executive team members responsible for managing and overseeing [New] GCU and developing its strategic vision are employed by" Grand Canyon, a point made even more salient in light of "the scope of the activities [Grand Canyon] is performing

under the MSA." These factors establish that Grand Canyon and GCU are, at minimum, affiliates warranting related party disclosure.

234. This concern is not merely formalistic. ASC 850-10-05-2 explains that "[i]nformation about transactions with related parties is useful in comparing an entity's results of operations and financial position with those of prior periods and with those of other entities. It helps users of financials statements to detect and explain possible differences." Similarly, the Public Company Accounting Oversight Board has explained that "[a] company's related party transactions could pose increased risks of material misstatement, as their substance might differ materially from their form."

235. Here, Defendants repeatedly represented that Grand Canyon was becoming a servicing company and expected to sign on additional customers imminently. Defendants' failure to provide appropriate related-party disclosures, in conjunction with their repeated false assurances that the terms of the arrangement with New GCU were industry-standard, gave investors the false impression that Grand Canyon's arrangements with New GCU were negotiated at arms-length and represented terms that were generally available in the marketplace. By failing to identify Grand Canyon's transactions with New GCU as related party transactions, Defendants improperly denied investors the opportunity to "compar[e] [New GCU]'s results of operations and financial position with those of prior periods and with those of other entities" and to "detect and explain possible differences" as they evaluated the Company's prospects.

## VI. THE TRUTH EMERGES

236. Defendants' materially false and misleading statements, and failure to disclose material facts necessary to prevent their statements from being misleading, artificially inflated the price of Grand Canyon's shares during the Class Period. The truth about Grand Canyon's scheme to artificially inflate its reported financial results by improperly designating New GCU as a non-

profit, which thereby failed to disclose Grand Canyon's actual less favorable financial performance, as well as the actual terms of the Conversion and the DOE's review thereof, was revealed to the market through two partial corrective disclosures in November 2019 and January 2020. Each of these partial corrective disclosures partially removed artificial inflation in the price of Grand Canyon's stock. As such, Defendants' wrongful conduct alleged herein directly and proximately caused the economic losses suffered by Lead Plaintiffs and the Class.

### A. November 6-7, 2019: Grand Canyon Discloses That New GCU Failed To Meet The DOE's Definition Of A Non-profit

237. On November 6, 2019, after the market close, Defendants Mueller and Bachus hosted Grand Canyon's third-quarter fiscal 2019 earnings call (the "3Q 2019 Earnings Call"). During the call, Defendants announced strong results, including a revenue beat and increased full-year revenue, margin, and EPS guidance. However, at the tail end of the call, after the portion of the call allocated to analyst questions had ended, Defendant Mueller announced that New GCU had informed Grand Canyon "approximately 1 hour ago" that it had received correspondence from the DOE concerning its approval of the New GCU non-profit Conversion. Defendant Mueller stated that the DOE had determined that New GCU "d[id] not satisfy the department's definition of a non-profit entity, and as a result, [would] continue to be treated as a for-profit entity for purposes of its participation in Title IV HEA programs."

238. The following day, November 7, 2019, Grand Canyon filed with the SEC a Form 8-K concerning the DOE's correspondence (the "November 7, 2019 8-K"). The November 7, 2019 8-K explained that "the [DOE] has taken the position that Grand Canyon University does not satisfy the Department's definition of a non-profit entity and, as a result, that the Department will continue to treat the University as a for-profit institution for purposes of its continued participation in Title IV, HEA programs."

239. These revelations shocked the market, and Grand Canyon's stock price plummeted as a result. Even though Grand Canyon announced strong results for third quarter 2019, and materially raised its full-year guidance for several key financial metrics, Grand Canyon's stock declined by a statistically significant amount in response to the disclosure of the DOE's decision. From a close of $91.88 on November 6, 2019, Grand Canyon's stock price dropped by $3.80, or 4.14%, to close at $88.08 on November 7, 2019, on extraordinary volume. On November 8, 2019, Grand Canyon's stock price decline continued: it dropped a further $3.19, or 3.62%, closing that day at $84.89.

240. Analysts and the news media connected the declines in Grand Canyon's stock price to the revelation of the DOE decision. For example, in a report issued before the market opened on November 7, 2019 titled "3Q19 Takeaways: Quarter and Guidance Fine, But New ED Disclosures," analysts from BMO Capital Markets explained:

> LOPE reported a solid EPS "beat" and raised 2019 guidance by that amount. Unfortunately at the end of the call, management noted that "about an hour ago" it had been notified by the Dept. of Education (ED) that in approving GCU's program participation agreement (allows Title IV eligibility), it still considers [New] GCU to be a proprietary (for-profit) institution.

The Motley Fool published an article that same day titled "Why Grand Canyon Education Stock Dropped Today," which explained:

> Grand Canyon Education's revenue rose 24% year over year to $193.3 million . . . [and] [t]he company's profits also increased at a solid clip.
>
> . . .
>
> However, investors appear to be focusing more on news that Grand Canyon University (GCU), for which Grand Canyon Education provides support services, will continue to be treated as a for-profit entity for purposes of its participation in federal financial aid programs by the U.S. Department of Education. As a result, Grand Canyon University will be subject to regulations that require it to meet stricter standards for financial aid and graduate employment.
>
> Grand Canyon Education Chairman and CEO Brian Mueller said during a conference call with analysts that he hasn't yet had time to review the Education

> Department's reasoning for treating [New] GCU as a for-profit entity but that the university would likely challenge the decision. Mueller also said that the stricter for-profit regulations would likely have little impact on the university's operations.
>
> Investors, however, appear to be somewhat concerned with the Education Department's ruling, and some are choosing to sell their shares of Grand Canyon Education today.

Similarly, in a report issued on November 8, 2019, analyst Barrington Research explained:

> While the transaction was approved as expected, ED said [New] GCU does not satisfy its definition of a non-profit entity and, as a result, will continue to be treated as a for-profit entity for regulatory purposes. Despite the better-than-expected Q3 results and guidance, the stock, which was down as much at $15 (or 17%) at one point, closed down $3.80 (or 4%) to $88.08.

241. Defendants' announcements concerning the DOE decision on November 6-7, 2019 partially revealed the truth about Defendants' fraudulent scheme, by revealing that the DOE had determined that New GCU failed to meet DOE requirements for a non-profit institution.

242. The applicable DOE regulations defined a "nonprofit institution" as an institution that:

> (i) Is owned and operated by one or more non-profit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual; and
>
> (ii) Is legally authorized to operate as a non-profit organization by each State in which it is physically located; and
>
> (iii) Is determined by the Internal Revenue Service to be an organization to which contributions are tax deductible under 26 U.S.C. §501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3)).

34 C.F.R. §600.2.

243. As Grand Canyon had previously disclosed, New GCU was owned by a non-profit entity. Moreover, as Mueller reiterated on the November 6, 2019 earnings call, New GCU was being "treated as a non-profit entity by the State of Arizona" and the IRS had "determined that Grand Canyon University is a 501(c)(3) tax-exempt organization." Thus, Defendants'

announcement on November 6, 2019 revealed that the basis for DOE disapproval of New GCU's non-profit application was its failure to be "operated by one or more nonprofit corporations or associations, no part of the net earnings of which benefits any private shareholder or individual."

244. The fact that New GCU failed to meet this criterion for treatment as a non-profit by the DOE partially revealed that several of Defendants' Class-Period statements were materially false and/or misleading and materialized the substantial and undisclosed risk of DOE disapproval that Defendants had concealed. For example, it directly contradicted Defendants' repeated representations about New GCU's supposed independence following the Conversion—such as their representations that, as a result of the Conversion, New GCU would (and did) become an "independent" non-profit entity, and that Grand Canyon would (and did) "no longer" function as New GCU's "operator, but as a third party service provider to an independent customer."

245. The disclosure also partially revealed the false and misleading nature of Defendants' repeated assurances to investors about the DOE review process, such as assurances that delays in DOE approval were solely attributable to DOE "understaff[ing]," which were at minimum misleading by virtue of their omission of key facts, including Grand Canyon's receipt of detailed interrogatories from the DOE in May 2018, which plainly would have altered the total mix of information for investors.

246. Similarly, the disclosure partially revealed the misleading nature of Defendants' statements touting the similarity of the Conversion to other approved transactions, like the Purdue-Kaplan deal. Defendants repeatedly touted the Conversion's similarity to those approved transactions, but refused to disclose numerous critical facts that differentiated the Conversion from those deals—such as details necessary to understanding the economic reality of the post-

Conversion arrangements between Grand Canyon and New GCU, which Defendants had withheld from the IRS and HLC and redacted in public filings:

**EXHIBIT D**

**PRICING AND PAYMENT TERMS; OTHER AGREEMENTS**

**1. University Adjusted Gross Revenue.**

For purposes of this Agreement, University adjusted gross revenue (***University Adjusted Gross Revenue***) consists of all revenue received by University or its Affiliates in respect of the following (in each case net of refunds and scholarships actually granted by University to its students to the extent accounted for as a discount to tuition):

[***]

These very details formed the basis of the DOE's determination that New GCU failed to meet the DOE's requirements for treatment as a non-profit.

