**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 1:20-cv-00639-MN-CJB |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT FOR
<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Evan N. Glustrom (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
evan.glustrom@alston.com

*Counsel for Defendants*

Dated:  March 15, 2022

**TABLE OF CONTENTS**

Preliminary Statement..................................................................................................... 1

Background ...................................................................................................................... 2

Legal Standard ................................................................................................................ 4

Argument ........................................................................................................................ 4

I.      The SAC Fails to Plausibly Allege Scienter. ...................................................... 4

        A.      The SAC Does Not Allege a Cogent Theory of Scienter. ...................... 5

                1.      Plaintiffs' "Gamble" Theory Remains Unavailing. .................... 5

                2.      The Court Rejected Plaintiffs' "Zig-Zagging" Theory of Scienter. ........... 6

                3.      Plaintiffs Offer No Plausible Rationale for the Alleged Fraud. .................. 8

                4.      The Competing Inference of Non-Fraudulent Intent is Significantly More Compelling. .............................................. 9

        B.      The SAC's Factual Allegations Fail to Plead Scienter. ....................... 10

II.     The SAC Fails to Plausibly Allege Falsity. ...................................................... 15

III.    The SAC Fails to Plausibly Allege Loss Causation........................................... 19

Conclusion ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................................4

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013)............................................................................... passim

*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)......................................................................................................13

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)........................................................................................................7

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009)........................................................................5, 10, 11, 20

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................................7, 11

*In re 2007 Novastar Fin., Inc.*,
No. 07-0139-W-ODS, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008).....................19

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997).........................................................................................6, 12, 16

*In re CDNow, Inc. Sec. Litig.*,
138 F. Supp. 2d 624 (E.D. Pa. 2001) .........................................................................................8

*In re Columbia Labs, Inc.*,
602 F. App'x 80 (3d Cir. 2015) ................................................................................................10

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008)........................................................................................12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009).........................................................................................................19

*In re Newell Brands, Inc. Sec. Litig.*,
837 F. App'x 869 (3d Cir. 2020) ..........................................................................................4, 17

*In re Par Pharm. Sec. Litig.*,
No. 06-cv-3226 (PGS), 2008 U.S. Dist. LEXIS 49599 (D.N.J. June 24, 2008)................14, 15

ii

*In re PolarityTE, Inc. Sec. Litig.*,
No. 2:18-cv-00510, 2020 U.S. Dist. LEXIS 219835 (D. Utah Nov. 22, 2020).......................17

*In re Radian Secs. Litig.*,
No. 07-3375, 2010 U.S. Dist. LEXIS 42849 (E.D. Pa. Apr. 30, 2010) ..................................20

*Jasin v. Vivus, Inc.*,
No. 14-cv-03263-BLF, 2016 U.S. Dist. LEXIS 52388 (N.D. Cal. Apr. 19,
2016) .......................................................................................................................................10

*Lefkowitz v. Bank of N.Y.*,
676 F. Supp. 2d 229 (S.D.N.Y. 2009)....................................................................................12

*Martin v. GNC Holdings, Inc.*,
757 F. App'x 151 (3d Cir. 2018) ..............................................................................................4

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ..............................................................................................20

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
720 F. Supp. 2d 517 (D.N.J. 2010) .....................................................................................8, 11

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ...............................................................................................5, 7

*Sanofi Secs. Litig. v. Meeker*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)......................................................................................18

*Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*,
396 F. Supp. 3d 413 (E.D. Pa. 2019) ......................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................................................4, 9

*Winer Fam. Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007).....................................................................................................15

**RULES**

Fed. R. Civ. P. 9(b) ....................................................................................................................4

Fed. R. Civ. P. 12(b)(6)..............................................................................................................4

**STATUTES**

15 U.S.C. § 78u-4(b)(1)-(2) .......................................................................................................4

26 U.S.C. § 501(c)(3)..................................................................................................................9

Freedom of Information Act, 5 U.S.C. § 552 ................................................................................20

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4...........................................1, 4, 13, 15

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ..................3, 16, 18, 20

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)...............................3, 20

**OTHER AUTHORITIES**

17 C.F.R § 240.10b-5.....................................................................................................3, 4, 20

34 C.F.R. § 666.28 .......................................................................................................................2

## CITATION CONVENTIONS

"Amended Complaint": Plaintiffs' Amended Consolidated Complaint for Violations of the Federal Securities Laws, filed September 28, 2021 (DCKT #55)

"Bachus":  Defendant Daniel E. Bachus, GCE's Chief Financial Officer

"Class Period":  January 5, 2018 through January 27, 2020

"Complaint" or "Compl.":  Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws, filed October 20, 2020 (DCKT #34)

"Defendants":  Defendants Grand Canyon Education, Inc., Brian E. Mueller and Daniel E. Bachus

"DOE":  United States Department of Education

"GAAP":  Generally Accepted Accounting Principles

"GCE":  Defendant Grand Canyon Education, Inc.

