## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 20-639-MN-CJB |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<table>
<tr>
<td>

**BERNSTEIN LITOWITZ BERGER**
**  & GROSSMANN LLP**
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
greg.varallo@blbglaw.com

        **-**and-

Hannah G. Ross
Katherine M. Sinderson (*pro hac vice*)
John C. Browne
Robert F. Kravetz (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
katiem@blbglaw.com
johnb@blbglaw.com
robert.kravetz@blbglaw.com
michael.mathai@blbglaw.com
benjamin.horowitz@blbglaw.com

*Counsel for Lead Plaintiffs*
*and Lead Counsel for the Class*

</td>
<td>

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman
Jeffrey B. Gittleman (*pro hac vice*)
Chad A. Carder (*pro hac vice*)
Meghan J. Talbot
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com
mtalbot@barrack.com

*Counsel for Lead Plaintiffs*
*and Lead Counsel for the Class*




**Dated: May 6, 2022**

</td>
</tr>
</table>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT .................................................................................................................. 7

    I.    Plaintiffs Allege Actionable Misstatements ............................................ 7

        A.    Defendants Misrepresented GCU's Supposed "Independence" ................ 7

        B.    Defendants Misrepresented The Conversion's Similarity To Other Approvals ................................................................................................... 9

        C.    Defendants Misrepresented Risks To GCU's Non-Profit Label ............... 10

        D.    Defendants Misrepresented The DOE's Review Of The Conversion ................................................................................................... 11

        E.    Defendants Violated GAAP .................................................................... 13

    II.    The Complaint Adequately Alleges Scienter Against All Defendants ................. 14

        A.    The Complaint Details A Cogent Inference Of Scienter ......................... 14

        B.    Defendants' Opposing Inference Is Not More Plausible, And The Benefits Of Proceeding With The Conversion Outweighed Any Risks ........................................................................................................ 16

    III.    There Is No Basis To Ignore The Solinski Allegations ...................................... 21

    IV.    The Complaint Sufficiently Pleads Loss Causation ............................................ 23

CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................................15

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)................................................................................................13

*Align Tech., Inc. v. 3Shape A/S*,
2020 WL 5979353 (D. Del. Oct. 8, 2020) .......................................................................14

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) .............................................................9, 10, 11, 17

*In re Amylin Pharm., Inc. Sec. Litig.*,
2003 WL 21500525 (S.D. Cal. May 1, 2003)....................................................................18

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013)..................................................................................23

*In re Bristol-Myers Squibb Sec. Litig.*,
2005 WL 2007004 (D.N.J. Aug. 17, 2005) ......................................................................24

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)............................................................................................13

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ..................................................................................17

*In re CDNOW, Inc. Sec. Litig.*,
138 F. Supp. 2d 624 (E.D. Pa. 2001) ...............................................................................21

*In re Celgene Corp. Sec. Litig.*,
2019 WL 6909463 (D.N.J. Dec. 19, 2019)........................................................................15

*Chapin v. Fort-Rohr Motors, Inc.*,
621 F.3d 673 (7th Cir. 2010) ............................................................................................22

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...........................................................................................................23

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)..........................................................................8

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000)..............................................................................................23

*Fitzpatrick v. Uni-Pixel, Inc.*,
　35 F. Supp. 3d 813 (S.D. Tex. 2014) ......................................................................................18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
　574 F.3d 29 (2d Cir. 2009)......................................................................................................24

*Flora v. Cty. of Luzerne*,
　776 F.3d 169 (3d Cir. 2015)....................................................................................................22

*Fowler v. UPMC Shadyside*,
　578 F.3d 203 (3d Cir. 2009)....................................................................................................17

*Gillis v. QRX Pharm. Ltd.*,
　197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................................21

*Grigsby v. BofI Holding, Inc.*,
　979 F.3d 1198 (9th Cir. 2020) ................................................................................................25

*Guzman v. Mana*,
　2018 WL 10150989 (D.N.J. Dec. 6, 2018) ............................................................................17

*In re Horsehead Holding Corp. Sec. Litig.*,
　2018 WL 4838234 (D. Del. Oct. 4, 2018) ........................................................................22, 23

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
　818 F.3d 85 (2d Cir. 2016)......................................................................................................20

*Institutional Invs. Grp. v. Avaya, Inc.*,
　564 F.3d 242 (3d Cir. 2009)..............................................................................................15, 22

*IWA Forest Indus. Pension Fund v. Textron Inc.*,
　14 F.4th 141 (2d Cir. 2021) ...........................................................................................8, 11, 16

*Kline v. First W. Gov't Sec., Inc.*,
　24 F.3d 480 (3d Cir. 1994)...................................................................................................7, 14

*Lea v. TAL Educ. Grp.*,
　837 F. App'x 20 (2d Cir. Nov. 25, 2020) ...............................................................................13

*In re Mattel, Inc. Sec. Litig.*,
　2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) ........................................................................24

*McDermid v. Inovio Pharms., Inc.*,
　520 F. Supp. 3d 652 (E.D. Pa. 2021) ................................................................................14, 17

*Meyer v. Greene*,
　710 F.3d 1189 (11th Cir. 2013) ..............................................................................................25

*Nguyen v. Endologix, Inc.*,
 962 F.3d 405 (9th Cir. 2020) .............................................................................................21

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)...............................................................................................16

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
 367 F. Supp. 3d 16 (S.D.N.Y. 2019)...................................................................................15

*Pub. Empls. Ret. Sys. of Miss. v. Amedisys, Inc.*,
 769 F.3d 313 (5th Cir. 2014) ..............................................................................................25

*Roofer's Pension Fund v. Papa*,
 2018 WL 3601229 (D.N.J. July 27, 2018)..........................................................................14

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*,
 181 F.3d 410 (3d Cir. 1999)................................................................................................22

*S.E.C. v. Infinity Grp. Co.*,
 212 F.3d 180 (3d Cir. 2000)................................................................................................18

*S.E.C. v. Todd*,
 642 F.3d 1207 (9th Cir. 2011) ............................................................................................17

*SEB Inv. Mgmt AB v. Endo Int'l, PLC*,
 351 F. Supp. 3d 874 (E.D. Pa. 2018) ..................................................................................15

*Semerenko v. Cendant Corp.*,
 223 F.3d 165 (3d Cir. 2000)..........................................................................................23, 24

*Sgalambo v. McKenzie*,
 739 F. Supp. 2d 453 (S.D.N.Y. 2010).................................................................................20

*Shah v. Zimmer Biomet Holdings, Inc.*,
 348 F. Supp. 3d 821 (N.D. Ind. 2018) .................................................................................20

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
 2018 WL 1587457 (D. Conn. Mar. 31, 2018) .....................................................................20

*Spitzberg v. Hous. Am. Energy Corp.*,
 758 F.3d 676 (5th Cir. 2014) ..............................................................................................18

*In re Suprema Specialties, Inc. Sec. Litig.*,
 438 F.3d 256 (3d Cir. 2006)................................................................................................14

*Tomaszewski v. Trevena, Inc.*,
 482 F. Supp. 3d 317 (E.D. Pa. 2020) ..............................................................................12, 18

iv

*Tracinda Corp. v. DaimlerChrysler AG*,
    362 F. Supp. 2d 487 (D. Del. 2005)......................................................................17

*United States v. Cook*,
    820 F. Appx. 110 (3d Cir. 2020)..........................................................................17

*United States v. Johnson*,
    592 F.3d 442 (3d Cir. 2010)................................................................................22

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ..............................................................13, 14

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014)..................................................................13, 24

STATUTES

18 U.S.C. § 371.................................................................................................................16

18 U.S.C. § 1001(a) .........................................................................................................16

18 U.S.C. § 1519...............................................................................................................16

## INTRODUCTION

The Complaint plausibly alleges actionable misstatements because Defendants knowingly misrepresented facts about their plan to convert Grand Canyon University into a "non-profit" University, which deprived GCE[1] investors of materially complete and accurate information necessary for them to evaluate the true risk of their investment. Defendants' misrepresentations harmed investors, who relied on Defendants' false statements and their misleading portrayal of the Company's efforts to shed heightened regulatory risk through the Conversion.

