**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 1:20-cv-00639-MN-CJB |

**DEFENDANTS' REPLY BRIEF
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Evan N. Glustrom (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
evan.glustrom@alston.com

*Counsel for Defendants*

Dated:  June 3, 2022

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

I.    Plaintiffs Fail to Plausibly Allege Scienter. ............................................................... 1

    A.    The SAC Does Not Allege a Cogent Theory of Scienter. ..................................... 1

        1.    The SAC continues to rely on the baseless "gamble" and "zig-zagging" theories of scienter the Court has properly rejected. ...................................................................................................... 1

        2.    The Opposition does not offer any cogent reason for Defendants to attempt to defraud GCE investors regarding the Transaction. ............... 3

        3.    The competing inference of non-fraudulent intent remains significantly more compelling. .................................................................. 5

    B.    The SAC's Factual Allegations Fail to Plead Scienter. ......................................... 7

        1.    The Motion established that the SAC fails to plead facts giving rise to a strong inference of scienter. .......................................................... 7

        2.    The SAC does not plausibly allege that Defendants acted recklessly ............................................................................................... 8

II.    Plaintiffs Have Not Met Their Burden of Pleading Falsity. ........................................... 10

III.    Plaintiffs Fail to Plausibly Allege Loss Causation. .......................................................... 13

CONCLUSION .................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bartesch v. Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013) .............................................................................. passim

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
  632 F.3d 751 (1st Cir. 2011) ........................................................................................1, 9

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009) ..............................................................................7, 9

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..............................................................................2

*Grigsby v. Ball Holding, Inc.*,
  979 F.3d 1198 (9th Cir. 2020) .......................................................................................14

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ...........................................................................................8

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ..................................................................................9

*In re DVI, Inc. Sec. Litig.*,
  No. 2:03-cv-05336, 2010 U.S. Dist. LEXIS 92888 (E.D. Pa. Sept. 3, 2010) .........................14

*In re Egalet Corp. Sec. Litig.*,
  340 F. Supp. 3d 479 (E.D. Pa. 2018) ...............................................................................11

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  No. 09 MD 2030 (LAP), 2011 U.S. Dist. LEXIS 14053 (S.D.N.Y. Feb. 9,
  2011) ...........................................................................................................................9

*In re Wilmington Trust Securities Litigation*,
  29 F. Supp. 3d 432 (D. Del. 2014) ..................................................................................13

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ..............................................................................................5

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ................................................................................14

*Sanofi Secs. Litig. v. Meeker*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) ...............................................................................13

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007)..................................................................................................10

**Statutes**

Exchange Act § 10(b) ...............................................................................................................3, 11

Freedom of Information Act (FOIA) ...............................................................................................14

Private Securities Litigation Reform Act (PSLRA)....................................................................8, 10

**Other Authorities**

*GCU statement regarding Dept. of Education decision* (Nov. 12, 2019),
    https://news.gcu.edu/2019/11/gcu-statement-regarding-dept-of-education-
    decision/ ........................................................................................................................................6

## PRELIMINARY STATEMENT

As demonstrated in Defendants' Motion to Dismiss ("MTD" or the "Motion"),[1] the SAC fails to address the deficiencies the Court identified with Plaintiffs' "gamble" theory and continues to rely on a "zig-zagging" scienter theory the Court rejected as "less-than-cogent."  Plaintiffs do not establish otherwise in their opposition brief ("Opposition" or "Opp.").  Instead, the Opposition argues that Plaintiffs' scienter theory "makes sense" because the Transaction provided "immediate and tangible benefits" to GCE.  The Opposition, however, does not identify any plausible or cogent allegations in support of this new theory, and it fails accordingly.  Moreover, while the Opposition argues that Defendants acted "recklessly" by not disclosing certain alleged facts about the Transaction, Plaintiffs have failed to meet the high threshold required for pleading scienter based on "recklessness."  Indeed, "the inferences are stronger that defendants did *not* knowingly or recklessly risk misleading the reasonable investor, as defendants reasonably did not expect" that the DOE would deny the University's request for non-profit status.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 758-59 (1st Cir. 2011).  Accordingly, the Opposition's recklessness argument also fails.  Further, as the Motion established, none of the SAC's other scienter allegations, including the Solinski Allegations, support a strong inference of fraudulent intent.  Finally, the SAC also fails to plausibly allege falsity or loss causation, both of which are essential elements of Plaintiffs' claims.

