IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE


IN RE: GRAND CANYON EDUCATION, )Case No.
INC., SECURITIES LITIGATION.    )20-639-MN-CJB


TRANSCRIPT OF MOTION TO DISMISS


MOTION TO DISMISS had before the

Honorable Christopher J. Burke, U.S.M.J., in

Courtroom 2A on the 25th of October, 2022.


APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
     BY: GREGORY VARALLO, ESQ.
     KATIE SINDERSON, ESQ.
     JOHN BROWNE, ESQ.

              -and-

BARRACK RODOS & BACINE
     BY: CHAD CARDER, ESQ.
     JEFFREY GOLAN, ESQ.

                    Counsel for Lead
                    Plaintiffs


DLA PIPER
     BY: PETER KYLE, ESQ.

              -and-

ALSTON & BIRD LLP
     BY: CARA PETERMAN, ESQ.
     JOHN LATHAM, ESQ.

                    Counsel for Defendants

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

THE COURT:  Welcome, everyone, and as we go on the record, let me just say a few things for the record, and the first is that we're here this morning in the matter of *In Re: Grand Canyon Education Securities*.  It's Civil Action Number 20-639-MN-CJB.

We're here today for argument on Defendants' motion to dismiss, and before we go further, let's have counsel for each side identify themselves for the record.  I start first with counsel for the plaintiffs' side and begin there with Delaware counsel

MR. VARALLO:  Good morning, Your Honor.  May it please the Court.  Gregory Varallo from Bernstein, Litowitz, Berger, and Grossman for the Oakland County Pension Funds and the Fire and Police Pension Association of Colorado, proposed lead plaintiffs.  I have with me at counsel table my partners Katie Sinderson and John Browne and our colleagues and colead counsel Jeff Golan and Chad Carder from the Barrack, Rodos, and Bacine from Philadelphia.

THE COURT:  Thank you to you all. We'll do the same for counsel on

Defendants' side.  Again, we'll begin with Delaware counsel.

MR. KYLE:  Good morning, Your Honor. Peter Kyle of DLA Piper on behalf of Defendants Grand Canyon Education, Inc., Daniel Bachus, and Brian Mueller.  With me at counsel table are my colleagues John Latham and Cara Peterman of Alston and Bird, and with the Court's permission, Ms. Peterman will be presenting the argument this morning on behalf of Defendants.

THE COURT:  Okay.  Thank you.

All right, counsel.  Just by way of preliminaries, I think I allocated an hour per side for arguments.  We'll keep track of your time up here.  I'll let me you when you get to 15 minutes left in your argument just in case you want to a pause or slow down, especially if the defendants' side wants to save some time for rebuttal.  If you have slides that you're going to use and you have copies of those, feel free to hand those up to us, two copies if you have them, before you get started.

And otherwise, unless there's anything further, we can go ahead and begin.  I'll call on Defendants' side as it's their motion.

Ms. Peterman.

MS. PETERMAN:  Thank you, Judge.  No slides for us today.

THE COURT:  Okay.

MS. PETERMAN:  Good morning, Your Honor.  May it please the Court.

Your Honor is, of course, already familiar with this case, having issued a report and recommendation that Plaintiffs' claims be dismissed in their entirety last year.  As you no doubt recall, the dismissal was based on Plaintiffs' failure to meet the heightened pleading requirements under the PSLRA and notably their inability to plead with particularity a theory of scienter that is both cogent and at least as compelling as the opposing inference of non-fraudulent intent.

In recommending that their claims be dismissed, Your Honor correctly held, first, that Plaintiffs failed to plead with particularity a cogent theory as to why, knowing that the university did not qualify as a nonprofit under Title IV, Defendants nevertheless believed that the DOE staff would "wholly vacate their job responsibilities and

simply rubber-stamp the conversion, including as to the requested nonprofit designation."

Second, you found that Plaintiffs failed to support their "zigzagging" theory of scienter, alleging that Defendants initially gambled on DOE approval, and then, even after recognizing that the approval was not likely to be forthcoming, nevertheless moved forward with the transaction in order to "maximize profits in the interval" by touting GCU as a nonprofit to potential students.

Third, you found, Judge, that Defendants' opposing theory of non-fraudulent intent was significantly more compelling, including because the IRS had already granted nonprofit status to the university at the time of the alleged misstatements. The district court thereafter adopted Your Honor's report, granted Defendants' motion to dismiss, and allowed Plaintiff to file an amended complaint to "correct the deficiencies identified in the report."

Shortly thereafter, Plaintiffs filed a first amended complaint, which included certain allegations related to the HLC accreditation

and approval process and statements allegedly made by Karen Solinski, a former HLC employee who was terminated in February 2018.

Counsel for Defendants thereafter contacted Plaintiffs' counsel, alerting them to certain demonstrable falsehoods in Ms. Solinski's statements and supplying them with certain documents, mainly a letter from Ms. Solinski to HLC copying Defendants sent shortly before her termination from the accreditor, copies of a publicly available complaint that Ms. Solinski had brought against the HRC alleging that she was wrongfully terminated, Ms. Solinski's publicly available discrimination complaint filed with the Illinois Department of Human Rights again alleging that she was discharged without progressive discipline, and was offered a severance package.  These documents are referenced in the complaint at page one, in paragraph 90, and footnote 2, and they're additionally attached as motions.  I'm sorry. As exhibits to our motion.  At Plaintiffs' request, Defendants thereafter consented to the filing of a second amended complaint to

"address those documents" concerning Ms. Solinski.

Judge, that leads us to the operative complaint that's before you today.  Almost five years since GCE announced its plans to engage in the transaction, four and a half years since the transaction closed, and three years since the DOE denied the university's request to participate in Title IV as a not-for-profit, the parade of horribles that Plaintiffs warn of in their complaint have, unsurprisingly, never come to pass.

Plaintiffs do not allege that GCE has been subject to any SEC inquiry related to its accounting treatment of its relationship with universities under GAP.  They do not allege that GCE has made any restatements of their financials.  The university is not alleged to have violated any of DOE's rules specific to for-profit institutions.  And Plaintiffs could not and have not alleged that enrollments at the university are down, despite the fact that DOE continues to classify it as a for-profit under Title IV.

Judge, given the Court's previously --

the Court previously dismissed Plaintiffs' claims, and Plaintiffs now purport to address these prior deficiencies identified in their theory of liability.  My intention today is to focus primarily on Plaintiffs' supplemental allegations in their second amended complaint. And as our papers demonstrate, despite the fact that Plaintiffs have now filed four complaints total in this matter, they still fail to state a claim under federal securities laws.

Judge, I would describe the supplemental allegations as falling into a few primary buckets.  The first I'll call allegations regarding the regulatory environment under the Trump Administration.  And I want to say at the outset, Judge, that there's absolutely nothing extraordinary and certainly nothing fraudulent about companies making business decisions influenced in part by the current regulatory environment.  That, of course, happens all the time, and it cannot serve as a basis for a fraud claim.

Instead, to successfully allege a fraud, Plaintiffs would have to plead with particularity to show that Defendants knew the

university did not qualify as a nonprofit under Title IV but they nevertheless thought that the DOE would rubber-stamp their request and that they made material representations to their investors regarding the same.  The Court, of course, previously held that Plaintiffs failed to make this showing, in part because they did not plead with particularity to show how Secretary DeVos's viewpoints would "necessarily cause line DOE employees to make a decision about GCU's non-profit status that cannot be reasonably be squared with DOE's regulations."

In an attempt to patch these holes in Plaintiffs' scienter theory, the second amended complaint contains a smattering of novel allegations regarding the personnel and priorities of the DOE under the Trump Administration.  It alleges, for instance, that certain former employees, consultants, and lobbyists within the industry were appointed to various positions within the Trump Administration, some within the DOE and some entirely outside of the agency.  The complaint does not, however, make any allegation that these appointees had any role in overseeing

change in control conversions or that they ever directed any DOE staff to approve a university's request for nonprofit participation in Title IV without meeting the applicable regulatory requirements.

Judge, the second amend complaint also alleges that Secretary DeVos "rolled back" certain DOE rules applicable to for-profit universities, and but none of those rules are at issue here, nor is the university alleged to have violated any such rules.

Finally, Your Honor, the second amended complaint alleges that in January of 2018, there was news of a potential settlement between the DEO and CEHE after the Obama Administration had previously denied the organization's request for non-profit participation in Title IV. Notably, that news regarding a possible settlement that came out several months after GCE determined to undergo the conversion and had submitted its plan to HLC. So Defendants are not alleged to have been aware of or relied upon that potential settlement when they decided to conduct the transaction.

Your Honor, even taken together, these allegations do not remedy the fatal flaw that this Court previously identified. They do not support a cogent theory that Defendants believed the DOE staff would simply rubber-stamp the university's request knowing that the request did not meet the most basic tenant of nonprofit status.

THE COURT: Ms. Peterman, you're starting with scienter. In the parties' briefs that were submitted last time, there are three buckets of broad legal issues that are discussed. There's scienter and the alleged failure of the allegations relating to scienter. There's the allegations relating to false and materially misleading statements and the alleged failure of those, and then allegations relating to loss causation. And it's notable the parties take those buckets up in different orders. You start with scienter. The other side starts with material misstatements. Obviously, you talk about them all.

Stepping back, when I'm approaching the decision -- the last time, of course, I

addressed scienter.  I found the allegations wanting, and I granted dismissal.  If I were to do that again, which I think you're asking me to do, and I think you're asking by starting with scienter, when I'm doing that, because I haven't addressed the arguments about the alleged insufficiency of the various allegations of false or misleading statements, am I necessarily assuming arguendo that the allegations as to the various false and misleading statements are sufficiently pleaded and nevertheless setting out why it is that the allegations of scienter are not sufficient?

Or am I -- alternatively, should I or do I need to first address the arguments about the alleged sufficiency or insufficiency of the allegations regarding the false or materially misleading statements, and only after determining what is sufficiently pleaded and what's not as to that bucket go on to address the issue of scienter?

What's your view about all of that?

MS. PETERMAN:  Yes, Your Honor.  Of course, Plaintiffs have to meet all three requirements.  They have to plead all three

allegations, so we would not agree that's any concession or any indication that they've met those other requirements just because you decide this on scienter.  Now, scienter is -- their inability to plead scienter is fatal to the entirety of their complaints and their claims, as is true of loss causation and falsity.  So if you find for us on scienter, I would posit that you do not need to reach loss causation or falsity, although, of course, we think they've failed to meet either of those as well.

THE COURT:  I guess that's my question.  In not reaching them -- I have to assess the allegations with regard to the scienter issue.  If I'm not addressing or reaching the back-and-forth about the alleged false statements, when I'm considering the allegations as a whole as to scienter, am I necessarily assuming for sake of argument that the asserted false statements were false but nevertheless determining, if you're connect, that the allegations as a whole don't rise to the level of providing at least as cogent and compelling a theory as your alternative theory?

Is that what I'm doing?

Last time I made a decision, for example, there were the allegations about the false statements that were made about why it is that the DOE had not made a final determination as of summer 2018 with regard to the for-profit or nonprofit status.  There were assertions those were false, and in the R and R, I assumed those allegations were sufficient but explained why I didn't agree with the alternative rationale as to why those statements might have been made and why they didn't, ultimately, result in a situation where your theory was less cogent and compelling.

Is that the way I would do it if I were to go your way on scienter and only address that issue?

MS. PETERMAN:  Judge, just because it has failed in the entirety of the claims, you could say, even accepting -- without reaching the issue of falsity and loss causation, their complaint must be dismissed.  But I would posit that's not, again, a recognition that they met the threshold showing falsity and loss causation.

I would say, Judge, you correctly, following caselaw, looked at their theory of scienter and whether, taken as a whole, it was cogent or compelling, so you really don't have to reach falsity or loss causation in order to find in our favor.

THE COURT:  I think on that, in your briefing, I think you see that analysis, the scienter analysis, as kind of potentially two parts.  In other words, first, you assert there has to be allegations in an overarching theory that is cogent and compelling and at least as cogent and compelling at the defendants'.  Let's say it was.  Let's say the theory was cogent enough.  At times, you seem to kind of say, "Judge, even if that's true, certain of the allegations that support that theory aren't sufficient."  Is that what you're attempting to do in your briefing?

MS. PETERMAN:  Correct, Judge.  They have to make both showings, both that the overarching theory is cogent and compelling and that they have to plead with particularity facts to support that theory.  That's correct.

THE COURT:  Okay.  And I guess just

to -- I'll let you continue, but as to the new allegations with regard to the Trump Administration and the folks there who worked at the DOE, there are at least new allegations now that purportedly demonstrate that there was a different viewpoint with regard -- in the DOE with regard to for-profit and nonprofit institutions, the assertion being decisions that may have been made in the Obama Administration about whether or not the 2014 conversion should have amounted in a non-profit finding might come out differently because the people overseeing the agency has changed.

Is it not a plausible allegation that if the bosses, the people who run an agency, are different and have a different view about for-profit and nonprofit issues, that could, in fact, trickle down to the line folks who have to make the day-to-day decisions?

MS. PETERMAN:  Judge, I think the key distinction here is not about whether it's a favorable regulatory environment in the abstract.  It's were these type of conversions altered.  And, again, Plaintiffs would have to show that despite the favorable regulatory

environment, the staff of the DOE was taking an application for nonprofit participation in Title IV and rubber-stamping that despite the fact that it didn't meet the DOE's regulations and that Defendants believed that to be the case. In other words, the defendants had the state of mind where they believed we could give the DOE this completely -- doesn't meet the most basic tenants of non-profit status, and the DOE is going to rubber-stamp it because suddenly Trump is in power, and they just have not met that threshold showing.

THE COURT: Let me let you continue.

MS. PETERMAN: Thank you, Judge.

The second bucket, as I would call it, of supplemental scienter allegations go to GCE's purported reason to move ahead with the transaction.

Plaintiffs attempt to remedy a critical deficiency that this Court identified in the prior complaint, their "zigzagging" theory that after Defendants received a request for information from the DOE in 2018, they realized that their gamble was unlikely to pay off but they decided to move forward with the

transaction anyways, all the while concealing the truth from investors.

Plaintiffs now attempt to offer a number of supposed justifications for Defendants' allegedly fraudulent scheme, none of which established a cogent theory of scienter. Plaintiffs first assert that Defendants could obtain "marketing benefits" while they awaited DOE's inevitable denial and that, indeed, enrollments went up as the transaction closed. Your Honor, however, has already rejected this theory as a less than cogent narrative, and rightly so.

Why would Defendants commit a fraud on their students and investors, which is, of course, what the plaintiffs allege, knowing that it would be revealed in a matter of, at most, a few months?  Frankly, if the DOE had come down with a decision in a more timely fashion as expected, the purported fraud could have been revealed in a matter of days, before any alleged marketing benefits would even have taken effect.  Nor do Plaintiffs allege that Defendants hoped or expected that something might change in the interim to forever mask

their alleged fraud.

THE COURT:  Part of what's at issue here, I think, is why?  Why, if by May of 2018, after they received the interrogatories and after there was some additional discussions with the DOE about them, if in light of that it's asserted that the defendants had to know that the DOE approval of nonprofit status was either not going to happen or almost certainly not going to happen, why would they proceed forward and make false statements about whether, in fact, that was likely to happen?

Sometimes in securities fraud cases, why might defendants make false statements even if the fraud might ultimately come to light?  They may profit personally.  I think part of your assertion here is there aren't allegations that at least the individual defendants profited personally by, like, selling stock, for example.  Am I right?

MS. PETERMAN:  Yes, Your Honor.

THE COURT:  But I think the plaintiffs, I think they're suggesting, and both sides help me with understanding what they think the allegations here are.  I guess the

assertion is that there were going to be certain maybe short-term benefits to GCU and maybe GCE from May of 2018 until whenever it was that the DOE got around to making their final decision.  And either from a financial perspective or otherwise, those short-term benefits before the public would know that the fraud was committed might outweigh what I think is called still the existential issue for GCU, which is without the nonprofit status, the business plan was in trouble.

I guess if that's all correct, give me your take on why it is as to what Plaintiffs are relying on as to this is what we expected them to gain doesn't hold water, in your view.

MS. PETERMAN:  Absolutely.  And I'll walk through each of their proffered reasons, but I'll tell you, Judge, you absolutely hit the nail on the head.  The question is why.  Why would this make sense?  Again, they are alleging a fraud.  Why would we defraud -- why would the university defraud its students?  Why would GCE defraud its investors?

The cases that you see in this arena are, again, masking some significant issue, some

significant regulatory concern or financial concern, and the hope is we can conceal it long enough to maybe get ourselves out of this hole. And the complaint is completely devoid of those allegations. There's no allegations that either GCU or GCE faced any significant regulatory concerns, that they were in violation of any of DOE's rules applicable to for-profits.

And I would also add, Your Honor, in the interim, from the time that the application went in until the DOE denied nonprofit status, the university was operating as a for-profit in a month-to-month agreement of PPA with the DOE. It was subject to all the regulations during the entire time period, including until today. You're absolutely right. This is vastly different from the types of securities fraud cases that we see where there was some hope to mask exigent circumstances.

THE COURT: Are there not, though, allegations that there were short-term financial and other benefits to the university, the allegations that in the interval, you're drawing from new student pools, that enrollment

may be up, that there were some financial benefits to going around saying we're going to be a nonprofit, we are a nonprofit, we think that the DOE is likely to find us to be a nonprofit?  There are some allegations in that regard, aren't there?

MS. PETERMAN:  I walk through each of those, but I do want to note there is no allegation that we said the DOE was likely to find us to be a nonprofit, so that's one point of clarification.  To the broader question, let me walk through each of the proffered reasons by Plaintiff and dismantle them in turn.

So again, Judge, and I think you pointed to this, Plaintiffs first assert that Defendants could obtain marketing benefits going out to universities and marketing themselves as a nonprofit, marketing themselves as a nonprofit to schools, but Your Honor already rejected that.  Your Honor found in the R and R that that was a less than cogent theory, again, because it's likely to have been revealed in a matter of months or even days.

The second issue or second item that Plaintiffs offer is that Defendants felt

compelled to move forward with the transaction based on this purported "limited political window" available to them.  Judge, that is also not a cogent theory, because on the one hand, Plaintiffs are alleging that Defendants recognize that the university was not likely to receive DOE's nonprofit designation while, on the other hand, they were still attempting to avail themselves of this purportedly favorable regulatory environment.  So the theory is not even internally consistent and definitely does not rise to the level of cogent and compelling.

THE COURT:  Put another way, I think what you're saying is the assertions in the complaint to you sound like up until the Trump Administration took over, the plaintiffs knew they weren't a nonprofit and they weren't going to get approved to be a nonprofit.  And then the complaint pivots and explains why, when the Trump Administration took over, they believed that even though on the merits they shouldn't be a nonprofit, the regulatory environment is in place that they might get approved.

Then as of May, they get the interrogatories.  Now the assertion is they

know they're not going to be a nonprofit and shouldn't be a nonprofit. So the assertion that there was still a limited regulatory window, you say, doesn't make sense. What window? We already know now the line DOE people are going to do the right thing. That's what you're saying.

MS. PETERMAN: Correct, Judge. It's as if they doubled down on the "zigzag" theory. They zigzagged from the Obama Administration is against non-profits, the Trump Administration is for them, but maybe not really that much for them and we're realizing it and there's this closing window. It's as if they doubled down on their theory.

THE COURT: People can have changing motivations. Things can be complex. Part of the issue I said last time with the complaint was if there was an asserted pivoting mindset because there's a new administration and there weren't any allegations about why it is that one would think that, and now there are a bunch. It's not impossible, right, that an alleged wrongdoer might be nimble enough to change their plan midstream if events occur and

still be trying to fool the public; right? That's possible?

MS. PETERMAN:  I can't speak to hypothetical possibilities, but I can say the plaintiffs absolutely have not established it here, including they have to establish at the start of the class period, at the start of the case, that there was a plan for fraud.  And now they've proffered multiple plans for fraud, again, pivoting and zigzagging between them. And it's simply not cogent, and it's their burden to meet that threshold.

THE COURT:  I'll let you continue.

MS. PETERMAN:  Thank you, Judge.

Plaintiffs next offer two business reasons why GCE determined to move forward with the transaction in July 2018, and those allegations are purportedly based on statements that GCU had made in its ongoing litigation against the DOE.  Business considerations, however, do not rise to the level of scienter sufficient to plead a claim for fraud.  Rather, Plaintiffs must allege a plausible theory for why the defendants believed that the purported benefits of concealment, not the alleged

benefits of a business decision, outweighed the cost of disclosure.  This goes to the issue I discussed before about what you typically see in securities fraud cases and the cases that they cited to with attempts to mask over the risks of disclosure.

So moreover, the fact that the university even brought a claim against the DOE related to its nonprofit determination demonstrates that, at a minimum, Brian Mueller, as the university's president, believed and continues to believe that the university qualifies as a nonprofit under Title IV.  In any event, the two proffered business considerations are themselves illogical.

The first reason that Plaintiffs offer for GCE's decision to move forward with the transaction even, again, after allegedly realizing that the DOE was unlikely to grant nonprofit status is that GCE had already incurred significant costs in preparing for the transaction, including transitioning over 7,500 employees and assets valued over a billion dollars.  But moving forward with the transaction wasn't going to alleviate any of

these alleged sunk costs, so GCE -- so that could hardly serve as a cogent reason to close the transaction while committing fraud on GCE's investors.  Indeed, GCE was positioned to incur additional expenses in finalizing and consummating the transaction, and it would make no sense to do so if GCE believed that the DOE was likely to deny nonprofit status in the near term.

THE COURT:  I'm trying to parse through, and I know you made this assertion in the briefs, the distinction that you see between business decisions and a sufficiently alleged fraudulent scheme.  I'm not sure I understand where the line is in your mind.  And I think it's asserted if we're trying to figure out is there a cogent theory, why would they -- why would these defendants commit fraud?  Why would they, knowing that it was very unlikely that the DOE, after May 2018, would approve nonprofit status?  Why would they mislead investors and the world about the likelihood that would happen and whether it would happen?

The other side, I think, in part says, well, they had already gone down this road with

the conversion, so there were sunk costs and other benefits.

I guess if there are business-related facts that might assertedly make a theory more plausible, why is the fact that the facts relate to a business decision irrelevant to the calculus?

MS. PETERMAN:  I would say first, Your Honor, I don't find it cogent or compelling that the executives of a for-profit company that, again, is performing well, is facing no financial issues, is facing no regulatory concerns, would simply shrug its shoulders and say, "We've lost money on this, so why don't we commit fraud on the investors." I don't find that a cogent or compelling reason.  And you can't fall back on valid business reasons for doing something and point to those standing alone and say that must mean that you did have that fraudulent intent.  It's simply not cogent, Your Honor.

THE COURT:  Please continue.

MS. PETERMAN:  Finally, Judge, Plaintiffs allege that Defendants moved forward with the transaction because they were running

up against the expiration of HLC's approval, but Plaintiffs don't and can't allege that HLC would not have granted approval of the transaction once again if needed.  Thus, Your Honor, none of the proffered reasons for why GCE would move forward with the transaction, even while recognizing that the DOE would soon deny nonprofit status, create a cogent or compelling theory of fraud.

THE COURT:  Since we're talking about the HLC's 2018 approval -- it was 2018 when the agency is --

MS. PETERMAN:  That's correct, Judge. I believe it was early 2018.

THE COURT:  Okay.  I mean, I have to say on both sides I'm a little perplexed about the 2018 HLC aspect of this whole complaint at issue.  We know that HLC in 2018 ultimately approves the defendants' application.

MS. PETERMAN:  Correct, Your Honor.

THE COURT:  The HLC's approval, to what extent do you assert that -- it looks like in your brief, though, you say that the fact that HLC approved the application is immaterial to the questions at issue here about scienter

and the competing theories; is that right?  Are you asserting that the fact that HLC approved in 2018 is something I shouldn't consider at all one way or the other?

MS. PETERMAN:  Judge, I think it's relevant insofar as this was a significant transaction that required regulatory approval as from multiple entities and not just with respect to the Title IV nonprofit participation.  So I think it's absolutely a positive indication to Defendants, to students, to the market that HLC approved of this change in control transaction.

THE COURT:  Do you assert that the facts suggest that HLC's approval would tell the defendants something about whether or not the DOE was likely to approve nonprofit status?  Put differently, in your view, did the HLC's approval have anything to do with the nonprofit issue?

MS. PETERMAN:  No, Judge, because HLC, as Plaintiffs allege, did not look into that issue.  I do think that it's relevant to the DOE's entire review of the transaction.  Recall that the PPA and that Title IV nonprofit

participation is only one component of the DOE's review, and the DOE, of course, approved the change in control transaction in November of 2019.

THE COURT:  What impact did the HLC's decision then have on Defendants' mindset, if any, on, say, the likelihood of DOE approval, if at all?  What impact would it have, if any?

MS. PETERMAN:  Of DOE's approval of the Title IV participation --

THE COURT:  Yes.

MS. PETERMAN:  -- as a nonprofit?  I think it's immaterial.

THE COURT:  Immaterial to the nonprofit calculus.

MS. PETERMAN:  Yes.

THE COURT:  Is it immaterial to Defendants' mindset totally?  Does it have any impact on the mindset that's relevant for the scienter assertions?

MS. PETERMAN:  Not for the claims that are alleged, no, Your Honor.

THE COURT:  Okay.  Let me let you continue.

MS. PETERMAN:  Speaking of HLC, I

will turn, next, to the final set of new allegations, which are the HLC-related allegations.  And I think you hit the issue exactly on the head.  There are a few things that I would like to supplement as well.

So the second amended complaint, of course, contains a litany of unrelated allegations regarding the HLC accreditation process based almost exclusively on statements allegedly made by Karen Solinski, who of course is a former HLC employee who was terminated from her employment during the relevant time period.

Your Honor, there's a lot of noise around the Solinski allegations and Solinski statements, but if you actually focus on the allegations themselves, you'll realize that they're nothing more than attempted character assassinations and frankly conspiratorial musings.  None are actually relevant to supporting the plaintiffs' claims.

As an initial matter and as set forth in our motion, a number of Solinski-related allegations in the compliant are directly refuted by Solinski's own contemporaneous

statements made in the documents cited in the complaint.

First, Judge, as I mentioned, we provided Plaintiffs' counsel with a copy of Ms. Solinski's verified complaint against HLC in which Ms. Solinski alleged under oath that she was terminated from her employment with no previous discipline or warning on March 1, 2018.  And, Judge, I will note that that litigation is referenced in footnote two of Plaintiffs' complaint.

THE COURT:  I guess, though, to the extent that you, at times, may point me to documents that themselves aren't referenced in the complaint, or even to the extent that you point me to documents that are referenced in the complaint but that might make assertions about facts that the other side says are disputed -- I can take judicial notice, for example, of the fact that the complaint in federal court was filed.  If that complaint makes an assertion about a fact, and if that fact, that asserted fact, is contradicted by an allegation in the complaint, I can't credit the underlying asserted fact in that other

complaint, can I?

MS. PETERMAN:  Judge, I would say for this issue, you can both take judicial notice of the fact that the complaint was filed and the fact that complaint makes that statement. You don't have to take judicial notice of the fact that she was terminated or it's their allegation that she resigned.  The fact of the matter is either she was making misrepresentations in her complaint filed before a federal court or she's making misrepresentations in her present statements.

THE COURT:  I guess stepping back, and I'll ask the plaintiffs this too, since there's a lot of allegations in the complaint -- it used to be in the prior complaint basically the only assertion about HLC in this 2018 process was it's apples and oranges.  HLC is doing one thing.  They're making an education-related call.  This issue is about nonprofit status.  They're doing different things.  So the fact that the HLC approved, it's apples and oranges.  Doesn't mean anything.

Now there's all these allegations about

the substance of HLC's review, what Ms. Solinski was telling Defendants about whether or not their proposed transaction was similar to others that the Department of Education maybe were reviewing or that were public.  If the HLC decision is immaterial to the issues here, why is Ms. Solinski going back and forth, allegedly, and providing information to the defendants about the nature of their proposed transaction, how it compares to the Purdue-Kaplan deal, all the things that are alleged here?  What's your view about that?

MS. PETERMAN:  Well, Your Honor, I think that you're absolutely correct that these HLC allegations are immaterial and unrelated to the actual allegations in the complaint.

THE COURT:  I'm not sure they're immaterial.  You said they're immaterial.  I'm trying to figure if they're immaterial or not.  I'm also trying to figure out also what the HLC is doing.  If they're not doing anything that relates to the substance of what is happening with regard to the DOE's process and the statements that the defendants are alleged to make about that process, I'm trying to figure

out why it is, then, there's all this information about conversations that the defendants were having with Ms. Solinski and/or others with HLC and Ms. Solinski was saying. I'm trying to parse that and figure out who's right and who's wrong.

MS. PETERMAN:  That's right, Your Honor.  Let's focus on the Purdue-Kaplan statements, because I think this will answer you question.

Ms. Solinski alleges that in May of 2017, so well before the company came up with MSA, before they filed it with the DOE, before they had even received HLC approval, Plaintiffs allege that Ms. Solinski had a phone call with Dan Bachus, the CFO of GCE, in which she said that there were "key differences" between the two transactions.  They don't allege in what context that was happening.  They don't allege that she noted any of the key differences or whether they even would go to Title IV approval.

THE COURT:  It seems like -- and I'll ask Plaintiffs this.  It seems like regardless of what HLC's ultimate decision is about, it

seems like the plaintiffs are alleging that nevertheless, HLC was having lots of back-and-forth with the defendants about whether or not the proposed transaction would really amount to kind of two independent entities, GCE and GCU, or not, i.e., the kinds of issues that ultimately, it's asserted, led the Department of Education to deny the nonprofit status application.  It sounds like Plaintiffs think, and I think I'm right, that there's a lot of substantive back-and-forth going on between HLC and the defendants about the independence issues, the separateness issues, that ultimately are going to make a difference for nonprofit status on the Department of Education side.  Is that wrong? Is that what they're alleging?

MS. PETERMAN:  I would posit, Judge, that the allegations to that effect are actually quite sparse, that mostly, again, these are character assassinations.  But even to the extent there were conversations about the independence or the separateness of the entities, recall again that DOE approved the change in control transaction, just like HLC

did.  HLC, of course, is an accreditor.  It has to look at the educational aspects and whether the university will continue to service its students, and that's what it did.

THE COURT:  That's the problem.  You say their decision is immaterial.  Put it differently, if it was asserted that what HLC was doing, their decision, the decision they made in mid 2018, if that decision was asserted it was going to be a yes, you're good, Defendants, you're good, we're on board, even though we weren't before, and if that decision had something to do with the likelihood that the Department of Education might approve nonprofit status, then one on your side might say that's another fact.  The agency ultimately approved.  Regardless what is alleged about questions or concerns, they changed their view.  That's an additional decisionmaker who is giving the defendants more ammunition to believe that we're going to get approved by the DOE, not some scheme where they know they're not.

But you're not saying that.  You're saying what the HLC did was immaterial, that

whatever they're doing or talking about or Solinski is discussing doesn't have anything to do with issues at play with the DOE and false statements, et cetera.

The plaintiffs, I think, think whatever the HLC was doing does have something to do with it, though they don't confront why the HLC's ultimate decision going the other way wouldn't impact the defendants' mindset in a way that hurts them.

