# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University, | No. CV-21-00177-PHX-SRB |
| Plaintiff, | **ORDER** |
| v. | |
| Miguel Cardona, et al., | |
| Defendants. | |

The Court now considers the Motion for Summary Judgment ("Motion") of Plaintiff Grand Canyon University ("GCU") and the Cross-Motion for Summary Judgment ("Cross-Motion") of Defendants Miguel Cardona ("the Secretary") and the United States Department of Education ("DOE") (collectively, "Defendants"). (Doc. 59, ("MSJ"); Doc. 74, Cross-MSJ ("X-MSJ").) For the following reasons, the Court grants Defendants' Cross-Motion and denies GCU's Motion.

## I.    BACKGROUND

The Higher Education Act of 1965 ("HEA") divides institutions of higher education into three categories: "public or other nonprofit institution[s]" as defined in § 1001 of the HEA; "proprietary institution[s]" defined in § 1002(b); and "postsecondary vocational institution[s]" defined in § 1002(c).[1] 20 U.S.C. §§ 1001(a)(4), 1002(b), 1002(c); *see Grand Canyon Univ. v. Cardona*, No. CV-21-00566-PHX-DLR, 2021 WL 5396090, at *1 (D.

---

[1] Congress reauthorized the HEA in 1992, at which point Congress adopted amendments to the HEA that "focused on proprietary schools." (Doc. 84, MSJ Reply at 5.) GCU represents that the DOE "informed Congress, at that time, that it intended to treat proprietary and nonprofit institutions differently." (*Id.*)

Ariz. Nov. 18, 2021). Through Title IV of the HEA, 20 U.S.C. § 1001 et seq., ("Title IV"), "Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education." *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012). This case arises from GCU's attempt to convert to a nonprofit institution under Title IV and Defendants' allegedly unlawful denial of this conversion. (*See generally* Doc. 75, X-MSJ Statement of Facts ("X-MSJ SOF").)

GCU is a private, Christian university that has operated in Phoenix, Arizona since 1951. (Doc. 60, Plaintiff's Statement of Facts in Supp't of MSJ ("MSJ SOF") ¶ 1.) GCU functioned continuously as a nonprofit institution but began experiencing financial difficulties in the early 2000s. (*Id.* ¶¶ 2–3.) In 2004, GCU's Board of Trustees ("Board") sold GCU to the publicly traded company Grand Canyon Education ("GCE"), and GCU began participating in Title IV as a proprietary institution. (*See id.* ¶ 3; X-MSJ SOF ¶ 25.) In 2014, after GCU regained financial stability, the Board sought to convert GCU back to its nonprofit status. (MSJ SOF ¶¶ 4–5.)

The Board then began a protracted process to convert GCU to nonprofit status. A converting institution needs to meet three requirements to be recognized as a nonprofit under Title IV: (1) recognition as a 26 U.S.C. § 501(c)(3) tax-exempt organization; (2) recognition as a nonprofit from a state accreditor; and (3) recognition that it is operated by a nonprofit and none of its earnings benefit any private organization or individual. *See* 34 C.F.R. § 600.2. To meet these criteria, the Board created Gazelle University, a new entity, which contracted to purchase "the real property comprising the GCU campus as well as tangible and intangible academic-related assets (including the GCU name)" from GCE for approximately $853 million. (MSJ SOF ¶ 6; X-MSJ SOF ¶ 26; Doc. 1, Compl. ¶ 39.) GCE agreed to lend Gazelle the money necessary to purchase GCU. (*See* Doc. 59-2, 2019 Decision at 2.) The Board and GCE also negotiated a Master Services Agreement ("MSA") whereby GCE would provide "technological, marketing, promotional, financial aid, and other support services" to GCU once it had been sold to Gazelle. (*See* MSJ SOF ¶¶ 10–11, 15; Doc. 59-6, MSA at 2; Doc. 59-37, Req. for Preacquisition Review at 1–2.) GCE would

perform these services in exchange for a fixed 60% share of GCU's adjusted gross revenue. (X-MSJ SOF ¶ 27.) The MSA ran for an initial 15-year term and then provided for automatic five-year renewals. (*Id.* ¶ 38.) GCU could not terminate the MSA for at least seven years after its effective date, and if GCU chose to terminate the MSA after its initial term, the MSA obligated GCU to pay GCE a "non-renewal fee" equal to 50 percent of the previous year's services fee. (*See* AR-B-1295, AR-B-1322.)

GCE and Gazelle believed that outsourcing services to GCE under the MSA would not draw scrutiny under Title IV, as DOE regulation allows educational institutions to contract out "the administration of any aspect of the institution's participation in any Title IV, HEA program." (*See* MSJ at 22 (citing 34 C.F.R. § 668.25).) GCU represents, and Defendants do not dispute, that many nonprofit institutions maintain service agreements and revenue sharing agreements with for-profit companies. (MSJ at 21; *see* Doc. 75, X-MSJ Resp. to MSJ SOF ("X-MSJ RSOF") ¶¶ 12, 15.) Gazelle and the Board consulted other service agreements and revenue sharing contracts used by nonprofit institutions and for-profit service providers in drafting the MSA. (*See* MSJ at 20–21; MSJ SOF ¶¶ 77–78.) These service agreements included one in which Purdue University, a public institution based in Indiana, created a new entity, Purdue University Global ("Purdue Global"), to buy the "credential-issuing side" of Kaplan University ("Kaplan"), a for-profit institution ("Purdue-Kaplan transaction"). (Compl. ¶¶ 200, 203.) From GCU's account, Purdue Global and Kaplan executed a service agreement under which Kaplan continued to administer, *inter alia*, Purdue Global's marketing, financial aid, technology support, facilities management, and accounting. (*Id.* ¶ 204.) As compensation for these services, Purdue Global contracted to pay Kaplan for the costs of the "support services" plus 12.5 percent of Purdue Global's "consolidated revenues." (*Id.* ¶ 205.) In contrast to GCU's 15-year MSA term, Purdue Global and Kaplan contracted to a 30-year term with automatic five-year renewals, and Purdue Global's termination fee is 125 percent of the revenue earned over the year prior to termination. (*Id.* ¶¶ 207–09, 211.) Purdue Global participates

- 3 -

in Title IV as a public institution.[2] (Doc. 21, Ans. ¶ 315; X-MSJ SOF ¶ 36.)

The Board and GCE's Board of Directors, which are "fully independent" from each other, agreed that Brian Mueller, CEO of GCE, would be President of GCU after its sale. (MSJ SOF ¶¶ 75–76.) But the Board instituted several checks for Gazelle and GCU to retain independence from GCE. (*Id.* ¶ 76.) Per GCU's bylaws and the terms of the MSA, Mr. Mueller could not have any control over GCU's relationship with GCE. (*Id.*) The MSA further obligates GCE to "comply with all policies and standards of GCU," but imposes no reciprocal obligation on GCU. (MSJ at 25.) Under the MSA, GCU oversees the services executed by GCE and has the "unilateral ability to audit GCE at any time to ensure compliance with GCU's requirements." (*Id.* at 26 (citing AR-B-1292–94, 1324–38).) GCU also created an independent "MSA Committee" to "oversee" the relationship between service recipient and provider. (*Id.*)

### A. Initial Conversion Review

On October 8, 2015, the Board applied to the Internal Revenue Service ("IRS") for Gazelle to be recognized as a § 501(c)(3) tax-exempt institution. (MSJ SOF ¶ 16.) In its application, the Board explained that Gazelle was "organized to . . . acquire, and thereafter own and operate [GCU]." (*Id.* ¶ 17.) The Board also provided the IRS "a substantially completed copy" of the MSA and "detailed the material terms of the MSA." (*Id.* ¶ 19.) The application to the IRS included the precise services GCE contracted to perform under the MSA, for which GCU would pay GCE fees "contemplated to be 55% of the University's Adjusted Gross Revenue." (*Id.* ¶¶ 20–21.) Additionally, the application disclosed that Mr. Mueller would serve as both President of the GCU and CEO of GCE following the sale. (*Id.* ¶ 22.) On November 20, 2015, the IRS approved the University's § 501(c)(3) tax-exempt status, concluding that GCU's gross income did not "inure to the benefit of a private shareholder or individual." (*Id.* ¶ 23; Doc. 59-31, IRS Decision); *see* 26 U.S.C. § 501(c)(3). The IRS affirmed its 2015 decision on August 31, 2018, though Defendants assert that the 2018 affirmation did not involve any substantive analysis of GCU's circumstances at that

---

[2] Because Purdue University is a public institution, its Title IV student loans are backed by the state of Indiana. (X-MSJ SOF ¶ 36 (citing AR-J-0006).)

time. (MSJ SOF ¶ 24; X-MSJ RSOF ¶ 89; *see* AR-F-0612.)

After receiving tax-exempt status, GCU's Board next sought approval for the sale from its accrediting agency, the Higher Learning Commission ("HLC"). (MSJ SOF ¶ 26.) The HLC initially denied the Board's request, as the HLC had not developed guidelines to review the kind of MSA at issue. (*Id.* ¶ 27.) In 2017, once the HLC had developed appropriate guidelines, the Board reapplied for accreditation and informed the HLC about GCU's conflict of interest policy, the checks on Mr. Mueller's power over GCU, and how the relationship between GCU and GCE had been structured to "ensure GCE had no ability to exercise authority over GCU and was subject to GCU's policies and control."[3] (*Id.* ¶¶ 27–28.) After reviewing the application and visiting GCU's campus, HLC staff issued a report approving GCU's change in control. (*Id.* ¶¶ 29–30.) The HLC specifically found that Mr. Mueller was excluded from any input regarding the relationship between GCE and GCU, the MSA was not subject to conflicts of interest with GCE, and the sale would not impose an excessive financial burden on Gazelle. (*Id.* ¶¶ 30–33.) On March 5, 2018, the HLC voted to approve GCU's change of control.[4] (*Id.* ¶ 34.)

