**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| IN RE GRAND CANYON EDUCATION, INC. SECURITIES LITIGATION | ) ) ) ) ) | Civil Action No. 20-639-MN-CJB Consolidated |

**REPORT AND RECOMMENDATION**

In this consolidated securities class action case, Plaintiffs assert claims against

Defendants Grand Canyon Education, Inc. ("GCE"), Brian E. Mueller ("Mueller") and Daniel E.

Bachus ("Bachus") (collectively, "Defendants"), pursuant to Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and

United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.

Presently before the Court is Defendants' motion (the "Motion") to dismiss Plaintiffs' Second

Amended Consolidated Complaint (the "SAC"), filed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  (D.I. 61)  For the following reasons, the Court recommends that

Defendants' Motion be DENIED.

**I.      BACKGROUND**

**A.      The Parties**

**1.      Lead Plaintiffs**

The Lead Plaintiffs in this case are Fire and Police Pension Association of Colorado

("Colorado FPPA"), Oakland County Employees' Retirement System ("Oakland County ERS")

and Oakland County Voluntary Employees' Beneficiary Association Trust (collectively with

Oakland County ERS, "Oakland County").  (D.I. 60 at ¶¶ 26-27)  Colorado FPPA is a benefit

pension plan that purchased shares of GCE stock during the Class Period.  (*Id.* at ¶ 26)  Oakland

County are entities that provide retirement benefits to employees of Oakland County, Michigan

and that also purchased GCE stock during the Class Period.  (*Id.* at ¶ 27)  These Lead Plaintiffs

are bringing the instant action individually and on behalf of all other persons who purchased the common stock of GCE during the Class Period.  (*Id.* at 1)  The Class Period runs from January 5, 2018 through January 27, 2020.  (*Id.*)

### 2.     Defendants

Defendant GCE is a public company and a Delaware corporation.  (*Id*. at ¶ 28)  It operated as a "for-profit Christian University" from 2004 until July 2018, when it became an online program management ("OPM") company that "provide[s] management, back-office[] and other services to educational institutions."  (*Id.*)

Defendant Mueller is GCE's Chief Executive Officer ("CEO") (having held that role since July 2008) and Chairman (having held that role since January 2017).  (*Id*. at ¶ 29)  Mueller also has served as President of Grand Canyon University ("GCU" or "University") since 2012.  (*Id.*)  Bachus is GCE's Chief Financial Officer ("CFO"); he has held that role since 2008.  (*Id.* at ¶ 30)

### B.     Key Background Facts Regarding the Litigation[1]

### 1.     GCU, Its Status as a For-profit Entity and the 2014 Conversion

GCU was formerly known as Grand Canyon College.  (*Id.* at ¶¶ 32-33)  In 2004, Grand Canyon College was on the verge of bankruptcy and was acquired by Significant Education, LLC ("Significant").  (*Id.*)  Significant transformed Grand Canyon College into GCU—the first

---

[1]      In this Report and Recommendation, almost every fact of record that the Court cites will be drawn from the text of the SAC itself.  The SAC is extremely lengthy, as it spans 132 pages and includes 379 separate numbered paragraphs.  (D.I. 60)  In light of that, it would not be feasible or sensible for the Court to list every fact contained in the SAC.  Instead, the Court below has made a good faith (and still lengthy) effort to summarize the key facts in the SAC that relate to the issues discussed in the parties' briefing and in this Report and Recommendation.

for-profit Christian university in the United States, and one primarily focused on online education for working adults.  (*Id.*)  In 2008, Significant changed its name to GCE.  (*Id.*)

In recent years, a series of major scandals involving other for-profit educational companies brought negative attention to the for-profit sector.  (*Id.* at ¶¶ 34-39)  As government scrutiny of for-profit institutions increased and the public reputation of such institutions decreased, key figures in the for-profit industry began identifying alternate approaches that could give educational companies access to the public stock market while avoiding the stigma associated with the "for-profit" label.  (*Id.* at ¶ 38)  The SAC alleges that one approach was to adopt a "'hybrid' model" that "allow[ed] [companies] to take advantage of the interest of financial investors in the higher-education market" while purportedly preserving the "key attributes of non-profit private or public colleges."  (*Id.* (internal quotation marks omitted) (alteration in original))

By 2014, Mueller and Bachus began to explore a conversion (the "2014 Conversion") of GCU from a for-profit to a non-profit institution, in part to distance the school from the stigma around for-profit schools.  (*Id.* at ¶¶ 40-41)  The SAC alleges that GCE thus "pursued a restructuring [by which] it would spin off its educational assets" by "sell[ing] GCU to a newly formed non-profit organization called Gazelle University[, which would then be renamed] Grand Canyon University" at the close of the transaction.  (*Id.*)  After the transaction, GCE would remain a for-profit company and would provide educational services to the now purportedly non-profit new GCU.  (*Id.* at ¶ 41)

In conjunction with the 2014 Conversion, on October 8, 2015, GCE applied to the United States Internal Revenue Service ("IRS") for recognition of GCU as a tax-exempt non-profit

organization.  (*Id*. at ¶ 145)  The IRS granted the requested exemption on November 9, 2015.[2]
(*Id*.)  The SAC does not indicate that, prior to the IRS's decision, GCE supplied any documents
to the IRS that described the structure of the proposed 2014 Conversion.

GCE also applied to its regional accreditation body, the Higher Learning Commission
("HLC"), for a Change in Control, Structure or Organization ("Change in Control")—a
prerequisite to executing the 2014 Conversion.  (*Id*. at ¶ 42)  Karen Solinski, an experienced
regulatory lawyer, chaired the HLC's fact-finding evaluation team that analyzed GCU's 2014
Conversion application.  (*Id*. at ¶ 43)  Solinski had served in her position at HLC for
approximately 20 years, wrote HLC's Change of Control, Structure and Organization policy, and
led more than 50 Change of Control evaluations by the time GCE applied to the HLC.  (*Id*.)  On
February 25, 2016, HLC denied GCU's Change of Control application, concluding in part that
the proposed structure contravened HLC's existing accreditation requirements.  (*Id*. at ¶ 47)

In parallel with submitting the 2014 Conversion to HLC, GCE had also tried to persuade
the United States Department of Education ("DOE") as to the merits of its proposed conversion.
(*Id*. at ¶ 50; *see also id*. at ¶ 49)[3]  However, according to Solinski, GCE's outreach had not gone
well.  (*Id*. at ¶ 50)  Specifically, Michael Frola ("Frola"), a DOE Division Director, and other
DOE lawyers had informed GCE that "the transaction would result in the DOE, HLC, and other
regulatory bodies being unable to regulate significant portions of [] GCU's operations and would
likely improperly benefit the newly formed for-profit company."  (*Id*.)  Ultimately, according to

---

[2]     The SAC alleges that the IRS engages in little substantive review of such non-
profit recognition requests.  (D.I. 60 at ¶¶ 145-52)  The Court will discuss additional relevant
allegations in that regard later in this Report and Recommendation.

[3]     The DOE's role in reviewing a requested change in control of an educational
institution like GCU is explained in more detail later in this Section.

Solinski, Frola notified GCE that the DOE was "unlikely to approve" the conversion even if HLC had not rejected the accreditation application.  (*Id.* at ¶¶ 49-50)  The SAC alleges that Mueller was aware of and personally involved in GCE's outreach to the DOE in this regard.  (*Id.* at ¶ 52)  Indeed, at a "'fence-mending meeting'" in May 2016 between Defendants and HLC, at which both Bachus and Mueller were present, Mueller "complained that the DOE had given him pushback on the 2014 Conversion [] and that he did not believe the DOE or HLC would bless it in the future."  (*Id.*)  Given these issues, Mueller announced that the company would not be reapplying to convert GCU to non-profit status.  (*Id.*)

### 2.       GCE Again Seeks to Convert GCU Into a Non-profit

By late 2017, however, GCE had decided to revive its plan to restructure GCU as a non-profit.  The SAC alleges that what spurred Defendants' change of heart was the drastically different regulatory landscape that emerged for for-profit universities after Donald J. Trump was elected President of the United States in November 2016.  (*Id.* at ¶¶ 53-72)

The SAC alleges that this landscape began to change in earnest on February 7, 2017, when the United States Senate confirmed Betsy DeVos as Secretary of Education.  (*Id.* at ¶ 53) Immediately thereafter, the Trump Administration began installing veterans of for-profit education companies into key DOE and White House leadership roles.  (*Id.* at ¶¶ 55-61)  At the same time, the DeVos DOE also began rolling back key DOE protections against student abuses by for-profit institutions.  (*Id.* at ¶ 62)  Finally, the Trump Administration also signaled a shift in how strictly the federal government might scrutinize large-scale, for-profit to non-profit conversions.  (*Id.* at ¶ 63)  For instance, the DOE ultimately approved one such large-scale conversion in which Purdue University ("Purdue") would acquire for-profit Kaplan University ("Kaplan"), which would in turn become a separate third-party OPM provider to Purdue.  (*Id.* at

¶ 99)  According to the terms of that deal (the "Purdue-Kaplan Deal"), Purdue would convert Kaplan's programs into Purdue's new online education arm, while Kaplan would provide back-office services.  (*Id.*)  This deal received approval from the DOE in September 2017 and from its accreditor in March 2018.  (*Id.*)

Given this climate, what followed was a period in which for-profit to non-profit conversions took off.  (*Id.* at ¶¶ 63-72)  As one March 2018 article put it, "'one key phenomenon that intersects with the growth of higher education public-private partnerships is the rush of efforts to convert for-profit colleges to non-profit status in recent years.  Those efforts [were] now being blessed by the for-profit friendly Trump-DeVos team at the Department of Education.'"  (*Id.* at ¶ 71)

Due to the favorable and transformed regulatory environment, GCE decided in early 2017 to submit a renewed Change of Control application to the HLC.  (*Id.* at ¶ 73)  GCE presented this proposed conversion (referred to herein as the "Conversion") as being structurally similar to the 2014 Conversion that the HLC had previously rejected.  (*Id.* at ¶ 79)  Bachus informed Solinski of GCE's intent around May 2017, explaining to Solinski that the proposed GCU transaction was very similar to the Purdue-Kaplan Deal, which had just received pre-acquisition review from the DOE in April 2017.  (*Id.* at ¶ 74)  Solinski, however, informed Bachus that she believed, based on her experience evaluating the Purdue-Kaplan Deal for the HLC, that there were "'real'" and "'key'" differences between the two deal structures.  (*Id.*)  In support of her viewpoint, she pointed to publicly-available documents regarding the Purdue-

Kaplan Deal that detailed the alleged differences between the two, and sent Bachus articles clarifying those differences.  (*Id.*)[4]

Despite this, GCE decided to move forward.  (*Id.* at ¶ 76)  On January 5, 2018, GCE announced that it had submitted its renewed Change in Control application to the HLC in connection with its plan to convert GCU into a non-profit university.  (*Id.* at ¶ 79)  After an allegedly truncated and perfunctory review,[5] the HLC approved the Conversion in February 2018.  (*Id.* at ¶¶ 82-95)

---

[4]     The Court will explain in greater detail the alleged differences between the two conversions in connection with its recitation of Defendants' alleged material misstatements below.

[5]     The SAC contains numerous paragraphs denigrating the HLC's review process regarding the Conversion.  (D.I. 60 at ¶¶ 82-93; *see also* D.I. 66 at 4-5 & n.4)  These include allegations suggesting that HLC:  (1) curtailed its review process for the Conversion, contrary to its usual practice; and (2) violated its own policy, which required that the applicant (here, GCE) needed to submit a DOE pre-acquisition letter to the HLC Board before the Board would act on the application.  (D.I. 60 at ¶¶ 82-93)  The SAC also alleges that although Solinski told HLC administrators that she would not be the HLC staff member who substantively reviewed the Conversion application (due in part to her friendship and business acquaintance with Bachus), Solinski nevertheless repeatedly discussed the Conversion application process with Barbara Gellman-Danley (HLC's President), Robert Rucker (the HLC employee responsible for managing the application process), a member of the HLC's Board of Trustees and with Bachus himself.  (*Id*. at ¶¶ 76-77, 87, 89-93)

During oral argument, however, Plaintiffs' counsel stated that the Court should ignore all of these allegations in the SAC about the HLC's Conversion-related review process.  Plaintiffs' counsel explained that Plaintiffs had included these allegations because, at the time, they thought that Defendants would be asserting that the HLC's 2018 approval of GCE's Conversion application was relevant to issues at play in the instant Motion (such as scienter).  (D.I. 75 (hereinafter "Tr.") at 73-86).  But subsequently, Plaintiffs learned that Defendants agreed with them that the HLC's decision on the Conversion application is *not relevant* to the legal issues involved with the Motion.  (*Id*. at 29-32, 35, 43, 73-86; D.I. 62 at 13; D.I. 66 at 18; D.I. 68 at 8)  Therefore, Plaintiffs' counsel stated that these allegations in the SAC are "immaterial" to the Motion and "a sideshow[.]"  (Tr. at 82, 85)  Thus, the Court will not address these allegations further in this Report and Recommendation.

Because the Conversion would amount to a change in ownership of GCU, which would in turn result in a change of control over the university, GCU was statutorily required to obtain DOE approval of the transaction if it wished to continue to participate in programs regarding Title IV of the Higher Education Act ("Title IV") post-Conversion.  (D.I. 48, ex. 2 at 26); 34 C.F.R. 600.31(a)(3).  One option that GCE/GCU had as part of this DOE review process was to seek a voluntary "pre-acquisition review" from the DOE regarding the transaction.  Pursuant to this pre-acquisition review, the DOE would "determine whether the institution has answered all the questions on the application completely and accurately, and [would] notify the institution of the results of that review."  64 Fed. Reg. 58,608, 58,611 (Oct. 29, 1999).  The pre-acquisition review would not amount to an official approval or denial of the application for transaction approval.  But it would be a means for the DOE either to notify GCE that its application was approvable or to note that its application had significant problems that would need to be addressed before approval was possible.  *Id*.

GCE submitted a pre-acquisition review application (the "pre-acquisition application") to the DOE on January 18, 2018.  (D.I. 60 at ¶¶ 86, 107)  This pre-acquisition application "consisted of, among other things, drafts of the [Master Services Agreement, or 'MSA'], Asset Purchase Agreement [("APA")] and Credit Agreement [("CA") relating to the Conversion.]" (*Id.* at ¶ 107)  With this application, GCE not only sought approval of the change of ownership of GCU, but it also requested that the DOE allow GCU to convert to non-profit status for purposes of GCU's participation in Title IV.  (*Id*., ex. A at 1)[6]

---

[6]     In assessing whether an institution like GCU qualifies as a non-profit organization, the DOE uses criteria similar to the criteria that the IRS uses in order to determine non-profit status.  (D.I. 60, ex. A at 10)  One of these factors asks whether the institution at issue "[i]s owned and operated by one or more nonprofit corporations or associations, no part of the

Financial analysts particularly liked the fact that GCU might be recognized as a non-profit by the DOE due to the Conversion.  (D.I. 60 at ¶ 98)  For example, in February 2018, one analyst (BMO Capital Markets) noted that this would remove the school from the for-profit world where "future risks are unknown" and another (Barrington Research) noted that this would "de-risk [GCE] as an investment[.]"  (*Id*. (internal quotation marks omitted))

### 3.   Key Events Occurring Between the Submission of the DOE Pre-acquisition Application and the Closing of the Conversion

From March to early May 2018, Mueller made statements to the effect that he expected the DOE's review of the pre-acquisition application to be completed by mid-to-late May 2018. (*Id*. at ¶¶ 110-13, 118)  Mueller and Bachus also indicated that they planned to proceed forward with the Conversion only after the DOE's review was complete (i.e., "by July 1").  (*Id*. at ¶ 112)

However, the DOE did not complete its review of the pre-acquisition application by May 2018.  Instead, in connection with its review process, on May 17, 2018, the DOE propounded a series of interrogatories to GCE (the "interrogatories" or the "May 2018 interrogatories").  (*Id.* at ¶ 119)  The interrogatories contained 25 requests (with subparts) for responses and documents, including:

- "Produce any appraisals, valuations, valuation summaries, or valuation reviews obtained or commissioned by any party to the Transaction for purposes of valuing the Transaction[.]"

