## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 1:20-cv-00639-MN |

## DEFENDANTS' OBJECTIONS TO THE REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS

Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Evan N. Glustrom (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
evan.glustrom@alston.com

*Counsel for Defendants*

Dated:  February 27, 2023

## TABLE OF CONTENTS

Preliminary Statement .................................................................................................................... 1

Standard of Review ........................................................................................................................ 1

Objections ...................................................................................................................................... 1

I.      The SAC Fails to Plead a Strong Inference of Scienter. ..................................................... 1

      A.      Plaintiffs Rely on an Illogical Theory That Defendants Believed the Trump Administration's DOE Appointees Were Lawless and Corrupt. ............................ 1

      B.      The SAC's New "Marketing Benefits" Theory Is Not Cogent or Compelling ...................................................................................................................... 4

      C.      The Second R&R Applied the Wrong Legal Test When It Held That Scienter Was Plausibly Alleged Based on Conscious Misbehavior or Recklessness. ................................................................................................... 6

II.     The SAC Fails to Plausibly Allege Falsity. ......................................................................... 7

Conclusion ................................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bartesh v. Cook*,
   941 F. Supp. 2d 501 (D. Del. 2013).................................................................................8

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014)..........................................................................................1

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 2d 404 (D. Del. 2009)..............................................................................10

*Gillis* v. *QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016)............................................................................5

*Gold v. Ford Motor Co.*,
   937 F. Supp. 2d 526 (D. Del. 2013)................................................................................6

*In re GeoPharma, Inc.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006)............................................................................6

*In re Level 3 Communs. Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) .....................................................................................6

*In re PXRE Group, Ltd. Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009)............................................................................7

*Kasilingam v. Tilray, Inc.*,
   No. 20-cv-03459 (PAC), 2021 U.S. Dist. LEXIS 184499
   (S.D.N.Y. Sept. 27, 2021)..............................................................................................2

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ................................................................................5

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
   895 F.3d 933 (7th Cir. 2018) .........................................................................................5

*Sanofi Secs. Litig. v. Meeker*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)..............................................................................9

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)....................................................................................................6, 7

*Winer Fam. Tr. v. Queen*,
   503 F.3d 319 (3d Cir. 2007)...........................................................................................7

*Wyche v. Advanced Drainage Sys.*,
 710 F. App'x 471 (2d Cir. 2017) ......................................................................6

**RULES**

Fed. R. Civ. P. 72....................................................................................................1

SEC Rule 10b-5 .....................................................................................................10

Fed. R. Civ. P. Rule 11(b).......................................................................................4

**STATUTES**

28 U.S.C. § 636(b)(1)(C) .........................................................................................1

15 U.S.C. § 78j(b) ...............................................................................................8, 10

15 U.S.C. § 78t(a) ..................................................................................................10

## CITATION CONVENTIONS

"Defendants":  Defendants Grand Canyon Education, Inc., Brian E. Mueller and Daniel E. Bachus

"DOE":  United States Department of Education

"First R&R":  Report and Recommendation, filed August 9, 2021 (DCKT #50), and adopted by the Court on August 23, 2021 (DCKT #54)

"GCE":  Defendant Grand Canyon Education, Inc.

"GCU" or the "University":  Non-Party Grand Canyon University

"IRS":  Internal Revenue Service

"MSA": The Master Services Agreement executed July 1, 2018

"Plaintiffs":  Fire and Police Pension Association of Colorado, Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust

"SAC":  Plaintiffs' Second Amended Consolidated Complaint for Violations of the Federal Securities Laws, filed January 21, 2022 (DCKT #60)

"Second MTD": Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Second Amended Complaint, filed March 15, 2022 (DCKT #62)

"Second R&R":  Report and Recommendation, filed February 17, 2023 (DCKT #80)

"Title IV":  Title IV of The Higher Education Act of 1965, 20 U.S.C. § 1070, *eq seq.*

"Transaction":  GCE's 2018 sale of the University to a tax-exempt entity via an Asset Purchase Agreement and execution of the MSA

## PRELIMINARY STATEMENT

Plaintiffs attempt to transform a regulatory decision by a federal agency into a securities fraud claim – legal alchemy that would create claims of "securities fraud by hindsight" whenever a regulator makes a decision that a public company did not anticipate.  The Court initially dismissed this case because Plaintiffs' theory of scienter (*i.e.*, intent to defraud shareholders) was "notable for its strangeness," "head-scratching," and, ultimately, did not "make any sense."  (First R&R at 39.)  The Second R&R held that the SAC cured Plaintiffs' deficient pleadings, but this conclusion is not supported by the SAC's factual allegations.  Further, the Second R&R applied the incorrect legal test for determining whether the SAC's allegations plausibly alleged scienter based on "conscious misbehavior" or "recklessness."  Finally, the Second R&R erred when it held the SAC plausibly alleged falsity with particularity. This Court should sustain Defendants' objections.