247. However, for several reasons, these disclosures did not reveal the full truth to investors. Among other things, during the 3Q 2019 Earnings Call, Defendants strongly disputed the DOE's findings, claiming to "believe that Grand Canyon University meets all the requirements to be treated as a non-profit entity for Title IV HEA program purposes" and that they "expect[ed] that the university will initiate appropriate measures to challenge this decision." Defendants also attempted to undermine the DOE's finding by claiming that "the federal government in the form of the IRS has independently determined that Grand Canyon University is a 501(c)(3) tax-exempt organization" and that "the university is treated as a non-profit entity by the state of Arizona." They further claimed that the Conversion was undertaken for legitimate purposes, stating:

> [W]e would like to strongly emphasize the following. As discussed many times over the past several years, we did not undergo the transaction for the purpose of avoiding the various regulations. . . .

248. In the November 7, 2019 Form 8-K, while continuing to conceal the information provided to the DOE or the existence of the interrogatories sent by the DOE in May 2018, Defendants similarly attempted to delegitimize the DOE's findings, stating:

> The Department's determination appears to be based principally on the Department's analysis of Internal Revenue Code provisions, decisions of the United States Tax Court, and IRS private letter rulings. Insofar as the IRS has already concluded in [New] GCU's favor on the exact same issues purportedly analyzed by the Department and granted [New] GCU status as a 501(c)(3) tax-exempt organization, the Department would appear to be substituting its judgment regarding the application of the Internal Revenue Code for that of the United States federal agency responsible for administering the Internal Revenue Code.

It also repeated and expanded on Defendants' claims during the 3Q 2019 Earnings Call that GCE's purpose in executing the Conversion was legitimate, claiming that, "[a]s disclosed multiple times previously, the Company and [New] GCU did not undertake the transaction for the purposes of avoiding the various regulations . . . that apply solely or predominantly to for-profit entities." Defendants further claimed that the DOE's determination was largely irrelevant to Grand Canyon's and [New] GCU's performance, stating that they expected "that the Department's decision to continue to treat the University as a for-profit institution, if it withstands challenge, will have no material impact on the University's operations or its compliance with the applicable regulatory requirements, or on the Company's financial condition or results of operations."

249. On November 12, 2019, the DOE Letter was made publicly available. The DOE Letter is attached to this Complaint as Exhibit A. That letter explained in detail, as discussed above in Section V.J, that the Conversion violated "the most basic tenet of nonprofit status – that the non-profit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity." The DOE letter further made clear that the DOE had reached its decision based upon information that had been withheld from the IRS, thus demonstrating that the IRS had not "analyzed" the "same issues" as the DOE.

### B. January 28, 2020: Citron Research Exposes Grand Canyon's Scheme To Inflate Its Reported Financial Results By Using New GCU As An Off-Balance-Sheet Entity

250. Investors learned the truth about Grand Canyon's fraudulent scheme on January 28, 2020 when, prior to market open, financial analyst Citron published a nearly 50-page analyst report titled "The Educational Enron: The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings." The report is attached to this Complaint as Exhibit B. In the report, Citron explained that it had submitted a FOIA request to the DOE after reviewing the DOE Letter. In response, Citron "received 870 pages of supporting documentation that led to the obvious conclusion that LOPE is in clear violation of SEC rule 10b-5 as they use the private university to dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price."

251. In the report, Citron cited to documents submitted by Grand Canyon to the DOE in connection with its application for non-profit treatment (which, as noted above, Citron said it obtained via a FOIA request). To start, Citron noted that Grand Canyon's extraordinary margins—45%, as compared to approximately 6% margins from peers—were in large part a function of MSA terms which permitted Grand Canyon to obtain revenues at nearly 100% profit margins from areas of GCU's business for which Grand Canyon booked no expenses. Specifically, Citron revealed that Grand Canyon received 60% of ***all*** of New GCU's revenues (a fact Defendants specifically redacted from their public filings (*see supra* ¶¶190, 246) and hid from their internal advisors (*see supra* ¶¶201-05), while expenses related to several categories of those revenues—those unrelated to the provision of online services—were located solely on the non-public balance sheet of New GCU. Citron calculated that Grand Canyon was recognizing approximately $280 million of "pure profit" from such revenue sources, while reporting approximately $300 million EBITDA overall—and that, if the MSA was structured like "every other OPM contract," whereby Grand Canyon

would receive approximately 50% of New GCU's online tuition revenue, Grand Canyon's EBITDA would fall from $307 million to $27 million. This, in turn, would take Grand Canyon's margins down from approximately 45% to approximately 6%—putting it in line with its OPM peers, including Pearson, John Wiley, and Kaplan.

252. Citron further stated that the terms of the MSA permitted Grand Canyon to manipulate its results to achieve financial targets. Specifically, under the terms of the MSA, New GCU owed to Grand Canyon an approximately 60% service fee regardless of whether it obtained services from Grand Canyon or elsewhere. Accordingly, Citron noted, Grand Canyon could inflate its financial results by forcing New GCU to contract separately with third-party services providers—thereby moving the costs of providing such services off Grand Canyon's books and onto New GCU's private books, but leaving unchanged Grand Canyon's revenues from those very services. As Citron explained:

> If LOPE wants . . . Mr. Mueller can simply give the word to the private entity ([New] GCU), which he is president of, to take on some of these "non-exclusive services" onto its own income statement. . . . While this would depress the earnings and cash burn further of the private entity, the private entity would still owe the same level of fees (per the MSA) to LOPE[.] With none of the costs and the entirety of the ~60% fees, LOPE's reported profit and margins would continue to fraudulently rise while stuffing expenses onto the private entity[.]

253. Citron further reported that New GCU was able to fund these arrangements via various private credit arrangements, which were largely undisclosed. Specifically, Citron noted that Grand Canyon was consistently funding significantly higher amounts of CapEx at New GCU than was projected, that Grand Canyon's accounts receivable (and New GCU's accounts payable) was similarly growing rapidly, and that New GCU was taking on increasing amounts of secured debt it had identified by reviewing undisclosed Arizona state regulatory filings.

254. Citron pulled together all of this information—including previously-undisclosed information, such as information about New GCU's undisclosed credit arrangements—into a

holistic analysis that explained the details of Grand Canyon's fraud and the mechanisms of its cover-up.

255. These revelations shocked the market, and further revealed the false and/or misleading nature of several of Defendants' statements to investors about the Conversion. Citron utilized previously-undisclosed information in conducting financial calculations that demonstrated how Grand Canyon's margins and other financial results were improperly inflated as a result of the terms of the Conversion, and how Grand Canyon's accounting treatment of New GCU—whereby Grand Canyon failed to consolidate New GCU's results onto Grand Canyon's books, and indeed failed to even acknowledge that New GCU was a related party—was patently improper. It also revealed key details about how these accounting machinations were being covered up.

256. Grand Canyon's stock price declined dramatically in response. From a close of $91.50 on January 27, 2020, Grand Canyon's stock price dropped by $7.43, or 8.12%, to close at $84.07 on January 28, 2020, on extraordinary volume.

## VII. POST-CLASS PERIOD EVENTS

257. On February 20, 2020, Grand Canyon filed with the SEC its Annual Report on Form 10-K for fiscal-year 2019 (the "2019 10-K"). The 2019 10-K included several substantive changes to the Company's risk disclosures related to the Conversion and the DOE's denial of New GCU's application for non-profit status—risks of which the Company was already well aware, but did not disclose throughout the Class Period.

258. First, the Company acknowledged for the first time that the DOE's rejection of New GCU's application for non-profit status could severely harm the Company's marketing efforts. Grand Canyon prominently featured an entirely new risk disclosure admitting that the DOE's denial of New GCU's non-profit could have a material, adverse effect on New GCU's enrollment and, accordingly, on Grand Canyon's financial results:

> ***ED's determination to treat GCU as a proprietary institution for Title IV, HEA purposes could adversely impact GCU's enrollment.***
>
> On November 6, 2019, in connection with its approval of the Transaction, ED also informed GCU that GCU does not satisfy ED's definition of a nonprofit entity and, as a result, that ED will continue to treat GCU as a proprietary institution for purposes of its continued participation in Title IV programs. While the Company does not believe that ED's determination will impact GCU's ability to meet all regulatory requirements applicable to proprietary institutions, the determination, if upheld, would have the impact of limiting GCU's ability to identify itself as a nonprofit university in its advertising or other materials. Such a limitation could harm GCU's ability to compete against other nonprofit universities for students and could have a material adverse effect on its enrollment and, consequently, on its and our financial condition, results of operations and cash flows.

In addition, Grand Canyon specifically identified the "ED's determination to treat GCU as a proprietary institution for Title IV purposes, which could impact our ability to recruit students to GCU" as a "factor that could prevent us from successfully recruiting, enrolling, and retaining students."

259. Second, Grand Canyon admitted that the governance arrangements under the terms of the Conversion risked conflict-of-interest issues, and specifically walked back Defendants' prior claims that Defendant Mueller was the "only" employee with dual roles at the Company and New GCU. For the first time, Grand Canyon specifically highlighted as a risk that its "Chief Executive Officer's role as President of GCU may adversely affect his ability to run the Company," explaining that "Mr. Mueller's dual role could raise conflict of interest issues."