"GCU" or the "University":  Non-Party Grand Canyon University

"HLC":  The Higher Learning Commission, GCU's institutional accreditor

"Individual Defendants":  Defendants Brian E. Mueller and Daniel E. Bachus

"IRS":  Internal Revenue Service

"Mueller":  Defendant Brian E. Mueller, GCE's Chief Executive Officer and Chairman of the Board and President of GCU

"Plaintiffs":  Fire and Police Pension Association of Colorado, Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust

"PSLRA":  Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, *et seq.*

"R&R":  Report and Recommendation, filed August 9, 2021 (DCKT #50), and adopted by the Court on August 23, 2021 (DCKT #54)

"SAC":  Plaintiffs' Second Amended Consolidated Complaint for Violations of the Federal Securities Laws, filed January 21, 2022 (DCKT #60)

"SEC":  United States Securities and Exchange Commission

"Section 10(b)":  Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)

"Section 20(a)":  Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)

"Title IV":  Title IV of The Higher Education Act of 1965, 20 U.S.C. § 1070, *eq seq.*

## PRELIMINARY STATEMENT

On August 23, 2021, the Court dismissed this putative shareholder class action because Plaintiffs' Complaint did not allege a cogent theory of scienter, as required under the PSLRA. Plaintiffs' SAC suffers from the same pleading deficiency, and it should be dismissed.

First, despite the SAC's prolix allegations of a "perceived favorable regulatory environment" under the Trump Administration,[1] Plaintiffs still offer no plausible support for their theory that Defendants "gambled" on "line DOE employees" "blindly rubber stamp[ing] a request for non-profit status that clearly did not qualify under DOE's own regulations."[2]  The Court previously found this pleading failure fatal to Plaintiffs' claims, and the SAC offers no justification for straying from that well-reasoned holding.  Moreover, the Court has already rejected Plaintiffs' theory that Defendants' purported fraudulent scheme "changed radically mid-stream" and "yo-yoed haphazardly during the Class Period."[3]  Plaintiffs nevertheless stand by their illogical theory, and once again allege that Defendants pivoted to an entirely new fraudulent scheme when they purportedly learned that the DOE was, in fact, "not inclined to rubber-stamp" GCU's request.[4] This "zig-zagging" theory of scienter remains "less-than-cogent."[5]

Plaintiffs' "less-than-cogent" theory cannot be saved by the SAC's novel allegations, based on alleged statements of a former HLC employee who was terminated for cause due to a conflict in connection with the accreditor's review of the University's Change of Control application.

Finally, the SAC should be dismissed because it fails to plausibly allege falsity or loss causation, both of which are essential elements of Plaintiffs' claims.

---

[1] (SAC ¶ 66.)
[2] (R&R at 34-35, 40-41.)
[3] (*Id.* at 41-42.)
[4] (SAC ¶¶ 121, 283, 342.)
[5] (R&R at 41-43.)

## BACKGROUND

GCE is a publicly-traded educational services company which develops and provides operational services to institutions of higher education, including the University. (SAC ¶ 28.) The University was founded in 1949 as a private, nonprofit college, which GCE acquired in 2004 and thereafter operated as a for-profit institution of higher education.[6] (*Id.* ¶¶ 28, 32-33.)

This lawsuit arises out of GCE's 2018 sale of the University to an independent nonprofit entity and the simultaneous execution of a Master Services Agreement (the "MSA") between GCE and the University, pursuant to which GCE agreed to provide certain technological, marketing, financial aid, and other services in exchange for 60 percent of the University's tuition and fee revenue (the "Transaction"). (*Id.* ¶¶ 130-32.) In connection with the Transaction, the University applied to the DOE: (a) for approval of its change in control and continued participation in Title IV student aid programs; and (b) to be treated as a non-profit institution for Title IV purposes. (*Id.* ¶¶ 123, 176.) On November 6, 2019, the DOE approved the Transaction and the University's continued Title IV participation without imposing any regulatory restrictions, but denied the request to be treated as a non-profit for Title IV purposes. (*Id.* ¶¶ 237-38.)

The SAC alleges that Defendants made false or misleading statements to GCE stockholders regarding: the University's independence from GCE following the Transaction; the risk of the DOE's "denial of the conversion"; the similarity of the Transaction to shared services agreements at other institutions of higher education; and GCE's accounting of its post-Transaction financial relationship with the University. (*Id.* ¶¶ 265-318.) Plaintiffs further allege that the Individual Defendants acted with an intent to defraud GCE's investors (scienter), and once again theorize that

---

[6] For-profit institutions of higher education participating in federal student aid programs are subject to certain requirements that do not apply to nonprofits. 34 C.F.R. § 666.28. Plaintiffs do not, and could not, allege that the University risked violating any of these regulatory requirements at any point during the relevant time period.

(a) Defendants initially "gambled" on the DOE approving the University's allegedly deficient request based "solely on the political landscape, rather than [on its] merits"; and (b) after receiving the DOE's request for information a few months later, Defendants realized that the "DOE was not inclined to rubber-stamp" the University's request, but nevertheless "decided to move forward [with the Transaction] because of the sunk costs GCE had already invested." (*Id.* ¶¶ 121, 283, 342.) Relying on these unsubstantiated allegations, Plaintiffs claim that Defendants violated Section 10(b) and SEC Rule 10b-5 thereunder and that the Individual Defendants are liable as control persons under Section 20(a). (*Id.*, Counts I-II.)

In August 2021, the Court dismissed Plaintiffs' substantively identical claims, holding that Plaintiffs failed to establish "a logically coherent theory" of scienter. (R&R at 48.) The Court was "not sure if Plaintiffs *could* plead facts" to make their theory of scienter "seem cogent" (*id.* at 39), but it granted Plaintiffs leave to file an amended complaint to "correct the deficiencies outlined in the Report." (DCKT #54.) In September 2021, Plaintiffs filed the Amended Complaint. Before Defendants moved to dismiss, however, they provided Plaintiffs' counsel with public and non-public documents demonstrating that certain allegations in the Amended Complaint regarding former HLC employee Karen Solinski ("Solinski") were false, and, in response, Plaintiffs requested leave to amend to "address the documents provided by Defendants." (DCKT #58.) The Court granted Plaintiffs' request, and Plaintiffs thereafter filed the SAC.