Defendants' primary ground for dismissal is their assertion that the Complaint's scienter theory is illogical. Contrary to Defendants' inaccurate portrayal, Plaintiffs' scienter theory does not change or "yo-yo" during the Class Period. The Complaint alleges a consistent, straightforward and well-accepted theory of scienter: Defendants' substantial, personal involvement in the conversion process, including their prior interactions with the DOE and the HLC, gave them knowledge of non-public facts that ***contradicted specific false and misleading material misstatements, including misstatements that concealed key aspects of the material risk*** that the DOE would not approve GCU's non-profit status.[2] That risk, which existed throughout the Class Period, did not suddenly appear when the DOE issued its May 2018 information request; rather,

---

[1] Defined terms are the same as in the Second Amended Consolidated Complaint (the "Complaint") (D.I. 60). Unless otherwise noted, "¶__" refers to Complaint paragraphs, "Ex.__" refers to Complaint exhibits, "Opp. Ex.__" refers to exhibits to the Declaration of Katherine M. Sinderson in Support of Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss submitted herewith, and "DB" refers to Defendants' Motion to Dismiss ("Motion") (D.I. 62). Unless otherwise stated, all emphasis is added and internal quotes and citations are omitted.

[2] For instance, as shown below, Defendants knew, but failed to disclose, that the MSA funneled 95% of GCU's revenues to GCE while saddling GCU with 72% of the total expenses of operating the institution. They knew, but failed to disclose, that 41 members of the GCU's 58-person Executive Leadership Team consisted of GCE employees, thereby giving GCE effective control of GCU's decision-making body. And they knew, but failed to disclose, the significant differences between the undisclosed terms of the Conversion and earlier DOE-approved transactions.

the request revealed to Defendants an increase in a risk that had already attached.

Nor do Defendants offer a competing inference of non-fraudulent intent that is more compelling. Defendants' sole, non-fraudulent inference is that they "reasonably believed" that GCU was, in fact, a non-profit because the IRS made a separate determination of non-profit status. But that argument provides no explanation as to why they ***misrepresented nearly every basic fact underpinning the transaction and the DOE's review*** (including information never presented to the IRS). Defendants' reliance on the IRS's decision is also belied by allegations that Defendants knew that it was the DOE's non-profit decision that ultimately mattered to investors in evaluating the risk profile of their investment. Regardless, courts routinely find scienter when defendants deceive investors about heightened risks—even if they claim to have had a subjective belief about a more favorable outcome.

Finally, to address questions raised by the Court in its dismissal order, the Complaint includes significant new allegations providing more context as to why Defendants would choose to complete the GCU/GCE transaction despite not having received DOE approval of GCU's non-profit status. Contrary to certain assumptions in the Report & Recommendation ("R&R") (*see, e.g.,* R&R at 37-38), this was not an all-or-nothing, "bet the company" proposition. Rather, Defendants reaped immediate and significant advantages by implementing the one-sided MSA while GCE pursued non-profit status for GCU, regardless of whether the DOE ultimately granted such approval. In contrast, the cost of delaying the Conversion was prohibitive given the Company's sunk costs, a potentially changing political landscape, and the danger that GCU would lose the HLC's accreditation. Unfortunately for GCE investors, Defendants left them to shoulder the risks ***by misrepresenting nearly every fact*** that would have allowed investors to accurately gauge the true prospects for approval and, therefore, the true risk of their investment. When these

2

hidden risks materialized, investors suffered hundreds of millions of dollars in losses.

## FACTUAL BACKGROUND

The for-profit education industry has a long, troubled history that has earned it a reputation as a high-risk investment. ¶¶34-39. In the years leading up to the Class Period, a series of major scandals brought further negative attention to the sector, including multiple fraud scandals involving Apollo, where Defendants Mueller and Bachus were leading executives. ¶¶34-37. To avoid the negative stigma of for-profit status, for-profit institutions developed a "hybrid" model that allowed them to create (or pair with) a new "non-profit institution," sell the assets of the existing for-profit to the non-profit, and enter into an agreement in which the for-profit provides services to the non-profit for a fee. ¶¶5, 38-39; Ex. A at 1-4.

Defendants Mueller and Bachus, both longstanding for-profit industry veterans, had sought to convert GCU into a non-profit in 2014. Those efforts were stymied when GCE's accreditor, the HLC, denied the Change of Control application after finding that GCU was over-dependent on GCE and was set to incur prohibitive debt in connection with the transaction. ¶¶6, 40-42, 44-45, 47-48. Karen Solinski, a highly seasoned regulatory lawyer who led more than fifty Change of Control evaluations for the HLC over twenty years, chaired the HLC's Fact-Finding Evaluation Team that analyzed GCU's application in 2015-2016. ¶43.

In parallel with its pending application with the HLC, GCE's management tried to persuade the DOE to approve the structure of its proposal. ¶¶49-50, 52. That outreach was unsuccessful, and GCE learned that the DOE would have been unlikely to approve GCU's conversion proposal even if the HLC had not rejected it. *Id*. Mueller, who was personally involved in the Company's outreach to the DOE, told HLC staff at a May 2016 meeting that the DOE had "push[ed ]back" on the 2014 Conversion Proposal and that *he did not believe the DOE or the HLC would bless it in the future*. ¶52. Mueller declared that, as a result, the Company would not reapply to convert GCU

3

to non-profit status. *Id.*

Mueller, however, reconsidered that assessment when the for-profit regulatory landscape changed with the November 2016 election of President Trump, whose Secretary of Education, Betsy DeVos, took office in February 2017. ¶¶7, 53. The DeVos-led DOE began installing veterans of for-profit education companies into key leadership roles, which coincided with the rolling back of several DOE protections against student abuses. ¶¶53-62. Indeed, almost immediately at the outset of the Trump Administration, for-profit institutions commenced large scale conversions, and the "for-profit friendly Trump-DeVos team at the Department of Education" took new and very different positions towards those conversions than had the Obama Administration. ¶¶63-72.[3] Grand Canyon's own counsel advised clients to initiate new conversions with the change. ¶65.

Encouraged by this transformed regulatory environment, Grand Canyon made plans in early 2017 to submit a renewed Change of Control application to the HLC. ¶¶7, 73. Defendant Bachus informed Solinski of GCE's intent in a phone call in or around May 2017 and claimed the proposed transaction was similar to a highly publicized—and DOE-approved—conversion involving Purdue University and Kaplan, Inc. ¶¶10, 74. But Solinski—who had evaluated the Purdue-Kaplan transaction for the HLC—informed Bachus there were "real" and "key" differences between the two deal structures and sent Bachus information outlining the differences. *Id.* Despite learning of these dissimilarities, GCU forged ahead with a new Conversion attempt in December 2017, ¶76, with Mueller and Bachus involved directly in all aspects of the process. *See, e.g.,* ¶¶320-34.