I.     **Plaintiffs Fail to Plausibly Allege Scienter.**

   A.     **The SAC Does Not Allege a Cogent Theory of Scienter.**

      1.     *The SAC continues to rely on the baseless "gamble" and "zig-zagging" theories of scienter the Court has properly rejected.*

---

[1] Capitalized terms not otherwise defined herein have the same meaning as set forth in the Motion.

Plaintiffs continue to assert that Defendants took a "calculated risk" (*i.e.,* gambled) "that the DOE might approve" the University's request to participate in Title IV as a non-profit, even though they allegedly knew that the University did not so qualify. (Opp. at 19.)[2] Plaintiffs do not, however, remedy the deficiencies that the Court previously identified in their "gamble" theory, including because (a) they fail to allege facts to show that any "line DOE employees" were instructed to or did "blindly rubber stamp" applications that did not meet the agency's requirements for non-profit participation in Title IV and (b) they fail to plead with particularly facts to show that Defendants believed the DOE would approve the University's request, while simultaneously allegedly knowing that it violated the "most basic tenet of nonprofit status." (MTD at 5-6; R&R at 38-41.)

Moreover, the SAC continues to allege that Defendants' mindset and purported fraudulent scheme shifted radically during the putative Class Period, after the DOE issued a request for information in connection with its review of the Transaction—a "zig zagging" scienter theory this Court rejected as "less-than-cogent." (MTD at 7-8; R&R at 41-43.) Plaintiffs' present efforts to retreat from that theory (*see* Opp. at 14 n.14) are belied by the allegations in the SAC. *See, e.g.,* SAC ¶¶ 341-42 ("First, Defendants determined to renew their Conversion proposal in 2017 . . . because of the vastly different regulatory environment that accompanied the Trump presidency. Second, even after the DOE staff signaled skepticism and close scrutiny of the Conversion's terms in May 2018, the Company decided to move forward [with the Transaction]….").

---

[2] Plaintiffs rely on the "gamble" theory because they cannot allege that Defendants *knew* at the start of the putative Class Period that the DOE would deny the University's request for non-profit status under Title IV, but lied to their investors about it anyway. "[B]y its nature," that type of "purported scheme could not have continued in perpetuity," and necessarily "would be revealed, in relatively short order," upon the announcement of the DOE's determination. *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600-601 (S.D.N.Y. 2016). "Courts regularly refuse to infer scienter . . . when confronted with [such] illogical allegations." *Id*.

> 2.    *The Opposition does not offer any cogent reason for Defendants to attempt to defraud GCE investors regarding the Transaction.*

The Opposition nevertheless argues that "it 'makes sense' that Defendants would move forward with the Conversion prior to a final DOE determination as to non-profit status" — even after they allegedly realized in May 2018 that the DOE was not likely to grant the University's request — because "the transaction provided GCE with immediate and tangible benefits." (Opp. at 18-19.) Proceeding with the Transaction before a final DOE decision on the University's non-profit status was a *business* decision not subject to review under Section 10(b) of the Exchange Act. Thus, the key question for scienter is not why Defendants made the business decision to move forward with the Transaction, but why Defendants did so despite allegedly knowing that the University did not qualify as a non-profit institution for purposes of Title IV, and why they allegedly made false and misleading statements to investors regarding the same. (R&R at 37-43.) The Opposition fails to answer those critical questions.

*First*, to the extent Plaintiffs continue to baselessly assert that the Transaction was consummated in order to "shed heightened regulatory risk" allegedly attached to for-profit institutions (Opp. at 1), Plaintiffs do not offer *any* facts in support of such a theory, nor could they. Rather, the Transaction was entered into in order to: provide the University's students and faculty with "access to research opportunities and grants"; "open[] up the world of philanthropic giving to GCU"; allow "GCU to participate in NCAA governance at the Division I level"; and "most importantly," allow the University to "continue to freeze tuition" which it had already done for 10 straight years. (MTD, Ex. 5 at 8.)