I'm also confused, as we get to the plaintiffs' side, Ms. Solinski was the one that asserted, I think, ultimately to be skeptical of the defendants' independence arguments about their proposed conversion.  On the other hand, the HLC approves the application and she is said to have been strong on it.  She's on the one hand said not to be part of the decision but on the other hand alleged to have been very much a part of the back-and-forth.  I find it all very confusing exactly what HLC is meant to do here and both sides' assertions about why it matters or not confusing, and that's one of the things I need some help on here today.

MS. PETERMAN:  You've absolutely

identified some of the inconsistencies of their theories. Let me try to unpack this a little bit further.

I do agree that the HLC's decision was received positively from the university and GCE, that they reviewed it as a positive fact, again, in the overall review and approval on the transaction writ large, and that it was a good sign that the DOE was going to approve the change in control transaction. Frankly, that's what the company was focussed upon because, again, and I'll get to this, but again --

THE COURT: Change in control transaction as is divorced from the nonprofit status.

MS. PETERMAN: Correct. Writ large, the transaction writ large. The fact that you can do this deal and still participate in Title IV at all, whether as a nonprofit or for-profit, that you'll be accredited by the HLC. The reason that the defendants were not focused and the HLC determination was not material to the DOE's decision on the nonprofit component is, again, because the DOE nonprofit test is the same as the IRS test, and we had

already passed the IRS test.

I want to stick with HLC just momentarily, but Plaintiffs allege in their complaint that the HLC accreditation approval process was not -- that HLC did not assess whether a university could participate as a nonprofit or not because that was really an IRS test, and that's absolutely correct.

THE COURT:  Again, aren't Plaintiffs asserting that HLC representatives were having dialogue with Defendants' representatives that should have indicated to Defendants' representatives that they would not likely be approved for nonprofit status because their deal wasn't the same as the Kaplan deal because there were independence concerns?  I'm not saying it's correct.  I'm saying, isn't that what Plaintiff is trying to establish by talking about these alleged conversations between Ms. Solinski and the defendants' side?

MS. PETERMAN:  Really, the only alleged conversation that they point to that's actually between HLC and the defendants on that issue is the Purdue-Kaplan transaction, and again, they do not allege that Ms. Solinski

said to Mr. Bachus, "You're different from Purdue-Kaplan because you have different revenue sharing agreements, because you're providing different services, et cetera, et cetera." All they say is that she told Dan, again, a year before they moved forward with the transaction, that these two transactions had key differences.

THE COURT: Real key differences.

MS. PETERMAN: Real key differences. That can mean anything, Judge. Recall, Purdue is an existing university, a large university, a well-established university. It should come as no surprise that there may be differences in the minutia of their agreement with Kaplan as a servicer, but that doesn't mean the structure of the transactions is different.

THE COURT: But there's all these allegations in the complaint about it's all about explaining why it is that this HLC may have ended up approving in 2018 when they didn't approve before, all the business about Ms. Solinski and these rules that she wasn't going to be the -- she's the one who said no last time, but here's explaining why she's not

going to be the decisionmaker this time. Why is all that relevant if the HLC is not doing anything related to nonprofit status, their call about education-related concerns is totally different from the issues that the DOE is going to address? Why is that relevant? Why is that stuff relevant?

MS. PETERMAN: I would posit that it's not. I would posit that none of her allegations are relevant.

On the issue of why did HLC originally deny and now is approving, Your Honor, attached to Ms. Solinski's letter, which is in the complaint, are change in control guidelines that weren't implemented by HLC until 2017. We're not asking you to make the conclusion, but it's a good inference as to why HLC is suddenly approving when it did not.

THE COURT: And you have 15 minutes left, but I was going to say, of course it's possible that even if HLC's ultimate determination wasn't going to go to the nonprofit issue, it still could be that a person who works there who was knowledgeable about the subject matter could have

conversations with Defendants and say, "You're not a nonprofit. There's no way you're going to get approved. Let me tell you 17 reasons why. I know this doesn't have anything to do with what we're about to do in a month or two, but let me tell you. There's no way." That could happen; right? There doesn't have to be a link between the substance of the HLC decision and conversations that HLC people might have had with Defendants; right?

MS. PETERMAN: First of all, Your Honor, that's not alleged, that she or anyone at HLC told Dan or the company or anyone at GCE, "You're not going to meet the DOE approval standards. It's not going to happen under this transaction."

And second, Judge, I would posit that that's not actually -- doesn't speak to scienter because, again, Defendants were focused on IRS's approval, which is the standard that DOE follows. Why an HLC's representative's statements would be relevant to create scienter Plaintiffs have never alleged.

THE COURT: Okay.

MS. PETERMAN:  Your Honor, I would like to, if I may, reserve the remainder of my time for rebuttal.

THE COURT:  Okay.  As I said, there are only 15 minutes left, so we'll save that time for rebuttal and turn now to Plaintiffs' counsel.

MS. SINDERSON:  Good afternoon, Your Honor.  Katie Sinderson with Berstein Litowitz on behalf of Lead Plaintiffs.

THE COURT:  Good afternoon, Ms. Sinderson.

MS. SINDERSON:  I know I have an hour here with Your Honor.  My plan was to go through the affirmative points establishing that we've met the standards for a securities fraud claim here, particularly addressing our new evidence that we've afforded to address Your Honor's concerns, then to address, to the extent I haven't already, Your Honor's concerns as expressed in the R and R, and then address certain of Defendants' arguments to the extent I haven't already addressed them.

Obviously, if Your Honor has questions and wants to cut to particular questions, I'm

happy to address those.

Before I get started, just for clarity of the record, I'm going to try to address Grand Canyon Education as the company and Grand Canyon University as the university. I also want to make sure it's clear as I'm discussing this that when we talk about the application to the DOE, there's two parts to that application. There's the change in control application and the nonprofit conversion. I don't think anybody would dispute that, and I'll try to make it clear today.

THE COURT: Can I ask with regard to that, is the change in control aspect of the DOE's review particularly material to the allegations of fraud in the complaint? I mean, obviously, it was a component of the review, certain approvals had to have been obtained in order for the transaction to move forward at all. Am I right that the bulk of your allegations relate to the aspect of the DOE's review that focused on whether GCU would be considered to be a nonprofit institution?

MS. SINDERSON: That's exactly right, Your Honor. When they made their application,

they were making an application for change in control which we allege immediately accrued to the material benefit of the company when they executed on that change in control transaction in July of 2018.  Still pending, the meat of our case relates to the nonprofit conversion part of the application, and this really goes to Your Honor's questions about why would they execute on the change in control transaction when this nonprofit -- when we allege that the nonprofit conversion aspect to it, the significant plus factor of that nonprofit conversion, was still in doubt.  And we allege that Defendants had material nonpublic reasons to know there was significant risks associated with that nonprofit conversion.

I'm happy to jump right to the question Your Honor had about why would they execute on that change in control transaction in July 2018, and this goes to statements that Defendants actually have made in federal court. Your Honor had the question, why would they execute on this change in control transaction when they knew, based on the May 2018 service of the interrogatories, that this wasn't a done

deal, when they knew, as we alleged and must be accepted for the purposes of this motion, that they had been told by the DOE that the structure was going to face significant challenges if they ever submitted it to the Department of Education?

THE COURT: With regard to the nonprofit designation?

MS. SINDERSON: Exactly, Your Honor. So they were told that with respect to the nonprofit designation.

THE COURT: Is it your allegation that as of May 2018, once they received the interrogatories and saw where things were heading, at that point, the defendants knew that the DOE was not going to approve nonprofit status?

MS. SINDERSON: That's not our allegation. Our allegation is that from the beginning of class period, from the inception of this idea, they knew this was a high-risk gamble. They knew. They had been told by DOE that the DOE -- the staff that ultimately refused to approve the deal had significant issues with the structure and that they would

face significant problems with it.

However, the world changed, and as -- with the election of Donald Trump.  As defendants -- as my friend over here made the statement, it's a perfectly reasonable business decision to submit this application in hopes of getting a favorable reaction from a new administration.  This happens every time new presidents are elected.  Companies resubmit new regulatory applications.  There's nothing wrong with that.

What makes this securities fraud is they misrepresented the structure of the transaction.  They said this was just like Purdue-Kaplan and other mainstream applications that had been submitted in the past and approved by the Department of Education.  As we allege in the complaint, there are multiple material differences between this transaction and Purdue-Kaplan which Defendants do not submit.

THE COURT:  You're alleging the reason -- why are they making these misrepresentations, misrepresentations about whether the structure of this proposed deal was

similar to others that may have been approved or on track for approval?  Why would they make misrepresentations about the likelihood of whether the DOE was going to ultimately find that they were a nonprofit?  Why would they make those representations?  Because they want the public to believe that it is going to happen when they know it is -- and you're not saying when they know that it's not going to happen but you're saying when they know that there is a very, very good risk that it's not going to happen.

MS. SINDERSON:  A much higher risk than investors understood.  They knew.  They had multiple pieces of information that told them this was a much risker --

THE COURT:  Very unlikely.

MS. SINDERSON:  Very unlikely.

THE COURT:  But they wanted investors to think it was very likely.

MS. SINDERSON:  Right, exactly.  And there are multiple statements, as alleged in the complaint, that led investors to think this was very likely.

THE COURT:  But key to your

allegations is they knew if not that it was absolute zero chance of approval but pretty unlikely, very unlikely.  That's what they had to have known while they were making statements that said otherwise.  That's kind of key here; right?

MS. SINDERSON:  It is, Your Honor, and it's not something that I'm theorizing about.  This is based on the factual allegations in the complaint that have to be accepted as true and all inferences drawn in favor of Plaintiffs at this stage.

They knew before the class period that DOE had significant issues and they would face significant pushback if they submitted it to the DOE.  That's a factual allegation.  They knew -- they had been told by one of the most reputable third parties who had evaluated both Purdue-Kaplan, nonpublic documents about Purdue-Kaplan, and nonpublic documents about the Grand Canyon proposed nonprofit conversation.  They had been told these two are completely different, real and key differences. They knew all these key differences.

There's no question, and you'll be

hard-pressed to find -- you'll look in vain to find Defendants disputing Plaintiffs' allegations that both Defendant Mueller, who, as you recall, is CEO of the company and president of the university, and Defendant Bachus, who is the CFO, they never say they didn't know these facts, and that's a key, key point.

I will now turn to --

THE COURT:  Before you do, there's new allegations in the operative complaint about what was happening when the administration turned over.  But there is still this -- but we have what the complaint now does; right?  It alleges that prior to the Trump Administration, there were significant facts that the defendants knew that would have suggested to them that they were very unlikely, very, very unlikely, whatever it is, to get nonprofit approval by the DOE; right?

Then the complaint alleges all these facts about how as of January 2017, there's a bunch of facts now that might suggest to the defendants, wait a second, actually, maybe the DOE will approve nonprofit status.  Maybe even

that it's likely that they will.  All the facts that you allege about the folks who came into the administration and were appointed at the DOE and what we're seeing.

And then it gets to May 2018, and now all of a sudden the allegations are -- the facts are, because now we have the interrogatories, now they know it's very, very unlikely.  I guess the question is, where do you start to pivot?  When we get to May 2018, now they get to now it's incredibly unlikely.  What happened to the allegations five months before where all of a sudden it was very likely?  It's unlikely in May of 2018.

There are some parts in your complaint where you reference back to the DOE staffers, the line staffers, their years-ago comments to the defendants suggest that we never do those kind of transactions for nonprofit status.  All of a sudden, those are really relevant in May 2018.  What happened to the allegations about the new Trump Administration?  Wouldn't that be in the defendants' mind still, or no, did they go out of the defendants' mind?

MS. SINDERSON:  I appreciate that

question, and it's a very important point and what we try to address in the amended complaint, which is in 2017, they understand. 2016, they know this transaction is going face significant hurdles, and they say, "We're not going to submit it again.  It's not worth it."

2016, President Trump is elected.  There are a number of regulatory changes set into place, staffing changes, senior staffing changes, that they have hope -- their counsel has advised them.  Counsel has advised all of the for-profit companies that are considering a nonprofit conversion to wait until Betsy DeVos is installed as secretary.

THE COURT:  They have legitimate hope that they will be designated as a nonprofit.

MS. SINDERSON:  They have a hope, Your Honor, but they didn't tell investors that this entire nonprofit conversion is based on a hope that senior staff at Department of Education is going to turn on a dime, override their staff who had told them -- investors didn't know this, they knew -- that the staff had told them they had no chance.  But again, it's totally appropriate.  New administration,

take your shot, which is what they did.

There's no risk.  There's no risk to them personally or to the company if they took their shot.

THE COURT:  I'm trying to figure what you think is in the defendants' heads in these various periods.  You could say prior to January 2017, the defendants, experienced veterans in this area, would know, based on the prior comments of the DOE and otherwise, that there was almost no chance this proposed type of conversion would get nonprofit status.  You could say, "Let me tell you all these facts about what happened with the new Trump Administration.  What I'm telling you is, I'm not telling why the defendants in their minds, these new facts mean that they knew that, in fact, this was really a nonprofit and was going to be accepted as one.  They still knew it wasn't.  They knew it was not on the level, but they were cynically, cynically thinking and hoping that even though everybody on the merits of this issue would know it's not a nonprofit, maybe the Trump Administration maybe wouldn't care, that the folks who ran would basically

force the line people who knew the real deal to do otherwise." And then, as of May 2018, they newfoundedly realized that potential belief wasn't going to happen anymore. Is that what you're asserting?

Or are you asserting January 2017 to May 2018 that now the defendants actually believed they may be a nonprofit with different views in a changing administration about who's a nonprofit and who's not? What is the assertion about what you think is in their minds?

MS. SINDERSON: Your Honor, I think the first story line that you enunciated makes total sense. That is a plausible and cogent theory of fraud. Up until the May 2018 -- again, we don't allege that they knew it was dead in the water at that point. We allege that the risk is significant.

I do want to make one point very clear, which is as much as I agree with Your Honor that that is a plausible and cogent theory of fraud, it is not our job on a pleadings motion to guess what's in Defendants' mind. We allege the facts. We allege the fact that they knew

the DOE had pushed back, that there was this story that makes all of this make sense, that they thought maybe the Trump Administration could make a more favorable regulatory environment.  They were going to make hay while the sun was shining.  Again, there's no problem with that.  We allege the fact, though, that they misrepresented the very nature of the transaction.

THE COURT:  They misrepresented the risk that it might be --

MS. SINDERSON:  Exactly.  They misrepresented the structure of the transaction in multiple respects, the risk of DOE approval.

THE COURT:  The structure of the transaction also relates to the risk; right?  This is also about, if your allegations are correct, they knew that this transaction was structured in such a way that it really should not be considered a nonprofit.  They didn't tell people enough facts about that publicly, so that all is a way in which they misrepresented the risk that there would be a nonprofit designation when there wouldn't.

MS. SINDERSON:  Exactly, Your Honor.

Our allegations are that investors were not fully informed, as they must be under securities law, of the risk of their investment.

Going back to Your Honor's story of the fraud here, I agree it's a cogent theory of fraud, but it's not our job here --

THE COURT:  You say that, but the weird thing about this analysis is I'm actually required by the governing law to understand both sides' theories.  What is the plaintiffs' theory?  What is the defendants' theory?  And then I'm expected to weight them, which is unusual.  It's not usually what you do at the Rule 12 stage.  Of course, if there's a factual dispute, the allegations in the complaint can be plausible as long as they're plausible, but I have to do this weighing.

In order to do this weighing, I have to actually understand what is the theory that you have about what happened and what is the theory they have, and I have to figure out how do they weigh together.  I'm trying to figure what is your theory about what happened and that you're pleading.

MS. SINDERSON:  That's helpful, Your Honor.  I want to step back and say our theory, as illustrated in the complaint, is that the defendants has facts, they knew facts, that directly contradicted their public statements, and we articulate that in full in the complaint, and I'm happy to walk through those.  Under the caselaw, that is enough to allege scienter, and it's enough to be a plausible and cogent theory of scienter.

Why the defendants did that, the question of why, I absolutely understand, Your Honor.  I can't wait to find out why.  We're going to figure out exactly.  We're going to depose Defendants and find out why, what was their motivation in doing all of this.  But one thing I want to make very clear, the Third Circuit has said motive is not required to allege scienter.  All we have to allege is knowledge or access to information that contradicts their public statements, which we have done here.

There are a number of reasons why they could have done this.  I think the one we have set out in the complaint makes absolute sense, and it is an absolutely cogent theory of the

fraud.

THE COURT:  You have to put forward a theory.  There has to be a theory about why.

I guess the big -- the last question here would be, I think the other side will assert, because this is all going to the defendants' mindset, what is their mindset, what are they doing here, your theory is that they're intentionally committing a fraud.

So the other side might say, "We have all these allegations about why there's a new administration that they took a new view about whether or not this proposed structure amounts to an actual nonprofit per the DOE regulations, and the IRS regulations, which are the same." I think the other side may say, "When they make these allegations, those allegations can suggest substantively that these defendants thought, yes, it is more likely that the DOE will, in fact, approve our nonprofit application."

If that's true, if the facts make it more likely that the defendants thought the DOE would approve the application, I think that might undercut your case or your theory; right?

Now, alternatively, maybe those facts, you're saying, no.  Substantively, they don't make it more likely that the DOE would have approved.  They just make it more likely that the defendants might -- that's the thing.  I'm trying to figure out how all these new facts about why it is they went forward with this, why they don't show good faith, basically, in the defendants' minds about whether the nonprofit was going to be a probable yes and not a probable no.  Do you know what I mean?

MS. SINDERSON:  I hear what you're saying.  I think the problem here is there is a question about why would they do this.  And I think sitting in this courtroom, everybody here is thinking, why would you commit fraud. That's probably a place we're starting from, but that's not the benefit of the doubt we should give to the individual defendants here. The question I have here is, if they thought it was more likely than not that the DOE would approve this and that there was no risk to investors, if their public statements about the likelihood of approval were correct, why misrepresent the transaction?  That's an

allegation in the complaint that's never been refuted.

THE COURT:  In that regard, do you have a thought about my question about if I'm going forward here now, taking a new look, which I will, into the allegations of the motion to dismiss, there's the three buckets of issues, the scienter, the misrepresentations, and loss causation.  In your view, should I go to scienter first?  If I do go to scienter first, would I necessarily have to assume arguendo that the material misrepresentations at issue, that it is plausible that they were a material misrepresentation?  Or should I go to material misrepresentations first and make decisions about which I think are plausibly alleged and then address the issue of scienter?  Do you have anything you want to say about that?

MS. SINDERSON:  I would say the typical analysis and what makes the most sense here is to start with falsity.  Look at those misrepresentations.  We have statements about the structure of the transaction.  We have the undisclosed facts.  We put those two side by

side, they cannot be reconciled.  We have statements about independent management at the university.  We have the allegation that 75 percent of the university's executive management, responsible for the strategic vision of the university, got their paychecks from the company.  That was not disclosed. Those are statements that can cannot be reconciled if you put them side by side.  We have the statements that Defendant Mueller told the public that they had ongoing engagement with the DOE and the problem in the delay was attributable to understaffing.  We have the undisclosed fact that they later admitted in the District of Arizona before the court that they had no ongoing discussions with the DOE. He had no basis to make the statement about understaffing.

You put those side by side, and we submit falsity is an easy call here, and I don't think that they really submit credible arguments in opposition.  They say, for one thing, one of their major arguments, all these facts are disclosed.  Your Honor, they said these facts are disclosed through two rounds of briefing,

and last time before Your Honor, I had every time, I look at their exhibits that they cite and think is this the time I'm going to find it.  I have other people look for it.

THE COURT:  You point, for example, at a number of those disputes in the briefing where they will say it's disclosed and they will cite in the footnote but they won't necessarily tell you in the parenthetical where are we looking.

MS. SINDERSON:  Because it's not there, Your Honor.  What was not disclosed was in the redacted part of the AK, and that's the material facts that we allege are not disclosed.

THE COURT:  A couple questions about the process, though.  If I were to address scienter first, as I did last time -- you say I should not do that.  I should do misrepresentations first.  If I were to do it first, if I could find for defendants, which, again, I should not do in review, would I necessarily then have to be assuming arguendo that you're correct that all the material misrepresentations were plausibly alleged, and

nevertheless assuming arguendo that's touching that issue making that determination that there isn't an as cogent theory of scienter?  Is that what I would have to do if I were going to do that?

MS. SINDERSON:  I don't think Your Honor can do that here because the theory of scienter is that the public statements contradicted information in their possession, which the defendants don't dispute.  That latter point is critical.

THE COURT:  So I think -- what's the relationship between -- let's say I were to go through each of the six types of material misstatements and I were to make a determination that they plausibly alleged that under the law.  And let's say, for example, I would determine that it's plausibly alleged for the six material statements, yes, you plausibly alleged that these defendants made materially false and misleading statements.  I think what you're saying is, you would then have to consider those facts in the context of the arguments about the two different theories about what's going on here; is that right?

MS. SINDERSON:  That is right, Your Honor, and I would make the further point that even if you started with scienter, which, again, I actually think it makes more sense to start with falsity, given the fundamental theory of scienter, which is they had the information in their possession which contradicted --

THE COURT:  Because certain allegations about false statements were not plausibly made, I really shouldn't be considering them when I'm talking about what facts do I have in the complaint to muster about one side's theory versus the other; right?  If I were to determine that there's a set of allegations about certain facts, and I were to determine that I don't think the plaintiff has plausibly alleged that these are material statements, why would I be considering those facts, then, when I'm going to the scienter analysis; right?

MS. SINDERSON:  That does make sense as a matter of proof, Your Honor, but I would say, again, the basic theory of scienter, which makes this what I would submit not a close call

on scienter under the caselaw, they have these facts, and they contradict their public statements. There's no question they had the facts.

Again, I'm typically briefing a motion to dismiss with confidential witnesses where defendants are low level and defendants are saying there's no reason to think we knew this information. Defendants don't try to make that argument here, and there wouldn't be any credible argument.

But it's not just that. This case has even further significant evidence of scienter that, frankly, in my experience you do not see in a securities fraud class action, particularly one that's been dismissed, one here -- for example, Defendants were told personally before they started making the public statements about Purdue and Kaplan, Defendant Bachus was told that's wrong, that's a misstatement, it's misleading, and here are all these allegations.

THE COURT: Told by?

MS. SINDERSON: By Karen Solinski, who I'm happy to address.

One argument, if I may, on that particular point I'd like to address. One argument Defendants make regarding the Karen Solinski arguments, which I want to clarify the record because I think we otherwise address their attacks pretty thoroughly, which they make the point that Ms. Solinski only told Bachus and not Defendant Mueller about the differences between Purdue-Kaplan. Whether or not that actually matters because both of them knew the actual differences, this is an incredibly material misstatement that they repeated to the public. I can't imagine that Bachus wouldn't tell Mueller about conversations with this incredibly important third party.

THE COURT: Is it alleged that he did?

MS. SINDERSON: It's not alleged that he did. The inference, however, Your Honor, as must be drawn in favor of the plaintiff, is that the CFO, he is told by an HLC executive who had reviewed both transactions that these are totally different. If the company is going to go out, Defendant Mueller going to go out

and say they're exactly the same, probably the CFO is going to tell him.

The argument I specifically want to address is Defendants say Bachus never made statements about this, so whether he knew it or not doesn't matter.  That's absolutely wrong, Your Honor.  Bachus did make statements on this issue.  He signed SEC forms making this and similar comparisons, and that can be found at paragraphs 297, 298, 301, and 303.  So the argument that Ms. Solinski is relaying of this or the comparison with detailed backup is immaterial is absolutely wrong.

THE COURT:  This argument that she's relaying, talking about the comparison of the proposed conversion to the Kaplan, the relevance of it, the reason why it's in the complaint, I think, is because you're asserting that by telling one of the defendants that their proposed conversion is very different than the deal -- different how?  Different in light of the enmeshed nature of GCE and GCU, the lack of independence -- that's got some bearing, I think, on the defendants' mindset going forward as to whether or not the risk is

high that the DOE is not going to approve nonprofit status. Am I right about that? Is that why you're including the allegations in the complaint?

MS. SINDERSON: While this is a relevant point, Your Honor, the key point is that he then went on to say that these transactions are substantively similar or identical. That is the key point.

THE COURT: It needs to be material, that statement. The reason why it is material is because the nature of the transactions at issue, the differences between them, are said to relate to the independence question, and the independence question is said to relate to whether or not nonprofit status is going to be obtained. Am I right about that?

MS. SINDERSON: You're right about that, Your Honor, in the sense that investors relied on that statement, that material statement. Defendants don't object that this is an immaterial statement. They haven't made that argument. That material comparison between the two, why they made it? I think they did make it to reassure investors this was

likely to be approved, but whether -- if they made it for a different reason --

THE COURT:  Ms. Solinski could tell Mr. Bachus something, and Mr. Bachus would repeat it publicly, and it could be what she had for dinner.  That's not very material.  It has to be material to the issues at play.  I'm trying to figure out why is it material.  I think you're saying it's material because it's a conversation that goes to the differences the between the deals.  He made a public statement about it.  Why does it matter?  Why is it relevant and material?  Because the difference between the deals is the independence issue and that, in turn, goes to the risk of non-approval by the DOE of nonprofit status.  Am I right?

MS. SINDERSON:  It goes to the truth or falsity of his statements about Purdue-Kaplan --

THE COURT:  The material --

I'm sorry.  We can't speak at the same time.

I'm trying to get an answer to my question.  My question is understanding the materiality of those statements.  Why are the

statements material?  Please answer that question.

MS. SINDERSON:  Your Honor, I apologize.  I thought I had agreed with you.

They are material because they go to the independence of the university.  They go to the likelihood of Department of Education approval, and, again, they are material because Defendants have never argued that they are not independently material.

THE COURT:  Let me ask you questions about that.  Ms. Solinski is having conversations with the defendant while HLC's review is pending.  A review, I think, which you say assert in some paragraphs of the complaint that is supposed to have nothing to do with the merits or the substance of the DOE's later determination about nonprofit status.  Am I right?

Your assertion is that HLC's approval process is apples and oranges.  Talking about a different issue; is that right?  If so, why is Ms. Solinski having conversations with the defendants about this independence issue that does bear on the nonprofit status?

MS. SINDERSON:  And it's a very fair question.  The reason why we make these allegations about the HLC, I want to clarify that because I completely understand Your Honor's confusion and questions earlier.  There's a lot in there about HLC now, and part of it relates -- I want to address the scope and structure of those allegations.

So you may remember that last time, Defendants made the argument that the HLC approval directly related to Defendants' expectation that the nonprofit conversion would be approved.  That was their argument, and we had to respond.  Your Honor raised questions.  Does it relate to the nonprofit conversion or not?

THE COURT:  You said it didn't because the HLC approval, you told me, was about other educational issues.  Didn't say much.  Hard to tell.

MS. SINDERSON:  Exactly, Your Honor.  So we amended the complaint to address Your Honor's concerns head on.  We explained why the HLC's consideration and the review in 2018 was unrelated to the nonprofit conversion.  These

aren't issues that are necessarily -- the standard isn't something that they have to meet in order to meet a nonprofit status.

Now Defendants, I heard my friend here and I read the read their brief. They turn on a dime and say it's not material. Last time we said it was, now we say it's not.

But in amending the complaint, and the reason why these allegations are in there, is because we were trying to address Your Honor's concerns for two reasons, Your Honor. We had spoken with Ms. Solinski, and, again, this is something that is not common in a securities fraud complaint. Usually, we're dealing with confidential witnesses who don't want to be named in a public filing for obvious reasons. They set themselves up for attack, as happened here.

So we're dealing with a person who agreed to have themselves named in the complaint, highly unusual. There are no credibility discounts you can apply to her based on her identity, and, in fact, her identity is she's executive vice president of HLC. She reviewed both Purdue-Kaplan and the first conversion

application here.  She has intimate, nonpublic details of both.  She has repeated conversations, one on one, with each of our individual defendants about the issues at heart here.  And why they had those conversations, I can't tell you exactly why.

THE COURT:  That's what I'm struggling with.  Tell me if this is right.  I think this is what you're saying.  Tell me if I'm wrong.

In mid 2018, when this application for the HLC is pending, the HLC's ultimate determination, do we approve or not, it's got nothing do with whether the proposed conversion should result in GCU being a nonprofit or not, under the rules the IRS uses or the DOE uses.  The HLC's ultimate decision has nothing to do with that.

Nevertheless, nevertheless, even though the HLC's ultimate decision has nothing to do with that, it so happens that a representative from the HLC, a high-level representative, was having conversations with Defendants about factual matters that do have something to do with the facts relating to the nonprofit status

and the DOE.  And the reason why we're adding in these allegations about what Ms. Solinski told the defendants or the defendants' interactions with Ms. Solinski is because those conversations -- even though the HLC's process doesn't have anything to do with nonprofit status, those conversations actually do have something to do with the factual matters that relate to that.  Is that what you're saying?

MS. SINDERSON:  That's what we're saying, Your Honor, and I think you'll find that when you're doing a scienter analysis here, when you have a witness who has direct interactions with the individual defendants, that's highly unusual.  When you have a named witness that's willing to say they told the individual defendants that their statements are wrong and false before they start making them, highly unusual.  I myself have never seen that.

One point I do want to make because we cite to the *Celgene* case in our opposition to the motion to dismiss to say a witness telling a named defendant that their statements are false is highly probative of scienter, which is obviously true.  If you look at the *Celgene*

case, what the *Celgene* case is talking about is scienter, but it's talking about forward-looking statements, which aren't at issue here.

Where you actually have to allege that Defendants have actual knowledge of the falsity of their statements, where you have a witness who tells them that their statements are false, that counts as actual knowledge.  That's standard.  It's so above and beyond recklessness, severe recklessness, that we're dealing with that that has to be taken into account when you consider this.

THE COURT:  I want to ask you about some other aspects of the HLC allegations.  The complaint spends a lot of time, after talking about what Ms. Solinski said or didn't say to the defendants and the defendants said to her, it spends a lot of time basically, like, trashing the ultimate HLC decision, explaining why, ultimately, the decision was made by people -- it's strange because on the one hand it says it was made by people other than Ms. Solinski, yet it also says the defendants strong-armed a number of people, including her,

into making the decision.

But, ultimately, it basically alleges that the HLC approval of the transaction was made for non-substantive reasons.  It was made because some of the higher-ups at HLC were friendly with the defendants or the defendants strong-armed them.  When I'm reading that, I'm thinking the plaintiffs want me to think of these allegations -- first, they think this HLC decision matters, and they have to tear it down.  They're making allegations about why it was non-substantive, why it was almost an abdication of the HLC's responsibility as an overseer.  But on the other hand, they're telling me the HLC decision has got nothing to do with nonprofit status.

Why is the plaintiff going to these lengths to plead all these facts about why the HLC's decision was non-substantive, was based on strong-arming, if it's immaterial?  It must matter.  It must matter.  That's why they're doing it.  So what's going on there?

MS. SINDERSON:  There are three points I want to make about this to help Your Honor understand that.

The first is, as we discussed, Defendants have previously argued that the HLC accreditation decision was highly material to their mindset in thinking that the nonprofit conversion would be addressed.  So to address that point preemptively, that while we do have clear, particularized allegations -- and I think Your Honor has accepted them, now Defendants have accepted them -- that that decision had nothing to do with nonprofit conversion, we wanted to make it clear that even if it did, there's no merit to it.