### B. Preacquisition Review & Sale of GCU

After obtaining § 501(c)(3) tax-exempt status and while the Board's application to the HLC was still pending, the Board set out to secure Title IV nonprofit status for GCU. (*Id.* ¶ 35.) When an institution that has been participating in Title IV programs undergoes "a change in ownership that results in a change in control," it automatically ceases to qualify as an eligible institution and must reapply to the Secretary to participate in Title IV programs. *See* 34 C.F.R. § 668.14(g)(1). Once an institution lodges an application for change in ownership, the institution can participate in Title IV programs on a provisional basis while its application is being evaluated. § 600.20(g)(1). If the institution applies to participate in Title IV as a nonprofit institution, "it must demonstrate that its new ownership

---

[3] At the time of the IRS and HLC review, Mr. Mueller also sat on Gazelle's Board. (MSJ at 26.) However, before the sale of GCU was complete, Mr. Mueller resigned from the Board. (*See id.*; AR-J-0076.)

[4] In April 2018, state regulator Arizona Board of Private Postsecondary Education also approved the sale. (MSJ SOF ¶ 52.)

structure satisfies the definition of a 'nonprofit institution' under the HEA and its implementing regulations." (X-MSJ SOF ¶ 17; X-MSJ at 5–6 (citing § 600.20(b)(2)(i))); § 600.20(b) ("[A]n . . . institution that participates in the Title IV, HEA programs must apply to the Secretary for a determination that the institution continues to meet the [three applicable] requirements . . . if the institution chooses to . . . reestablish eligibility and certification as a private nonprofit."). Defendants interpret these regulations to mean that the Secretary has "broad authority" to regulate programs administered by the DOE, which includes Title IV. (*See* X-MSJ SOF ¶ 4 (citing 20 U.S.C. § 1221e-3)); 34 C.F.R. § 600.20(b)(2)(B). The DOE asserts that it has more aggressively scrutinized such applications to convert to nonprofit status since 2016, and the DOE rejected an application for nonprofit conversion before GCU's sale.[5] (X-MSJ SOF ¶¶ 19–20; Doc. 85, GCU Resp. to X-MSJ SOF ¶ 20.)

The DOE reviews an application for Title IV participation after an institution has already undergone a change in control, but an institution anticipating a change in control may also request a "preacquisition review" from the DOE. (MSJ SOF ¶ 37.) This discretionary review allows an institution to receive feedback on how its prospective change in ownership will affect its Title IV participation. (*Id.* ¶¶ 37, 40.) On January 18, 2018, GCU submitted a request for preacquisition review, hoping "for guidance as to any regulatory limitations that the Department might impose on GCU following the closing of the Transaction." (*Id.* ¶ 43.) GCU contends that this request included "substantially the same information provided to the IRS and HLC, including the proposed MSA, asset purchase agreement, credit agreement, and proposed corporate structure." (*Id.* ¶ 45.) GCU filed its request for preacquisition review almost six months before the sale was due to close.[6] (*Id.* ¶¶ 47–48.) While GCU relied on prior successful nonprofit conversions to craft

---

[5] The Board acknowledged this recent denial, stating to the DOE that "[GCU] understand[s] the [DOE] makes an independent decision regarding an institution's status as a nonprofit institution for Title IV purposes." (X-MSJ SOF ¶¶ 21–23.)

[6] GCU suggests that this closing date was set after its March 2018 HLC approval, as the "HLC typically requires transactions to close within 30 days of its grant of approval, but [the] HLC agreed to extend the time for closing until the end of June 2018." (MSJ SOF ¶ 53.)

the material terms of the sale, GCU still hoped for the DOE's particularized input and provided the DOE with any updated information necessary for its review. (*Id.* ¶¶ 48–51, 54, 77–78.) The DOE had no published guidance regarding how a for-profit university could successfully convert to a nonprofit institution under Title IV. (*Id.* ¶ 80.) By late June 2018, GCU had not received any feedback from the DOE about how it would receive the sale, but Gazelle and GCE still decided to close the sale on July 1, 2018. (*See id.* ¶ 54.) Gazelle paid a purchase price of approximately $870 million by senior secured note to GCE.[7] (*Id.* ¶¶ 54, 58.)

GCU timely sent the DOE the "principal transaction documents" so that the DOE could conduct its mandatory review of GCU's change in control. (*See id.* ¶¶ 60–61; X-MSJ SOF ¶ 31.) These documents were (1) an Asset Purchase Agreement, identifying the particular assets GCU purchased from GCE; (2) the Credit Agreement outlining the terms of the senior secured note; and (3) the MSA detailing the specific services GCE would perform for GCU after the sale, subject to an initial 15-year term and automatic five-year renewals. (MSJ SOF ¶ 58.) In addition to the principal transaction documents, GCU also shared valuation reports of GCU's assets completed by financial experts at Deloitte and Barclays. (*See id.* ¶ 70.)

The DOE reviewed GCU's application for nonprofit conversion under its regulatory definition of a nonprofit institution. Specifically, the DOE evaluated whether, after the sale, GCU was:

> (i) owned and operated by a nonprofit corporation, with no shareholder or individual benefitting from the net earnings of the corporation;
> (ii) legally authorized to operate as a nonprofit organization in the state in which it is physically located; and
> (iii) determined by the [IRS] to be an organization to which contributions are tax-deductible in accordance with section 501(c)(3) of the Internal Revenue Code.

34 C.F.R. § 600.2. The DOE's regulation is derived from the HEA definition of a nonprofit, which is an institution "owned and operated by one or more nonprofit corporations or

---

[7] After Gazelle purchased GCU from GCE, Gazelle changed its name to Grand Canyon University. (Doc. 59-3, 2021 Decision at 1 n.1; AR-B-1421.) This Order refers to Gazelle and GCU as one and the same post-sale, as the entities are now indistinguishable for present purposes.

- 7 -

associations, no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." (*See* X-MSJ SOF ¶ 7 (citing 20 U.S.C. § 1003(13)).) When evaluating GCU's application, the DOE considered the principal transaction documents; a chart of other service agreements which GCU provided to the DOE; valuation reports which GCU offered to support the conversion; and "relevant authority interpreting a similar standard from the Internal Revenue Code." (*Id.* ¶¶ 34–36.) During the review period, the DOE requested that GCU "identify any service providers . . . that are affiliates, owners, or former owners of the institution (including related persons and entities), and indicate whether any of the servicing agreements were entered into in conjunction with a change in ownership transaction [resulting in nonprofit conversion]." (*Id.* ¶ 35 (citing AR-J-0156–57).) GCU did not identify any such service agreements for the DOE, instead contending that "GCU believes that comparisons to the Kaplan transaction or any other example are not relevant . . . [r]ather, it believes that the Transaction stands on its own." (*Id.* (citing AR-J-0086).) Though the HEA and § 600.2 guide the DOE's nonprofit analysis, Defendants emphasize that the contours of change-in-control review may vary depending on the nature of the transaction at issue, leading to a "case-by-case" determination. (X-MSJ RSOF ¶ 138.)

### C. 2019 DOE Decision

On November 6, 2019, the DOE issued a decision refusing to recognize GCU as a nonprofit institution under Title IV ("2019 Decision"). (MSJ SOF ¶ 83.) The DOE found that GCU met the second and third prongs of § 600.2 but concluded that GCU did not meet the first prong ("Subsection i") of the nonprofit definition. (*Id.* ¶ 85; 2019 Decision at 10.) In short, the DOE found some part of GCU's net earnings benefit a private party—GCE—in violation of Subsection i. (2019 Decision at 10–17.) Three factors determined the outcome of the DOE's analysis: (1) the terms of the MSA made GCU operate for the benefit of GCE; (2) Mr. Mueller's dual roles as President of GCU and CEO of GCE indicate that he may not have "undivided loyalty" to GCU; (3) and GCU was not actually operating the university, given the number of institution-specific functions performed by GCE under the

- 8 -

MSA. (MSJ SOF ¶¶ 92–94.) In the 2019 Decision, the DOE also forbade GCU from holding itself out to the public as a nonprofit under Title IV.[8] (*See* MSJ at 30.) Notwithstanding the 2019 Decision, GCU could still participate in Title IV programs as a proprietary institution, as the DOE otherwise approved its change in control.[9] (X-MSJ RSOF ¶ 8.)

The DOE also explained how it considered the two valuation reports submitted with GCU's application and why it discredited certain conclusions therein. (X-MSJ SOF ¶ 39.) Skeptical of the accuracy of the reports, the DOE noted that "opinions in key areas appear to have been based on information supplied by GCE management" and reasoned that Deloitte's report was "incomplete," rooted in "fundamentally flawed assumptions," and based on an outdated draft of the MSA. (*Id.* (citing 2019 Decision at 9); 2019 Decision at 7–8.) And from the DOE's observation, the Barclay's Report revealed that the cost to operate GCU would increase by $697 million purely as a result of the commitments in the MSA. (2019 Decision at 4–6.) "The increase is not because GCE will be providing new or additional services," the DOE wrote, "but solely because the MSA requires [GCU] to pay GCE the Services Fee." (*Id.* at 5.) The DOE also noted that GCE pocketed 60% of GCU's revenue despite performing only 28% of the services necessary for GCU to operate. Per the DOE's calculations, "[w]hen payments on the Senior Secured Note are included in the analysis, GCE will be receiving approximately 95% of Gazelle's revenue." (Doc. 91, X-MSJ Reply at 7 (citing 2019 Decision at 14); 2019 Decision at 6 n.11.)