- "State whether GCE is a company with which [GCU] or the Foundation does 'substantial business' as used in Article III of the Foundation's Bylaws."

---

net earnings of which benefits any private shareholder or individual[.]"  (*Id.* at 9)  As is further discussed below, this factor would end up being important to the DOE's ultimate decision on GCE/GCU's request for non-profit status.

9

- "Describe the due diligence efforts by [GCU] and the Foundation with respect to the Transaction and produce any documents relating thereto."

- "Produce any PowerPoint presentations, summaries, reports, or similar documents presented to the Boards of [GCU], the Foundation, and GCE related to the Transaction."

- "Produce all documents assessing or analyzing the financial impact of the Transaction on [GCU], the Foundation, or GCE, including documents reflecting projected revenue streams/losses as a result of the Transaction, including any pro formas relating to the MSA."

- "Produce board meeting minutes, resolutions or consents relating to the Transaction.  This request includes the boards of [GCU], the Foundation, and GCE (and any subcommittees thereof)."

- "Provide the schedule of employees to be transferred to [GCU] as contemplated in APA, § 6.4.  Include each employee's current salary and the terms of any other compensation to which the employee is or may be entitled."

- "Identify any GCE employees to be jointly employed by GCE and [GCU] and explain how joint employee compensation has been or will be determined."

- "Produce any Schedules or Exhibits to the APA, MSA, and CA not previously provided and produce any amendments to the draft documents previously provided."

- "Identify all persons or entities that have been engaged to perform any transfer pricing study in connection with the Transaction, their engagement letters, and any studies produced by them."

(*Id.* at ¶¶ 119-20 (emphasis omitted, some alteration in original))  The SAC alleges that "[t]he extent of these new interrogatories indicated that the DOE was not inclined to rubber-stamp the Conversion and, in fact, had serious questions about the independence of [GCU] from [GCE]." (*Id.* at ¶¶ 121-22)  Despite their import, Defendants did not disclose to the market that the DOE had propounded these interrogatories, nor that DOE had raised serious questions (via the interrogatories) about the Conversion.  (*Id.* at ¶ 125)

10

Instead, the SAC alleges that when questioned during this time period as to why the DOE had not yet approved the Conversion, Mueller made false and misleading statements.  For example, on July 2, 2018, Mueller is alleged to have falsely stated in an article in *The Chronicle of Higher Education* that the DOE pre-approval process normally takes 45 days, but that it was taking longer in GCE's case because the DOE was "'very understaffed.'"  (*Id.* at ¶¶ 13, 134-35, 281 (emphasis omitted))[7]

Although GCE had not yet received a decision from the DOE regarding the pre-acquisition application, and despite the fact that it was clear to Defendants that there was a significant risk that the DOE would not approve the Conversion (in light of Frola's prior comments about the 2014 Conversion and the content of the May 2018 interrogatories), GCE nevertheless decided to move forward with the Conversion even without having received approval of the pre-acquisition application.  (*Id.* at ¶ 125)  Mueller and Bachus now explained to the public that the Conversion could close without DOE approval.  (*Id.*)  This comforted certain analysts, with one bank (Piper Jaffray) reporting thereafter that the Conversion was "'on track for a July/August close'" and that, based on conversations it had with Mueller and Bachus, the DOE review process was "'largely procedural[.]'"  (*Id.* at ¶¶ 126-27)  The SAC alleges that Defendants chose to move ahead with the Conversion, even despite the real risks that the DOE would not approve GCU's application in full, due to a number of factors including:  (1) the sunk costs Defendants had already poured into preparing the application and the Conversion, (*id.* at ¶¶

---

[7]        At another point in the SAC, Plaintiffs appear to allege that Mueller made this same "'very understaffed'" comment on June 12, 2018.  (D.I. 60 at ¶¶ 335-36)  It is not clear if Plaintiffs mean to assert that Mueller made this same statement on two different dates in two different fora, or if there is simply a mistake in the SAC and Mueller made the comment only once in *The Chronicle of Higher Education* in July 2018.

14, 123, 342); (2) the fact that after it closed the Conversion (but before it received a final response from the DOE), GCU could market itself to prospective students as a non-profit institution, which in turn could increase enrollment and revenue/profit for GCE during that time, (*id*. at ¶¶ 153-71, 342); and (3) that there was a "potentially narrow window of time in which Secretary DeVos'[] DOE would be in place to squeeze through the Conversion [were it to ultimately be approved]—but there would be no chance of approval if the political climate shifted again[,]" (*id*. at ¶ 16).

On July 2, 2018, GCE filed with the SEC a Form 8-K (the "July 2, 2018 8-K"), "announcing that it had closed the Conversion by executing the APA[,] whereby it sold the GCU campus and all academic related operations and assets to [the new] GCU." (*Id*. at ¶ 130)  The July 2, 2018 8-K also stated that GCE and GCU had entered into the MSA, whereby GCE would provide "'identified technological, counseling, marketing, financial aid processing and other support services to [] GCU in return for 60% of [] GCU's tuition and fee revenue[.]'" (*Id*. at ¶ 132)

Since the Conversion had now closed without the DOE responding to GCU's pre-acquisition application, GCU moved on to seek DOE's post-closing approval of the Conversion. To that end, GCU timely submitted to the DOE an application and other documentation, in order to satisfy the DOE's change in control regulatory requirements.  (*Id*., ex. A at 1)  As part of this application, GCU not only sought DOE's approval for the change in ownership of the institution, but it again asked for the DOE to recognize the new GCU as a non-profit institution for Title IV purposes.  (*Id*. at 1, 16-17)

Additionally, on July 17, 2018, more than two weeks after the close of the Conversion, GCU requested that the IRS re-affirm the new GCU's tax-exempt non-profit status.  (D.I. 60 at ¶

145)  The IRS did so, granting GCU non-profit status on August 31, 2018.  (*Id*. at ¶ 145)  The SAC alleges that the IRS reviewed "[n]o . . . documents" in coming to this decision, (*id*.), and includes a number of allegations indicating that the IRS has been roundly criticized for "rubber-stamping applications of for-profit institutions attempting to convert to [non-profits]" and for relying too heavily on declarations and representations made by the applicants as part of its review process, (*id*. at ¶ 146; *see also id*. at ¶¶ 147-52).

After the Conversion closed, the DOE continued to send GCU additional requests for further information, including:  (1) on July 3, 2018, the DOE requested audited financial statements and a copy of GCU's default management plan; (2) on August 24, 2018, the DOE asked GCU for copies of the final Conversion deal documents and an audited same-day balance sheet for GCU; and (3) on September 10, 2018, the DOE requested a "'narrative'" explaining how the structure of the Conversion "'warrant[ed] recognizing the institutions' conversion to non[-]profit status for the purposes of . . . Title IV.'"  (*Id*. at ¶ 140 (some alteration in original))  During the DOE review process, GCE responded to these and other requests by providing the DOE with "numerous non-public documents[,]" including:  (1) the fully unredacted MSA; (2) a report from Barclays dated April 26, 2018 (the "Barclays Report"); (3) a "'follow-on'" Barclays report discussed with GCE's Board of Directors on June 20, 2018 (the "Barclays Update"); and (4) a "'Transfer Pricing Report'" for 2018 prepared by Deloitte & Touche LLP (the "Deloitte Report").  (*Id*. at ¶ 173)

### 4.  GCE's Strong Post-Conversion Financial Results, the DOE's Decision and the Aftermath

Between the time period when the Conversion closed in July 2018 and when the DOE made a final decision on GCU's application, GCE reported "strong financial results that routinely exceeded market expectations[.]"  (*Id*. at ¶ 166)  For example, GCE's operating profit

margins "showed immediate, enormous growth" following the Conversion—growth that continued from the third quarter of 2018 through the third quarter of 2019.  (*Id*. at ¶ 167)  GCE repeatedly attributed its growing revenues and margins to the Conversion and to the fact that GCU was now marketing itself as a non-profit institution and in turn had increased enrollment. (*Id*. at ¶¶ 157-65)[8]  For instance, as a for-profit institution, GCE/GCU was barred from marketing to students in certain school districts, including the Los Angeles Unified School District (which at one point had around 700,000 students).  (*Id.* at ¶ 154)  Upon announcing that it was converting to a non-profit, however, GCU was able to reach a much larger number of potential students; those potential students, in turn, were more likely to enroll in the "non-profit" GCU because they believed non-profit institutions were more likely to have a student's best interests at heart.  (*Id.* at ¶ 159)  The SAC alleges that GCU took full advantage of the benefits of marketing itself as a non-profit, including by immediately changing its marketing tagline to "Private. Christian. Affordable. Nonprofit."  (*Id.* at ¶ 157)

In November 2019, however, the DOE finally made its decision on GCU's pending application.  On November 6, 2019, the DOE sent to GCU a letter (the "DOE Letter"), signed by Frola, who was then the Director of the DOE's Multi-Regional and Foreign Schools Participation Division.  (D.I. 60, ex. A)   The DOE Letter stated that the DOE:  (1) had approved the change in ownership application; (2) had approved the new GCU to be designated a for-profit institution for purposes of its continued participation in Title IV programs; but (3) was denying the new GCU's request for recognition of the institution as a non-profit.  (D.I. 60 at ¶¶ 237-38; *see also*

---

[8]     The SAC also contains accounts from three confidential witnesses, each former GCE employees, to the effect that post-Conversion, GCE also began to engage in aggressive and abusive recruitment strategies in order to further increase enrollments.  (D.I. 60 at ¶¶ 206-12)

*id.*, ex. A at 16-17)  On the last point regarding non-profit status, the DOE explained that GCU had not established that it was "operated by a nonprofit and [that its] net earnings [did not] benefit any private shareholder or individual" as required under applicable regulations.  (D.I. 60, ex. A at 10-17)  The DOE Letter concluded that this was so in part because the Conversion "'violate[d] the most basic tenet of non[-]profit status—that the non[-]profit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity.'"  (D.I. 60 at ¶ 173 (some alteration in original))  Instead, the DOE concluded that "'the primary purpose of the MSA' was to 'drive shareholder value for GCE with GCU as its captive client—potentially in perpetuity.'"  (*Id.* at ¶ 182)

The DOE came to this conclusion for a number of reasons.  These included:  (1) consideration of certain aspects of the Conversion relating to GCE's future expected income and expenses—including the fact that GCE would incur only 28% of the costs of operating GCU while receiving 95% of GCU's revenues each year; (2) its view that GCU and GCE were not truly independent from each other—due in part to the fact that Mueller was both President of GCU and the CEO of GCE, and to the large number of GCE executives who were to manage and oversee GCU's work; and (3) that it would be financially onerous and impractical for GCU to terminate its services agreement with GCE.  (*Id*. at ¶¶ 172-75, 177-78, 316; *id.*, ex. A at 12-16)

GCE disclosed the DOE's decision to the market during a November 6, 2019 earnings call and again in a November 7, 2019 SEC filing (the "November 6/7, 2019 announcements"); thereafter, GCE's stock price "plummeted[,]" dropping $6.99 between November 6-8, 2019.

(D.I. 60 at ¶¶ 237-39)[9]  Analysts connected this decline to the fact of the DOE's decision.  (*Id*. at ¶ 240)

Thereafter, on January 28, 2020, analyst Citron Research ("Citron") published a nearly 50-page report titled "The Educational Enron:  The Multiple Smoking Guns that Prove [GCE] is Using a Captive Subsidiary to Manipulate Earnings" (the "Citron Report").  (*Id*. at ¶ 250)  The SAC alleges that GCE's stock fell again after this disclosure, falling $7.43 per share from January 27-28, 2019.  (*Id*. at ¶ 256)

## C.    Plaintiffs' Allegations Regarding the Alleged Fraudulent Scheme

Having set out the relevant background facts above, next the Court will summarize Plaintiffs' description of Defendants' alleged fraudulent scheme.

The SAC alleges that this case arises from Defendants' materially false and misleading statements or omissions about the Conversion.  (*Id*. at ¶ 1)  Defendants allegedly claimed that the Conversion would result in GCU becoming an independent, non-profit institution under separate management from GCE, that the Conversion was virtually identical to other approved transactions, and that after the Conversion, GCE would merely act as a third-party service provider to GCU.  (*Id.*)  These claims allowed Defendants to avoid the "'stigma'" of for-profit education and to market GCU as a non-profit for 18 months during the Class Period, which drove higher enrollment and boosted GCE's profit margins.  (*Id.* at ¶ 2)  In reality, the SAC alleges that Defendants Mueller and Bachus omitted or mispresented key terms of the Conversion, such that investors were unable to accurately assess the risk of a DOE denial of

---

[9]     The DOE Letter, which is attached as Exhibit A to the SAC, was not made publicly available until November 12, 2019.  (D.I. 60 at ¶ 249)

GCU's request for non-profit status—even while Defendants understood the real risks of denial, given their knowledge of the terms of the Conversion.   (*Id.* at ¶ 3)

For instance, "Defendants knew—but investors did not—that the distinctive terms of [the] Conversion were far afield of any other conversion transaction approved by the DOE[.]" (*Id.* at ¶ 8)  Defendants repeatedly sought to reassure investors that the Conversion was very similar to the Purdue-Kaplan Deal, for example, even though Bachus had previously been told by Solinski that there were "real" and "key" differences between the two.  (*Id.* at ¶¶ 8, 10, 21) Defendants also knew, contrary to public statements, that a post-Conversion GCU would not be actually independent from GCE.  (*Id.* at ¶ 11, 21)  Rather, Defendants concealed from the public the fact that, *inter alia*, 75% of Defendant Mueller's executive team as President of GCU was made up of GCE employees.  (*Id.*)  Finally, Defendants concealed from the public the May 2018 interrogatories and how the DOE's concerns about the Conversion held up a decision on the pre-acquisition application, with Mueller instead falsely attributing the DOE's delay to DOE "'understaff[ing].'"  (*Id.* at ¶ 13; *see also id.* at ¶ 21)

Despite knowing that there was a substantial risk that the DOE would not approve the Conversion, a risk Defendants concealed from investors, Defendants chose to move forward with the Conversion anyway, in light of the logistical, regulatory and financial benefits (discussed previously) that this approach provided to them.  *See supra* at 11-12; (*see also* D.I. 60 at ¶¶ 14-17).

In addition to misrepresenting the structure of and status of the Conversion, Defendants are also alleged to have misrepresented GCE's financial performance by engaging in accounting fraud.  (D.I. 60 at ¶ 18)  Defendants are said to have falsely claimed that a post-Conversion GCU would be a non-profit, despite the fact that GCU would violate the "'most basic tenet of

17

nonprofit status.'" (*Id.*)  This allowed Defendants to "treat [the new] GCU as an improper off-balance-sheet entity—which [GCE] then used to hide expenses and costs while retaining a disproportionate amount of revenue, thereby inflating [GCE's] financial results." (*Id.*)

The SAC alleges that once the DOE denied Defendants' attempt to have GCU classified as a non-profit entity, Defendants' misstatements and omissions came to light.  (*Id.* at ¶¶ 19-20)  GCE's inflated stock price plummeted thereafter, all at the expense of Defendants' investors and shareholders.