## STANDARD OF REVIEW

This Court reviews *de novo* the portions of the Second R&R to which Defendants object. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72.

## OBJECTIONS

I.      **The SAC Fails to Plead a Strong Inference of Scienter.**

      A.      **Plaintiffs Rely on an Illogical Theory That Defendants Believed the Trump Administration's DOE Appointees Were Lawless and Corrupt.**

It would be implausible for Plaintiffs to allege that Defendants *knew* the DOE would deny GCU's request for nonprofit status under Title IV, but nevertheless intentionally sought to mislead the market into believing otherwise.  (First R&R at 33-34.).[1]  As such, Plaintiffs do not allege that

---

[1] *See, e.g., City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (dismissing a securities class action and finding it was "improbable" that defendants would have initiated a clinical drug trial "if they thought the drug was a complete failure.").

Defendants *knew* the DOE would deny GCU's request for nonprofit status.  Instead, Plaintiffs allege that Defendants believed it was "possible" the DOE would approve GCU's request for nonprofit status.  (Second R&R at 56 n.27.)  The most reasonable inference to draw from this allegation is that Defendants *genuinely believed* GCU was entitled to nonprofit status under Title IV.[2]  After all, companies normally expect federal agencies to approve requests when they are entitled to that approval, and not for any other reason.  If, however, Defendants genuinely believed that GCU was entitled to nonprofit status, then Plaintiffs have no securities fraud claim, even if Defendants' belief turned out to be incorrect.  *See Kasilingam v. Tilray, Inc.*, No. 20-cv-03459 (PAC), 2021 U.S. Dist. LEXIS 184499, at *33 (S.D.N.Y. Sept. 27, 2021) (dismissing securities claim because "being wrong—even embarrassingly so—is not the same as being dishonest").

Plaintiffs, therefore, ask the Court to infer Defendants *knew* the DOE *should* deny GCU's request but also believed it was "possible" the DOE would nevertheless approve it because Defendants thought that the Trump Administration's appointees at the DOE were corrupt — "the type of people who would have pressured line DOE employees to grant GCU non-profit status, *even though GCU should not have qualified pursuant to DOE regulations*." (Second R&R at 57 n.28.) (emphasis added).  It would be **unprecedented** to hold that scienter can be plausibly alleged based solely on a theory that a public company believed a federal agency was corruptly biased in its favor.  As such, this Court previously rejected Plaintiffs' scienter theory because Plaintiffs

---

[2] That inference is significantly strengthened by the IRS's decision to grant GCU nonprofit status using a legal test that "mirrored in relevant respects" the DOE's test. (First R&R at 44.)  The First R&R correctly found that the IRS's decision supported an inference of non-fraudulent intent. (*Id.* at 44-45.)  The Second R&R, however, reverses course based on arguments the Court previously considered and rejected. (*Compare* First R&R at 44-45 (concluding IRS determination supported inference of non-fraudulent intent despite allegations attacking the rigor of the IRS's review, including that "the IRS reviewed '[n]o documents'") *with* Second R&R at 62-63 (explaining that nearly identical allegations "blunt the impact of the IRS's 2015 or 2018 approval" of GCU's nonprofit status).

failed to plausibly allege why it would "make any sense that [Defendants] thought that these DOE reviewers would wholly vacate their job responsibilities and simply rubber stamp" GCU's supposedly deficient application.  (First R&R at 39.)