260. Third, a report by the GAO, published December 31, 2020 and titled "Higher Education: IRS and Education Could Better Address Risks Associated with Some For-Profit College Conversions," as well as an April 20, 2021 Congressional House Education and Labor Committee hearing titled "For-Profit College Conversions: Examining Ways to Improve Accountability and Prevent Fraud," further elucidated the anemic nature of the IRS's review of

Change of Control transactions such as the Conversion and the critical role of the DOE's close scrutiny of these transactions (discussed above in the GAO Report).

261. In prepared testimony to the House Education and Labor Committee, Professor Brian Galle testified that the GAO Report confirms that "the IRS hasn't closely examined a lot of these conversions," and "[s]ome of them it hasn't even known about." Mr. Galle attributed this to the fact that the "IRS doesn't have the resources" to properly scrutinize these transactions. "Even if that agency got another $1 billion a year, there's still 1.5 million charities for them to monitor every year."

262. Fourth, after the DOE refused to approve the Conversion, Grand Canyon re-submitted an amended MSA in an attempt to change the DOE's decision. Even with an amended MSA, however, on January 12, 2021, the DOE sent Grand Canyon a 19-page letter affirming its denial of the Conversion. Among other things in the January 12, 2021 letter, the DOE found that the revenue split set forth in the amended MSA "is not appreciably different than the revenue split set forth in the MSA" and that "Although the revenue sharing percentages have changed somewhat under the ARMSA, the basic structure whereby a substantial portion of GCU's revenues benefits GCE remains unchanged. Based on the tax authority cited in the Decision [referring to the DOE's November 6, 2019 letter determination], the Department has determined that, under the ARMSA, GCU will still not meet the requirement that both the primary activities of the organization and its stream of revenue benefit the nonprofit itself." The January 12, 2021 letter further continued to note Defendant Mueller's dual roles as the President of New GCU and the Chief Executive Officer of GCE "as a concerning factor."

263. Fifth, on February 2, 2021, Grand Canyon sued the DOE for refusing to approve the Conversion. *Grand Canyon University v. Rosenfelt*, Case No. 2:21-cv-00177-SRB (D.

Arizona). That case remains pending. In a separate suit, on April 1, 2021, Grand Canyon sued the DOE alleging that the DOE had wrongfully withheld CARES Act funding due to the Coronavirus pandemic because the DOE correctly refused to classify New GCU as a non-profit institution. *Grand Canyon University v. Cardona*, Case No. 2:21-cv-566-DLR (D. Arizona). On November 18, 2021, the District Court granted the DOE's motion to dismiss the *Cardona* suit, noting in its ruling that "[t]he parties agree that GCU does not qualify as a nonprofit institution" under DOE regulations, which "determines eligibility" for the CARES Act funds. The case is currently pending before the United States Court of Appeals for the Ninth Circuit.

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

264. Throughout the Class Period, Defendants Mueller, Bachus, and Grand Canyon issued false and misleading statements concerning New GCU's purported independence from GCE, the DOE's review of GCE's application for non-profit status, the Conversion's purported similarity to the Purdue-Kaplan transaction and other transactions, and GCE's accounting and financial statements post-Conversion.

### A. False And Misleading Statements Regarding New GCU's Purported Independence Made Before The Conversion

265. Beginning January 5, 2018, when GCE announced the Conversion, Defendants falsely and misleadingly claimed that the Company and New GCU would be separate, operated and controlled by separate management, and that New GCU would be a non-profit entity.

266. The Class Period begins on January 5, 2018, when Grand Canyon issued a press release, also filed with the SEC on Form 8-K, announcing its renewed plan to pursue the Conversion and reporting that it had applied to HLC for approval of non-profit status for GCU (the "January 5, 2018 8-K"). The January 5, 2018 8-K was signed by Defendant Bachus. In the press release, the Company stated, "Following the [Conversion], [Grand Canyon] would operate as a

for-profit third-party provider of educational and related services to GCU . . . ." Defendant Mueller further stated, "[T]his return to our historical non-profit status would convey an accurate reflection of who GCU is today and will be in the future[.]"

267. On February 21, 2018, Grand Canyon filed its Annual Report on Form 10-K with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Mueller and Bachus. In the 2017 10-K, Grand Canyon stated, "New GCU would be a separate non-profit entity under the control of an independent board of trustees and independent management. Accordingly, our relationship with New GCU, both pursuant to the shared services arrangement and operationally, would no longer be as owner and operator, but as a third party contract party . . . . GCU's current faculty, academic leadership and related staff and other employees . . . would become employed by New GCU and New GCU would be governed by the current institutional board of trustees of GCU."

268. On February 26, 2018, the Company filed with the SEC on Form 8-K that it had entered into a non-binding letter of intent with New GCU to effectuate the Conversion (the "February 26, 2018 8-K"). The February 26, 2018 8-K was signed by Defendant Bachus. In the 8-K, the Company stated: "GCU's current faculty, academic leadership and related staff would become employed by New GCU and New GCU would be governed by a board of trustees comprised of the persons who currently serve on the institutional board of trustees of GCU."

269. On March 6, 2018, the Company issued a press release, also filed with the SEC on Form 8-K, announcing that HLC had approved its portion of the Conversion (the "March 6, 2018 8-K"). The March 6, 2018 8-K was signed by Defendant Bachus. In the March 6, 2018 8-K, the Company stated: "Following the [Conversion], [Grand Canyon] will operate as a third-party provider of education and related services to [New] GCU."

270. On May 2, 2018, the Company filed its Quarterly Report on Form 10-Q with the SEC (the "Q1 2018 10-Q"). Defendants Mueller and Bachus signed the Form Q1 2018 10-Q. In the Q1 2018 10-Q, the Company stated: "[T]he University submitted to the Higher Learning Commission an application for approval to effect the sale of the University's academic-related assets . . . as a means of enabling New GCU to conduct itself as a traditional non-profit university . . . . The University's current faculty, academic leadership and related staff would become employed by New GCU and New GCU would be governed by a board of trustees comprised of the persons who currently serve on the institutional board of trustees to the University."

271. On May 2, 2018, the Company held its first quarter of 2018 earnings call. On the earnings call, Defendant Mueller stated:

> Following the [Conversion], we would no longer own and operate a regulated institution of higher education, but would instead provide a bundle of services in support of New GCU's operations. This is a very common practice in higher education today . . . . New GCU would be a separate non-profit entity under the control of an independent board of trustees and independent management. Accordingly, our relationship with new GCU, both pursuant to the shared-services arrangement and operationally, would no longer be as owner and operator, but as a third-party contract provider. While we believe this relationship would remain strong, new GCU's board of trustees and management would have to fiduciary and other duties that would require them to focus on the best interest of new GCU.

272. On May 29, 2018, Grand Canyon published on its website a statement entitled "GCU refutes testimony at NACIQI meeting" (the "NACIQI Testimony Response"). In the NACIQI Testimony Response, Grand Canyon purported to refute testimony provided by Georgetown University Law Center Professor Brian Galle to the NACIQI. Among other things, Grand Canyon stated that the professor's testimony that Grand Canyon and GCU were "operated by a group of individuals who serve two masters" was "false" because, other than Defendant Mueller, "there will be no overlapping management or employees between the two entities." Grand Canyon also stated that the professor's statement that "'GCU's proposal fails the control

test' under IRS rules" was "false" and "based on . . . misinformation and faulty conclusions," and that the professor's "purported legal conclusion is simply [his] personal opinion—and [his] attempt to substitute that opinion for the conclusions of those bodies that actually have access to full information and have fully vetted the proposal—should not be taken seriously."

273. These statements were materially false and misleading. The statements that New GCU would be a separate entity, utilize independent management, and operate as a "non-profit" and a "separate non-profit entity" were false and misleading because, among other things, they failed to accurately describe the planned structure of the Conversion and to provide complete and accurate information so as not to otherwise make the statements false and misleading.

274. The statements that New GCU would be a "separate" entity, that GCE would "no longer . . . operate a regulated institution of higher education," that GCE would act as a "third party" to New GCU, and that "GCU's current faculty, academic leadership and related staff and other employees . . . would become employed by New GCU" were each materially false and misleading because they misstated and omitted the highly material facts that 41 members of the university's 58-member Executive Leadership Team were employed by GCE, that significant members of New GCU's academic leadership were employed by GCE, and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for New GCU as they had previously for old GCU.

275. The statements that New GCU operate as a "non-profit" and a "separate non-profit entity" were also false and misleading for the reasons described above. Indeed, the DOE noted that it was "skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the

Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original). *See* Section V.J.i.

276. The statements that other "bodies," such as the IRS and HLC, "actually have access to full information and have fully vetted the proposal" were false, as Defendants withheld material, non-public documents like the analyses conducted by Barclays and Deloitte, to the IRS or HLC. The DOE, the only agency to consider all relevant information as to the terms of the Conversion, used such information to conclude that New GCU was not a non-profit institution.

277. In addition, the statements regarding "non-profit" status were false and misleading because, among other things, the planned structure of New GCU violated "the most basic tenet" of a non-profit and instead would act to funnel 95% of its revenue to GCE, while GCE only had to cover 28% of the institution's costs. *See* Section V.J.ii. Here, Grand Canyon redacted the services fee from SEC filings and otherwise omitted this material information from public disclosure.

**B. False And Misleading Statements And Omissions Regarding The Risks of DOE Denial Of The Conversion**

278. After the Company received extensive interrogatories from the DOE raising substantial doubts about whether the DOE would approve New GCU as a non-profit, and during a period of increased Congressional scrutiny and additional for-profit scandals, Defendants concealed this highly material information and made a series of false and misleading statements about its prospects of DOE approval and the likely effect of a potential DOE denial on the Company's condition and operations.