The SAC, however, continues to rely on demonstrably false allegations concerning Solinski's HLC employment and champions the same illogical theory of scienter as the original Complaint. Plaintiffs have, therefore, failed to correct the pleading failures that rightly caused the Court to dismiss this case.

**LEGAL STANDARD**

"To state a claim under Rule 10b-5, a plaintiff must demonstrate: (1) A material misrepresentation (or omission); (2) scienter (a wrongful state of mind); (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation." *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020). To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citation omitted). This requires more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do." *Id.* In addition, Plaintiffs must satisfy Rule 9(b) and the PSLRA, and must "specify each statement alleged to have been misleading" as well as "the reason or reasons why the statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2); *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153 (3d Cir. 2018).

**ARGUMENT**

**I.     The SAC Fails to Plausibly Allege Scienter.**

As this Court previously explained, "the heart of the scienter inquiry requires the Court to: (1) understand what is Plaintiffs' pleaded theory regarding scienter; (2) understand what is the opposing inference of non-fraudulent intent that Defendants believe the Court should draw based on the facts pleaded; and (3) then ask, if one accepts the pleaded facts as true, 'Would a reasonable person deem the inference of scienter [offered by Plaintiffs] cogent and at least as compelling as any opposing inference one could draw from the facts alleged?' If the answer to that question is 'yes' then the allegations survive; if the answer is 'no,' then they do not." (R&R at 32; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).) Moreover, "if the central

4

premise or theory of scienter put forward by a plaintiff does not 'make a whole lot of sense[,]' then such a theory will not be found 'cogent' or 'at least as compelling as any opposing inference one could draft from the facts alleged.'"  (R&R at 35 (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414-15 (9th Cir. 2020)).)

Here, just like the original Complaint, the SAC fails to plausibly allege scienter.[7]

## A.    The SAC Does Not Allege a Cogent Theory of Scienter.

In dismissing Plaintiffs' original Complaint, the Court held that that the scienter allegations did not establish "a 'cogent' theory," because: (a) the Complaint failed to allege why it would "make any sense that Mueller and Bachus thought that the[] DOE reviewers would wholly vacate their job responsibilities and simply rubber stamp" GCU's request for non-profit status (R&R at 39); and (b) the Complaint alleged that Defendants' purported scheme "*changed radically in mid-stream, within the span of a few months*," and "the zig-zagging nature of Defendants' alleged mindset suggests a less-than-cogent" theory of scienter.  (*Id.* at 42-43.)  The SAC fails to cure either of these fatal pleading deficiencies.

### 1.    *Plaintiffs' "Gamble" Theory Remains Unavailing.*

First, the SAC once again fails to plausibly allege a "gamble" theory of scienter—*i.e.*, that while Defendants allegedly knew their MSA with the University violated "the most basic tenet of non-profit status," they nevertheless "gambled" that DOE would rubber-stamp GCU's request based "solely on the political landscape, rather than [its] merits."  (SAC ¶ 283.)  To be sure, the SAC contains generalized allegations about the purportedly favorable regulatory environment that the University faced after the 2016 election; proposed initiatives to "roll[]-back" certain "DOE

---

[7] As the SAC fails to plausibly allege scienter as to the Individual Defendants, it also fails to plausibly allege corporate scienter as to GCE.  *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 426 (D. Del. 2009), *aff'd*, 442 F. App'x 672 (3d Cir. 2011).

protections against student abuses," which are not at issue here; and the DOE's January 2018 settlement with another institution that had sought to convert to a non-profit university (which, notably, was announced *after* the University had already submitted its application for approval of the Transaction to HLC).[8] (*Id.* ¶¶ 53-72.)  Plaintiffs, however, do *not* allege any facts to remedy the deficiencies that the Court explicitly identified in the original Complaint, including the critical inquiry: "how would [Secretary Devos's] viewpoints necessarily cause line DOE employees to make a decision about GCU's non-profit status that cannot reasonably be squared with DOE regulations?"  (R&R at 40.)

Indeed, Plaintiffs do not point to a single instance in which DOE staff under the Trump Administration "rubber stamped" an institution's request to participate in federal student aid programs as a non-profit, let alone allege that Defendants had knowledge of any such instance. To the contrary, once again Plaintiffs allege numerous facts to show that "DOE personnel, even post-November 2016, were thoughtful and diligent reviewers of applications for non-profit status. Such facts would not support the inference that these government employees would blindly rubber stamp a request for non-profit status that clearly did not qualify under DOE's own regulations." (*Id.* at 40-41.)[9]

### 2. The Court Rejected Plaintiffs' "Zig-Zagging" Theory of Scienter.

---

[8] *See* Declaration of Ronald N. Brown III ("Brown Decl."), Ex. 7, GCE, Current Report (Form 8-K) (Jan. 5, 2018).  The January 5, 2018 Form 8-K is repeatedly referenced in the SAC and "its full content may be considered here in resolving the Motion."  (R&R at 3, n. 2 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997))).

[9] *See also* SAC ¶ 122 ("The seriousness and scope of the interrogatories indicated that, notwithstanding the approach of the senior leaders of the DOE to the for-profit industry, the staff at the DOE would still approach these conversions with significant scrutiny.") (emphasis added); *id.* ¶ 185 (alleging conditions the DOE imposed on the Purdue-Kaplan transaction); *id.* ¶ 330 (alleging that the DOE engaged in a "thorough review of the materials Grand Canyon provided").