As of 2017, the HLC required that change of control applicants obtain DOE pre-acquisition

---

[3] A leading lawyer for for-profit institutions gave an industry presentation set to song reflecting the industry's views: he stated that the industry was "down—and life was rough[,]" and that "[a]fter so many years [w]e'd just had enough, but [n]ow, we've got a friend in Trump." ¶72.

4

approval—a process that typically takes 45 days to complete—before the HLC would consider a change of control application. ¶¶85-86. But Grand Canyon filed its DOE application late, making it virtually impossible for the DOE to render a decision before the HLC's February 22, 2018 board meeting, and causing HLC staff to inform Defendants that the Company could either delay consideration until the HLC's next board meeting in June 2018 or risk rejection under HLC's policy. ¶¶86-87, 92. Delay, however, placed in peril Defendants' timeline "to complete the transaction by the end of 2Q18." ¶¶111-12. Mueller "exploded" at the suggestion, demanded that Solinski be removed from overseeing the application's processing, and convinced HLC leadership to ignore its own written requirements and approve the application. ¶¶88-89, 91-95, 334.[4]

In May 2018, in its "*only* communications with the DOE," Defendants received a lengthy series of interrogatories from the DOE, the tenor and scope of which heightened the risk of the DOE's review and made it unrealistic that the DOE would approve the transaction within the Company's July 1, 2018 timeline. ¶¶13, 111-12, 118-22, 126, 279-83, 335. Yet, when Defendants chose to speak about the DOE process, they mischaracterized it, baselessly attributing DOE delay to "understaff[ing]" and falsely claiming that they had "ongoing engagement" with the DOE. ¶¶134, 135, 283, 336. And although Defendants previously informed the public that they would await DOE approval before completing the transaction (like applicants had in other, approved conversions), they reversed course after receiving the lengthy interrogatories—declaring for the

---

[4] In addition, the HLC's evaluation of Grand Canyon's renewed application was unusually short and limited to a document review of the Conversion Application and follow-up calls with Grand Canyon executives. ¶¶80, 82, 84. The HLC's curtailed review was even more unusual given certain differences from Grand Canyon's 2014 Conversion Proposal, including (1) the absence of traditional financing from the 2017 proposal in favor of an arrangement whereby GCE acted as the lender to GCU, which removed scrutiny of the transaction by third parties; and (2) Defendant Mueller's ascension to Chairman of the Board of GCE in January 2017, while maintaining his positions as President of GCU and CEO of GCE (¶21), which should have prompted further analysis of his overlapping roles. ¶¶83-84.

first time that DOE pre-approval was unnecessary. ¶¶125, 127. Analysts were comforted by Defendants' misleading portrayal of the Conversion and the DOE's review and thus considered DOE approval to be "highly likely" and "largely procedural." ¶¶111, 127. For investors, such approval would have "many benefits (e.g., removal from the 'for-profit' world where future risks are unknown)" and would "*de-risk* [GCE] as an investment and position the new entity to trade more in line with other education technology providers." ¶98; *see also* ¶¶102, 111.

Defendants proceeded with the Conversion on July 2, 2018, completing the sale of GCE's assets to GCU pursuant to an Asset Purchase Agreement ("APA"), and executing a Master Services Agreement ("MSA") to govern their relationship. ¶¶130, 132. The reasons for proceeding with the Conversion were clear. On the one hand, Defendants received immediate and tangible benefits from the Conversion and the MSA, which funneled 95% of GCU's revenues to GCE while requiring GCU to bear 72% of the expenses—none of which was revealed to investors. ¶¶17, 193, 195. Indeed, in the following months, while the DOE considered the application and Defendants continued to conceal material aspects of the transaction, Defendants rode a self-described non-profit "tailwind" to report record profits and operating margins far outpacing its peers. ¶¶17-18, 153-235. On the other hand, Defendants knew—as they admitted in GCU's complaint against the DOE—that they had expended "significant [sunk] costs" and "monumental efforts" to close the Conversion in July, and that delaying it would increase costs further, place in jeopardy previous approvals received from the HLC and other agencies, and expose them to an unfavorable change in the political environment. ¶¶14-16, 123-24.

Defendants redacted material portions of the MSA, which would have revealed the true nature of the relationship between GCU and GCE, its dissimilarity to other conversions, and the Company's improper accounting practices. ¶¶133, 246. When the hidden facts and their impact

6

was ultimately revealed, the price of GCE's stock fell significantly. *First*, on November 6, 2019, Defendants announced that the DOE had determined that GCU "d[id] not satisfy the department's definition of a non-profit entity" and that the DOE would continue to treat GCU as a for-profit. ¶¶19, 237-38. Despite having posted better-than-expected results, GCE's stock price plummeted nearly 8%. ¶239. Analysts connected these declines to the DOE decision. ¶240. *Second,* on January 28, 2020, analyst Citron Research published a nearly 50-page report titled "The Educational Enron: The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings," which was based in part on 870 pages of non-public documentation Citron received in response to a FOIA request. ¶¶20, 250-54; Ex. B. Citron concluded that GCE was using GCU as a "captive non-reporting subsidiary" to "dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price." *Id*. GCE's stock price declined more than 8% as a result of the report. ¶¶255-56.

## ARGUMENT

### I.    Plaintiffs Allege Actionable Misstatements

#### A.    Defendants Misrepresented GCU's Supposed "Independence"

Throughout the Class Period, Defendants made false and misleading statements attesting that GCU would be independent of GCE—a key prerequisite to non-profit status and an important risk factor to investors. For example, when challenged that GCU would be "operated by a group of individuals who serve two masters," GCE responded that "*there will be no overlapping management or employees between the two entities*." ¶¶176, 272. Defendants also stated repeatedly that, besides Mueller, "no other employee of [GCU] or [GCE] has a *dual role* in both organizations," that "GCU would be a *separate . . . entity under the control of . . . independent management*," and that GCE "*would no longer be . . . [GCU's] . . . operator*" but rather just a "*third-party contract provider*." ¶¶139, 176, 267, 271, 285, 288.

These statements were false or, at minimum, materially misleading. In reality, nearly 75% of the 58-person "Executive Leadership Team" that was "responsible for managing and overseeing [GCU]"—i.e., "most of [GCU's] key management personnel"—were GCE employees. *See* ¶¶177, 274-75, 293. Further, the unredacted MSA shows that GCU was a "captive client" of GCE, including because GCE received 95% of GCU's revenues while incurring just 28% of GCU's costs, and GCU was "locked in" to the MSA due to an "arguably prohibitive termination fee." ¶¶195, 197-98; Ex. A at 14.

Defendants' principal response is that their statements were literally true because these "key management personnel" were formally employed by GCE. DB 16. This misses the point entirely: they, in fact, had dual roles (not dual employment) as employees of GCE and "key management" of GCU. Defendants also dismiss allegations that "significant members of GCU's academic leadership were employed by GCE" because Plaintiffs supposedly have not "even attempt[ed]" to identify such personnel (DB 16)—but ignore that the DOE itself labeled these individuals as "executive team members" and "executive leaders," and that the Complaint otherwise identifies specific employees. *See* ¶177-78, 229, 274, 307, Ex. A.[5] Even if literally true (which they were not), Defendants' statements—made to assuage concerns about GCE's control— were misleading for omitting that the overwhelming majority of GCU's senior-most management were GCE employees. *See In re Enzymotec Sec. Litig.,* 2015 WL 8784065, at *7 (D.N.J. Dec. 15, 2015).