*Second,* the Opposition asserts that moving forward with the Transaction granted the University certain temporary "marketing advantages." (Opp. at 19.) If, however, Defendants recognized by May 2018 that the DOE intended to deny the University's request, as Plaintiffs

3

allege, then they also knew that any perceived "marketing advantages" would have lasted, at most, a few months.  The alleged "benefits of concealment" of the University's not-for-profit status and the DOE's review thereof thus do not establish a cogent reason for Defendants to defraud GCE investors, knowing that the fraud was soon-to-be revealed.  (*See* R&R at 43) (rejecting Plaintiffs' theory that Defendants "press[ed] ahead" with the Transaction and "in the meantime (until the DOE's final decision came down) they tried to make as much money as they could … by touting GCU's 'non-profit' status").

*Third,* the Opposition alleges that Defendants sought to take advantage of a "limited political window" to participate in Title IV as a non-profit.  (Opp. at 19.)  This allegation, however, does not support a cogent theory of scienter, where the SAC simultaneously alleges that at least as of May 2018 Defendants knew that there was a "substantial risk that the DOE would deny [the University's] request for non-profit status," despite the allegedly favorable regulatory environment.  (SAC ¶ 13.)

*Fourth*, the Opposition argues that Defendants sought to recover pre-closing "sunk costs," by moving forward with the Transaction in July 2018.  (Opp. at 19-20.)  Those pre-closing costs, however, would not be recovered regardless of whether GCE moved forward with the Transaction, and therefore cannot serve as the basis for a theory that Defendants determined to close the Transaction despite allegedly knowing that the University's request was soon to be denied.[3]

*Fifth*, and finally, the Opposition argues that Defendants were concerned about "losing HLC approval" of the change-in-control Transaction.  (Opp. at 20.)  However, while Plaintiffs

---

[3] Moreover, if Defendants were allegedly motivated by those costs and also purportedly knew it was likely the DOE would deny the University's request, it would have made more sense to delay the Transaction and prevent additional *post*-closing costs associated with separating the University from GCE.

allege that the HLC's February 2018 approval would have expired if the Transaction was delayed, the SAC does not (because it cannot) allege there was any risk that the HLC would thereafter reverse itself and reject the Transaction.[4]

In all, Plaintiffs fail to offer a single compelling reason for why Defendants would make false and misleading statements to GCE investors regarding the University's non-profit status, its post-Transaction independence from GCE, or the DOE's review of the same, particularly after allegedly realizing that their fraud was likely to soon be revealed.  Having relied once again on a theory that "simply does not square with common sense," Plaintiffs' claims should be dismissed. (R&R at 43.)[5]

        3.     *The competing inference of <u>non</u>-fraudulent intent remains significantly more compelling.*

As set forth in the Motion, the competing inference of Defendants' <u>non</u>-fraudulent intent remains significantly more compelling, including because the IRS previously found that the University qualifies as a tax-exempt organization, and the DOE's test for non-profit status "mirrors" the test applied by the IRS.  (MTD at 9-10; *see also* R&R at 44-45 ("if one large federal regulator (using certain standards) concluded that new GCU qualified as a non-profit, it seems reasonable that Defendants might have thought that another large federal regulator (using the same standards) could come to the same conclusion.")

---

[4] In any event, the alleged decision to move forward with the Transaction based on the timing of HLC approval was a business decision which, as set forth above, cannot establish scienter.

[5] The authority cited in the Opposition is inapposite because there plaintiffs alleged a plausible theory for *why* the defendants would have believed the purported benefits of *concealment* – not the alleged benefits of a business decision – outweighed the costs of disclosure.  *See, e.g., Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-97 (2d Cir. 2016) (plaintiffs adequately pled scienter where, at the time of the alleged misstatements, the defendant company believed that it "had more time before prosecutors would reveal" an executive's kickback scheme, and thus continued to conceal the illegal activity in order to preserve its existing contracts).

Plaintiffs now assert that the IRS used "separate standards" from the DOE and the IRS's non-profit designation was thus irrelevant to Defendants' state of mind at the time of the alleged misstatements. (Opp. at 16-17.) Plaintiffs' unsupported present assertion, however, runs contrary to the DOE's acknowledgement – set forth in Exhibit A to the SAC – that the two standards are identical. (SAC Ex. A, at 10; R&R at 43-45.). Plaintiffs next baselessly allege that Defendants "withheld key information" from the IRS and therefore could not have reasonably relied upon the IRS's non-profit determination. (Opp. at 17.) While the DOE may have requested supplemental information in its review of the change-in-control Transaction, that does not mean that Defendants "withheld" any information from the IRS, nor does the SAC plausibly so allege. Plaintiffs' conspiratorial allegations otherwise do not undermine the inference of non-fraudulent intent.[6]