Second, even more importantly, going back to Your Honor's question about why they would proceed with a change in control transaction even without the nonprofit conversion being approved at that point, there were several reasons why they did that, and, again, I'm essentially quoting from Defendants' own words. This is not our theory of why they did this. This is why they said they did it, which is the company had already expended significant costs, that delaying it would increase its costs further, and, lastly, that delaying would put in jeopardy the approval previously granted by

the HLC.  And to help Your Honor understand why that is a material risk to them, why they would do that, there's some additional allegations added to understand how unusual that HLC decision was made.

Lastly, Your Honor, the third point is that, as my colleague pointed out at the beginning of her presentation, there were two amended complaints here.  There was the first amended complaint, in which we sought to address all of Your Honor's concerns as expressed in the R and R.  Following that, as Defendants have submitted to the Court, Defendants sent counsel a letter calling into question our investigation and making Rule 11 accusations about our dealings with Ms. Solinski.

We take our -- obviously, our ethical considerations and our investigations in these types of cases incredibly seriously.  A Rule 11 accusation is not something that we would cast aside lightly.  We went back to Ms. Solinski. The accusation from Defendants in their letter was that Ms. Solinski had nothing to do with the second application in 2018.  So we asked

Ms. Solinski and we added additional allegations to respond to that allegation that she had nothing to do with the 2018 application so that there's no basis for her -- her allegations with respect to that. We added, for example, the voicemail from Defendant Bachus asking her to personally intervene.

THE COURT: Is your assertion that she -- it's hard to tell. Is your assertion that she didn't have anything to do with the HLC decision? On the one hand, the complaint has allegations about how she wasn't going to be the person making the decisions, there were rules, it was going to be somebody different. And then there's all this interaction she has with the defendants making the application and ultimately said that she was strong-armed into approving the application, like she did have to do with it. Is the allegation that she did have something to do with it or she didn't have something to do with it?

MS. SINDERSON: So our allegation is that she had no substantive decisionmaking capacity with respect to the second conversion. She did on the first, not on the second. No

substantive decisionmaking capacity with respect to it.  She did provide procedural oversight, because this is her entire area. She's led over 50 change in control transaction reviews.  She wrote the policy that was supposed to govern this application and ultimately did not.  And ultimately, she was asked to be removed from the review.

Honestly, Your Honor, I think it's somewhat of a sideshow I would prefer not to get into with respect to the all of the voicemails and the questions and the back-and-forth.

THE COURT:  It's just there's so many allegations about it.  For example, I think you drop a footnote that's disputed in the briefs that she resigned from her job.  And the other side says, "She didn't resign.  She was fired." I think the reason you drop the footnote is you're worried about bias.  You don't want the reader to think that these allegations that you think are helpful to your case maybe are hinged by bias.  So you don't want the reader to think that she was fired by the company that she's now talking about.  They say she was fired.

They said she was let go.  You say that she left.  They say she was fired.  Was she fired?  Seems like she said she was fired.

MS. SINDERSON:  So Defendants have pointed to her publicly filed complaint.  As an extraneous document, that cannot be considered in conflict with the pleadings of the present.  That's the baseline rule we're dealing with here.  As we put forward our allegations here, they seem to be confusing constructive termination with --

THE COURT:  You said that, but the document -- again, you're right.  There's only so much I can take into account as to a separate document that's not explicitly referenced in or internal thereto of the complaint.  You also have a Rule 11 application that if you make an allegation in your complaint, you have reason to believe that it's truthful.  The thing they pointed to, when I read the sentence, it didn't seem to me like she was saying "I resigned."  It seems like she was saying "I got fired without notice, without" -- it seems pretty clear that that's what she was saying.  In your brief you talk

about how it was a legal term of art.

I don't know whether any of this is relevant. I think you're almost saying, "If I knew what their position was going to be about the immateriality of the HLC, we might not have included any of this stuff." But it's in there, and I'm trying to figure out what's going on.

Do you think she was fired, or do you think she resigned?

MS. SINDERSON: I think the witness we talked to several times said she resigned, and I think that is the allegation that we have to include in the complaint.

THE COURT: Last question about this. I want to give you a chance to talk about other things too.

It's all about what this stuff has to do with anything, and it's like, again, like I said, you made allegations that seem to be focused on tearing down the HLC's ultimate approval process. I think you said the reason why you did that is not because you think the process actually has anything to do with the nonprofit status that's really at the heart of

the complaint because they said it was.  And you wanted to show that if somehow they were right, which you don't think they were, nevertheless, the defendants would have known the process was bad and shouldn't have even mentioned.

If that was wrong, if the HLC approval process did have something to do with the mindset about the nonprofit issue, and if Ms. Solinski was assertedly telling the defendants, hey, your deal is different than these others but, ultimately, the HLC approves so they did have something to do with it, then it would seem like whatever she might have said or the HLC might have said, they were good with it at the end.  They approved, so if it had something to do with nonprofit status, it would seem like the fact of the approval would be good for the defendants, but I guess you would say Defense here asserts it's immaterial.  We assert it's immaterial, so don't worry about it; is that right?

MS. SINDERSON:  That's absolutely right, Your Honor.  It is immaterial to the position of nonprofit conversion.  The

allegations with respect to HLC that are material are Ms. Solinski's recollection and recounting of her conversations with Defendant Mueller and Defendant Bachus. Beyond that it goes directly to their answer, Your Honor.

THE COURT: Can you see how this piece is confusing to the Court? What's going on here? It's very complicated. Like, you have to kind of, like, with all these allegations, well, the plaintiff says they're not material so kind of ignore them. They're really not material except for the allegations about Solinski telling the defendants that their deal was not similar to Robbins-Kaplan. That is material because it's going to be relevant later and material to the nonprofit issue that's going to come up in May.

MS. SINDERSON: Exactly, Your Honor, and it's material that Defendant Mueller told Ms. Solinski that he got such pushback from the DOE that he didn't expect to submit an application in the future, which goes directly to their understanding of the risk.

THE COURT: Let me let you continue.

MS. SINDERSON: Let me make sure I

addressed certain key points.

Another concern that Your Honor had, and it seems like Defendants understand this, that all parties here understand this, one of the key concerns expressed in the R and R was that this was a "bet the company" transaction and that -- why would they go ahead with this, even if the nonprofit conversion wasn't --

THE COURT:  In the first page of your brief, you suggest that the Court got it wrong when it suggested that the issue of whether or not GCU was going to be approved as a nonprofit was incredibly significant, both to GCU and GCE.  I think you suggested, no, it may not have been a big deal.

I guess the question is what -- I thought it was existential to GCU's existence.  I thought it was -- and there was another quote in the prior complaint that basically said the same thing.  This decision, it was existential to the existence of GCU.  GCU is the only client and only source of revenue for GCE, but not a big deal.  What's the deal with that?

MS. SINDERSON:  Understood, Your Honor, and I went back and looked at those

allegations in the complaint, and I understand where Your Honor's -- where that viewpoint came from.  Our point and the point in the amended complaint here today:  This is a critical aspect to investors.  It was in no way a "bet the company" transaction.  Obviously, it can't be.  The company is continuing on today, as my colleague pointed out.  It's not a "bet the company" transaction for Defendants.  It's not an "incredibly high-stakes gamble for Defendants."

To be clear, it was a gamble.  It was a gamble on the part of investors who didn't know that it was an incredibly high-stakes gamble.  They didn't know the risks of their investment in the company here.  Defendants here were betting with investors' money, not with their own.

THE COURT:  Whether the DOE ultimately approved GCU as a nonprofit or not was actually not that big a deal from GCU's perspective is what you're saying?

MS. SINDERSON:  I would not say it was not that big of a deal, but it wasn't an existential crisis.  It was this would be a

significant plus factor for us if we could go forward as a nonprofit.  There's no question they wanted to be a nonprofit.

THE COURT:  I just want to -- because some of the same allegations are in the operative complaint now, so I want to get -- it's the original R and R, and it's the portion of it that is blocked out in block quotes, what I believe to be your argument.  It's the last -- it's on page 37 the original R and R.

And the last line of that of the one full bullet point on that page says, "In fact, the CAC pleads that after DOE ultimately rejected GCU's nonprofit status, this 'placed in jeopardy' GCU and GCE's 'long-term financial viability,'" citing paragraph 94 of that operative complaint.

And I also cited from paragraph 85 of that complaint for the proposition that the complaint was describing the prospect of GCU's nonprofit status being revoked as an existential risk to GCE.  I know, because I checked, that the existential risk quote is in the current complaint.  But is there aspects of these assertions that I got wrong, that I

misread?  What you you trying to say in these portions of the prior complaint, and to the extent similar allegations are in the current complaint, what are you trying to say about the stakes?

Because the stakes could matter if we're talking about theories.  These individuals in the companies are making fraudulent statements.  What are the stakes?  If the stakes are super high and they know -- and the other side is saying there's no reason to do that, the stakes kind of matter.

I think now you're saying the stakes weren't that high, and I'm asking what about these allegations that suggested they were pretty darn high?

MS. SINDERSON:  So the stakes absolutely were high, and I do think in drafting the first complaint that our approach was to put into context the stakes for investors, and that's always going to be our perspective, Your Honor.  We tried to make that clear in the second complaint, that investors -- look.  The stock price shoots up because they think --

THE COURT: You say the stakes for investors. You're making a distinction? Like, the stakes for investors were high but the stakes for GCU and GCE were not high?

MS. SINDERSON: The stakes for GCE and GCU -- and I want to distinguish when I say "stakes" because there are plus factors and risks; right?

Plus factors, this would be a tremendous advantage. If they got nonprofit conversion status for GCU, their sole client, huge. It would be a parade going through town. If they lost it, they're back where they started, except they have a change in control where they're realizing these amazing margins. They can siphon off 95 percent of the revenue while only asserting 28% of the costs. We have a financial benefit there.

THE COURT: If they lost it -- if the stakes were huge if they got it, the nonprofit status, but if they lost nonprofit status, if the DOE ultimately determined we don't agree, we're going to stick with the decision, I think you're saying the stakes were not that high. And I'm saying -- I'll go back again and look,

but I think in your prior complaint, you said the risk -- that the risk if they were to have the nonprofit status rejected, it would place in jeopardy GCU and GCE's long-term financial viability.  Did you not say that?

MS. SINDERSON:  In the first complaint, the context was this could be the consideration.  In the amended complaint, we don't make that allegation.

THE COURT:  Right because part of the presentation here is it's almost like from the plaintiff's side, we never get this kind of evidence.  We're kind of shocked we're even here.

This new complaint has to be read on its merits and the allegations, and I totally take your point that looking now, adding material to the complaint, that it tells a different story and the outcome of the motion should be different.  I guess I'm just suggesting there's a lot -- seems like there's a heck of lot of circumstances where the allegations in the original complaint haven't really changed a lot.  I'm being told different things about what the stakes were, whether they matter or

not, and that's a little concerning because the truth shouldn't be different.  It should be the same.

Were the stakes high for the individual defendants, for GCE and GCU, if the nonprofit designation was revoked?  Were they?

MS. SINDERSON:  I would say from our point of view, the first complaint, we thought it was sustainable.  We did think that, Your Honor, and we think that for the same reasons we think so today.  In the first complaint, there were -- for some of the same reasons, there were known facts that contradicted their public statements.  That's a fact from one complaint to the next.

Understanding Your Honor's concerns about the why of this all and the questions you had about the change in control versus the nonprofit conversion, we sought to clarify that to make that -- to address Your Honor's concerns.  That's why that change is.  I don't think the facts have changed because, again, this was never going to, like, bankrupt the company.  It never did.  We were always after the fact.  We always knew, as my colleague said

earlier, the parade of horribles that she constructed.  The company is still a viable entity.  The difference is the company is trading at a much lower stock price than it would have.

THE COURT:  And if fraudulent statements were made that caused it to be hurt, there should be a recourse for that.  I totally understand that argument.  I guess it's just when I picture myself looking at these in the future, I'm sitting down, and make -- I get to the point where I'm going through the scienter analysis.  And one of the things that I know the defendants are going to be telling me is they're going to say, "Judge, it doesn't make any sense that these individuals and the entity that it's alleged that, like, in May of 2018 or June of 2018 or July of 2018" -- or was it 2019 when the DOE comes back?  I forget when they come back.

In these months, the allegations, the defendants are going to say, are they knew, maybe not to a certainty, but they were -- almost certainly had to know, whether it's 80 percent, 70 percent, 90 percent, the answer

was going to be no on nonprofit status. The DOE was going to come out. They could come out in a month and tell the world that and why. And the DOE had all the information.

So the allegation, the defendants are going to say, is these people are certainly making false statements when they knew that perhaps in days or weeks or months the DOE was going to come out and tell the truth, and if it's asserted that the stakes at issue by trying to get nonprofit status or not are super high, they're going to say why would these defendants do it? Why would they -- an incredibly material transaction for them, the companies they work for. They make materially false statements, and it's going to be known they did, and it's a certainty they're going to lose, and the stakes are high. They're going to crater the companies. They're going to say that matters in your analysis. It matters what the stakes were. Because if the stakes were super high and they knew it was all going to go down, who would do that?

And I think what you're now saying is the stakes weren't that high if they lost it. I

think you said the opposite before.  Now I'm going to hear a different story in the current complaint, I guess.  Do I just accept that as, okay, the new allegations are if the DOE didn't approve them for nonprofit status, not a big deal, the company would go on to for-profit status and make tons of money?  Is that what I should think?

MS. SINDERSON:  I think you do have to accept the amended complaint on its own basis because you went to the trouble of drafting a lengthy R and R that we took very seriously and we sought to address.  We continued our investigation and added significant additional allegations.  And, Your Honor, respectfully, we believe we have met the standard for alleging scienter, the most basic standards, knowledge of facts that contradict their public statements.

Even if Your Honor was to take into account the prior allegations, which, again, I don't think you can or should, just because Defendants may have overestimated their level of success or may have gone ahead with the transaction, even knowing that they have a high

level of risk that this wasn't going to be approved, successfully alleging securities fraud cannot depend on corporate defendants acting in a perfectly rational manner.  And there are no -- Defendants haven't cited a case and I haven't found a case that says because Defendants acted illogically here, even where there was some financial motive as we allege, the marketing benefits, the financial benefits, that you cannot allege securities fraud under those circumstances.

THE COURT:  For sure.  I mean, obviously, it can certainly be the case that defendants alleged to commit fraud may have acted at least in part in an illogical or basically act that way, et cetera, but I guess necessarily because the requirement in the law is that I assess competing theories -- again, unusual in the law -- I do have to in some way assess the logic of the theories.  And the greater the extent to which one side, the plaintiff, is suggesting that individuals act in an illogical way, as they would suggest in an incredibly illogical way, and the other side were to come up with a theory based on the

facts pleaded that suggests they acted in a logical way, it would matter; right? Like, the logic of the asserted facts would matter.

MS. SINDERSON: So the logic would matter in the sense of only if you require motive, and I will tell you -- let me explain myself in that respect because to the extent that you find that Defendants are told -- corporate defendants or executives are told that their statements are false and they go ahead and say them anyway, whether or not they had some logical reason or because they thought it was going to satisfy the Easter Bunny, they could have a completely illogical purpose in doing something. Plaintiffs still allege securities fraud.

THE COURT: Sounds like from your briefing and probably now, it sounds like you're saying, "Look, Judge. If we've alleged any plausible material misstatements, we've been on the standard. Our theory is at least as cogent as theirs. The presence of misstatements, because we can show the false statements, plausibly demonstrate that, that's it. Done deal." It sounds almost like that's

what you're saying.  Don't even worry about the whole comparison of the theories and cogency. We show they made a false statement.  That's it.  We're done.

MS. SINDERSON:  I'm glad you asked that question because that's definitely not what we're saying.  Obviously, Your Honor's burden here is to weigh these two competing theories, to evaluate Defendants' countervailing theories with a non-fraudulent inference and compare the two.  Our belief, our strong belief, is that we have presented both facts that support their knowledge, actual knowledge, incredibly rare evidence here, and a story that explains why they would do this here.

On the other hand, Defendants have completely failed to offer a countervailing non-fraudulent inference that makes sense here. For example, why did they tell the investors that the DOE's approval was delayed because of a staffing issue, that they had been in constant communication with them, and that that was an issue?

THE COURT:  I agree.  As I said in

the R and R, I think those are very helpful allegations, and there can be, of course, ways in which you make up a false statement about that and still there could be a theory that -- of yours that isn't cogent or as cogent as theirs.  But yes, very helpful.

MS. SINDERSON:  Your Honor, in the R and R -- again, Defendants have never explained that.  But you, on their behalf -- not on their behalf, but in your R and R, you theorized about a possible non-fraudulent inference for the false statements, including that maybe Mueller mislead the public in a misguided attempt to buy time until the DOE saw the light.  Respectfully, Your Honor, that is quintessential securities fraud, and that's exactly what we're alleging here.  They thought that they could hide the apparent risk from investors hoping that intervening events, DOE approval, would render a disclosure unnecessary or irrelevant.  And at the end of the day, the longer they can push that off, the better.

THE COURT:  If that explanation was accurate but at odds with your theory of scienter and of the case, would that matter in

terms of the analysis that you have to do?  It almost sounds like what you're saying, again, is if there's a plausible false statement, regardless of what it has to do with our theory, even if it's in opposition to it, it's enough.  I know that's not what you're saying; right?

Just then, I think you said, "Judge, even you were right there, we should prevail.  Even if that explanation of what was going on is totally at odds with our theory of scienter, we should have prevailed."  How could that be?  How could that be?

MS. SINDERSON:  If our theory was something different --

THE COURT:  They knew that they weren't going to get nonprofit status.  They knew it was almost a certainty.  There's an alternative explanation.  They made a false statement, but they actually thought they were going to get it.  You would -- that would help you?

MS. SINDERSON:  I want to make sure I'm following Your Honor's question here.  If our theory was something different than what

Your Honor enunciated in the R and R, that they knew eventually that the DOE was going to reject it and still they barrelled head to get as much benefits as they could in the short term versus our actual theory, which is they knew the risks were far greater than Defendants had told investors and they were buying time, as Your Honor said, hoping that the Department of Education saw the light.  They had hope, I assume.  They may not have, but they knew in the meantime that they could get substantial financial benefits.

So as far as I know -- and Defendants have only pointed to the two cases in which the Court has rejected scienter on the basis of "this doesn't make sense" types of theories, the *Endologix* and the *Gillis* case.  In both of these cases, as Your Honor rightly distinguished, the theory of fraud is completely different than what we have here. What we have here is they knew substantial risks of regulatory disapproval that they did not disclose or accurately describe to investors throughout the time period.  And in those cases -- in the meantime, they realized

substantial financial benefits from that fraud.

In those cases, there was no financial benefits to be realized.  The company wasn't marketing the drugs that eventually they were hoping for FDA approval.  They told investors.  Stock price went up.  They couldn't market the drug in the meantime.  There's no benefit.  And the Courts there, rightly or wrongly, said that doesn't make sense.  It can't be securities fraud.  Those were, I will submit, in the context of very weak otherwise allegations of securities fraud.  The confidential witnesses were weak.  They didn't have information about information going to the -- so my point is, in those two cases that support a rejection of a securities complaint where plaintiffs adequately alleged falsity of statements or information known by defendants, they're completely different than what you have before you today, Your Honor.

THE COURT:  And I think I noted the differences in my R and R.  You're over your time, but I have a couple questions I want to ask.

First, let me step back.  I think what

you were doing earlier was suggesting that part of the Court's analysis in the R and R was incorrect, and it may be incorrect, so I want to make sure as I'm going forward I at least have the benefit knowing how you think I should assess the law.

This is what I thought I was doing there. Tell me if I'm wrong.  I understood your theory of scienter in the case to be that whatever happened before, at least as of May 2018 and thereafter, when the defendants were presented with substantial objections from the Department of Education by way of the interrogatories, that at that point, the defendants knew either that it was a very, very unlikely prospect that the Department of Education would approve their nonprofit status request -- it was substantially unlikely.  That's what I thought the theory was.  The Defendants' mindset is it's very, very unlikely that this is going to get approved, but we are going to make false statements to the public suggesting the opposite, suggesting the fact that the DOE hasn't approved yet has nothing to do with the merits and, ultimately, suggesting and

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

implicating that our transaction is similar to others that may be on the path to approval or been approved, et cetera.  That was the theory.

The other side had a different theory. Their theory is that Defendants actually believed that it was very likely that the DOE would approve the nonprofit status, and so I went through and I grappled with that.

At the end, though, I noted that we have these alleged misstatements.  It's pretty clearly alleged in the complaint that the defendants, or at least one of the defendants, told the public that the reason why the DOE had not yet come to a final decision was based on understaffing.  It's clearly alleged that was false and the defendants knew it was false.  So I had to grapple with that.

But I think I said it could be a reason why they made what's alleged to be a false -- I'm accepting it's a false statement.  Could be the reason that they made that false statement is because they knew they weren't going to get approved, so they made a false statement to string people along.  But I also suggested there could be other explanations.  One of the

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, Delaware 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

explanations could have been, no, they thought that they were going to get approved for nonprofit status.

Are there reasons why someone might make -- still make a false statement and lie about why the DOE hasn't come forward yet? Yeah, there could be other reasons. Like they think approval is coming, but it's slower.

But I think what you were suggesting is even if that had been the mindset, we should have still prevailed. And I think my question to you is but that scenario would have been not your theory. It would have been a scenario that's opposed to your theory. You theory is they knew they weren't going to get approved. This scenario I'm describing is they thought they were going to get approved and there's another reason why they didn't. I think you just suggested that it wouldn't matter, but I don't see how it wouldn't matter. Do I have you wrong?

MS. SINDERSON: So I think it would not -- respectfully, Your Honor, I don't think it would have mattered. I think to the extent that there is an inference of fraud, which is

what Your Honor described, misleading investors in order to push off the day of reckoning, I think that is enough to sustain the complaint even if it's something --

THE COURT:  Even if it's not pleaded in the complaint; right?  The complaint was not making those allegations that that was the mindset.  It still would go your way?

MS. SINDERSON:  What the complaint does is it alleged the false statements and it alleged Defendants' information that they knew at the time.  That is -- that's meeting the scienter standard.  The theory of tying those two together, which we have done thoroughly in the complaint, addresses Your Honor's concerns. I do think that the pleadings have to be read on their own, but I don't think -- I think for Your Honor's sake today, we're dealing with a different situation, which is that we have addressed the lack of a theory that makes sense fully and, I believe, very cogently.

Second, we've added this additional evidence, Defendants being told -- Defendants' filings in the District of Arizona that they had no such communications with the Department

of Education that could have given rise to this statement, which addresses Your Honor's other plausible non-fraudulent inference that maybe they thought it was a staffing issue.  They now admitted they never talked to the DOE, so any claims of ongoing engagement or understanding it's a staffing issue, it falls apart on its face.

And respectfully, under these circumstances, where Defendants have never tried to explain why they made those false statements, Defendants here should not be given the benefit of the doubt that their other statements that were admittedly material to investors and false, and Defendants never had the disclosure of why those are not false other than the idea they were disclosed, which is not the case.  Defendants should not get the benefit of the doubt with respect to those statements as well.

THE COURT:  The last question I'm going ask is when you say -- when you were talking about the two cases I discussed and distinguished in the briefing, I think you said something like those are the only two cases

that exist in which a Court said that a plaintiff's theory doesn't exist. I want to probe that a little bit.

My understanding of the law is that the task of the Court is to weigh competing theories. It happens all the time. And my understanding is there are plenty of cases, quite a number, out there in federal courts in which Courts do do that analysis and ultimately conclude that the plaintiff's assertions are not as cogent and compelling as the defendant's. Am I right about that?

MS. SINDERSON: You're absolutely right.

THE COURT: And secondly, in terms of the "doesn't make sense as a theory" rationale, you're saying as far as you know, the only two cases prior to this Court's decision that kind of use that kind of terminology were the two that are discussed in the briefing?

MS. SINDERSON: Those are the main examples in the cases and those are what Defendants offered here. I would submit that to the extent there is a securities fraud case in the Third Circuit where plaintiffs

adequately allege falsity of statements, where the information contradicting those public statements are in their possession, where they're told those statements are false and have all the myriad of scienter factors we have here and yet it's dismissed, I would say that's in contradiction with the Third Circuit's guidance on scienter.

THE COURT:  I have to ask it because it's about -- I think I counted about five different times during your argument where you're characterizing what's at issue here where you laughed almost.  You said something like, "I can't believe," almost like suggesting it's just shocking that we are even here in light of how strong and overwhelming the allegations in either the prior complaint or this complaint are on these issues.  Definitely that is at least the sense I'm getting from your -- the tone and tenor of some of your comments, especially kind of the --

Is that what you're trying to suggest, that in your view, the allegations -- maybe it's as to the prior complaint or the ones here.  You can have a world of close calls, but

this is, like, in the 90th, 100th percentile. That's what's coming across, and I'm not feeling it, so I want to -- ultimately, the judge who ultimately reviewed the original complaint here found it wanting. It may be wrong, but I just want to give you a chance if that's not what you mean to convey or maybe it is to be able to respond. It's something that certainly I'm thinking about when I hear your argument and I see the way it's presented.

MS. SINDERSON: So, Your Honor, I apologize if I am at all having any demeanor that would imply that I'm not taking this fully seriously because I absolutely do. I 100 percent do, and I fully respect Your Honor's decision in the R and R.

My only comment on this not being a close call is just personally -- and this is my entire career. I've been doing this for almost 20 years. I personally have never prosecuted -- I prosecuted the Wilmington Trust civil suit in this courthouse. I have never personally seen allegations where a witness has been willing to come forward, be named, talk about her personal conversations with executive

defendants and why she told them that their statements are false before they said them. I haven't seen a case where Defendants have filings in another court that directly addressed Your Honor's concerns.

And, again, your R and R absolutely gave us clear guidance, and we tried very seriously to address that, and it also gave us a chance to reopen our investigation. And respectfully, I think our second complaint is miles above in strength of the allegations of the first complaint.

I am not at all suggesting and I hope that has not come across that I thought your first decision was laughable in any way. That's absolutely not the case. I just think our second complaint is head and shoulders as to the clarity and the strength of evidence that we presented to Your Honor.

THE COURT: Fair enough. Thank you. All right. I appreciate Plaintiffs' argument. Let me give Defendants' counsel a chance to get a little under 14 minutes and give them a chance to make their rebuttal.

MS. PETERMAN: Thank you, Judge.

Your Honor, I think that you recognized some discrepancies in the original complaint and the amended complaint that is before you today, of course.

Of course, Plaintiffs had the ability to add, to supplement, their amended complaint, but they can't today say -- they can't say black and white, essentially.  They can't say what we said before was inaccurate or wrong and now we're coming up with a new story, and I think that's --

THE COURT:  Can I just press you on that.  If the allegations in some respect are different, even if in some ways they contradict what was stated in the original complaint, in terms of the analysis I have to do for a motion to dismiss, whatever other process might occur, if the analysis on this motion is looking at the operative complaint in front of me, looking at its allegations and making calls to whether or not claims have been plausibly pleaded under the law, there's no mechanism for me to go back and say, "Wait a minute.  You said something different the first time, so I'm going to hold that against you here."

MS. PETERMAN:  I agree with you, Judge, that you should be assessing the complaint that's before you.  However, in light of your R and R, because Plaintiffs have the option to object to that R and R, take it up to the district court, substantively object and say, "Respectfully, Judge Burke got it wrong."  And they elected not to do so.

THE COURT:  They're going to get the ability to amend anyway.  Why spend the time and resources to object?  Obviously, they believe it was wrong.  They were pressing for approval of their complaint as to the original motion to dismiss.  I don't see why the fact they didn't object -- it makes sense in some ways, more streamlined for them to say, "Let's file an amended complaint and let's add to our allegations and convince the Judge there's plenty here."

MS. PETERMAN:  Certainly, I think it's more streamlined, but they're still bound by your R and R and the law of the case.  It has been approved, and Defendants' motion was granted by the district court with leave to amend, Your Honor.

Judge, Plaintiffs continue to pivot for new theories of liability, including up through today.  Plaintiffs concede they don't allege Defendants knew the request for information indicated that DOE was going to deny, only that it elevated the risk of that denial.  And they don't allege that Defendants said anything specific about the risk of denial.  They don't allege, for instance, that Defendants said, "We think this is a shoo-in.  DOE is going to approve."  And I can guarantee you if those statements had been made, you absolutely would have seen them in the complaint.

THE COURT:  What about just implicitly the assertion that if it's a false statement that -- what's asserted is that they said the review was taking longer because of staffing issues, when, in fact, they knew the DOE had real concerns and the DOE was likely not to approve.  They didn't say X, but that's the express basis of the intent of what they did.  Why can't I consider that?

MS. PETERMAN:  I would posit, Your Honor, that they have not pleaded particularized facts to show the falsity of the

statement that it was taking longer than usual, in fact, a year and a half, because the DOE was understaffed. They plead no particularized facts, aside from the receipt of a request for information. I would hold, Your Honor, and the caselaw holds that routine requests for information do not need to be disclosed to the market, and, certainly, they have not pled that it gave rise to submission scienter.

THE COURT: We talked about this last time. You keep saying it's a routine request for information. They say 25 different substantive points that suggest real concern. How do I know one way or the other whether these interrogatories were routine or not? I can look at them and see on their face that they obviously were showing questioning. And I mean, where's the allegation that these are routine?

MS. PETERMAN: Certainly, Judge, even accepting their characterization of the request for information, they have not pled particularized facts to show that there was any falsity to the statement that there was understaffing. In other words, even if these

were extraordinary requests for information, which, again, we dispute, that does not demonstrate that it was false for Defendant Mueller to say things are taking a long time because there's understaffing.  The two are not equivalent, in other words.

THE COURT:  By the way, was there understaffing?

MS. PETERMAN:  It's not alleged, but certainly we looked into sort of the discussions that were happening in the marketplace, the articles that were coming out at that time, and all of those referenced understaffing, yes, Your Honor.

Once again, they're pivoting and reverting to this recklessness theory, but recklessness still requires a showing that there were facts that contradicted Defendants' public statements, and Plaintiffs have not pointed to any such facts.  Indeed, all of Defendants' alleged knowledge is based on the Solinski allegations.  She doesn't work at the DOE.  She can't speak to what the DOE process would be or whether they would approve or not.

THE COURT:  Is she not someone,

though, this is generally knowledgeable about issues that were going to be at play with the DOE's nonprofit review, even if those legal issues are not necessarily the ones that would motivate the HLC's ultimate decision?

MS. PETERMAN:  For purposes of the motion to dismiss, we're not disputing her credentials with respect to the HLC, but again, it's a separate issue with respect to the DOE, which we previously discussed.

THE COURT:  I mean, put differently, let's say I look at the facts and say, "Okay. The plaintiff alleges that HLC's approval process does not have anything to do substantively with the DOE's process for determining nonprofit status.  They allege it's different."

The defendant doesn't disagree with that. In fact, the defendant tells me the HLC's approval process is immaterial to the issues I have to decide.  You say it twice in the briefs, and so I'm going to credit that.

Nevertheless, it could be alleged Ms. Solinski told the defendants on X date, "I want to tell you I'm very experienced with

these transactions, and I reviewed the proposed structure of this conversion, and I'm telling you that from an independence perspective there's no way in the world that you are going to be approved for nonprofit status." Obviously, that's not the exact allegations in the complaint.  But someone in her shoes could say that.  If they said something that amounted to that, why couldn't the plaintiffs utilize that allegation as a way to bolster what was in the defendants' mind in the relevant time?

MS. PETERMAN:  Hypothetically, if they had alleged that, then they could argue that.  Of course, as you pointed out, they have not alleged that.