In the remainder of the 2019 Decision, the DOE distinguished its review under

---

[8] Between completing the sale and receiving the 2019 Decision, Mr. Mueller made public representations about GCU's Title IV status. For example, on December 20, 2018, Mr. Mueller stated in an interview: "[T]he University being not-for-profit is a tremendous advantage. That stigma is now gone. We can recruit in high schools that would not let us in the past . . . We're just 90 days into this, but we're experiencing, we believe, a tailwind already just because of how many students didn't pick up the phone [before] because we were for-profit." (X-MSJ SOF ¶ 32.) On February 20, 2019, Mr. Mueller shared in an earnings call that "new student online growth [following GCU's conversion] was more than we expected and I think it's evidence that being out there now a million times a day saying we're non-profit has had an impact." (*Id.* ¶ 33.)

[9] Proprietary institutions may still participate in some programs under Title IV, but they are not eligible for certain programs authorized by the HEA. (X-MSJ SOF ¶ 6; X-MSJ at 3.)

§ 600.2 from the IRS's decision to grant GCU § 501(c)(3) status. First, the DOE asserted that material terms of the transaction had changed in the time between the 2015 IRS approval and the 2018 sale of GCU. (X-MSJ SOF ¶ 44.) The DOE disputed that it reviewed the same information in the 2019 Decision that the IRS reviewed when it granted GCU § 501(c)(3) tax-exempt status. (X-MSJ RSOF ¶¶ 23, 45, 90.) Second, the DOE reasoned that its review was more thorough, in that "[u]nlike the IRS's initial grant of tax-exempt status, the Department's determination of nonprofit status considers the structure and planned operations of the institution when its owner(s) apply for that change of status." (X-MSJ SOF ¶ 45 (quoting AR-J-0077 n.3).) The DOE also raised that the IRS issued its § 501(c)(3) approval only 22 business days after Gazelle applied, whereas the DOE took more than a year to process GCU's application under Title IV. (X-MSJ at 19–20 (citing 2019 Decision at 15).) Relatedly, the IRS completes its analysis "based solely upon the facts, attestations, and representations" made by the entity seeking § 501(c)(3) status, whereas the DOE may conduct a "more in-depth" review. (*Id.* at 20.)

**D.      2021 DOE Decision**

GCU met with DOE officials on December 16, 2019 to discuss the nonprofit denial. (MSJ SOF ¶ 99.) At this meeting, the DOE affirmed that the issues raised in the 2019 Decision were the dispositive factors in the DOE's nonprofit denial. (*Id.* ¶ 100; *see* AR-B-2325.) In response to this meeting, GCU amended the MSA in an attempt to make the terms more favorable to GCU. (MSJ SOF ¶¶ 101–02, 104–06.) Specifically, the amended MSA ("AMSA") capped the fee for GCE's services at whichever was lower: 59% of GCU's total revenue or 66.8% of only GCU's tuition and fees. (*Id.* ¶ 104.) The AMSA also provided GCU more flexibility to terminate its relationship with GCE. (*Id.* ¶ 105.) Additionally, GCU took over certain responsibilities previously delegated to GCE, namely coordinating Curriculum Services and Faculty Operations. (2021 Decision at 17 n.23.) On January 8, 2020, GCU sent the AMSA to the DOE for consideration but explained that adoption of the AMSA was contingent on an updated transfer pricing study from Deloitte and the DOE's approval of GCU's nonprofit status. (MSJ SOF ¶ 107.) Later that month, the DOE

- 10 -

asked GCU to provide the updated transfer pricing study and requested GCU retain an independent expert to review the transfer pricing study to "ensure the [A]MSA was fair to GCU." (*Id.* ¶ 108.)

GCU set to work facilitating the DOE's review of the AMSA. GCU retained Deloitte to perform a transfer pricing study of the AMSA and retained BKD, LLP ("BKD") to review Deloitte's new study for fairness. (*Id.* ¶ 109.) BKD also performed valuations of GCU's investments as of July 1, 2018 and January 7, 2020. (*Id.* ¶ 110.) After reviewing Deloitte's transfer pricing study, BKD concluded that Gazelle paid below fair market value to purchase GCU from GCE. (*Id.* ¶¶ 114, 117.)

On January 12, 2021, the DOE once again denied GCU's application for nonprofit status, this time reviewing the AMSA and updated studies ("2021 Decision"). (X-MSJ SOF ¶ 49.) Though the DOE acknowledged the AMSA had altered certain problematic terms in the original MSA, it found the AMSA kept in place "the basic structure whereby a substantial portion of GCU's revenues benefits GCE."[10] (*Id.* ¶ 50 (citing 2021 Decision at 17).) The 2021 Decision explained that while the DOE considered Deloitte and BKD's valuations of GCU's assets, these valuations were not truly independent. (*See id.* ¶¶ 51–52; X-MSJ RSOF ¶¶ 13–14, 70.) The DOE also outlined how Deloitte and BKD found the AMSA was not comparable to any other service agreement in operation yet failed to consider the appropriate factors about this unique revenue-share agreement.[11] (2021 Decision at 10–12.) Further, the Barclays report commissioned by GCE indicated that "the costs to operate GCU following the change in ownership (with GCE providing services) would increase from $810 million to $1.496 billion for fiscal year 2019, solely as a result

---

[10] The DOE also considered the HLC's accreditation of GCU as a nonprofit institution, but found the HLC's review "neither binding nor persuasive." (X-MSJ SOF ¶ 46 (citing 2021 Decision at 17).)

[11] The DOE took issue with the use of the transfer pricing method in the analyses provided by GCU. (X-MSJ SOF ¶ 52.) According to the DOE, transfer pricing analysis "allow[s] for the establishment for the goods and services exchanged between a subsidiary, an affiliate, or commonly controlled companies that are part of the same larger enterprise [which] can lead to tax savings for corporations." (*Id.* (citing 2021 Decision at 7).) The DOE consequently did not condone transfer pricing analysis to evaluate "whether the service agreement is consistent with the behavior of what should be two financially independent entities." (*Id.*)

of fees paid to GCE," which suggested the sale was not in the university's financial interest. (X-MSJ RSOF ¶ 118 (citing AR-C-0041); 2021 Decision at 4 (noting that the AMSA did not substantially change the MSA revenue split).) The DOE explained that the AMSA ensured a "continuing revenue stream to [GCU's] former owner GCE, the primary purpose of which is to drive shareholder value for GCE." (X-MSJ SOF ¶ 51 (quoting 2021 Decision at 6).) The 2021 Decision recognized that GCU had taken more responsibility from GCE over the operations of the university, but the Decision also raised that GCE would receive almost the same revenue share under the AMSA as under the MSA, notwithstanding its reduced duties under the AMSA. (2021 Decision at 17 n.23.) The 2021 Decision also "reiterated [the DOE's] concerns about Mr. Mueller's dual roles as President of GCU and CEO of GCE," which had not changed under the AMSA. (*See* X-MSJ SOF ¶ 54.) The DOE clarified to Mr. Mueller that it "is not directing GCU to remove you as President of the University, [but] your multiple roles continue to be of concern to the Department. Of course, nothing would prevent you from severing ties with GCE if you (and the GCU Board) thought it was more important for you to stay with GCU instead of serving in two potentially conflicting positions." (2021 Decision at 18.)

### E. Procedural History

On February 2, 2021, GCU filed its Complaint in this Court, alleging that the 2019 and 2021 Decisions (collectively, "the Decisions") violated the Administrative Procedure Act ("APA") and the First Amendment of the United States Constitution. (Compl.) Regarding Defendants' alleged APA violation, GCU argued that the Decisions are contrary to law because, *inter alia*, GCU should have been determined to be a nonprofit institution under both the HEA and § 600.2. (Compl. ¶¶ 338, 340, 346.) GCU also argued that the Decisions are arbitrary and capricious on several grounds. (*Id.* ¶ 339.) Separate from its APA claims, GCU alleged that the DOE's requirement that GCU refrain from calling itself a nonprofit under Title IV violates the First Amendment. (*Id.* ¶¶ 347–55.)

After litigating to establish the proper contents of the administrative record in this case, GCU filed its Motion on May 16, 2022. (MSJ; Doc. 55, 03/03/2022 Order (granting

in part GCU's Motion to Complete the Administrative Record).) On June 30, 2022, Defendants filed their Cross-Motion and Response to GCU's Motion, to which GCU filed its Response to the Cross-Motion and Reply to the DOE's Response on August 1, 2022. (X-MSJ; MSJ Reply.) On August 25, 2022, Defendants filed their Reply to GCU's Response. (X-MSJ Reply.) The Court held oral argument on the Motion and Cross-Motion on September 8, 2022. (Doc. 92, Min. Entry.)

## II. LEGAL STANDARD

"[T]he standard set forth in Rule 56(c) does not apply [in reviewing cross-motions for summary judgment under the APA] because of the limited role of a court in reviewing the administrative record." *Gill v. Dep't of Justice*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal. 2017) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006)). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). "In other words, 'the district court acts like an appellate court, and the entire case is a question of law.'" *Gill*, 246 F. Supp. 3d at 1268 (quoting *Nat'l Law Ctr. on Homelessness v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012)).