At issue in the briefing on the Motion are Plaintiffs' allegations regarding:  (1) the types of false and/or misleading statements and omissions that allegedly fueled the scheme; (2) facts demonstrating that Defendants acted with the requisite scienter; and (3) facts regarding loss causation.  Below the Court summarizes the SAC's additional allegations relating to these issues.

### 1.    False and Misleading Statements and Omissions

Plaintiffs allege that Defendants made five types of relevant, actionable false and misleading statements and/or omissions, (*id.* at ¶ 264):  (1) Defendants misrepresented GCU's purported independence from GCE, in statements made before the Conversion, (*id.* at ¶¶ 265-77); (2) Defendants misrepresented the risks of DOE denial of the request for non-profit status for GCU, (*id.* at ¶¶ 278-83); (3) Defendants misrepresented GCU's purported independence from GCE, in statements made after the Conversion, (*id.* at ¶¶ 284-95); (4) Defendants misrepresented the Conversion's similarity to other transactions, (*id.* at ¶¶ 296-309); and (5) Defendants misrepresented GCE's accounting and compliance with Generally Accepted Accounting Principles (or "GAAP"), (*id.* at ¶¶ 310-18)  These specific allegations are discussed further below.

a.    **Statements About GCU's Purported Independence from GCE Made Before the Conversion**

The SAC alleges that from January 5, 2018 (when GCE announced the Conversion) through to the Conversion's closing, Defendants made false and misleading claims about GCE's separateness or independence from GCU.  (*Id.* at ¶ 265)  These include the following:

- The SAC alleges that Defendants stated that the new GCU would operate as a "non-profit" and a "separate non-profit entity[.]"  (*Id.* at ¶¶ 266-67, 270, 271 (internal quotation marks and emphasis omitted))  These statements are alleged to have been materially false and misleading because "the planned structure of [] GCU violated 'the most basic tenet' of a non-profit and instead would act to funnel 95% of [GCU's] revenue to GCE, while GCE only had to cover 28% of the institution's costs" (hereafter, the "95%/28% revenue/costs imbalance issue").  (*Id.* at ¶ 277).

- Additionally, the SAC alleges that Defendants stated that the new GCU would be a "separate" entity from GCE, that it would utilize "independent management," that GCE would "no longer . . . operate a regulated institution of higher education," that GCE would act as a "third party" to the new GCU, and that "GCU's current faculty, academic leadership and related staff and other employees . . . would become employed by [the new] GCU[.]"  (*Id.* at ¶¶ 267, 270-71, 273 (internal quotation marks and emphasis omitted))  These statements are said to have been materially false and misleading because they "misstated and omitted . . . that 41 members of the university's 58-member Executive Leadership Team were employed by GCE, that significant members of [new] GCU's academic leadership were employed by GCE, and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for [the new] GCU as they had previously" (hereafter, the "high percentage of GCE employees that oversaw the work of GCU").  (*Id.* at ¶ 274)

b.    **Risks of DOE Denial of Non-profit Status**

According to Plaintiffs, after GCE received the May 2018 interrogatories, Defendants concealed the DOE's concerns about the Conversion and misrepresented the prospects of DOE approval of the new GCU as a non-profit.  (*Id.* at ¶¶ 125, 278)  To that end, Defendants stated

19

that based on "ongoing engagement" with the DOE about the transaction throughout the review process, GCE "concluded that . . . any regulatory limitations imposed by [the DOE] could be managed" and that the DOE approval process was taking longer than usual because the DOE was "very understaffed[.]"  (*Id.* at ¶¶ 279-81 (internal quotation marks and emphasis omitted); *see also id.* at ¶¶ 134-35, 336)

Plaintiffs assert that the statement that "any regulatory limitations . . . could be managed" was materially false and misleading (1) because it omitted that the DOE had propounded the May 2018 interrogatories; (2) in light of the material terms of the agreements between GCE and GCU; (3) due to other key information known by GCE officers and directors; and (4) in light of the new GCU's lack of independence under the proposed structure of the Conversion—all of which "rais[ed] a significant risk that the DOE would decline the Conversion or otherwise impose disabling conditions."  (*Id.* at ¶ 283)  The SAC also alleges that the "understaffing" statement was materially false and misleading for the additional reason that "[GCE] itself acknowledged that its only communications with the DOE in May 2018, when [GCE] made the decision to abandon the pre[-]approval process, related to the interrogatories themselves, not to any staffing concerns."  (*Id.*)  Moreover, Defendants did not disclose to investors that GCE received three additional sets of requests for information from the DOE, or that the DOE had previously informed Defendants in connection with the 2014 Conversion that it was unlikely to approve the Conversion's structure.  (*Id.*)

### c.    Statements About GCU's Purported Independence from GCE Made After the Conversion

Plaintiffs contend that after the Conversion, Defendants misleadingly claimed that GCU was an operationally independent non-profit and that GCE did not control GCU's day-to-day operations.  (*Id.* at ¶ 284)  More specifically:

20

- The SAC alleges that Defendants made statements that GCE "no longer owns and operates a regulated institution of higher education," that its relationship to the new GCU was "no longer as owner and operator, but as a third[-]party service provider to an independent customer[,]" and that "[a]side from Mr. Mueller, no other employee of [GCU] or [GCE] has a dual role in both organizations." (*Id.* at ¶¶ 285-86, 288 (internal quotations marks and emphasis omitted))  The SAC alleges that these statements were materially false and misleading because they omitted the fact of the high percentage of GCE employees that oversaw the work of GCU. (*Id.* at ¶ 293)

- Additionally, the SAC alleges that in this time period, Defendants again made statements that the new GCU would be a "separate non-profit entity[,]" which were allegedly misleading for the reasons set out previously. (*Id.* at ¶¶ 285 (internal quotation marks and emphasis omitted), 294))

- Finally, the SAC alleges that in this time period, Defendants made statements that GCU was a "not-for-profit[,]" which were allegedly misleading for the reasons set out previously. (*Id.* at ¶¶ 290 (internal quotation marks and emphasis omitted), 295))

### d.    The Conversion's Similarity to Other Transactions

Plaintiffs next allege that throughout the Class Period, Defendants sought to reassure investors that the Conversion would be approved by the DOE, and that it was structured similarly to other transactions that the DOE had approved like the Purdue-Kaplan Deal. (*Id.* at ¶¶ 99, 296) However, the SAC asserts that in reality, the Conversion's structure was far different from the structure of the Purdue-Kaplan Deal or to other DOE-approved structures. (*Id.* at ¶ 296; *see also id.* at ¶¶ 182-200)

More specifically, the SAC alleges that Defendants made statements that:  (1) the Conversion was "mainstream" or "very similar to[,]" "comparable to[,]" "almost identical to[,]" and "almost an identical replica of" the Purdue-Kaplan Deal or services arrangements at "hundreds" of universities around the country; and (2) that "[GCU] has commissioned studies to

21

ensure that the rates and terms of the services arrangement are consistent with market norms[.]"
(*Id.* at ¶¶ 297-304 (internal quotation marks and emphasis omitted))  These statements are
alleged to have been materially false and misleading because:  (1) the terms of the Conversion
were "unusually and egregiously favorable to [GCE]," in light of the 95%/28% revenue/costs
imbalance issue (while in the Purdue-Kaplan Deal, Kaplan was to receive only a 12.5% services
fee related to the provision of academic services, and only after Purdue Global, the online
university, had reached breakeven status), (*id.* at ¶ 306); (2) a high percentage of GCE employees
would oversee the work of GCU (unlike the Purdue-Kaplan Deal, where there was no
overlapping leadership between the two entities), (*id.* at ¶ 307); and (3) the "Conversion resulted
in an undisclosed, captive relationship between GCE and [GCU,]" in that the services
arrangement between GCE and GCU had an initial term of 15 years that renewed automatically
every 5 years, and GCU could only exit the arrangement if it satisfied in full an $854 million
secured note and paid an early termination fee—all of which would be essentially impossible for
GCU to accomplish given the lopsided revenue share between GCE and GCU (whereas in the
Purdue-Kaplan deal, either party could terminate the services agreement after the sixth year for a
termination fee of 1.25 times the total revenue of Purdue Global, payable by way of a promissory
note), (*id.* at ¶¶ 308-09; *see also id.* at ¶¶ 191-99).

### e.   GCE's Accounting and Compliance with GAAP

The SAC explains that because of GCE's control over the new GCU, and the fact that
GCE was the primary beneficiary of GCU's operations, GCE was "required to consolidate [the
new] GCU into its financial statements . . . or at a minimum to identify [it] as a related party[.]"
(*Id.* at ¶ 310; *see also id*. at ¶¶ 214-35)  Had GCE done so during the Class Period, this would
have "dramatically decreased [GCE's] reported margins" and would have given investors a far

less optimistic picture of GCE's operating results than what GCE actually presented in that time

period.  (*Id*. at ¶ 214)  Instead, it is alleged that Defendants made a number of materially false

statements regarding this subject matter during the Class Period, as follows:

- Defendants stated that the new "GCU is not a related party to [GCE]" and that "GCU is not a related party to [GCE] in accordance with [Accounting Standards Codification, or 'ASC'] Topic 850[.]"  (*Id*. at ¶¶ 311, 313 (internal quotation marks and emphasis omitted))  These statements are alleged to have been materially false or misleading because the new GCU "was not a non-profit" and because GCE "controlled [the new] GCU, making them 'affiliates under common control' and thus related parties for purposes of GAAP."  (*Id*. at ¶ 316)  The statements also allegedly omitted the material fact of the high percentage of GCE employees that oversaw the work of GCU. (*Id*.)

- Defendants stated that GCE did not have "any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on [its] financial condition[.]"  (*Id*. at ¶ 312 (internal quotation marks and emphasis omitted))  This statement is alleged to have been false or misleading because GCE used the new GCU "as an off-balance sheet entity to which it funneled expenses while recognizing revenues generated by [the new] GCU."  (*Id*. at ¶ 317)

- Additionally, Defendants stated that GCE's "results of operations do not include the operations of GCU but rather reflect the operations of [GCE] as a service/technology provider[.]"  (*Id*. at ¶ 287 (internal quotation marks omitted) (alteration in original))  This statement is alleged to have been false and misleading because GCU's operations did not so reflect this reality and instead "reflected the highly unusual and exploitative control relationship that [GCE] had with [the new GCU.]"  (*Id*. at ¶ 317)

- Lastly, the SAC alleges that GCE's reported operating margins from the third quarter of 2018 through the third quarter of 2019, which showed that operating margins had "greatly increased year-over-year[,]" (*id*. at ¶ 315), were materially false and misleading because they were "inflated by [GCE's] treatment of [the new] GCU as a separate and unconsolidated

entity, which allowed [GCE] to report higher margins . . . than it would have" under consolidation, (*id.* at ¶ 318).

### 2. Scienter

The SAC pleads some additional facts (or underscores some facts already pleaded) that are said to go particularly to the issue of scienter. These include the following:

- Defendants had knowledge of the undisclosed, non-public terms of the Conversion. (*Id.* at ¶¶ 320-26) The SAC alleges that Defendants, by virtue of their roles as GCE's senior leadership, were undoubtedly aware of the terms of the Conversion, as the contractual arrangement between GCE and GCU would change the very nature of GCE. (*Id.* at ¶ 323) Moreover, Defendants also indicated in filings with the SEC that they had reviewed the MSA (which included these terms). (*Id.* at ¶ 322) According to the SAC, these facts "support[] a strong inference that Defendants Mueller and Bachus knew, or were severely reckless in not knowing, about the terms on which the deal was struck, and the false and misleading nature of their statements to investors." (*Id.* at ¶ 326)

- Defendants had knowledge that the Conversion differed materially from the Purdue-Kaplan Deal. (*Id.* at ¶ 327) Specifically, the SAC highlights the allegation that Solinski, who was responsible for reviewing the Purdue-Kaplan Deal at HLC, had told Defendants that there were "'real'" and "'key'" differences between their deal and the Purdue-Kaplan Deal. (*Id.*)

- Defendants had knowledge of the overlapping members of the executive team leading GCE and GCU. (*Id.* at ¶ 328)

- The DOE repeatedly indicated to Defendants that it was scrutinizing the Conversion closely by: (1) telling Mueller and Bachus that it would review the proposed structure of the 2014 Conversion, which was the same structure as the Conversion, with extreme skepticism; (2) propounding the May 2018 interrogatories, which indicated that the "DOE was unexpectedly probing the underlying structure of the transaction"; and (3) requesting additional information on July 3, 2018, August 24, 2018 and September 10, 2018. (*Id.* at ¶¶ 332-39) The SAC alleges that based on these facts, "Defendants Mueller and Bachus knew, or were severely

24

reckless in not knowing, that there was an enhanced and undisclosed risk of the DOE denying [the new] GCU's application for non-profit status." (*Id.* at ¶ 339)

- Defendants moved forward with the Conversion notwithstanding the heightened undisclosed risks because of the various logistical, regulatory and financial benefits (discussed previously) this approach provided to them. *See supra* at 11-12; (D.I. 60 at ¶¶ 340-45).

### 3.    Loss Causation

The SAC also pleads some additional facts relevant to loss causation.  It asserts that the truth concealed by Defendants' misrepresentations and omissions was disclosed to the market in two stages.  After each disclosure, the price of GCE's common stock "fell precipitously[.]" (*Id.* at ¶ 349)

The first disclosure came via the November 6/7, 2019 announcements. (*Id.*)  After the market closed on November 6, 2019, Defendants (who had just learned from the DOE that it had rejected GCU's application for non-profit status) disclosed that fact on an earnings call. (*Id.* at ¶ 351)  Then, on November 7, 2019, before the market opened, Defendants filed a Form 8-K detailing that the DOE had rejected GCU's non-profit application. (*Id.*)  This disclosure is alleged to have caused GCE's stock price to fall by -7.61% to $84.89. (*Id.*)

The second disclosure was on January 28, 2020. (*Id.* at ¶ 349)  Before the market opened on that date, Citron published the Citron Report. (*Id.* at ¶ 351)  The additional disclosures in that report are alleged to have caused GCE's stock price to fall by -8.12% to $84.07. (*Id.*)

The SAC alleges that these declines in GCE's stock price were "a direct and proximate result of Defendants' scheme being revealed to investors and to the market." (*Id.* at ¶ 352)  And it also asserts that "the timing and magnitude of [GCE's] stock price declines negate[] any inference that the economic losses and damages suffered by [] Plaintiffs . . . were caused by

changed market conditions, macroeconomic factors, or even [GCE]-specific facts unrelated to Defendants' fraudulent conduct." (*Id*.)

### D.      Procedural History of the Case and Defendants' Motion

This consolidated securities class action arises out of two class action Complaints filed in this Court on May 12, 2020, (D.I. 1), and on June 12, 2020, (Civil Action No. 20-801-MN, D.I. 1), respectively.  On August 13, 2020, United States District Judge Maryellen Noreika consolidated the two cases in the instant action and appointed Colorado FPPA and Oakland County to serve as Lead Plaintiffs in this suit on behalf of themselves and others.[10]  (D.I. 28 at 1-2)

On October 15, 2020, Judge Noreika ordered that the cases be referred to the Court to hear and resolve all pre-trial matters, up to and including the resolution of expert discovery matters.  (D.I. 32)  Plaintiffs filed an amended complaint on October 20, 2020 (the "CAC"), (D.I. 34), which Defendants moved to dismiss on December 21, 2020 (the "first motion to dismiss"), (D.I. 36).  At the parties' joint request, the Court did not enter a case schedule at that time.  (D.I. 41)  Instead—and again at the parties' joint request—the Court heard oral argument on the first motion to dismiss on May 26, 2021.  (D.I. 47)  Thereafter, on August 9, 2021, the Court issued a Report and Recommendation granting the first motion to dismiss in its entirety (the "first R&R").  (D.I. 50)  After neither party filed objections, Judge Noreika adopted the first R&R on August 23, 2021; Judge Noreika permitted Plaintiffs to file a further amended complaint to correct the deficiencies outlined in the first R&R.  (D.I. 54)

---

[10]      When this Report and Recommendation refers herein to "Plaintiffs" it is thus referring to Lead Plaintiffs and those whom they purport to represent.