The Second R&R, however, held that the SAC cured this pleading deficiency with new allegations that "as of 2017 and 2018, for-profit veterans held a sufficiently significant number of DOE leadership positions."  (Second R&R at 57.)  The Second R&R concluded that this new window-dressing "could allow the reasonable inference that such persons actually could have impacted the Conversion's outcome" and "now it seems plausible that Defendants reasonably thought the Conversion might actually be approved in full (even if, on the merits, it really should not have been)." (*Id.*)  The Second R&R's conclusion is unsupported by the SAC and rooted in implausible conjecture.  The SAC identifies only five persons with experience in the for-profit industry who joined the DOE during the Trump Administration (the "For-Profit Veterans").  (SAC ¶¶ 55-59, 61.)  It is hard to imagine that five persons can reasonably be considered to hold a "significant number" of "leadership positions" in a vast federal agency like the DOE.

The Second R&R further erred in inferring that "For-Profit Veterans" "could have impacted the Conversion's outcome" (*i.e.*, that they were "the type of people who would have pressured line DOE employees to grant GCU non-profit status" in violation of DOE regulations). (*Id.*, 57 n.28.)  The SAC nowhere alleges that the "For-Profit Veterans" actually interfered or attempted to interfere with the DOE staff's review of GCU's request.  Indeed, none of them allegedly worked in the DOE's Office of Federal Student Aid ("FSA"), which reviewed the request.  (*Compare* SAC ¶¶ 55-59, 61 (none of the "For Profit Veterans" worked in the FSA) *with* SAC, Ex. A (DCKT #60-1) (letter from FSA denying GCU's request)).  The SAC also does not allege that the "For-Profit Veterans" made any decisions contrary to federal regulations during

3

their time at DOE.  Finally, the SAC does not allege that Defendants were told that the "For-Profit Veterans" or anyone else at DOE would lawlessly and corruptly approve GCU's non-profit request, or that Defendants even knew the identity of these supposedly critical "For-Profit Veterans" they allegedly relied upon to approve GCU's request in violation of DOE regulations.

Instead, the Second R&R draws an inference that the "For-Profit Veterans" would act lawlessly and corruptly in favor of GCU solely because they previously worked in the for-profit education industry.  (Second R&R at 57.)  That inference, however, is not plausible.  Many judges, for example, previously worked as prosecutors or defense attorneys, but it is not reasonable to infer they will lawlessly and corruptly rule in favor of the government or defendants, respectively. Indeed, the Second R&R's inference runs so contrary to commonplace public-private career overlap that it would need to be supported by the most specific type of factual allegations to be reasonable (never mind cogent and compelling), and those allegations are lacking here.  The Second R&R therefore erred in holding that the SAC cured Plaintiffs' prior deficient pleading.

**B.      The SAC's New "Marketing Benefits" Theory Is Not Cogent or Compelling.**

This Court previously identified an additional basis for rejecting Plaintiffs' scienter theory: Plaintiffs ask the Court "to believe that Defendants' plan for fraud yo-yoed haphazardly during the Class Period."  (First R&R at 41.)  The SAC attempts to cure this pleading deficiency with new allegations that Defendants were consistently motivated throughout the class period to mislead the market because "while the DOE was reviewing [GCU's] non-profit request[], Defendants could and did bring in significant revenues for GCU and GCE—due to the financial terms of the Conversion and by touting GCU as a 'non-profit' institution."  (Second R&R at 58.)[3]

---

[3] Notably, the SAC abandoned Plaintiffs' prior conflicting theory, pleaded subject to Rule 11(b), that the DOE's denial of GCU's request for nonprofit status posed an existential threat to both GCU and GCE.  (Second R&R at 60 n.33.)  The Second R&R noted that "[i]t is somewhat

4

It is black-letter law, however, that Defendants' alleged desire to "bring in significant revenues for GCU and GCE" (*id.*) is the "type of general business motive" that is insufficient to plead scienter. *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 551-52 (D.N.J. 2010). If, as the Second R&R erroneously held, allegations regarding "a generalized motive common to all corporate executives" were all that was needed to plead scienter, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 940-41 (7th Cir. 2018) (quotations and citation omitted).