279. On July 2, 2018, the Company filed on Form 8-K with the SEC an announcement that it had entered into an agreement to consummate the Conversion (the "July 2, 2018 8-K"). The July 2, 2018 8-K was signed by Defendant Bachus. In the July 2, 2018 8-K, the Company stated:

> On January 18, 2018, GCU voluntarily filed a request for pre-acquisition review of the transaction with the U.S. Department of Education ('ED') seeking ED's review of the proposed transaction and input as to any regulatory limitations, such as a letter of credit or growth restrictions, that ED may choose to impose on New GCU following the closing of the transaction . . . . GCU has had ongoing engagement with ED about the transaction throughout the review process . . . and, based on this engagement . . . the Board of directors of the Company and the board of trustees of New GCU concluded that the benefits of consummating the transaction at this time were numerous and any regulatory limitations imposed by ED could be managed.

280. The Company subsequently repeated these statements in their entirety in its August 18, 2018 Quarterly Report on Form 10-Q (the "Q2 2018 10-Q") and its Form 8-K filed with the SEC on November 7, 2019 announcing the DOE's denial of its application for non-profit status (the "November 7, 2019 8-K"). Defendant Mueller repeated substantially the same statements on the Company's November 6, 2019 third quarter earnings call.

281. Also on July 2, 2018, Defendant Mueller stated, in an article in *The Chronicle of Higher Education*, that the DOE "pre-approval" process normally takes forty-five days, but that it was taking longer in the Company's case because "[the DOE is] very understaffed."

282. As reported by *Azcentral* on July 2, 2018, Defendant Mueller stated, with respect to the DOE's review of the Conversion, that while Defendants had not yet "got their letter that says there are no restrictions" in connection with the Conversion, Defendants "would be very surprised, based on our discussions with them, if there were."

283. These statements were materially false and misleading. The statements that "based on ongoing engagement" with the DOE, the Company "concluded that . . . any regulatory limitations imposed by ED could be managed," and that the DOE approval process was taking longer than usual because the DOE was "understaffed" were misleading because they omitted the

highly material fact that, on May 17, 2018, the Company received extensive interrogatories from the DOE about the structure of the Conversion, the agreements between GCE and New GCU, internal reports and other information known by GCE officers and directors, and New GCU's independence under the proposed structure of the Conversion raising a significant risk that the DOE would decline the Conversion or otherwise impose disabling conditions. The Company's statements regarding DOE "understaffing" were also false because the Company itself acknowledged that its only communications with the DOE in May 2018, when the Company made the decision to abandon the preapproval process, related to the interrogatories themselves, not to any staffing concerns. The Company received three sets of additional requests for information from the DOE before it denied the Company's application, none of which was disclosed to investors. The Company also omitted the highly material fact that the DOE had previously informed Defendants that the Conversion's structure would be very difficult for the DOE to approve—and that Defendants were relying solely on the political landscape, rather than the merits of the Conversion, to obtain approval.

### C. False And Misleading Statements Regarding New GCU's Purported Independence Made After The Conversion

284. After the Conversion, Defendants falsely and misleadingly continued to claim that New GCU was an operationally independent non-profit institution and that the Company did not have "authority over decision making related to day-today-operations of New GCU."

285. In the July 2, 2018 8-K, the Company stated:

> <u>The Company no longer owns and operates a regulated institution of higher education</u>, but instead provides a bundle of services in support of New GCU's operations . . . . New GCU is a <u>separate non-profit entity</u> under the control of an independent board of trustees, none of whose members have ever served in a management or corporate board role at the Company . . . . Accordingly, the Company's relationship with New GCU, both pursuant to the Master Services Agreement and operationally, is <u>no longer as owner and operator, but as a third party service provider to an independent customer</u>.

286. Defendants repeated the statements that it "no longer owns and operates a regulated institution of higher education," that "New GCU is a separate non-profit entity," and that its relationship to New GCU was "no longer as owner and operator, but as a third party service provider to an independent customer" throughout the Class Period. The statements appeared in the Company's Q2 2018 10-Q, November 8, 2018 Quarterly Report on Form 10-Q (the "3Q 2018 10-Q"), and February 20, 2019 Annual Report on Form 10-K (the "2018 10-K").

287. In the 3Q 2018 10-Q, Defendants also stated that, after the Conversion, Grand Canyon's "results of operations do not include the operations of GCU but rather reflect the operations of the Company as a service/technology provider[.]" Defendants substantively repeated this statement in the 2018 10-K, the May 7, 2019 Quarterly Report on Form 10-Q (the "Q1 2019 10-Q"), the August 6, 2019 Quarterly Report on Form 10-Q (the "Q2 2019 10-Q"), and the November 6, 2019 Quarterly Report on Form 10-Q (the "Q3 2019 10-Q"). Defendants also substantively repeated this statement in the Company's Form 8-Ks filed with the SEC on February 20, 2019, May 7, 2019, August 6, 2019, and November 6, 2019, and Defendant Mueller substantively repeated this statement during the Company's earnings conference calls on November 8, 2018, February 20, 2019, May 7, 2019, and August 6, 2019.

288. In the July 2, 2018 8-K, the Company further stated: "Aside from Mr. Mueller, no other employee of [New GCU] or [Grand Canyon] has a dual role in both organizations."

289. On the Company's August 8, 2018 earnings call, Defendant Mueller stated: "As a result of this transaction, various aspects of GCE's operations have changed in important ways. These changes include, but are not limited to the following: GCE no longer owns and operates a regulated institution of higher education, but instead provides a bundle of services in support of New GCU's operations."

290. In an interview with *The Motley Fool* on December 20, 2018, Mueller stated that "Investors were very excited about us getting out of the for-profit university space, which, if there's a change in administration, could be problematic. We're now a non-profit university and have all the privileges of that." Mueller further stated that it was "very difficult to overcome" the "negative stigma" of being a for-profit, and that "the University now being not-for profit is a tremendous advantage. The stigma is now gone . . . . But we're excited now that we're on the not-for-profit side because that just opens up the world in a lot of ways that was not open in the past."

291. On the Company's February 20, 2019 earnings call, Defendant Mueller stated: "Grand Canyon University is now a non-profit institution, with its own board and mission."

292. In the Q1 2019 10-Q, the Company stated: "As a result of the Transaction and Acquisition, the Company <u>no longer owns and operates an institution of higher education</u>, but instead provides a bundle of services in support of its 18 university partners." This statement was substantially repeated in the Company's Q2 2019 10-Q.

293. These statements were materially false and misleading and omitted complete and accurate information so as not to otherwise make the statements false and misleading. The statements that the Company "no longer owns and operates a regulated institution of higher education," that its relationship to New GCU was "no longer as owner and operator, but as a third party service provider to an independent customer," and that "[a]side from Mr. Mueller, no other employee of [New GCU] or [Grand Canyon] has a dual role in both organizations" were false and misleading because, among other things, they misstated and omitted the highly material facts that 41 members of Mueller's 58-member Executive Leadership Team for GCU remained employed by GCE and that numerous other operationally-significant GCU employees were employees of GCE while performing the same responsibilities for New GCU as they had previously. Indeed,

the DOE noted that it was "skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original).

294. The statements that New GCU would be a "separate non-profit entity" were each materially false and misleading because the planned structure of New GCU violated "the most basic tenets" of a non-profit and instead would act to funnel 95% of its revenue to GCE, while GCE only had to cover 28% of the institution's costs. *See* Section V.J.ii. As stated in ¶¶190 and 246, *supra*, Grand Canyon redacted the services fee from SEC filings and otherwise omitted this material information from public disclosure. And as stated in ¶276, *supra*, the Company withheld material information from the IRS and HLC, which the DOE relied upon in finding that New GCU was not a non-profit institution.

295. The statements that New GCU was a "not-for-profit" educational institution were also false and misleading because they concealed non-public information necessary to prevent the statements from being misleading in context, namely that the prolonged DOE investigation into the singularly unique Grand Canyon attempted conversion, in the midst of major for-profit scandals and increased Congressional oversight, had significantly increased the risk that the DOE would deny the application, which it ultimately did.

**D. False And Misleading Statements Regarding The Conversion's Similarity To Other Transactions**

296. Throughout the Class Period, Defendants sought to reassure investors that the Conversion would be approved by the DOE and that it was a familiar structure for analysts to

review. In reality, however, the GCE-New GCU relationship was far different from the Purdue-Kaplan structure and the other such structures with which Defendants sought to claim similarity.

297. In the January 5, 2018 8-K, the Company stated:

> The revenue share between the two entities remains subject to completion of a transfer pricing study and subsequent negotiation, but is expected to be <u>comparable to other shared services arrangements currently in place in the higher education marketplace</u> and to reflect the level of services that the Company would be providing to new GCU.

This statement was repeated in the Company's 2017 10-K. Defendant Mueller also repeated the statements on the Company's February 21, 2018 earnings call.

298. The Company also stated in the January 5, 2018 8-K that "[t]he structure [of the Conversion] . . . is similar to the proposed structure in which Purdue University hopes to acquire the education assets of Kaplan University . . . with Kaplan becoming the service company . . . ."