Second, Plaintiffs continue to cling to the theory that Defendants' mindset and scheme shifted radically during the putative Class Period. (SAC ¶¶ 341-42.) More specifically, Plaintiffs allege that in May 2018, Defendants learned, based on a routine request for information from the agency, that "the DOE was not inclined to rubber-stamp the Conversion." (*Id.* ¶ 121.) Thereafter, Plaintiffs speculate, Defendants devised an *entirely new* fraudulent scheme to mislead the market into believing that the DOE would approve the University's request to be treated as a non-profit institution for Title IV purposes. (*Id.* ¶ 125.) An identical "zig-zagging" theory was alleged in the original Complaint and rejected by the Court because "this type of allegation . . . requires the reader to believe that Defendants knowingly hitched GCE's entire future operational and financial viability *to a plan that they changed radically in mid-stream, within the span of a few months*," which "suggests a less-than-cogent narrative." (*See* R&R at 41-43.) Plaintiffs' illogical theory is fatal to their claims.

But even accepting Plaintiffs' "zig-zagging" theory of fraud, their allegation that Defendants knew as of May 2018 that the DOE was unlikely to grant the University's request, but nevertheless sought to temporarily mislead the market into believing otherwise, is nonsensical. "[B]y its nature, [Defendants'] purported scheme could not have continued in perpetuity," and necessarily "would be revealed, in relatively short order," upon the announcement of the DOE's determination. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600-601 (S.D.N.Y. 2016). "Courts regularly refuse to infer scienter . . . when confronted with [such] illogical allegations." *Id.*; *see also Nguyen*, 962 F.3d at 415 (affirming the dismissal of securities claims alleging that "defendants knew the FDA would not approve" a new drug because that "theory does not make a whole lot of sense"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014)

7

(affirming dismissal of a securities class action because it was "improbable" that defendants would have initiated a clinical drug trial "if they thought the drug a complete failure," as plaintiff alleged).

### 3.       *Plaintiffs Offer No Plausible Rationale for the Alleged Fraud.*

Further, Plaintiffs fail to plausibly allege *why* Defendants would engage in a risky, fraudulent plot that (at least of May 2018) they knew would soon fail. Plaintiffs do not, for instance, claim that the Individual Defendants made improper stock sales to profit from their alleged scheme, or that the University was in danger of violating any of the rules specific to for-profit institutions of higher education. Instead, Plaintiffs speculate that Defendants' short-term fraudulent scheme was motivated by: (a) the "sunk costs GCE had already invested in the Conversion," which costs would not be recoverable in any event once the DOE denied the University's request; (b) "the fact that this was likely their last chance to accomplish such a transaction given the changing political environment," despite simultaneously alleging that Defendants realized in May 2018 that the DOE would *not* grant the University's request; and (c) "the risk-free benefits of marketing Grand Canyon as a non-profit," despite the fact that Defendants knew these alleged "benefits" would last at most a few months.[10]   (SAC ¶ 342.) Plaintiffs' allegation that Defendants were willing to commit an intentional fraud on their investors based on these illogical purported motivations do not establish a "cogent" or "compelling" theory of scienter. *See, e.g., In re CDNow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 642-43 (E.D. Pa. 2001) (dismissing putative securities class action for failing to allege scienter because, *inter alia*, plaintiffs' motive allegations were "illogical" and "rest[ed] on strained and tenuous inferences").

---

[10] Any alleged desire to increase enrollments is a "general business motive," and Plaintiffs cannot plead scienter based solely on "allegations that amount to circumstances constituting legitimate business motives." *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 551-52 (D.N.J. 2010).

8

> **4.      The Competing Inference of Non-Fraudulent Intent is Significantly More Compelling.**

Finally, Plaintiffs' theory fails because the competing inference of non-fraudulent intent – that Defendants reasonably believed GCU met the DOE's definition of a nonprofit institution – is significantly more compelling. *See Tellabs,* 551 U.S. at 324 ("An inference of scienter is plausible only if a reasonable person would deem the inference . . . at least as compelling as any opposing inference one could draw from the facts alleged.")  In that regard, the IRS's qualification of GCU as a tax-exempt nonprofit organization under 26 U.S.C. § 501(c)(3) is critical because the DOE's "definition of a nonprofit institution mirrors the statutory language for tax exempt organizations found in 26 U.S.C. § 501(c)(3)." (SAC, Ex. A, at 10; *see also* R&R at 43-45.)  As the Court correctly held, "if one large federal regulator (using certain standards) concluded that new GCU qualified as a non-profit, it seems reasonable that Defendants might have thought that another large federal regulator (using the same standards) could come to the same conclusion." (R&R at 44-45.)[11]

Moreover, as Plaintiffs allege, the University has filed litigation against the DOE challenging the denial of GCU's request to participate in federal student aid programs as a non-profit institution. (SAC ¶¶ 123, 342.)  The University's lawsuit belies Plaintiffs' allegations that Mueller knew or suspected that either (a) the University failed to meet the requirements for non-profit status or (b) the DOE was likely to reject the request.  Instead, the ongoing litigation supports the competing inference that Mueller reasonably believed – and continues to believe – that the University meets the requirements for participation in Title IV as a non-profit.  Thus, a

---

[11] The SAC's allegations regarding the IRS's review of tax-exempt conversions are not substantively different than the original Complaint's allegations (SAC ¶¶ 145-152), which the Court considered but rightly rejected in dismissing Plaintiffs' claims. (R&R at 44.)