Second, Defendants cherry-pick a DOE phrase regarding the services that GCU "outsource[d]" to GCE (¶¶275, 293, 307) to argue that this confirms that the two entities were

---

[5] To the extent Defendants dispute the meanings of the terms "dual roles" and "academic leadership," those disputes are factual ones that cannot be resolved now. *See IWA Forest Indus. Pension Fund v. Textron Inc.*, 14 F.4th 141, 147 (2d Cir. 2021).

separate. DB 15. Again, this misses the point. Whether GCU and GCE were separate corporate entities on paper, GCU was not "independent," as Defendants claimed. The full quote (not included by Defendants) corroborates that the DOE considered GCU to be a "captive" client: the DOE was "skeptical that any nonprofit could outsource the number and type of institutional functions that [New GCU] has and still be deemed to operate the institution." *See* ¶177 (DOE determined that, "as a practical matter," GCE was the entity "***actually operating***" GCU) (emphasis in original). Having chosen to speak about GCU's supposed independence to assure the market, Defendants "cannot omit material facts related to that issue so as to make its disclosure misleading." *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 222 (E.D. Pa. 2021). Finally, Defendants falsely argue that the facts demonstrating GCU's lack of independence were public during the Class Period. DB 16 & n.17.[6] As demonstrated in the Complaint, however, ***every*** alleged undisclosed material fact was either redacted (the true Services Fee in the MSA) or otherwise absent from the public filings. *E.g.*, *¶¶*133, 172.

### B.    Defendants Misrepresented The Conversion's Similarity To Other Approvals

To assure investors of DOE approval and GCU's independence, Defendants repeatedly stated that the Conversion was virtually "identical" to the Purdue-Kaplan deal and other DOE-approved transactions. *See* ¶¶100-01, 103-05, 182, 296-304. In reality, the Conversion was materially different from those other transactions, with differences including that:

- From the start, GCE would receive approximately 95% of GCU's revenues, including revenues entirely unrelated to services GCE rendered, while paying only 28% of GCU's expenses—while under the Purdue-Kaplan deal, the services provider would be paid only when the non-profit university broke even and would receive only 12% of the non-profit university's revenue thereafter (¶¶188, 195-96);

---

[6] The document Defendants cite (DB 16 n.17) as disclosing the truth actually contains false statements on these topics. *See* Brown Decl. Ex. 5, at 3, 5 (stating that GCU's "academic leadership . . . transferred their employment from [GCE] to [GCU]," GCE would provide certain services "in return for ***60%*** of [GCU]'s tuition and fee revenue," and "[a]side from Mr. Mueller, ***no other employee of New GCU or GCE has a dual role in both organizations***").

- Particularly in light of the revenue and expense split, the termination provisions of the MSA were far more draconian than in the Kaplan-Purdue transaction (¶¶197-99); and

- GCE directly employed 75% of GCU's Executive Leadership Team—while in the Purdue-Kaplan deal, no "entity or persons" controlled the non-profit, and Kaplan and Purdue shared no overlapping executives or directors. ¶¶184, 187.[7]

Defendants' *sole* challenge here is that all of these facts were publicly disclosed. DB 18. This is simply wrong: *neither* of the documents they cite (Def. Exs. 5-6) include any of these facts.[8] To the contrary, the publicly-filed MSA was highly redacted as to its financial terms, thereby concealing the actual financial and practical relationship between GCU and GCE. ¶246.

## C.    Defendants Misrepresented Risks To GCU's Non-Profit Label

Defendants also stated, repeatedly and without qualification, that GCU became a non-profit entity following the Conversion. *See* ¶¶266-71. However, as the DOE later found, the undisclosed terms and structure of the Conversion violated "the most basic tenet" of non-profit status— including because of GCE and GCU's revenue and cost splits, the MSA's "arguably prohibitive termination fee," and the fact that 75% of GCU's "key management personnel" worked for GCE. *See supra* p. 8. The failure to disclose these facts (while also affirmatively misrepresenting them) rendered Defendants' claims of "non-profit" status materially misleading. *See Energy Transfer*, 532 F. Supp. 3d at 222.

---

[7] Based on these and other reasons, Solinski told Bachus in 2017 that the Conversion was different in "real" and "key" ways *before* Defendants began making their contrary claims. Moreover, the DOE had not granted applications for non-profit status, including one by the Center for Excellence in Higher Education, where the conversion resulted in an income stream not being retained for the benefit of the educational institution. ¶64.

[8] *Compare* ¶¶285-92, 297-304 (identifying false statements about the nature of the services fee, overlapping employment, and the captive relationship between GCU and GCE) *with* Brown Decl. Ex. 6 (stating that GCE provided services in return for "60% of New GCU's tuition and fee revenue," not 95%; misrepresenting that "[a]side from Mr. Mueller, no other employee of New GCU or GCE has a dual role in both organizations"; and failing to disclose that terminating the MSA was prohibitively costly for GCU).

Defendants argue that the statements were true because regulatory agencies other than the DOE treated GCU as a non-profit. *See* DB 16-17. But Defendants' statements were plainly intended to portray GCU as a "non-profit university" under Title IV, "with all the [associated] privileges." ¶¶158, 290. Indeed, after the Conversion closed, Mueller crowed about the ***marketing*** benefits that non-profit status conveyed, including the absence of "stigma" and the fact that "[w]e can recruit in high schools that would not let us in in the past." *Id.* These were the very benefits torn away when the DOE rejected GCU's application for non-profit status. ¶¶19, 249; Ex. A at 17. Investors plainly understood Defendants' statements this same way: GCE's stock price dropped when news of the DOE denial was made public, even though GCE's treatment by other regulatory agencies was unaffected. ¶239. Given these facts, Defendants' dispute as to the meaning of their statements raises, at best, fact issues that cannot be resolved on a 12(b)(6) motion. *See Textron,* 14 F.4th at 147.

Defendants also argue that the Complaint relies on a subsequent event—the DOE's denial—to allege that Defendants' statements were misleading. DB 15. Not so. The Complaint pleads that Defendants made misrepresentations while knowing contrary non-public facts that existed all along—and that those undisclosed facts led to the DOE's rejection of GCU's non-profit status. *See, e.g.*, ¶¶172-205; Ex. A at 2 n.2, 3-5, 7-8, 13-14.[9]

### D. Defendants Misrepresented The DOE's Review Of The Conversion

The Complaint also adequately alleges that Defendants misrepresented the scope and risks of the DOE review. As Defendants later conceded, they had no communications with the DOE

---

[9] Defendants' assertion that GCE's Form 8-K filed on July 2, 2018 (Brown Decl., Ex. 5) disclosed the facts concerning GCU's purported lack of independence is wrong. Nothing in the 8-K reveals, for example, that 75% of GCU's Executive Leadership Team were GCE employees or that the MSA would result in GCE receiving 95% of the revenues generated by GCU while requiring GCU to bear 72% of the expenses.

other than receiving the May 2018 interrogatories, thus rendering false and misleading their statements regarding "ongoing engagement" and "discussions" with the DOE, their claims that any DOE limitations "could be managed," and their assertions attributing DOE delays to "understaff[ing]." ¶283. These statements, which Defendants do not challenge,[10] are actionably false because Defendants misrepresented engagement with the DOE that was non-existent and otherwise failed to fully and accurately disclose (a) the Company's prior engagement with the DOE and (b) the nature of the DOE's interrogatories. ¶283. *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 331 (E.D. Pa. 2020) (requirement "to speak truthfully and completely on the subject to not mislead investors" and not to make "affirmative statement[s] that painted a favorable picture without including the details that would have presented a complete and less favorable one").