Finally, the Opposition asserts that the University's ongoing litigation against the DOE does not support an inference of non-fraudulent intent, because the suit arises out of the DOE's review of an *amended* MSA, "which is different from the initial MSA at issue in this case." (Opp. at 21.) Plaintiffs, however, do not allege how any such purported differences undermine an inference that Defendant Mueller as President of the University reasonably believed and continues to believe that the University qualifies as a not-for-profit under the DOE's regulations.[7] To the contrary – the SAC alleges that "the revenue split set forth in the amended MSA '*is not appreciably different* from the revenue split set forth in the [original] MSA.'" (SAC ¶ 262).

In short, the inference that Defendants acted with non-fraudulent intent remains more compelling than any competing inference that they intentionally lied to GCE investors.

---

[6] In any event, the Court rejected Plaintiffs' argument in that regard. (R&R at 44.)

[7] Indeed, Mueller and the University have *consistently* challenged the DOE's determination and publicly expressed "surprise[] and disappoint[ment]" regarding the same. *See GCU statement regarding Dept. of Education decision* (Nov. 12, 2019), https://news.gcu.edu/2019/11/gcu-statement-regarding-dept-of-education-decision/.

### B.    The SAC's Factual Allegations Fail to Plead Scienter.

#### 1.    *The Motion established that the SAC fails to plead facts giving rise to a strong inference of scienter.*

Even if the SAC alleged a cogent theory of scienter (it does not), it fails to "plead with particularity facts giving rise to a strong inference that defendants acted with scienter." *Roseville*, 686 F. Supp. 3d at 420; (MTD at 10-12.)    First, as the Motion demonstrates, Plaintiffs continue to rely on an impermissible "fraud by hindsight" theory.  (MTD at 10-11.)  While Plaintiffs argue that the alleged facts underlying its scienter allegations "existed all along" (Opp. at 11), they do not explain how Defendants purportedly knew those facts demonstrated that the alleged misstatements were false or misleading, except by reference to the DOE's decision letter.

Likewise, Defendants' knowledge of the DOE review process does not evidence scienter because there is no plausible basis to conclude that Defendants knew or should have known that any interactions with the DOE during the review process presaged the agency's ultimate denial of the University's request for non-profit status.  (MTD at 11.)  Finally, the SAC's allegations about 15-plus year-old claims against the Individual Defendants' former employers do not evidence scienter either.  (MTD at 11-12.)  The Opposition does not directly respond to either of these arguments set forth in the Motion.

The Motion also established that the Solinski Allegations, which the SAC relies upon to plead scienter, are unreliable and "the Court must discount them steeply." *Bartesch v. Cook,* 941 F. Supp. 2d 501, 507 (D. Del. 2013); (MTD at 12-15.)  Remarkably, the Opposition does not address Defendants' argument (and, thus, concedes) that numerous of the Solinski Allegations are demonstrably false,[8] and otherwise claims that because Solinski worked at HLC and

---

[8] The Opposition appears to dispute Solinski's own allegation that she was "terminated" by HLC, but does not address her sworn statement that she was "discharged" from HLC "for a

7

communicated with certain Defendants, "[n]othing more is required at this stage." (Opp. at 22.)

The Opposition is wrong. As this Court has held, in assessing whether a witness's allegations "meet the particularity requirement of the PSLRA, courts *must* evaluate," among other things, the witness's reliability and the coherence and plausibility of those allegations. *Bartesch*, 941 F. Supp. 3d at 507.[9] Thus, the Opposition's claim that Plaintiffs are not required to establish Solinski's reliability is meritless. Finally, the Opposition concedes that the Solinski Allegations regarding the HLC accreditation process are irrelevant to Plaintiffs' claims that Defendants made false and misleading statements regarding the University's non-profit status (SAC ¶ 42; MTD at 12-13; Opp. at 18), and does not respond to Defendants' argument that the alleged communications between Defendant Bachus and Solinski have no relevance to this case. (MTD at 14.)