THE COURT:  You don't think the substance of what's alleged as to Ms. Solinski's conversations with individual defendants rise to that?

MS. PETERMAN:  Absolutely not, Your Honor.  I do want to address that a little bit further.  I think Your Honor was getting to this issue of her credibility and the disparate statements that she made in a sworn statement to the federal court in her complaint against

the HLC and the allegations that are in the current complaint.  In addition to that, you know --

THE COURT:  Can I just stop you there and ask.  Let's say in the current complaint, it said, like it does, Ms. Solinski resigned.  In other words, it's not like she was fired.  It's not like she has a real ax to grind against the HLC which might taint your view about what she's about to say.  She resigned.  And then you show me this other complaint filed in federal court that I, if I read the words on that page, I just as a lawyer think what she was saying there is "I was fired," without notice actually.

And I think that says one thing.  The complaint says something diametrically opposed to it.  Those two things are in conflict.  How could I possibly credit the allegation in the document that you put forward that is not in the complaint, referenced in the complaint, integral to the complaint?  How can I credit it and say -- and disregard the competing allegation in the claim?  How can I do that?

MS. PETERMAN:  Certainly.  Well,

first, to kind of go back to *Tellabs* and -- and what you are allowed to and, in fact, under *Tellabs* must consider are documents integral to the complaint, as you set forth, and documents of which you can take public notice -- I'm sorry -- judicial notice of public documents, which you can here.

Again, you don't have to decide yes, she was terminated or yes, she resigned. What these two documents show is that she's not credible and most critically, her allegations are not credible.

THE COURT: It would only show that -- it would only show she's not credible if I could take judicial notice of the truth of the fact that is asserted in the paragraph of the complaint, the truth of the fact that she, in fact, was fired. And I'm almost certain that the state of the law on 12(b)(6) and judicial notice would not allow me to do that. Are you saying I actually can do that?

MS. PETERMAN: No, Judge. I agree with you. What I'm saying is you don't have to decide the truth of the fact. You have to look at the complaint and say, "She made that

statement, and she swore to it.  Whether true or not, she made it.  And now, she's making a completely opposite statement in a complaint filed before my court."  You don't have to decide whether she resigned or whether she was terminated, but the documents show she's not a credible witness.

THE COURT:  But I should draw a negative inference from the fact she made that statement.  You want me to see it, take notice of it, and you want me to draw an inference that helps me and hurts them; right?

MS. PETERMAN:  I want you to see it and take notice that it was made, that the statement was made in a sworn complaint, and I think you're entitled to do so.

THE COURT:  Let me let you continue.

MS. PETERMAN:  In addition to that sworn complaint, her statements are, additionally, not credible based on the letter that is referenced in the complaint in paragraph 90.  It's distinctly referenced, her recusal letter to the HLC on February 19th, 2018, where she says, "I'm writing to memorialize our conversation on Thursday,

August 3, 2017.  In that conversation, I explained that I would need to recuse myself from any aspect of any forthcoming transaction relating to Grand Canyon University."

She later said, "I asked all parties not to copy me on any further internal or external correspondence related to this matter."

And this is exactly the letter that we sent to Plaintiffs' counsel and that generated the second complaint.  All told, Your Honor --

THE COURT:  Can I just ask -- I don't know where I read this, but we've been talking about, like, the allegations in the complaint about Ms. Solinski, a lot of allegations I think meant to convey that she was not going to be involved in the decisionmaking process about the HLC's approval because she previously participated in the prior process, and also some allegations about how she's interacting with the defendants, responding to their calls relating to the substance of that process, relating to why are things taking so long.  Am I correct that one of the issues in the litigation that she has related to the HLC had to do with whether or not she was properly

walled off from the decisionmaking process here?

MS. PETERMAN:  Well, in her complaint against HLC, she says that she was terminated for sexual harassment but that the reason that HLC offered was due to loss of confidentiality with respect to a single university, and we believe that that has to do with Grand Canyon University.

All of that aside, it really -- the main point here is that she was making contemporaneous statements in her letter, which was referenced in the complaint, in her complaint against the HLC, which is a publicly available document, which exists and you can take notice, that directly contradict her current statements.  And if these are the only statements that Plaintiff can offer showing that Defendants had knowledge of facts that contradicted what they're saying to the market --

THE COURT:  That contradict statements that's about how -- I know there are some allegations in the complaint -- again, like, I think asserted to be now totally

irrelevant, maybe by both sides, but allegations about how HLC's process here, it was so truncated and it was so unusual, it was basically a sham process, is what's alleged. And I think you push back in the briefs and say Ms. Solinski is explaining she's the one who told them to use the short process. Ms. Solinski is the person who's asserted to be the truth-teller who's telling the defendants what's what with regard to to nonprofit status.

But again, even if she has some letter that you've attached to your declaration that maybe could be said to contradict the facts alleged here, if it's even relevant, how could I credit it?  I couldn't credit the substance of the facts, the truth of them; right?

MS. PETERMAN:  Once again, Your Honor, you can credit the existence of her statements in 2018 in a letter that is referenced in the complaint.  This is not something that you have to go outside of the complaint to look for.  They talk about this at some length in paragraph 90.  You can credit the fact that she was saying, at that time, one thing, and now she's taking her instructions

and weaponizing them against the defendants in the current complaint.

Judge, I would put forward that you can take those facts into account in assessing her credibility, particularly because, again, these are the only facts that Plaintiffs are proffering as demonstrating that Defendants had any knowledge that Defendants' statements were false and misleading.  So she is taking on more significant weight than usual

THE COURT:  They might dispute that.

You're at your time.  Is there one last point you wanted to make?

MS. PETERMAN:  Yes, Judge.  Just quickly on the question that you have regarding whether this is exigent or not, regardless of the fact that the university is still performing well and that GCE is still performing well and that there were no, again, regulatory or financial issues that needed to be addressed or that Defendants were concerned about in effectuating this transaction, they were still, under Plaintiffs' theory, risking allegations of fraud, which have now been made, SEC investigations, restated financials, et

cetera.  And Plaintiffs still cannot answer why these Defendants would risk all of those things for no reason, essentially.

THE COURT:  To the extent the other side said, at least in the prior complaint, that the DOE's decision, if it were to deny nonprofit status, could be incredibly consequential for GCU and GCE, do you agree with that or disagree with that?

MS. PETERMAN:  I'm not going to deny that both the university and GCE hoped for and expected nonprofit status.  That was one of their goals in this transaction, certainly, and they've now sued the DOE related to its determination.

Obviously, they are more than capable of continuing to operate.  Enrollments are up at the university.  They have not been alleged to have violated any of the rules that govern for-profit universities, so I agree with Ms. Sinderson's current statement that it was not an exigent transaction in that the university would fail if they didn't get it, but it was an important consideration and something they were hopeful for, Judge.

THE COURT: To the extent that the plaintiffs now assert that were the decision of the DOE to have been not to approve nonprofit status, that would have been, you know, not insignificant but not existential to GCU's existence, nothing like that. This would have been, not great, but fine, we'll move on, that kind of thing. You think that's kind of right, that's what the stakes were; is that right?

MS. PETERMAN: I put it a little bit differently. I would say that clearly the university has continued to perform this entire time. Never has it received in the relevant time period nonprofit designation, so it's not that it's incapable of performing under for-profit designation. And, again, meeting all the rules that apply. But I do think it's an important consideration.

Recall, Judge, that the university started as a nonprofit institution and only became for-profit in 2008 when it was on the verge of bankruptcy, so returning to its nonprofit roots has always been one of the primary goals of this transaction.

THE COURT: Okay. All right. Thank

you.

MS. PETERMAN:  Thank you for your time, Your Honor.

THE COURT:  Ms. Peterman, Ms. Sinderson, thank you for your arguments.

All right.  Again, I thank counsel for their arguments today.

Just to try to give you a sense as to where we stand, we're going to begin to work on this right away.  I'll take the matter under advisement, obviously.

The issues are really serious.  It's a very substantial complaint, hundreds and hundreds of paragraphs.  The parties have raised quite a number of issues and subissues with respect to scienter, to misrepresentation issues with respect to loss caution.  It will take some time to get through those and provide a decision that's thorough, but we're going to work on that, and I hope to get it to you as soon as possible.

If it's at all helpful, I think I would sum up just my sense of today's argument and where it stands in that it does seem to me that the current operative second amended complaint

is, obviously, more robust than the first, in terms of having included many additional allegations that may well be relevant to my decision here.  It may well be that the decision is different than the decision on the prior complaint as a result, but, again, I'll have to go through all the allegations and all the issues we've discussed today thoroughly in order to come to that conclusion.

I will say there are a number of issues we discussed here today that are kind of concerning.  I don't know if they'll ultimately make a difference when it comes to the decision on the motion to dismiss, but today we've talked about how there's a pretty substantial portion of the current second amended complaint and its allegations, particularly as it relates to that HLC, that are maybe immaterial, some that maybe are still relevant, but much of which relates to an issue that isn't asserted to be relevant in my decisionmaking process, and that is what the HLC's ultimate approval process has to do with the core issues that are at play in the motion to dismiss.

We talked about, certainly, a couple of

instances, at least one with regard to the significance of the DOE's ultimate rejection of nonprofit status where I think what's being asserted to me now is different. Again, I will look hard at the prior complaint and look hard at the current complaint, but unless I'm getting something wrong, there's new allegations. I think the only thing I can do is assess the new complaint, but I think the assertions have changed kind of significantly, and I don't know that I should be or will be taking that into account on my motion to dismiss, but if true, that's concerning.

We talked about that footnote about Ms. Solinski. Ms. Solinski is someone who I think is a really important part of this new complaint. Again, albeit some number of the allegations about her are now said to be immaterial, but it's kind of important. Again, I don't know that I'll be able to consider it or should consider it when I make a decision on the motion to dismiss, but the assertion about the circumstances in which she left her employer, it's a little concerning that the substance of the footnote in the complaint and

the documents I've seen otherwise -- again, may not be relevant to the motion to dismiss.

And there are other ways in which, from what I have read so far, the substance of this second amended consolidated complaint, in terms of what it alleges, in terms of what it alleges about the theories at issue, are just additional and more substantive, but they're somewhat different than what was asserted before, some of which I think, rightly, I think is probably responsive to the Court's request for more information.  Some of it just different.  It's a little concerning.  But it's also a different complaint.  Again, much more substantive complaint in a lot of respects, and I'll have to go through and make a determination of whether or not it meets the bar of Rule 12(b)(6).

To the extent that's helpful just to give you a sense of where I'm coming from going out of this hearing, the process I'm going to take, the timeframe in which I hope to get your decision, I just wanted to touch base.

With all that said, is there anything further from the plaintiff's side that I need

to take up before we end our argument today, Ms. Sinderson?

MS. SINDERSON:  No, Your Honor, thank you.

THE COURT:  Thank you.

And anything from the Defendants' side, Ms. Peterman?

MS. PETERMAN:  No, Judge.  Thank you.

THE COURT:  For out of town folks, we wish you safe travel.  For everyone else, we wish you continued health and safety, and the Court will now stand in recess.  Thank you.

**C E R T I F I C A T E**

STATE OF DELAWARE          )
                          ) ss:
COUNTY OF NEW CASTLE      )

I, Deanna L. Warner, a Certified Shorthand Reporter, do hereby certify that as such Certified Shorthand Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings in Case Number 20-639-MN-CJB, *IN RE: GRAND CANYON EDUCATION, INC., SECURITIES LITIGATION* heard on October 25, 2022.

I further certify that a transcript of my shorthand notes was typed and that the foregoing transcript, consisting of 134 typewritten pages, is a true copy of said **MOTION TO DISMISS**.

**SIGNED**, **OFFICIALLY SEALED**, and **FILED** with the Clerk of the District Court, NEW CASTLE County, Delaware, this 26th day of October, 2022.

_____
Deanna L. Warner, CSR, #1687
Speedbudget Enterprises, LLC

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna, DE 19977
Phone: (302) 893-1158  E-mail: deanna@speedbudget.biz

**#**

**#1687** [1] - 134:22

**'**

**'long** [1] - 89:15
**'long-term** [1] - 89:15
**'placed** [1] - 89:14

**1**

**1** [1] - 33:8
**100** [1] - 111:15
**100th** [1] - 111:1
**11** [3] - 80:15, 80:20, 83:17
**12** [1] - 58:15
**12(b)(6** [1] - 121:19
**12(b)(6)** [1] - 132:18
**134** [1] - 134:14
**14** [1] - 112:23
**15** [3] - 3:16, 43:19, 45:5
**17** [1] - 44:3
**19th** [1] - 122:23

**2**

**2** [1] - 6:21
**20** [1] - 111:20
**20-639-MN-CJB** [3] - 1:4, 2:6, 134:9
**2008** [1] - 128:21
**2014** [1] - 16:10
**2016** [2] - 54:4, 54:7
**2017** [7] - 36:11, 43:15, 52:22, 54:3, 55:8, 56:6, 123:1
**2018** [39] - 6:3, 10:13, 14:6, 17:23, 19:3, 20:3, 25:17, 27:20, 29:11, 29:14, 29:17, 29:18, 30:3, 33:9, 34:18, 38:9, 42:21, 47:5, 47:20, 47:24, 48:13, 53:5, 53:10, 53:14, 53:21, 56:2, 56:7, 56:16, 73:24, 75:11, 80:25, 81:3, 94:17, 94:18, 104:10, 122:24, 125:19
**2019** [2] - 31:4, 94:18
**2022** [3] - 1:10, 134:11, 134:20
**25** [2] - 116:12, 134:11

**25th** [1] - 1:10
**26th** [1] - 134:19
**28%** [1] - 91:17
**297** [1] - 69:10
**298** [1] - 69:10
**2A** [1] - 1:10

**3**

**3** [1] - 123:1
**301** [1] - 69:10
**303** [1] - 69:10
**37** [1] - 89:10

**5**

**50** [1] - 82:4

**7**

**7,500** [1] - 26:22
**70** [1] - 94:25
**75** [1] - 63:4

**8**

**80** [1] - 94:25
**85** [1] - 89:18

**9**

**90** [4] - 6:21, 94:25, 122:22, 125:23
**90th** [1] - 111:1
**94** [1] - 89:16
**95** [1] - 91:16

**A**

**abdication** [1] - 78:13
**ability** [2] - 113:5, 114:10
**able** [2] - 111:8, 131:20
**absolute** [2] - 51:2, 59:24
**absolutely** [21] - 8:16, 20:16, 20:18, 21:17, 25:5, 30:10, 35:14, 39:25, 41:8, 59:12, 59:25, 69:6, 69:13, 85:23, 90:18, 109:13, 111:14, 112:6, 112:16, 115:12, 119:20
**abstract** [1] - 16:23

**accept** [2] - 96:3, 96:10
**accepted** [5] - 48:2, 51:11, 55:19, 79:8, 79:9
**accepting** [3] - 14:20, 105:20, 116:21
**access** [1] - 59:20
**account** [5] - 77:13, 83:14, 96:21, 126:4, 131:12
**accounting** [1] - 7:15
**accreditation** [4] - 5:25, 32:8, 41:4, 79:3
**accredited** [1] - 40:20
**accreditor** [2] - 6:11, 38:1
**accrued** [1] - 47:2
**accurate** [1] - 100:24
**accurately** [1] - 102:23
**accusation** [2] - 80:21, 80:23
**accusations** [1] - 80:16
**act** [2] - 97:16, 97:22
**acted** [3] - 97:7, 97:15, 98:1
**acting** [1] - 97:4
**action** [2] - 2:6, 67:15
**actual** [7] - 35:16, 60:14, 68:11, 77:6, 77:9, 99:13, 102:5
**add** [3] - 21:10, 113:6, 114:17
**added** [5] - 80:4, 81:1, 81:5, 96:14, 107:22
**adding** [2] - 76:1, 92:17
**addition** [2] - 120:2, 122:18
**additional** [9] - 19:5, 27:5, 38:19, 80:3, 81:1, 96:15, 107:22, 130:2, 132:8
**additionally** [2] - 6:22, 122:20
**address** [27] - 7:1, 8:2, 12:15, 12:20, 14:16, 43:6, 45:18, 45:19, 45:21, 46:1, 46:3, 54:2, 62:17, 64:17, 67:25, 68:2, 68:5, 69:4, 73:7, 73:22, 74:10, 79:5, 80:11, 93:20, 96:13, 112:8, 119:21
**addressed** [8] - 12:1, 12:6, 45:23, 79:5,

87:1, 107:20, 112:5, 126:21
**addresses** [2] - 107:15, 108:2
**addressing** [2] - 13:16, 45:17
**adequately** [2] - 103:17, 110:1
**Administration** [5] - 9:22, 10:16, 23:16, 24:11, 55:15
**administration** [17] - 8:15, 9:18, 16:3, 16:10, 23:20, 24:10, 24:20, 49:8, 52:13, 52:16, 53:3, 53:22, 54:25, 55:24, 56:9, 57:3, 60:12
**admitted** [2] - 63:14, 108:5
**admittedly** [1] - 108:14
**adopted** [1] - 5:18
**advantage** [1] - 91:10
**advised** [2] - 54:11
**advisement** [1] - 129:11
**afforded** [1] - 45:18
**afternoon** [2] - 45:8, 45:11
**agency** [5] - 9:23, 16:13, 16:15, 29:12, 38:16
**ago** [1] - 53:17
**agree** [11] - 13:1, 14:10, 40:4, 56:21, 58:6, 91:22, 99:25, 114:1, 121:22, 127:8, 127:20
**agreed** [2] - 72:4, 74:19
**agreement** [2] - 21:14, 42:15
**agreements** [1] - 42:3
**ahead** [5] - 3:24, 17:17, 87:7, 96:24, 98:11
**AK** [1] - 64:13
**albeit** [1] - 131:17
**alerting** [1] - 6:5
**allegation** [22] - 9:24, 16:14, 22:9, 33:24, 34:8, 48:12, 48:19, 51:16, 62:1, 63:3, 81:2, 81:19, 81:22, 83:18, 84:13, 92:9, 95:5, 116:18, 119:10, 120:19, 120:24
**allegations** [121] -

5:25, 8:6, 8:12, 8:13, 9:16, 11:2, 11:14, 11:15, 11:18, 12:1, 12:8, 12:10, 12:13, 12:17, 13:1, 13:15, 13:19, 13:23, 14:3, 14:9, 15:11, 15:17, 16:2, 16:4, 17:16, 19:17, 19:25, 21:5, 21:22, 21:24, 22:5, 24:21, 25:18, 32:2, 32:3, 32:8, 32:15, 32:17, 32:24, 34:15, 34:25, 35:15, 35:16, 37:19, 42:19, 43:10, 46:16, 46:21, 51:1, 51:10, 52:3, 52:11, 53:6, 53:12, 53:21, 57:17, 58:1, 58:16, 60:11, 60:17, 62:6, 66:10, 66:16, 67:22, 70:3, 73:3, 73:8, 74:9, 76:2, 77:15, 78:9, 78:11, 79:7, 80:3, 81:2, 81:5, 81:12, 82:15, 82:21, 83:9, 84:20, 86:1, 86:10, 86:12, 88:1, 89:5, 90:3, 90:15, 92:16, 92:22, 94:21, 96:4, 96:15, 96:21, 100:2, 103:11, 107:7, 110:17, 110:23, 111:23, 112:11, 113:13, 113:20, 114:18, 117:22, 119:6, 120:1, 121:11, 123:13, 123:14, 123:19, 124:24, 125:2, 126:24, 130:3, 130:7, 130:17, 131:8, 131:18
**allege** [37] - 7:13, 7:16, 8:23, 18:16, 18:23, 25:23, 28:24, 29:2, 30:22, 36:15, 36:18, 36:19, 41:3, 41:25, 47:2, 47:10, 47:13, 49:18, 53:2, 56:17, 56:18, 56:24, 56:25, 57:7, 59:8, 59:18, 59:19, 64:14, 77:5, 97:8, 97:10, 98:15, 110:1, 115:3, 115:7, 115:9, 118:16
**alleged** [55] - 5:17, 7:18, 7:21, 10:10, 10:22, 11:13, 11:17, 12:7, 12:16, 13:17,

18:22, 19:1, 24:24, 25:25, 27:1, 27:14, 31:22, 33:6, 35:12, 35:24, 38:17, 39:19, 41:19, 41:22, 44:12, 44:24, 48:1, 50:22, 62:17, 64:25, 65:16, 65:18, 65:20, 66:18, 68:17, 68:19, 94:17, 97:14, 98:19, 103:17, 105:10, 105:11, 105:15, 105:19, 107:10, 107:11, 117:9, 117:21, 118:23, 119:13, 119:15, 119:17, 125:4, 125:14, 127:18

**allegedly** [5] - 6:1, 18:5, 26:18, 32:10, 35:8

**alleges** [10] - 9:18, 10:7, 10:13, 36:11, 52:15, 52:21, 78:2, 118:13, 132:6

**alleging** [11] - 5:5, 6:13, 6:17, 20:21, 23:5, 37:1, 37:17, 49:22, 96:17, 97:2, 100:17

**alleviate** [1] - 26:25
**allocated** [1] - 3:13
**allow** [1] - 121:20
**allowed** [2] - 5:19, 121:2

**almost** [15] - 7:4, 19:9, 32:9, 55:11, 78:12, 84:3, 92:11, 94:24, 98:25, 101:2, 101:18, 110:13, 110:14, 111:19, 121:18

**alone** [1] - 28:19
**Alston** [1] - 3:8
**ALSTON** [1] - 1:23
**altered** [1] - 16:24
**alternative** [3] - 13:25, 14:10, 101:19
**alternatively** [2] - 12:14, 61:1
**amazing** [1] - 91:15
**amend** [3] - 10:6, 114:10, 114:25
**amended** [20] - 5:20, 5:24, 6:25, 8:6, 9:14, 10:12, 32:6, 54:2, 73:22, 80:9, 80:10, 88:3, 92:8, 96:10, 113:3, 113:6, 114:17, 129:25,

130:16, 132:5
**amending** [1] - 74:8
**ammunition** [1] - 38:20
**amount** [1] - 37:5
**amounted** [2] - 16:11, 119:8
**amounts** [1] - 60:13
**analysis** [13] - 15:8, 15:9, 58:9, 62:21, 66:21, 76:12, 94:13, 95:20, 101:1, 104:2, 109:9, 113:16, 113:18
**AND** [1] - 1:2
**announced** [1] - 7:5
**answer** [6] - 36:9, 71:23, 72:1, 86:5, 94:25, 127:1
**anyway** [2] - 98:11, 114:10
**anyways** [1] - 18:1
**apart** [1] - 108:7
**apologize** [2] - 72:4, 111:12
**apparent** [1] - 100:18
**APPEARANCES** [1] - 1:12
**apples** [3] - 34:18, 34:23, 72:21
**applicable** [3] - 10:5, 10:8, 21:8
**application** [24] - 17:2, 21:11, 29:19, 29:24, 37:9, 39:16, 46:7, 46:8, 46:9, 46:25, 47:1, 47:7, 49:6, 60:21, 60:24, 75:1, 75:11, 80:25, 81:3, 81:16, 81:18, 82:6, 83:17, 86:22
**applications** [2] - 49:10, 49:15
**apply** [2] - 74:22, 128:17
**appointed** [2] - 9:20, 53:3
**appointees** [1] - 9:25
**appreciate** [2] - 53:25, 112:21
**approach** [1] - 90:19
**approaching** [1] - 11:24
**appropriate** [1] - 54:25
**approval** [44] - 5:6, 5:7, 6:1, 19:8, 29:1, 29:3, 29:11, 29:21, 30:7, 30:15, 30:19, 31:7, 31:9, 36:14,

36:22, 40:7, 41:4, 44:14, 44:20, 50:2, 51:2, 52:20, 57:14, 61:24, 71:15, 72:7, 72:20, 73:11, 73:18, 78:3, 79:25, 84:22, 85:7, 85:18, 99:21, 100:20, 103:5, 105:2, 106:8, 114:13, 118:13, 118:20, 123:17, 130:22
**approvals** [1] - 46:18
**approve** [21] - 10:2, 27:20, 30:17, 38:14, 40:9, 42:22, 48:16, 48:24, 52:25, 60:20, 60:24, 61:22, 70:1, 75:13, 96:5, 104:16, 105:7, 115:11, 115:20, 117:24, 128:3
**approved** [31] - 23:18, 23:23, 29:24, 30:2, 30:12, 31:2, 34:23, 37:24, 38:17, 38:21, 41:14, 44:3, 49:17, 50:1, 61:4, 71:1, 73:13, 79:17, 85:16, 87:12, 88:20, 97:2, 104:21, 104:24, 105:3, 105:23, 106:2, 106:15, 106:17, 114:23, 119:5
**approves** [3] - 29:19, 39:16, 85:12
**approving** [4] - 42:21, 43:12, 43:18, 81:18
**area** [2] - 55:9, 82:3
**arena** [1] - 20:24
**argue** [1] - 119:13
**argued** [2] - 72:9, 79:2
**arguendo** [4] - 12:9, 62:12, 64:23, 65:1
**argument** [21] - 2:7, 3:10, 3:16, 13:20, 67:10, 67:11, 68:1, 68:3, 69:3, 69:11, 69:14, 70:23, 73:10, 73:13, 89:9, 94:9, 110:11, 111:10, 112:21, 129:23, 133:1
**arguments** [11] - 3:14, 12:6, 12:15, 39:14, 45:22, 63:21, 63:23, 65:24, 68:4, 129:5, 129:7
**Arizona** [2] - 63:15,

107:24
**armed** [3] - 77:25, 78:7, 81:17
**arming** [1] - 78:20
**art** [1] - 84:1
**articles** [1] - 117:12
**articulate** [1] - 59:6
**aside** [3] - 80:22, 116:4, 124:10
**aspect** [6] - 29:17, 46:14, 46:21, 47:11, 88:5, 123:3
**aspects** [3] - 38:2, 77:15, 89:24
**assassinations** [2] - 32:19, 37:21
**assert** [9] - 15:10, 18:7, 22:15, 29:22, 30:14, 60:5, 72:15, 85:21, 128:2
**asserted** [19] - 13:21, 19:7, 24:19, 27:16, 33:23, 33:25, 37:7, 38:7, 38:9, 39:13, 95:10, 98:3, 115:16, 121:16, 124:25, 125:8, 130:20, 131:4, 132:9
**assertedly** [2] - 28:4, 85:10
**asserting** [6] - 30:2, 41:10, 56:5, 56:6, 69:18, 91:17
**assertion** [14] - 16:8, 19:17, 20:1, 23:25, 24:2, 27:11, 33:22, 34:17, 56:11, 72:20, 81:8, 81:9, 115:15, 131:22
**assertions** [8] - 14:7, 23:14, 31:20, 33:17, 39:22, 89:25, 109:10, 131:10
**asserts** [1] - 85:20
**assess** [6] - 13:15, 41:5, 97:18, 97:20, 104:6, 131:9
**assessing** [1] - 114:2, 126:4
**assets** [1] - 26:23
**associated** [1] - 47:15
**association** [1] - 2:17
**assume** [2] - 62:11, 102:10
**assumed** [1] - 14:8
**assuming** [4] - 12:9, 13:20, 64:23, 65:1
**attached** [3] - 6:22, 43:12, 125:12
**attack** [1] - 74:17

**attacks** [1] - 68:6
**attempt** [4] - 9:13, 17:19, 18:3, 100:14
**attempted** [1] - 32:18
**attempting** [2] - 15:18, 23:8
**attempts** [1] - 26:5
**attributable** [1] - 63:13
**August** [1] - 123:1
**avail** [1] - 23:9
**available** [4] - 6:11, 6:14, 23:3, 124:15
**awaited** [1] - 18:8
**aware** [1] - 10:23
**ax** [1] - 120:8

## B

**Bachus** [13] - 3:5, 36:16, 42:1, 52:6, 67:20, 68:8, 68:14, 69:4, 69:7, 71:4, 81:7, 86:4
**BACINE** [1] - 1:16
**Bacine** [1] - 2:22
**back-and-forth** [5] - 13:17, 37:3, 37:11, 39:20, 82:13
**backup** [1] - 69:12
**bad** [1] - 85:5
**bankrupt** [1] - 93:23
**bankruptcy** [1] - 128:22
**bar** [1] - 132:18
**Barrack** [1] - 2:22
**BARRACK** [1] - 1:16
**barrelled** [1] - 102:3
**base** [1] - 132:23
**based** [14] - 4:11, 23:2, 25:18, 32:9, 47:24, 51:9, 54:19, 55:9, 74:22, 78:19, 97:25, 105:14, 117:21, 122:20
**baseline** [1] - 83:8
**basic** [4] - 11:7, 17:9, 66:24, 96:17
**basis** [6] - 8:21, 63:17, 81:4, 96:11, 102:15, 115:21
**bear** [1] - 72:25
**bearing** [1] - 69:24
**became** [1] - 128:21
**begin** [4] - 2:12, 3:1, 3:24, 129:9
**beginning** [2] - 48:20, 80:8
**behalf** [5] - 3:4, 3:10,

45:10, 100:9, 100:10
**belief** [3] - 56:3, 99:11, 99:12
**benefit** [7] - 47:3, 61:18, 91:18, 103:7, 104:5, 108:13, 108:19
**benefits** [16] - 18:8, 18:22, 20:2, 20:7, 21:23, 22:2, 22:16, 25:25, 26:1, 28:2, 97:9, 102:4, 102:12, 103:1, 103:3
**Berger** [1] - 2:15
**BERGER** [1] - 1:13
**Bernstein** [1] - 2:15
**BERNSTEIN** [1] - 1:13
**Berstein** [1] - 45:9
**bet** [3] - 87:6, 88:5, 88:8
**Betsy** [1] - 54:13
**better** [1] - 100:22
**betting** [1] - 88:17
**between** [15] - 10:15, 25:10, 27:13, 36:17, 37:12, 41:20, 41:23, 44:8, 49:19, 65:13, 68:9, 70:13, 70:24, 71:11, 71:14
**beyond** [2] - 77:10, 86:4
**bias** [2] - 82:20, 82:23
**big** [6] - 60:4, 87:15, 87:23, 88:21, 88:24, 96:5
**billion** [1] - 26:23
**Bird** [1] - 3:8
**BIRD** [1] - 1:23
**bit** [4] - 40:3, 109:3, 119:21, 128:10
**black** [1] - 113:8
**block** [1] - 89:8
**blocked** [1] - 89:8
**board** [1] - 38:11
**bolster** [1] - 119:10
**bosses** [1] - 16:15
**bound** [1] - 114:21
**Brian** [2] - 3:6, 26:10
**brief** [4] - 29:23, 74:5, 83:25, 87:10
**briefing** [8] - 15:8, 15:19, 63:25, 64:6, 67:5, 98:18, 108:24, 109:20
**briefs** [5] - 11:10, 27:12, 82:16, 118:22, 125:5
**broad** [1] - 11:12
**broader** [1] - 22:11
**brought** [2] - 6:12,

26:8
**BROWNE** [1] - 1:14
**Browne** [1] - 2:20
**bucket** [2] - 12:20, 17:15
**buckets** [4] - 8:13, 11:12, 11:19, 62:7
**bulk** [1] - 46:20
**bullet** [1] - 89:12
**bunch** [2] - 24:23, 52:23
**bunny** [1] - 98:13
**burden** [2] - 25:12, 99:8
**Burke** [2] - 1:9, 114:7
**business** [12] - 8:18, 20:11, 25:15, 25:20, 26:1, 26:14, 27:13, 28:3, 28:6, 28:18, 42:22, 49:5
**business-related** [1] - 28:3
**buy** [1] - 100:14
**buying** [1] - 102:7
**BY** [1] - 1:13