## III. ANALYSIS

GCU argues that the Decisions are a product of Defendants' overreach and error, violating the APA in several respects. (MSJ at 10–30.) GCU also argues that Defendants have placed an unjustified prior restraint on GCU's ability to represent itself as a nonprofit entity, violating the First Amendment. (*Id.* at 30–31.) The Court addresses each argument in turn.

### A. APA Claims

GCU argues that Defendants violated the APA in multiple ways. First, GCU contends that Defendants acted contrary to law because (1) the Secretary does not have the

authority to determine nonprofit status under Title IV and (2) the Decisions constitute an amendment of previous DOE regulation without the requisite notice-and-comment rulemaking.[12] (*See* MSJ 10–16, 18.) Second, GCU asserts that even if Defendants have authority to determine nonprofit status under Title IV, the Decisions are arbitrary and capricious because (1) the DOE did not adequately explain its "reinterpretation" of § 600.2 and erred in determining that GCU's profits inure to GCE; (2) the DOE failed to consider factors relevant to the Decisions, namely GCU's § 501(c)(3) status and the HLC's grant of accreditation; (3) the DOE applied IRS tax law, which is outside the scope of the DOE's expertise and warrants no administrative deference; and (4) the DOE applied inconsistent, undefined standards to evaluate GCU's application for Title IV nonprofit status, damaging GCU's reliance interest in a uniformly-administered review process. (*Id.* at 18–27.)

### 1.    Contrary to Law

#### a.    The DOE's Statutory and Regulatory Authority

GCU argues that the "text, history, and structure" of the HEA and § 600.2 all indicate that nonprofit status under Title IV is a function of state approval and IRS § 501(c)(3) tax-exempt status. (MSJ Reply at 2.) GCU posits that the Secretary accordingly did not have independent authority to determine whether GCU is a nonprofit under Title IV. (MSJ at 10, 18.) Alternatively, GCU argues that if § 600.2 is ambiguous, the DOE's interpretation of the statute is unreasonable and unworthy of deference. (*See* MSJ Reply at 2.) For the following reasons, GCU does not persuade the Court.

##### i.    Clear Interpretation

To interpret the meaning of a regulation, "a court must carefully consider the text, structure, history, and purpose of a regulation [before resorting to agency deference]. . . . If genuine ambiguity remains, [however], the agency's reading must still be reasonable."

---

[12] GCU briefly argues that even if Defendants have authority to determine GCU's nonprofit status, the Decisions are still contrary to law because they are wrong about GCU's nonprofit status. (*See* MSJ at 16–17.) As GCU asserts that the Decisions reached an incorrect conclusion because the DOE did not adequately explain its reasoning and misapplied IRS authority, this argument is more appropriately addressed alongside GCU's claims that the Decisions are arbitrary and capricious.

- 14 -

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (internal citations and quotation marks omitted). But "when the language [of a regulation] is clear . . . [courts] need not look to history or purpose of a regulation. Indeed, to do so sometimes amounts to an invitation for a freewheeling judicial inquiry, given the often amorphous or conflicting history or purpose of a regulation." *Mountain Cmtys. for Fire Safety v. Elliot*, 25 F.4th 667, 677 n.4 (9th Cir. 2022). GCU argues that the DOE's change-in-control regulations, as well as the most "natural reading of [§] 600.2, which the Department long endorsed," support the conclusion that Defendants have no independent authority to determine Title IV nonprofit status. (MSJ at 10–12.)

The DOE counters that the plain text of the HEA and § 600.2 both indicate that Defendants' review is independent from that of the IRS and the state accreditor. (X-MSJ at 10–13.) The Court agrees with Defendants. All subsections of § 600.2 are connected by the word "and," which reflects that the regulation requires all three subsections to apply in nonprofit evaluation. *See* § 600.2. Nothing in the surrounding regulation suggests that "and" should be read to mean "or," let alone that Subsection i is inoperative. *See Confederated Tribes and Bands of Yakima Nation v. Yakima Cnty.*, 963 F.3d 982, 990–91 (9th Cir. 2020) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930)) (explaining that while certain context-sensitive exceptions indicate that "and" means "or," "when 'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'") Relatedly, the DOE persuasively raises that accepting GCU's interpretation of § 600.2 would render Subsection i mere surplusage. (*See* X-MSJ at 11; X-MSJ Reply at 4.) GCU asks the Court to functionally disregard Subsection i—asserting that the first subsection of a three-part regulation is an affirmation of the third section—but fails to rebut the presumption that every word in a statute or regulation is included for its specific meaning. (*See* MSJ Reply at 4); *c.f. Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 976 n.6 (D. Ariz. 2020) (citing *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) ("[Courts] are . . . reluctant to treat statutory terms as surplusage in any setting.").

GCU also makes much of the contrast between § 501(c)(3) and the relevant

- 15 -

language in the HEA, but to no avail. (*See* MSJ Reply at 3.) Citing the HEA's definition of a nonprofit as an institution "no part of the net earnings of which inures, *or may lawfully inure*, to the benefit of any private shareholder or individual," GCU argues that "those institutions prohibited by law from engaging in private inurement qualify as nonprofit institutions for the Title IV programs." (*Id.* (citing 20 U.S.C. § 1003(13)) (emphasis in original).) The italicized text is the only difference between the HEA nonprofit definition and the § 501(c)(3) nonprofit definition. But this circular argument again fails to rebut the presumption against surplusage. If IRS approval were the only criterion for nonprofit status, both Subsections i and ii of § 600.2 would be meaningless. And GCU's narrow construction of "or" is not supported by the relevant law nor consistent with the statute itself. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994) (citing *McNally v. U.S.*, 483 U.S. 350, 358–59 (1987)) ("[The] second phrase in disjunctive [was] added simply to make the meaning of the first phrase 'unmistakable.'") Indeed, GCU's interpretation of "or may lawfully inure" does not comport with the HEA's purpose. One purpose of the HEA, and specifically of Title IV review, is undisputedly to guard the integrity of Title IV funds. (*See* MSJ Reply at 7–9 (acknowledging that Defendants are responsible for at least overseeing compliance with state accreditation and § 501(c)(3) nonprofit status); X-MSJ at 1.) If the Court adopted GCU's interpretation of § 1003(13), an institution would qualify as a nonprofit even its earnings in fact privately inured, so long as the institution had previously been determined to be a § 501(c)(3) nonprofit. The relevant law and record do not support this conclusion.

Defendants correctly note that because the text of § 600.2 is clear, the Court need not look to GCU's remaining arguments regarding the regulation's interpretation. (X-MSJ Reply at 4.) Even so, GCU's interpretation of the regulation still fails when accounting for the background of the regulation. GCU asserts that if the DOE intended to clarify that it independently reviewed nonprofit conversions, it would have done so during the 1992 reauthorization of the HEA, but there was a "conspicuous absence of such talk." (MSJ Reply at 5.) Firing back about the relevant "statutory and regulatory framework,"

- 16 -

Defendants persuasively recount that the DOE *did* state its intent to "independently scrutinize non-profit conversions in connection with" the HEA's 1992 amendments. (X-MSJ Reply at 5 (citing 59 Fed. Reg. 22,333 (Apr. 29, 1994)).) The DOE stated,

> The Secretary considers it reasonable to treat changes in business form [to a 501(c)(3)] as significant changes warranting the same scrutiny section 498(i) of the HEA dictates for other, perhaps far less consequential changes in governance by schools. . . . [A]lthough a corporation may affect the change in form from taxable to tax-exempt, nonprofit status with little formality . . . these consequences of the change make it a change cognizable under [the change-in-control requirements] of the HEA.

59 Fed. Reg. 22,333.

On this very note, GCU cites a written exchange between Congress and the Secretary that occurred after the 1992 HEA amendments. (MSJ Reply at 5–6.) Congress opens by asking the DOE how its "new approach" to differentiating between proprietary and nonprofit institutions will address regulatory abuses by nonprofit schools, particularly when "school[s] change [their] status from for-profit to non-profit and . . . simply plough through all of [their] profits into salary and expenses." (*Id.* at 5); Abuses in Fed. Student Grant Programs Proprietary School Abuses, S. Hr'g 104-477 at 222 (July 12, 1995) ("1995 Hearing"). It would make little sense that Congress inquired as to how the DOE would ensure regulatory compliance if Congress had not tasked the DOE with ensuring regulatory compliance. And in keeping with the conclusion that the DOE is empowered to police such compliance, the DOE responded that certain states allow schools to "easily switch" between for-profit and nonprofit status, but the DOE planned to "subject schools that do change from profit to non-profit" to certain standards to "ensure that schools do not evade certain regulatory requirements." (MSJ Reply at 6); 1995 Hearing. This exchange only confirms that the DOE may independently scrutinize conversions to ensure "the integrity of Title IV," even though the DOE must respect a state's independent determination of nonprofit status.[13] (*See* X-MSJ at 1, 17 (quoting 75 Fed. Reg. 66832-01).)