Plaintiffs filed a further amended complaint on September 28, 2021, (D.I. 55), which they thereafter amended by filing the SAC on January 21, 2022, (D.I. 60).  Defendants then filed the instant Motion on March 15, 2022.  (D.I. 61)  The parties completed briefing on the Motion on June 3, 2022.  (D.I. 68)  At Plaintiffs' request, (D.I. 69), the Court heard oral argument on the Motion on October 25, 2022.  Subsequent to that, Plaintiffs filed an additional motion asking that the Court take judicial notice of certain statements when resolving the Motion (the "motion for judicial notice"), (D.I. 76); briefing on the motion for judicial notice was completed on January 19, 2023, (D.I. 79). [11]

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(6) and a Motion to Dismiss for Failure to State a Claim

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When presented with such a motion, a court typically conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210-11.  Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In

---

[11]   The Court ORDERS that the motion for judicial notice is DENIED as MOOT. That is because even were the Court to decline to consider the statements that Plaintiffs want it to take judicial notice of, Plaintiffs would still prevail as to the instant Motion.

assessing the plausibility of a claim, the court must "'construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). [12]

### B.    Special Pleading Requirements for Securities Fraud Allegations

### 1.    Section 10(b)

In connection with the "purchase or sale of any security[,]" Section 10(b) prohibits the "use or employ . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) ("Section 10(b)"). Pursuant to its statutory authority, the SEC promulgated Rule 10b-5, which "in connection with the purchase or sale of any security" makes it "unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). "The courts have implied from these statutes and Rule [10b-5] a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). According to the Supreme Court of the United States, the elements of a Section 10(b) claim are:

> (1) a material misrepresentation (or omission) . . .[;] (2) scienter, i.e., a wrongful state of mind . . .[;] (3) a connection with the purchase or sale of a security. . .[;] (4) reliance, often referred to in

---

[12]    In reviewing a Rule 12(b)(6) motion, a district court typically considers only the allegations of the complaint, the exhibits attached thereto, documents or facts that are incorporated by reference into the complaint or that are otherwise integral to the complaint's allegations, matters of public record and items for which the Court can take judicial notice. *See, e.g.*, *Illumina, Inc. v. Guardant Health, Inc*., Civil Action No. 22-334-GBW-CJB, 2023 WL 1407716, at *3 n.3 (D. Del. Jan. 31, 2023).

> cases involving public securities markets (fraud-on-the-market
> cases) as "transaction causation" . . . [;] (5) economic loss . . . [;]
> and (6) "loss causation," i.e., a causal connection between the
> material misrepresentation and the loss[.]

*Id*. at 341-42 (emphasis and citations omitted); *see also In re Newell Brands, Inc. Sec. Litig.*, 837

F. App'x 869, 874 (3d Cir. 2020).

### a.      Heightened pleading requirements for Section 10(b) claims

The analysis of a pleading in a securities fraud action "requires more than mere reference

to the conventional standard applicable to motions under Rule 12(b)(6)."  *In re Rockefeller Ctr.*

*Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002).  For example, in the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), Congress raised the pleading standards for the first

two Section 10(b) elements:  material misrepresentation (or omission) and scienter.  *Institutional*

*Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009).  With regard to a material

misrepresentation or omission, "the complaint shall specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *see also*

*Avaya*, 564 F.3d at 252-53.  With regard to scienter, "the complaint shall . . . state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also Avaya*, 564 F.3d at 253.

### b.      Rule 9(b) considerations

"In addition to the PSLRA [misrepresentation/omission and scienter] requirements,

plaintiffs alleging fraud under the Exchange Act must also comply with the heightened pleading

requirement of Rule 9(b)."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir.

2006) (citation omitted); *see also Newell Brands*, 837 F. App'x at 874.  According to Rule 9(b),

a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of [Section 10(b)] securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 217 (citation omitted).

For the most part, the PSLRA's particularity requirement harmonizes with Rule 9(b). That is, the United States Court of Appeals for the Third Circuit has concluded that "Rule 9(b)'s particularity requirement 'is comparable to and effectively subsumed by the requirements of . . . the PSLRA.'" *Avaya*, 564 F.3d at 253 (citation omitted).

However, the PSLRA's requirement for pleading scienter "marks a sharp break with Rule 9(b)," *id.*, because Rule 9(b) allows plaintiffs to plead scienter generally, Fed. R. Civ. P. 9(b). Thus, "[t]o the extent that Rule 9(b)'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with scienter . . . the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'" *Suprema Specialties*, 438 F.3d at 277 (citation omitted); *see also Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, Civil Action No. 09-799, 2011 WL 2444675, at *5 (D. Del. June 14, 2011).

### 2.    Section 20(a)

Section 20(a) of the Exchange Act provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]"  15 U.S.C. § 78t(a) ("Section 20(a)").  This "creates a cause of action

30

against individuals who exercise control over a 'controlled person,' including a corporation, who has committed a [S]ection 10(b) violation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014) (citation omitted). "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252. [13]

## III.    DISCUSSION

Defendants challenge the SAC's allegations on three grounds:  (1) failure to sufficiently plead scienter, (D.I. 62 at 4-15); (2) failure to sufficiently allege actionable false or misleading statements or omissions, (*id.* at 15-19); and (3) failure to sufficiently plead loss causation, (*id.* at 19-20).  The Court will begin by addressing whether Plaintiffs sufficiently alleged falsity, then will move to consider whether Plaintiffs plausibly alleged scienter, and finally, whether Plaintiffs plausibly alleged loss causation.

### A.    Material False or Misleading Statements and/or Omissions

Defendants challenge the sufficiency of the following alleged false or misleading statements and/or omissions:  (1) Statements regarding GCU's purported independence, (*id.* at 15-16); (2) statements regarding the risks to GCU's non-profit label, (*id.* at 16-17); (3) statements regarding the DOE's review of the Conversion, (*id.* at 17-18); (4) statements

---

[13]    Thus, because Mueller and Bachus are alleged to have exercised control over GCE during the relevant period, as the parties do, the Court will consider the Section 20(a) allegations to rise and fall with the merit of the Section 10(b) and Rule 10b-5 allegations.  (D.I. 62 at 20 n.24)

regarding the Conversion's similarity to other approved transactions, (*id.* at 18); and (5) statements regarding GCE's compliance with GAAP, (*id.* at 18-19).[14]

Again, to plead the element of material misrepresentation or omission pursuant to Rule 10b-5, a plaintiff must "specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d at 259 (citing 15 U.S.C. § 78u-4(b)(1)). A misstatement or omission is material if there is "'a substantial likelihood that the [misstatement or] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *See Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (citation omitted).

An alleged misstatement or omission concerning a fact already made publicly available cannot be materially misleading. *See In re Discovery Labs. Sec. Litig.,* No. 06-1820, 2006 WL 3227767, at *11 (E.D. Pa. Nov. 1, 2006); *see also In re Incyte Shareholder Litig.*, Civil Action No. 13-365, 2014 WL 707207, at *10 n.15 (D. Del. Feb. 21, 2014); *The Winer Family Tr. v. Queen*, No. Civ.A. 03-4318, 2004 WL 2203709, at *4 (E.D. Pa. Sept. 27, 2004). "Thus, a defendant can avoid liability for a false statement or one that reveals less than the truth of the matter by showing that the market was not affected by the representation because the truth of the

---

[14]     Above in Section I.C.1, the Court explained how the SAC breaks up Defendants' alleged false statements and omissions into five different categories. The first and third of those five categories were similar, in that both of them related to statements made about GCU's purported independence from GCE (with the first category relating to statements made before the Conversion and the third relating to statements made after the Conversion). Here in this part of their Motion, Defendants are essentially challenging all five of those categories of statements/omissions. (D.I. 62 at 15) Defendants' first two challenges (regarding statements about GCU's purported independence and statements about the risks to GCU's non-profit label) are generally related to the SAC's categories one and three; Defendants' other three challenges are related to the SAC's categories two, four and five.

matter was known already and had been factored into the market price." *Winer*, 2004 WL 2203709, at *4 (internal quotation marks and citation omitted).

As to omissions, there is no affirmative duty to disclose material facts, but "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Allegheny Cty. Emps.' Retirement Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 222 (E.D. Pa. 2021) (internal quotation marks and citation omitted).  Generally, the duty to disclose arises when "there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran v. Stafford,* 226 F.3d 275, 285-86 (3d Cir. 2000).

The Court will now address Defendants' challenge to the SAC's allegations of false or misleading statements and/or omissions.  It will take up the five categories of statements cited by Defendants in turn.

### 1.    Statements Regarding GCU's Purported Independence from GCE

At issue first is the SAC's allegations that Defendants made the following false or materially misleading statements or omissions regarding GCU's independence from GCE:  (1) that GCE would no longer own GCU, but would be a "separate" entity from GCU and act as a "third party" service provider thereto; (2) that GCU's "faculty, academic leadership and related staff and other employees" would be employed by GCU, not GCE; and (3) that aside from Mueller, no other employee would have a "dual role" at GCE and GCU.  (D.I. 62 at 15-16); *see also supra* Section I.C.1(a) & (c).  Defendants make various arguments for dismissal of these allegations, but the Court finds them to be unavailing.

33

Defendants' main argument is that the DOE's decision (as reflected in the DOE Letter) does not indicate that these statements are false or misleading.  For instance, in response to the "dual role" allegation, Defendants argued that the DOE Letter states that 75% of the 58-person "'executive team members responsible for managing and overseeing GCU and developing its strategic vision *are employed by its service provider* [i.e., GCE].'"  (D.I. 62 at 16 (quoting D.I. 60, ex. A at 16) (emphasis added); *see also* D.I. 68 at 10)  According to Defendants, since the DOE Letter says that team members at issue were formally employed by GCE (not by *both* GCE and GCU), then the statement that no GCE employee other than Mueller had a "dual role" with both institutions was not false or misleading.  (D.I. 62 at 16)

The Court, however, agrees with Plaintiffs that such an argument misses the point.  (D.I. 66 at 8)  The SAC's allegations are that, under the terms of the Conversion, approximately 75% of the "Executive Leadership Team" that was "responsible for managing and overseeing [GCU]" (i.e., "most of [GCU's] key management personnel") were employed by GCE.  (D.I. 60 at ¶¶ 177 (internal quotations marks omitted), 274-75, 293; *see also id*. at ¶¶ 229, 307).  And the SAC further alleges that "significant members of [] GCU's academic leadership were employed by GCE, and that numerous other operationally-significant GCU employees became employees of GCE while performing the same responsibilities for [] GCU as they had [before the Conversion.]"  (*Id.* at ¶ 274; *see also id*. at ¶¶ 178, 293, 307) [15]  Just because these GCE

---

[15]    To the extent Defendants argue that these allegations fail to meet the PSLRA's pleading standard because Plaintiffs do not "attempt to identify th[e]se purported members of the University's academic leadership" by name, (D.I. 62 at 16), the Court disagrees.  Defendants cite to no similar decision that requires a plaintiff to provide a laundry list of names in such circumstances.  And the SAC provides some level of identification of these employees' roles.  Moreover, in two instances, the SAC identifies certain exemplary former GCU academic executives by their new GCE title.  (D.I. 60 at ¶ 178)

employees were not also formally employed by GCU does not necessarily mean they did not have a key "role" at GCU—especially if, as alleged, their job duties required that they be a part of GCU's leadership group.  Indeed, the DOE Letter itself concluded that "[g]iven the enormous leverage GCE now has over [GCU] by virtue of the . . . fact that most of [GCU's] key management personnel work for GCE, not [GCU], . . . [GCU] is not the entity actually operating [GCU]."  (*Id.*, ex. A at 16 (emphasis omitted))  This certainly could suggest that the DOE believed there to be numerous individuals who held "dual roles" at GCE and GCU.  At a minimum, Plaintiffs' interpretation of "dual role" in this context (i.e., as referencing a person who has significant oversight or functional responsibilities with two entities, and not necessarily a person who is employed or paid by both entities) was a reasonable one; at the pleading stage, that is all that is needed.[16]  *See IWA Forest Indus. Pension Plan v. Textron, Inc.*, 14 F.4th 141, 147 (2d Cir. 2021); *City of Warren Police & Fire Retirement Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 129-30 (S.D.N.Y. 2020).

---

[16]     Defendants also assert that it was publicly disclosed that GCE employees would play a "role" at GCU—in that the public was alerted that GCE would operate as a third-party service provider to GCU following the Conversion.  (D.I. 68 at 10-11)  But it seems pretty clear that Plaintiffs' allegation here is that the type of "role" being referenced in Defendants' public statements (i.e., being a third-party service provider) is something less significant than the type of leadership "roles" that many GCE employees actually played at GCU post-Conversion.  In other words, Plaintiffs are alleging that Defendants' reference to "dual role" connotes a person who works for one entity (i.e., GCE) but also is a part of the team that helps to manage or lead another entity (i.e., GCU)—and that this concept is not captured by simply alerting the public that GCE would be a third-party service provider to GCU.  Indeed, Defendants themselves must have had in mind a more robust definition of "dual role" than a term describing someone who works for a company that provides services to another company.  Had they not, they would not have said in the July 2, 2018 8-K that only Mueller would have a "dual role" at both GCE and GCU.  (D.I. 63, ex. 5 at 5)  As noted above, the real dispute here is over what "dual role" actually conveys to a reader.  And that is an issue of fact not well decided at the pleading stage.

Defendants also pointed to a statement in the DOE Letter to the effect that post-Conversion, GCU "'*outsource[s]*'" a significant number of "'institutional functions'" to GCE; it claims that the DOE's use of this "outsource" language means that the DOE felt that these functions were being performed by a "separate" entity that was in fact a "third-party" as to GCU (i.e., GCE). (D.I. 62 at 15-16 (quoting D.I. 60 at ¶ 275); *see also* D.I. 60, ex. A at 16) But Plaintiffs are alleging that regardless of whether GCU and GCE were distinct corporate entities on paper, the two had such a close relationship that it was misleading to call them "separate," independent entities. And the DOE's use of the word "outsource" does not render this assertion implausible. This is corroborated when one reads the surrounding portion of the relevant statement from the DOE Letter:

> The [DOE] is skeptical that any nonprofit could outsource the number and type of institutional functions that [GCU] has and still be deemed to operate the [i]nstitution. Given the enormous leverage GCE now has over [GCU] by virtue of the MSA and the fact that most of the [GCU's] key management personnel work for GCE, not []GCU, the [DOE] concludes that, as a practical matter, [GCU] is not the entity *actually operating* the [i]nstitution as is required under the [DOE]'s regulations.

(D.I. 60, ex. A at 16 (emphasis in original); *see also* D.I. 60 at ¶ 177) Thus, in the DOE Letter, the DOE seems like it is basically making the same allegation that Plaintiffs make in the SAC: that the idea that GCE and GCU are "separate" entities is misleading, if not outright false.