In addition, the Second R&R erred in disregarding the key logical flaw in Plaintiffs' new "marketing benefits" theory: "[b]y its nature, [Defendants'] purported scheme could not have continued in perpetuity, [and] . . . would be revealed, in relatively short order," when the DOE denied GCU's nonprofit request. *Gillis* v. *QRX Pharma Ltd*., 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016). For Defendants, "this development would likely have generated recriminations—or worse," and "[a]bsent allegations of insider sales during the period of stock-price inflation" (*there are none here*), "[c]ourts regularly refuse to infer scienter . . . when confronted with [such] illogical allegations." *Id.* at 600-01. The Second R&R, nevertheless, found Plaintiffs' new "marketing benefits" theory compelling because "it is alleged that these marketing advantages [ultimately] lasted for much more than a 'few months'—that is, that they lasted from mid-2018 through to the DOE's decision in November 2019." (Second R&R at 59 n.30.)[4] The Second R&R, however,

---

concerning that the facts about this point seem to have differed from pleading to pleading," but nevertheless allowed Plaintiffs to reverse themselves on this critical factual point in the SAC. (*Id.*)

[4] The Second R&R alternatively rejects Defendants' argument because "Plaintiffs are not alleging that Defendants *knew* as of May 2018 that the DOE would not approve GCU's non-profit request. Rather, Plaintiffs are alleging that the May 2018 interrogatories *heightened the risk* that the DOE would not approve." (Second R&R at 59 n.30.) Even if Defendants believed only that it was

5

relies only on hindsight and misses the key point:  Defendants did not and could not have known

the alleged "marketing benefits" would last that long, and, in fact, the DOE could have issued its

decision at any time.  Plaintiffs' new "marketing benefits" theory is illogical because it asks the

Court to infer Defendants knowingly embarked on a fraudulent scheme that could have lasted mere

weeks and caused only harmful recriminations, given the absence of any insider sales.[5]

**C.      The Second R&R Applied the Wrong Legal Test When It Held That Scienter
Was Plausibly Alleged Based on Conscious Misbehavior or Recklessness.**

"A strong inference of fraudulent intent or recklessness arises when it is 'more than merely

plausible or reasonable – it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent.'"  *Gold v. Ford Motor Co.*, 937 F. Supp. 2d 526, 531-32 (D. Del. 2013)

(quoting *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).[6]  The Second

R&R, however, did not consider whether the SAC's "conscious misbehavior" or "recklessness"

allegations were "cogent and at least as compelling as an opposing inference of nonfraudulent

intent."  *Id.*  The Second R&R's failure to apply the correct test is a plain legal error.[7]

Moreover, under the correct legal standard, the SAC's allegations do not support an

---

unlikely that the DOE would approve GCU's request, it remains illogical to allege that Defendants
pursued a fraud scheme that they thought was likely to be revealed in short order.

[5] Moreover, if, as the SAC alleges, Defendants sought to mislead investors to take advantage of
"marketing benefits," Defendants would have made every effort to delay the DOE's decision.  The
SAC, however, alleges that Defendants did just the opposite and *voluntarily* sought the DOE's
abridged pre-acquisition review of the Transaction and otherwise promptly responded to the
DOE's information requests.  (SAC ¶¶ 86, 107, 173, 249.)

[6] *See also In re Level 3 Communs. Sec. Litig.*, 667 F.3d 1331, 1343 (10th Cir. 2012) ("[W]e will
draw a 'strong inference' of recklessness only if, based on plaintiff's allegations, 'a reasonable
person would deem the inference of scienter cogent and at least as compelling as any opposing
inference one could draw from the facts alleged.'") (citation omitted); *Wyche v. Advanced
Drainage Sys.*, 710 F. App'x 471, 473 (2d Cir. 2017) (same).

[7] For the reasons explained above, the SAC's theory of scienter is illogical, and "[c]ourts often
refuse to infer scienter, *even on a recklessness theory*, when confronted with illogical allegations."
*In re GeoPharma, Inc.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006) (emphasis added).  Indeed,
the Court previously dismissed this case because Plaintiffs' scienter allegations were illogical,
without analyzing whether Plaintiffs plausibly alleged recklessness allegations.

inference of "conscious misbehavior" or "recklessness" that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. For the reasons explained above, the most cogent and compelling inference is that Defendants genuinely believed GCU was entitled to nonprofit status under Title IV. As such, "[i]t follows naturally" that "the more compelling inference [is] that, rather than knowing or being reckless in not knowing" that the alleged misstatements were false or misleading, "Defendants issued the challenged statements in good faith, but based upon ultimately erroneous" belief about GCU's entitlement to nonprofit status. *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009).

## II.    The SAC Fails to Plausibly Allege Falsity.

Plaintiffs further failed to meet their burden of pleading with particularity facts to show that each alleged statement was materially false and misleading when made, and the Second R&R erred in holding otherwise. *See, e.g., Winer Fam. Tr. v. Queen,* 503 F.3d 319, 326 (3d Cir. 2007).