299. During a press conference on January 5, 2018, Defendant Mueller stated, with respect to the arrangement between Grand Canyon and New GCU contemplated under the Conversion: "This arrangement will be very similar to hundreds of arrangements that already exist in the higher-education landscape today. And so this is not new. This is something that already exists in America."

300. On the Company's February 21, 2018 earnings call, Defendant Mueller stated that "our proposed transaction and structure is almost identical to many others in the industry and is very similar to the Purdue and Kaplan proposal . . . ."

301. In the March 6, 2018 8-K, the Company stated: "The structure [of the Conversion] is similar to that at hundreds of non-profit universities in the country that outsource services to third-party providers."

302. In the NACIQI Testimony Response, published on May 29, 2018, Grand Canyon stated that "the third party services model was and is a model deeply embedded throughout the

higher education world" and "the University has commissioned studies to ensure that the rates and terms of the services arrangement are consistent with market norms."

303. In the July 2, 2018 8-K, Grand Canyon stated: "The shared services arrangement is similar to that at hundreds of non-profit universities in the country that outsource services to for-profit third-party providers."

304. Also on July 2, 2018, during a speech, Defendant Mueller stated, with respect to the arrangements under the Conversion: "This is very mainstream in higher education today. Hundreds of universities are doing it, and our model is almost an identical replica of that, so we're in the mainstream of what's happening."

305. The statements were materially false and misleading. Statements that (1) the Conversion was "mainstream" or "very mainstream," (2) the Conversion was "similar to," "very similar to," "comparable to," "almost identical to," and "almost an identical replica of" the Purdue-Kaplan deal or services arrangements at "hundreds" of universities around the country, and (3) "the University has commissioned studies to ensure that the rates and terms of the services arrangement are consistent with market norms" were each materially false and misleading for several reasons. Indeed, Defendant Bachus was directly <u>told</u> that these comparisons were inaccurate—but continued to make the comparisons regardless.

306. First, the terms of the Conversion were unusually and egregiously favorable to Grand Canyon, including because it received 95% of New GCU's revenues, including revenues from sources unrelated to the services Grand Canyon provided to New GCU, while paying only 28% of the costs required to run New GCU. These terms were completely dissimilar to the Purdue/Kaplan transaction, in which Kaplan would receive a 12.5% services fee related to the provision of academic services and only after Purdue Global had reached breakeven.

307. Second, these statements were further each materially misleading because they misstated and omitted the highly material facts that 41 members of the university's 58-member Executive Leadership Team remained employed by GCE and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for New GCU as they had previously. This arrangement was unlike the Purdue/Kaplan transaction, in which there was no overlapping leadership between the two entities. Indeed, the DOE noted that it was "skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original).

308. Third, the Conversion resulted in an undisclosed, captive relationship between GCE and New GCU. The services arrangement between Grand Canyon and New GCU had an Initial Term of 15 years, and would renew automatically every 5 years after that, ostensibly in perpetuity. New GCU could only exit the arrangement during the Initial Term after seven years, and then only by <u>fully satisfying</u> the $854 million Secured Note <u>and</u> paying an "Early Termination Fee" of 100% of the aggregate Services Fee it had paid to Grand Canyon for the prior 12 months. If New GCU declined to renew the arrangement after the Initial Term, it would owe a "Non-Renewal Fee" of 50% of the aggregate Services Fee it had paid Grand Canyon over the prior 12 months. Each of these fees was to be paid "by wire transfer of immediately available funds." Since New GCU would incur 72% of the costs of running the university while receiving only 5% of the revenues,

paying off the Secured Note and these fees was effectively impossible, and so New GCU had essentially no real option to exit.

309. In contrast, the Purdue/Kaplan transaction permitted either party to terminate the services agreement after the sixth year for a termination fee of 1.25 times the total revenue of Purdue Global (the online university, not the full public university) in the preceding year—a fee "payable by a promissory note, rather than cash."

**E. False And Misleading Statements Regarding Grand Canyon's Accounting And Compliance with GAAP**

310. As discussed above, by virtue of Grand Canyon's control over New GCU and the fact that Grand Canyon was the primary beneficiary of New GCU's operations, Grand Canyon was required to consolidate New GCU into its financial statements pursuant to ASC 810, or at minimum to identify New GCU as a related party pursuant to ASC 850. *See* Section V.K.

311. In the Q2 2018 10-Q, Defendants stated: "New GCU is not a related party to the Company in accordance with ASC Topic 850."

312. In the Q3 2018 10-Q, Defendants stated: "We do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources." Defendants repeated this statement in Grand Canyon's 2018 10-K, as well as in each of Grand Canyon's Q1 2019 10-Q, Q2 2019 10-Q, and Q3 2019 10-Q. Each of these filings was signed by Defendants Mueller and Bachus.

313. In addition, in the Q3 2018 10-Q, Defendants failed to consolidate New GCU's results or identify New GCU as a related party, stating: "ASC 810-10-15-17 provides scope exceptions to the variable interest entity analysis that include a not-for profit entity carve out. GCU is not a related party to the Company in accordance with ASC Topic 850." Defendants repeated

this statement in Grand Canyon's 2018 10-K, and failed to consolidate New GCU's results in Grand Canyon's 2018 10-K, as well as in the 1Q 2019 10-Q, the 2Q 2019 10-Q, and the 3Q 2019 10-Q.

314. Further, the Q3 2018 10-Q, 2018 10-K, Q1 2019 10-Q, Q2 2019 10-Q, and Q3 2019 10-Q each contained Sarbanes-Oxley certifications signed by Defendants Mueller and Bachus. In the certifications, Mueller and Bachus attested, with respect to the report to which the certification was attached, that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

315. Throughout the Class Period, the Company reported operating margins that had greatly increased year-over-year. The following chart details the Company's reported operating margins as reported in Forms 8-K filed on November 8, 2018, February 20, 2019, May 7, 2019, and November 6, 2019.

| **Quarter** | **Operating Margin** |
|---|---|
| 3Q18 | 35.6%[6] |
| 4Q18 | 45.1% |
| 1Q19 | 36.7% |
| 2Q19 | 29.2% |
| 3Q19 | 30.9% |

316. These statements were materially false and misleading. The statements that "New GCU is not a related party to the Company" and that "[New] GCU is not a related party to the

[6] The Company reported an adjusted margin figure for third-quarter 2018 that accounted for one-time costs related to the Conversion, which is reflected on this Table.

Company in accordance with ASC Topic 850" because New GCU was a non-profit entity were each false and misleading because the Company controlled New GCU, making them "affiliates under common control" and thus related parties for purposes of GAAP. The statement omitted the highly material fact that 41 members of the university's 58-member Executive Leadership Team remained employed by GCE and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for New GCU as they had previously. Indeed, the DOE, which was the only federal agency to have received complete and accurate information regarding the terms of the Conversion, noted that it was "skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution. Given the enormous leverage GCE now has over [New GCU] by virtue of the MSA and the fact that most of the Institution's key management personnel work for GCE, not [New GCU], the Department concludes that, as a practical matter, [New GCU] is not the entity *actually operating* the Institution as is required under the Department's regulations." (emphasis in original). These statements were each false and misleading because New GCU was not a non-profit. As the DOE found, the planned structure of New GCU, which was undisclosed to the public (and not fully disclosed to the IRS), violated "the most basic tenets" of a non-profit and instead would act to funnel 95% of its revenue to GCE, while GCE only had to cover 28% of the institution's costs. *See* Section V.J.ii.

317. The statements that the Company did "not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition" were false and misleading because the Company used New GCU as an off-balance sheet entity to which it funneled expenses while recognizing revenues generated by New GCU. As the DOE found, the Conversion would act to funnel 95% of New GCU's revenue to GCE, while

GCE only had to cover 28% of the institution's costs. *See id*. The statement that the Company's "results of operations do not include the operations of GCU but rather reflect the operations of the Company as a service/technology provider" was false and misleading because, Grand Canyon's operations did <u>not</u> "reflect the operations of the Company as a service/technology provider," but rather reflected the highly unusual and exploitative control relationship that Grand Canyon had with New GCU, as the Conversion would act to funnel 95% of New GCU's revenue to GCE, while GCE only had to cover 28% of the institution's costs. *See id*.

318. The Company's reported operating margins were also materially false and misleading. Grand Canyon's margins were inflated by Grand Canyon's treatment of New GCU as a separate and unconsolidated entity, which allowed Grand Canyon to report higher margins—based on Grand Canyon's receipt of the overwhelming majority of university-related revenues while bearing only a fraction of university-related costs—than it would have under consolidation. However, as set forth above in Section V.K, Grand Canyon was required to consolidate New GCU under GAAP. In addition, even if Grand Canyon's margins were considered to be literally accurate, they were nonetheless misleading (i) because they were obtained by improperly failing to consolidate New GCU, and (ii) in light of Defendants' improper failure to identify New GCU as a related party in violation of GAAP requirements.

## IX. ADDITIONAL ALLEGATIONS OF SCIENTER

319. A host of facts, including and in addition to those discussed above, support a strong inference that Defendants Mueller and Bachus knew, or, at minimum, were severely reckless in not knowing, that the statements detailed above were materially false and misleading when made.