9

reasonable person would not "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" in the SAC.  (R&R at 32.)

**B.      The SAC's Factual Allegations Fail to Plead Scienter.**

Even if the SAC alleged a cogent theory of scienter (and it does not), it nevertheless should be dismissed because it fails to "plead with particularity facts giving rise to a strong inference that defendants acted with scienter."  *Roseville*, 686 F. Supp. 2d at 420.

The SAC first alleges that the Individual Defendants acted with scienter because they were aware of certain non-public details about the fees owed and services provided under the MSA, which purportedly demonstrated to Defendants that the University was not a non-profit entity and that the DOE would deny the request for non-profit status.  (SAC ¶¶ 320-26.)  Whatever "Plaintiffs may now be able to say, with the benefit of hindsight" about that aspect of the Transaction, however, "Plaintiffs have failed to allege facts to demonstrate that Defendants knew any of this at the time of their challenged statements."  *See Jasin v. Vivus, Inc.*, No. 14-cv-03263-BLF, 2016 U.S. Dist. LEXIS 52388, at *66 (N.D. Cal. Apr. 19, 2016), *aff'd*, 721 F. App'x 665 (9th Cir. 2018). That is, setting aside *post hoc* inferences about the University's non-profit status drawn from the DOE's decision, the SAC does not allege how Defendants knew *at the time of the alleged misstatements* that the non-public details of the MSA demonstrated that any of their statements were false or misleading.  *See In re Columbia Labs, Inc.*, 602 F. App'x 80, 82 (3d Cir. 2015) (affirming dismissal of claims regarding drug trial results rejected by the FDA because "the facts alleged . . . do not create a strong inference that [defendants] even knew that the alleged benchmarks would be required by the FDA").[12]  In addition, Defendants provided those non-public

---

[12] Plaintiffs relatedly assert that the Transaction's "centrality to the Company's operations support a strong inference" that the Defendants knew the Transaction was entered into for improper purposes.  (SAC ¶ 326.)  To the extent Plaintiffs attempt to plead a "core operations inference" of scienter, their attempt fails because Plaintiffs cannot escape their burden of pleading

details about the Transaction to the DOE, and the SAC offers no rational explanation for why Defendants would do so, if they allegedly knew it meant that GCU did not qualify for non-profit status.[13] "Courts regularly refuse to infer scienter . . . when confronted with [such] illogical allegations." *Gillis*, 197 F. Supp. 3d at 600-602.

The SAC next alleges that the DOE's routine inquiries regarding the Transaction "support a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, that there was an enhanced and undisclosed risk of the DOE denying New GCU's application for non-profit status." (SAC ¶¶ 332-339.) The SAC, however, fails to allege "clear facts verifying plaintiff's deductions with respect to defendant's state of mind." *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 553. The SAC does not, for example, plausibly allege that it was unusual for the DOE to send such requests when reviewing a change-in-control transaction. Moreover, since the IRS and every other regulator that had assessed the University's nonprofit status confirmed that status, there is no plausible basis to conclude that the Individual Defendants knew or should have known that the DOE's requests presaged its ultimate denial of the University's request for non-profit status. (R&R at 44.)

The SAC further alleges that 15-plus year-old claims against the Individual Defendants' former employers somehow establishes their scienter in this case. (*Id.* ¶¶ 346-48.) Those claims, however, were not asserted against Mueller or Bachus personally. In any event, the alleged misconduct of those former employers (a purported "recruiting scandal" and a restatement due to

---

"particularized allegations showing that defendants had ample reason to know of the falsity of their statements." *Roseville*, 686 F. Supp 2d at 423.

[13] Likewise, the SAC offers no rational explanation for why Defendants would withhold information from an advisor to "secure[] a favorable (but unreliable) transfer pricing analysis" of the Transaction, where Defendants provided both the analysis *and the information they allegedly withheld* from that advisor to the DOE, which would have made any purported scheme to mislead the advisor a pointless endeavor. (SAC ¶¶ 315-17.)

11

"options-granting practices") are untethered to the alleged misstatements in this case and have no bearing on Defendants' alleged scienter. *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 221 (S.D.N.Y. 2008) (allegations of prior misconduct that was not of the same type as presently alleged "add[ed] little if anything to support an inference of scienter.")

The SAC additionally posits a series of disjointed allegations purportedly based on statements made by a former HLC employee, Karen Solinski (the "Solinski Allegations"). (*See* SAC ¶¶ 40-52, 73-95.) The Solinski Allegations, however, do not salvage Plaintiffs' claims.

First, the Solinski Allegations are unreliable, and therefore "the Court must discount them steeply." *Bartesch v. Cook*, 941 F. Supp. 2d 501, 507 (D. Del. 2013) (quotations omitted) (in assessing scienter at the pleadings stage, discounting article whose author was involved in litigation against the defendant company, which "suggest[ed] that the author [had] an incentive to disparage" the defendants). Most notably, the SAC alleges that in February 2018, "Solinski submitted her resignation to the HLC for reasons unrelated to the GCU evaluation." (SAC ¶ 90 n.2.) That allegation is demonstrably false, based on Solinski's own sworn statements in her lawsuit against HLC and its President. Solinski did not resign from the HLC; she was terminated for cause due to a conflict of interest issue in connection with HLC's review of the University's change in control application. (*See* Brown Decl., Ex. 3 at 5; Brown Decl., Ex. 4 at 17.)[14] Numerous other Solinski Allegations are likewise contradicted by Solinski's letter documenting her recusal