Defendants' sole challenge to these misrepresentations is that the Complaint neither alleges the DOE interrogatories were "unusual" nor that the DOE indicated it was likely to deny approval. DB 17-18. But that is irrelevant as to the specific false statements mischaracterizing the DOE's review process, and it wholly ignores that Defendants (a) repeatedly made false statements about the structure of the transaction, *supra* pp. 9-10,[11] and (b) otherwise concealed specific risks relating

---

[10] As the Court previously held, Defendants' "understaff[ing]" statement is at minimum "misleading" or "bad information," R&R, 47-48. Defendants have not challenged the falsity or materiality of the "understaff[ing] and related statements in their briefing.

[11] These affirmative misrepresentations distinguish this case from *In re Sanofi Securities Litigation* (DB 18), where there was no "legal duty to disclose" under an omission theory of liability and where the defendants' statements were not misleading because they otherwise accurately disclosed the design of a clinical trial consistent with what investors understood to be the FDA's "publicly stated" preference. 87 F. Supp. 3d 510, 539-40 (S.D.N.Y. 2015). In contrast here, Defendants *spoke about* the DOE's review repeatedly and misleadingly. Moreover, analysts focused on the DOE's review by asking Defendants about the "milestones" they needed to reach (which Defendants mischaracterized), ¶¶113, 127, and stated upon disclosure of the DOE denial that "investors appear to be focusing more on news that Grand Canyon University (GCU), for which Grand Canyon Education provides support services, will  continue to be treated as a for-profit entity for purposes of its participation in federal financial aid programs by the U.S. Department of Education." ¶240.

to the DOE's prior and contemporaneous consideration of the Conversion. ¶¶283, 340. Moreover, given Defendants' consistent portrayal of the DOE's review in response to specific inquiries, ¶¶113, 126, 134-38, their omission of the actual circumstances of the DOE's review process presents an "obvious risk of misleading investors" as to the risks of denial. *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015).

### E.      Defendants Violated GAAP

GCE was required to consolidate interdependent GCU as a "variable interest entity" ("VIE"), ¶¶214-231, or, at minimum, to recognize GCU as a related party—and Defendants' failure to do either violated GAAP. ¶¶232-235. *See*, *e.g.*, *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 21-22 (2d Cir. Nov. 25, 2020) (vacating dismissal of a complaint alleging misuse of a VIE by an educational services company). Defendants argue that GCU was independent on paper (DB 19), but this fails for the reasons set forth above. *See supra* §I.A. Defendants' other argument—that the GAAP allegations must fail because the Complaint does not allege GCE's auditors' concern (DB 19)—is routinely rejected as a matter of law. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).[12]   Regardless, disagreements over GAAP compliance raise issues of fact that cannot be resolved at this stage. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997).[13]

---

[12] Auditors frequently raise private criticisms and concerns that later emerge in discovery and, indeed, private litigants routinely identify and adequately allege GAAP violations without public criticism by auditors. *See*, *e.g., TAL Educ. Grp.*, 837 F. App'x at 25-27; *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 449 (D. Del. 2014) (auditor issued numerous private warnings concerning potential GAAP violations but never made their concerns public).

[13] Defendants do not contest that the Complaint adequately alleges Defendants' omission of material facts regarding the sources of GCE's revenue growth. ¶164. These statements concealed GCU's captive status and the true benefits received by GCE from the Conversion, which gave rise to a likelihood that the DOE would deny GCU non-profit status. They also failed to disclose that GCE employees, under the guise of being GCU employees, engaged in the type of abusive recruitment strategies that have plagued other for-profit educators to drive further revenue to GCE. *(continued on next page)*

**II.     The Complaint Adequately Alleges Scienter Against All Defendants**

Plaintiffs' showing of Defendants' scienter is clear and consistent throughout the Class Period: Defendants knew facts or had access to information ***contradicting specific false and misleading material misstatements*** regarding the structure of the Conversion, its similarity to other conversions, and the DOE review process, all of which concealed the true risk that the DOE would decline to approve GCU as a non-profit institution.[14] While such allegations alone establish scienter, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278-79 (3d Cir. 2006) (scienter established where defendants "knew of or recklessly disregarded the falsity" of material misstatements), the Complaint alleges additional facts that directly refute Defendants' implausible scienter theory and further explain why it "makes . . . sense" that Defendants moved forward with a risky transaction. *See* R&R at 38-39.

**A.     The Complaint Details A Cogent Inference Of Scienter**

The Complaint alleges in detail that Defendants Mueller and Bachus, experienced industry veterans,[15] were "directly involved" in the Conversion and intimately familiar with its terms, and thus "knew or reasonably should have known" facts regarding each category of the concededly material[16] misstatements. *In re Urban Outfitters,* 103 F. Supp. 3d at 653. They executed and/or

---

¶¶34-37, 206-212. It is well-settled that statements describing the sources of a company's financial success that omit unfavorable or illicit facts related to those sources are actionable. *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018) (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994)).

[14] As set forth in the Complaint, while the DOE's May 2018 interrogatories certainly heightened the risk of DOE denial, ¶¶122-23, that risk already existed, ¶¶320, 327-31, 333, particularly given the DOE's undisclosed prior views toward the Company's earlier Conversion attempt and increasing for-profit conversion failures. ¶¶50, 52, 114-18. There was thus no "*entirely new* fraudulent scheme." DB 7 (emphasis in original).

[15] A defendant's background and experience in the industry is relevant evidence of scienter. *McDermid v. Inovio Pharms., Inc.,* 520 F. Supp. 3d 652, 657 (E.D. Pa. 2021). *See also* ¶¶346-47.

[16] Defendants do not challenge, and have thus waived, the materiality of any of these false statements. *See Align Tech., Inc. v. 3Shape A/S*, 2020 WL 5979353, at *3 n.5 (D. Del. Oct. 8, *(continued on next page)*

14

approved key documents underlying the Conversion, including the APA and the MSA. ¶¶320, 322-23. And Defendants had been "explicitly told" that the DOE was disinclined to support GCU's substantially similar prior conversion request *and* that the Company's 2017 Conversion Proposal differed materially from others approved by the DOE—important facts contradicting their public statements. *See, e.g., In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *16 (D.N.J. Dec. 19, 2019); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35-39 (S.D.N.Y. 2019) (scienter may be established through evidence that defendant received information contradicting statements).

Defendants also knowingly or recklessly misrepresented the structure of the Conversion and the DOE's review process to investors while "speaking as authoritative sources who possessed the information to support their statements." ¶¶279-82, 298, 300, 304. *See SEB Inv. Mgmt AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018). Many of Defendants' statements were not "off-the-cuff" remarks, but rather were "researched and intentional," which further heightens an inference of scienter. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020). The context in which Defendants misrepresented basic facts also demonstrates scienter because "what [they] knew made obvious the risk that [their] confident, unhedged" statements regarding the structure of the conversion and the nature of the DOE's review would mislead investors. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).

Additionally, as the Complaint alleges, Grand Canyon conceded that it did not have any material "discussions" or any "ongoing engagement" with the DOE that would have allowed Defendants, in July 2018, to make the statements they did concerning the DOE's review. *See* ¶283.

_____

2020); Del. L.R. 7.1.3(c)(2). Their sole reference to materiality (DB 18) relates to an inapplicable "omissions" theory and not to the affirmative misrepresentations actually at issue in this case. *See* n.11, *supra*.