### 2.   *The SAC does not plausibly allege that Defendants acted recklessly.*

Plaintiffs alternatively argue that they have alleged "clear evidence of recklessness," and that the referenced allegations "alone establish scienter." (Opp. at 14, 16.) To plausibly allege scienter based on Defendants' recklessness, the SAC must plead facts with particularity to show that Defendants' actions amounted to "an *extreme* departure from the standards of ordinary care, and which present[] a danger of misleading buyers or sellers that is either known to the defendant or is *so obvious* that the actor *must* have been aware of it." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (emphasis added). Accordingly, to plead recklessness, the SAC must "specifically allege defendants' knowledge of facts or access to

---

conflict of interest issue and loss of confidentiality in relation to a single member institution" and that she thereafter sought to be reinstated. (MTD, Ex. 4 at 10, 13). There is no indication she resigned, voluntarily or under duress. In any event, it is clear based on the multiple actions against her former employer that she holds significant animus towards the agency, further undermining the reliability of her alleged statements in the SAC.

[9] The Opposition attempts to distinguish *Bartesch* (Opp. at 22), but its relevance and applicability is simple: the Court should steeply discount the credibility of a witness who has an incentive to disparage the defendants. *Bartesch*, 941 F. Supp. 2d at 507.

information *contradicting* their public statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (citation omitted) (emphasis added); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 424 (D. Del. 2009) (same).

The Opposition argues that Defendants acted "recklessly" because they allegedly "knew facts or had access to information contradicting specific false and misleading material misstatements regarding the structure of the Conversion, its similarity to other conversions, and the DOE review process, all of which concealed the true risk that the DOE would decline to approve GCU as a non-profit institution." (Opp. at 14.)   These allegations do not clear the "substantially higher bar set for recklessness allegations." *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 (LAP), 2011 U.S. Dist. LEXIS 14053, at *29 (S.D.N.Y. Feb. 9, 2011). For recklessness, "[t]he key question . . . is not whether defendants had knowledge of certain undisclosed facts." *City of Dearborn Heights*, 632 F.3d at 758.  After all, "[a] company does not commit securities fraud merely by failing to disclose all non-public material information that it knows." *Id.* at 760.  Instead, "[t]he key question" for recklessness is "whether defendants knew or should have known that their failure to disclose those facts present[ed] a danger of misleading" GCE's shareholders.  *Id.* at 758.  Here, "the inferences are stronger that defendants did not knowingly or recklessly risk misleading the reasonable investor, as defendants reasonably did not expect" the DOE would deny the University's request for non-profit status.  *Id.* at 758-59 (rejecting inference of recklessness).  In that regard, and as discussed *supra* at 5-6, the IRS's qualification of the University as a tax-exempt organization is critical.  (MTD at 9-10.)

In all, even if the SAC alleged a cogent theory of scienter (it does not), it still fails to state a claim because the SAC's factual allegations do not plausibly allege a strong inference of scienter.

9

## II.      Plaintiffs Have Not Met Their Burden of Pleading Falsity.

The PSLRA requires a plaintiff to, among other things, "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007).  The SAC fails to meet these requirements.

**GCU's Independence.**  Pursuant to the terms of the Transaction approved by the DOE, GCE no longer owns the University and GCE operates as a third-party educational service provider to both the University and other university partners.[10]  The Opposition does not argue otherwise. Instead, the Opposition attempts to recast the SAC's falsity theory by asserting that, in two respects, Defendants failed to provide "complete information" about the University's independence. (Opp. at 8.)

*First*, the Opposition argues that it was misleading for GCE to state that (other than Mueller) the University and GCE would have "no overlapping management" or employees with "a dual role in both organizations" because "nearly 75%" of the University's "'Executive Leadership Team' . . . were GCE employees." (Opp. at 8.)  That an alleged 75% of the University's pre-transaction "Executive Leadership Team" stayed at GCE post-transaction, however, does not make GCE's statements false or misleading, where the SAC does not allege that anyone on the University's "Executive Leadership Team" *also* managed GCE ("overlapping management") or was dually employed by GCE and the University.  And to the extent the Opposition argues that Defendants' statements were misleading because they failed to disclose that GCE employees

_____

[10] Moreover, as Defendants noted in the Motion, and as Plaintiffs do not now dispute, (a) the University is managed by an independent Board of Trustees; (b) upon the close of the Transaction, all of the University's faculty, academic leadership and related academic staff transferred their employment from GCE to the University; and (c) no employee other than Mr. Mueller is dually employed by both entities. (MTD at 15-16; see also MTD Ex. 5 at 4.)

would play a "role" at the University by providing services thereto, that argument also fails because it was, of course, publicly disclosed that GCE and its employees would operate as third-party service providers to the University following the Transaction. *See In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 507 (E.D. Pa. 2018) (dismissing falsity allegations that could not "mislead reasonable investors"). Thus, the statements were neither false nor misleading.