## C

**CAC** [1] - 89:13
**calculus** [2] - 28:7, 31:15
**cannot** [8] - 8:21, 9:11, 63:1, 63:8, 83:6, 97:3, 97:10, 127:1
**canyon** [5] - 2:5, 46:4, 46:5, 123:4, 124:8
**Canyon** [2] - 3:5, 51:21
**CANYON** [2] - 1:3, 134:9
**capable** [1] - 127:16
**capacity** [2] - 81:24, 82:1
**Cara** [1] - 3:7
**CARA** [1] - 1:23
**carder** [1] - 2:21
**CARDER** [1] - 1:17
**care** [1] - 55:25
**career** [1] - 111:19
**Case** [2] - 1:3, 134:8
**case** [22] - 3:16, 4:8, 17:6, 25:8, 47:6, 60:25, 67:12, 76:21, 77:1, 82:22, 97:5, 97:6, 97:13, 100:25, 102:17, 104:9, 108:18, 109:24, 112:3, 112:16,

114:22
**caselaw** [4] - 15:2, 59:8, 67:1, 116:6
**cases** [16] - 19:13, 20:24, 21:19, 26:4, 80:20, 102:14, 102:18, 102:25, 103:2, 103:15, 108:23, 108:25, 109:7, 109:18, 109:22
**cast** [1] - 80:21
**CASTLE** [2] - 134:3, 134:19
**causation** [7] - 11:18, 13:7, 13:10, 14:21, 14:25, 15:5, 62:9
**caused** [1] - 94:7
**caution** [1] - 129:17
**CEHE** [1] - 10:15
**Celgene** [3] - 76:21, 76:25, 77:1
**CEO** [1] - 52:4
**certain** [13] - 5:24, 6:6, 6:8, 9:19, 10:8, 15:16, 20:2, 45:22, 46:18, 66:9, 66:16, 87:1, 121:18
**certainly** [13] - 8:17, 19:9, 94:24, 95:6, 97:13, 111:9, 114:20, 116:8, 116:20, 117:10, 120:25, 127:13, 130:25
**certainty** [3] - 94:23, 95:17, 101:18
**Certified** [2] - 134:4, 134:6
**certify** [2] - 134:5, 134:12
**cetera** [6] - 39:4, 42:4, 42:5, 97:16, 105:3, 127:1
**CFO** [4] - 36:16, 52:6, 68:22, 69:2
**Chad** [1] - 2:21
**CHAD** [1] - 1:17
**challenges** [1] - 48:5
**chance** [8] - 51:2, 54:24, 55:11, 84:16, 111:6, 112:8, 112:22, 112:24
**change** [21] - 10:1, 18:25, 24:25, 30:12, 31:3, 37:25, 40:10, 40:13, 43:14, 46:9, 46:14, 47:1, 47:4, 47:9, 47:19, 47:23, 79:15, 82:4, 91:14,

93:18, 93:21
**changed** [6] - 16:13, 38:18, 49:2, 92:23, 93:22, 131:10
**changes** [3] - 54:8, 54:9, 54:10
**changing** [2] - 24:16, 56:9
**character** [2] - 32:18, 37:21
**characterization** [1] - 116:21
**characterizing** [1] - 110:12
**checked** [1] - 89:23
**Christopher** [1] - 1:9
**Circuit** [1] - 59:17
**circuit** [1] - 109:25
**Circuit's** [1] - 110:7
**circumstances** [5] - 21:20, 92:22, 97:11, 108:10, 131:23
**cite** [3] - 64:2, 64:8, 76:21
**cited** [4] - 26:5, 33:1, 89:18, 97:5
**citing** [1] - 89:16
**civil** [2] - 2:5, 111:22
**claim** [6] - 8:10, 8:22, 25:22, 26:8, 45:17, 120:24
**claims** [9] - 4:9, 4:18, 8:2, 13:7, 14:19, 31:21, 32:21, 108:6, 113:21
**clarification** [1] - 22:11
**clarify** [3] - 68:4, 73:3, 93:19
**clarity** [2] - 46:2, 112:18
**class** [4] - 25:7, 48:20, 51:13, 67:15
**classify** [1] - 7:23
**clear** [10] - 46:6, 46:12, 56:20, 59:17, 79:7, 79:11, 83:24, 88:12, 90:23, 112:7
**clearly** [3] - 105:11, 105:15, 128:11
**Clerk** [1] - 134:18
**client** [2] - 87:22, 91:11
**close** [4] - 27:2, 66:25, 110:25, 111:17
**closed** [2] - 7:7, 18:10
**closing** [1] - 24:14
**cogency** [1] - 99:2
**cogent** [32] - 4:16, 4:21, 11:4, 13:24,

14:13, 15:4, 15:12, 15:13, 15:15, 15:22, 18:6, 18:12, 22:21, 23:4, 23:12, 25:11, 27:2, 27:17, 28:9, 28:16, 28:21, 29:8, 56:15, 56:22, 58:6, 59:10, 59:25, 65:3, 98:22, 100:5, 109:11
**cogently** [1] - 107:21
**colead** [1] - 2:21
**colleague** [3] - 80:7, 88:8, 93:25
**colleagues** [2] - 2:20, 3:7
**Colorado** [1] - 2:18
**coming** [5] - 106:8, 111:2, 113:10, 117:12, 132:20
**comment** [1] - 111:17
**comments** [3] - 53:17, 55:10, 110:21
**commit** [5] - 18:14, 27:18, 28:15, 61:16, 97:14
**committed** [1] - 20:8
**committing** [2] - 27:3, 60:9
**common** [1] - 74:13
**communication** [1] - 99:23
**communications** [1] - 107:25
**companies** [6] - 8:18, 49:9, 54:12, 90:8, 95:15, 95:19
**company** [22] - 28:11, 36:12, 40:11, 44:13, 46:4, 47:3, 52:4, 55:3, 63:7, 68:24, 79:22, 82:24, 87:6, 88:6, 88:7, 88:9, 88:16, 93:24, 94:2, 94:3, 96:6, 103:3
**compare** [1] - 99:11
**compares** [1] - 35:10
**comparison** [4] - 69:12, 69:15, 70:23, 99:2
**comparisons** [1] - 69:9
**compelled** [1] - 23:1
**compelling** [13] - 4:16, 5:14, 13:25, 14:14, 15:4, 15:12, 15:13, 15:22, 23:12, 28:10, 28:16, 29:9, 109:11
**competing** [5] - 30:1, 97:18, 99:8, 109:5,

120:23
**complaint** [153] - 5:20, 5:24, 6:12, 6:15, 6:20, 6:25, 7:4, 7:11, 8:6, 9:15, 9:23, 10:6, 10:13, 14:22, 17:21, 21:4, 23:15, 23:19, 24:18, 29:17, 32:6, 33:2, 33:5, 33:11, 33:15, 33:17, 33:20, 33:21, 33:24, 34:1, 34:4, 34:5, 34:10, 34:16, 34:17, 35:16, 41:4, 42:19, 43:14, 46:16, 49:18, 50:23, 51:10, 52:11, 52:14, 52:21, 53:15, 54:3, 58:16, 59:3, 59:7, 59:24, 62:1, 66:13, 69:18, 70:4, 72:16, 73:22, 74:8, 74:14, 74:20, 77:16, 80:10, 81:11, 83:5, 83:17, 83:19, 84:14, 85:1, 87:19, 88:1, 88:4, 89:6, 89:17, 89:19, 89:20, 89:24, 90:2, 90:4, 90:19, 90:23, 92:1, 92:7, 92:8, 92:15, 92:18, 92:23, 93:8, 93:11, 93:15, 96:3, 96:10, 103:16, 105:11, 107:3, 107:6, 107:9, 107:15, 110:17, 110:18, 110:24, 111:5, 112:10, 112:12, 112:17, 113:2, 113:3, 113:6, 113:15, 113:19, 114:3, 114:13, 114:17, 115:13, 119:7, 119:25, 120:2, 120:5, 120:11, 120:17, 120:21, 120:22, 121:4, 121:17, 121:25, 122:3, 122:15, 122:19, 122:21, 123:10, 123:13, 124:3, 124:13, 124:14, 124:24, 125:20, 125:22, 126:2, 127:5, 129:13, 129:25, 130:6, 130:16, 131:5, 131:6, 131:9, 131:17, 131:25, 132:5, 132:14, 132:15

**complaints** [3] - 8:8, 13:6, 80:9
**completely** [9] - 17:8, 21:4, 51:23, 73:4, 98:14, 99:18, 102:20, 103:19, 122:3
**complex** [1] - 24:17
**compliant** [1] - 32:24
**complicated** [1] - 86:8
**component** [3] - 31:1, 40:24, 46:17
**conceal** [1] - 21:2
**concealing** [1] - 18:1
**concealment** [1] - 25:25
**concede** [1] - 115:3
**concern** [4] - 21:1, 21:2, 87:2, 116:13
**concerned** [1] - 126:21
**concerning** [6] - 7:1, 93:1, 130:12, 131:13, 131:24, 132:13
**concerns** [16] - 21:7, 28:13, 38:18, 41:16, 43:4, 45:19, 45:20, 73:23, 74:11, 80:11, 87:5, 93:16, 93:21, 107:15, 112:5, 115:19
**concession** [1] - 13:2
**conclude** [1] - 109:10
**conclusion** [2] - 43:16, 130:9
**conduct** [1] - 10:24
**confidential** [3] - 67:6, 74:15, 103:12
**confidentiality** [1] - 124:6
**conflict** [2] - 83:7, 120:18
**confront** [1] - 39:7
**confused** [1] - 39:11
**confusing** [4] - 39:21, 39:23, 83:10, 86:7
**confusion** [1] - 73:5
**connect** [1] - 13:22
**consented** [1] - 6:24
**consequential** [1] - 127:8
**consider** [7] - 30:3, 65:23, 77:13, 115:22, 121:3, 131:20, 131:21
**consideration** [4] - 73:24, 92:8, 127:24, 128:18
**considerations** [3] -

25:20, 26:14, 80:19
**considered** [3] - 46:23, 57:20, 83:6
**considering** [4] - 13:18, 54:12, 66:12, 66:19
**consistent** [1] - 23:11
**consisting** [1] - 134:14
**consolidated** [1] - 132:5
**conspiratorial** [1] - 32:19
**constant** [1] - 99:23
**constructed** [1] - 94:2
**constructive** [1] - 83:10
**consultants** [1] - 9:19
**consummating** [1] - 27:6
**contacted** [1] - 6:5
**contains** [2] - 9:15, 32:7
**contemporaneous** [2] - 32:25, 124:12
**context** [5] - 36:19, 65:23, 90:20, 92:7, 103:11
**continue** [9] - 16:1, 17:13, 25:13, 28:22, 31:24, 38:3, 86:24, 115:1, 122:17
**continued** [3] - 96:14, 128:12, 133:11
**continues** [2] - 7:23, 26:11
**continuing** [2] - 88:7, 127:17
**contradict** [6] - 67:2, 96:18, 113:14, 124:16, 124:22, 125:13
**contradicted** [7] - 33:23, 59:5, 65:9, 66:8, 93:13, 117:18, 124:20
**contradicting** [1] - 110:2
**contradiction** [1] - 110:7
**contradicts** [1] - 59:20
**control** [18] - 10:1, 30:13, 31:3, 37:25, 40:10, 40:13, 43:14, 46:9, 46:14, 47:2, 47:4, 47:9, 47:19, 47:23, 79:15, 82:4, 91:14, 93:18
**conversation** [5] - 41:22, 51:22, 71:10,

122:25, 123:1
**conversations** [16] - 36:2, 37:22, 41:19, 44:1, 44:9, 68:15, 72:13, 72:23, 75:3, 75:5, 75:23, 76:5, 76:7, 86:3, 111:25, 119:18
**conversion** [29] - 5:1, 10:21, 16:11, 28:1, 39:15, 46:10, 47:6, 47:11, 47:13, 47:16, 54:13, 54:19, 55:12, 69:16, 69:20, 73:12, 73:15, 73:25, 74:25, 75:14, 79:5, 79:11, 79:16, 81:24, 85:25, 87:8, 91:10, 93:19, 119:2
**conversions** [2] - 10:1, 16:23
**convey** [2] - 111:7, 123:15
**convince** [1] - 114:18
**copies** [3] - 3:20, 3:21, 6:11
**copy** [3] - 33:4, 123:6, 134:15
**copying** [1] - 6:9
**core** [1] - 130:23
**corporate** [2] - 97:3, 98:9
**correct** [15] - 5:21, 15:20, 15:24, 20:12, 24:8, 29:13, 29:20, 35:14, 40:16, 41:8, 41:17, 57:18, 61:24, 64:24, 123:23
**correctly** [2] - 4:19, 15:1
**correspondence** [1] - 123:7
**cost** [1] - 26:2
**costs** [6] - 26:21, 27:1, 28:1, 79:22, 79:23, 91:17
**Counsel** [1] - 1:25
**counsel** [20] - 1:18, 2:9, 2:11, 2:12, 2:19, 2:21, 2:25, 3:2, 3:6, 3:12, 6:4, 6:5, 33:4, 45:7, 54:10, 54:11, 80:14, 112:22, 123:9, 129:6
**counted** [1] - 110:10
**countervailing** [2] - 99:10, 99:18
**counts** [1] - 77:9
**COUNTY** [1] - 134:3
**county** [1] - 2:16

**County** [1] - 134:19
**couple** [3] - 64:16, 103:23, 130:25
**course** [17] - 4:7, 8:20, 9:6, 11:25, 12:24, 13:10, 18:16, 31:2, 32:7, 32:10, 38:1, 43:20, 58:15, 100:2, 113:4, 113:5, 119:14
**court** [11] - 5:17, 33:21, 34:11, 47:21, 63:15, 112:4, 114:6, 114:24, 119:25, 120:12, 122:4
**COURT** [114] - 1:1, 2:1, 2:24, 3:11, 4:4, 11:9, 13:13, 15:7, 15:25, 17:13, 19:2, 19:22, 21:21, 23:13, 24:16, 25:13, 27:10, 28:22, 29:10, 29:15, 29:21, 30:14, 31:5, 31:11, 31:14, 31:17, 31:23, 33:12, 34:13, 35:17, 36:23, 38:5, 40:13, 41:9, 42:9, 42:18, 43:19, 44:25, 45:4, 45:11, 46:13, 48:7, 48:12, 49:22, 50:17, 50:19, 50:25, 52:10, 54:15, 55:5, 57:10, 57:15, 58:8, 60:2, 62:3, 64:5, 64:16, 65:12, 66:9, 67:23, 68:17, 69:14, 70:10, 71:3, 71:20, 72:11, 73:17, 75:7, 77:14, 81:8, 82:14, 83:12, 84:15, 86:6, 86:24, 87:9, 88:19, 89:4, 91:1, 91:19, 92:10, 94:6, 97:12, 98:17, 99:25, 100:23, 101:16, 103:21, 107:5, 108:21, 109:15, 110:9, 112:20, 113:12, 114:9, 115:14, 116:10, 117:7, 117:25, 118:11, 119:16, 120:4, 121:13, 122:8, 122:17, 123:11, 124:22, 126:11, 127:4, 128:1, 128:25, 129:4, 133:5, 133:9
**Court** [14] - 2:14, 4:6, 8:1, 9:5, 11:3, 17:20, 80:13, 86:7, 87:10,

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

102:15, 109:1, 109:5, 133:12, 134:18

**Court's** [5] - 3:8, 7:25, 104:2, 109:18, 132:11

**courthouse** [1] - 111:22

**courtroom** [1] - 61:15

**Courtroom** [1] - 1:10

**Courts** [2] - 103:8, 109:9

**courts** [1] - 109:8

**crater** [1] - 95:19

**create** [2] - 29:8, 44:23

**credentials** [1] - 118:8

**credibility** [3] - 74:21, 119:23, 126:5

**credible** [7] - 63:21, 67:11, 121:11, 121:12, 121:14, 122:7, 122:20

**credit** [8] - 33:24, 118:22, 120:19, 120:22, 125:15, 125:18, 125:23

**crisis** [1] - 88:25

**critical** [3] - 17:19, 65:11, 88:4

**critically** [1] - 121:11

**CSR** [1] - 134:22

**current** [12] - 8:19, 89:24, 90:3, 96:2, 120:2, 120:5, 124:17, 126:2, 127:21, 129:25, 130:16, 131:6

**cut** [1] - 45:25

**cynically** [2] - 55:21

**D**

**Dan** [3] - 36:16, 42:5, 44:13

**Daniel** [1] - 3:5

**darn** [1] - 90:16

**date** [1] - 118:24

**day-to-day** [1] - 16:19

**days** [3] - 18:21, 22:23, 95:8

**dead** [1] - 56:18

**deal** [18] - 35:11, 40:18, 41:15, 48:1, 48:24, 49:25, 56:1, 69:21, 85:11, 86:14, 87:15, 87:23, 88:21, 88:24, 96:6, 98:25

**dealing** [5] - 74:14, 74:19, 77:12, 83:8,

107:18

**dealings** [1] - 80:16

**deals** [2] - 71:11, 71:14

**Deanna** [2] - 134:4, 134:22

**decide** [5] - 13:4, 118:21, 121:8, 121:24, 122:5

**decided** [2] - 10:24, 17:25

**decision** [50] - 9:10, 11:25, 14:2, 18:19, 20:5, 26:1, 26:17, 28:6, 31:6, 35:6, 36:25, 38:6, 38:8, 38:9, 38:12, 39:8, 39:18, 40:4, 40:23, 44:9, 49:6, 75:17, 75:20, 77:20, 77:21, 78:1, 78:10, 78:15, 78:19, 79:3, 79:10, 80:5, 81:11, 87:20, 91:23, 105:14, 109:18, 111:16, 112:15, 118:5, 127:6, 128:2, 129:19, 130:4, 130:5, 130:13, 131:21, 132:23

**decisionmaker** [2] - 38:19, 43:1

**decisionmaking** [5] - 81:23, 82:1, 123:16, 124:1, 130:21

**decisions** [6] - 8:18, 16:8, 16:19, 27:13, 62:16, 81:13

**declaration** [1] - 125:12

**defendant** [9] - 52:3, 52:5, 63:10, 68:8, 68:25, 72:13, 76:23, 118:18, 118:19

**Defendant** [6] - 67:20, 81:6, 86:3, 86:4, 86:19, 117:3

**defendant's** [1] - 109:12

**Defendants** [12] - 1:25, 18:7, 18:24, 23:5, 74:4, 79:1, 88:9, 108:15, 115:4, 124:19, 126:7, 127:2

**defendants** [132] - 3:4, 3:10, 4:23, 5:5, 6:4, 6:9, 6:24, 8:25, 10:22, 11:4, 17:5, 17:6, 17:22, 18:14, 19:7, 19:14, 19:18,

22:16, 22:25, 25:24, 27:18, 28:24, 30:11, 30:16, 35:2, 35:9, 35:24, 36:3, 37:3, 37:12, 38:11, 38:20, 40:21, 41:23, 44:1, 44:10, 44:19, 47:14, 47:21, 48:15, 49:4, 49:20, 52:2, 52:17, 52:24, 53:18, 55:8, 55:16, 56:7, 59:4, 59:11, 59:15, 60:18, 60:23, 61:5, 61:19, 64:21, 65:10, 65:20, 67:7, 67:9, 67:17, 68:3, 69:4, 69:19, 70:21, 72:9, 72:24, 73:10, 75:4, 75:23, 76:3, 76:14, 76:17, 77:6, 77:18, 77:24, 78:6, 79:9, 80:13, 80:14, 80:23, 81:16, 83:4, 85:4, 85:11, 85:19, 86:13, 87:3, 88:11, 88:16, 93:5, 94:14, 94:22, 95:5, 95:13, 96:23, 97:3, 97:5, 97:7, 97:14, 98:8, 98:9, 99:17, 100:8, 102:6, 102:13, 103:18, 104:11, 104:14, 105:5, 105:12, 105:16, 107:23, 108:10, 108:12, 108:18, 109:23, 112:1, 112:3, 115:7, 115:9, 118:24, 119:19, 123:20, 125:9, 126:1, 126:21

**Defendants'** [2] - 5:12, 31:18

**defendants'** [37] - 2:8, 3:1, 3:18, 3:25, 5:19, 15:13, 18:4, 29:19, 31:6, 39:9, 39:14, 41:11, 41:12, 41:20, 45:22, 53:23, 53:24, 55:6, 56:24, 58:12, 60:6, 61:9, 69:24, 73:11, 76:3, 79:19, 99:9, 104:19, 107:11, 107:23, 112:22, 114:23, 117:18, 117:21, 119:11, 126:8, 133:6

**defense** [1] - 85:20

**deficiencies** [2] - 5:21, 8:3

**deficiency** [1] - 17:20

**definitely** [3] - 23:11, 99:6, 110:18

**defraud** [3] - 20:21, 20:22, 20:23

**DELAWARE** [2] - 1:2, 134:2

**Delaware** [3] - 2:12, 3:2, 134:19

**delay** [1] - 63:12

**delayed** [1] - 99:21

**delaying** [2] - 79:23, 79:24

**demeanor** [1] - 111:12

**demonstrable** [1] - 6:6

**demonstrate** [4] - 8:7, 16:5, 98:24, 117:3

**demonstrates** [1] - 26:9

**demonstrating** [1] - 126:7

**denial** [3] - 18:9, 115:6, 115:8

**denied** [3] - 7:8, 10:16, 21:12

**deny** [7] - 27:8, 29:8, 37:8, 43:12, 115:5, 127:6, 127:10

**DEO** [1] - 10:15

**department** [10] - 35:4, 37:8, 38:14, 48:6, 49:17, 72:7, 102:8, 104:12, 104:16, 107:25

**Department** [3] - 6:16, 37:16, 54:20

**depose** [1] - 59:14

**describe** [2] - 8:11, 102:23

**described** [1] - 107:1

**describing** [2] - 89:20, 106:16

**designated** [1] - 54:16

**designation** [8] - 5:2, 23:7, 48:8, 48:11, 57:24, 93:6, 128:14, 128:16

**despite** [4] - 7:22, 8:7, 16:25, 17:3

**detailed** [1] - 69:12

**details** [1] - 75:2

**determination** [10] - 14:5, 26:9, 40:22, 43:22, 65:2, 65:16, 72:18, 75:13, 127:15, 132:17

**determine** [3] - 65:18, 66:15, 66:17

**determined** [3] - 10:20, 25:16, 91:22

**determining** [3] - 12:19, 13:22, 118:16

**devoid** [1] - 21:4

**DeVos** [2] - 10:7, 54:13

**DeVos's** [1] - 9:9

**dialogue** [1] - 41:11

**diametrically** [1] - 120:17

**difference** [4] - 37:15, 71:13, 94:3, 130:13

**differences** [14] - 36:17, 36:20, 42:8, 42:9, 42:10, 42:14, 49:19, 51:23, 51:24, 68:9, 68:11, 70:13, 71:10, 103:22

**different** [43] - 11:20, 16:6, 16:16, 21:18, 34:22, 42:1, 42:2, 42:4, 42:17, 43:5, 51:23, 56:8, 65:24, 68:24, 69:20, 69:21, 71:2, 72:22, 81:14, 85:11, 92:18, 92:20, 92:24, 93:2, 96:2, 101:15, 101:25, 102:20, 103:19, 105:4, 107:19, 110:11, 113:14, 113:24, 116:12, 118:17, 130:5, 131:4, 132:9, 132:13, 132:14

**differently** [5] - 16:12, 30:18, 38:7, 118:11, 128:11

**dime** [2] - 54:21, 74:6

**dinner** [1] - 71:6

**direct** [1] - 76:13

**directed** [1] - 10:2

**directly** [7] - 32:24, 59:5, 73:11, 86:5, 86:22, 112:4, 124:16

**disagree** [2] - 118:18, 127:9

**disapproval** [1] - 102:22

**discharged** [1] - 6:17

**discipline** [2] - 6:18, 33:8

**disclose** [1] - 102:23

**disclosed** [8] - 63:7, 63:24, 63:25, 64:7, 64:12, 64:15, 108:17, 116:7

**disclosure** [4] - 26:2, 26:6, 100:20, 108:16

**discounts** [1] - 74:22

**discrepancies** [1] -

113:2
**discrimination** [1] - 6:15
**discussed** [8] - 11:13, 26:3, 79:1, 108:23, 109:20, 118:10, 130:8, 130:11
**discussing** [2] - 39:2, 46:6
**discussions** [3] - 19:5, 63:16, 117:11
**dismantle** [1] - 22:13
**dismiss** [13] - 2:8, 5:19, 62:7, 67:6, 76:22, 113:17, 114:14, 118:7, 130:14, 130:24, 131:13, 131:22, 132:2
**DISMISS** [3] - 1:6, 1:8, 134:16
**dismissal** [2] - 4:11, 12:2
**dismissed** [6] - 4:10, 4:19, 8:1, 14:22, 67:16, 110:6
**disparate** [1] - 119:23
**dispute** [5] - 46:11, 58:16, 65:10, 117:2, 126:11
**disputed** [2] - 33:19, 82:16
**disputes** [1] - 64:6
**disputing** [2] - 52:2, 118:7
**disregard** [1] - 120:23
**distinction** [3] - 16:21, 27:12, 91:2
**distinctly** [1] - 122:22
**distinguish** [1] - 91:6
**distinguished** [2] - 102:19, 108:24
**District** [2] - 63:15, 134:18
**district** [4] - 5:17, 107:24, 114:6, 114:24
**DISTRICT** [2] - 1:1, 1:2
**divorced** [1] - 40:14
**DLA** [2] - 1:20, 3:4
**document** [5] - 83:6, 83:13, 83:15, 120:20, 124:15
**documents** [14] - 6:8, 6:19, 7:1, 33:1, 33:14, 33:16, 51:19, 51:20, 121:3, 121:4, 121:6, 121:10, 122:6, 132:1
**DOE** [98] - 4:24, 5:6,

7:8, 7:23, 9:3, 9:10, 9:17, 9:22, 10:2, 10:8, 11:5, 14:5, 16:4, 16:6, 17:1, 17:8, 17:10, 17:23, 18:18, 19:6, 19:8, 20:4, 21:12, 21:14, 22:4, 22:9, 24:5, 25:20, 26:8, 26:19, 27:7, 27:20, 29:7, 30:17, 31:2, 31:7, 36:13, 37:24, 38:22, 39:3, 40:9, 40:24, 43:5, 44:14, 44:21, 46:8, 48:3, 48:16, 48:22, 48:23, 50:4, 51:14, 51:16, 52:20, 52:25, 53:4, 53:16, 55:10, 57:1, 57:14, 60:14, 60:19, 60:23, 61:3, 61:21, 63:12, 63:16, 70:1, 71:16, 75:16, 76:1, 86:21, 88:19, 89:13, 91:22, 94:19, 95:2, 95:4, 95:8, 96:4, 100:14, 100:19, 102:2, 104:23, 105:6, 105:13, 106:6, 108:5, 115:5, 115:10, 115:19, 116:2, 117:23, 118:9, 127:14, 128:3
**DOE's** [19] - 7:19, 9:12, 17:4, 18:9, 21:8, 23:7, 30:24, 31:2, 31:9, 35:23, 40:23, 46:15, 46:21, 72:18, 99:21, 118:3, 118:15, 127:6, 131:2
**dollars** [1] - 26:24
**Donald** [1] - 49:3
**done** [6] - 47:25, 59:21, 59:23, 98:25, 99:4, 107:14
**doubled** [2] - 24:9, 24:14
**doubt** [5] - 4:11, 47:13, 61:18, 108:13, 108:19
**down** [11] - 3:17, 7:22, 16:18, 18:19, 24:9, 24:14, 27:25, 78:11, 84:21, 94:11, 95:23
**drafting** [2] - 90:19, 96:12
**draw** [2] - 122:8, 122:11
**drawing** [1] - 21:25
**drawn** [2] - 51:11,

68:21
**drop** [2] - 82:16, 82:19
**drug** [1] - 103:7
**drugs** [1] - 103:4
**due** [1] - 124:6
**during** [3] - 21:15, 32:12, 110:11

**E**

**early** [1] - 29:14
**Easter** [1] - 98:13
**easy** [1] - 63:20
**Education** [2] - 3:5, 54:21
**EDUCATION** [2] - 1:3, 134:10
**education** [15] - 2:5, 34:20, 35:5, 37:8, 37:16, 38:14, 43:4, 46:4, 48:6, 49:17, 72:7, 102:9, 104:13, 104:16, 108:1
**education-related** [2] - 34:20, 43:4
**educational** [2] - 38:2, 73:19
**effect** [2] - 18:23, 37:19
**effectuating** [1] - 126:22
**either** [7] - 13:11, 19:9, 20:5, 21:6, 34:9, 104:14, 110:17
**elected** [3] - 49:9, 54:7, 114:8
**election** [1] - 49:3
**elevated** [1] - 115:6
**employee** [2] - 6:2, 32:11
**employees** [3] - 9:10, 9:19, 26:23
**employer** [1] - 131:24
**employment** [2] - 32:12, 33:7
**end** [4] - 85:16, 100:21, 105:9, 133:1
**ended** [1] - 42:21
**Endologix** [1] - 102:17
**engage** [1] - 7:5
**engagement** [2] - 63:11, 108:6
**enmeshed** [1] - 69:22
**enrollment** [1] - 21:25
**enrollments** [3] - 7:21, 18:10, 127:17
**Enterprises** [1] - 134:23
**entire** [6] - 21:16,

30:24, 54:19, 82:3, 111:19, 128:12
**entirely** [1] - 9:23
**entirety** [3] - 4:10, 13:6, 14:19
**entities** [3] - 30:8, 37:6, 37:24
**entitled** [1] - 122:16
**entity** [2] - 94:3, 94:16
**enunciated** [2] - 56:14, 102:1
**environment** [7] - 8:14, 8:20, 16:22, 17:1, 23:10, 23:22, 57:5
**equivalent** [1] - 117:6
**especially** [2] - 3:17, 110:21
**ESQ** [8] - 1:13, 1:14, 1:14, 1:17, 1:17, 1:21, 1:23, 1:24
**essentially** [3] - 79:19, 113:8, 127:3
**establish** [2] - 25:6, 41:18
**established** [3] - 18:6, 25:5, 42:13
**establishing** [1] - 45:15
**et** [6] - 39:4, 42:4, 97:16, 105:3, 126:25
**ethical** [1] - 80:18
**evaluate** [1] - 99:9
**evaluated** [1] - 51:18
**event** [1] - 26:13
**events** [2] - 24:25, 100:19
**eventually** [2] - 102:2, 103:4
**evidence** [6] - 45:18, 67:13, 92:13, 99:14, 107:23, 112:18
**exact** [1] - 119:6
**exactly** [14] - 32:4, 39:21, 46:24, 48:9, 50:21, 57:12, 57:25, 59:14, 69:1, 73:21, 75:6, 86:18, 100:17, 123:8
**example** [9] - 14:2, 19:20, 33:20, 64:5, 65:17, 67:17, 81:6, 82:15, 99:20
**examples** [1] - 109:22
**except** [2] - 86:12, 91:14
**exclusively** [1] - 32:9
**execute** [3] - 47:9, 47:18, 47:23
**executed** [1] - 47:4