---

[13] GCU also fails to address why it modeled the MSA off of previous changes in control approved by Defendants, as well as why it repeatedly conceded the DOE reviews changes in control under all three factors in § 600.02, if § 501(c)(3) status and state law were and are the controlling authorities for Title IV nonprofit status. (*See also* X-MSJ at 11 n.5 (GCU stating that "[t]o our knowledge, the [DOE] has never published any [policy] on any other factors that [it] would consider in assessing whether an institution qualifies as a nonprofit

- 17 -

GCU also points to the DOE's definition of a foreign nonprofit educational institution, added after the HEA's most recent reauthorization in 2008, to show that IRS approval is dispositive for nonprofit designation. (*See* MSJ Reply at 6.) As of 2010, the DOE "automatically accept[s]" a foreign institution as a Title IV nonprofit if it has been designated as a nonprofit by its "relevant tax authority," on the condition that the tax authority applies the same criteria as the IRS. (*Id.*) But the DOE persuasively responds that this does not reflect that the DOE must defer to the IRS regarding domestic institutions. Foreign nonprofit institutions only receive Title IV funds for American students enrolled— the DOE need not allocate resources to monitor such a small output of funds. (*See* X-MSJ at 13 n.7.) Further, if the DOE clarified that § 501(c)(3) tax-exempt status controls nonprofit determination for foreign schools, it certainly could have done the same for domestic institutions. The absence of domestic institutions in this regulation, particularly given the existence of § 600.2's three-part definition, confirms that the DOE need not defer to IRS nonprofit determination for domestic schools. *See N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017) (explaining that the interpretive canon *expressio unius est exclusio alterius* applies when "circumstances support a sensible inference that the term left out must have been meant to be excluded.") (internal citation and quotation marks omitted). Notwithstanding GCU's arguments to the contrary, the Court finds that reviewing change-in-control nonprofit conversions is clearly within the DOE's authority under the HEA and not contrary to law.

### ii.     Genuine Ambiguity

Defendants alternatively argue that even if § 600.2 is ambiguous, the DOE's interpretation of the statute is reasonable and entitled to deference. (X-MSJ at 13.) Courts presume that Congress intended an agency to have "the power authoritatively to interpret its own regulations [as] a component of the agency's delegated lawmaking powers . . . Congress usually intends to give [agencies] considerable latitude to interpret the ambiguous rules they issue." *Kisor*, 139 S. Ct. at 2412. "[T]he presumption that Congress intended

entity for Title IV purposes beyond the three factors [of § 600.2].").)

- 18 -

[such] deference stems from the awareness that resolving genuine regulatory ambiguities often 'entail[s] the exercise of judgment grounded in policy concerns.'" *Id.* at 2413 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). But "the basis for deference ebbs when the subject matter of the dispute is distant from the agency's ordinary duties or falls within the scope of another agency's authority." *Id.* at 2417 (cleaned up). Further, "an agency's reading of a rule must reflect 'fair and considered judgment' to receive . . . deference [from courts]." *Id.* (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

The Court finds that if § 600.2 were ambiguous, the DOE's interpretation is reasonable and warrants judicial deference. GCU argues that the DOE's position is unreasonable, given that it "conflicts with its change-in-control regulations, deviates from its own prior interpretation, and takes the agency far outside its substantive expertise." (MSJ Reply at 2.) As addressed in the previous subsection, § 600.2 includes three separate criteria for Title IV nonprofit status, and the DOE's insistence that GCU meet each criterion does not contradict the regulation. Further, Defendants point out that while the DOE previously deferred in practice to the § 501(c)(3) determination of the IRS, there is no record that the DOE actually interpreted § 600.2 to leave nonprofit status to the IRS and the states, nor was any announcement made to suggest as much.[14] (Doc. 95, Not. of Hearing Trans. ("Hr'g Tr.") at 26:25–27:19.) And by GCU's own admission, Defendants have been

---

[14] GCU cites a passage from the regulatory history of the HEA in an attempt to argue that the DOE has publicly acknowledged that state and IRS approval are legally sufficient for Title IV nonprofit status. (*See* MSJ Reply at 7–8.) The passage in question reads, "[a]lthough changes in the form of incorporation from for-profit to nonprofit are governed by a variety of State laws, only those nonprofit organizations that meet the further restrictions of section 501(c)(3) of the Internal Revenue Code qualify to participate in the title IV, HEA programs as nonprofit institutions." 59 Fed. Reg. at 22,334. But GCU omits the sentence that immediately follows: "To so qualify, a corporation must not merely ensure that its net earnings do not benefit private individuals, but that, unlike a general corporation that may engage in any lawful business, this nonprofit institution must be organized and operated exclusively for educational or other qualifying purposes." Even in 1994, during the period when the DOE deferred to IRS determination of nonprofit status, Defendants detailed the criteria that an aspiring Title IV nonprofit needed to meet in order to survive *Departmental* scrutiny. As explained *infra*, it makes sense that certain Title IV nonprofit criteria are informed by IRS authority. But GCU's contention that the DOE has no role in determining nonprofit status, even in the context of this regulatory history, does not comport with the regulatory scheme or history.

- 19 -

tasked for decades with reviewing changes in control, so its argument that Defendants have insufficient expertise to determine nonprofit status falls flat. (*See* MSJ at 11–12.) Finally, regarding the agency's policy judgment, Defendants repeat that the DOE acts with the unique policy concern that Title IV funds are allotted to benefit the educational institutions which receive these funds, "serving [the HEA's] purpose of preventing program weaknesses and abuse among for-profit institutions." (X-MSJ at 13.) The Court agrees with Defendants that even if § 600.2 were ambiguous, the DOE's interpretation should stand.

### b. Regulatory Rulemaking

Under the APA's "notice and comment" requirement, agencies must advise the public through a notice in the Federal Register of the substance of a proposed rule, allowing the public a period to comment. See 5 U.S.C. §§ 553(b), (c); *Auer*, 519 U.S. at 459. The notice and comment requirement does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (quoting 5 U.S.C. § 553(b)(3)(A)). In general, courts reviewing agency action under the APA must give "broad deference to agencies' interpretations of the statutes they are charged with implementing." *California by and through Becerra v. Azar*, 950 F.3d 1067, 1074 (9th Cir. 2020).

GCU argues that the Decisions were a departure from prior DOE practices, namely the practice of deferring to an IRS grant of § 501(c)(3) tax-exempt status when determining whether an institution qualified as a nonprofit under Title IV. (MSJ at 14–16.) It follows, GCU argues, that the DOE needed to go through the formal process of notice-and-comment rulemaking if it were going to apply a different process for change-in-control review under § 600.2. (*See id.*) Defendants repeatedly counter that the HEA empowers the DOE to ensure "the integrity of Title IV programs," meaning that Title IV funds are administered to benefit students rather than private companies. (X-MSJ at 17.) And "since at least 2016," two years before the sale of GCU, the DOE had been more closely analyzing applications for change-in-control and nonprofit conversion. (X-MSJ at 23.) Defendants contend that in denying GCU's application for nonprofit status, the DOE did nothing more than apply its

preexisting practice, in contrast to "actually chang[ing] [its] interpretation of the [controlling] regulation." (*Id.* (citing *Select Specialty Hosp.-Bloomington, Inc. v. Sibelius*, 774 F. Supp. 2d 332, 345 (D.D.C. 2011)).) The Court agrees with Defendants.

The record reflects that all parties understood that Defendants would independently review GCU's nonprofit status. As above explained, the DOE's authority to administer the HEA is distinct from the IRS's grant of § 501(c)(3) tax-exempt status. (*Supra* at Section II(A)(1)(a).) GCU accepted this conclusion throughout the change-in-control application and following review period, during which GCU repeatedly acknowledged that the DOE's review is discrete. (X-MSJ at 24; AR-J-0077–78 (letter to DOE stating, *inter alia*, "[GCU] recognize[s] the Department's position that it must make an independent determination as to [GCU's nonprofit status]."), 0081.) GCU also acknowledges that Defendants have previously taken other measures to ensure that institutions are not converting to nonprofit status in bad faith. (*See* MSJ Reply at 8–9 (explaining that the DOE can "ensure [an] institution had not converted to evade for-profit rules.").)[15] The relevant law and record reflects that the DOE has long monitored compliance with § 600.2 by applying different methods of scrutiny and control. Since 2016, the DOE has taken a more aggressive approach to monitoring compliance, but this is in keeping with the DOE's pattern of ensuring compliance within the scope of its delegated power.

Confirming the consistency of the DOE's process, the DOE gave GCU an opportunity to explain why other schools' service agreements were relevant to the DOE's analysis during the review period. (X-MSJ Reply at 7.) GCU declined to draw a parallel. (*Id.*) Specifically, the DOE asked GCU to review its proffered list of other schools' service agreements and "identify any service providers that are affiliates, owners, or former owners of the institution (including related persons and entities), and indicate whether any of the

---

[15] Attempting to minimize this history, GCU argues that the DOE's role is "not to determine whether the institution *is* a nonprofit for Title IV purposes; but, instead, to ensure the institution had not converted to evade for-profit rules." (MSJ Reply at 8–9.) This is a distinction without a difference. The DOE acknowledges that it previously deferred to the IRS evaluation of nonprofit status, yet the DOE still sought to at least ensure that nonprofits were not unlawfully acting as for-profit corporations after converting. In other words, the DOE wanted to make sure the nominally converted nonprofits were actually nonprofits.

- 21 -

servicing agreements were entered into in conjunction with a change in ownership transaction." (X-MSJ at 25 (citing AR-J-0156).) GCU responded that the sale of GCU "stands on its own." (*Id.* (citing AR-J-0086).) Consistent with the DOE's "case-by-case" review and GCU's assertion to the DOE that the sale should be evaluated individually, the DOE assessed the sale under its regulatory criteria and came to its reasoned Decisions. This is not regulatory rulemaking in violation of the APA.

### 2. Arbitrary & Capricious

The APA mandates that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). "Under . . . this 'narrow' standard of review, [courts] insist that an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" *F.C.C. v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A] court is not to substitute its judgment for that of the agency . . . and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513–14 (internal quotations and citation omitted). This means that a reviewing court cannot "second-guess" the agency's "weighing of risks and benefits [or] penalize [the agency] for departing from [a different authority's] inferences and assumptions," nor may the court "ask whether [an agency] decision is the best one possible or even whether it is better than the alternatives." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019) (quoting *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016)).