Finally, Defendants argue that the facts underlying the statements at issue were publicly available and thus cannot be said to be misleading. (D.I. 62 at 16) More specifically, Defendants assert that "[GCU's] purported lack of independence [was] repeatedly disclosed to the market, including in detailed descriptions of the services provided under the parties' MSA." (*Id.*) The Court rejects this argument, because Defendants made no real effort to explain *how or where* the facts underlying Plaintiffs' allegations in this regard were publicly available. In

support of their assertion, Defendants cited only to one page of the July 2, 2018 8-K (and even then, they did not point to any particular wording on that page).  (*Id.* at 16 n.17 (citing D.I. 63, ex. 5 at 4))  As far as the Court can tell, to the extent that this page discloses anything relevant, it provides only part of the picture.  For instance, while the document notes that Mueller would serve as both CEO of GCE and President of the new GCU, it also states that "[a]side from Mr. Mueller, no other employee of [n]ew GCU or GCE has a dual role in both organizations."  (D.I. 63, ex. 5 at 5)  Yet as discussed above, the Court believes Plaintiffs have plausibly alleged why such a statement could, at the very least, mislead investors.  And this page of the July 2, 2018 8-K does not make any reference, for example, to the fact that (as Plaintiffs allege) 75% of GCU's Executive Leadership Team was employed by GCE post-Conversion.  (D.I. 66 at 11 n.9)

For these reasons, Plaintiffs have plausibly alleged that this first category of statements was false or misleading.

### 2. Statements Regarding Risks to GCU's Non-Profit Label

At issue next are the SAC's allegations that Defendants made misstatements regarding GCU's status when Defendants stated that following the Conversion, GCU would be a "non-profit" or a "non-profit entity."  (D.I. 60 at ¶¶ 275, 277) *see also supra* Section I.C.1(a) & (c). According to the SAC, such statements were false or misleading because the DOE later noted that it was "skeptical that any nonprofit could outsource the number and type of institutional functions that [GCU] has and still be deemed to operate the institution[,]" (*id.* at ¶ 275), and that the planned structure of GCU violated "the most basic tenet" of a non-profit, (*id.* at ¶ 277). Defendants' statements at issue here were made in SEC filings or in an earnings call in the first half of 2018—i.e., well prior to the DOE's 2019 decision on the Conversion.  (*Id*. at ¶¶ 266-67, 270-71)

Defendants challenge these allegations in two ways.  First they argue that the statements were true at the time Defendants made them because GCU *was* recognized as a non-profit entity by, *inter alia*, the IRS.  (D.I. 62 at 16-17) [17]  And second, they assert that Plaintiffs' allegations rely on the DOE's subsequent 2019 decision to establish falsity; that is, that Plaintiffs' allegations do not show how the statements at issue were false *when they were made in 2018*.  (*Id.* at 17)

As to the first argument, it is true that at the time these statements were made, the IRS had recognized GCU as a non-profit (having done so back in October 2015).  (D.I. 60 at ¶ 145) Yet while this fact may be helpful to Defendants' case at the proof stage, it does not negate the plausibility of Plaintiffs' allegations.  At a minimum, this is so because Plaintiffs allege that the structure of the Conversion was set out in certain key documents (such as the MSA or the analyses conducted by Barclays and Deloitte), which were not negotiated and finalized until 2018.  (*Id.*)  Therefore, the IRS obviously did not have these documents in 2015 when it made its decision with regard to GCU's non-profit status.  (*Id.*)  And importantly, Plaintiffs also allege that the details that help demonstrate *why it is* that GCU would not actually be a non-profit organization post-Conversion were located in these very same documents—again, documents that Defendants would have known that the IRS had never reviewed.  (*Id.* at ¶¶ 233, 249; *see also id.*, ex. A at 14-15)

---

[17]      In their briefing, Defendants also assert that other "state licensing authorities . . . state and local tax authorities, the State of Arizona, and the NCAA" had also deemed GCU a non-profit organization as of the time of these statements.  (D.I. 62 at 17 (citing D.I. 48, ex. 2 at 26))  The Court has looked and cannot locate the record source for Defendants' assertion in this regard.  Above, then, the Court will simply address the issue with regard to the IRS's prior 2015 recognition of GCU as a non-profit organization (a fact that is of record).

With regard to the second argument, it is true that in "alleging falsity, a plaintiff cannot rely on conjecture based on subsequent events, but should instead cite contemporaneous sources." *In re Newell Brands*, 837 F. App'x at 875 (internal quotation marks and citation omitted). But the Court does not read Plaintiffs' allegations here as relying on the DOE's 2019 determination in order to establish that Defendants' "non-profit" statements were knowingly false or misleading when made in early 2018. Instead, the SAC pleads that when they made these statements in 2018, Defendants knew non-public facts about the structure of GCU post-Conversion that would undercut the assertion that GCU would truly be a non-profit. (D.I. 66 at 11 (citing D.I. 60 at ¶¶ 172-205))

For these reasons, Plaintiffs have plausibly alleged that this second category of statements was false or misleading.

### 3.   Statements Regarding the DOE's Review of the Conversion

The SAC alleges several misstatements regarding the scope and risks of the DOE review, including:  (1) a July 2, 2018 statement that GCE had "ongoing engagement" with the DOE and that "any regulatory limitations imposed by [the DOE] could be managed[,]" (D.I 60 at ¶¶ 279-80 (emphasis omitted)); (2) a July 2, 2018 statement that the DOE's decision was delayed because "[the DOE is] very understaffed[,]" (*id.* at ¶ 281 (emphasis omitted)); and (3) a July 2, 2018 statement that Mueller "would be very surprised, based on our discussions with [the DOE], if there were [any restrictions,]" (*id.* at ¶ 282 (emphasis added)). *See also supra* Section I.C.1(b). Plaintiffs argue that these statements were false or misleading because by that point:  (1) Defendants had not had any real engagement with the DOE other than having received the May 2018 interrogatories; (2) Defendants knew that the DOE's delay in addressing the application was not due to understaffing; and (3) Defendants knew that due to the content of the

interrogatories and for other reasons, there was a significant risk that the DOE would not grant GCU non-profit status.  (D.I. 60 at ¶¶ 121-22, 283)

It is easy to see how at least certain of these statements are plausibly alleged to be false and/or misleading.  For example, Mueller's July 2018 statement that the DOE was taking longer than usual with its pre-acquisition application review because the agency was "very understaffed" is clearly and understandably alleged to be flatly false (the SAC calls it a "blatant lie[]").  (*Id.* at ¶ 13)  This is because the SAC asserts that:  (1) the DOE had never said this to Mueller, and (2) the reason the review had not yet concluded was not due to understaffing, but instead to the many questions DOE had about the Conversion (reflected in the May 2018 interrogatories).  (*Id.* at ¶¶ 13, 281, 283; *see also* D.I. 66 at 12)  And Defendants' statement about their "ongoing engagement" with the DOE as of July 2018 is plausibly alleged to have been at least misleading—since the SAC asserts that the only contact that Defendants had had with the DOE as of July 2018 was that it received the May 2018 interrogatories.  (D.I. 60 at ¶¶ 279, 283; *see also* D.I. 66 at 11-12)

As for statements or omissions going to the *risk* that the DOE would not approve the Conversion, Defendants argue that these allegations are not plausibly false or misleading.  They claim that in order to viably allege otherwise, the SAC would have had to separately state that it was *unusual* for the DOE to propound discovery requests like the May 2018 interrogatories during a pre-acquisition application review, or that the SAC would need to allege that the DOE had told GCU that it was "likely to deny" the request for non-profit status.  (D.I. 62 at 17-18; D.I. 68 at 13)  The Court disagrees.  Even without those types of allegations, the SAC includes enough information to allow the reader to understand why, as of May 2018, DOE approval of GCU's non-profit request was in real doubt.  For one thing, the text of the May 2018

interrogatories themselves could suggest as much.  They give the reader the firm sense that the

DOE was skeptical of GCU's claim to non-profit status post-Conversion.  (D.I. 60 at ¶ 120

(DOE, via the interrogatories, questioning whether GCE is a company that does "substantial

business" with GCU, and seeking documents analyzing the "financial impact" of the transaction

on GCU) (internal quotation marks omitted))  And the SAC also alleges that DOE

representatives had previously suggested skepticism to GCE about a conversion similar to this

one (i.e., the 2014 Conversion).  (*Id.* at ¶¶ 50, 340)  In light of this, for example, it is plausible

that when Mueller said in July 2018 that he "would be very surprised, based on our discussions

with [the DOE], if there were" any restrictions placed on GCU by DOE, this was a misleading

statement.  And having chosen to speak about DOE review process, Mueller created a duty to

disclose other details (like the fact that GCE had actually received the May 2018 interrogatories)

so that investors would have the full picture.  *See Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d

317, 331 (E.D. Pa. 2020); *In re Celgene Corp. Sec. Litig.*, Civil Action No. 18-4772, 2019 WL

6909463, at *17 (D.N.J. Dec. 19, 2019); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458,

471 (E.D. Pa. 2014).[18]

Therefore, Plaintiffs have adequately alleged this third category of false and/or

misleading statements.

---

[18]     Defendants also argue that "the non-disclosure of the DOE's routine information requests does not amount to a *material* omission."  (D.I. 62 at 18 (emphasis in original); *see also id.* at 11)  But the SAC never asserts that the May 2018 interrogatories were "routine . . . requests[.]"  (Tr. at 115-16)  And what it does allege about those requests suggest that with them, the DOE was taking a skeptical look at the Conversion.  So the Court cannot assume these requests were "routine"; instead, it must infer what the SAC suggests—that the requests were a real, material problem for GCE/GCU.

### 4.   Statements Regarding the Conversion's Similarities to the Purdue-Kaplan Deal

Next up are Plaintiffs' allegations about why it was false and misleading for Defendants to tell investors that the terms of the Conversion were similar to other DOE-approved transactions such as the Purdue-Kaplan Deal.  (D.I. 60 at ¶¶ 100-05, 182, 296-304)  The SAC alleges that, in reality, the terms of the Conversion differed materially from the Purdue-Kaplan Deal.  This is allegedly due to the fact that:  (1) the Conversion involved GCE receiving 95% of GCU's revenues, while incurring only 28% of total costs (while in the Purdue-Kaplan Deal, the services provider would be paid only when the non-profit university broke even and would receive only 12.5% of the non-profit university's revenue thereafter), (*id.* at ¶¶ 188, 195-96); (2) the Conversion's exit and termination fees would have been essentially impossible for GCU to manage given the revenue and expense split, effectively tying GCU to GCE in perpetuity (while in the Purdue-Kaplan Deal, either side could terminate the relationship after the sixth year for a feasible termination fee), (*id.* at ¶¶ 197-99); and (3) GCE employed roughly 75% of GCU's Executive Leadership Team (while Kaplan and Purdue shared no overlapping executives or directors), (*id.* at ¶¶ 184, 187; D.I. 66 at 9-10); *see also supra* Section I.C.1(d).

The only challenge that Defendants make to the sufficiency of these allegations is to assert that they "disclosed all of the facts that allegedly made those comparisons false or misleading[.]"  (D.I. 62 at 18)  In support, Defendants simply point, without further citation or explanation, to the July 2, 2018 8-K and to a November 8, 2018 Form 10-Q Quarterly Report ("November 8, 2018 10-Q").  (*Id.* at 18 n.20)  The Court rejects this half-formed argument.  Defendants do not identify any specific page in these documents that bolsters the claim that the information-at-issue was publicly available.  And the Court cannot be expected to hunt blindly for supporting material in the record that may or may not be there.  *Cf. United States v. Dunkel*,

927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Moreover, Plaintiffs argued (and Defendants did not meaningfully rebut) that the two cited documents do *not* disclose any of the above-referenced key facts about the Conversion and how it compares to the Purdue-Kaplan Deal.  (D.I. 66 at 10 n.8; *see also* D.I. 60 at ¶¶ 9, 193) For instance, the July 2, 2018 8-K states that post-Conversion, GCE would provide services in return for *60%* of GCU's tuition and fee revenue (not *95%* of revenue).  (D.I. 63, ex. 5 at 3)[19] Plus, Plaintiffs alleged in the SAC that the revenue sources included in GCE's 60% figure were redacted from view when the MSA was filed publicly in February 2019.  (D.I. 60 at ¶ 133)  This all indicates that Defendants' blanket claim—i.e., that the facts that allegedly made these misstatements false were already publicly available—cannot win the day here.

For these reasons, Plaintiffs have plausibly alleged that this fourth category of statements were false or misleading.

### 5.    Statements Regarding GCE's Compliance with GAAP

The SAC alleges that because of GCE's control over the new GCU, and the fact that GCE was the primary beneficiary of GCU's operations, GCE was "required to consolidate [the new] GCU into its financial statements [] or at minimum to identify [it] as a related party[.]"  (*Id.*

---

[19]    In their briefing, Defendants disagree with the allegation that GCE was to receive 95% of GCU's revenues post-Conversion.  (D.I. 68 at 11 n.11)  Defendants say that this claim is belied by the July 2, 2018 8-K's statement (referenced above) that GCU agreed to pay just 60% of tuition and fee revenue to GCE (and that Plaintiffs' claim also simply flies in the face of "common sense").  (*Id.*)  Yet in the DOE Letter, the DOE concluded that when payments on a Senior Secured Note were included in the analysis, GCE would, in reality, be receiving roughly 95% of GCU's total revenues post-Conversion.  (D.I. 60, ex. A at 14)  As the DOE Letter appears to indicate, here the parties simply have a factual dispute about what is the most accurate way to calculate and represent these numbers.  The Court cannot say Plaintiffs' side of the story is implausible (especially in light of the DOE Letter).  And so Plaintiffs get the benefit of the doubt at the pleading stage.

at ¶ 310; *see also id.* at ¶¶ 214-35)  But the SAC asserts that Defendants instead made a number of material misstatements regarding its GAAP compliance, including, among other things, that "GCU is not a related party to [GCE]" and that GCE did not have "any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on [its] financial condition[.]"  *See supra* Section I.C.1(e).

In response, Defendants simply assert that these allegations should fail because the statements at issue were not false—in that GCU "was and is an independent entity following the [Conversion], and was properly treated as such for purposes of GCE's financials."  (D.I. 62 at 18-19)  Yet here Defendants are essentially raising a factual dispute about whether GCE (in light of the role its executives are alleged to have played in overseeing GCU post-Conversion) "controlled" the new GCU or whether GCU was in reality an "'off-balance sheet'" entity vis-à-vis GCE (in light of, *inter alia*, the 95%/28% revenue/costs imbalance issue).  (*See, e.g.*, D.I. 60 at ¶¶ 316-17)  And above in Section III.A.1, the Court has already concluded that the SAC plausibly alleges that GCU was not, in fact, independent from GCE for many of the same reasons.  (D.I. 68 at 13 (Defendants acknowledging that Plaintiffs allegations as to the GAAP claims are "entirely dependent" on Plaintiffs' other allegations regarding Defendants' false or misleading statements)) [20]

For this reason, Plaintiffs have adequately alleged that this fifth category of statements were false or misleading.

---

[20]    Defendants also pointed to the fact that "[n]either GCE's auditors [n]or the SEC have raised any concerns" regarding GCE's GAAP compliance, and therefore that Plaintiffs' claims "should not replace the sound judgment of these authorities."  (D.I. 62 at 19)  But there is nothing in the relevant record, one way or the other, about what GCE's auditors or the SEC thought about these allegations, or what "concerns" they do or do not have about them.  So the Court declines to make any assumptions about those matters here.

### B.     Scienter

Having found that Plaintiffs adequately alleged material misrepresentations/omissions, the Court now turns to scienter.  The Court will first begin with a discussion of scienter-specific legal standards.  Then it will move on to discuss the merits, ultimately explaining why it concludes that Plaintiffs have adequately alleged scienter.