First, all facts purportedly undermining Mueller's statements comparing the *structure* of the Transaction with the *structure* of the Purdue-Kaplan transaction were disclosed, including:

- The scope of services to be provided under the MSA.[8]

- GCE and GCU's 60%/40% revenue share agreement.[9]

- The terms of the parties' Asset Purchase Agreement and the Senior Secured Note, pursuant to which GCU purchased assets including the 275-acre campus. The DOE unilaterally relied upon GCU's payments under the note to determine, without any analysis or prior indication, that GCE should be considered to receive approximately

---

[8] *See, e.g.,* Second MTD Ex. 5 (July 2, 2018 8-K) (DCKT 63-5) at 4 (describing in detail the services provided under the MSA); Defendants' Letter to Judge Burke, May 28, 2021 Ex. 5 (Nov. 8, 2018 10-Q, Ex. 10.8) (DCKT 48-5) at 45-57 (publicly-filed MSA describing the services provided). To the extent Plaintiffs assert that each specific subpart of the MSA was not publicly disclosed, Plaintiffs fail to allege that any reasonable investor would find the redacted information material.

[9] Second MTD Ex. 5 (DCKT 63-5) at 3.

95% of the GCU's revenue rather than the 60% revenue share disclosed to investors (a determination which Defendants vehemently dispute).[10]

- The termination and non-renewal fees set forth in the MSA.[11]

- Mr. Mueller's dual employment at GCE and GCU.[12]

It is axiomatic that there can be "no Section 10(b) claim" where "the alleged omissions are contradicted by the company's public disclosures." *Bartesh v. Cook*, 941 F. Supp. 2d 501 (D. Del. 2013). Plaintiffs' claim that Defendants made materially false and misleading comparisons to the structure of the Purdue-Kaplan transaction should be dismissed accordingly.

The Second R&R next erroneously found that (a) it was false and misleading for Defendants to state, based on their interactions with the DOE prior to July 2018, that "any regulatory limitations imposed [by the DOE] could be managed" and (b) Mr. Mueller "blatant[ly] lie[d]" when quoted in a news article that the DOE's delay in its pre-acquisition review was due to understaffing, without also stating that two months prior GCU had received an initial request for information from the DOE. (Second R&R at 39.) Critically, however, the DOE approved the change-in-control Transaction ***without imposing any regulatory limitations***. (SAC Ex. A at 16-

---

[10] *See* SAC Ex. A at 14 (DOE letter finding that "*When payments on the Senior Secured Note are included in the analysis,* GCE will be receiving approximately 95% of [GCU's] revenue.") (emphasis added); *see also* Second MTD Ex. 5 (DCKT 63-5) at 3 (describing the terms of the Asset Purchase Agreement and the note). The Second R&R's wholesale and repeated adoption of the 95% revenue share allegation is troubling, in that, in addition to injecting improper hindsight bias, it repeatedly disregards that even accepting the DOE's unsupported analysis, the relevant inputs were fully disclosed.

[11] *See, e.g.,* Second MTD Ex. 5 (DCKT 63-5) at 3 (describing the termination and non-renewal fees).

[12] Plaintiffs additionally allege that the respective transactions were distinguishable because Kaplan and Purdue shared no "overlapping executives or directors." Plaintiffs have never disputed, however, that GCU maintains an independent board or alleged that any executive of GCE is also an executive of GCU, aside from Mr. Mueller.

8

17.)[13]  Defendants' statements regarding "regulatory limitations" were thus neither false nor misleading.  Further, Plaintiffs alleged no facts to show that Mr. Mueller's statement that the DOE was "very understaffed" was a "blatant lie," including because (a) Mr. Mueller is not alleged to have attributed his statement to any communications with the agency (nor would a reasonable investor presume that agency staff would disclose such a fact to its regulated entities); and (b) GCU's receipt of an *initial* request for information *five months after* it submitted its voluntary request for pre-acquisition review only supports Mr. Mueller's belief that the DOE was understaffed.  *See, e.g.,* SAC ¶ 86 (the "DOE's guidelines state that [pre-acquisition reviews] take at least 45 days to *complete.*") (emphasis added).  Finally, Plaintiffs failed to plead with particularity that the alleged omission of the May 2018 requests for information would be *material* to a reasonable investor, and such interim regulatory inquiries are not.  *See, e.g., Sanofi Secs. Litig. v. Meeker*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) (collecting cases rejecting claims of "material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review.").