320. <u>Knowledge Of The Terms Of The Conversion</u>: Defendants undoubtedly knew the undisclosed terms of the Conversion, including the breakdown of the Services Fee, which were set forth in the final MSA (although redacted from public filings and not provided to Deloitte). As

set forth above, throughout the Class Period, Defendants repeatedly and confidently told the market that New GCU would and did become independent as a result of the Conversion, and that the Conversion was "mainstream" and "very similar" and "almost identical to" the Purdue-Kaplan deal and others in the industry. Defendants also reported astronomical margins for Grand Canyon, while assuring the market that Grand Canyon was complying with GAAP rules for consolidation and related party disclosures.

321. But these statements were materially false and misleading in light of the undisclosed terms of the Conversion. These terms showed that GCE would be entitled to 95% of New GCU's revenue, including from multiple sources that had nothing to do with the services GCE would provide New GCU. These terms clearly showed that Defendants' statements about New GCU's independence, the Conversion's similarity to other deals, and Grand Canyon's margins and GAAP compliance were materially false and misleading. In short, the undisclosed (but readily available to Mueller and Bachus) terms showed that: (i) New GCU was not independent, but was actually controlled by Grand Canyon; (ii) the Conversion was entirely dissimilar to the Purdue-Kaplan deal and others in the industry, given Grand Canyon's control and the extremely inequitable financial terms of the arrangements between Grand Canyon and New GCU; (iii) under those arrangements, Grand Canyon had to consolidate New GCU's results onto Grand Canyon's financial statements, and to identify New GCU as a related party; (iv) New GCU was not a true non-profit, and could not benefit from the marketing and recruiting advantages such status would convey; and (v) Grand Canyon's accounting failures rendered its margin results materially misleading.

322. Defendants were aware of these undisclosed terms of the Conversion, which were set forth in the final confidential MSA dated July 1, 2018. As an initial matter, both Mueller and

Bachus indicated in filings with the SEC that they had reviewed the MSA. According to the November 8, 2018 Form 10-Q that attached the final (albeit redacted for public review) MSA, Defendant Bachus was the signatory to the MSA on GCE's behalf and all notices issued by New GCU pursuant to the MSA were required under the MSA to be served to him. Further, Defendant Mueller personally certified the accuracy of the November 8, 2018 Form 10-Q.

323. Even had Defendants not sworn in public filings that they had reviewed the MSA, there can be no serious question that they were aware of the terms of the document. The Conversion critically transformed the Company, and it is inconceivable that Mueller and Bachus did not know about or personally negotiate Grand Canyon's crucial contract with New GCU—Grand Canyon's only customer, which was responsible for all of its revenue. Indeed, the Conversion went to the core of GCE's business and business model, and the MSA and other contractual arrangements between GCE and New GCU fundamentally changed the nature of the Company. In fact, in the Company's 2018 10-K, which it filed with the SEC on February 20, 2019, the Company specifically explained that "[o]ur business and structure have changed in important ways" and that "[a]s a result of the [Conversion], various aspects of the Company's operations have changed in important ways," stating: "The Company no longer owns and operates a regulated institution of higher education, but instead provides a bundle of services in support of university clients." Given its importance to the fundamental nature of GCE, its revenue sources (current and projected), its profit margins, its liabilities, and its CapEx budget, the Conversion was discussed in every major filing the Company made with the SEC from its announcement until its consummation. Moreover, updates regarding the Conversion—including the Company's renewed pursuit of the Conversion and the consummation of the transaction—were regularly discussed in filings with the SEC on Form 8-K. The DOE also noted that, "as CEO of GCE, [Mueller] is the

key executive of GCE, he is the key executive responsible for providing the services under the MSA."

324. Further, in connection with its attempts to secure DOE approval of New GCU's non-profit status, Grand Canyon provided the DOE with extensive non-public analysis, including the Barclays Report, the Barclays Update, and the Deloitte Report, that it commissioned in connection with the Conversion. Each of these reports was reviewed by GCE's Board of Directors, on which Defendant Mueller sat, and Defendant Bachus had particular expertise in and understanding of these non-public reports given his prior employment as a financial auditor at Deloitte and his work as a controller and chief accountant at Apollo.

325. As set forth above, these reports and the publicly undisclosed terms of the MSA demonstrated Grand Canyon's control over New GCU and the unprecedented share of revenue Grand Canyon would receive—facts that showed the false and misleading nature of Defendants' statements about New GCU's post-Conversion independence, the similarity of the Conversion to other well-known deals, and Grand Canyon's post-conversion margins and GAAP compliance.

326. Thus, Mueller and Bachus's personal access and review of the MSA (which contained material, undisclosed terms), as well as the Conversion's centrality to the Company's operations—and the fact that Mueller and Bachus were overwhelmingly likely to have participated in the negotiations and reviewed key deal terms themselves—supports a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, about the terms on which the deal was struck, and the false and misleading nature of their statements to investors.

327. Knowledge That The Conversion Differed Materially From The Purdue-Kaplan Transaction: Defendants were told directly by Solinski—who was responsible for reviewing the Purdue-Kaplan transaction for HLC—that Defendants' claim that the Conversion closely

resembled the Purdue-Kaplan deal was incorrect. When the Company renewed its attempt to complete the Conversion in 2017, Solinski spoke on the phone with Defendant Bachus about the proposed transaction. During that call, when Defendant Bachus claimed that the proposed transaction was similar to the Purdue-Kaplan deal, Solinski told Defendant Bachus that there were "real" and "key" differences between the two deal structures. After the call, Solinski sent Defendant Bachus articles illustrating the key differences with the Purdue-Kaplan deal and pointed him to publicly available filings about the Purdue/Kaplan transaction that demonstrated the differences when compared to the non-public information Bachus and Solinski had about Grand Canyon's proposed transaction.

328. Knowledge Of The Overlapping Members of the Executive Team Leading GCE and New GCU: As set forth above, Defendants repeatedly insisted that, besides Defendant Mueller, no other employee had a "dual role" at GCE and New GCU. However, as the DOE found, nearly 75% of Defendant Mueller's 58-person "Executive Leadership" Team for New GCU were actually employed by GCE. There can be no question that Defendant Mueller, who was both CEO of GCE and President of New GCU, would be aware that the vast majority of his Executive Team—which included those with the title of Chief Information Officer, Chief Operating Officer, Chief Technology Officer, Executive Vice President, Senior Vice President, and Executive Director—had the "dual role" of operating New GCU as a GCE employee. Defendant Bachus, who the DOE also notes was a member of the Executive Team at GCE, would similarly have known or should have known about the dual roles of the vast majority of his peers or near-peers.

329. Defendants Misled GCE's Transfer Pricing Advisor: As Defendant Mueller explained during the fourth-quarter 2017 earnings call, the revenue share between Grand Canyon and New GCU was determined "subject to completion of a transfer pricing study and subsequent

negotiation." In fact, Deloitte was commissioned to produce the Deloitte Report—a transfer pricing report—for GCE. This report purported to justify the terms of the Conversion, and concluded that the 60%/40% revenue split between the Company and GCU was reasonable given what each party would contribute to the revenue-generating activities. Indeed, Grand Canyon provided the Deloitte report to the DOE in connection with its review—which the DOE viewed as a potential attempt "to circumvent the somewhat obvious conclusion that under the MSA [New GCU] costs an additional $697 Million to operate in the first fiscal year."

330. However, as the DOE concluded following its thorough review of the materials Grand Canyon provided only upon the DOE's demand, the Deloitte Report was facially incomplete and based on flawed information provided by Grand Canyon management. Among other things: (i) Deloitte was provided an outdated version of the MSA, which did not include sources of revenue from the arena, athletic tickets, etc.—meaning that the entire Deloitte Report was based on "fundamentally flawed assumptions"; (ii) Deloitte did not include New GCU's physical campus (owned by New GCU) as a revenue-generating asset, "which is at odds with statements made by GCE to its shareholders" that identified its physical campus as "one of the primary factors for its revenue increase in 2017"; and (iii) Deloitte failed to assess which party assumed risks to revenue, a "failure [which] render[ed] Deloitte's . . . analysis 'incomplete'"—as Deloitte itself acknowledged. In fact, the DOE noted that the Deloitte Report did not "appear to be based on information that Deloitte independently tested and analyzed on behalf of [New GCU]" but rather "on information supplied by GCE management."

331. In other words, while Deloitte was supposed to provide New GCU with a transfer pricing analysis to help New GCU assess the fairness of the deal, Grand Canyon provided Deloitte with incomplete and biased information that led Deloitte to conclude the terms of the deal were

reasonable. The fact that Grand Canyon provided Deloitte with a misleading picture of the terms of the deal and thereby secured a favorable (but unreliable) transfer pricing analysis supports the strong inference that Defendants knew, or were severely reckless in not knowing, that the terms of the Conversion unfairly benefited Grand Canyon and New GCU's expense.

332. <u>The DOE Repeatedly Indicated To Defendants Mueller And Bachus That It Was Scrutinizing The Conversion Closely</u>: The DOE review process took close to two years. Grand Canyon stated that it expected to close the Conversion by April 1, 2018, and in its February 2018 Annual Report, it stated that it "[did] not expect to execute any definitive agreements until HLC and Department of Education processes have concluded." During the earnings call on May 2, 2018, Defendant Mueller again confirmed that the plan was to close the Conversion following DOE approval, which he explained was expected by the end of the month.