---

[14] The SAC's contrary allegation is baffling, particularly because Defendants previously provided Plaintiffs' counsel with the publicly-available documents which demonstrate the falsity of the allegation and which served as the basis for Plaintiffs' most recent amendments. (*See* Brown Decl., Ex. 1 at 1-2.) This Court can and should take judicial notice of Solinski's complaint and other documents filed in connection with that action, Solinski's February 19, 2018 recusal letter, and Defendants' letter to Plaintiffs, which are referenced in the SAC. (R&R at 3, n. 2 (citing *Burlington*, 114 F.3d at 1426); *see also Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 249 (S.D.N.Y. 2009) ("Judicial notice may encompass the status of other lawsuits, including in other courts, and the substance of papers filed in those actions."); SAC at p. 2; *id.* ¶ 90.)

from HLC's review of the University's change-in-control application, which is discussed at length in the SAC.  (SAC ¶ 90; *compare, e.g.,* SAC ¶¶ 82-84 (alleging that HLC's review was "unusually short and abridged" and that "HLC would typically have required an extensive evaluation of these complex facts") *with* Brown Decl., Ex. 2 at 5 (Solinki's letter, stating that she had *encouraged* HLC reviewers to "consider abbreviating some aspects of the Fact-Finding Visit process" including because "GCU had [ ] undergone a full comprehensive evaluation in December 2016 with no findings."); *compare* SAC ¶¶  94, 343 (alleging that HLC's "about face" accreditation decision was solely the result of Defendants "personally strong-arm[ing] HLC personnel" and "exploit[ing] their personal relationships" with HLC's President) *with* Brown Decl., Ex. 2 at 10 (attachment to Solinski's letter dated November 17, 2017, containing  HLC's "new guidelines related to the determination and evaluation of shared services arrangements")).  The Solinski Allegations should be heavily discounted accordingly.[15]  *See Bartesch*, 941 F. Supp. 2d at 508.

In any event, even accepting Solinski's unreliable statements, Plaintiffs' allegations regarding the HLC accreditation process do not support their claims.  As an initial matter, Plaintiffs do not allege that Defendants made any materially false or misleading statements regarding the HLC review and approval process, nor could they.  Moreover, as the SAC notes, "HLC does not analyze, or opine on, whether universities should be considered non-profit institutions."  (SAC ¶ 42.)  Thus, Solinski's statements regarding the HLC process are irrelevant to whether Defendants

---

[15] Certain Solinski Allegations are particularly specious in that they rely on at least double-hearsay statements purportedly made nearly six years ago.  *See, e.g.,* SAC ¶¶ 50, 333 (recounting alleged conversations between DOE attorneys and Mueller that were thereafter purportedly relayed to Solinski in May 2016); *see also Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) (holding that "conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard" of the PSLRA.)

made material misstatements regarding the University's non-profit status, or whether Defendants knew that any such alleged misstatements were false and misleading.[16]

Solinski's purported conversations with Bachus regarding what she believed "were 'real' and 'key' differences" between the Transaction and the Purdue-Kaplan shared services agreement similarly do not support a strong inference of scienter either. (SAC ¶ 200.) Even if the personal opinions of a former HLC employee could establish scienter (and they cannot), (a) this alleged conversation occurred in May 2017 (*id.*), long before the Transaction was finalized in July 2018; (b) Bachus is not alleged to himself have made any misstatements concerning the Purdue-Kaplan agreement; and (c) Plaintiffs do not allege that Mueller was aware of Solinski's purported views on that agreement. Thus, Solinski's opinion has no bearing on Mueller's state of mind when he remarked on the similar structures of the two transactions. *In re Par Pharm. Sec. Litig.*, No. 06-cv-3226 (PGS), 2008 U.S. Dist. LEXIS 49599, at *38 (D.N.J. June 24, 2008) (dismissing securities fraud claim after finding that each "individual's participation and scienter must be pled separately and with particularity.")

And, lastly, the alleged voicemail from Bachus to Solinski does not evidence any fraudulent intent. Rather, a plain reading of the transcription demonstrates nothing more than an inquiry regarding the contours of an HLC rule and the sentiment that GCE had done "exactly what [HLC has] asked and we feel like things have now been changed." (*Id.* ¶ 92.) Plaintiffs' competing inference – that Defendants would "do whatever" to push-through the accreditor's review of the Transaction simultaneously with its review of the Purdue-Kaplan agreement, solely to "convince

---

[16] And, like HLC, the DOE *approved* the Transaction, after allegedly taking into account additional purportedly damaging documents. (SAC ¶ 174.)

14

DOE as to the similarities of the two transactions" – does not follow, and, in any event, does not support a finding of scienter.  (SAC ¶ 334.)

In all, just like the original Complaint, the SAC fails to allege a cogent theory of scienter and its factual allegations do not support a strong inference of fraudulent intent.

## II.     The SAC Fails to Plausibly Allege Falsity.

The PSLRA requires a plaintiff to "specify each allegedly misleading statement, *why* the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity."  *Winer Fam. Tr. v. Queen,* 503 F.3d 319, 326 (3d Cir. 2007).  The SAC alleges that Defendants made material misstatements and omissions regarding (i) GCE's relationship with the University pursuant to the Transaction, (ii) the University's non-profit status, (iii) the DOE's review of the Transaction, (iv) comparisons of the Transaction to shared services arrangements at other institutions of higher education, and (v) GCE's compliance with GAAP.  For the reasons explained below, however, the SAC fails to adequately allege that any of those alleged misstatements were false or misleading.