That is clear evidence of recklessness as to those misstatements and precludes any cogent nonculpable explanation. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (scienter established where the defendant "never actually investigated . . . whether there was a basis for the [defendant's] assertions"); *cf.* R&R at 48. Regardless, what Mueller "legitimately believed," *id*., cannot be resolved upon a motion to dismiss. See *Textron*, 14 F.4th at 147 (courts may not apply their own "alternative interpretation of the challenged statements").

Finally, Defendants' compliance with a government document request does not defeat scienter. DB 10-11. To the contrary, it would have been ***illegal*** to have knowingly withheld or falsified information requested by the DOE. *See, e.g.,* 18 U.S.C. §§ 1001(a) (false statement); 1519 (obstruction of justice); 371 (criminal conspiracy to defraud the United States). And the Complaint alleges that some of the information Defendants did provide to the DOE—specifically, Deloitte's transfer pricing report—was itself based on misleading and flawed information and assumptions. *See* ¶¶329-31.

### B.     Defendants' Opposing Inference Is Not More Plausible, And The Benefits Of Proceeding With The Conversion Outweighed Any Risks

Defendants' ***sole*** basis for an inference of non-fraudulent intent is that they "reasonably believed GCU met the DOE's definition of a nonprofit institution" because the IRS had qualified GCU as a non-profit under its separate standards and the Company later sued the DOE for denying GCU non-profit status. DB 9.[17] Defendants' post-hoc reliance on IRS approval is belied by

---

[17] Defendants misstate Plaintiffs' scienter theory regarding DOE approval of GCU's non-profit status, which infects their entire scienter argument. DB 5-9. Defendants wrongly assert that the Complaint alleges they knew that GCU was not a "non-profit" and that their scheme "would soon fail" because the "DOE would *not* grant the University's request." DB 8 (emphasis in original). But as the Court previously recognized, this is not Plaintiffs' theory (*see* R&R at 33-35); rather, the Complaint alleges that Defendants misled the market about "the risks of DOE denial of the Conversion" and "the likely effect of a potential DOE denial on the Company's condition and operations" while knowing material undisclosed facts. ¶278; *see also* ¶¶3, 14.

multiple allegations establishing Defendants' contemporaneous knowledge that the DOE's separate determination controlled. *See, e.g.,* ¶¶ 50, 52, 87-92.[18] Defendants also withheld key information from multiple parties opining on the transaction, including the IRS, the HLC, and GCU's transfer price advisor (Deloitte), further undercutting any dependence on those determinations as to the DOE's review. ¶¶14, 201-05, 320; *S.E.C. v. Todd*, 642 F.3d 1207, 1217-18 (9th Cir. 2011).

Regardless, even if true, Defendants' reliance on the IRS's independent determination in no way exculpates their knowing misrepresentations about the structure of the transaction, its similarity to other conversions, and the DOE's review. *See* Compl. §§ VIII.A, C-D. It provides ***no*** cogent nonculpable explanation for Defendants' lies about concededly material facts of the Conversion, withholding of material information from third parties and the public, and mischaracterization of the DOE's review process. Instead, the allegations present classic evidence of scienter. *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (recklessness pleaded where complaint "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"); *Energy Transfer*, 532 F. Supp. 3d at 228-30 (scienter pleaded where executives were "closely involved" and had "personal oversight" over project yet made misleading public statements about it); *McDermid,* 520 F. Supp. 3d at 668 (scienter established where "Defendants knew several material facts contradicting their claim").

---

[18] Neither allegation in ¶¶50 and 52 is hearsay (DB 13, n.15)*. See Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 495 (D. Del. 2005) (statements of a party opponent are not hearsay under Rule 801(d)(2)(B)); *United States v. Cook*, 820 F. Appx. 110, 114-15 (3d Cir. 2020) (the "plain terms" of Rule 801(d)(2) "exclude from the definition of hearsay…statements made by attorneys in a representational capacity"). And even if they were, "[t]he fact that the SAC contains alleged hearsay statements is irrelevant because at the motion to dismiss stage, the Court is required to accept all factual statements as true in order to 'test the legal sufficiency of the complaint.'" *Guzman v. Mana*, 2018 WL 10150989, at *2 n.2 (D.N.J. Dec. 6, 2018) (*quoting Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).

Courts routinely find scienter when executives knowingly or recklessly misrepresent facts that deceive investors about heightened risk, even if they claim to have subjectively expected a favorable outcome.[19]

Further, Defendants have abandoned any argument that the HLC's approval of the Change of Control application led Defendants to believe that the DOE would do so, as well. R&R at 44. In response to the Court's comment that it "would have been helpful . . . if Plaintiffs would have provided additional particularized facts to explain *why and how* the HLC's review and the DOE's review differed with regard to consideration of New GCU's asserted non-profit status," R&R at 45 n.22 (emphasis in original), the Complaint now alleges: "HLC does not analyze, or opine on, whether universities should be considered non-profit institutions. Indeed, HLC's criteria for evaluating a Change of Control transaction nowhere mention an institution's for-profit or non-profit status." ¶42. Defendants acknowledge this fact in their brief (DB 13) and now claim that the HLC process was "irrelevant" to scienter. Thus, there is no longer any basis to credit an opposing inference of nonfraudulent intent based on the HLC's decision. *Compare* R&R at 45-46.

Additionally, the amended Complaint alleges why it "makes sense" that Defendants would move forward with the Conversion prior to a final DOE determination as to non-profit status.

---

[19] *See S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000) (a purported "good faith belief" will "not insulate the defendants from liability if it is the result of reckless conduct"); *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014) (reversing district court); *Tomaszewski*, 482 F. Supp. 3d at 333-34 (finding scienter where defendants "deceived investors about the increased risk" that a drug application would not be approved "in the hope that the FDA would end up agreeing with the data from the Phase 3 studies and approve [the drug]"); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 832-33 (S.D. Tex. 2014) (what "defendants actually believed" about the company's ability to solve manufacturing problems was "irrelevant at this stage" where plaintiffs alleged facts showing that defendants recklessly misled investors) *In re Amylin Pharm., Inc. Sec. Litig.*, 2003 WL 21500525, at *5 (S.D. Cal. May 1, 2003) (finding scienter where defendant "knew that there may be a problem" with drug trial data but "took the calculated risk of continuing the trials and application process as originally planned").

Completing the transaction provided GCE with immediate and tangible benefits: it allowed GCE to implement the exploitative MSA whereby GCE would receive 95% of GCU's revenues while bearing only 28% of GCU's expenses, ***regardless of the DOE's decision on non-profit status***. ¶¶9, 17, 153-171, 195, 206-12, 321. In other words, Defendants' calculated risk that the DOE might approve its Conversion did not involve a bet on GCE's "entire future operational and financial viability" (R&R at 37), because the Conversion (and certain attendant financial benefits to GCE) would proceed nonetheless. Grand Canyon also gained an instant, self-described "tailwind" based on marketing GCU as a "non-profit" institution. ¶¶158-63. Mueller recognized publicly that "[i]nvestors were very excited about us getting out of the for-profit university space, which, if there's a change in administration, could be problematic" and touted marketing advantages. ¶¶158, 290. And following the transaction, Grand Canyon reported strong revenue results and operating margins that far surpassed its peers. ¶¶166-67. Analysts praised GCE's performance and GCU's growing enrollment, which they predicted "should still continue." ¶171.