*Second*, the Opposition argues that Defendants' statements about the University's independence were misleading because Defendants failed to disclose that the University was an alleged "'captive client' of GCE, including because GCE received 95% of GCU's revenues while incurring just 28% of GCU's costs, and GCU was 'locked in' to the MSA due to an 'arguably prohibitive termination fee.'"  (Opp. at 8.)[11]   The facts purportedly demonstrating that the University was GCE's "captive client," however—including the various services that GCE supplied to the University, as well as all relevant details regarding the parties' fee agreements— were disclosed in significant detail in the MSA and other publicly-available transaction documents (*see* MTD at 16), and "there can be no Section 10(b) claim" when "the alleged omissions are contradicted by the company's public disclosures." *Bartesch*, 941 F. Supp. 2d at 508.[12]

---

[11] Plaintiffs misleadingly allege that GCE receives 95% of the University's revenues pursuant to the MSA.  (Opp. at 8.)  Not so. As both the DOE's letter and GCE's public filings make clear, under the MSA the University agreed to pay GCE 60% of its tuition and fee revenues in exchange for GCE's provision of services.  The parties separately executed an Asset Purchase Agreement governing the transfer of certain assets, including the 275-acre Phoenix campus, the terms of which were likewise publicly disclosed.  (MTD Ex. 5 at 3.)  Plaintiffs' erroneous allegation is further belied by common sense: it would be unsustainable for the University to pay 95% of its revenues to GCE, while maintaining 72% of operating costs, and yet the University continues to thrive as of the date of this filing, nearly four years after the Transaction closed.

[12] Plaintiffs' claim that Defendants made false and misleading statements regarding the University's revenue growth rely on the same allegations and, thus, fails for this reason as well. (*See, e.g.*, SAC at ¶ 348., Opp. at 13-14, n.13).

11

**Similarity of Transaction to Other Non-Profit Conversions.**  The Opposition next argues that Defendants' generic statements comparing the Transaction to other non-profit conversions were false or misleading because the Transaction "was materially different from those other transactions." (Opp. at 9-10.)  Again, however, Defendants disclosed the facts that allegedly made those comparisons false or misleading, including the services that GCE would provide to and fees it would receive from the University, which is fatal to Plaintiffs' claim.  (MTD at 18); *Bartesch*, 941 F. Supp. 3d at 508.[13]

**The University's Non-Profit Status.**  The Opposition does not (because it cannot) dispute that GCU was a non-profit after the Transaction as recognized by its state licensing authorities, federal, state and local tax authorities, the State of Arizona, and the NCAA.  (Opp. at 11, MTD at 16-17.) The Opposition instead pivots and argues that Defendants' *truthful* statements about the University's non-profit status were nevertheless misleading because Defendants allegedly "intended to portray GCU as a 'non-profit university' under Title IV." (Opp. at 11.)  Defendants, however, repeatedly disclosed that the DOE's review of the Transaction and the University's request for non-profit status was ongoing.  It strains credulity to suggest the market was nevertheless misled into believing the DOE had already approved the University's request.

**The DOE's Review of the Transaction.**  The Opposition argues that Defendants' statements regarding the DOE's review of the Transaction were false because Defendants "had no communications with the DOE other than receiving the May 2018 interrogatories." (Opp. at 11-12.)  This argument, however, is inconsistent with the SAC's allegations, which state that Defendants had continuing communications with the DOE "related to the interrogatories." (SAC

---

[13] Similarly, the terms of the Purdue-Kaplan agreement were publicly available and readily comparable to the terms of the Transaction.  (*See, e.g.,* SAC at ¶ 184.)