**executive** [4] - 63:4, 68:22, 74:24, 111:25
**executives** [2] - 28:10, 98:9
**exhibits** [2] - 6:23, 64:2
**exigent** [3] - 21:20, 126:16, 127:22
**exist** [2] - 109:1, 109:2
**existence** [4] - 87:17, 87:21, 125:18, 128:6
**existential** [7] - 20:9, 87:17, 87:20, 88:25, 89:22, 89:23, 128:5
**existing** [1] - 42:12
**exists** [1] - 124:15
**expect** [1] - 86:21
**expectation** [1] - 73:12
**expected** [5] - 18:20, 18:24, 20:14, 58:13, 127:12
**expended** [1] - 79:22
**expenses** [1] - 27:5
**experience** [1] - 67:14
**experienced** [2] - 55:8, 118:25
**expiration** [1] - 29:1
**explain** [2] - 98:6, 108:11
**explained** [4] - 14:9, 73:23, 100:8, 123:2
**explaining** [4] - 42:20, 42:25, 77:20, 125:6
**explains** [2] - 23:19, 99:15
**explanation** [3] - 100:23, 101:10, 101:19
**explanations** [2] - 105:25, 106:1
**explicitly** [1] - 83:15
**express** [1] - 115:21
**expressed** [3] - 45:21, 80:12, 87:5
**extent** [14] - 29:22, 33:13, 33:15, 37:22, 45:20, 45:22, 90:3, 97:21, 98:7, 106:24, 109:24, 127:4, 128:1, 132:19
**external** [1] - 123:6
**extraneous** [1] - 83:6
**extraordinary** [2] - 8:17, 117:1

**F**

**face** [6] - 48:4, 49:1,

51:14, 54:4, 108:8, 116:16
**faced** [1] - 21:6
**facing** [2] - 28:12
**fact** [45] - 7:22, 8:7, 16:18, 17:4, 19:12, 26:7, 28:5, 29:23, 30:2, 33:20, 33:22, 33:23, 33:25, 34:4, 34:5, 34:7, 34:8, 34:22, 38:16, 40:6, 40:17, 55:18, 56:25, 57:7, 60:20, 63:14, 74:23, 85:18, 89:12, 93:14, 93:25, 104:23, 114:14, 115:18, 116:2, 118:19, 121:2, 121:16, 121:17, 121:18, 121:24, 122:9, 125:24, 126:17
**factor** [2] - 47:12, 89:1
**factors** [3] - 91:7, 91:9, 110:5
**facts** [49] - 15:24, 28:4, 28:5, 30:15, 33:18, 52:7, 52:17, 52:22, 52:23, 53:1, 53:6, 55:13, 55:17, 56:25, 57:21, 59:4, 60:22, 61:1, 61:6, 62:25, 63:23, 63:24, 64:14, 65:23, 66:13, 66:16, 66:20, 67:2, 67:4, 75:25, 78:18, 93:13, 93:22, 96:18, 98:1, 98:3, 99:13, 115:25, 116:4, 116:23, 117:18, 117:20, 118:12, 124:19, 125:13, 125:16, 126:4, 126:6
**factual** [5] - 51:9, 51:16, 58:15, 75:24, 76:8
**fail** [2] - 8:9, 127:23
**failed** [6] - 4:20, 5:3, 9:6, 13:11, 14:19, 99:18
**failure** [3] - 4:12, 11:14, 11:17
**fair** [2] - 73:1, 112:20
**faith** [1] - 61:8
**fall** [1] - 28:17
**falling** [1] - 8:12
**falls** [1] - 108:7
**false** [43] - 11:16, 12:8, 12:10, 12:17, 13:18, 13:21, 14:3,

14:8, 19:11, 19:14, 39:3, 65:21, 66:10, 76:18, 76:24, 77:8, 95:7, 95:16, 98:10, 98:23, 99:3, 100:3, 100:12, 101:3, 101:19, 104:21, 105:16, 105:19, 105:20, 105:21, 105:23, 106:5, 107:10, 108:11, 108:15, 108:16, 110:4, 112:2, 115:15, 117:3, 126:9
**falsehoods** [1] - 6:6
**falsity** [14] - 13:8, 13:10, 14:21, 14:24, 15:5, 62:22, 63:20, 66:5, 71:18, 77:6, 103:17, 110:1, 115:25, 116:24
**familiar** [1] - 4:8
**far** [4] - 102:6, 102:13, 109:17, 132:4
**fashion** [1] - 18:20
**fatal** [2] - 11:2, 13:5
**favor** [3] - 15:6, 51:12, 68:21
**favorable** [5] - 16:22, 16:25, 23:9, 49:7, 57:4
**FDA** [1] - 103:5
**February** [2] - 6:3, 122:23
**federal** [7] - 8:10, 33:21, 34:11, 47:21, 109:8, 119:25, 120:12
**felt** [1] - 22:25
**few** [4] - 2:2, 8:12, 18:18, 32:4
**figure** [12] - 27:16, 35:19, 35:20, 35:25, 36:5, 55:5, 58:22, 58:23, 59:14, 61:6, 71:8, 84:7
**file** [2] - 5:20, 114:17
**FILED** [1] - 134:17
**filed** [10] - 5:23, 6:15, 8:8, 33:21, 34:4, 34:10, 36:13, 83:5, 120:11, 122:4
**filing** [2] - 6:25, 74:16
**filings** [2] - 107:24, 112:4
**final** [4] - 14:5, 20:5, 32:1, 105:14
**finalizing** [1] - 27:5
**finally** [2] - 10:12, 28:23

**financial** [14] - 20:5, 21:1, 21:23, 22:1, 28:12, 89:15, 91:18, 92:4, 97:8, 97:9, 102:12, 103:1, 103:2, 126:20
**financials** [2] - 7:18, 126:25
**fine** [1] - 128:7
**fire** [1] - 2:17
**fired** [11] - 82:18, 82:24, 82:25, 83:2, 83:3, 83:23, 84:9, 120:7, 120:14, 121:18
**first** [36] - 2:3, 2:11, 4:19, 5:24, 8:13, 12:15, 15:10, 18:7, 22:15, 26:16, 28:8, 33:3, 44:11, 56:14, 62:10, 62:11, 62:15, 64:18, 64:20, 64:21, 74:25, 78:9, 79:1, 80:9, 81:25, 87:9, 90:19, 92:6, 93:8, 93:11, 103:25, 112:11, 112:15, 113:24, 121:1, 130:1
**five** [3] - 7:4, 53:12, 110:10
**flaw** [1] - 11:2
**focus** [3] - 8:5, 32:16, 36:8
**focused** [4] - 40:22, 44:20, 46:22, 84:21
**focussed** [1] - 40:11
**folks** [5] - 16:3, 16:18, 53:2, 55:25, 133:9
**following** [3] - 15:2, 80:12, 101:24
**follows** [1] - 44:21
**fool** [1] - 25:1
**footnote** [7] - 6:21, 33:10, 64:8, 82:16, 82:19, 131:14, 131:25
**FOR** [1] - 1:2
**for-profit** [14] - 7:20, 7:23, 10:8, 14:6, 16:7, 16:17, 21:13, 28:10, 40:20, 54:12, 96:6, 127:20, 128:16, 128:21
**for-profits** [1] - 21:9
**force** [1] - 56:1
**foregoing** [2] - 134:8, 134:14
**forever** [1] - 18:25
**forget** [1] - 94:19
**former** [3] - 6:2, 9:19,

32:11
**forms** [1] - 69:8
**forth** [8] - 13:17, 32:22, 35:8, 37:3, 37:11, 39:20, 82:13, 121:4
**forthcoming** [2] - 5:8, 123:3
**forward** [23] - 5:8, 17:25, 19:11, 23:1, 25:16, 26:17, 26:24, 28:24, 29:6, 42:6, 46:19, 60:2, 61:7, 62:5, 69:25, 77:3, 83:9, 89:2, 104:4, 106:6, 111:24, 120:20, 126:3
**forward-looking** [1] - 77:3
**four** [2] - 7:6, 8:8
**frankly** [4] - 18:18, 32:19, 40:10, 67:14
**fraud** [42] - 8:22, 8:23, 18:14, 18:20, 19:1, 19:13, 19:15, 20:8, 20:21, 21:18, 25:8, 25:9, 25:22, 26:4, 27:3, 27:18, 28:15, 29:9, 45:17, 46:16, 49:12, 56:16, 56:23, 58:6, 58:7, 60:1, 60:9, 61:16, 67:15, 74:14, 97:3, 97:10, 97:14, 98:16, 100:16, 102:19, 103:1, 103:10, 103:12, 106:25, 109:24, 126:24
**fraudulent** [12] - 4:17, 5:13, 8:17, 18:5, 27:14, 28:20, 90:8, 94:6, 99:10, 99:19, 100:11, 108:3
**free** [1] - 3:21
**friend** [2] - 49:4, 74:4
**friendly** [1] - 78:6
**front** [1] - 113:19
**full** [2] - 59:6, 89:11
**fully** [4] - 58:2, 107:21, 111:13, 111:15
**fundamental** [1] - 66:5
**funds** [1] - 2:16
**future** [2] - 86:22, 94:11

---

**G**

**gain** [1] - 20:15
**gamble** [6] - 17:24,

48:22, 88:10, 88:12, 88:13, 88:14
**gambled** [1] - 5:6
**GAP** [1] - 7:16
**GCE** [27] - 7:5, 7:13, 7:17, 10:20, 20:3, 20:23, 21:6, 25:16, 26:20, 27:1, 27:4, 27:7, 29:6, 36:16, 37:6, 40:6, 44:14, 69:22, 87:14, 87:22, 89:22, 91:4, 91:5, 93:5, 126:18, 127:8, 127:11
**GCE's** [5] - 17:16, 26:17, 27:3, 89:15, 92:4
**GCU** [21] - 5:10, 20:2, 20:9, 21:6, 25:19, 37:6, 46:22, 69:22, 75:15, 87:12, 87:13, 87:21, 88:20, 89:15, 91:4, 91:6, 91:11, 92:4, 93:5, 127:8
**GCU's** [6] - 9:11, 87:17, 88:21, 89:14, 89:20, 128:5
**generally** [1] - 118:1
**generated** [1] - 123:9
**Gillis** [1] - 102:17
**given** [4] - 7:25, 66:5, 108:1, 108:12
**glad** [1] - 99:5
**goals** [2] - 127:13, 128:24
**Golan** [1] - 2:21
**GOLAN** [1] - 1:17
**govern** [2] - 82:6, 127:19
**governing** [1] - 58:10
**Grand** [2] - 3:5, 51:21
**grand** [5] - 2:5, 46:3, 46:4, 123:4, 124:8
**GRAND** [2] - 1:3, 134:9
**grant** [1] - 26:19
**granted** [6] - 5:15, 5:18, 12:2, 29:3, 79:25, 114:24
**grapple** [1] - 105:17
**grappled** [1] - 105:8
**great** [1] - 128:7
**greater** [2] - 97:21, 102:6
**Gregory** [1] - 2:14
**GREGORY** [1] - 1:13
**grind** [1] - 120:8
**Grossman** [1] - 2:16
**GROSSMAN** [1] - 1:13
**guarantee** [1] - 115:11

**guess** [16] - 13:13, 15:25, 19:25, 20:12, 28:3, 33:12, 34:13, 53:9, 56:24, 60:4, 85:19, 87:16, 92:20, 94:9, 96:3, 97:16
**guidance** [2] - 110:8, 112:7
**guidelines** [1] - 43:14

## H

**half** [2] - 7:6, 116:2
**hand** [10] - 3:21, 23:4, 23:8, 39:15, 39:18, 39:19, 77:22, 78:14, 81:11, 99:17
**happy** [4] - 46:1, 47:17, 59:7, 67:25
**harassment** [1] - 124:5
**hard** [5] - 52:1, 73:20, 81:9, 131:5
**hard-pressed** [1] - 52:1
**hardly** [1] - 27:2
**hay** [1] - 57:5
**head** [5] - 20:19, 32:4, 73:23, 102:3, 112:17
**heading** [1] - 48:15
**heads** [1] - 55:6
**health** [1] - 133:11
**hear** [3] - 61:12, 96:2, 111:9
**heard** [2] - 74:4, 134:10
**hearing** [1] - 132:21
**heart** [2] - 75:4, 84:25
**heck** [1] - 92:21
**heightened** [1] - 4:12
**held** [2] - 4:19, 9:6
**help** [5] - 19:24, 39:24, 78:24, 80:1, 101:21
**helpful** [6] - 59:1, 82:22, 100:1, 100:6, 129:22, 132:19
**helps** [1] - 122:12
**hereby** [1] - 134:5
**hide** [1] - 100:18
**high** [18] - 48:21, 70:1, 75:22, 88:10, 88:14, 90:10, 90:14, 90:16, 90:18, 91:3, 91:4, 91:24, 93:4, 95:12, 95:18, 95:22, 95:25, 96:25
**high-level** [1] - 75:22
**high-risk** [1] - 48:21
**high-stakes** [2] -

88:10, 88:14
**higher** [2] - 50:13, 78:5
**higher-ups** [1] - 78:5
**highly** [5] - 74:21, 76:15, 76:19, 76:24, 79:3
**hinged** [1] - 82:22
**hit** [2] - 20:18, 32:3
**HLC** [80] - 5:25, 6:2, 6:9, 10:22, 29:2, 29:17, 29:18, 29:24, 30:2, 30:12, 30:22, 31:25, 32:2, 32:8, 32:11, 33:5, 34:18, 34:19, 34:22, 35:6, 35:15, 35:20, 36:4, 36:14, 37:2, 37:12, 37:25, 38:1, 38:7, 38:25, 39:6, 39:16, 39:21, 40:21, 40:22, 41:2, 41:4, 41:5, 41:10, 41:23, 42:20, 43:2, 43:11, 43:15, 43:17, 44:8, 44:9, 44:13, 68:22, 73:3, 73:6, 73:10, 73:18, 74:24, 75:12, 75:22, 77:15, 77:20, 78:3, 78:5, 78:9, 78:15, 79:2, 80:1, 80:4, 81:11, 84:5, 85:7, 85:12, 85:15, 86:1, 118:8, 120:1, 120:9, 122:23, 123:24, 124:4, 124:6, 124:14, 130:18
**HLC's** [28] - 29:1, 29:11, 29:21, 30:15, 30:18, 31:5, 35:1, 36:25, 39:8, 40:4, 43:21, 44:21, 72:13, 72:20, 73:24, 75:12, 75:17, 75:20, 76:5, 78:13, 78:19, 84:21, 118:5, 118:13, 118:19, 123:17, 125:2, 130:22
**HLC-related** [1] - 32:2
**hold** [3] - 20:15, 113:24, 116:5
**holds** [1] - 116:6
**hole** [1] - 21:3
**holes** [1] - 9:13
**honestly** [1] - 82:9
**Honor** [88] - 2:14, 3:3, 4:6, 4:7, 4:19, 10:12, 11:1, 12:23, 18:11, 19:21, 21:10, 22:19, 22:20, 28:9, 28:21,

29:5, 29:20, 31:22, 32:14, 35:13, 36:8, 43:12, 44:12, 45:1, 45:9, 45:14, 45:24, 46:25, 47:18, 47:22, 48:9, 51:7, 54:18, 56:13, 56:21, 57:25, 59:2, 59:12, 63:24, 64:1, 64:12, 65:7, 66:2, 66:23, 68:20, 69:7, 70:6, 70:19, 72:3, 73:14, 73:21, 74:11, 76:11, 78:25, 79:8, 80:1, 80:6, 82:9, 85:24, 86:5, 86:18, 87:2, 87:25, 90:22, 93:10, 96:16, 96:20, 100:7, 100:15, 102:1, 102:8, 102:18, 103:20, 106:23, 107:1, 111:11, 112:19, 113:1, 114:25, 115:24, 116:5, 117:14, 119:21, 119:22, 123:10, 125:18, 129:3, 133:3
**Honor's** [20] - 5:18, 45:19, 45:20, 47:8, 58:5, 73:5, 73:23, 74:10, 79:14, 80:11, 88:2, 93:16, 93:20, 99:7, 101:24, 107:15, 107:18, 108:2, 111:16, 112:5
**Honorable** [1] - 1:9
**hope** [10] - 21:2, 21:19, 54:10, 54:15, 54:17, 54:20, 102:9, 112:13, 129:20, 132:22
**hoped** [2] - 18:24, 127:11
**hopeful** [1] - 127:25
**hopes** [1] - 49:6
**hoping** [4] - 55:22, 100:19, 102:8, 103:5
**horribles** [2] - 7:10, 94:1
**hour** [2] - 3:13, 45:13
**HRC** [1] - 6:13
**huge** [2] - 91:11, 91:20
**Human** [1] - 6:16
**hundreds** [2] - 129:13, 129:14
**hurdles** [1] - 54:5
**hurt** [1] - 94:7
**hurts** [2] - 39:10,

122:12
**hypothetical** [1] - 25:4
**hypothetically** [1] - 119:12

## I

**i.e** [1] - 37:6
**idea** [2] - 48:21, 108:17
**identical** [1] - 70:9
**identified** [5] - 5:21, 8:3, 11:3, 17:20, 40:1
**identify** [1] - 2:10
**identity** [2] - 74:23
**ignore** [1] - 86:11
**Illinois** [1] - 6:16
**illogical** [5] - 26:15, 97:15, 97:23, 97:24, 98:14
**illogically** [1] - 97:7
**illustrated** [1] - 59:3
**imagine** [1] - 68:13
**immaterial** [20] - 29:24, 31:13, 31:14, 31:17, 35:6, 35:15, 35:18, 35:19, 38:6, 38:25, 69:13, 70:22, 78:20, 85:20, 85:21, 85:24, 118:20, 130:18, 131:19
**immateriality** [1] - 84:5
**immediately** [1] - 47:2
**impact** [4] - 31:5, 31:8, 31:19, 39:9
**implemented** [1] - 43:15
**implicating** [1] - 105:1
**implicitly** [1] - 115:15
**imply** [1] - 111:13
**important** [6] - 54:1, 68:15, 127:24, 128:18, 131:16, 131:19
**importantly** [1] - 79:13
**impossible** [1] - 24:23
**IN** [4] - 1:1, 1:2, 1:3, 134:9
**inability** [2] - 4:14, 13:5
**inaccurate** [1] - 113:9
**Inc** [1] - 3:5
**INC** [2] - 1:4, 134:10
**incapable** [1] - 128:15
**inception** [1] - 48:20
**include** [1] - 84:14
**included** [3] - 5:24,

84:6, 130:2
**including** [9] - 5:1, 5:14, 21:16, 25:6, 26:22, 70:3, 77:25, 100:12, 115:2
**inconsistencies** [1] - 40:1
**incorrect** [2] - 104:3
**increase** [1] - 79:23
**incredibly** [11] - 53:11, 68:12, 68:15, 80:20, 87:13, 88:10, 88:14, 95:14, 97:24, 99:14, 127:7
**incur** [1] - 27:4
**incurred** [1] - 26:21
**indeed** [3] - 18:9, 27:4, 117:20
**independence** [11] - 37:13, 37:23, 39:14, 41:16, 69:23, 70:14, 70:15, 71:14, 72:6, 72:24, 119:3
**independent** [2] - 37:5, 63:2
**independently** [1] - 72:10
**indicated** [2] - 41:12, 115:5
**indication** [2] - 13:2, 30:11
**individual** [7] - 19:18, 61:19, 75:4, 76:14, 76:17, 93:4, 119:18
**individuals** [3] - 90:7, 94:16, 97:22
**industry** [1] - 9:20
**inevitable** [1] - 18:9
**inference** [10] - 4:17, 43:17, 68:20, 99:11, 99:19, 100:11, 106:25, 108:3, 122:9, 122:11
**inferences** [1] - 51:11
**influenced** [1] - 8:19
**information** [21] - 17:23, 35:8, 36:2, 50:15, 59:20, 65:9, 66:7, 67:9, 95:4, 103:13, 103:14, 103:18, 107:11, 110:2, 115:4, 116:5, 116:7, 116:12, 116:22, 117:1, 132:12
**informed** [1] - 58:2
**initial** [1] - 32:22
**inquiry** [1] - 7:14
**insignificant** [1] - 128:5

**insofar** [1] - 30:6
**installed** [1] - 54:14
**instance** [2] - 9:18, 115:9
**instances** [1] - 131:1
**instead** [1] - 8:23
**institution** [2] - 46:23, 128:20
**institutions** [2] - 7:20, 16:8
**instructions** [1] - 125:25
**insufficiency** [2] - 12:7, 12:16
**integral** [2] - 120:22, 121:3
**intent** [4] - 4:17, 5:13, 28:20, 115:21
**intention** [1] - 8:4
**intentionally** [1] - 60:9
**interacting** [1] - 123:19
**interaction** [1] - 81:15
**interactions** [2] - 76:4, 76:14
**interim** [2] - 18:25, 21:11
**internal** [2] - 83:16, 123:6
**internally** [1] - 23:11
**interrogatories** [7] - 19:4, 23:25, 47:25, 48:14, 53:7, 104:13, 116:15
**interval** [2] - 5:10, 21:24
**intervene** [1] - 81:7
**intervening** [1] - 100:19
**intimate** [1] - 75:1
**investigation** [3] - 80:15, 96:14, 112:9
**investigations** [2] - 80:19, 126:25
**investment** [2] - 58:4, 88:15
**investors** [29] - 9:5, 18:2, 18:15, 20:23, 27:4, 27:22, 28:15, 50:14, 50:19, 50:23, 54:18, 54:22, 58:1, 61:23, 70:19, 70:25, 88:5, 88:13, 90:21, 90:24, 91:2, 91:3, 99:20, 100:19, 102:7, 102:24, 103:5, 107:1, 108:15
**investors'** [1] - 88:17
**involved** [1] - 123:16
**irrelevant** [3] - 28:6,

100:21, 125:1
**IRS** [6] - 5:15, 40:25, 41:1, 41:7, 60:15, 75:16
**IRS's** [1] - 44:20
**issue** [44] - 10:10, 12:21, 13:16, 14:17, 14:21, 19:2, 20:9, 20:25, 22:24, 24:18, 26:2, 29:18, 29:25, 30:20, 30:23, 32:3, 34:3, 34:20, 41:24, 43:11, 43:23, 55:23, 62:13, 62:17, 65:2, 69:8, 70:13, 71:14, 72:22, 72:24, 77:4, 85:9, 86:17, 87:11, 95:10, 99:22, 99:24, 108:4, 108:7, 110:12, 118:9, 119:23, 130:20, 132:7
**issued** [1] - 4:8
**issues** [29] - 11:12, 16:17, 28:12, 35:7, 37:7, 37:13, 37:14, 39:3, 43:5, 48:25, 51:14, 62:8, 71:7, 73:19, 74:1, 75:4, 110:18, 115:18, 118:2, 118:4, 118:20, 123:23, 126:20, 129:12, 129:15, 129:17, 130:8, 130:10, 130:23
**item** [1] - 22:24
**IV** [13] - 4:23, 7:9, 7:24, 9:2, 10:4, 10:18, 17:3, 26:13, 30:9, 30:25, 31:10, 36:21, 40:19

## J

**January** [4] - 10:13, 52:22, 55:8, 56:6
**Jeff** [1] - 2:21
**JEFFREY** [1] - 1:17
**jeopardy** [2] - 79:25, 92:4
**jeopardy'** [1] - 89:15
**job** [4] - 4:25, 56:23, 58:7, 82:17
**John** [2] - 2:20, 3:7
**JOHN** [2] - 1:14, 1:24
**judge** [4] - 16:20, 30:5, 111:4, 115:1
**Judge** [40] - 4:2, 5:12,

7:3, 7:25, 8:11, 8:16, 10:6, 14:18, 15:1, 15:16, 15:20, 17:14, 20:18, 22:14, 23:3, 24:8, 25:14, 28:23, 29:13, 30:21, 33:3, 33:9, 34:2, 37:18, 42:11, 44:17, 94:15, 98:19, 101:8, 112:25, 114:2, 114:7, 114:18, 116:20, 121:22, 126:3, 126:14, 127:25, 128:19, 133:8
**judicial** [6] - 33:19, 34:3, 34:6, 121:6, 121:15, 121:20
**July** [4] - 25:17, 47:5, 47:20, 94:18
**jump** [1] - 47:17
**June** [1] - 94:18
**justifications** [1] - 18:4

## K

**Kaplan** [16] - 35:11, 36:8, 41:15, 41:24, 42:2, 42:15, 49:15, 49:20, 51:19, 51:20, 67:19, 68:9, 69:16, 71:19, 74:25, 86:14
**Karen** [4] - 6:2, 32:10, 67:24, 68:3
**Katie** [2] - 2:19, 45:9
**KATIE** [1] - 1:14
**keep** [2] - 3:14, 116:11
**key** [16] - 16:20, 36:17, 36:20, 42:8, 42:9, 42:10, 50:25, 51:5, 51:23, 51:24, 52:7, 70:6, 70:9, 87:1, 87:5
**kind** [19] - 15:9, 15:15, 37:5, 51:5, 53:19, 86:9, 86:11, 90:12, 92:12, 92:13, 109:18, 109:19, 110:21, 121:1, 128:8, 130:11, 131:10, 131:19
**kinds** [1] - 37:6
**knowing** [6] - 4:22, 11:6, 18:16, 27:19, 96:25, 104:5
**knowledge** [9] - 59:19, 77:6, 77:9, 96:18, 99:13, 99:14, 117:21, 124:19,

126:8
**knowledgeable** [2] - 43:24, 118:1
**known** [5] - 51:4, 85:4, 93:13, 95:16, 103:18
**KYLE** [2] - 1:21, 3:3
**Kyle** [1] - 3:4

## L

**lack** [2] - 69:23, 107:20
**large** [4] - 40:8, 40:16, 40:17, 42:12
**last** [17] - 4:10, 11:11, 11:25, 14:2, 24:18, 42:25, 60:4, 64:1, 64:18, 73:9, 74:6, 84:15, 89:10, 89:11, 108:21, 116:10, 126:12
**lastly** [2] - 79:24, 80:6
**LATHAM** [1] - 1:24
**Latham** [1] - 3:7
**latter** [1] - 65:11
**laughable** [1] - 112:15
**laughed** [1] - 110:13
**law** [10] - 58:3, 58:10, 65:17, 97:17, 97:19, 104:6, 109:4, 113:22, 114:22, 121:19
**laws** [1] - 8:10
**lawyer** [1] - 120:13
**lead** [2] - 2:18, 45:10
**Lead** [1] - 1:18
**leads** [1] - 7:3
**least** [13] - 4:16, 13:24, 15:12, 16:4, 19:18, 97:15, 98:21, 104:4, 104:10, 105:12, 110:19, 127:5, 131:1
**leave** [1] - 114:24
**led** [3] - 37:7, 50:23, 82:4
**left** [5] - 3:16, 43:20, 45:5, 83:2, 131:23
**legal** [3] - 11:12, 84:1, 118:3
**legitimate** [1] - 54:15
**length** [1] - 125:23
**lengths** [1] - 78:18
**lengthy** [1] - 96:12
**less** [3] - 14:13, 18:12, 22:21
**letter** [10] - 6:8, 43:13, 80:14, 80:23, 122:20, 122:23,

123:8, 124:12, 125:11, 125:19
**level** [8] - 13:24, 23:12, 25:21, 55:20, 67:7, 75:22, 96:23, 97:1
**liability** [2] - 8:4, 115:2
**lie** [1] - 106:5
**light** [7] - 19:6, 19:15, 69:22, 100:15, 102:9, 110:16, 114:3
**lightly** [1] - 80:22
**likelihood** [6] - 27:22, 31:7, 38:13, 50:3, 61:24, 72:7
**likely** [21] - 5:7, 19:12, 22:4, 22:9, 22:22, 23:6, 27:8, 30:17, 41:13, 50:20, 50:24, 53:1, 53:13, 60:19, 60:23, 61:3, 61:4, 61:21, 71:1, 105:6, 115:19
**limited** [2] - 23:2, 24:3
**line** [8] - 9:10, 16:18, 24:5, 27:15, 53:17, 56:1, 56:14, 89:11
**link** [1] - 44:8
**litany** [1] - 32:7
**LITIGATION** [2] - 1:4, 134:10
**litigation** [3] - 25:19, 33:10, 123:24
**Litowitz** [2] - 2:15, 45:9
**LITOWITZ** [1] - 1:13
**LLC** [1] - 134:23
**LLP** [2] - 1:13, 1:23
**lobbyists** [1] - 9:20
**logic** [3] - 97:20, 98:3, 98:4
**logical** [2] - 98:2, 98:12
**long-term** [1] - 92:4
**look** [17] - 30:22, 38:2, 52:1, 62:5, 62:22, 64:2, 64:4, 76:25, 90:24, 91:25, 98:19, 116:16, 118:12, 121:24, 125:22, 131:5
**looked** [3] - 15:2, 87:25, 117:10
**looking** [6] - 64:10, 77:3, 92:17, 94:10, 113:18, 113:19
**looks** [1] - 29:22
**lose** [1] - 95:18
**loss** [9] - 11:18, 13:7, 13:9, 14:21, 14:24,

15:5, 62:9, 124:6, 129:17
**lost** [5] - 28:14, 91:13, 91:19, 91:21, 95:25
**low** [1] - 67:7
**lower** [1] - 94:4

**M**

**main** [2] - 109:21, 124:10
**mainstream** [1] - 49:15
**major** [1] - 63:23
**management** [2] - 63:2, 63:5
**manner** [1] - 97:4
**March** [1] - 33:8
**margins** [1] - 91:15
**market** [4] - 30:12, 103:6, 116:8, 124:21
**marketing** [7] - 18:8, 18:22, 22:16, 22:17, 22:18, 97:9, 103:4
**marketplace** [1] - 117:12
**mask** [3] - 18:25, 21:20, 26:5
**masking** [1] - 20:25
**material** [43] - 9:4, 11:21, 40:23, 46:15, 47:3, 47:14, 49:19, 62:12, 62:14, 62:15, 64:14, 64:24, 65:14, 65:19, 66:19, 68:12, 70:10, 70:11, 70:20, 70:23, 71:6, 71:7, 71:8, 71:9, 71:13, 71:20, 72:1, 72:5, 72:8, 72:10, 74:6, 79:3, 80:2, 86:2, 86:11, 86:12, 86:15, 86:16, 86:19, 92:17, 95:14, 98:20, 108:14
**materiality** [1] - 71:25
**materially** [4] - 11:16, 12:17, 65:20, 95:15
**matter** [24] - 2:4, 8:9, 18:17, 18:21, 22:23, 32:22, 34:9, 43:25, 66:23, 69:6, 71:12, 78:21, 90:6, 90:12, 92:25, 98:2, 98:3, 98:5, 100:25, 106:19, 106:20, 123:7, 129:10
**mattered** [1] - 106:24
**matters** [7] - 39:23, 68:10, 75:24, 76:8,