But agencies must act within reasoned boundaries, and "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Telev. Stations*, 556 U.S. at 515 (*citing United States v. Nixon*, 418 U.S. 683, 696 (1974)). Agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *State Farm*, 463 U.S. at 43. Additionally, courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

GCU argues that the Decisions are arbitrary and capricious for multiple reasons. GCU asserts that the DOE did not adequately explain or justify its "reinterpretation" of § 600.2, particularly its analysis of why it determined that GCU's net revenue inures to the benefit of a private shareholder or individual. (MSJ at 18, MSJ Reply at 11–12, 16–20.) GCU argues that the DOE arbitrarily departed from the IRS's and the HLC's conclusions about GCU's nonprofit status and misapplied IRS authority in the Decisions. (MSJ Reply at 12–14, 20–23.) GCU relatedly argues that the DOE unlawfully ignored its own regulations and denied GCU fair notice of the outcome of the Decisions, damaging GCU's reliance interest. (*See id.* at 9–11.)

### a.     Private Inurement

The Decisions focused on Subsection i, the prohibition of private benefit from nonprofit earnings, in denying GCU nonprofit status. (2019 Decision at 10.) In the 2019 Decision, the DOE analyzed the MSA's revenue-sharing agreement using the Treasury's operational test, which prohibits both private benefit and private inurement. (*Id.* at 10–11 (citing 26 C.F.R. § 1.501(c)(3), (2), (1)).) The DOE explained that "unlike private inurement, private benefit does not necessarily involve the flow of funds from an exempt organization to a related private party, it can also include other benefits from the activities of the exempt organization to *an unrelated party*." (*Id.* at 11 (citing *P.L.R. 200914063*, 2009 WL 889714 (IRS PLR Apr. 3, 2009)) (emphasis in original).) The DOE went on to clarify that "[i]n looking at payments to a related for-profit enterprise, the focus is on whether 'the entire enterprise is carried on in such a manner that the for-profit organization benefits substantially from the operation of the [nonprofit entity].'" (*Id.* (citing *Church by Mail, Inc. v. C.I.R.*, 765 F.2d 1387, 1392 (9th Cir. 1985)).) Applying these authorities to the MSA, the DOE concluded that GCU's profits were benefitting GCE and its shareholders, violating Subsection i. (2019 Decision at 13.) The structure of the MSA,

- 23 -

including GCE's entitlement to an uncapped dollar amount in exchange for services, indicated to the DOE that "the revenues generated by GCU are transferred to and retained by GCE for the benefit of its shareholders." (*Id.* at 13–14.) After considering the AMSA, the DOE found "the basic structure whereby a substantial portion of GCU's revenues benefits GCE remains unchanged." (2021 Decision at 17.)

GCU argues that the DOE's private inurement analysis is arbitrary and capricious for multiple reasons. GCU first argues that the DOE has no "discernable standards" to determine private inurement. (MSJ Reply at 2.) Second, the DOE applied IRS tax authority in its private inurement analysis, which GCU contends is outside the scope of the DOE's expertise. (*See id.*) But GCU's more detailed analysis reaches a less subtle conclusion: the Decisions are simply incorrect, as GCU's revenues do not privately inure. (*Id.* at 17–20.) GCU asserts that because a nonprofit may incur "ordinary and necessary [operating] expenditures" without jeopardizing its nonprofit status, and because it is undisputed that GCU pays "fair market value" for GCE's services, any money GCU pays to GCE is "directly related to [GCU's] nonprofit mission." (*Id.* at 17–18.) Further, focusing on what GCU describes as the "well-established private inurement test," GCU argues that in order for GCU's revenue to be privately inuring to GCE, GCU's *insiders* would need to excessively benefit from GCU's revenues. (*Id.* at 17–19.) Citing the numerous conflict checks and corporate separation between GCU and GCE, GCU asserts that GCE is not an insider of GCU. (*Id.* at 19–20.) In sum, GCU argues that there is no private inurement as a matter of law. (*Id.* at 17.)

The Court finds the DOE's analysis of private benefit and inurement in the Decisions was not arbitrary and capricious. A reviewing court "must uphold a [decision] if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *F.E.R.C.*, 577 U.S. at 292. To justify the DOE's conclusion that GCU's operation creates excess private benefit for GCE, Defendants again turn to the structure of the MSA, whereby GCE receives 60% of GCU's revenue in exchange for providing only

28% of the services necessary to run GCU. (X-MSJ Reply at 8; Hr'g Tr. at 9:1–2, 35:2–4.) Defendants also point to the $870 million-dollar debt GCU owed GCE at the time of the Decisions, which only increased the percentage of revenue GCU paid to GCE. (X-MSJ Reply at 8.) Though GCU counters that GCE risks being undercompensated for its services that increase in value, the DOE points out that the opposite is also true, in that if GCU's revenues substantially increase, GCE will be paid a far greater amount of money for providing the same services. (*Id.*; Hr'g Tr. at 9:5–14.) Given the windfall to GCE once the cost of its services are subtracted from its revenue share, the DOE reasonably determined that an unacceptable percentage of GCU's revenue is enriching GCE, violating § 600.2's prohibition of private benefit.

To the extent that the DOE specifically addressed private inurement, the Court also finds it acted within the bounds of reasoned decision-making. "A [nonprofit] is not to siphon its earnings to its founder, or the members of its board . . . or anyone else fairly to be described as an insider, that is, as the equivalent of an owner or manager. The test is *functional*. It looks to the reality of control rather than to the insider's place in a formal table of organization." *United Cancer Council v. Commissioner*, 165 F.3d 1173, 1176 (7th Cir. 1999) (emphasis added). "[A]n organizational structure . . . entailing domination by the founder . . . raises concern about the potential for abuse unless allayed by other information in the record." *Fam. Trust of Mass., Inc. v. U.S.*, 892 F. Supp. 2d 149, 156 (D.D.C. 2012) (quoting *Church of the Visible Intel. that Governs the Universe v. U.S.*, 4 Cl. Ct. 55, 60 (1983)). "The [benefitting] insider could be a 'mere' employee—or even a nominal outsider, such as a physician with hospital privileges in a charitable hospital." *United Cancer*, 165 F.3d at 1176 (citing *Harding Hosp., Inc. v. U.S.*, 505 F.2d 1068, 1078 (6th Cir. 1974)).

At the time of the Decisions, GCE's only client was GCU.[16] (Hr'g Tr. at 22:6; 2019

---

[16] GCU raises that GCE has since expanded to providing services for additional institutions. (Hr'g Tr. at 34:11–18.) But given that this Court's review is limited to the Decisions and the information before the DOE at the time it issued the Decisions, GCE's subsequent business ventures are immaterial under the APA. *Dep't of Commerce*, 139 S. Ct. at 2573 ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.").

Decision at 13.) It is undisputed that the MSA caused the cost of operating GCU to increase,[17] though it is unclear whether GCU could have obtained a more favorable service agreement, as there is no record that GCU ever solicited offers from other service providers. (Hr'g Tr. at 23:4–8.) In addition to the disproportionate percentage of revenue awarded in compensation for GCE's services, the Decisions clarify the DOE's concern that Mr. Mueller's dual roles further commit GCU to operate for the financial benefit of GCE. (*See* X-MSJ 16–17.) As President, Mr. Mueller is an insider of GCU, yet he and the company he runs—GCE—stand to profit enormously from GCU's income. Mr. Mueller's entanglement between for-profit service provider and educational institution further explains the DOE's conclusion that GCU is a source of captive income for GCE. GCU touts that GCE is performing the services under the MSA for fair market value, but particularly given the incomparable nature of this conversion and service agreement, it is reasonable that the DOE's inquiry did not stop there. (*See* MSJ Reply at 21; X-MSJ Reply at 7 (DOE noting that the sale was "unlike any other prior nonprofit conversion").) The Court concludes that the DOE articulated its reasons for finding GCU does not meet Subsection i and connected those reasons to factors which the DOE is required to consider. *See Fox Telev. Stations., Inc.*, 556 U.S. at 513–14 ("[A] court is not to substitute its judgment for that of the agency . . . and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.").

GCU makes much of the DOE's particular scrutiny of the "economic profit split" transfer pricing method Deloitte and BKD used to analyze the fairness of the MSA and AMSA. (*See* MSJ Reply at 21–23; 2021 Decision at 13.) The DOE analyzed the transfer pricing study under 26 C.F.R. § 1.482-9, a Treasury regulation that speaks to applicability

---

[17] GCU asserts that Defendants' calculation of GCU's increased operating expense—$810 million to $1.496 billion as a consequence of the fees paid to GCE—was based on "mathematical errors." (MSJ at 23.) This purported error is rooted in the Barclays Report. (*See* 2019 Decision at 5; Doc. 59-10, Barclays Report at 33.) Yet the DOE did not make this conclusion about *GCU's* operating expenses. It instead opined that "under the planned separation . . . the costs to operate [GCU] increase from $810 million to $1.496 billion solely as a result of the Services Fee paid to GCE." (2019 Decision at 5; X-MSJ at 17 n.9.) It is undisputed that GCE and GCU are both contributing services to GCU. The DOE correctly observed that the Barclays Report showed a cost increase for both contributing parties, solely as a result of the MSA.

of different pricing methods for determining controlled transaction fairness.[18] (2021 Decision at 9.) Despite GCU's attacks, the Court finds the DOE adequately explained its objections to the transfer pricing analysis before it. The DOE explained not only that transfer pricing is not a preferred method of analyzing purportedly arm's length transactions, but also that transfer pricing analysis is normally applied to transactions between two parties under common control or ownership. (*See id.* at 7, 14.) The DOE noted that despite these indications that Deloitte and BKD did not use the appropriate evaluation method, "[n]either the Deloitte 2020 TPPR nor the BKD Review . . . explain why transfer pricing is an appropriate tool to evaluate a price being charged between two supposedly independent entities." (*Id.* at 8.) The DOE also reiterated its more generalized skepticism of GCU and GCE's incomplete separation, explaining that,

> [b]oth Deloitte and BKD[19] fail to acknowledge that the claimed lack of comparability [to other revenue-sharing agreements] is a creature of the unique structure of this transaction: taking a fully integrated proprietary institution and separating its academic and campus structure into a nonprofit entity, retaining the 'servicing' functions in the publicly-traded for-profit former owner for which the institution is the primary, if not only client, and providing services for a fee that is 59.9% of Tuition and Fee Revenue.