### 1.     Legal Standards Regarding How to Plead Scienter

With regard to scienter, as noted above, the SAC must, as to each alleged false or misleading act or omission, "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  And "in determining whether the pleaded facts give rise to [that type of] a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

This inquiry is "inherently comparative" in that it requires a court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24.  The inference that the defendant acted with scienter need not be irrefutable or of the "smoking gun" genre, nor even the most plausible of competing inferences. *Id.* at 324.  But the inference must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.*  In the end, a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged[.]" *Id.*  And courts evaluate scienter by examining the totality of the circumstances. *Avaya*, 564 F.3d at 269 ("Accordingly, as with all totality-of-the-circumstances tests, our analysis will be case specific."); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Thus, *Tellabs*

counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."); *see also In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448-49 (D. Del. 2014).

"Scienter is a mental state embracing intent to deceive, manipulate, or defraud, . . . and requires a knowing or reckless state of mind[.]"  *Avaya*, 564 F.3d at 252 (internal quotation marks and citations omitted).  A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (internal quotation marks and citation omitted).[21]  One may "state a claim based on recklessness[,]" for example, by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements."  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (internal quotation marks and citation omitted); *see also City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 424 (D. Del. 2009) (same).[22]

---

[21]     To plead scienter as to a corporate defendant (here, GCE), the complaint must "identify facts raising a strong inference that false or misleading statements were made or otherwise promoted by an individual acting on behalf of each company and who knew or was reckless in not knowing that the statements were false or misleading at the time they were made."  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 426 (D. Del. 2009).  To the extent that the SAC here would serve to sufficiently allege scienter as to Mueller and Bachus, its scienter allegations would suffice as to GCE; were the allegations wanting on this front as to Mueller and Bachus, they would be wanting as to GCE.  (D.I. 62 at 5 n.7)

[22]     In *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), the Third Circuit held that plaintiffs asserting a Section 10(b) claim may "plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior."  180 F.3d at 534-35 (internal

2.      **Discussion**

a.      **Defendants Knew or Recklessly Disregarded Facts
Contradicting Their Public Statements**

The Court begins its scienter analysis by considering Plaintiffs' proposed theory of

scienter.  Plaintiffs assert, and the Court agrees, that a plaintiff often plausibly establishes

scienter where it shows that the defendants knew or recklessly disregarded the falsity of material

misstatements relevant to the alleged scheme.  *See Avaya*, 564 F.3d at 268 (analyzing whether

plaintiffs had adequately alleged that the defendants knew or were reckless regarding the risk

that their statements were false or misleading when made); *see also Suprema Specialties*, 438

F.3d at 278-79 (same); *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[S]ecurities fraud

claims typically have sufficed to state a claim based on recklessness when they have specifically

alleged defendants' knowledge of facts or access to information contradicting their public

statements.").

The Court has earlier set out Plaintiffs' theory of scienter.  *See supra* Section I.C.2.  In

their briefing, Plaintiffs helpfully distill that theory down in the following way:

Defendants knew facts or had access to information *contradicting
specific false and misleading material misstatements* regarding the

---

quotation marks and citations omitted).  In 2009, the Third Circuit addressed this question
further; it recognized that after the Supreme Court's 2007 decision in *Tellabs, Inc. v. Makor
Issues & Rights, Ltd.*, 551 U.S. 308 (2007), a "showing of motive and opportunity" could no
longer amount to independent grounds for demonstrating scienter.  *Avaya*, 564 F.3d at 276-77 &
n.50; *see also City of Edinburgh Council*, 754 F.3d at 172 (citing *Advanta* as "abrogated . . . by"
*Tellabs* on certain grounds); *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014)
(noting that a plaintiff properly pleads scienter by alleging facts that constitute circumstantial
evidence of either reckless or conscious behavior, and that motive and opportunity may no
longer serve as an independent route to scienter).  Instead, the Third Circuit concluded that "a
general rule that motive allegations are sufficient—or necessary—is unsound."  *Avaya*, 564 F.3d
at 277.  That said, the Third Circuit also recognized that the Supreme Court left much of the case
law "about 'motive and opportunity' undisturbed."  *Id.*  As a result, it concluded that "allegations
of motive and opportunity are not entitled to a special, independent status[,]" but "they are to be
considered along with all the other allegations in the complaint."  *Id.* (citations omitted).

> structure of the Conversion, its similarity to other conversions, and
> the DOE review process, all of which concealed the true risk that
> the DOE would decline to approve GCU as a non-profit institution
> [to the detriment of investors].

(D.I. 66 at 14 (emphasis in original); *see also id.* at 1 ("Defendants' substantial, personal

involvement in the [C]onversion process . . . gave them knowledge of non-public facts that

contradicted specific false and misleading material misstatements, including misstatements that

concealed key aspects of the material risk that the DOE would not approve GCU's non-profit

status.") (emphasis omitted); D.I. 60 at ¶ 319)  Plaintiffs support their allegations that Defendants

knew, or were reckless in not knowing, of the false or misleading nature of certain of their

statements by pointing to several factors:

- First, with regard to the "structure of the Conversion," Plaintiffs allege that Defendants were directly involved in the Conversion and intimately familiar with its terms—such that they knew or reasonably should have known that after the Conversion went into effect, GCU would not truly be a separate and independent entity from GCE, and that many GCE employees other than Mueller would have a "dual role" at both GCE and GCU.  For instance, the SAC alleges that it would be "inconceivable" for Mueller and Bachus to be unaware of the terms of the Conversion, since the Conversion "critically transformed" GCE and "went to the core of GCE's business and business model," including the "fundamental nature of GCE, its revenue sources (current and projected), its profit margins, its liabilities, and its CapEx budget[.]"  (D.I. 60 at ¶ 323 (also noting that in a 2018 SEC filing, GCE stated that "'various aspects of [GCE's] operations have changed in important ways'" post-Conversion))  Additionally, Mueller and Bachus indicated in SEC filings that they had reviewed the MSA, and therefore, would necessarily have had knowledge of the terms of the Conversion, which were set out therein.  (*Id.* at ¶ 322)  Given these pleaded facts, the Court concludes that Plaintiffs have adequately alleged that Defendants had knowledge of the terms of the Conversion.  *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) (finding it plausibly alleged that two defendants, who were top executives at a company, knew or reasonably should

have known of certain increased markdown activity and sales declines at the company, which were the subject of securities fraud allegations, where the executives were directly involved with the company's business activities and had signed and certified SEC documents that included false or misleading statements at issue); *see also SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 905-06 (E.D. Pa. 2018).

- <u>Second, with regard to the Conversion's "similarity to other conversions," Plaintiffs allege that Bachus was personally told facts that contradicted Defendants' later statements that the Conversion's structure was similar to the Purdue-Kaplan Deal.</u> More specifically, when Defendants decided in early 2017 to submit the renewed Change of Control application to the HLC, Solinski is alleged to have told Bachus that there were "'real'" and "'key'" differences between the structures of the Conversion and the recently-approved Purdue-Kaplan Deal, to have sent Bachus articles clarifying the differences and to have pointed Bachus to publicly available filings about the Purdue-Kaplan Deal that demonstrated these differences.  (D.I. 60 at ¶¶ 73-74); *cf. Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 980-81 (6th Cir. 2018); *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *16.  And a fair inference from the pleaded facts is that Bachus would have in turn shared Solinski's comments with Mueller, since the two men were heavily involved in the Conversion together and because the Conversion was a very significant transaction for GCE/GCU. *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192-93 (N.D. Cal. 2010).  Now, admittedly, the SAC does not state what were the "real" and "key" differences between the two deals that Ms. Solinski highlighted for Bachus, nor how those differences impacted whether GCU should be considered a non-profit institution post-Conversion. (Tr. at 42)  But as set out above, the SAC includes many other allegations about why the structure of the Conversion and the Purdue-Kaplan Deal were materially different in a manner that would impact DOE's decision as to GCU's non-profit status. In light of those other allegations, the Court can at least infer that Bachus' conversation with Solinski should have caused Mueller and Bachus to exercise ordinary care in reviewing the terms of the two transactions, which would in turn have made plain the differences highlighted in the SAC.

- <u>And third, with regard to the "DOE review process," the SAC alleges that Defendants knew about or recklessly disregarded</u>

the significant risk that the DOE would not approve GCU as a
non-profit after the Conversion.  For example, there are the
allegations that according to Solinski, [23] in 2016 Frola and

---

[23]       Defendants argue that any of the SAC's allegations drawn from conversations
that Plaintiffs' attorneys had with Solinski should be discounted as unreliable, on the grounds
that Solinski is biased against HLC and Defendants.  (D.I. 62 at 12 (citing *Bartesch v. Cook*, 941
F. Supp. 2d 501, 507 (D. Del. 2013))  On this score, Defendants argue that while the SAC states
in a footnote that Solinski "submitted her resignation to the HLC [in early 2018] for reasons
unrelated to the GCU evaluation[,]" (D.I. 60 at ¶ 90 n.2), this allegation is false.  (D.I. 62 at 12)
This is so, Defendants state, because Solinski:  (1) did not resign from HLC and instead was
terminated for cause; and (2) the reason she was terminated related to the GCU evaluation (i.e., it
was "due to a conflict of interest in connection with HLC's review of [GCU's] change in control
application").  (*Id.*)  For support, Defendants include as exhibits to their opening brief:  (1) a
Complaint that Solinski personally filed against HLC and Gellman-Danley in September 2020 in
the United States District Court for the Northern District of Illinois (the "Solinski Complaint"),
in which Solinski stated that she was "terminated [by HLC] on March 1, 2018 with no previous
discipline or warning"; and (2) a Charge of Discrimination that Solinski filed with an Illinois
state agency, in which Solinski appears to have stated that she was "discharged [from HLC] for a
conflict of interest issue and loss of confidentiality in relation to a single member institution[.]"
(D.I. 63, ex. 3 at 5; *id.*, ex. 4 at 10-11; *see also* D.I. 62 at 12)

       As an initial matter, it is worth noting that much of the allegations in the SAC that relate
to something Solinski told Plaintiffs' counsel are about the HLC's review process regarding the
Conversion.  (D.I. 60 at ¶¶ 75-95)  Yet as the Court previously discussed above, both sides now
agree that those HLC-review-related allegations are irrelevant to the instant Motion, and so the
Court is not considering them here.  *See supra* n.5.  What is at issue in this portion of the R&R
are statements in the SAC that Solinski made about:  (1) a meeting in May 2016 in which
Mueller referenced the fact that the DOE "had given him pushback on the 2014 Conversion
Proposal and that [Mueller] did not believe the DOE or HLC would bless it in the future"; and
(2) Solinski's alleged conversations with Bachus in 2017, in which Solinski told Bachus about
the differences between the Conversion and the Purdue-Kaplan Deal.  (D.I. 60 at ¶¶ 50, 52, 74)

       For a few reasons, the Court will consider (and will not discount) these allegations, at
least at the pleading stage.

       First, the Court clarifies that even to the extent that it could take judicial notice of certain
statements made in the Solinski Complaint and the Charge of Discrimination (the "extra-SAC
document(s)"), it is only permitted to consider the *fact* that those statements were made therein,
not whether those statements are *true*.  *See Del Puerto Water Dist. v. U.S. Bureau of
Reclamation*, 271 F. Supp. 2d 1224, 1234 (E.D. Cal. 2003) ("Judicial Notice is taken of the
existence and authenticity of the public and quasi public documents listed.  To the extent their
contents are in dispute, such matters of controversy are not appropriate subjects for judicial
notice."); *In re Peregrine Sys., Inc.*, 311 B.R. 679, 692 (D. Del. 2004) (same).  So if the SAC
alleged one thing, and an extra-SAC document asserted the opposite, it is not as if the Court

others at the DOE informed Mueller that the DOE was unlikely to approve the 2014 Conversion (a proposal that was structurally identical to the Conversion at issue here) because "the transaction would result in the DOE, HLC, and other regulatory bodies being unable to regulate significant portions of [] GCU's operations and would likely improperly benefit the newly formed for-profit company." (D.I. 60 at ¶¶ 49-50, 52, 79)[24] Additionally, Plaintiffs allege that Defendants knew the

---

could easily determine that the SAC's allegation is *false*. (Tr. at 83) A court cannot make findings as to disputed facts at the motion to dismiss stage. *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015).

Second, to the extent that the Court can consider the fact that Solinski made certain statements in the extra-SAC documents that are asserted to conflict with her statements in the SAC, the Court cannot yet be sure that there is such a conflict. For example, with regard to the issue of how Solinski left HLC, the Court acknowledges that the Solinski Complaint states that Solinski was "terminated," while the SAC states that Solinski submitted her "resignation" from HLC. If "terminated" means "fired" then this discrepancy may well later be problematic for Plaintiffs. (Tr. at 131) But Plaintiffs assert that "terminated" is a "legal term of art" and that by it, Solinski did not intend to suggest that she was fired; in support, Plaintiffs point to a letter Solinski later received from HLC (a letter referenced in the SAC, such that it can be considered here), in which the HLC references Solinski's "departure" from the organization (not her "firing" or "termination"). (D.I. 60 at ¶ 43; D.I. 66 at 22) In light of the limited record on this point, the Court is not comfortable concluding that what is stated in the Solinski Complaint about Solinski's departure is necessarily inconsistent with what is alleged in the SAC on that score. And with regard to the issue of whether Solinski's reason for leaving HLC was "unrelated" to GCU, so far as the Court can tell, the Charge of Discrimination does not actually state the name of the "institution" as to which Solinski was asserted to have a conflict of interest. (D.I. 63, ex. 4 at 10-11; *see also* D.I. 66 at 22-23 n.25) And the Court does not want to (nor should it) guess at the answer here.

And third, even if these extra-SAC documents could lead the Court to question whether Solinski might be biased in some way against HLC, the Court is not sure how they would demonstrate that she has an "incentive to disparage" *Defendants*. (D.I. 68 at 8 n.9) Defendants did not work with Solinski, nor did they directly cause her departure from HLC. If anything, the SAC alleges that Solinski had a close relationship with Mueller and Bachus (at least as of the relevant timeframe discussed in the SAC).

[24]     In the SAC, Solinski reports on Mueller's description of his conversations with the DOE in this regard. (D.I. 60 at ¶¶ 50, 52, 333) Defendants assert that this allegation should not be considered because it relies in some part on hearsay. (D.I. 62 at 13 n.15) But even if it did, that would be irrelevant, as at the pleading stage the Court must accept all factual statements as true in order to test the sufficiency of the SAC. *See, e.g.*, *Guzman v. Mana*, Civil Action No.

falsity or misleading nature of certain statements they made in or around July 2018 to the effect that: (1) they had had ongoing engagement with DOE, and (2) the reason DOE had not yet issued a decision on GCU's pre-acquisition application was due to the DOE being "very understaffed." This is alleged to be so because: (1) the only communications that Defendants had with DOE as of that date related to the DOE's May 2018 interrogatories, through which the DOE was expressing skepticism about GCU's request for non-profit status; and (2) the DOE had simply never told Defendants that any delay was due to "understaffing" (an assertion that was flatly untrue). (*Id.* at ¶ 283)

Given these allegations, the Court concludes that Plaintiffs have adequately alleged that Defendants either knew or recklessly disregarded facts that contradicted their above-referenced public statements (or that should not have been omitted from their public statements). Even having so concluded, the Court will nevertheless go on to engage in the "inherently comparative" process of considering Plaintiffs' theory of fraudulent conduct along with Defendants' theory as to why no fraud has occurred. *Tellabs, Inc.*, 551 U.S. at 323-24.

> **b.      Plaintiffs' Theory is at Least as Compelling as the Opposing Inference**

After engaging in that comparative process, the Court concludes that Plaintiffs' overall theory (i.e., as to why Defendants had an intent to deceive, manipulate, or defraud) is at least as cogent as Defendants' competing theory of no fraud. In explaining why this is so, it is perhaps easiest to start with a review of the first R&R's decision regarding scienter—and an explanation of how, with the SAC's allegations, Plaintiffs have overcome the problems that beset their prior pleading.