Finally, the Second R&R erred in allowing Plaintiffs to rely solely on the DOE's determination that GCU did not qualify for nonprofit participation in Title IV to allege that Defendants made materially false and misleading statements regarding the Company's financials

---

[13] Defendants stated that "GCU voluntarily filed a request for pre-acquisition review with [the DOE] seeking [its] review of the proposed transaction and input as to any regulatory limitations, *such as a letter of credit or growth restrictions,* that [the DOE] may choose to impose on [GCU] following the closing of the transaction … [T]he Board of directors of the Company and the board of trustees of [GCU] concluded that … *any regulatory limitations imposed [by the DOE] could be managed.*" (SAC ¶ 279.). A plain reading of the statement demonstrates that "regulatory limitations" refers to items "such as a letter of credit or growth restrictions" which could be imposed in any change-in-control transaction, and *not* the rules applicable to for-profit institutions. Even accepting Plaintiffs' strained reading of the phrase "regulatory limitations," however, there is no allegation that GCU has ever failed to comply with the for-profit rules.

and its compliance with GAAP.  (*See, e.g.*, SAC at p. 77 (alleging that the Company was required to consolidate GCU's results into its financial statements because GCU was not a "bona fide non-profit," *as determined solely by the DOE.*))  The DOE's decision in that respect was based on, *e.g.*, the scope of services supplied under the MSA and the number of GCE employees who allegedly assisted in "developing [GCU's] strategic vision."  (SAC ¶¶ 229, 233.)[14]   Plaintiffs have not and could not allege that the DOE's analysis is equivalent to – or even relevant to – the applicable accounting standards under GAAP.  In any event, Plaintiffs and the DOE recognize, as they must, that GCU remains a tax-exempt organization and a distinct corporate entity.  *See, e.g.,* SAC Ex. A at 17 (DOE letter noting the agency "does not take a position with respect to [GCU's] non-profit 501(c)(3) status with the [IRS]"); *see also* Second R&R at 36.  Plaintiffs' claims that Defendants filed false and misleading financial statements and misrepresented the Company's compliance with GAAP should be dismissed accordingly.

Finally, Plaintiffs' claims that Defendants made false and misleading statements regarding GCE's post-Transaction relationship with GCU and GCU's nonprofit status should be dismissed for the reasons set forth in the Second MTD at pp.15-17, and above.

## CONCLUSION

The SAC fails to plausibly allege scienter or falsity and should be dismissed.[15]

---

[14] To be sure, Plaintiffs again relied upon an alleged 95%/5% revenue share in support of their GAAP claims.  That alleged revenue share figure, however, was generated and adopted *solely* by the DOE with no application of any accounting principles (or any other analysis).  Once again, the Court erred in its wholesale adoption of that figure to hold that Defendants knowingly issued materially false and misleading financial statements. *See* Second R&R at 44.

[15] Having failed to state a claim under Section 10(b) of the Securities Exchange Act of 1934 or SEC Rule 10b-5 thereunder, the SAC's Section 20(a) claims also fail, as a matter of law.  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 428 (D. Del. 2009).

Respectfully submitted this 27th day of February, 2023.

/s/  Ronald N. Brown, III
Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

John L. Latham (*pro hac vice*)
Cara M. Peterman (*pro hac vice*)
Timothy J. Fitzmaurice (*pro hac vice*)
Evan N. Glustrom (*pro hac vice*)
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
john.latham@alston.com
cara.peterman@alston.com
tim.fitzmaurice@alston.com
evan.glustrom@alston.com

*Counsel for Defendants*

11

## CERTIFICATION

Pursuant to the Standing Order for Objections Filed Under Fed. R. Civ. P. 72, Defendants hereby certify that the foregoing Objections do not raise new legal or factual arguments. In addressing the Court's Report and Recommendation, the Objections focus on the aspects of the SAC and Defendants' prior briefing upon which the Court relied in recommending that Defendants' Second Motion to Dismiss be denied.

**DLA PIPER LLP (US)**

*/s/ Ronald N. Brown, III*
Ronald N. Brown, III (DE Bar No. 4831)
Peter H. Kyle (DE Bar No. 5918)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
ronald.brown@dlapiper.com
peter.kyle@dlapiper.com

12