333. As noted above, in connection with Grand Canyon's prior attempted conversion in 2016, DOE officials under the Obama administration had informally conveyed to Defendants Mueller and Bachus that the DOE would review their proposed structure with extreme skepticism. In May of 2016, Solinski met with Defendant Mueller in order to "mend the fences" given his publicly stated displeasure with HLC after its rejection of the 2014 Conversion Proposal. During the meeting, which Defendant Mueller attended with approximately twenty of his senior staff members, including Defendant Bachus, Mueller complained that the DOE had given him pushback personally on the 2014 Conversion Proposal and that he did not believe the DOE or HLC would bless the 2014 Conversion Proposal in the future.

334. Notwithstanding these warnings, Mueller and Bachus determined to move forward with the same structure in 2017 with the hope that the different regulatory environment would lead to success. Defendants pressured HLC officials, causing that entity to violate its own guidelines

and grant special exceptions to Grand Canyon in considering the Conversion Application. Further, Defendants timed their submissions to HLC and the DOE in an attempt to obtain HLC approval on the same date as the Purdue-Kaplan transaction, which the DOE had already approved. The clear inference from Defendants' conduct is that they would seek to use HLC's simultaneous approval of the Purdue-Kaplan and Grand Canyon transactions in an effort to convince the DOE as to the similarities of the two transactions so that the DOE would approve Grand Canyon's Conversion, as well.

335. But on May 17, 2018, Donna Mangold from the DOE's Office of the General Counsel wrote to the Company's counsel with "additional requests for information regarding the Department's pre-acquisition review on the [Conversion]." The letter requested information regarding "any appraisals, valuations, valuation summaries, or valuation reviews obtained or commissioned by any party to the Transaction for purposes of valuing the Transaction," "the members of [New GCU's] Board from incorporation to present," "all personal or business relationships among any member of [New GCU's] Board and . . . any executive officer of GCE," among other information. After the Company received these communications, Defendants Mueller and Bachus met with analysts on June 11, 2018, and told them—without disclosing the interrogatories from the DOE—that, contrary to the Company's previous statements that it would await DOE approval before closing the Conversion, "DOE approval is NOT required in advance to close the transaction. Accreditor approval (already received) was the primary regulatory hurdle."

336. The following day, rather than disclose that the DOE was unexpectedly probing the underlying structure of the transaction, Defendant Mueller claimed instead that the DOE approval had not been received yet because the DOE was "very understaffed." This, of course, was false

and Mueller had zero basis to make the claim: as Grand Canyon admitted in its complaint against the DOE, "the only official communication that GCU received in May [2018] was a supplemental document request, to which GCU promptly responded," and it closed the Conversion "[w]ith no further contact from the Department."

337. The DOE's investigation would continue for almost a further year-and-a-half. On July 3, 2018, the day after Grand Canyon announced the closing of the Conversion, the DOE again requested information from the Company, including "[a]udited financial statements for the two most recently completed fiscal years for both the institution and the new owner" and "a copy of the default management plan." Defendant Mueller responded to this letter on July 10, 2018. On August 24, 2018, the DOE propounded sixteen additional requests regarding the Conversion to the Company, including requests for an "audited same-day balance sheet," "a copy of the final agreement by which the [Conversion] was consummated," and "all valuation relating to the transaction . . . ." On August 31, 2018, Defendant Mueller responded to this letter. On September 10, 2018, the DOE again propounded requests for information to the Company, including requesting a "narrative" explaining how the structure of the Conversion "warrants recognizing the institution's conversion to nonprofit status for purposes of . . . Title IV . . . ." The Company's counsel responded to the letter on October 1, 2018.

338. Moreover, Defendant Mueller personally involved himself in the intricacies of the approval of the Conversion. For instance, according to Solinski, Defendant Mueller personally demanded that HLC and the DOE review the Conversion on an expedited basis, utilized personal connections with HLC's President such that HLC ignored deficiencies in GCE's Change of Control application, demanded an exception to HLC policy requiring that the Board review the pre-acquisition letter from DOE prior to reviewing a Change of Control application, and personally

intervened to get the HLC reviewer that had written the previous report that resulted in a denial of the Company's initial 2014 Change of Control application removed from overseeing the renewed application. Similarly, Defendant Mueller made inaccurate representations to the markets about the DOE's approval process, including that the DOE approval was taking longer than expected because it was "very understaffed."

339. Multiple facts support a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that there was an enhanced and undisclosed risk of the DOE denying New GCU's application for non-profit status. The Company repeatedly received requests for voluminous amounts of information from a government agency that was closely scrutinizing the terms of the transaction, during a period in which there was increased public and political pressure on the DOE following for-profit failures and judicial setbacks. Defendant Mueller, who was intimately involved in the Conversion approval process and spoke to the market in detail about it, responded to the DOE letters directly, yet failed to provide complete and accurate information about that process to the market. The Company also changed its characterization of DOE approval—beginning to characterize it as "not required"—only after the receipt of these letters. In light of the risks posed by the DOE's review, Defendants' statements that, among other things, they would be "be very surprised, based on our discussions with" the DOE if it imposed any restrictions on Grand Canyon and that "any regulatory limitations imposed by ED could be managed" were misleading in light of Defendants' failure to disclose the DOE's ongoing scrutiny into issues bearing directly on its likelihood of approving the deal.

340. <u>Defendants Moved Forward With The Conversion Notwithstanding These Heightened Undisclosed Risks:</u> Defendants had multiple reasons for moving forward with the Conversion, notwithstanding their prior (undisclosed) knowledge that the DOE viewed the

Conversion with extreme skepticism, the strong signals from the DOE that it would review the unprecedented transaction much more closely than Defendants had hoped, and their knowledge of the undisclosed features of the Conversion that differentiated the proposed Conversion from all other conversions in the field.

341. First, Defendants determined to renew their Conversion proposal in 2017, just a year after the prior failed attempt of an identical Conversion, because of the vastly different regulatory environment that accompanied the Trump presidency.

342. Second, even after the DOE staff signaled skepticism and close scrutiny of the Conversion's terms in May 2018, the Company decided to move forward because of the sunk costs GCE had already invested in the Conversion, the fact that this was likely their last chance to accomplish such a transaction given the changing political environment, and the risk-free benefits of marketing Grand Canyon as a non-profit. As GCU has admitted in a complaint it filed against the DOE in February 2021 in the United States District Court for the District of Arizona, Grand Canyon had several reasons to close the transaction without having DOE approval in hand, including "the significant costs already incurred, the additional costs that would be incurred if the Transaction were further delayed, and the monumental efforts already undertaken" which "included, among other things, the transition from GCE to GCU of nearly 7,500 employees, as well as real estate, improvements, and other assets valued at over $1.0 billion; the establishment of insurance, employee benefits programs, and policies to govern and support GCU and its employees; and the establishment of separate email and communication systems for the 2,500 employees remaining with GCE." GCU's complaint also points to "the risk of placing in jeopardy previously received approvals from HLC and other agencies if the delay persisted," explaining:

> [T]he initial application to HLC required multiple meetings, a lengthy written submission, and a multi-day site visit before HLC's Commission would formally

> act on the application. If GCU had to start the HLC approval process over again because HLC's approval was allowed to lapse, it is likely that the transaction would have been delayed for several more months after GCU received a response from the Department of Education.

343. As discussed above, the HLC accreditation decision was achieved after Defendants Mueller and Bachus personally strong-armed HLC personnel, exploited their personal relationships, and obtained extraordinary concessions and special treatment. HLC's role in accreditation of these troubled for-profit colleges was receiving high-profile attention around this time. In June 2018, Senator Durbin requested that HLC investigate the accreditation of two Dream Center colleges that had suddenly collapsed. Congressional investigations followed. In May 2018, NACIQI held a special session on non-profit conversions specifically calling out the Grand Canyon transaction as particularly concerning and indirectly implicating HLC. Restarting the Change of Control approval process, should that have been necessary in the future, may have placed Grand Canyon's approval at significant risk. Moreover, Defendants knew that moving forward and marketing New GCU as a non-profit would immediately accrue significant benefits to GCE, and that the benefits of concealment might have exceeded the costs of disclosing complete and accurate information as of the time of the false and misleading statements. As set forth below, GCE reported improved revenue that Defendants specifically attributed to the "tailwinds" provided by Defendants' practice of marketing New GCU as a non-profit—regardless of the pending nature of the DOE's review and thus the prematurity of the claim.

344. As a result of the Company's success in this regard, the Company exceeded its revenue and EBITDA targets for 2018 and 2019—notwithstanding the material headwinds the for-profit industry was facing during this time period. This allowed Defendants Mueller and Bachus, respectively, to achieve incentive bonuses of over $1 million and $750,000 in 2018 and 2019.

Combined with the equity awards they received from GCE, Mueller received nearly $4 million and Bachus nearly $3 million in compensation during the Class Period.

345. By contrast, the Individual Defendants were incentivized to take the chance that DeVos's DOE would approve the transaction—likely the only political environment in which the Conversion might be approved. From the standpoint of the Individual Defendants, the reward of non-profit status would bring increased admission numbers and substantially enhanced revenues, which they had experienced while the Conversion application was pending before the DOE. Those significant rewards outweighed any risks of denial or full disclosure of material facts, particularly since GCE had already sunk substantial costs into their renewed Conversion effort.