**GCE's Relationship with the University.**  The SAC alleges it was false and misleading for Defendants to state that, following the Transaction:  (i) GCE would no longer own the University, but would be a "separate" entity from and act as a "third party" service provider thereto, (ii) the University's "faculty, academic leadership and related staff and other employees" would be employed by the University (rather than GCE), and (iii) aside from Mueller, no other employee would have a "dual role" at GCE and the University.  (*Id.* ¶¶ 274-75, 293-94.)

The SAC first alleges these statements were false because the DOE concluded that the University "***outsource[s]***" a significant number of "institutional functions" to GCE.  (*Id.* ¶ 275 (emphasis added).)  This aspect of the DOE's determination, however, does not render any statement by Defendants false or misleading; on the contrary, it *confirms* that the organizations are

15

separate entities and that GCE acts as a third-party service provider to the University. The SAC further alleges these statements were false and misleading because (according to Plaintiffs) certain GCE employees other than Mueller played a "dual role" at the University. (SAC ¶ 293.) That is not, however, reflected in the DOE's findings. Rather, the DOE noted only that certain "executive team members responsible for managing and overseeing GCU and developing its strategic vision are employed by its service provider," again confirming that, aside from Mueller, no GCE employees played a "dual role" at GCU. (SAC, Ex. A at 16.) Finally, the SAC alleges "that significant members of GCU's academic leadership were employed by GCE," but it does not plead any facts in support of this allegation or even attempt to identify those purported members of the University's academic leadership, nor could it. (SAC ¶ 274.) Plaintiffs thus cannot plausibly allege that any member of the University's faculty or academic leadership is employed by GCE.

In any event, the facts that Plaintiffs now allege demonstrate the University's purported lack of independence were repeatedly disclosed to the market, including in detailed descriptions of the services provided under the parties' MSA.[17] Plaintiffs cannot therefore claim to have been "misled" by alleged misstatements regarding the entities' post-Transaction "separateness." *See Bartesch*, 941 F. Supp. 2d at 508 ("[T]here can be no Section 10(b) claim" where "the alleged omissions are contradicted by the company's public disclosures.").

**The University's Nonprofit Status.** The SAC next alleges that it was false and misleading for Defendants to state that the University would operate as a "non-profit entity" following the Transaction. (SAC ¶¶ 274, 277.) Defendants' statements, however, were demonstrably true. The

---

[17] (*See* GCE, Current Report (Form 8-K) (July 2, 2018) at p. 4 (attached hereto as Brown Decl., Ex. 5).) The July 2, 2018 Form 8-K is repeatedly referenced in the SAC and "its full content may be considered here in resolving the Motion." (R&R at 3, n. 2 (citing *Burlington*, 114 F.3d at 1426).)

16

University was a nonprofit after the Transaction, as recognized by its state licensing authorities, federal, state and local tax authorities, the State of Arizona, and the NCAA.[18]  (*See* DCKT #48, Ex. 2 at 26); *In re PolarityTE, Inc. Sec. Litig.*, No. 2:18-cv-00510, 2020 U.S. Dist. LEXIS 219835, at *21-22 (D. Utah Nov. 22, 2020) (the alleged misstatements "were true" and "thus do not constitute material misrepresentations").

Nevertheless, Plaintiffs assert that Defendants' statements were false based on the DOE's *subsequent* decision to reject the University's request to participate in federal student aid programs as a nonprofit.  (SAC ¶¶ 274, 277.)  Allegations of falsity, however, "must be sufficient to show that the challenged statements were actionably unsound ***when made***," must "refer to ***contemporaneous sources*** showing that Defendants' statements were false or misleading," and cannot be "based on subsequent events" such as a regulator's *post-hoc* decision.  *Newell Brands*, 837 F. App'x at 875 (quotations and citation omitted) (emphasis added).  Defendants' statements regarding the University's nonprofit status were based on the its ***contemporaneous*** status as a nonprofit as determined by the IRS and the other authorities set forth above, and pre-date the DOE's November 2019 decision to treat the University otherwise solely for purposes of Title IV. Accordingly, the SAC cannot plausibly allege the falsity of Defendants' alleged misstatements.

**The DOE's Review of the Transaction.**  The SAC further alleges that Defendants' July 2, 2018 statements regarding the DOE's review of the Transaction "were misleading because they omitted" that GCE had received requests for information from the DOE that allegedly "rais[ed] a significant risk that the DOE would decline" the request to participate in Title IV as a nonprofit. (SAC ¶¶ 278-283.)  Nowhere, however, does the SAC allege that it was unusual for the DOE to

---

[18] The DOE noted that it did "not take a position with respect to GCU's non-profit 501(c)(3) status" with the IRS.  (SAC, Ex. A at 17.)  Plaintiffs likewise have no authority to second-guess the IRS's determination in this regard.

17

send such inquiries when reviewing a change-in-control transaction.  Nor does the SAC allege that the DOE indicated it was likely to deny the request.  Further, the non-disclosure of the DOE's routine information requests does not amount to a *material* omission.  *See Sanofi Secs. Litig. v. Meeker*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) ("[C]ourts have rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review."), *aff'd sub nom. by Gen. Partner Glenn Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  Accordingly, Defendants' alleged misstatements were not materially misleading simply because they did not refer to the DOE's information requests.[19]

**Comparisons to Other Higher Education Shared Services Agreements.**  The SAC alleges Defendants made false and misleading statements comparing the structure of the Transaction to other higher education shared services agreements.  (SAC ¶¶ 296-309.)  Defendants, however, disclosed all of the facts that allegedly made those comparisons false or misleading, including the services that GCE would provide and fees it would receive from the University.[20] That is fatal to Plaintiffs' claims because, of course, "there can be no Section 10(b) claim" if the allegedly omitted information was disclosed.  *Bartesch*, 941 F. Supp. 2d at 508.

**GCE's Compliance with GAAP.**  Finally, the SAC alleges that Defendants made false and misleading statements regarding GCE's accounting treatment of its financial arrangements

---

[19] The SAC alleges in passing that Defendants "also omitted the highly material fact that the DOE had previously informed Defendants that the Conversion's structure would be very difficult for the DOE to approve."  (SAC ¶ 283.)  That allegation, however, is based on a second-hand recounting of a purported meeting in 2014 or 2015 between GCE's lawyers and DOE regarding "the 2014 Conversion Proposal," not the Transaction.  (*Id.* ¶ 50.)

[20] *See, e.g.,* GCE, Current Report (Form 8-K) (July 2, 2018); GCE, Quarterly Report (Form 10-Q) Ex. 2.1 (November 8, 2018) (attached as Brown Decl. Ex. 6).  In any event, Plaintiffs do not allege that the *structures* of the respective transactions differed, nor could they.

18

with the University under GAAP.  (SAC ¶¶ 310-318.)  These claims fail because the University was and is an independent entity following the Transaction, and was properly treated as such for purposes of GCE's financials.  In any event, Plaintiffs do not and cannot allege that either GCE's auditors or the SEC have raised any concerns in this respect, and Plaintiffs' unsubstantiated opinions should not replace the sound judgment of these authorities.  *In re 2007 Novastar Fin., Inc.*, No. 07-0139-W-ODS, 2008 U.S. Dist. LEXIS 44166, at \*12 (W.D. Mo. June 4, 2008), *aff'd*, 579 F.3d 878 (8th Cir. 2009).[21]

For each of these reasons, the SAC fails to plausibly allege falsity.

### III. The SAC Fails to Plausibly Allege Loss Causation.

To plead loss causation, which is an essential element of Plaintiffs' claims, the SAC must plausibly allege that GCE's "stock price dropped in response to a 'corrective disclosure' of ***new information*** that ***directly demonstrates that the defendant's representations were false***." *Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 477 n.43 (E.D. Pa. 2019) (emphasis added).  Here, Plaintiffs attempt to plead loss causation based on two alleged corrective disclosures:  (i) GCE's November 6-7, 2019 announcements that the DOE approved the Transaction but denied the University's request to participate in Title IV as a non-profit and (ii) a January 28, 2020 "report" issued by Citron Research, a short-seller that stood to profit from a drop in GCE's stock price.  (SAC ¶ 349.)  Neither are corrective disclosures.

GCE's November 6-7, 2019 announcements did not reveal that any of the alleged misstatements were false or misleading, nor do Plaintiffs so allege.  (SAC ¶¶ 265-318.)[22]  On the

---

[21] For the same reason, Plaintiffs fail to plead scienter with respect to their GAAP claims.

[22] Indeed, the Complaint alleges that information disclosed *for the first time* in the DOE's decision letter published on November 12, 2019 itself purportedly revealed the falsity of the alleged misstatements.  (SAC ¶ 249).  The Complaint does not allege, however, that the letter constitutes a corrective disclosure, presumably because it did not materially impact GCE's stock price.

contrary, the SAC alleges that the November 6-7, 2019 announcements ***were themselves misleading*** (*id.* ¶¶ 280, 287), which independently precludes them from simultaneously being corrective disclosures. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (a plaintiff "cannot have it both ways" by "simultaneously argu[ing] that [a] misstatement itself constituted a corrective disclosure"). As for Citron's "report" about GCE, it cannot be a corrective disclosure because it did not reveal any new information to the market. Rather, it stated that "all information contained herein . . . has been obtained from public sources." (SAC ¶ 210.) *See, e.g.*, *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (analyst report was not a corrective disclosure because it "stat[ed] that all of the information in the presentation was 'obtained from publicly available sources'") (quotations and citation omitted).[23] As the SAC does not identify a corrective disclosure of the alleged fraud, it fails to plausibly allege loss causation.

## CONCLUSION

The SAC should be dismissed, in its entirety and with prejudice.[24] *See, e.g.*, *In re Radian Secs. Litig.*, No. 07-3375, 2010 U.S. Dist. LEXIS 42849, at *3, *39-40 (E.D. Pa. Apr. 30, 2010) (dismissing case with prejudice where "the plaintiffs already filed original complaints, a consolidated class action complaint, and a consolidated amended class action complaint").

---

[23] While Citron purported to base its "report," in part, on documents it received through a Freedom of Information Act ("FOIA") request, the SAC does not identify any allegedly corrective information that was derived from the FOIA documents.

[24] Having failed to state a claim under Section 10(b) or SEC Rule 10b-5, the SAC's Section 20(a) claims fail, as a matter of law. *Roseville*, 686 F. Supp. 2d at 428.

20

Respectfully submitted this 15th day of March, 2022.

**DLA PIPER LLP (US)**

**OF COUNSEL:**

 */s/ Ronald N. Brown, III*

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Evan N. Glustrom (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
(404) 881-7000
(404) 881-7777 (Fax)
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
evan.glustrom@alston.com

Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
(302) 468-5700
(302) 394-2341 (Fax)
ronald.brown@us.dlapiper.com
peter.kyle@us.dlapiper.com

*Counsel for Defendants*