On the other hand, the potential risks of ***not*** closing the Conversion were considerable:

- **Limited Political Window**: The for-profit landscape changed considerably following President Trump's election, leading "for-profit institutions to commence large-scale conversions almost immediately after the Trump Administration took power." ¶¶66, 71; *see also* ¶¶54-62, 70, 72. Grand Canyon's own counsel described the "different regulatory environment" and advised clients to initiate new conversions, ¶65, and Grand Canyon began preparing for the Conversion in May 2017, just after Secretary DeVos was confirmed. ¶¶73-74.[20] But industry insiders recognized that there was a "limited political window" to complete conversions, ¶124, which concern grew when several for-profit conversions approved by the DeVos-led DOE failed. ¶¶116-17.

- **GCE's Sunk Costs**: It took approximately fourteen months for Defendants to complete the transaction on July 2, 2018, during which they undertook "monumental efforts," before receiving the DOE interrogatories in May 2018. ¶¶123, 342. Those significant costs "included, among other things, the transition from GCE to GCU of nearly 7,500 employees, as well as real estate, improvements, and other assets valued at over $1.0

---

[20] These allegations directly answer this Court's questions in the R&R as to why Defendants would believe that the political landscape had changed for for-profit conversions. R&R at 39-41.

billion; the establishment of insurance, employee benefits programs, and policies to govern and support GCU and its employees; and the establishment of separate email and communication systems for the 2,500 employees remaining with GCE." ¶342.

- **Losing HLC Approval**: When Defendants moved forward with the Conversion without DOE pre-approval, they did so knowing they faced the acute "***risk of placing in jeopardy previously received approvals from HLC and other agencies if the delay persisted,***" as "the initial application to HLC required multiple meetings, a lengthy written submission, and a multi-day site visit before HLC's Commission would formally act on the application. If GCU had to start the HLC approval process over again because HLC's approval was allowed to lapse, it is likely that the transaction would have been delayed for several more months after GCU received a response from the Department of Education." ¶342.

Thus, even if the DOE might ultimately deny non-profit status, it was not illogical or nonsensical for Defendants to move forward with the Conversion because the perceived "benefits of concealment might [have] exceed[ed] the costs" of full disclosure of the risks of DOE disapproval, the timing of which was uncertain. *Ind. Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85, 95-97 (2d Cir. 2016) (rejecting argument that it was implausible that a company would deliberately misstate information regarding a large-scale fraud for "***just over two months***" because that "argument confuses expected with realized benefits"); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 484 n.193 (S.D.N.Y. 2010) (finding a "range of plausible explanations for [the company's] behavior that do not undermine an inference of [the executives'] scienter," including that the company might "have been pessimistic regarding" one aspect of the project "but chose to remain on the project and gamble on the success" of another aspect "because its finances were sufficiently secure to withstand the costs of a failed exploration").[21]

---

[21] *See also Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 845 (N.D. Ind. 2018) (misrepresentations made **one month** before revelation of false statement established scienter where "[the company] may have held out hope yet that the FDA's seemingly inevitable Form 483 letter would not be that bad and that the extent of the problems could be kept under wraps"); *Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.,* 2018 WL 1587457, at *11 n.16 (D. Conn. Mar. 31, 2018) ("[The defendant] may have thought that [the company's] prospects eventually would improve but he wanted to avoid even a ***temporary drop*** in its stock price").
*(continued on next page)*

20

Finally, GCU's lawsuit challenging the DOE's non-profit determination (DB 9-10)—which was filed ***after*** this case was—does not impact scienter. To start, GCU's lawsuit is based on the DOE's rejection of non-profit status following the Amended MSA being put into place, which is different from the initial MSA at issue in this case. ¶262. And even if Defendants were right that the lawsuit supports an inference that Mueller continues to believe that the University is non-profit, that does not non-culpably explain Defendants' repeated misrepresentations about specific facts concerning the Conversion and DOE review. *See supra* §§I.A, I.D.

### III.    There Is No Basis To Ignore The Solinski Allegations

The Court should also reject Defendants' distasteful attempts to discredit the allegations of Karen Solinski, a named witness and well-placed industry veteran who had numerous direct interactions with Defendants relevant to the claims at issue. *See, e.g.*, ¶¶43-44, 48-51, 65, 74-78, 80-95.[22] Given Ms. Solinski's two-decade tenure at the HLC "[o]verseeing and managing HLC's

---

Defendants' cited cases are inapposite. In *In re CDNOW, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 642-43 (E.D. Pa. 2001), the court found implausible allegations that defendants concealed the company's true condition during a two-week period in hopes of finding a completely new merger partner where any such merger partner would conduct due diligence that would have revealed the fraud. Here, no investor in GCE had access to internal GCE records or even to the portions of the MSA that were redacted from the publicly filed version. The two pharmaceutical cases cited at DB 7 present different scienter theories than in this case, as the Court recognized (R&R at 33-34): the plaintiffs there alleged that the defendants knew that a drug was "doomed to fail," *Gillis v. QRX Pharm. Ltd.*, 197 F. Supp. 3d 557, 600-04 (S.D.N.Y. 2016), and knew that "there was absolutely no hope of receiving FDA PMA approval," *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). Further, in *Gillis*, the court found that the challenged press release's "inexact prose was the product of sloppiness, inattention, and/or inartful drafting," and that the plaintiffs' theory was implausible because there was evidence at the time the statement was made that "the statement at issue was not false." 197 F. Supp. 3d at 603-04.

[22] Before moving to dismiss, Defendants attempted to undermine this percipient witness by claiming that Ms. Solinski had "no involvement" in GCU's application and thus no basis for her knowledge, and by recklessly accusing Plaintiffs' counsel of failing to meet their Rule 11 obligations. Def. Ex. 1. Since defense counsel's baseless accusations were proved utterly false—including through the February 2018 voicemail recording of ***their own client*** requesting Ms. Solinski's help, showing that Ms. Solinski was very much involved in the GCU application (¶92)—they have largely abandoned their prior accusations and attack Ms. Solinski's report on brand-new grounds. DB 12-15.

21

Change of Control process" and providing advice on change of control policies and practices (¶¶43, 76), her contemporaneous knowledge of Grand Canyon's conversion proposals (¶¶76-78, 81, 87-90, 92) and the HLC's review process (¶¶80-90, 94-95), and her direct interactions with Defendants and Company counsel (¶¶48, 50, 52, 74, 78, 92), Ms. Solinski was well-positioned to provide the information attributed to her in the Complaint.[23]  Nothing more is required at this stage. *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) ("The district court may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it.").

Defendants claim that the Complaint's statement that Ms. Solinski resigned from the HLC is "demonstrably false." DB 12.[24] However, the HLC accepted Ms. Solinski's resignation and provided her with a letter (quoted in ¶43 and incorporated therein) that confirmed her "departure" from the HLC—not her termination—and detailed the numerous responsibilities she performed within the organization providing her with access to the information alleged in the Complaint. ¶90; *See* Opp. Ex. 1. Defendants mistakenly rely on language in Ms. Solinski's now-settled Title VII complaint, ignoring (or not realizing) that the term "termination" is a legal term of art that established the requisite adverse employment action. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010).[25]

---

[23] Ms. Solinski's status as a named witness enhances the reliability of her direct allegations. *See Avaya, Inc.*, 564 F.3d at 262 (recognizing that while there is no requirement that sources in a complaint be identified, "all else being equal, a complaint with named sources 'would be better' than one with confidential witnesses"); *see also United States v. Johnson,* 592 F.3d 442, 449, 451 (3d Cir. 2010) (referencing the "enhanced" credibility of a named witness who could be "held responsible if the information was untrue").

[24] While the Court may take judicial notice of the ***existence*** of other judicial proceedings, it may not take judicial notice of the ***truth of any facts*** relating to those proceedings. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 427 n.7 (3d Cir. 1999); *In re Horsehead Holding Corp. Sec. Litig.*, 2018 WL 4838234, at *9 (D. Del. Oct. 4, 2018).

[25] The documents cited at DB 12 do not mention Grand Canyon or the change in control application, let alone specially link the University to Solinski's departure as Defendants claim. Even the extraneous EEOC Complaint on which Defendants rely does not support their claim. *See (continued on next page)*

22

Finally, the sole case relied on by Defendants to attack the Solinski allegations is inapposite. In *Bartesch v. Cook*, 941 F. Supp. 2d 501, 507 (D. Del. 2013), Judge Andrews disregarded two sources of information in a complaint because neither provided any nexus to the alleged fraud. Judge Andrews first declined to consider allegations derived from an internet article written by the defendant's competitor six months after the fraud, where the competitor was in ongoing litigation with the defendant over the subject matter of the article and otherwise had no personal knowledge of the fraud. *Id.* at 506-07. Judge Andrews also disregarded allegations from a separate *qui tam* complaint that had been voluntarily dismissed (after the government declined to join it) and was "devoid of any" firsthand allegations against the defendant. *Id.* at 507. Neither situation is remotely present here, where the Complaint includes allegations of contemporaneous, direct interactions between Ms. Solinski and Defendants and otherwise details her first-hand knowledge of the 2017 Conversion Proposal. *See, e.g.*, ¶¶42-52, 73-95.

## IV. The Complaint Sufficiently Pleads Loss Causation

Loss causation is asserted by pleading that the security's price was inflated "due to an alleged misrepresentation," and that the revelation of the truth "proximately caused the decline in the security's value." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184-85 (3d Cir. 2000). It is subject to Rule 8's notice pleading standard, *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005), and "is usually reserved for the trier of fact." *EP Medsystems, Inc. v. EchoCath, Inc.*,

---

Def. Ex. 4 (referring to "a conflict of interest issue and loss of confidentiality in relation to a single [***unnamed***] member institution"). Further, Ms. Solinski's reference to the reason given ***by the HLC*** for her discharge does not mean the HLC's stated reasons for forcing her out was accurate (she, in fact, referred to the HLC's "retaliatory motivation," Def. Ex. 4, and requested in her Complaint that that the HLC "clear[] her personnel file of all false information," Def. Ex. 3 at 5). Regardless, Defendants do not allege that the claims in the Complaint are "based on" the extrinsic documents such that the Court may consider the extrinsic information without converting the motion to dismiss to a motion for summary judgment. *See In re Horsehead*, 2018 WL 4838234, at *9.

235 F.3d 865, 884 (3d Cir. 2000). The Complaint exceeds these standards. *See* ¶¶349-352.

**November 6, 2019 Corrective Disclosure**. Defendants repeatedly misstated and concealed relevant facts and downplayed the risk that the DOE would deny GCU's application for non-profit status. *See*, *e.g.*, ¶¶265-309. On November 6, 2019, that risk materialized when investors learned the DOE had rejected GCU's application. ¶237. GCE's stock price plummeted in response, falling $6.99 per share (or 7.61%) over the next two trading days. ¶¶239, 351. This adequately pleads loss causation. *See In re Wilmington Tr.*, 29 F. Supp. 3d at 450.

Defendants respond that some corrective information was contained in the DOE's letter, which only became public on November 12, 2019. DB 19 n.22. But the November 6, 2019 announcement drove investors' losses, and post-disclosure events (such as the publication of the DOE letter) can demonstrate falsity or scienter in connection with an earlier, incomplete corrective disclosure. *See In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *21 (D.N.J. Aug. 17, 2005) (that "the stock price fell without a more complete and detailed disclosure, if anything, only goes to show that the tip of the iceberg was enough to cause the loss").[26] Defendants also dispute that the November 6 disclosure was a corrective disclosure because Plaintiffs also allege that misstatements were made on the same and subsequent days. DB 19-20; *see also* ¶350. But courts routinely uphold loss causation allegations where defendants continue to mislead the market after a partial corrective disclosure. *See, e.g., Semerenko,* 223 F.3d at 171 (after corrective disclosure, "the market price of [a company's] common stock was 'buoyed' by" continued false statements).[27]

---

[26] *See also In re Mattel, Inc. Sec. Litig.,* 2021 WL 1259405, *11 (C.D. Cal. Jan. 26, 2021) (rejecting argument that "companies may announce the *fact* of a whistleblower letter . . . but not its contents, and avoid liability") (emphasis in original).

[27] *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) (DB 20) is inapposite. There, the Second Circuit rejected allegations that the ***very same statement*** was both corrective and misleading. *See* 574 F.3d at 41. It did not hold that false statements could not be uttered contemporaneously with partially corrective ones, as Defendants argue here.

**January 28, 2020 Corrective Disclosure.** On January 28, 2020, Citron published a report revealing, *inter alia*, that GCE was receiving nearly 100% profit margins from areas of GCU's business for which it booked no expenses. ¶¶250-254. With these and other revelations, GCE's stock price declined that day by $7.43 per share, or 8.12%, to close at $84.07. ¶¶256, 351. Analyst reports revealing previously non-public facts, accompanied by price declines, are actionable disclosures. *See Pub. Empls. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) (Citron report constituted partial corrective disclosure). Defendants argue that the Citron report disclosure cannot be corrective because it was "obtained from public sources," DB 20, but the report was based, at least in part, on 870 pages of previously undisclosed information Citron had received via its FOIA request. ¶250; Ex. B at 3. Loss causation is adequately pled in these circumstances. *See Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1202-06 (9th Cir. 2020) (plaintiffs may rely on a corrective disclosure derived from a FOIA response).[28]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motion. Should the Court dismiss the Complaint in whole or in part, Plaintiffs respectfully request that the dismissal be without prejudice so that Plaintiffs may seek leave to replead.

---

[28] *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013) is inapposite, as it involved corrective disclosures based on information that had already been publicly ***disclosed***. *Id.* at 1198 & n.9 ("the material portions of the [corrective disclosure document] were gleaned entirely from public filings and other publicly available information" and any information obtained through FOIA requests was "immaterial").

DATED:   May 6, 2022

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Hannah G. Ross
Katherine M. Sinderson (*pro hac vice*)
John C. Browne
Robert F. Kravetz (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
katiem@blbglaw.com
johnb@blbglaw.com
robert.kravetz@blbglaw.com
michael.mathai@blbglaw.com
benjamin.horowitz@blbglaw.com

*Counsel for Lead Plaintiffs*
*and the Lead Counsel for the Class*

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman
Jeffrey B. Gittleman (*pro hac vice*)
Chad A. Carder (*pro hac vice*)
Meghan J. Talbot
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jgolan@barrack.com
rhoffman@barrack.com
jgittleman@barrack.com
ccarder@barrack.com
mtalbot@barrack.com

*Counsel for Lead Plaintiffs*
*and Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
*/s/ Gregory V. Varallo*
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
greg.varallo@blbglaw.com

*Counsel for Lead Plaintiffs*
*and the Lead Counsel for the Class*

**VANOVERBEKE, MICHAUD**
  **& TIMMONY, P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Lead Plaintiffs*
*Oakland County Employees' Retirement*
*System and Oakland County Voluntary*
*Employees' Beneficiary Association Trust*