12

¶ 283.)  In any event, there is no allegation that the DOE's requests were unusual or indicated the DOE was likely to deny the University's request for non-profit status under Title IV.  Accordingly, as the Motion established, the non-disclosure of the DOE's routine information requests does not amount to a material omission.  (MTD at 17-18.)[14]

**GCE's Compliance with GAAP.**  Plaintiffs' GAAP claims are entirely dependent on the SAC's other allegations regarding Defendants' alleged false or misleading statements.  For the reasons explained above, the SAC has failed to plausibly allege any false or misleading statements.  Accordingly, the SAC also fails to allege GCE violated GAAP, as the Motion established.  (MTD at 18-19.)

## III.  Plaintiffs Fail to Plausibly Allege Loss Causation.

The SAC attempts to plead the requisite element of loss causation based on purported "corrective disclosures" on November 6-7, 2019 and January 28, 2020.[15]  (SAC ¶¶ 349-52.)  As the Motion established, those announcements are not corrective disclosures.[16]  (MTD at 19-20.)

---

[14] Plaintiffs' attempt to distinguish *Sanofi Secs. Litig. v. Meeker*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015), is unavailing.  *Sanofi* held that falsity was not plausibly alleged because "[c]ourts have rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review."  *Id.* at 541.  The same is true here with respect to Defendants' purported failure to disclose every information request received from the DOE during its review of the Transaction.

[15] To the extent the Opposition attempts to pivot to the "materialization of risk" loss causation theory, that argument fails because the Third Circuit has not adopted that pleading theory.  *See Bartesch*, 941 F. Supp. 3d at 512 ("The Third Circuit has not adopted the 'materialization of risk' test" and "instead, requires that there have been corrective disclosures that exposed the alleged fraud.").  The Opposition cites *In re Wilmington Trust Securities Litigation*, 29 F. Supp. 3d 432 (D. Del. 2014), where this Court discussed the theory but held that loss causation was plausibly alleged based on actual corrective disclosures, not a "materialization of the risk."  29 F. Supp. 3d at 450.

[16] It is undisputed that neither of those alleged corrective disclosures revealed the falsity of the alleged misstatements "regarding the sources of GCE's success," which are based solely on alleged statements by former employees that were revealed for the first time in the complaint.  (MTD at 19 n.21.)  At a minimum, therefore, those allegations should be dismissed.

**November 6-7, 2019 Announcements.**  The Opposition argues these announcements were corrective disclosures because they "drove investors' losses."  (Opp. at 24.)  Causing a stock price decline, however, is *necessary*, but not *sufficient*, for an announcement to be a corrective disclosure.  As the Opposition acknowledges, these announcements did not reveal the falsity of any purported misstatements by Defendants and they cannot be corrective disclosures as a matter of law.  *See Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010) ("plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud"); *In re DVI, Inc. Sec. Litig.*, No. 2:03-cv-05336, 2010 U.S. Dist. LEXIS 92888, at *88 (E.D. Pa. Sept. 3, 2010) (if an announcement does not reveal the alleged fraud, it "is not a 'corrective disclosure' because the resulting share price decline does not necessarily dissipate the particular price inflation caused by the alleged fraud") (quotations and citation omitted).

**January 28, 2020 Announcement.**  Citron Research's January 28, 2020 "short report" is not a corrective disclosure because it admittedly was based solely on "information . . . obtained from public sources," and, thus, did not reveal any new information to the market.  (MTD at 20.) The Opposition argues it is a corrective disclosure because it "was based on 870 pages of previously undisclosed information Citron had received via its FOIA request."  (Opp. at 25). Plaintiffs, however, cite to no Third Circuit authority – and Defendants are not aware of any such authority – in support of their argument that publicly-accessible information supplied in response to a FOIA request can constitute a corrective disclosure.  Moreover, the single Ninth Circuit authority cited by Plaintiffs held only that information received via a FOIA request *may* be used to plead loss causation *if* it is corrective.  *Grigsby v. Ball Holding, Inc.*, 979 F.3d 1198, 1206-07 (9th Cir. 2020).  Here, however, the Opposition does not identify any allegedly corrective

14

information that was derived from the documents Citron purportedly obtained via a FOIA request.

(Opp. at 25.)

## CONCLUSION

Because it fails to meet any of the requisite elements of a claim under Sections 10(b) or 20(a) of the Exchange Act or Rule 10b-5, the SAC should be dismissed in its entirety and with prejudice.

Respectfully submitted this 3rd day of June, 2022.

*/s/ Ronald N. Brown, III*
Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Evan N. Glustrom (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
evan.glustrom@alston.com

*Counsel for Defendants*