78:10, 95:20
**maximize** [1] - 5:9
**mean** [12] - 28:19, 29:15, 34:24, 42:11, 42:16, 46:16, 55:17, 61:11, 97:12, 111:7, 116:18, 118:11
**meant** [2] - 39:21, 123:15
**meantime** [3] - 102:11, 102:25, 103:7
**meat** [1] - 47:5
**mechanism** [1] - 113:22
**meet** [10] - 4:12, 11:7, 12:24, 13:11, 17:4, 17:8, 25:12, 44:14, 74:2, 74:3
**meeting** [3] - 10:4, 107:12, 128:16
**meets** [1] - 132:17
**memorialize** [1] - 122:25
**mentioned** [2] - 33:3, 85:6
**merit** [1] - 79:12
**merits** [5] - 23:21, 55:22, 72:17, 92:16, 104:25
**met** [5] - 13:2, 14:23, 17:12, 45:16, 96:16
**mid** [2] - 38:9, 75:11
**midstream** [1] - 24:25
**might** [25] - 14:11, 16:12, 18:25, 19:14, 19:15, 20:8, 23:23, 24:24, 28:4, 33:17, 38:14, 38:15, 44:10, 52:23, 57:11, 60:10, 60:25, 61:5, 84:5, 85:14, 85:15, 106:4, 113:17, 120:9, 126:11
**miles** [1] - 112:10
**mind** [6] - 17:7, 27:15, 53:23, 53:24, 56:24, 119:11
**minds** [3] - 55:16, 56:12, 61:9
**mindset** [13] - 24:19, 31:6, 31:18, 31:19, 39:9, 60:7, 69:24, 79:4, 85:9, 104:19, 106:10, 107:8
**minimum** [1] - 26:10
**minute** [1] - 113:23
**minutes** [4] - 3:16, 43:19, 45:5, 112:23
**minutia** [1] - 42:15

**misguided** [1] - 100:13
**mislead** [2] - 27:21, 100:13
**misleading** [8] - 11:16, 12:8, 12:11, 12:18, 65:21, 67:21, 107:1, 126:9
**misread** [1] - 90:1
**misrepresent** [1] - 61:25
**misrepresentation** [2] - 62:14, 129:16
**misrepresentations** [11] - 34:10, 34:12, 49:24, 50:3, 62:8, 62:12, 62:15, 62:23, 64:20, 64:25
**misrepresented** [5] - 49:13, 57:8, 57:10, 57:13, 57:23
**misstatement** [2] - 67:21, 68:12
**misstatements** [6] - 5:17, 11:22, 65:15, 98:20, 98:23, 105:10
**momentarily** [1] - 41:3
**money** [3] - 28:14, 88:17, 96:7
**month** [4] - 21:14, 44:5, 95:3
**month-to-month** [1] - 21:14
**months** [6] - 10:20, 18:18, 22:23, 53:12, 94:21, 95:8
**moreover** [1] - 26:7
**morning** [5] - 2:4, 2:13, 3:3, 3:10, 4:5
**most** [7] - 11:7, 17:9, 18:18, 51:17, 62:21, 96:17, 121:11
**mostly** [1] - 37:20
**MOTION** [3] - 1:6, 1:8, 134:16
**motion** [21] - 2:8, 3:25, 5:19, 6:23, 32:23, 48:2, 56:23, 62:7, 67:5, 76:22, 92:19, 113:16, 113:18, 114:14, 114:23, 118:7, 130:14, 130:24, 131:12, 131:22, 132:2
**motions** [1] - 6:22
**motivate** [1] - 118:5
**motivation** [1] - 59:16
**motivations** [1] - 24:17

**motive** [3] - 59:18, 97:8, 98:6
**move** [8] - 17:17, 17:25, 23:1, 25:16, 26:17, 29:6, 46:19, 128:7
**moved** [3] - 5:8, 28:24, 42:6
**moving** [1] - 26:24
**MR** [2] - 2:13, 3:3
**MS** [110] - 4:2, 4:5, 12:23, 14:18, 15:20, 16:20, 17:14, 19:21, 20:16, 22:7, 24:8, 25:3, 25:14, 28:8, 28:23, 29:13, 29:20, 30:5, 30:21, 31:9, 31:12, 31:16, 31:21, 31:25, 34:2, 35:13, 36:7, 37:18, 39:25, 40:16, 41:21, 42:10, 43:8, 44:11, 45:1, 45:8, 45:13, 46:24, 48:9, 48:18, 50:13, 50:18, 50:21, 51:7, 53:25, 54:17, 56:13, 57:12, 57:25, 59:1, 61:12, 62:20, 64:11, 65:6, 66:1, 66:22, 67:24, 68:19, 70:5, 70:18, 71:17, 72:3, 73:1, 73:21, 76:10, 78:23, 81:22, 83:4, 84:11, 85:23, 86:18, 86:25, 87:24, 88:23, 90:17, 91:5, 92:6, 93:7, 96:9, 98:4, 99:5, 100:7, 101:14, 101:23, 106:22, 107:9, 109:13, 109:21, 111:11, 112:25, 114:1, 114:20, 115:23, 116:20, 117:9, 118:6, 119:12, 119:20, 120:25, 121:22, 122:13, 122:18, 124:3, 125:17, 126:14, 127:10, 128:10, 129:2, 133:3, 133:8
**MSA** [1] - 36:12
**Mueller** [11] - 3:6, 26:10, 52:3, 63:10, 68:8, 68:14, 68:25, 86:4, 86:19, 100:13, 117:4
**multiple** [6] - 25:9, 30:8, 49:18, 50:15, 50:22, 57:14

**musings** [1] - 32:20
**must** [9] - 14:22, 25:23, 28:19, 48:1, 58:2, 68:21, 78:20, 78:21, 121:3
**muster** [1] - 66:13
**myriad** [1] - 110:5

**N**

**nail** [1] - 20:19
**named** [5] - 74:16, 74:20, 76:15, 76:23, 111:24
**narrative** [1] - 18:12
**nature** [4] - 35:9, 57:8, 69:22, 70:12
**near** [1] - 27:8
**necessarily** [9] - 9:9, 12:9, 13:20, 62:11, 64:9, 64:23, 74:1, 97:17, 118:4
**need** [6] - 12:15, 13:9, 39:24, 116:7, 123:2, 132:25
**needed** [2] - 29:4, 126:20
**needs** [1] - 70:10
**negative** [1] - 122:9
**never** [18] - 7:11, 44:23, 52:6, 53:18, 62:1, 69:4, 72:9, 76:19, 92:12, 93:23, 93:24, 100:8, 108:5, 108:10, 108:15, 111:20, 111:22, 128:13
**Nevertheless** [1] - 75:19
**nevertheless** [10] - 4:24, 5:8, 9:2, 12:12, 13:22, 37:2, 65:1, 75:19, 85:4, 118:23
**new** [25] - 16:1, 16:4, 21:25, 24:20, 32:1, 45:18, 49:7, 49:8, 49:9, 52:11, 53:22, 54:25, 55:14, 55:17, 60:11, 60:12, 61:6, 62:5, 92:15, 96:4, 113:10, 115:2, 131:7, 131:9, 131:16
**NEW** [2] - 134:3, 134:18
**newfoundedly** [1] - 56:3
**news** [2] - 10:14, 10:18
**next** [3] - 25:15, 32:1,

93:15
**nimble** [1] - 24:24
**noise** [1] - 32:14
**non** [15] - 4:17, 5:13, 9:11, 10:17, 16:11, 17:9, 24:11, 71:15, 78:4, 78:12, 78:19, 99:10, 99:19, 100:11, 108:3
**non-approval** [1] - 71:15
**non-fraudulent** [6] - 4:17, 5:13, 99:10, 99:19, 100:11, 108:3
**non-profit** [4] - 9:11, 10:17, 16:11, 17:9
**non-profits** [1] - 24:11
**non-substantive** [3] - 78:4, 78:12, 78:19
**none** [5] - 10:9, 18:5, 29:5, 32:20, 43:9
**nonprofit** [131] - 4:23, 5:2, 5:10, 5:15, 9:1, 10:3, 11:8, 14:7, 16:7, 16:17, 17:2, 19:8, 20:10, 21:12, 22:3, 22:5, 22:10, 22:18, 22:19, 23:7, 23:17, 23:18, 23:22, 24:1, 24:2, 26:9, 26:13, 26:20, 27:8, 27:21, 29:8, 30:9, 30:17, 30:19, 30:25, 31:12, 31:15, 34:21, 37:9, 37:15, 38:15, 40:14, 40:19, 40:23, 40:24, 41:7, 41:14, 43:3, 43:23, 44:2, 46:10, 46:23, 47:6, 47:10, 47:11, 47:12, 47:16, 48:8, 48:11, 48:16, 50:5, 51:21, 52:20, 52:25, 53:19, 54:13, 54:16, 54:19, 55:12, 55:18, 55:23, 56:8, 56:10, 57:20, 57:24, 60:14, 60:20, 61:10, 70:2, 70:16, 71:16, 72:18, 72:25, 73:12, 73:15, 73:25, 74:3, 75:15, 75:25, 76:6, 78:16, 79:4, 79:10, 79:16, 84:25, 85:9, 85:17, 85:25, 86:16, 87:8, 87:12, 88:20, 89:2, 89:3, 89:14, 89:21, 91:10, 91:20, 91:21, 92:3, 93:5, 93:19, 95:1, 95:11, 96:5, 101:17,

104:17, 105:7, 106:3, 118:3, 118:16, 119:5, 125:10, 127:7, 127:12, 128:3, 128:14, 128:20, 128:23, 131:3
**nonpublic** [4] - 47:14, 51:19, 51:20, 75:1
**not-for-profit** [1] - 7:9
**notable** [1] - 11:19
**notably** [2] - 4:14, 10:18
**note** [2] - 22:8, 33:9
**noted** [3] - 36:20, 103:21, 105:9
**notes** [1] - 134:13
**nothing** [14] - 8:16, 8:17, 32:18, 49:10, 72:16, 75:14, 75:17, 75:20, 78:15, 79:10, 80:24, 81:3, 104:24, 128:6
**notice** [12] - 33:19, 34:3, 34:6, 83:23, 120:15, 121:5, 121:6, 121:15, 121:20, 122:10, 122:14, 124:16
**novel** [1] - 9:15
**November** [1] - 31:3
**Number** [2] - 2:6, 134:9
**number** [10] - 18:3, 32:23, 54:8, 59:22, 64:6, 77:25, 109:8, 129:15, 130:10, 131:17

## O

**Oakland** [1] - 2:16
**oath** [1] - 33:6
**Obama** [3] - 10:15, 16:9, 24:10
**object** [5] - 70:21, 114:5, 114:6, 114:11, 114:15
**objections** [1] - 104:12
**obtain** [2] - 18:8, 22:16
**obtained** [2] - 46:18, 70:17
**obvious** [1] - 74:16
**Obviously** [1] - 45:24
**obviously** [13] - 11:22, 46:17, 76:25, 80:18, 88:6, 97:13, 99:7,

114:11, 116:17, 119:6, 127:16, 129:11, 130:1
**occur** [2] - 24:25, 113:17
**October** [3] - 1:10, 134:11, 134:20
**odds** [2] - 100:24, 101:11
**OF** [4] - 1:2, 1:6, 134:2, 134:3
**offer** [6] - 18:3, 22:25, 25:15, 26:16, 99:18, 124:18
**offered** [3] - 6:18, 109:23, 124:6
**OFFICIALLY** [1] - 134:17
**once** [4] - 29:4, 48:13, 117:15, 125:17
**one** [46] - 6:20, 22:10, 23:4, 24:22, 30:4, 31:1, 34:19, 38:15, 39:12, 39:18, 39:23, 42:24, 51:17, 55:19, 56:20, 59:16, 59:23, 63:22, 66:14, 67:16, 68:1, 68:2, 69:19, 75:3, 76:20, 77:22, 81:11, 87:4, 89:11, 93:14, 94:13, 97:21, 105:12, 105:25, 116:14, 120:16, 123:23, 125:6, 125:24, 126:12, 127:12, 128:23, 131:1
**ones** [2] - 110:24, 118:4
**ongoing** [4] - 25:19, 63:11, 63:16, 108:6
**operate** [1] - 127:17
**operating** [1] - 21:13
**operative** [6] - 7:3, 52:11, 89:6, 89:17, 113:19, 129:25
**opposed** [2] - 106:14, 120:17
**opposing** [2] - 4:17, 5:13
**opposite** [3] - 96:1, 104:23, 122:3
**opposition** [3] - 63:22, 76:21, 101:5
**option** [1] - 114:5
**oranges** [3] - 34:19, 34:23, 72:21
**order** [7] - 5:9, 15:5, 46:19, 58:19, 74:3, 107:2, 130:9

**orders** [1] - 11:20
**organization's** [1] - 10:17
**original** [7] - 89:7, 89:10, 92:23, 111:4, 113:2, 113:15, 114:13
**originally** [1] - 43:11
**otherwise** [8] - 3:23, 20:6, 51:5, 55:10, 56:2, 68:5, 103:11, 132:1
**ourselves** [1] - 21:3
**outcome** [1] - 92:19
**outset** [1] - 8:16
**outside** [2] - 9:23, 125:21
**outweigh** [1] - 20:8
**outweighed** [1] - 26:1
**overall** [1] - 40:7
**overarching** [2] - 15:11, 15:22
**overestimated** [1] - 96:23
**override** [1] - 54:21
**overseeing** [2] - 9:25, 16:13
**overseer** [1] - 78:14
**oversight** [1] - 82:3
**overwhelming** [1] - 110:16
**own** [5] - 32:25, 79:19, 88:18, 96:10, 107:17

## P

**package** [1] - 6:19
**page** [5] - 6:20, 87:9, 89:10, 89:12, 120:13
**pages** [1] - 134:15
**papers** [1] - 8:7
**parade** [3] - 7:10, 91:12, 94:1
**paragraph** [6] - 6:21, 89:16, 89:18, 121:16, 122:22, 125:23
**paragraphs** [3] - 69:10, 72:15, 129:14
**parenthetical** [1] - 64:9
**parse** [2] - 27:10, 36:5
**part** [16] - 8:19, 9:7, 19:2, 19:16, 24:17, 27:24, 39:18, 39:20, 47:7, 64:13, 73:6, 88:13, 92:10, 97:15, 104:1, 131:16
**participate** [3] - 7:9,

40:18, 41:6
**participated** [1] - 123:18
**participation** [6] - 10:4, 10:18, 17:2, 30:10, 31:1, 31:10
**particular** [2] - 45:25, 68:2
**particularity** [5] - 4:15, 4:21, 8:25, 9:8, 15:23
**particularized** [4] - 79:7, 115:25, 116:3, 116:23
**particularly** [5] - 45:17, 46:15, 67:16, 126:5, 130:17
**parties** [5] - 11:19, 51:18, 87:4, 123:5, 129:14
**parties'** [1] - 11:10
**partners** [1] - 2:19
**parts** [3] - 15:10, 46:8, 53:15
**party** [1] - 68:16
**pass** [1] - 7:12
**passed** [1] - 41:1
**past** [1] - 49:16
**patch** [1] - 9:13
**path** [1] - 105:2
**pause** [1] - 3:17
**pay** [1] - 17:24
**paychecks** [1] - 63:6
**pending** [3] - 47:5, 72:14, 75:12
**pension** [1] - 2:16
**Pension** [1] - 2:17
**people** [13] - 16:13, 16:15, 24:6, 24:16, 44:9, 56:1, 57:21, 64:4, 77:22, 77:23, 77:25, 95:6, 105:24
**per** [2] - 3:13, 60:14
**percent** [6] - 63:4, 91:16, 94:25, 111:15
**percentile** [1] - 111:1
**perfectly** [2] - 49:5, 97:4
**perform** [1] - 128:12
**performing** [4] - 28:11, 126:18, 126:19, 128:15
**perhaps** [1] - 95:8
**period** [7] - 21:16, 25:7, 32:13, 48:20, 51:13, 102:24, 128:14
**periods** [1] - 55:7
**permission** [1] - 3:9
**perplexed** [1] - 29:16

person [4] - 43:24, 74:19, 81:13, 125:8
personal [1] - 111:25
personally [8] - 19:16, 19:19, 55:3, 67:18, 81:7, 111:18, 111:20, 111:23
personnel [1] - 9:16
perspective [4] - 20:6, 88:22, 90:22, 119:3
PETER [1] - 1:21
peter [1] - 3:4
PETERMAN [56] - 1:23, 4:2, 4:5, 12:23, 14:18, 15:20, 16:20, 17:14, 19:21, 20:16, 22:7, 24:8, 25:3, 25:14, 28:8, 28:23, 29:13, 29:20, 30:5, 30:21, 31:9, 31:12, 31:16, 31:21, 31:25, 34:2, 35:13, 36:7, 37:18, 39:25, 40:16, 41:21, 42:10, 43:8, 44:11, 45:1, 112:25, 114:1, 114:20, 115:23, 116:20, 117:9, 118:6, 119:12, 119:20, 120:25, 121:22, 122:13, 122:18, 124:3, 125:17, 126:14, 127:10, 128:10, 129:2, 133:8
Peterman [6] - 3:7, 3:9, 4:1, 11:9, 129:4, 133:7
Philadelphia [1] - 2:23
phone [1] - 36:15
picture [1] - 94:10
piece [1] - 86:7
pieces [1] - 50:15
PIPER [1] - 1:20
piper [1] - 3:4
pivot [2] - 53:10, 115:1
pivoting [3] - 24:19, 25:10, 117:15
pivots [1] - 23:19
place [4] - 23:23, 54:9, 61:17, 92:3
plaintiff [8] - 41:18, 66:18, 68:21, 78:17, 86:10, 97:22, 118:13, 124:18
Plaintiff [2] - 5:20, 22:13
plaintiff's [4] - 92:12, 109:2, 109:10, 132:25

plaintiffs [49] - 2:18, 5:3, 7:10, 7:13, 7:20, 8:2, 8:8, 8:24, 9:6, 12:24, 16:24, 17:19, 18:3, 18:7, 18:16, 18:23, 19:23, 20:13, 22:25, 23:5, 23:16, 25:5, 25:15, 25:23, 26:16, 28:24, 30:22, 34:14, 36:14, 36:24, 37:1, 37:10, 39:5, 41:3, 41:9, 45:10, 51:12, 78:8, 98:15, 103:16, 109:25, 113:5, 114:4, 115:1, 115:3, 117:19, 119:9, 127:1, 128:2
Plaintiffs [7] - 1:19, 4:20, 5:23, 22:15, 29:2, 44:23, 126:6
Plaintiffs' [1] - 9:14
plaintiffs' [17] - 2:11, 4:9, 4:12, 6:5, 6:23, 8:1, 8:5, 32:21, 33:4, 33:11, 39:12, 45:6, 52:2, 58:11, 112:21, 123:9, 126:23
plan [5] - 10:21, 20:11, 24:25, 25:8, 45:14
plans [2] - 7:5, 25:9
plausible [12] - 16:14, 25:23, 28:5, 56:15, 56:22, 58:17, 59:9, 62:13, 98:20, 101:3, 108:3
plausibly [9] - 62:16, 64:25, 65:16, 65:18, 65:19, 66:11, 66:18, 98:24, 113:21
play [4] - 39:3, 71:7, 118:2, 130:24
plead [10] - 4:14, 4:20, 8:24, 9:8, 12:25, 13:5, 15:23, 25:22, 78:18, 116:3
pleaded [6] - 12:11, 12:19, 98:1, 107:5, 113:21, 115:24
pleading [2] - 4:13, 58:25
pleadings [3] - 56:23, 83:7, 107:16
pleads [1] - 89:13
pled [2] - 116:8, 116:22
plenty [2] - 109:7, 114:19
plus [4] - 47:12, 89:1, 91:7, 91:9
point [32] - 22:10,

28:18, 33:13, 33:16, 41:22, 48:15, 52:8, 54:1, 56:18, 56:20, 64:5, 65:11, 66:2, 68:2, 68:7, 70:6, 70:9, 76:20, 79:6, 79:17, 80:6, 88:3, 89:12, 92:17, 93:8, 94:12, 103:14, 104:14, 124:11, 126:13
pointed [8] - 22:14, 80:7, 83:5, 83:20, 88:8, 102:14, 117:20, 119:14
points [4] - 45:15, 78:24, 87:1, 116:13
police [1] - 2:17
policy [1] - 82:5
political [1] - 23:2
pools [1] - 21:25
portion [2] - 89:7, 130:16
portions [1] - 90:2
posit [7] - 13:9, 14:22, 37:18, 43:8, 43:9, 44:17, 115:23
position [2] - 84:4, 85:25
positioned [1] - 27:4
positions [1] - 9:21
positive [2] - 30:11, 40:6
positively [1] - 40:5
possession [3] - 65:9, 66:7, 110:3
possibilities [1] - 25:4
possible [5] - 10:19, 25:2, 43:21, 100:11, 129:21
possibly [1] - 120:19
potential [4] - 5:11, 10:14, 10:23, 56:3
potentially [1] - 15:9
power [1] - 17:11
PPA [2] - 21:14, 30:25
preemptively [1] - 79:6
prefer [1] - 82:10
preliminaries [1] - 3:13
preparing [1] - 26:21
presence [1] - 98:22
present [3] - 34:12, 83:7, 134:7
presentation [2] - 80:8, 92:11
presented [4] - 99:12, 104:11, 111:10, 112:19

presenting [1] - 3:9
President [1] - 54:7
president [3] - 26:11, 52:5, 74:24
presidents [1] - 49:9
press [1] - 113:12
pressed [1] - 52:1
pressing [1] - 114:12
pretty [6] - 51:2, 68:6, 83:24, 90:16, 105:10, 130:15
prevail [1] - 101:9
prevailed [2] - 101:12, 106:11
previous [1] - 33:8
previously [9] - 7:25, 8:1, 9:6, 10:16, 11:3, 79:2, 79:25, 118:10, 123:17
price [3] - 90:24, 94:4, 103:6
primarily [1] - 8:5
primary [2] - 8:12, 128:24
priorities [1] - 9:17
probable [2] - 61:10, 61:11
probative [1] - 76:24
probe [1] - 109:3
problem [4] - 38:5, 57:6, 61:13, 63:12
problems [1] - 49:1
procedural [1] - 82:2
proceed [2] - 19:10, 79:15
proceedings [1] - 134:8
process [28] - 6:1, 32:9, 34:18, 35:23, 35:25, 41:5, 64:17, 72:21, 76:5, 84:22, 84:24, 85:5, 85:8, 113:17, 117:23, 118:14, 118:15, 118:20, 123:16, 123:18, 123:21, 124:1, 125:2, 125:4, 125:7, 130:21, 130:23, 132:21
proffered [5] - 20:17, 22:12, 25:9, 26:14, 29:5
proffering [1] - 126:7
profit [20] - 7:9, 7:20, 7:23, 9:11, 10:8, 10:17, 14:6, 16:7, 16:11, 16:17, 17:9, 19:16, 21:13, 28:10, 40:20, 54:12, 96:6, 127:20, 128:16,

128:21
profited [1] - 19:18
profits [3] - 5:9, 21:9, 24:11
progressive [1] - 6:18
proof [1] - 66:23
properly [1] - 123:25
proposed [13] - 2:18, 35:3, 35:10, 37:4, 39:15, 49:25, 51:21, 55:11, 60:13, 69:16, 69:20, 75:14, 119:1
proposition [1] - 89:19
prosecuted [2] - 111:21
prospect [2] - 89:20, 104:15
provide [2] - 82:2, 129:18
provided [1] - 33:3
providing [3] - 13:24, 35:8, 42:4
PSLRA [1] - 4:13
public [23] - 20:7, 25:1, 35:6, 50:7, 59:5, 59:21, 61:23, 63:11, 65:8, 67:2, 67:19, 68:13, 71:11, 74:16, 93:14, 96:19, 100:13, 104:22, 105:13, 110:2, 117:19, 121:5, 121:6
publicly [6] - 6:11, 6:14, 57:21, 71:5, 83:5, 124:14
Purdue [13] - 35:11, 36:8, 41:24, 42:2, 42:11, 49:15, 49:20, 51:19, 51:20, 67:19, 68:9, 71:19, 74:25
Purdue-Kaplan [11] - 35:11, 36:8, 41:24, 42:2, 49:15, 49:20, 51:19, 51:20, 68:9, 71:19, 74:25
purport [1] - 8:2
purported [4] - 17:17, 18:20, 23:2, 25:24
purportedly [3] - 16:5, 23:9, 25:18
purpose [1] - 98:14
purposes [2] - 48:2, 118:6
push [3] - 100:22, 107:2, 125:5
pushback [2] - 51:15, 86:20
pushed [1] - 57:1
put [14] - 23:13, 30:18,

38:6, 60:2, 62:25, 63:9, 63:19, 79:24, 83:9, 90:20, 118:11, 120:20, 126:3, 128:10

**Q**

qualifies [1] - 26:12
qualify [2] - 4:22, 9:1
questioning [1] - 116:17
questions [12] - 29:25, 38:18, 45:24, 45:25, 47:8, 64:16, 72:11, 73:5, 73:14, 82:12, 93:17, 103:23
quickly [1] - 126:15
quintessential [1] - 100:16
quite [3] - 37:20, 109:8, 129:15
quote [2] - 87:18, 89:23
quotes [1] - 89:8
quoting [1] - 79:19

**R**

raised [2] - 73:14, 129:15
ran [1] - 55:25
rare [1] - 99:14
rather [1] - 25:22
rational [1] - 97:4
rationale [2] - 14:10, 109:16
re [1] - 2:4
RE [2] - 1:3, 134:9
reach [2] - 13:9, 15:5
reaching [3] - 13:14, 13:17, 14:20
reaction [1] - 49:7
read [8] - 74:5, 83:21, 92:15, 107:16, 120:12, 123:12, 132:4
reader [2] - 82:21, 82:23
reading [1] - 78:7
real [7] - 42:9, 42:10, 51:23, 56:1, 115:19, 116:13, 120:8
realize [1] - 32:17
realized [4] - 17:23, 56:3, 102:25, 103:3
realizing [3] - 24:13, 26:19, 91:15

really [17] - 15:4, 24:12, 37:5, 41:7, 41:21, 47:7, 53:20, 55:18, 57:19, 63:21, 66:11, 84:25, 86:12, 92:23, 124:10, 129:12, 131:16
reason [24] - 17:17, 26:16, 27:2, 28:17, 40:21, 49:23, 67:8, 69:17, 70:11, 71:2, 73:2, 74:9, 76:1, 82:19, 83:19, 84:22, 90:11, 98:12, 105:13, 105:18, 105:21, 106:18, 124:5, 127:3
reasonable [1] - 49:5
reasonably [1] - 9:12
reasons [16] - 20:17, 22:12, 25:16, 28:18, 29:5, 44:3, 47:14, 59:22, 74:11, 74:16, 78:4, 79:18, 93:10, 93:12, 106:4, 106:7
reassure [1] - 70:25
rebuttal [4] - 3:19, 45:3, 45:6, 112:24
receipt [1] - 116:4
receive [1] - 23:7
received [6] - 17:22, 19:4, 36:14, 40:5, 48:13, 128:13
recess [1] - 133:12
recklessness [4] - 77:11, 117:16, 117:17
reckoning [1] - 107:2
recognition [1] - 14:23
recognize [1] - 23:6
recognized [1] - 113:1
recognizing [2] - 5:7, 29:7
recollection [1] - 86:2
recommendation [1] - 4:9
recommending [1] - 4:18
reconciled [2] - 63:1, 63:9
record [5] - 2:2, 2:3, 2:10, 46:3, 68:5
recounting [1] - 86:3
recourse [1] - 94:8
recusal [1] - 122:23
recuse [1] - 123:2
redacted [1] - 64:13
reference [1] - 53:16
referenced [11] - 6:20,

33:10, 33:14, 33:16, 83:16, 117:13, 120:21, 122:21, 122:22, 124:13, 125:20
refused [1] - 48:24
refuted [2] - 32:25, 62:2
regard [12] - 13:15, 14:6, 16:2, 16:6, 16:7, 22:6, 35:23, 46:13, 48:7, 62:3, 125:10, 131:1
regarding [8] - 8:14, 9:5, 9:16, 10:19, 12:17, 32:8, 68:3, 126:15
regardless [4] - 36:24, 38:17, 101:4, 126:16
regulations [5] - 9:12, 17:4, 21:15, 60:14, 60:15
regulatory [17] - 8:14, 8:19, 10:5, 16:22, 16:25, 21:1, 21:7, 23:10, 23:22, 24:3, 28:13, 30:7, 49:10, 54:8, 57:4, 102:22, 126:20
reject [1] - 102:3
rejected [5] - 18:11, 22:20, 89:13, 92:3, 102:15
rejection [2] - 103:15, 131:2
relate [6] - 28:6, 46:21, 70:14, 70:15, 73:15, 76:9
related [13] - 5:25, 7:14, 26:8, 28:3, 32:2, 32:23, 34:20, 43:3, 43:4, 73:11, 123:7, 123:24, 127:14
relates [6] - 35:22, 47:6, 57:16, 73:7, 130:17, 130:20
relating [7] - 11:14, 11:15, 11:18, 75:25, 123:4, 123:21, 123:22
relationship [2] - 7:15, 65:13
relaying [2] - 69:11, 69:15
relevance [1] - 69:17
relevant [22] - 30:6, 30:23, 31:19, 32:12, 32:20, 43:2, 43:6, 43:7, 43:10, 44:22,

53:20, 70:6, 71:13, 84:3, 86:16, 119:11, 125:14, 128:13, 130:3, 130:19, 130:21, 132:2
relied [2] - 10:23, 70:20
relying [1] - 20:14
remainder [1] - 45:2
remedy [2] - 11:2, 17:19
remember [1] - 73:9
removed [1] - 82:8
render [1] - 100:20
reopen [1] - 112:9
repeat [1] - 71:5
repeated [2] - 68:13, 75:2
report [3] - 4:8, 5:18, 5:22
reported [1] - 134:7
Reporter [2] - 134:5, 134:6
representations [2] - 9:4, 50:6
representative [2] - 75:21, 75:22
representative's [1] - 44:22
representatives [3] - 41:10, 41:11, 41:13
reputable [1] - 51:18
request [14] - 6:24, 7:8, 9:3, 10:3, 10:17, 11:6, 11:7, 17:22, 104:17, 115:4, 116:4, 116:11, 116:21, 132:11
requested [1] - 5:2
requests [2] - 116:6, 117:1
require [1] - 98:5
required [3] - 30:7, 58:10, 59:18
requirement [1] - 97:17
requirements [4] - 4:13, 10:5, 12:25, 13:3
requires [1] - 117:17
reserve [1] - 45:2
resign [1] - 82:18
resigned [9] - 34:8, 82:17, 83:22, 84:10, 84:12, 120:6, 120:10, 121:9, 122:5
resources [1] - 114:11
respect [16] - 30:9, 48:10, 81:5, 81:24, 82:2, 82:11, 86:1,

98:7, 108:19, 111:15, 113:13, 118:8, 118:9, 124:7, 129:16, 129:17
respectfully [5] - 96:16, 100:15, 106:23, 108:9, 112:9
Respectfully [1] - 114:7
respects [2] - 57:14, 132:15
respond [3] - 73:14, 81:2, 111:8
responding [1] - 123:20
responsibilities [1] - 4:25
responsibility [1] - 78:13
responsible [1] - 63:5
responsive [1] - 132:11
restated [1] - 126:25
restatements [1] - 7:17
resubmit [1] - 49:9
result [3] - 14:12, 75:15, 130:6
returning [1] - 128:22
revealed [3] - 18:17, 18:21, 22:23
revenue [3] - 42:3, 87:22, 91:16
reverting [1] - 117:16
review [14] - 30:24, 31:2, 35:1, 40:7, 46:15, 46:17, 46:22, 64:22, 72:14, 73:24, 82:8, 115:17, 118:3
reviewed [5] - 40:6, 68:23, 74:24, 111:4, 119:1
reviewing [1] - 35:5
reviews [1] - 82:5
revoked [2] - 89:21, 93:6
rightly [4] - 18:13, 102:18, 103:8, 132:10
Rights [1] - 6:16
rise [6] - 13:23, 23:12, 25:21, 108:1, 116:9, 119:19
risk [25] - 48:21, 50:11, 50:13, 55:2, 56:19, 57:11, 57:14, 57:16, 57:23, 58:3, 61:22, 69:25, 71:15, 80:2, 86:23, 89:22, 89:23, 92:2, 97:1,

100:18, 115:6, 115:8, 127:2
**risker** [1] - 50:16
**risking** [1] - 126:23
**risks** [6] - 26:6, 47:15, 88:15, 91:8, 102:6, 102:22
**road** [1] - 27:25
**Robbins** [1] - 86:14
**Robbins-Kaplan** [1] - 86:14
**robust** [1] - 130:1
**RODOS** [1] - 1:16
**Rodos** [1] - 2:22
**role** [1] - 9:25
**rolled** [1] - 10:7
**roots** [1] - 128:23
**rounds** [1] - 63:25
**routine** [4] - 116:6, 116:11, 116:15, 116:19
**rubber** [5] - 5:1, 9:3, 11:6, 17:3, 17:10
**rubber-stamp** [4] - 5:1, 9:3, 11:6, 17:10
**rubber-stamping** [1] - 17:3
**rule** [1] - 83:8
**Rule** [5] - 58:15, 80:15, 80:20, 83:17, 132:18
**rules** [10] - 7:19, 10:8, 10:9, 10:11, 21:8, 42:23, 75:16, 81:14, 127:19, 128:17
**run** [1] - 16:15
**running** [1] - 28:25

## S

**safe** [1] - 133:10
**safety** [1] - 133:11
**sake** [2] - 13:20, 107:18
**satisfy** [1] - 98:13
**save** [2] - 3:18, 45:5
**saw** [3] - 48:14, 100:14, 102:9
**scenario** [3] - 106:12, 106:13, 106:16
**scheme** [3] - 18:5, 27:14, 38:22
**schools** [1] - 22:19
**scienter** [57] - 4:15, 5:5, 9:14, 11:10, 11:13, 11:15, 11:20, 12:1, 12:5, 12:13, 12:21, 13:4, 13:5, 13:8, 13:16, 13:19,

14:16, 15:3, 15:9, 17:16, 18:6, 25:21, 29:25, 31:20, 44:19, 44:23, 59:9, 59:10, 59:19, 62:8, 62:10, 62:17, 64:18, 65:3, 65:8, 66:3, 66:6, 66:21, 66:24, 67:1, 67:13, 76:12, 76:24, 77:2, 94:12, 96:17, 100:25, 101:11, 102:15, 104:9, 107:13, 110:5, 110:8, 116:9, 129:16
**scope** [1] - 73:7
**SEALED** [1] - 134:17
**SEC** [3] - 7:14, 69:8, 126:25
**second** [24] - 5:3, 6:25, 8:6, 9:14, 10:6, 10:12, 17:15, 22:24, 32:6, 44:17, 52:24, 79:13, 80:25, 81:24, 81:25, 90:23, 107:22, 112:10, 112:17, 123:10, 129:25, 130:16, 132:5
**secondly** [1] - 109:15
**secretary** [3] - 9:9, 10:7, 54:14
**securities** [18] - 2:5, 8:10, 19:13, 21:18, 26:4, 45:16, 49:12, 58:3, 67:15, 74:13, 97:2, 97:10, 98:16, 100:16, 103:9, 103:12, 103:16, 109:24
**SECURITIES** [2] - 1:4, 134:10
**see** [13] - 15:8, 20:24, 21:19, 26:3, 27:12, 67:14, 86:6, 106:20, 111:10, 114:14, 116:16, 122:10, 122:13
**seeing** [1] - 53:4
**seem** [7] - 15:15, 83:10, 83:21, 84:20, 85:14, 85:18, 129:24
**selling** [1] - 19:19
**senior** [2] - 54:9, 54:20
**sense** [22] - 20:20, 24:4, 27:7, 56:15, 57:2, 59:24, 62:21, 66:4, 66:22, 70:19, 94:16, 98:5, 99:19, 102:16, 103:9,

107:20, 109:16, 110:19, 114:15, 129:8, 129:23, 132:20
**sent** [3] - 6:9, 80:14, 123:9
**sentence** [1] - 83:21
**separate** [2] - 83:15, 118:9
**separateness** [2] - 37:13, 37:23
**serious** [1] - 129:12
**seriously** [4] - 80:20, 96:13, 111:14, 112:7
**serve** [2] - 8:21, 27:2
**service** [2] - 38:3, 47:24
**servicer** [1] - 42:16
**services** [1] - 42:4
**set** [7] - 32:1, 32:22, 54:8, 59:24, 66:16, 74:17, 121:4
**setting** [1] - 12:12
**settlement** [3] - 10:14, 10:19, 10:24
**several** [3] - 10:20, 79:17, 84:12
**severance** [1] - 6:19
**severe** [1] - 77:11
**sexual** [1] - 124:5
**sham** [1] - 125:4
**sharing** [1] - 42:3
**shining** [1] - 57:6
**shocked** [1] - 92:13
**shocking** [1] - 110:15
**shoes** [1] - 119:7
**shoo** [1] - 115:10
**shoo-in** [1] - 115:10
**shoots** [1] - 90:24
**short** [5] - 20:2, 20:6, 21:22, 102:4, 125:7
**short-term** [3] - 20:2, 20:6, 21:22
**Shorthand** [2] - 134:5, 134:6
**shorthand** [2] - 134:7, 134:13
**shortly** [2] - 5:23, 6:10
**shot** [2] - 55:1, 55:4
**shoulders** [2] - 28:14, 112:17
**show** [14] - 8:25, 9:8, 16:25, 61:8, 85:2, 98:23, 99:3, 115:25, 116:23, 120:11, 121:10, 121:13, 121:14, 122:6
**showing** [6] - 9:7, 14:24, 17:12, 116:17, 117:17,

124:18
**showings** [1] - 15:21
**shrug** [1] - 28:13
**side** [31] - 2:9, 2:11, 3:1, 3:14, 3:18, 3:25, 11:21, 27:24, 33:18, 37:16, 38:15, 39:12, 41:20, 60:5, 60:10, 60:16, 62:25, 63:1, 63:9, 63:19, 82:18, 90:10, 92:12, 97:21, 97:24, 105:4, 127:5, 132:25, 133:6
**side's** [1] - 66:14
**sides** [3] - 19:24, 29:16, 125:1
**sides'** [2] - 39:22, 58:11
**sideshow** [1] - 82:10
**sign** [1] - 40:9
**SIGNED** [1] - 134:17
**signed** [1] - 69:8
**significance** [1] - 131:2
**significant** [21] - 20:25, 21:1, 21:6, 26:21, 30:6, 47:12, 47:15, 48:4, 48:24, 49:1, 51:14, 51:15, 52:16, 54:5, 56:19, 67:13, 79:22, 87:13, 89:1, 96:15, 126:10
**significantly** [2] - 5:14, 131:10
**similar** [7] - 35:4, 50:1, 69:9, 70:8, 86:14, 90:3, 105:1
**simply** [5] - 5:1, 11:5, 25:11, 28:13, 28:21
**Sinderson** [5] - 2:20, 45:9, 45:12, 129:5, 133:2
**SINDERSON** [56] - 1:14, 45:8, 45:13, 46:24, 48:9, 48:18, 50:13, 50:18, 50:21, 51:7, 53:25, 54:17, 56:13, 57:12, 57:25, 59:1, 61:12, 62:20, 64:11, 65:6, 66:1, 66:22, 67:24, 68:19, 70:5, 70:18, 71:17, 72:3, 73:1, 73:21, 76:10, 78:23, 81:22, 83:4, 84:11, 85:23, 86:18, 86:25, 87:24, 88:23, 90:17, 91:5, 92:6, 93:7, 96:9, 98:4, 99:5, 100:7, 101:14, 101:23,

106:22, 107:9, 109:13, 109:21, 111:11, 133:3
**Sinderson's** [1] - 127:21
**single** [1] - 124:7
**siphon** [1] - 91:16
**sitting** [2] - 61:15, 94:11
**situation** [2] - 14:13, 107:19
**six** [2] - 65:14, 65:19
**skeptical** [1] - 39:13
**slides** [2] - 3:19, 4:3
**slow** [1] - 3:17
**slower** [1] - 106:8
**smattering** [1] - 9:15
**sole** [1] - 91:11
**Solinski** [47] - 6:2, 6:9, 6:12, 7:2, 32:10, 32:15, 32:23, 33:6, 35:2, 35:7, 36:3, 36:4, 36:11, 36:15, 39:2, 39:12, 41:20, 41:25, 42:23, 67:24, 68:4, 68:7, 69:11, 71:3, 72:12, 72:23, 74:12, 76:2, 76:4, 77:17, 77:24, 80:17, 80:22, 80:24, 81:1, 85:10, 86:13, 86:20, 117:22, 118:24, 120:6, 123:14, 125:6, 125:8, 131:15
**Solinski's** [7] - 6:7, 6:14, 32:25, 33:5, 43:13, 86:2, 119:18
**Solinski-related** [1] - 32:23
**someone** [4] - 106:4, 117:25, 119:7, 131:15
**sometimes** [1] - 19:13
**somewhat** [2] - 82:10, 132:9
**soon** [2] - 29:7, 129:21
**sorry** [3] - 6:22, 71:21, 121:6
**sort** [1] - 117:10
**sought** [3] - 80:10, 93:19, 96:13
**sound** [1] - 23:15
**sounds** [5] - 37:9, 98:17, 98:18, 98:25, 101:2
**source** [1] - 87:22
**sparse** [1] - 37:20
**speaking** [1] - 31:25
**specific** [2] - 7:19,

115:8
**specifically** [1] - 69:3
**Speedbudget** [1] - 134:23
**spend** [1] - 114:10
**spends** [2] - 77:16, 77:19
**spoken** [1] - 74:12
**squared** [1] - 9:12
**ss** [1] - 134:2
**staff** [8] - 4:24, 10:2, 11:5, 17:1, 48:23, 54:20, 54:22, 54:23
**staffers** [2] - 53:16, 53:17
**staffing** [6] - 54:9, 99:22, 108:4, 108:7, 115:18
**stage** [2] - 51:12, 58:15
**stakes** [25] - 88:10, 88:14, 90:5, 90:6, 90:9, 90:11, 90:13, 90:17, 90:20, 91:1, 91:3, 91:4, 91:5, 91:7, 91:20, 91:24, 92:25, 93:4, 95:10, 95:18, 95:21, 95:25, 128:9
**stamp** [4] - 5:1, 9:3, 11:6, 17:10
**stamping** [1] - 17:3
**stand** [2] - 129:9, 133:12
**standard** [6] - 44:21, 74:2, 77:10, 96:17, 98:21, 107:13
**standards** [3] - 44:15, 45:16, 96:18
**standing** [1] - 28:19
**stands** [1] - 129:24
**start** [8] - 2:10, 11:20, 25:7, 53:9, 62:22, 66:5, 76:18
**started** [6] - 3:22, 46:2, 66:3, 67:18, 91:13, 128:20
**starting** [3] - 11:10, 12:4, 61:17
**starts** [1] - 11:21
**state** [3] - 8:9, 17:7, 121:19
**STATE** [1] - 134:2
**statement** [26] - 34:5, 49:5, 63:17, 70:11, 70:20, 70:21, 70:22, 71:11, 99:3, 100:3, 101:3, 101:20, 105:20, 105:21, 105:23, 106:5,

108:2, 115:16, 116:1, 116:24, 119:24, 122:1, 122:3, 122:10, 122:15, 127:21
**statements** [77] - 6:1, 6:7, 11:16, 12:8, 12:11, 12:18, 13:18, 13:21, 14:4, 14:11, 19:11, 19:14, 25:18, 32:9, 32:16, 33:1, 34:12, 35:24, 36:9, 39:4, 44:22, 47:20, 50:22, 51:4, 59:5, 59:21, 61:23, 62:23, 63:2, 63:8, 63:10, 65:8, 65:19, 65:21, 66:10, 66:19, 67:3, 67:19, 69:5, 69:7, 71:18, 71:25, 72:1, 76:17, 76:23, 77:3, 77:7, 77:8, 90:8, 93:14, 94:7, 95:7, 95:16, 96:19, 98:10, 98:24, 100:12, 103:17, 104:22, 107:10, 108:12, 108:14, 108:20, 110:1, 110:3, 110:4, 112:2, 115:12, 117:19, 119:24, 122:19, 124:12, 124:17, 124:18, 124:23, 125:19, 126:8
**STATES** [1] - 1:1
**status** [56] - 5:16, 9:11, 11:8, 14:7, 17:9, 19:8, 20:10, 21:12, 26:20, 27:8, 27:21, 29:8, 30:17, 34:21, 37:9, 37:15, 38:15, 40:15, 41:14, 43:3, 48:17, 52:25, 53:19, 55:12, 70:2, 70:16, 71:16, 72:19, 72:25, 74:3, 75:25, 76:7, 78:16, 84:25, 85:17, 89:14, 89:21, 91:11, 91:21, 92:3, 95:1, 95:11, 96:5, 96:7, 101:17, 104:17, 105:7, 106:3, 118:16, 119:5, 125:10, 127:7, 127:12, 128:4, 131:3
**Stenotype** [1] - 134:7
**step** [2] - 59:2, 103:25
**stepping** [2] - 11:24,

34:13
**stick** [2] - 41:2, 91:23
**still** [26] - 8:9, 20:9, 23:8, 24:3, 25:1, 40:18, 43:23, 47:5, 47:13, 52:13, 53:23, 55:19, 94:2, 98:15, 100:4, 102:3, 106:5, 106:11, 107:8, 114:21, 117:17, 126:17, 126:18, 126:23, 127:1, 130:19
**stock** [4] - 19:19, 90:24, 94:4, 103:6
**stop** [1] - 120:4
**story** [7] - 56:14, 57:2, 58:5, 92:18, 96:2, 99:15, 113:10
**strange** [1] - 77:22
**strategic** [1] - 63:5
**streamlined** [2] - 114:16, 114:21
**strength** [2] - 112:11, 112:18
**string** [1] - 105:24
**strong** [7] - 39:17, 77:25, 78:7, 78:20, 81:17, 99:12, 110:16
**strong-armed** [3] - 77:25, 78:7, 81:17
**strong-arming** [1] - 78:20
**structure** [11] - 42:16, 48:4, 48:25, 49:13, 49:25, 57:13, 57:15, 60:13, 62:24, 73:8, 119:2
**structured** [1] - 57:19
**struggling** [1] - 75:8
**student** [1] - 21:25
**students** [5] - 5:11, 18:15, 20:22, 30:11, 38:4
**stuff** [3] - 43:7, 84:6, 84:18
**subissues** [1] - 129:15
**subject** [3] - 7:14, 21:15, 43:25
**submission** [1] - 116:9
**submit** [9] - 49:6, 49:21, 54:6, 63:19, 63:21, 66:25, 86:21, 103:10, 109:23
**submitted** [6] - 10:21, 11:11, 48:5, 49:16, 51:15, 80:13
**substance** [9] - 35:1,

35:22, 44:8, 72:17, 119:17, 123:21, 125:15, 131:25, 132:4
**substantial** [6] - 102:11, 102:21, 103:1, 104:12, 129:13, 130:15
**substantially** [1] - 104:18
**substantive** [9] - 37:11, 78:4, 78:12, 78:19, 81:23, 82:1, 116:13, 132:8, 132:15
**substantively** [5] - 60:18, 61:2, 70:8, 114:6, 118:15
**success** [1] - 96:24
**successfully** [2] - 8:23, 97:2
**sudden** [3] - 53:6, 53:13, 53:20
**suddenly** [2] - 17:11, 43:18
**sued** [1] - 127:14
**sufficiency** [1] - 12:16
**sufficient** [4] - 12:13, 14:9, 15:18, 25:22
**sufficiently** [3] - 12:11, 12:19, 27:13
**suggest** [8] - 30:15, 52:23, 53:18, 60:18, 87:10, 97:23, 110:22, 116:13
**suggested** [6] - 52:18, 87:11, 87:14, 90:15, 105:24, 106:19
**suggesting** [10] - 19:23, 92:20, 97:22, 104:1, 104:22, 104:23, 104:25, 106:9, 110:14, 112:13
**suggests** [1] - 98:1
**suit** [1] - 111:22
**sum** [1] - 129:23
**summer** [1] - 14:6
**sun** [1] - 57:6
**sunk** [2] - 27:1, 28:1
**super** [3] - 90:9, 95:11, 95:22
**supplement** [2] - 32:5, 113:6
**supplemental** [3] - 8:5, 8:11, 17:16
**supplying** [1] - 6:7
**support** [6] - 5:4, 11:4, 15:17, 15:24, 99:13, 103:15

**supporting** [1] - 32:21
**supposed** [3] - 18:4, 72:16, 82:6
**surprise** [1] - 42:14
**sustain** [1] - 107:3
**sustainable** [1] - 93:9
**swore** [1] - 122:1
**sworn** [3] - 119:24, 122:15, 122:19

## T

**table** [2] - 2:19, 3:6
**taint** [1] - 120:9
**task** [1] - 109:5
**tear** [1] - 78:10
**tearing** [1] - 84:21
**Tellabs** [2] - 121:1, 121:3
**teller** [1] - 125:9
**tenant** [1] - 11:8
**tenants** [1] - 17:9
**tenor** [1] - 110:20
**term** [8] - 20:2, 20:6, 21:22, 27:9, 84:1, 89:15, 92:4, 102:5
**terminated** [8] - 6:3, 6:14, 32:11, 33:7, 34:7, 121:9, 122:6, 124:4
**termination** [2] - 6:10, 83:11
**terminology** [1] - 109:19
**terms** [6] - 101:1, 109:15, 113:16, 130:2, 132:5, 132:6
**test** [4] - 40:25, 41:1, 41:8
**THE** [115] - 1:1, 1:2, 2:1, 2:24, 3:11, 4:4, 11:9, 13:13, 15:7, 15:25, 17:13, 19:2, 19:22, 21:21, 23:13, 24:16, 25:13, 27:10, 28:22, 29:10, 29:15, 29:21, 30:14, 31:5, 31:11, 31:14, 31:17, 31:23, 33:12, 34:13, 35:17, 36:23, 38:5, 40:13, 41:9, 42:9, 42:18, 43:19, 44:25, 45:4, 45:11, 46:13, 48:7, 48:12, 49:22, 50:17, 50:19, 50:25, 52:10, 54:15, 55:5, 57:10, 57:15, 58:8, 60:2, 62:3, 64:5, 64:16, 65:12, 66:9,

67:23, 68:17, 69:14, 70:10, 71:3, 71:20, 72:11, 73:17, 75:7, 77:14, 81:8, 82:14, 83:12, 84:15, 86:6, 86:24, 87:9, 88:19, 89:4, 91:1, 91:19, 92:10, 94:6, 97:12, 98:17, 99:25, 100:23, 101:16, 103:21, 107:5, 108:21, 109:15, 110:9, 112:20, 113:12, 114:9, 115:14, 116:10, 117:7, 117:25, 118:11, 119:16, 120:4, 121:13, 122:8, 122:17, 123:11, 124:22, 126:11, 127:4, 128:1, 128:25, 129:4, 133:5, 133:9

**theirs** [2] - 98:22, 100:6

**themselves** [9] - 2:10, 22:18, 23:9, 26:15, 32:17, 33:14, 74:17, 74:20

**theories** [14] - 30:1, 40:2, 58:11, 65:24, 90:7, 97:18, 97:20, 99:2, 99:9, 99:10, 102:16, 109:6, 115:2, 132:7

**theorized** [1] - 100:10

**theorizing** [1] - 51:8

**theory** [73] - 4:15, 4:21, 5:4, 5:13, 8:4, 9:14, 11:4, 13:25, 14:13, 15:2, 15:11, 15:14, 15:17, 15:22, 15:24, 17:21, 18:6, 18:12, 22:22, 23:4, 23:10, 24:9, 24:15, 25:23, 27:17, 28:4, 29:9, 56:16, 56:22, 58:6, 58:12, 58:20, 58:21, 58:24, 59:2, 59:10, 59:25, 60:3, 60:8, 60:25, 65:3, 65:7, 66:6, 66:14, 66:24, 79:20, 97:25, 98:21, 100:4, 100:24, 101:5, 101:11, 101:14, 101:25, 102:5, 102:19, 104:8, 104:19, 105:3, 105:4, 105:5,

106:13, 106:14, 107:13, 107:20, 109:2, 109:16, 117:16, 126:23

**thereafter** [5] - 5:18, 5:23, 6:4, 6:24, 104:11

**thereto** [1] - 83:16

**they've** [4] - 13:2, 13:11, 25:9, 127:14

**thinking** [5] - 55:21, 61:16, 78:8, 79:4, 111:9

**Third** [1] - 59:17

**third** [6] - 5:12, 51:18, 68:16, 80:6, 109:25, 110:7

**thorough** [1] - 129:19

**thoroughly** [3] - 68:6, 107:14, 130:8

**three** [6] - 7:7, 11:11, 12:24, 12:25, 62:7, 78:23

**threshold** [3] - 14:24, 17:12, 25:12

**throughout** [1] - 102:24

**Thursday** [1] - 122:25

**timeframe** [1] - 132:22

**timely** [1] - 18:19

**Title** [13] - 4:23, 7:9, 7:24, 9:2, 10:4, 10:18, 17:3, 26:13, 30:9, 30:25, 31:10, 36:21, 40:18

**TO** [3] - 1:6, 1:8, 134:16

**today** [20] - 2:7, 4:3, 7:4, 8:4, 21:16, 39:24, 46:12, 88:4, 88:7, 93:11, 103:20, 107:18, 113:4, 113:7, 115:3, 129:7, 130:8, 130:11, 130:14, 133:1

**today's** [1] - 129:23

**together** [3] - 11:1, 58:23, 107:14

**tone** [1] - 110:20

**tons** [1] - 96:7

**took** [5] - 23:16, 23:20, 55:3, 60:12, 96:12

**total** [2] - 8:9, 56:15

**totally** [8] - 31:18, 43:5, 54:25, 68:24, 92:16, 94:8, 101:11, 124:25

**touch** [1] - 132:23

**touching** [1] - 65:1

**touting** [1] - 5:10

**town** [2] - 91:12, 133:9

**track** [2] - 3:14, 50:2

**trading** [1] - 94:4

**transaction** [60] - 5:9, 7:6, 7:7, 10:25, 17:18, 18:1, 18:10, 23:1, 25:17, 26:18, 26:22, 26:25, 27:3, 27:6, 28:25, 29:4, 29:6, 30:7, 30:13, 30:24, 31:3, 35:3, 35:10, 37:4, 37:25, 40:8, 40:10, 40:14, 40:17, 41:24, 42:7, 44:16, 46:19, 47:4, 47:9, 47:19, 47:23, 49:14, 49:19, 54:4, 57:9, 57:13, 57:16, 57:18, 61:25, 62:24, 78:3, 79:15, 82:4, 87:6, 88:6, 88:9, 95:14, 96:25, 105:1, 123:3, 126:22, 127:13, 127:22, 128:24

**transactions** [8] - 36:18, 42:7, 42:17, 53:19, 68:23, 70:8, 70:12, 119:1

**TRANSCRIPT** [1] - 1:6

**transcript** [2] - 134:12, 134:14

**transitioning** [1] - 26:22

**trashing** [1] - 77:20

**travel** [1] - 133:10

**treatment** [1] - 7:15

**tremendous** [1] - 91:9

**trickle** [1] - 16:18

**tried** [3] - 90:22, 108:11, 112:7

**trouble** [2] - 20:11, 96:11

**true** [8] - 13:7, 15:16, 51:11, 60:22, 76:25, 122:1, 131:13, 134:15

**Trump** [9] - 9:21, 17:11, 23:15, 23:20, 24:11, 49:3, 52:16, 54:7, 55:14

**trump** [6] - 8:15, 9:17, 16:2, 53:22, 55:24, 57:3

**truncated** [1] - 125:3

**trust** [1] - 111:21

**truth** [9] - 18:2, 71:17, 93:2, 95:9, 121:15, 121:17, 121:24,

125:9, 125:16

**truth-teller** [1] - 125:9

**truthful** [1] - 83:20

**try** [6] - 40:2, 46:3, 46:11, 54:2, 67:9, 129:8

**trying** [19] - 25:1, 27:10, 27:16, 35:19, 35:20, 35:25, 36:5, 41:18, 55:5, 58:23, 61:6, 71:8, 71:23, 74:10, 84:7, 90:1, 90:4, 95:11, 110:22

**turn** [7] - 22:13, 32:1, 45:6, 52:9, 54:21, 71:15, 74:5

**turned** [1] - 52:13

**twice** [1] - 118:21

**two** [29] - 3:21, 15:9, 25:15, 26:14, 33:10, 36:18, 37:5, 42:7, 44:5, 46:8, 51:22, 62:25, 63:25, 65:24, 70:24, 74:11, 80:8, 99:8, 99:11, 102:14, 103:15, 107:14, 108:23, 108:25, 109:17, 109:19, 117:5, 120:18, 121:10

**tying** [1] - 107:13

**type** [2] - 16:23, 55:11

**typed** [1] - 134:13

**types** [4] - 21:18, 65:14, 80:20, 102:16

**typewritten** [1] - 134:15

**typical** [1] - 62:21

**typically** [2] - 26:3, 67:5

---

**U**

**U.S.M.J** [1] - 1:9

**ultimate** [11] - 36:25, 39:8, 43:21, 75:12, 75:17, 75:20, 77:20, 84:21, 118:5, 130:22, 131:2

**ultimately** [23] - 14:12, 19:15, 29:18, 37:7, 37:14, 38:16, 39:13, 48:23, 50:4, 77:21, 78:2, 81:17, 82:7, 85:12, 88:20, 89:13, 91:22, 104:25, 109:9, 111:3, 111:4, 130:12

**under** [24] - 4:13, 4:23,

7:16, 7:24, 8:10, 8:14, 9:1, 9:17, 26:13, 33:6, 44:15, 58:2, 59:8, 65:17, 67:1, 75:16, 97:10, 108:9, 112:23, 113:21, 121:2, 126:23, 128:15, 129:10

**undercut** [1] - 60:25

**undergo** [1] - 10:20

**underlying** [1] - 33:25

**understaffed** [1] - 116:3

**understaffing** [7] - 63:13, 63:18, 105:15, 116:25, 117:5, 117:8, 117:14

**understood** [3] - 50:14, 87:24, 104:8

**undisclosed** [2] - 62:25, 63:14

**UNITED** [1] - 1:1

**universities** [4] - 7:16, 10:9, 22:17, 127:20

**university** [31] - 4:22, 5:16, 7:18, 7:22, 9:1, 10:10, 20:22, 21:13, 21:23, 23:6, 26:7, 26:12, 38:3, 40:5, 41:6, 42:12, 42:13, 46:5, 52:5, 63:3, 63:6, 72:6, 124:7, 124:9, 126:17, 127:11, 127:18, 127:23, 128:12, 128:19

**University** [2] - 46:5, 123:4

**university's** [5] - 7:8, 10:3, 11:6, 26:11, 63:4

**unless** [2] - 3:23, 131:6

**unlikely** [15] - 17:24, 26:19, 27:19, 50:17, 50:18, 51:3, 52:18, 52:19, 53:8, 53:11, 53:14, 104:15, 104:18, 104:20

**unnecessary** [1] - 100:20

**unpack** [1] - 40:2

**unrelated** [3] - 32:7, 35:15, 73:25

**unsurprisingly** [1] - 7:11

**unusual** [7] - 58:14, 74:21, 76:15, 76:19, 80:4, 97:19, 125:3

**up** [22] - 3:15, 3:21, 11:19, 18:10, 22:1, 23:15, 29:1, 36:12, 42:21, 56:16, 74:17, 86:17, 90:24, 97:25, 100:3, 103:6, 113:10, 114:5, 115:2, 127:17, 129:23, 133:1
**ups** [1] - 78:5
**uses** [2] - 75:16
**usual** [2] - 116:1, 126:10
**utilize** [1] - 119:9

## V

**vacate** [1] - 4:25
**vain** [1] - 52:1
**valid** [1] - 28:17
**valued** [1] - 26:23
**VARALLO** [2] - 1:13, 2:13
**Varallo** [1] - 2:15
**various** [4] - 9:21, 12:7, 12:10, 55:7
**vastly** [1] - 21:17
**verge** [1] - 128:22
**verified** [1] - 33:5
**versus** [3] - 66:14, 93:18, 102:5
**veterans** [1] - 55:9
**viability** [2] - 89:16, 92:5
**viable** [1] - 94:2
**vice** [1] - 74:24
**view** [11] - 12:22, 16:16, 20:15, 30:18, 35:12, 38:18, 60:12, 62:9, 93:8, 110:23, 120:9
**viewpoint** [2] - 16:6, 88:2
**viewpoints** [1] - 9:9
**views** [1] - 56:9
**violated** [3] - 7:19, 10:11, 127:19
**violation** [1] - 21:8
**vision** [1] - 63:6
**voicemail** [1] - 81:6
**voicemails** [1] - 82:12

## W

**wait** [4] - 52:24, 54:13, 59:13, 113:23
**walk** [4] - 20:17, 22:7, 22:12, 59:7

**walled** [1] - 124:1
**wants** [2] - 3:18, 45:25
**warn** [1] - 7:10
**warner** [1] - 134:4
**Warner** [1] - 134:22
**warning** [1] - 33:8
**water** [2] - 20:15, 56:18
**ways** [4] - 100:2, 113:14, 114:16, 132:3
**weak** [2] - 103:11, 103:13
**weaponizing** [1] - 126:1
**weeks** [1] - 95:8
**weigh** [3] - 58:23, 99:8, 109:5
**weighing** [2] - 58:18, 58:19
**weight** [2] - 58:13, 126:10
**weird** [1] - 58:9
**welcome** [1] - 2:1
**well-established** [1] - 42:13
**white** [1] - 113:8
**whole** [5] - 13:19, 13:23, 15:3, 29:17, 99:2
**wholly** [1] - 4:25
**willing** [2] - 76:16, 111:24
**Wilmington** [1] - 111:21
**window** [4] - 23:3, 24:4, 24:5, 24:14
**wish** [2] - 133:10, 133:11
**witness** [7] - 76:13, 76:16, 76:22, 77:7, 84:11, 111:23, 122:7
**witnesses** [3] - 67:6, 74:15, 103:12
**words** [7] - 15:10, 17:6, 79:19, 116:25, 117:6, 120:7, 120:12
**works** [1] - 43:24
**world** [5] - 27:22, 49:2, 95:3, 110:25, 119:4
**worried** [1] - 82:20
**worry** [2] - 85:21, 99:1
**worth** [1] - 54:6
**writ** [3] - 40:8, 40:16, 40:17
**writing** [1] - 122:24
**wrongdoer** [1] - 24:24
**wrongfully** [1] - 6:13
**wrongly** [1] - 103:8

**wrote** [1] - 82:5

## Y

**year** [3] - 4:10, 42:6, 116:2
**years** [5] - 7:5, 7:6, 7:7, 53:17, 111:20
**years-ago** [1] - 53:17

## Z

**zero** [1] - 51:2
**zigzag** [1] - 24:9
**zigzagged** [1] - 24:10
**zigzagging** [3] - 5:4, 17:21, 25:10