(2021 Decision at 10–11.) Even taking the analyses at face value, the DOE clearly explained its reasonable conclusion that the analyses commissioned by GCU indicated the MSA and AMSA were unique among service agreements, given the prior and ongoing

---

[18] GCU also argues that the DOE improperly relied on a typo in the BKD report to condemn the transfer pricing study. (Doc. 63, Mot. to Supp. AR at 2; *see* MSJ at 27.) To support this contention, GCU moved to supplement the administrative record with a declaration from a BKD employee, in which the employee restates BKD's conclusions and discusses how the DOE erred in applying § 1.482-9. (Mot. to Supp. AR.) While true that the Decision appears to reference the misstatement in the BKD report, the DOE based its analysis on other portions of § 1.482-9, all of which are accurate reflections of the statute. *See* 26 C.F.R. §§ 1.482-9, 1.482-1 ("An arm's length result may be determined under any method without establishing the inapplicability of another method, but if another method subsequently is shown to produce a more reliable measure of an arm's length result, such other method must be used."); (2021 Decision at 9.) The Court therefore finds that supplementation would not aid the Court in understanding the complex issues at hand. *See Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703–04 (9th Cir. 1996) (courts only supplement with extra-record materials when "necessary to explain technical terms or complex subject matter.").

[19] Defendants also note that GCU's proffered expert opinions are not entitled to "controlling weight." (X-MSJ at 19 (quoting *Azar*, 950 F.3d at 1100).) The Court agrees. *See Azar*, 950 F.3d at 1096 n.28 ("'[T]he agency has discretion to rely on its own expertise 'even if, as an original matter, a court might find contrary views more persuasive.'")

- 27 -

relationship between GCU and GCE. (*Id.* at 15.) The above explanation is all that is required of the DOE under the APA.

### b. IRS Review

Defendants also argue that the DOE's distinction from IRS review is not arbitrary and capricious. (X-MSJ 20–21.) GCU counters that the DOE had no proper basis to dismiss the conclusions of the IRS. (MSJ at 24.) GCU also argues that because Defendants merely applied IRS tax authority in the Decisions, the Decisions are not entitled to deference under the APA. (MSJ 23–24 (citing *Kisor*, 139 S. Ct. at 2417 ("[D]eference ebbs when the subject matter of a dispute is distant from the agency's ordinary duties or falls within the scope of another agency's authority."))).)

The Court finds that the DOE reasonably explained its discrete analysis. As outlined above, the DOE administers the nonprofit compliance provisions in the HEA, some of which are reflected in § 600.2, and ensuring compliance with these authorities is within the scope of the DOE's power and expertise. (*Supra* Section II(A)(1).) In delegating this power of review to Defendants, Congress did not mandate that Defendants promulgate authority completely distinct from that already applied by the IRS. (*See* Hr'g Tr. at 25:14–18 (explaining that the IRS approved GCU's § 501(c)(3) status but "does not have the expertise to understand what [MSA-provided] services are in the education context that the [DOE] has."); X-MSJ at 21.) It is undisputed that the DOE applied IRS regulations in the Decisions. But given that the DOE has no independent body of law under which to analyze changes in control, applying IRS authority to reach a coherently-explained conclusion about GCU's Title IV nonprofit status is a reasonable exercise of the DOE's unique power of review. (*See* X-MSJ Reply at 12 n.9, 21); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (the requirement of agency explanation "is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'"); *c.f. Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 314 (D.C. Cir. 2014) (holding any "amorphous" decisional rule to be arbitrary and capricious).

### c. HLC Accreditation

- 28 -

GCU also attacks Defendants' lack of deference to the HLC's determination as arbitrary and capricious. (MSJ at 25.) Specifically, GCU argues that Defendants "had no legitimate basis to dismiss" the HLC's conclusions, which included that "[GCU's] Board of Trustees has sufficient independence to ensure it is free from undue influence of the part of . . . GCE or its stockholders." (*Id.* at 25–26.) From GCU's perspective, the DOE disregarded the fact that GCU's "Executive Leadership team" and MSA Committee would be free from conflicts of interest after the sale closed and that GCU retained ultimate control over Mr. Mueller's employment as President. (*Id.* at 26.) Though the HLC found that GCU had dispelled any "apparent conflict of interest" by instituting these conflict checks, the Decisions outlined how the DOE reached a different conclusion. (*Id.*; 2019 Decision at 16 (observing that most of the Executive Leadership team remained employed by GCE after the sale closed and that GCE effectively operated GCU); 2021 Decision at 17 ("The Department makes its own determination regarding nonprofit status, and the fact that HLC may have reached a different conclusion is neither binding nor persuasive.").) GCU asserts that the DOE's conclusion regarding the HLC "fails the APA's requirement to fairly consider the relevant evidence before it." (MSJ at 27.)

Defendants contend that they considered the HLC's determination and explained why they reached a different conclusion, which suffices under APA review. (X-MSJ at 22); *see Fox Telev. Stations., Inc.*, 556 U.S. at 513. Neither the HEA nor the relevant regulations mandate that the DOE defer to the assessment of an accreditor. On the contrary, the HLC itself noted that it must defer to Defendants' assessment of whether GCU qualifies as a nonprofit under Title IV. (X-MSJ at 22 (citing AR-G-0048).) The Court finds that the DOE's disagreement with the HLC's conclusion does not render the Decisions arbitrary and capricious. *See Ass'n of Private Sector Colleges and Univs.*, 681 F.3d at 441 (under "fundamentally deferential" court review of agency decisions, an agency decision is arbitrary and capricious if it "offered an explanation of its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or a product of agency expertise.")

- 29 -

#### d.       Fair Notice to GCU

Asserting that it relied on the DOE's prior practice of equating § 501(c)(3) status with Title IV nonprofit status, GCU argues that the DOE "failed to provide fair notice . . . about its standards governing nonprofit status." (MSJ Reply at 9; *see* MSJ at 18.) Defendants concede that they have raised their level of scrutiny in assessing applications for Title IV nonprofit status. (*See* Hr'g Tr. at 27:5–14; X-MSJ at 23.) "[T]he choice whether to proceed by rulemaking or adjudication is primarily one for the agency regardless of whether the decision may affect agency policy and have general prospective application . . . [although] there could be instances where reliance on adjudication rather than rulemaking would amount to an abuse of discretion." *Chisholm v. F.C.C.*, 538 F.2d 349, 365 (D.C. Cir. 1976) (citing *NLRB v. Bell Aerospace*, 416 U.S. 267, 291–95 (1974)). "Such [an abuse of discretion] may present itself where the new standard, adopted by adjudication, departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application." *Pfaff v. U.S. Dept. of Housing and Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996).

The Decisions do not meet this standard. The Court already explained that this enhanced scrutiny is not a "radical" departure from prior interpretation of § 600.2, but instead is in keeping with the DOE's pattern of using various methods to ensure compliance with its regulations. In turn, GCU acknowledges that the DOE denied nonprofit status to an institution with § 501(c)(3) status in 2016, so GCU cannot persuasively argue that the Decisions present a completely new interpretation of § 600.2. (Hr'g Tr. at 12:21–24.) Lastly, GCU does not dispute that it is still able to participate in Title IV as a proprietary institution and certainly faces no fines or damages as a direct result of the Decisions.[20] (*Id.*

---

[20] Even though the DOE points out that its heightened scrutiny of nonprofit conversions has spanned multiple presidential administrations, "it is hardly improper for an agency head to come into office with policy preferences and ideas . . . and work with staff attorneys to substantiate the legal basis for a preferred policy." *Biden v. Texas*, 142 S. Ct. 2528, 2547 (2022) (quoting *Dep't of Commerce*, 139 S. Ct. at 2574); (Hr'g Tr. at 28:2–8.)

at 15:22–16:1, 18:7–12.) The Court finds that the Decisions comport with the standards for fair agency adjudication mandated by the APA.

GCU also raises that it asked the DOE if there were any "additional requirements" for nonprofit approval before closing the sale but received no response from the DOE. (MSJ at 18.) The DOE counters that GCU had the opportunity to gather information from the DOE about the status of its application through the preacquisition review process, but GCU chose to time the sale in such a way that it did not wait to receive the DOE's particularized guidance. (X-MSJ Reply at 8 n.3.) The Court agrees with the DOE. GCU does not and cannot assert that the DOE forced or incentivized GCU to seek out HLC approval in early 2018. Had GCU not sought HLC approval on its own timeline, it would not have needed to close the transaction on July 1, 2018. (*See* MSJ SOF ¶ 53.)

Related to its fair notice argument, GCU argues that the DOE "ignored" its own statutes, regulations, and guidance regarding changes in ownership. (MSJ Reply at 14.) The HEA forbids the DOE from exercising "direction, supervision, [and] control" over a nonprofit institution's "employment or administrative decisions." (*See* X-MSJ Reply at 13); 20 U.S.C. § 1232a; *Vitarelli v. Seaton*, 359 U.S. 535, 539–40 (1959) (an agency must follow its own regulations). GCU asserts that by repeatedly criticizing Mr. Mueller's dual roles as President of GCU and CEO of GCE, the Decisions attempted to interfere with GCU's employment decisions in violation of § 1232a.[21] (MSJ Reply at 14.) But the Decisions belie GCU's argument. In the 2021 Decision, the DOE noted GCU's preference for retaining Mr. Mueller as President of GCU and expressed concern over Mr. Mueller's potentially conflicting role *as CEO of GCE*. (2021 Decision at 18.) There is no record that

---

[21] GCU also argues that the Decisions interfere with GCU's ability to contract out services, in violation of DOE regulation which "expressly allow[s]" revenue-sharing agreements. (*See* MSJ Reply at 14 (citing 34 C.F.R. § 668.25(a)).) To support this argument and evidence that the DOE failed to consider the prevalence of colleges that use service agreements, GCU asks the Court to include a Government Accountability Office ("GAO") report regarding many service agreements used by various educational institutions. (Mot. to Supp. AR at 3.) While GCU now argues the DOE should have considered such data, this GAO report did not exist at the time of either Decision. Additionally, given the evidence already in the record, the Court does not doubt that many institutions used such service agreements at the time of the Decisions, nor does the GAO report independently clarify a complicated issue. The Court will not add the GAO report to the administrative record. *See Glickman*, 88 F.3d at 703–04.

- 31 -

the DOE "conditioned GCU's nonprofit status on removing its chosen President," but instead the Decisions suggest that GCU's application for Title IV status would have been stronger if Mr. Mueller were not the CEO of GCE. (*See* MSJ at 22.) GCU has pointed to no regulation, and the Court knows of none, indicating that the DOE may not speak to the employment decisions of a for-profit service provider associated with an institution seeking recognition as a Title IV nonprofit.

GCU's argument that existing nonprofits have similar revenue sharing agreements does not change the outcome of the Motion. (*See* MSJ at 20; MSJ Reply at 1.) Defendants are not expressly empowered by the HEA to "monitor service agreements of existing nonprofits," even though DOE regulations permit the Secretary to periodically review an institution's eligibility to participate in Title IV programs. (*See* MSJ at 20); 34 C.F.R. § 668.13(b) (enabling but not requiring the Secretary to periodically review and reauthorize an institution's eligibility for Title IV programs); *Fla. Coastal Sch. of Law v. Cardona*, No. 3:21-cv-721-MMH-JBT, 2021 WL 3493311, at *17–18 (M.D. Fla. Aug. 9, 2021) (discussing an institution's application for recertification under Title IV). Instead, the regulations at issue empower the DOE to review the eligibility of institutions undergoing a change in control for participation in programs under Title IV. (*See* X-MSJ at 24 (quoting AR-J-0329) ("The Department's decision to deny a conversion to nonprofit status '*depends on the structure and impact of the Transaction* in the context of the regulatory requirements for a nonprofit institution.'").) This Court's review is limited to whether the agency acted in accord with its own governing regulations in the instant Decisions. *See Dep't of Commerce*, 139 S. Ct. at 2569 ("[Courts] may not substitute [their] judgment for that of the Secretary . . . but instead must confine [them]selves to ensuring that he remained within the bounds of reasoned decisionmaking.") (internal citation and quotation marks omitted).

Lastly, GCU has consistently expressed that the DOE's "case-by-case" review of nonprofit conversions undermines fair notice to institutions like GCU and leads to inconsistent results. (MSJ at 20; *see* Hr'g Tr. at 41:21–25; MSJ Reply at 9–10.) Specifically citing the Purdue-Kaplan transaction, GCU asserts that there is no reasoned distinction

between the DOE's decision to grant Purdue Global nonprofit status and deny it to GCU. (*See* Hr'g Tr. at 40:18–41:6.) Defendants agree that there was no specific standard for service agreement structure at the time of the Decisions, but persuasively raise that GCU could have received case-specific guidance had it waited for the results of the DOE's preacquisition review. (*Id.* at 30:6–12.) Further, Defendants point to the fact that GCU received guidance through the 2019 Decision and chose not to substantially address many of DOE's concerns outlined in that Decision.[22] (*See id.* at 31:16–24.) Particularly where, as here, the agency provided ample case-specific feedback in the 2019 Decision and would have provided preacquisition feedback, the Court does not find its case-by-case adjudication process to be arbitrary and capricious.

### B. First Amendment Claims

GCU argues that Defendants' licensing policy prohibiting GCU from holding itself out to the public as a nonprofit under Title IV is an unconstitutional prior restraint on speech. (MSJ at 30); *see* 34 C.F.R. § 668.71(b) (a Title IV participant may lose Title IV funding if it makes "substantial misrepresentations about the nature of its educational program, its financial charges, or the employability of its graduates."). The DOE does not restrict GCU from representing itself as a § 501(c)(3) tax-exempt entity or from openly disagreeing with the DOE's Title IV nonprofit determination, but GCU argues that there is no reason for the DOE's narrower ban. (*See* X-MSJ at 29; MSJ at 31.) According to GCU, any representation of nonprofit status by GCU is not misleading because GCU is a nonprofit. (MSJ at 30.) And regardless, GCU argues, "there is no evidence in the record that students place any importance on the [DOE]'s elusive nonprofit/for-profit distinction." (*Id.* at 30–31.) Defendants persuasively counter these claims.

As a threshold matter, "false or misleading commercial speech" is not protected under the First Amendment. (X-MSJ 26); *Hoffman v. Cap. Cities/ABC, Inc.*, 255 F.3d 1180,

---

[22] Defendants have repeatedly distinguished the Purdue-Kaplan transaction—after which the DOE recognized Purdue Global as a public institution—from GCU's sale. (*See* X-MSJ at 25, 25 n.16.) And again, GCU informed the DOE that the sale "stands on its own," which undermines its current claim that Defendants unfairly deviated from their decision regarding Purdue Global's Title IV status. (*See* X-MSJ at 25 (citing AR-J-0156).)

- 33 -

1184–85 (9th Cir. 2001) (citing *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995)). The DOE argues that GCU "marketing itself as a nonprofit *school* suggests to students and the public that the [DOE] considers GCU a nonprofit under its regulations." (X-MSJ at 29.) GCU has an "economic motive" to present itself as a nonprofit institution, as evidenced by Mr. Mueller's comments that GCU recruiting has boomed since losing its for-profit stigma. (*See* X-MSJ SOF ¶ 32); *Am. Academy of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)) (speech is commercial when "(1) the speech is admittedly advertising; (2) the speech references a specific product; and (3) the speaker has an economic motive for engaging in the speech."). GCU suggests that some of its speech inviting enrollment at GCU is advertising. (*See* MSJ at 30.) Any such misleading speech is not protected by the First Amendment.

Defendants also contend that the DOE's speech licensing provision is a "permissible condition on [GCU's] receipt of federal funds under Title IV." (X-MSJ at 26.) The Court agrees. "If speech is not 'purely commercial'—that is, if it does more than propose a commercial transaction—then it is entitled to full [protection]." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002) (quoting *Hoffman*, 255 F.3d at 1185–86). But "if a party objects to a [speech-related] condition on the receipt of federal funding, its recourse is [usually] to decline the funds." *Agency for Intern. Dev. v. Alliance for Open Society Intern., Inc.*, 570 U.S. 205, 214 (2013). A speech-related condition on funding is only unconstitutional if "prohibits the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 217 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). GCU is not forbidden from calling itself a § 501(c)(3) tax-exempt organization, nor is it forced to adopt the DOE's opinion about its Title IV nonprofit status—on the contrary, it may openly disagree with the DOE's determination and receive the same Title IV funding. *C.f. id.* at 218–19 (funding condition that forced recipients to "espouse [the Government's] belief as its own" violated the First Amendment). Defendants' speech condition only requires that GCU accurately represent the outcome of

the Decisions to the public. As such, the condition is a permissible restriction within the scope of Title IV. *Ass'n of Priv. Sector Colleges and Univs*, 681 F.3d at 435 ("[S]tudents are expected to repay their federal loans; their failure to do so shifts their tuition costs onto taxpayers. But schools receive the benefit of accepting tuition payments from students receiving federal financial aid, regardless of whether those students are ultimately able to repay their loans. Therefore, Congress codified statutory requirements in the HEA to ensure against abuse by schools.")

## IV.     CONCLUSION

The record and law reflect that the DOE has authority to determine whether an institution qualifies as a nonprofit under Title IV. Further, Defendants have shown that the Decisions were not arbitrary and capricious. The Court concludes that Defendants lawfully decided that GCU is not a nonprofit under Title IV, and therefore the DOE does not violate the First Amendment by placing corresponding restrictions on GCU's self-representation.

**IT IS ORDERED** denying Plaintiff Grand Canyon University's Motion for Summary Judgment (Doc. 59) and granting Defendants Department of Education and Miguel Cardona's Cross-Motion for Summary Judgment (Doc. 74).

**IT IS FURTHER ORDERED** denying Plaintiff Grand Canyon University's Motion to Supplement the Administrative Record and Take Judicial Notice (Doc. 63).

**IT IS FURTHER ORDERED** directing the Clerk to enter Judgment.

Dated this 1st day of December, 2022.

_____
Susan R. Bolton
United States District Judge

- 35 -