---

17-2551, 2018 WL 10150989, at *2 n.2 (D.N.J. Dec. 6, 2018); *Dowell v. Bayview Loan Servs., LLC*, CIVIL NO. 1:16-CV-02026, 2017 WL 9486188, at *21 (M.D. Pa. May 4, 2017).

In the first R&R, the Court concluded that the inferences Plaintiffs wished it to draw did not meet the "cogent and at least as compelling" test. This was because the theory Plaintiffs put forward in the CAC did not square with common sense and was not "cogent." (D.I. 50 at 35-43) The Court so concluded for a few primary reasons:

- The CAC clearly and repeatedly alleged that when Defendants submitted GCU's pre-acquisition application, they were aware that, under the prevailing DOE regulations, GCU did not qualify on the merits as a non-profit institution. And the CAC alleged that Defendants freely gave documents to the DOE that would demonstrate as much. This led to an understandable question that the CAC's allegations did not answer: Why would Defendants think that there was any chance that the DOE would actually approve GCU for non-profit status if, on the merits, there was no way that the DOE reviewers *should* actually approve such a request? (*Id.* at 38-39) The Court noted that the CAC had not attempted to provide any factual explanation that answered this question—with the possible exception of a conclusory, one-sentence reference to the fact that after President Trump's election and the appointment of Secretary DeVos at the DOE "for-profit institutions faced a 'different regulatory environment' that might lead the DOE to be more favorable to non-profit conversions." (*Id.* at 39-40 (citing D.I. 34 at ¶ 44)) The Court explained that the lack of detail in the CAC as to the nature of this "regulatory environment"—and what it meant for the Conversion—was problematic. (*Id.*)

- The lack of an answer to that question was even more perplexing in light of the CAC's allegations that having the DOE approve GCU as a non-profit organization was "a critically important feature of" the Conversion, and was "fundamental to [] Mueller's marketing plan to maximize enrollment[.]" (D.I. 34 at ¶¶ 4, 49) In fact, the CAC pleaded that after DOE ultimately rejected GCU's non-profit status, this "placed in jeopardy" GCU's and GCE's entire "long-term financial viability[.]" (*Id.* at ¶ 94)[25] Again, these allegations

---

[25]    In their briefing, Plaintiffs suggest that in the first R&R, the Court wrongly assumed that the DOE's approval of GCU's non-profit status was an "all-or-nothing, 'bet the company' proposition." (D.I. 66 at 2) But as noted above, the Court assumed that this was the case because in the CAC, Plaintiffs pleaded that non-profit approval was "critically important"

seemed to describe a theory of scienter that made little sense. If Defendants knew that the DOE was not likely to grant their request for non-profit status for GCU, and if the failure of the DOE to do so *would place in jeopardy GCU's and GCE's entire long-term viability*, why would  Defendants have sought the DOE's approval in the first place?  As the Court put it in the first R&R "[w]hy would Mueller and Bachus, two experienced executives in the education sector, bet the future of GCU (an entity worth nearly a billion dollars) and their own large company (GCE), on a 'gamble' that DOE would treat GCU as a non-profit—when, if the Plaintiffs' theory of scienter is correct, any thinking person with real experience in this sector would *know*, just as Mueller and Bachus are said to have *known*, that GCU clearly and unmistakably *did not qualify* as a non-profit?  Why would these men make that incredibly high-stakes gamble with GCU's and GCE's future—a gamble that would seem, absent further explanation, to be surely doomed to fail?"  (D.I. 50 at 38 (emphasis in original))

- Lastly, the Court noted that it did not seem sensible that in Plaintiffs' telling, Defendants' plan for fraud "yo-yoed haphazardly during the Class Period."  (*Id.* at 41)  Here the Court noted that in the CAC, it appeared that Plaintiffs were asserting that:  (1) as of January 2018, Defendants' plan "was to gamble with the future of GCE and GCU, and hope that DOE would approve GCU's request for non-profit status, while knowing that on the merits DOE should never come to such a conclusion"; but also that (2) "just five months later in May 2018—after DOE propounded interrogatories that 'probed the underlying structure of the Conversion and its financial benefits to [GCE]'—Defendants now realized 'that the DOE was not inclined to rubber-stamp the Conversion'" and then "'reversed course'" by pressing "'full steam ahead'" with the Conversion and "simply await[ing] the DOE's final decision (one that now looked like it would be negative as to non-profit status), all while telling the public that they still remained optimistic about the outcome."  (*Id*. at 41-42 (citations omitted))  The Court noted that it did not make sense to think that Defendants would "knowingly hitch[] GCE's entire future operational and financial viability *to a plan that they changed*

---

and "fundamental" to GCE's future plans, and that the DOE's ultimate denial of the request "placed in jeopardy" GCU and GCE's "long-term financial viability."  In other words, if the Court got the wrong idea about the asserted stakes involved with the DOE's review of GCU's non-profit status, it got that idea from Plaintiffs' own words in the CAC.  (Tr. at 87-91)

*radically in mid-stream, within the span of a few months.*"  (*Id.* at 42 (emphasis in original))  Without further explanation, this theory suggested a "a less-than-cogent narrative."  (*Id.* at 43)

However, in the SAC, Plaintiffs have now added numerous factual allegations meant to answer these questions.  In the Court's view, these new allegations provide additional needed context and help articulate how Plaintiffs' theory of the fraud scheme is cogent.

For example, the SAC now includes allegations that better explain why, although Defendants are said to have understood that their MSA with GCU "violated 'the most basic tenet' of" non-profit status, (D.I. 60 at ¶ 277), they nevertheless thought that there was a reasonable chance that the DOE would approve GCU's non-profit request.  To that end, the SAC includes significant new detail about why, during the DeVos administration at DOE, for-profit entities might initially have expected a more favorable outcome for proposals like the Conversion.  These included the following allegations:

- As soon as Secretary DeVos was confirmed, the Trump Administration began installing veterans of for-profit education companies into DOE and White House leadership roles.  This included the appointment of former executives or consultants of for-profit education companies as a senior policy advisor to Secretary DeVos, as senior counsel to the Secretary, as DOE's general counsel and as the head of the DOE team policing fraud in higher education.  (*Id.* at ¶¶ 55-61)

- This coincided with the rolling back of several DOE protections against student-abuses—protections that had been unfavorable to for-profit institutions.  These roll-backs included Secretary DeVos' plans to dismantle "two key Obama-era rules enacted in 2016":  the Gainful Employment Rule and the Borrower Defense Rule.  (*Id.* at ¶ 62)

- For-profit institutions recognized this changed environment and began delaying plans to submit conversions until after President Trump assumed the presidency.  (*Id.* at ¶¶ 65-66)  According to Solinski, GCE's outside counsel informed her in the summer of 2017 that he had advised his clients to wait until

55

the Trump Administration took power to initiate new conversions.[26]  (*Id.* at ¶ 65)

- After January 2017, a number of for-profit institutions commenced large scale conversions.  This included Dream Center Educational Holdings, Inc.'s agreement to purchase 13 for-profit post-secondary institutions, and the Purdue-Kaplan transaction.  In both cases, the DOE sent pre-acquisition review letters to those parties in September 2017 indicating that it did not see any impediment to the respective requests for, *inter alia*, conversion into non-profit status.  (*Id.* at ¶¶ 66-67)

- The changed environment was so marked that various articles published around that time highlighted the issue, (*id.* at ¶¶ 54, 70-72), as did other industry insiders, (*id.* at ¶ 72).

These allegations render it more understandable why—even after being told by the DOE after the abandoned 2014 Conversion that it was unlikely to approve such a transaction in the future—Defendants might have reasonably thought that their odds for success had changed.[27]  It seems plausible that an agency's leadership might sometimes alter outcomes in the regulatory process in line with their pre-conceived views about what is good for an industry.  This could be so even

---

[26]    For reasons set out earlier, the Court will credit this Solinski-related allegation at the pleading stage.  *See supra* n.23.

[27]    The Court acknowledges that Plaintiffs are attempting to walk a nuanced line here in terms of articulating Defendants' alleged mindset.  On the one hand, Defendants are said to have been told by Frola and others at DOE in 2016 that the DOE was unlikely to approve a non-profit proposal like that in the Conversion.  They are also said to have been aware that, on the merits, GCU really should not be considered a non-profit, post-Conversion.  In light of this, Plaintiffs assert that Defendants should have known that DOE approval of GCU's 2018 non-profit request *was not very likely*.  On the other hand, Plaintiffs are alleging that due to the background and mindset of DOE leadership as of 2017, Defendants could have reasonably thought that it was *still possible* that DOE might nevertheless approve the request.  And they are asserting that Defendants could have still felt that way even after receiving the May 2018 interrogatories, which made the prospect of success *even less likely*.  (Tr. at 22-24, 48-56)  But cogent theories (and alleged fraudulent schemes) can have nuance to them.  And it is at least plausible that all of these things could have been true here.

if the agency's line employees, after interpreting agency regulations, would take a very different view about what the outcome should be.  After all, executive decisionmakers typically are empowered with great discretion.  Moreover, the SAC alleges that as of 2017 and 2018, for-profit veterans held a sufficiently significant number of DOE leadership positions; this could allow the reasonable inference that such persons actually could have impacted the Conversion's outcome.  And in light of the SAC's claims about how these DOE leaders were so closely aligned with the thinking of for-profit educational institutions like GCE, now it seems plausible that Defendants reasonably thought the Conversion might actually be approved in full (even if, on the merits, it really should not have been). [28]

Additionally, because the SAC now better contextualizes how the request for non-profit status could have (and did) benefit GCE in the short term—without threatening its viability in the long term were there a DOE denial—this also makes Plaintiffs' theory of scienter seem more cogent and compelling.  Put differently, while Plaintiffs' allegations in the CAC about Defendants' mindset during the alleged fraud seemed "zig-zagging" in nature, now the SAC's allegations make this appear less so.  For example, the SAC asserts that GCE and GCU stood to

---

[28]     The Court notes that it is not *agreeing* with the SAC's allegations about the mindset of DOE leadership during Secretary DeVos' tenure (i.e., that these leaders were in fact the type of people who would have pressured line DOE employees to grant GCU non-profit status, even though GCU should not have qualified pursuant to DOE regulations).  Indeed, the SAC goes on to plead that the DOE ended up engaging in a vigorous review of GCU's non-profit request and ultimately *did not approve* that request.  That decision, of course, came from an agency led by Secretary DeVos, during the Trump Administration.

Instead, here the Court only concludes that, at the pleading stage—when it must give Plaintiffs the benefit of all reasonable inferences—it is now *plausible* (and cogent) that *Defendants thought* that their alleged scheme could be successful, in light of the background of DOE's new leadership in early 2017.

benefit financially simply by virtue of the fact that the Conversion application was submitted to the DOE. This was because during this time period (i.e., while the DOE was reviewing their non-profit request), Defendants could and did bring in significant revenues for GCU and GCE—due to the financial terms of the Conversion and by touting GCU as a "non-profit" institution. On this score, the SAC alleges that from the Conversion's close in July 2018 until the DOE's final decision in November 2019, GCE reported "strong financial results that routinely exceeded market expectations[,]" and its profit margins "showed immediate, enormous growth[,]" which GCE attributed to the fact that it was now marketing itself as a non-profit institution (leading to increased enrollment). (*Id.* at ¶¶ 153-71) And so the SAC now reads as if Defendants knew and believed *from the start* that GCU's request for non-profit status could have paid off either way. If that request was granted, then many long-term financial benefits would certainly accrue to GCE and GCU. But even if the request was denied, a number of financial benefits would still have been generated in the interval. And GCE and GCU could still be viable in the future (i.e., with GCU simply continuing moving forward as a for-profit institution).[29] This better explains how it could have been Defendants' plan *from the start* to attempt the Conversion and move forward with it, even if the risks of rejection by the DOE were real and became greater during the pendency of GCU's application.

---

[29] Defendants suggest that the Court, in the first R&R, "already rejected" the notion that the benefits of marketing GCU as a non-profit could have been a reason why Defendants pushed forward with the alleged scheme, even after May 2018. (Tr. at 22) But the Court did no such thing. Instead, in the first R&R, the Court was saying that if Defendants had an understandable plan for fraud that was clear and unchanged from the outset (as opposed to one that changed "in mid-stream"), then Plaintiffs needed to do a better job of explaining this. (D.I. 50 at 35 n.18 & 42-43) Plaintiffs have done a better job in that regard in the SAC.

Relatedly, it now makes better sense why Defendants would have chosen to move

forward with the Conversion, even after receiving the May 2018 interrogatories (which further

placed the prospect of GCU's non-profit approval in doubt). To that end, the SAC explains that

it was sensible for Defendants to continue with the Conversion post-May 2018, in light of, *inter*

*alia*: (1) the significant and "risk-free" financial and marketing benefits of touting GCU as a

non-profit, at least prior to a final decision from the DOE, (*id.* at ¶¶ 153-71, 342)[30]; (2) the

knowledge that, if there was any chance that the request might still get approved, that chance

could fall away if President Trump lost reelection in 2020, (*id.* at ¶¶ 123-24, 341-42)[31]; and (3)

---

[30]    Defendants call this allegation illogical, arguing that "[i]f . . . Defendants
recognized by May 2018 that the DOE intended to deny [GCU's] request . . . then they also
knew that any perceived 'marketing advantages' would have lasted, at most, a few months."
(D.I. 68 at 3-4) But for one thing, it is alleged that these marketing advantages lasted for much
more than a "few months"—that is, that they lasted from mid-2018 through to the DOE's
decision in November 2019. And more than that, Plaintiffs are not alleging that Defendants
*knew* as of May 2018 that the DOE would not approve GCU's non-profit request. Rather,
Plaintiffs are alleging that the May 2018 interrogatories *heightened the risk* that the DOE would
not approve. (D.I. 60 at ¶¶ 122-23; *see also* D.I. 66 at 16 n.17; Tr. at 48) Since the SAC alleges
that GCE would receive at least some of these financial benefits whether or not the DOE
approved the transaction in full, (D.I. 60 at ¶ 17), and since it is no longer alleged that failure to
obtain non-profit status for GCU would threaten that institution's (or GCE's) long-term viability,
the allegation does not seem illogical to the Court.

[31]    Defendants assert that it does not make sense that they would be concerned about
this limited political window in which to obtain DOE approval if they "knew [] there was a
substantial risk" that even the Trump Administration's DOE was going to deny the request for
non-profit status. (D.I. 68 at 4 (internal quotation marks and citation omitted)) But as the Court
has said, the SAC now better explains why, even if Defendants were uncertain as to whether
their alleged fraudulent scheme would work post-May 2018, they could have felt their "gamble"
might still pay off with full DOE approval of the Conversion. *See Sgalambo v. McKenzie*, 739 F.
Supp. 2d 453, 484 n.193 (S.D.N.Y. 2010) (finding scienter adequately pleaded, and rejecting the
defendants' alternate theory that they did not act with fraudulent intent because they continued to
invest in the joint venture at issue, since there were plausible explanations that did not undermine
the inference of scienter, such as the fact that that the defendants might "have been quite
pessimistic" regarding the joint venture "but chose to remain with the project and gamble on [its]
success . . . because its finances were sufficiently secure to withstand the costs of a failed
exploration"); *Tomaszewski*, 482 F. Supp. 3d at 333 (finding scienter adequately alleged where,

the sunk costs Defendants had already put into preparing the application and Conversion (including the transition of nearly 7,500 of employees from GCE to GCU and the transfer of over $1.0 billion in assets), (*id.* at ¶¶ 14, 123, 342).[32]

Lastly, in light of the above, the SAC now better explains (somewhat contrary to what was asserted in the CAC) why if the DOE did not approve GCU as a non-profit, this would not have threatened the existence of GCE or GCU. To this end, the SAC no longer includes the allegations (previously found in the CAC) that DOE approval of GCU's non-profit request was "critically important" to GCE/GCU, or that denial of that request "placed in jeopardy" GCU's and GCE's "long-term financial viability."[33] Instead, the SAC pleads that while Defendants clearly hoped that the DOE would fully approve the Conversion, "moving forward with the

---

due to a "time and money crunch, [defendants] took—and lost—a calculated gamble to initiate the preparatory work for the Phase 3 studies without FDA approval, and that when the FDA expressed disagreement, [the defendant] deceived investors in the hope that the FDA would end up agreeing with the data from the Phase 3 studies and approve [the drug in question]").

[32] Defendants argue that these sunk costs "would not be recovered regardless of whether GCE moved forward with the Transaction[.]" (D.I. 68 at 4; *see also* D.I. 62 at 8) But Plaintiffs' point is that having already put a substantial amount of time and money into the Conversion process, this provided an incentive for Plaintiffs to continue to try for (and hope for) an outcome in which the DOE entirely approved the Conversion, even after May 2018. If that outcome came to pass, then GCE would have gotten the most out of their investment of resources. This is an understandable allegation.

[33] During oral argument, when the Court asked about the "long-term financial viability" allegation, Plaintiffs' counsel noted that the allegation was "in the first complaint" but that "[i]n the amended complaint, we don't make that allegation." (Tr. at 92) It is somewhat concerning that the facts about this point seem to have differed from pleading to pleading. (Tr. at 94-96, 131); *cf. ECB USA, Inc. v. Savencia, S.A.*, Civil Action No. 19-731-RGA-CJB, 2020 WL 3893044, at *3-4 (D. Del. July 10, 2020). But in reviewing the instant Motion, the Court must only look at the operative pleading (the SAC) and its allegations; it cannot consider the content of the prior pleading (the CAC). (Tr. at 96, 114) And even Defendants' counsel agreed that had GCU been denied non-profit status by the DOE, that was not an "exigent" matter for GCU, in that the "[U]niversity would[ not] fail if they didn't get it." (*Id.* at 127)

Conversion would have immediate and tangible financial benefits for [GCU], even in the . . .
event that the DOE declined to approve [n]ew GCU as a non-profit."  (D.I. 60 at ¶ 17; *see also*
D.I. 66 at 19)  As Plaintiffs' counsel noted at oral argument, the SAC now suggests that while
the DOE's approval in full of the Conversion would have been a "significant plus factor" for
GCE/GCU, the prospect that the DOE might deny non-profit status to GCU was not an
"existential crisis" for those entities.  (Tr. at 88-89)

      When considered as a whole, the SAC's allegations now establish a cogent theory:  that
Defendants took a chance on obtaining DOE approval for GCU as a non-profit and, in the
interval before a decision was made, they knowingly misled the market regarding the substance
of that request and about the risks of denial from the DOE.  And they did so because if their
gamble paid off, GCU would have obtained valuable non-profit status; but even if it did not, in
the meantime, GCE could earn significant revenue from the Conversion, including by increasing
enrollment through misleadingly marketing GCU as a non-profit institution.  (D.I. 60 at ¶¶ 278,
319; *see also id.* at ¶¶ 1-23; D.I. 66 at 2 ("Defendants reaped immediate and significant
advantages by implementing the one-sided MSA while GCE pursued non-profit status for GCU,
regardless of whether the DOE ultimately granted such approval."))

      Meanwhile, Defendants' opposing theory of non-fraudulent intent is that they always
reasonably believed that GCU met the DOE's definition of a non-profit institution.  (D.I. 62 at 9)
In articulating why this theory is cogent and more compelling that Plaintiffs' theory, Defendants
point to the IRS's 2015 and 2018 decisions to treat GCU as a non-profit.  According to
Defendants, the IRS's view was "critical" because "the DOE's 'definition of a nonprofit
institution mirrors the statutory language for tax exempt organizations found in 26 U.S.C.
501(c)(3).'"  (*Id.* (quoting D.I. 60, ex. A at 10))  Defendants also note that after the DOE denied

GCU non-profit status, GCU went on to file litigation against the agency challenging that denial. Defendants argue that the fact that they were willing to sue the DOE shows that they firmly believed—and continue to believe—that GCU should rightly be treated as a non-profit.[34] (*Id.* (citing D.I. 60 at ¶¶ 123, 342))

As the Court has noted in the past, these facts may be helpful to Defendants' case. (D.I. 50 at 44-47)  It might be that Defendants truly believed that GCU was a non-profit post-Conversion and that Defendants did not knowingly misstate the risks of an alternative outcome. But there are other facts of record that the Court must consider.  And on *this* record, the Court now concludes that Defendants' theory is not as compelling as Plaintiffs' theory.

One such factor has to do with the nature of the IRS's approval of GCU's non-profit status.  On that point, as they did in the CAC, (*id.* at 44-45), Plaintiffs allege in the SAC that the fact of the IRS's approval was "no guarantee" that DOE would also bless GCU's non-profit request, (D.I. 60 at ¶ 109).  To that end, the SAC notes that in August 2016, the DOE rejected an application for a change in ownership and to non-profit status that was filed by multiple for-profit colleges owned by the Center for Excellence in Higher Education ("CEHE")—even though the IRS had approved CEHE's tax-exempt status in 2013.  (*Id.*; *see also id.* at ¶ 64) Moreover, the SAC repeatedly alleges, in some detail, how the IRS has been accused by various sources (e.g., the media, academics and the Government Accountability Office) of rubber-stamping applications of for-profit institutions attempting to convert to tax-exempt entities.  (*Id.* at ¶¶ 145-52, 260-61)  For example, in an October 7, 2020 report entitled "How For-Profits Masquerade as Nonprofit Colleges[,]" the author asserted that the "IRS tax-exempt division has

---

[34]     Defendants' argument here presumes that it can be demonstrated that they played some role in causing GCU to pursue this litigation.

become an unreliable enforcer of nonprofit integrity"; in support, the author specifically called out the IRS's review of GCE's 2015 tax-exempt application, noting that the IRS approved the nearly 600-page application in just three weeks and "raised no issues and asked no questions[.]" (*Id.* ¶¶ 147-48 (internal quotation marks omitted))  Finally, the SAC asserts that the IRS reviewed no documents relating to the Conversion in approving GCU's request; therefore it did not have access to key documents detailing the deal's structure (like the MSA, or the analyses conducted by Barclays and Deloitte).  (*Id.* at ¶ 173-74; *see also id.* at ¶ 276)  As noted above, the SAC alleges that the DOE denied the Conversion *based on* the information found in such documents.  (*Id.* at ¶¶ 233, 249; *see also id.*, ex. A at 14-15)  So all of these allegations, which the Court must take as true, help blunt the impact of the IRS's 2015 or 2018 approval.

Additionally (and crucially), above the Court has determined that it is plausible that Defendants knowingly made many materially false or misleading statements and/or omissions about multiple aspects of the Conversion.  Thus, the Court must take as true the assertions that, *inter alia*, Defendants knowingly or recklessly:  (1) misrepresented to the public the fact of GCU's lack of independence from GCE; (2) misrepresented the risks that GCU would not be deemed a non-profit by the DOE; (3) made false statements about the status of DOE's review of the Conversion (after receipt of the May 2018 interrogatories); and (4) falsely or misleadingly claimed that the Conversion was similar to the Purdue-Kaplan Deal.  If Defendants were making false and misleading statements about nearly every aspect of the DOE non-profit approval process, then its seems a lot harder to believe that Defendants legitimately believed that GCU was in fact a non-profit.  (D.I. 66 at 2)  And so this makes their theory of the case seem less compelling (for now) than Plaintiffs' theory.  *See McDermid v. Inovio Pharms., Inc*., 520 F. Supp. 3d 652, 668 (E.D. Pa. 2021) (determining that plaintiffs had adequately pleaded scienter,

63

and concluding that because defendants made several knowing false statements and omissions, this bolstered the conclusion that the inference of fraud raised by plaintiffs was at least as strong as any opposing inference offered by defendants); *see also In re Amylin Pharms., Inc. Sec. Litig.*, No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *5 (S.D. Cal. May 1, 2003) ("There is nothing unlawful about taking a calculated risk.  However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable.").

For all of the reasons set forth above, the Court believes that with the new allegations in the SAC, Plaintiffs have adequately alleged scienter.

### C.    Loss Causation

Finally, Defendants challenge the SAC's loss causation allegations.  (D.I. 62 at 19-20)  Below, the Court will first set out the relevant legal standards that apply to pleading loss causation.  Thereafter, it will examine the merits.

### 1.    Legal Standards Regarding How to Plead Loss Causation

Loss causation "is a causal connection between the material misrepresentation [or omission] and the loss [suffered]."  *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).  The Third Circuit has adopted a "practical approach [to loss causation], in effect applying general causation principles."  *Id.* at 426 (internal quotation marks and citation omitted).  Adequately alleging loss causation requires only pleading a "sufficient causal nexus between the loss and the alleged misrepresentation[.]"  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000).[35]  Thus, Plaintiffs can meet their burden by alleging that they purchased a security at

---

[35]      There is some question as to whether Rule 9(b)'s pleading standards apply to allegations of loss causation, or whether Rule 8(a)'s standards do instead.  *See In re Chemours*

market price that was artificially inflated due to a fraudulent misrepresentation and that the revelation of the truth "proximately caused the decline in the security's value[.]" *Id*. at 184-85.

In general, a "corrective disclosure" (that is, a disclosure that reveals the truth that has been obscured by a defendants' false or misleading statements or omissions) must reveal at least part of the falsity of the alleged misrepresentation, and it must reveal new information to the market. *See, e.g.*, *Paxton v. Provention Bio, Inc.*, Civil Action No. 3:21-cv-11613, 2022 WL 3098236, at *18 (D.N.J. Aug. 4, 2022); *In re Urban Outfitters*, 103. F Supp. 3d at 655; *see also In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("[The disclosure] must at least relate back to the misrepresentation and not to some other negative information about the company."). "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation[.]" *In re Williams*, 558 F.3d at 1140; *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009); *see also In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990(SRC), 2005 WL 2007004, at *20-21 (D.N.J. Aug. 17, 2005). Nor does the disclosure have to be a "single, unitary disclosure[.]" *See In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006). Instead, the truth may be revealed through a series of partial disclosures through which the truth gradually "leaks out." *See, e.g.*, *Dura*, 544 U.S. at 342 (acknowledging that relevant truth can "leak out"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) ("[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation.").

---

*Co. Sec. Litig*., 587 F. Supp. 3d 143, 169 n.7 (D. Del. 2022). The Court need not resolve that issue as the parties' arguments here do not turn on this question.

2.      **Discussion**

To demonstrate loss causation here, the SAC alleges that Defendants artificially inflated the price of GCU stock by falsely stating or omitting:  (1) the truth about the relationship between GCE and GCU; (2) the true risk that the DOE would not approve the transaction; and (3) GCE's financial results and improper accounting treatment of GCU.  (D.I. 60 at ¶ 349) Plaintiffs assert that Defendants' scheme was thereafter exposed to the market through two partial corrective disclosures:  (1) the November 6/7, 2019 announcements, which simply stated that the DOE had denied GCU's request to participate in Title IV as a non-profit and (2) the January 28, 2020 report issued by Citron Research.  (*Id.* at ¶¶ 237-56, 349-52)  According to Plaintiffs, each partial disclosure caused a drop in GCE's stock price.  (*Id.* at ¶ 351)

The Court concludes that Plaintiffs have sufficiently alleged loss causation, for the reasons set out below.

The Court first addresses the November 6/7, 2019 announcements, in which Defendants disclosed only that the DOE had determined that GCU did not qualify as a non-profit (without articulating why the DOE had done so).  (*Id*. at ¶¶ 237-38)  Defendants assert that these announcements cannot act as partial corrective disclosures because they "did not reveal that any of the alleged misstatements were false or misleading[.]"  (D.I. 62 at 19; *see also* D.I. 68 at 14) Instead, Defendants contend that the announcements conveyed nothing more than the fact that the DOE had approved the transaction but had denied GCU's non-profit request; thus, they could not have corrected any allegedly false information.  (*See* D.I. 62 at 19)

At a minimum, the Court concludes that the November 6/7, 2019 announcements can qualify as a corrective disclosure because they revealed at least the falsity of Defendants' prior assertion that any delay in the DOE's approval of GCU's non-profit request had been solely due

66

to DOE "understaff[ing]."  The November 6/7, 2019 announcements could reasonably have conveyed to investors that, in actuality, the DOE's prior delay was due, at least in part, to the fact that the DOE had serious questions on the merits about whether GCU actually qualified as a non-profit—questions that, in turn, ultimately led to the DOE's November 6th decision.  (D.I. 60 at ¶ 245)

Finally, as to the January 28, 2020 Citron Report, Defendants argue that it cannot act as a partial corrective disclosure because "it did not reveal any new information to the market."  (D.I. 62 at 20)  In support, Defendants note that in the fine print on its last page, the report states that "'all information contained herein . . . has been obtained from public sources.'"  (*Id.*; *see also* D.I. 60, ex. B at 50)

Yet while that is so, other evidence indicates at least a dispute of fact on the point.  As Plaintiffs note in their briefing, (D.I. 66 at 25), and as is alleged in their Complaint, (D.I. 60 at ¶ 250), the Citron Report also explains that it is based in part on 870 pages of *previously undisclosed* information that Citron received from a FOIA request.  (*Id.* at ¶¶ 20, 250; *id.*, ex. B at 4)  Additional portions of the Citron Report also support this idea.  In multiple places, the report notes that Citron "supplement[ed]" the DOE Letter or "d[u]g deeper" with the transaction-related documents it received via the FOIA request.  (D.I. 60, ex. B at 5, 8, 47)  Plaintiffs further allege that the report disclosed that, in light of the terms of the MSA, GCE was receiving nearly 100% profit margins from areas of GCU's business for which GCE booked no expenses—i.e., facts that helped demonstrate why Defendants' prior statements about GCU's independence from GCE or GCU's status as a non-profit were not accurate.  (D.I. 66 at 25 (citing D.I. 60 at ¶¶ 250-55))  And these terms of the MSA are alleged not to have otherwise been public.  (D.I. 60 at ¶¶ 250-54; *see also id.*, ex. B at 47 (Citron Report noting that "relevant documents of the

67

transaction between [GCU] and [GCE]" were obtained via its FOIA request))[36]  Thus, the Court

concludes that Plaintiffs have sufficiently asserted, at the motion to dismiss stage, that the Citron

Report acted as a partial corrective disclosure based, in part, on previously undisclosed

information.  *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1202-06 (9th Cir. 2020) (holding that

a plaintiff can establish loss causation by pointing to a corrective disclosure that contained

previously non-public information obtained through a FOIA request).

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends that the Motion be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  Objections, if any, must be filed by **February 27, 2023**.

Responses, if any, must be filed by **March 9, 2023**.  The failure of a party to object to legal

conclusions may result in the loss of the right to de novo review in the district court.  *See*

*Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812

F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

Dated: February 17, 2023

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[36]   Additionally, the SAC alleges that the Citron Report revealed that GCE was able
to hide its expenses on an off-balance sheet entity (i.e., GCU) while recognizing nearly all of
GCU's revenue through credit arrangements that were previously undisclosed prior to the Citron
Report and Citron's FOIA request.  (D.I. 60 at ¶ 252-54; *see also id.*, ex. B at 20)  The
information regarding the credit arrangements, in turn, allegedly revealed the truth about
Defendants misstatements regarding the relationship between GCE and GCU and GCE's
accounting treatment of GCU.  (D.I. 60 at ¶ 255)