346. <u>Defendants Mueller and Bachus previously oversaw a company that engaged in serious fraud:</u> In 2004, the DOE found that the University of Phoenix—where Mueller was then CEO of the online campus—had intimidated recruiters that failed to meet targets and encouraged the enrollment of unqualified students. The recruiting scandal required Apollo (the University of Phoenix's parent company)—where Bachus was Chief Accounting Officer and Controller—to pay hundreds of millions of dollars to resolve multiple lawsuits. In 2008, a federal jury found Apollo liable for fraudulently misleading investors about its recruitment practices.

347. In November 2006, Mueller, who was President of Apollo at the time, announced that a company investigation identified various "deficiencies" in its options-granting practices, including "inaccurate documentation" about option grant dates. Apollo stated that it expected to restate financial results going to back to 2001 to account for unstated expenses. In connection with the announcement, Apollo's CFO resigned, and Bachus, as Chief Accounting Officer, was placed on leave and ultimately resigned.

348. Following the close of the Conversion, former employees of the Company recounted that the Company began to engage in abusive recruiting practices, such as aggressively recruiting students regardless of whether they were academically qualified, adopting nearly-unattainable recruitment quotas, and recruiting students that were less likely to be able to repay their student debt. *See supra* Section V.J.iv. That Defendants Mueller and Bachus previously led a university that engaged in abusive recruitment practices and committed accounting fraud supports the strong inference of scienter that they were aware, or were severely reckless in not knowing that, due to the structural inequality of the Conversion and the abusive recruitment practices being committed at New GCU, that the Conversion was entered into in order to use New GCU as an off-balance sheet entity to which it funneled expenses while recognizing revenues generated by New GCU and that New GCU was not a non-profit entity—thereby making their statements on these subjects knowingly or recklessly false and materially misleading when made.

**X. LOSS CAUSATION**

349. During the Class Period, as detailed herein (*see supra* Section VIII), Defendants made materially false and misleading statements and omissions—including both outright falsehoods and statements that were misleading for failing to disclose critical information necessary to provide investors with a complete and accurate disclosure about the issues the statements concerned—and engaged in a scheme to deceive the market. This artificially inflated the price of Grand Canyon common stock and operated as a fraud or deceit on the Class. When the truth concealed by Defendants' prior misrepresentations and omissions—including the truth about the nature of Grand Canyon's relationship with New GCU, the true risk that the DOE would not approve the transaction, and Grand Canyon's financial results and improper accounting treatment of New GCU—was disclosed to the market and/or the heightened risks concealed by those misstatements or omissions materialized on November 6-7, 2019 and January 28, 2020, the

price of Grand Canyon common stock fell precipitously, as the prior artificial inflation introduced or maintained by Defendants' misrepresentations came out of the price. As a result of their purchases of Grand Canyon common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

350. Neither of the individual revelations discussed above was sufficient, on its own, to fully remove the artificial inflation from Grand Canyon's stock price, because each only partially revealed the risks and conditions that were concealed from or misrepresented to investors. Moreover, as explained above, the corrective impact of the November 6, 2019 disclosure was diminished by Defendants' continued reassuring statements and failure to fully disclose the truth.

351. The disclosures that corrected the market prices of the Company's securities to reduce the artificial inflation caused by Defendants' materially false and misleading statements and omissions are detailed below and summarized in the following chart, which identifies each corrective disclosure event, the price declines in the Company's common stock resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on each event date:

| **Date*** | **Corrective Event** | **Closing Stock Price** | **Common Stock Price Change** | **S&P 500 Price Change** |
|---|---|---|---|---|
| 11/06/19<br><br>(11/07–11/08) | On November 6, 2019, after market close, Defendants disclosed that DOE had rejected their application for non-profit status of New GCU. Then, on November 7, 2019, before market open, Defendants filed a Form 8-K detailing that the DOE had rejected New GCU's application for non-profit status. | $84.89 | -7.61% | +.60% |

| **Date*** | **Corrective Event** | **Closing Stock Price** | **Common Stock Price Change** | **S&P 500 Price Change** |
|---|---|---|---|---|
| 01/28/20<br><br>(1/28) | On January 28, 2020, before market open, Citron Research published its report on the Company, "The Educational Enron: The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings," which revealed, *inter alia*, that Grand Canyon's financial results were inflated by the Conversion and that Grand Canyon was violating GAAP. | $84.07 | -8.12% | +1.01% |
| **Date of stock price drop in parentheses* | | | | |

352. The declines in Grand Canyon's stock price were a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Grand Canyon's stock price declines negates any inference that the economic losses and damages suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Grand Canyon-specific facts unrelated to Defendants' fraudulent conduct.

## XI. CLASS ACTION ALLEGATIONS

353. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Grand Canyon during the Class Period. Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Grand Canyon and their families and affiliates.

354. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of November 1, 2019, Grand Canyon had 48,225,070 shares of common stock outstanding.

355. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants misrepresented and/or omitted material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether the price of Grand Canyon common stock was artificially inflated;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

356. Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

357. Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

358. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## XII. PRESUMPTION OF RELIANCE

359. At all relevant times, the market for Grand Canyon common stock was an efficient market for the following reasons, among others:

(a) Grand Canyon met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Grand Canyon filed periodic public reports with the SEC;

(c) Grand Canyon's average weekly turnover as a percentage of shares outstanding was approximately 4.19%;

(d) On average, approximately 2 million Grand Canyon shares were traded each week during the Class Period;

(e) Grand Canyon was eligible to utilize Form S-3 throughout the Class Period;

(f) Grand Canyon regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(g) Grand Canyon was followed by several securities analysts employed by major brokerage firms, including BMO Capital Markets, Piper Jaffray, Barrington Research Associates, and Baird and Co, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

360. As a result of the foregoing, the market for Grand Canyon common stock promptly digested current information regarding Grand Canyon from all publicly available sources and reflected such information in the price of Grand Canyon stock. Under these circumstances, all purchasers of Grand Canyon common stock during the Class Period suffered similar injury through their purchase of Grand Canyon common stock at artificially inflated prices and the presumption of reliance applies.

361. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action

involves Defendants' withholding of material information regarding Grand Canyon's relationship with New GCU as a purported non-profit and independent entity, including critical information that was requested by the DOE during its review process, and Grand Canyon's subsequent revenue and earnings growth as a third-party service provider, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Conversion of New GCU and Grand Canyon's revenue and earnings as a third-party service provider, as demonstrated above, that requirement is met here.

## XIII. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

362. Grand Canyon's "Safe Harbor" warning accompanying its forward-looking statements made during the Class Period were ineffective to shield those statements from liability.

363. To the extent that any alleged false statements are found to be forward-looking, which they should not be, Defendants are also liable for any such false or misleading forward-looking statements pleaded in this Complaint because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Grand Canyon who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XIV. CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

364. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

365. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Grand Canyon common stock at artificially inflated prices.

366. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Grand Canyon common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

367. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

368. During the Class Period, Defendants made the false statements specified above, which they knew to be or recklessly disregarded the truth that they were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

369. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Grand Canyon's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

370. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Grand Canyon common stock. Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Grand Canyon common stock had been artificially inflated by Defendants' fraudulent course of conduct.

371. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

372. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

373. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

374. Defendants Mueller and Bachus acted as controlling persons of Grand Canyon within the meaning of Section 20(a) of the Exchange Act.

375. By virtue of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Grand Canyon's day-to-day operations during the Class Period, Defendants Mueller and Bachus had the power to and did control and influence the decision-making of the Company and the conduct of Grand Canyon's business, including the wrongful conduct complained of herein. Defendants Mueller and Bachus were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Lead Plaintiffs allege to be materially false and misleading. Moreover, these Defendants had a duty to disseminate accurate and truthful information regarding Grand Canyon's operations to correct any previously issued statements that had become untrue so that the market price of Grand Canyon securities would be based upon truthful and accurate information.

376. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Mueller and Bachus had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations as alleged herein. Defendants Mueller and Bachus were also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Grand Canyon during the Class Period. Further, as detailed above, Defendants Mueller and Bachus had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC. As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Grand Canyon within the meaning Section 20(a) of the Exchange Act.

377. As a direct and proximate cause of Defendants Mueller's and Bachus's wrongful conduct as set forth in this Count, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Grand Canyon common stock during the Class Period.

378. By virtue of their positions as controlling persons of Grand Canyon and as a result of their own aforementioned conduct, Defendants Mueller and Bachus, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## XV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVI. JURY TRIAL DEMAND

379. Lead Plaintiffs demand a trial by jury.

DATED: January 21, 2022

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
John C. Browne
Hannah G. Ross
Katherine M. Sinderson (pro hac vice)
Robert F. Kravetz (pro hac vice)
Michael M. Mathai (pro hac vice)
Benjamin W. Horowitz (pro hac vice)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
hannah@blbglaw.com
katiem@blbglaw.com
robert.kravetz@blbglaw.com
michael.mathai@blbglaw.com
benjamin.horowitz@blbglaw.com

*Counsel for Lead Plaintiffs and the Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Gregory V. Varallo*
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
greg.varallo@blbglaw.com

*Counsel for Lead Plaintiffs and the Lead Counsel for the Class*

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (pro hac vice)
Robert A. Hoffman
Jeffrey B. Gittleman (pro hac vice)
Chad A. Carder (pro hac vice)
Meghan J. Talbot
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com
mtalbot@barrack.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Aaron L. Castle (pro hac vice)
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust*