# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 20-639-MN-CJB<br><br>Judge Maryellen Noreika<br><br>**ORAL ARGUMENT REQUESTED**<br><br>FILED ON: January 5, 2024<br><br>**PUBLIC VERSION Filed January 12, 2024** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601

and

Hannah G. Ross
Katherine M. Sinderson (*pro hac vice*)
Robert F. Kravetz (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
Sarah Schmidt (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman
Chad A. Carder (*pro hac vice*)
Jordan R. Laporta
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201

*Additional Counsel for Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust*

## TABLE OF CONTENTS

**Page**

GLOSSARY .............................................................................................................. vii

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ..................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 2

STATEMENT OF FACTS ............................................................................................. 3

    A.    Defendants Forge a Plan to Evade the Challenges Faced by For-Profit Institutions by Converting GCU into a "Non-Profit" ............................................. 3

    B.    Defendants Mislead the Market Concerning the Nature of the Transaction, Relationship Between GCE and GCU, and Likelihood of DOE Approval ............ 4

ARGUMENT ............................................................................................................. 7

I.    THE PROPOSED CLASS SATISFIES RULE 23(a) .................................................. 7

    A.    The Proposed Class Is So Numerous That Joinder Is Impracticable ..................... 7

    B.    Multiple Questions of Law and Fact Are Common to the Class ........................... 8

    C.    Lead Plaintiffs' Claims Are Typical ............................................................... 9

    D.    Lead Plaintiffs Will Fairly and Adequately Protect the Class's Interests ............. 10

II.    THE PROPOSED CLASS SATISFIES RULE 23(b)(3) .............................................. 11

    A.    Common Questions of Law and Fact Predominate ............................................ 11

    B.    Reliance Is a Common Issue Based on the "Fraud-on-the-Market" Presumption ............................................................................................... 12

        a)    First *Cammer* Factor: High Average Trading Volume ............................. 14

        b)    Second *Cammer* Factor: Securities Analyst Coverage ............................ 14

        c)    Third *Cammer* Factor: Listing and Market Makers ................................ 15

        d)    Fourth *Cammer* Factor: Eligibility to File Form S-3 .............................. 16

        e)    Fifth *Cammer* Factor: The Price of GCE's Common Stock Reacted Swiftly to Company-Specific News ........................................................ 16

        f)    Other Factors Also Support Efficiency ................................................... 18

i

C.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action ...................................................... 18

III.    BLB&G AND BRB SHOULD BE APPOINTED CLASS COUNSEL........................... 19

CONCLUSION.................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advance Auto Parts, Inc. Sec. Litig.*,
    2020 WL 6544637 (D. Del. Nov. 6, 2020) ........................................................13, 18

*Allegheny Cnty. Emps. Ret. Sys. v. Energy Transfer LP*,
    623 F. Supp. 3d 470 (E.D. Pa. 2022) ..............................................................11

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..........................................................................................11

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013).......................................................................................7, 12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................................................12, 13

*Bing Li v. Aeterna Zentaris, Inc.*,
    324 F.R.D. 331 (D.N.J. 2018).............................................................................8

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ............................................................... passim

*In re Celgene Corp. Sec. Litig.*,
    2020 WL 8870665 (D.N.J. Nov. 29, 2020) ........................................................18

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)..............................................................................10

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*,
    2015 WL 5097883 (D.N.J. Aug. 31, 2015) .......................................................16

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) ...........................................................................7

*Dewey v. Volkswagen Aktiengesellschaft*,
    681 F.3d 170 (3d Cir. 2012)...............................................................................10

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011)...............................................................................13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).........................................................................................12

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
    2023 WL 2072227 (D. Del. Feb. 17, 2023)..........................................................5

iii

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................................... 13

*In re Heckmann Corp. Sec. Litig.*,
  2013 WL 2456104 (D. Del. June 6, 2013) ............................................................................. 19

*Hurwitz v. LRR Energy L.P.*,
  2018 WL 6804481 (D. Del. Jan. 2, 2018) ............................................................................... 8

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001): (1) ............................................................................. 13, 16

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  2020 WL 5026553 (D. Del. Aug. 25, 2020) ......................................................................... 18

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) .................................................................................................... 8

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................................................................ 9

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
  295 F.3d 380 (3d Cir. 2002) .................................................................................................... 7

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
  2013 WL 396117 (D.N.J. Jan. 30, 2013) ............................................................................. 10

*In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*,
  2012 WL 4482041 (D.N.J. Sept. 25, 2012) .............................................................. 14, 15, 16

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016) .................................................................................................... 7

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015) .................................................................................................. 11

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) .................................................................................................. 10

*In re NIO, Inc. Sec. Litig.*,
  2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023) ........................................................................ 18

*Norman v. Trans Union, LLC*,
  479 F. Supp. 3d 98 (E.D. Pa. 2020) ........................................................................................ 7

*OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*,
  63 F. Supp. 3d 394 (D. Del. 2014) .......................................................................................... 9

*Pelletier v. Endo Int'l PLC*,
 338 F.R.D. 446 (E.D. Pa. 2021)...................................................................................15

*In re Pharmaprint, Inc. Sec. Litig.*,
 2002 WL 31056813 (D.N.J. Apr. 17, 2002) ...........................................................12

*Pope v. Navient Corp.*,
 2021 WL 926611 (D.N.J. Mar. 11, 2021)...........................................................8, 14

*In re Res. Am. Sec. Litig.*,
 202 F.R.D. 177 (E.D. Pa. 2001)...............................................................................19

*Roofer's Pension Fund v. Papa*,
 333 F.R.D. 66 (D.N.J. 2019) ........................................................................... passim

*In re Schering Plough Corp. ERISA Litig.*,
 589 F.3d 585 (3d Cir. 2009)......................................................................................9

*Stewart v. Abraham*,
 275 F.3d 220 (3d Cir. 2001).......................................................................................9

*Sullivan v. DB Investments, Inc.*,
 667 F.3d 273 (3d Cir. 2011).......................................................................................9

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
 546 F.3d 196 (2d Cir. 2008)...............................................................................16, 17

*In re Tyson Foods, Inc.*,
 2003 WL 22316548 (D. Del. Oct. 6, 2003) .............................................................11

*United States v. Schiff*,
 602 F.3d 152 (3d Cir. 2010)......................................................................................16

*In re Vicuron Pharms., Inc. Sec. Litig.*,
 233 F.R.D. 421 (E.D. Pa. 2006)..................................................................................8

*W. Palm Beach Police Pension Fund v. DCF Glob. Corp.*,
 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ......................................................13, 16

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)....................................................................................................8

*In re Wilmington Trust Sec. Litig.*,
 310 F.R.D. 243 (D. Del. 2015) .................................................................................12

*In re Winstar Commc'ns Sec. Litig.*,
 290 F.R.D. 437 (S.D.N.Y. 2013) ..............................................................................14

**STATUTES & RULES**

17 C.F.R. § 239.13 ..............................................................................................................16

Fed. R. Civ. P. 23.......................................................................................................... passim

Securities Exchange Act of 1934 (15 U.S.C. § 78)
    Rule 10b-5....................................................................................................................1
    Section 10(b)................................................................................................................1
    Section 20(a) ...............................................................................................................1

**OTHER AUTHORITIES**

Report on Market Efficiency by Dr. Matthew Cain, Ph.D ..................................................... passim

## GLOSSARY

| TERM | MEANING |
|---|---|
| **Bachus** | Defendant Daniel E. Bachus, Chief Financial Officer of GCE |
| **BLB&G** | Lead Counsel Bernstein Litowitz Berger & Grossman LLP |
| **BRB** | Lead Counsel Barrack, Rodos & Bacine |
| **Class** | All persons who purchased the common stock of GCE between January 5, 2018 and January 27, 2020, inclusive, and were injured thereby |
| **Colorado FPPA** | Lead Plaintiff Fire and Police Pension Association of Colorado |
| **Complaint** | The Second Amended Consolidated Complaint for Violations of the Federal Securities Laws (D.I. 60) filed on January 21, 2022, which is the operative complaint in this action |
| **Conversion** | The transaction whereby GCU was converted into a purported non-profit |
| **Defendants** | Collectively, GCE, Mueller and Bachus |
| **DOE** | United States Department of Education |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **GAAP** | Generally Accepted Accounting Principles |
| **GCE** | Defendant Grand Canyon Education, Inc. |
| **GCU** | Grand Canyon University |
| **HLC** | Higher Learning Commission |
| **Lead Plaintiffs** | Collectively, Colorado FPPA, Oakland County ERS, and Oakland County VEBA |
| **Mueller** | Defendant Brian E. Mueller, Chief Executive Officer and Chairman of GCE, and President of GCU |
| **Oakland County** | Collectively, Lead Plaintiffs Oakland County ERS and Oakland County VEBA |
| **Oakland County ERS** | Lead Plaintiff Oakland County Employees' Retirement System |
| **Oakland County VEBA** | Lead Plaintiff Oakland County Voluntary Employees' Beneficiary Association Trust |
| **SEC** | United States Securities and Exchange Commission |

Lead Plaintiffs submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), to certify this case (the "Action") as a class action, to appoint Lead Plaintiffs as Class Representatives, and to appoint BLB&G and BRB as Class Counsel.[1]

## **STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS**

This class action is brought under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, and arises from Defendants' class-wide misrepresentations to investors concerning the conversion of for-profit GCU into a purportedly independent, non-profit university. Defendants mischaracterized GCU as independent from GCE, failed to disclose the significant risk and material facts underlying that risk that the DOE would deny the conversion application, drew false comparisons to other transactions, and failed to apply correct accounting treatment of GCU.

On February 17, 2023, Magistrate Judge Burke recommended denying Defendants' Motion to Dismiss the Complaint in its entirety., D.I. 80. On March 28, 2023, District Judge Noreika fully adopted Judge Burke's Report and Recommendation, sustaining all claims. Docket Entry dated March 28, 2023.  Both sides have served and responded to discovery requests, including document requests, interrogatories, and requests for admission.

---

[1] References to "Ex. __" are to the accompanying Declaration of Katherine M. Sinderson and Jeffrey W. Golan in Support of Lead Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel. References to "¶__" are to the operative Second Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"), D.I. 60. References to "Cain Rpt." and "Cain Ex." are to the accompanying Report on Market Efficiency by Dr. Matthew Cain, Ph.D, along with its exhibits, filed contemporaneously herewith as Exhibit 7. Unless otherwise indicated, all emphasis is added and all internal quotations and citations are omitted.  Other abbreviations are identified in the Glossary, above.

Pursuant to the Court-ordered schedule, Lead Plaintiffs now move for certification of the following Class:

> All persons who purchased GCE's common stock between January 5, 2018 and January 27, 2020, inclusive, and were injured thereby (excluding Defendants, directors and officers of GCE, and their families and affiliates).

Numerous courts—including the Supreme Court, the Third Circuit, and courts in this District—recognize that actions under the federal securities laws are ideally suited for class treatment under Federal Rule 23. This Action is no different. Here, numerosity, commonality, predominance, and superiority are satisfied because the proposed Class is comprised of thousands of investors whose claims involve multiple common questions capable of class-wide proof, including whether Defendants made class-wide misstatements and omissions. Typicality and adequacy are met because Lead Plaintiffs: (i) assert the same claims based on the same misconduct as other class members; and (ii) are institutional investors—exactly the type of investors that Congress intended to lead securities class actions—with no conflicts with absent class members.

## SUMMARY OF ARGUMENT

1.      This federal securities action is ideally suited for class treatment. *See infra* at Section I.

2.      The Class satisfies Rule 23(a) because: (i) Class members are so numerous that joinder is impracticable; (ii) there are multiple common questions of law and fact; (iii) Lead Plaintiffs' claims are typical of Class members' claims; and (iv) Lead Plaintiffs will fairly and adequately protect the interests of the Class. *See infra* at Sections I.A-D.

3.      The Class satisfies Federal Rule 23(b)(3) because: (i) common issues predominate over individual ones; and (ii) a class action is the superior method of adjudication. *See infra* at Section II.A-C.

2

4.      The Class is ascertainable because membership is based on objective criteria, *i.e.,* the dates that investors purchased GCE's publicly traded stock.

5.      BLB&G and BRB should be appointed as Class Counsel because they are skilled in securities litigation and have ably and vigorously prosecuted this action to date. *See infra* at III.

## STATEMENT OF FACTS

This securities class action arises from Defendants' class-wide misrepresentations to investors concerning their ill-fated attempt to convert for-profit GCU into a DOE-approved non-profit university (the "Conversion"). Defendants misled investors throughout the Class Period by claiming that GCE and GCU would be independent after the Conversion, that the Conversion was nearly identical to other DOE-approved transactions, that DOE approval was delayed only by understaffing, that "any regulatory limitations imposed by [the DOE] could be managed," and that GCU received proper accounting treatment under GAAP. ¶¶265-318.

### A.      Defendants Forge a Plan to Evade the Challenges Faced by For-Profit Institutions by Converting GCU into a "Non-Profit"

Over a decade ago, the for-profit education industry conceived of a mechanism to avoid the substantial reputational and regulatory stigma under which such institutions operated: nonprofit "conversions," whereby a for-profit entity would be spun off into a new nonprofit university, and the remaining for-profit entity would provide services to the university for a fee. Defendants launched their first conversion attempt in 2014, which GCU's accreditor, HLC, rejected in January 2016. ¶45. Following the election in November 2016 of President Trump, Defendants decided to seek HLC and DOE approval for a materially similar transaction.

On January 5, 2018, Defendants announced that they would be moving forward with another conversion attempt. ¶¶4, 40 79. Defendants submitted a request to the DOE for pre-acquisition review of GCU's nonprofit status and for approval of the conversion on January 18,

3

2018. ¶¶86, 107, 279. Defendants announced that DOE approval would be forthcoming by May 2018. ¶¶85-86, 118-21.

The DOE did not provide the requested approval in this time frame. Instead, the DOE ultimately rejected GCU's nonprofit application on November 6, 2019.

**B.    Defendants Mislead the Market Concerning the Nature of the Transaction, Relationship Between GCE and GCU, and Likelihood of DOE Approval**

Following the July 1, 2018 close of the Conversion, Defendants immediately began zealously marketing GCU as a "non-profit university,"[2] even though the DOE's review was still pending. ¶¶153, 157-65. Defendants repeatedly and knowingly misrepresented the structure of the Conversion, its similarity to other DOE-approved conversions, and the nature of the DOE's review of the transaction. ¶¶11-14, 21, 96-113. Analysts were comforted by Defendants' misleading portrayal of the Conversion and, as a result, considered DOE approval to be "highly likely" and "largely procedural." ¶¶111, 127.   Defendants' public misstatements fell into four related categories:

First, Defendants consistently represented to investors that based on engagement with the DOE, approval was imminent, that "any regulatory limitations imposed by [the DOE] could be managed," and that any delay was simply due to "understaffing." ¶¶13, 118, 121, 134-35, 137. However, Defendants failed to disclose that, as GCU later admitted in post-Class Period litigation against the DOE, from January 2018-July 2018 (when GCE/GCU preemptively closed the

---

[2] On December 27, 2023, the Federal Trade Commission ("FTC") filed suit against Defendants GCE and Mueller, as well as GCU, alleging that, beginning in July 2018, they "deceptively advertised Grand Canyon University as a nonprofit to prospective students" despite "operating [GCU] for the profit of GCE and its investors." Ex. 3 at 4.

The FTC further alleges that notwithstanding the incorporation of GCU as a nonprofit, GCU "was, in fact, organized by GCE and Defendant Mueller to advance GCE's for-profit business and advance Defendant Mueller's interests as officer, chairman, director, stockholder and promoter of investment in GCE." *Id.* at 6.

4

transaction to spin off GCU), the "only official communication that GCU received" from the DOE was a lengthy series of interrogatories—digging into the financial details of the transaction and governance of the resulting entities—sent by the DOE in May 2018. ¶336; *see also In re Grand Canyon Educ., Inc. Sec. Litig.,* 2023 WL 2072227, at *20 (D. Del. Feb. 17, 2023) (finding that the May 2018 interrogatories showed the transaction "was in real doubt"). The limited "unofficial" correspondence with the DOE clearly stated that the delay was due to the fact that the Conversion was "a complex transaction that is taking significant effort to review and analyze – as it is ***unlike any prior non-profit conversion***." Ex. 4, GCE-0004492 at -4493.

Second, Defendants touted the independence of GCU following the Conversion, claiming that GCE would "no longer . . . operate" GCU, which would be a "separate" and independently managed non-profit, and that, aside from Mueller, "no other employee of [] GCU or GCE has a ***dual role*** in both organizations." ¶¶11, 129, 139, 176. However, the DOE determined, based on confidential documents not provided to investors or the other entities that reviewed the Conversion, that nearly 75% of the executive leadership team responsible for managing and overseeing GCU, were actually employed by GCE post-conversion. ¶¶21, 173-75, 177, 274.

Third, Defendants consistently and publicly misrepresented that the proposed Conversion was similar to, if not an "exact replica" of other service arrangements, including the DOE-approved Purdue-Kaplan deal. ¶¶8, 100-01, 104, 138, 182. In reality, there were multiple key differences between the proposed Conversion and other transactions, including the amount of GCU's revenue (95%) flowing to GCE (¶¶188, 195-96), the draconian termination provisions (¶¶197-99), and the fact that GCE directly employed the majority of GCU's management (¶¶184, 187). Indeed, as noted above, before the Conversion closed, the DOE had already informed GCE's counsel that the Conversion was "***unlike any prior nonprofit conversion***." Ex. 4, GCE-0004492 at -4493; *see also*

5

Ex. 5, ███████████████████████████████████████████████████████

███████████████████████████████████

Finally, Defendants failed to apply accurate accounting treatment for GCU under GAAP, falsely claiming that it fell within a "not-for-profit entity carve out" of accounting rules that would otherwise require GCU's finances to be consolidated with GCE's, and that it was not a "related party" to the company. ¶¶170, 213-35. In doing so, Defendants avoided reporting the full financial position of the entities together and inflated GCE's financial results. ¶¶170, 213.

The truth was not revealed to the market until November 6, 2019, when the DOE issued its decision denying GCU's request for treatment as a non-profit, finding the Conversion failed "*the most basic tenet of non-profit status*" by operating GCU for the primary benefit of GCE and its shareholders, with GCU trapped as a "captive client." ¶¶3, 9, 18-19, 173, 249.  In response, despite having posted better-than-expected results, GCE's stock price plummeted, falling $3.80 per share, a decline of over 4%. ¶¶239-40.

Then, on January 28, 2020, Citron published a nearly 50-page report titled "The Educational Enron: The Multiple Smoking Guns that Prove LOPE is Using a Captive Subsidiary to Manipulate Earnings," which was based, in part, on 870 pages of non-public documentation Citron received in response to a FOIA request. ¶¶20, 250-54. Citron concluded that GCE was using GCU as a "captive non-reporting subsidiary" to "dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price." ¶¶20, 250. GCE's stock price declined just over 8% as a result of the report, falling $7.43 per share to close at $84.07 on January 28, 2020. ¶¶255-56.  In addition to the material stock price reaction, discovery has shown that ███████████████████████████████████████████

████████████████████████████████████████████████████████████

6

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

On August 13, 2020, the Court appointed Colorado FPPA and Oakland County as Lead Plaintiffs and approved the selection of BLB&G and BRB as Lead Counsel. D.I. 28. Lead Plaintiffs are large, sophisticated institutional investors that are collectively responsible for overseeing nearly $8 billion in assets. D.I. 15 at 15. Lead Plaintiffs purchased 48,311 shares of Grand Canyon common stock at artificially inflated prices during the Class Period and suffered losses of over $1.3 million as a result of the false and misleading statements described herein. D.I. 13 & 15.

## ARGUMENT

In the Third Circuit, class treatment of securities actions is "particularly appropriate and desirable." *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 384 (3d Cir. 2002); *see also In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003) ("Class actions are favored in securities fraud cases in this Circuit."). This Action is no different. As set forth below, the Action readily satisfies the criteria set forth in Federal Rule 23. Nothing more is required for certification to be granted.

## I.    THE PROPOSED CLASS SATISFIES RULE 23(a)

Federal Rule 23(a) states four prerequisites for certification: numerosity, commonality, typicality, and adequacy. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013). The proposed Class readily satisfies each.

### A.    The Proposed Class Is So Numerous That Joinder Is Impracticable

The numerosity requirement is met here. "[I]f the potential number of plaintiffs is more than forty, the first prong of Rule 23(a) has been met." *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 135 (E.D. Pa. 2020) (alteration in original) (quoting *In re Modafinil Antitrust Litig.*, 837

7

F.3d 238, 249 (3d Cir. 2016)). GCE had over 47 million shares of common stock outstanding during the Class Period. Cain Rpt. ¶70, Cain Ex. 10; *see also In re Vicuron Pharms., Inc. Sec. Litig.*, 233 F.R.D. 421, 425 (E.D. Pa. 2006) (numerosity met where 40 million shares were outstanding during class period, and stock traded on the NASDAQ); *Hurwitz v. LRR Energy L.P.*, 2018 WL 6804481, at *1 (D. Del. Jan. 2, 2018) (numerosity met where 15.4 million units issued). Further, GCE's stock traded on the NASDAQ, and "courts have recognized a presumption that the numerosity requirement is satisfied when a class action involves a nationally traded security." *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. May 30, 2019).

### B.      Multiple Questions of Law and Fact Are Common to the Class

Commonality "does not require identical claims or facts among class members," *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597-98 (3d Cir. 2012), and "even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "Courts in this Circuit…have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74-75 (D.N.J. 2019) (alterations omitted). Here, common questions include, among others: (i) whether Defendants violated the federal securities laws; (ii) whether Defendants' public statements during the Class Period misrepresented or omitted material facts needed to make the statements not misleading under the circumstances; (iii) whether Defendants acted with scienter in issuing false and misleading statements, knowingly or recklessly disregarding that their statements and omissions were false; (iv) whether the price of GCE common stock was artificially inflated by Defendants' statements; and (v) whether Defendants' conduct caused Class members to sustain damages. *See Pope v. Navient Corp.*, 2021 WL 926611, at *6 (D.N.J. Mar. 11, 2021). These common questions will

"generate common answers 'apt to drive the resolution of the litigation.'" *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 299 (3d Cir. 2011). Thus, this element is met.

### C.   Lead Plaintiffs' Claims Are Typical

"The typicality inquiry centers on whether the interests of the named plaintiffs align with the interests of the absent members." *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001). The Third Circuit has instructed that the "proper consideration in assessing typicality" includes:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009). "Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009).

Lead Plaintiffs' claims are typical of, if not virtually identical to, the claims of other members of the Class. The same course of conduct, *i.e.*, Defendants' series of misstatements and omissions to investors, gives rise to the claims of Lead Plaintiffs and other investors in GCE's common stock. Likewise, Lead Plaintiffs and the Class members share the same legal theory— namely, that Defendants' misstatements and omissions violated the Exchange Act. *See OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, 63 F. Supp. 3d 394, 401 (D. Del. 2014) (finding plaintiffs' Exchange Act claims "facially typical of the claims of the proposed class" where they "purchased shares of Cooper Tire stock on the open market," "purchased the shares at an inflated price as a result of Defendants['] concealment of material information regarding the merger," and

"suffered losses as a result"); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2013 WL 396117, at \*6 (D.N.J. Jan. 30, 2013) (finding typicality established where "[t]he class claims . . . arise out of the same conduct—transactions in Merck securities that were based on an allegedly artificially inflated stock price as a result of Defendants' misrepresentations and omissions"). Accordingly, Lead Plaintiffs' claims satisfy Rule 23(a)(3).

### D.      Lead Plaintiffs Will Fairly and Adequately Protect the Class's Interests

To meet the requirement under Rule 23(a)(4) that the class representatives "fairly and adequately protect the interests of the class," the district court must find that (1) the class representatives' interests do not "conflict with those of the class," and (2) the proposed class counsel are "capable of representing the class." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001).  Here, Lead Plaintiffs are adequate class representatives because their substantial financial stake in the litigation—having suffered significant losses on their investments due to Defendants' misrepresentations—provides "the ability and incentive to represent the claims of the class vigorously[.]" *In re Cendant Corp. Litig.*, 264 F.3d 201, 265 (3d Cir. 2001). In proving their own claims, Lead Plaintiffs will also prove the claims of the Class. The interests of Lead Plaintiffs and the Class are perfectly aligned, and no facts suggest any conflict of interest or other antagonism between them. *Cf. Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) ("[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy.").

Lead Plaintiffs understand the fiduciary obligations owed to the Class and have demonstrated their commitment to "fairly and adequately protect the interests of the class" by vigorously prosecuting this action on behalf of themselves and all other Class members. *See* Exs. 1-2.  Over the past three years, Lead Plaintiffs have been actively overseeing and involved in this

10

litigation by, among other things, receiving and reviewing periodic updates and other correspondence from counsel, participating in discussions with counsel regarding the litigation, attending court hearings, and reviewing drafts of filings and discovery responses. Ex. 1 ¶5; Ex. 2 ¶5. Moreover, as institutional investors, Lead Plaintiffs are exactly the type of investor expressly "favor[ed]" by Congress to lead securities class actions. *In re Tyson Foods, Inc.*, 2003 WL 22316548, at *6 (D. Del. Oct. 6, 2003).

Lead Plaintiffs' selection of Counsel further demonstrates adequacy. BLB&G and BRB are highly qualified and experienced in prosecuting securities class actions and, both jointly and independently, have recovered billions of dollars on behalf of investors in some of the largest and most complex securities class actions in history. D.I. 15 at 18-20; *see also Allegheny Cnty. Emps. Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 511 (E.D. Pa. 2022) (finding BLB&G and BRB adequate class counsel given their "extensive history litigating securities class actions" and "competent" representation throughout the action). Accordingly, Lead Plaintiffs are adequate class representatives.

## II.    THE PROPOSED CLASS SATISFIES RULE 23(b)(3)

This Action also satisfies Rule 23(b)(3), which requires that: (i) common issues predominate over individual questions, and (ii) the class action is superior to other available means of adjudication. Fed. R. Civ. P. 23(b)(3). Both elements are met here.

### A.    Common Questions of Law and Fact Predominate

The Supreme Court has recognized that predominance is "readily met" in securities fraud suits like this one. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Where common questions of law or fact outnumber those affecting only individual class members, predominance is satisfied. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015). Common question may predominate even if individual questions exist. *Id.*

11

The Class's claims all arise from the same conduct and will be proven through common evidence, and the Class's injuries are predicated on the same artificial inflation and subsequent decline in GCE's stock price after the truth exposed Defendants' materially false statements and omissions. *See supra* § I.B; *see also In re Pharmaprint, Inc. Sec. Litig.*, 2002 WL 31056813, at *7 (D.N.J. Apr. 17, 2002) ("Common issues are predominant in this litigation based on Lead Plaintiffs' allegation that Defendants made material representations to the general investing public."). Moreover, Lead Plaintiffs' expert determined that damages can be calculated on a class-wide basis through one or more common methodologies, Cain Rpt. ¶¶78-89, which suffices to meet the predominance requirement. *Roofer's*, 333 F.R.D. at 88; *In re Wilmington Trust Sec. Litig.*, 310 F.R.D. 243, 246 (D. Del. 2015) (stating that common issues predominated given "plaintiffs' theory that there is a common, class-wide methodology to calculate damages based on its expert's event study methodology is adequate to establish predominance").

### B. Reliance Is a Common Issue Based on the "Fraud-on-the-Market" Presumption

Common questions further predominate here because the Class is entitled to a presumption of reliance. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."). Courts employ a rebuttable presumption of reliance for securities class actions where there has been a "fraud on the market." *Basic Inc. v. Levinson*, 485 U.S. 224, 241, 248 (1988); *see also Amgen*, 568 U.S. at 460-62. Under the fraud-on the-market presumption, if the market for a security is efficient, reliance on material public misrepresentations may be presumed whenever an "investor buys or sells stock at the market price" because "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence any material

misrepresentations." *Halliburton Co. v. Erica P. John Fund, Inc., ("Halliburton II")*, 573 U.S. 573 U.S. 258, 268 (2014) (quoting *Basic*, 485 U.S. at 246-47).

In assessing market efficiency, courts routinely consider whether the security in question traded on a presumptively "efficient" major securities exchange, such as the New York Stock Exchange ("NYSE") or NASDAQ—where GCE traded throughout the Class Period. *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011), *abrogated on other grounds, Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ("Securities markets like the NYSE and the NASDAQ are 'open and developed' and are therefore 'well suited for application of the fraud on the market theory'").

Courts also look to the widely accepted factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989): (1) the stock's average weekly trading volume; (2) coverage of the stock in securities analyst reports; (3) the number of market makers; (4) the company's eligibility to file a registration statement on Form S-3; and (5) stock price reaction to unexpected corporate events or financial releases. *See also Roofer's*, 333 F.R.D. at 81. These factors are an "analytical tool," not a "checklist," and their utility depends on the circumstances. *In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 6544637, at \*3 (D. Del. Nov. 6, 2020). In addition, Courts frequently consider the factors enumerated in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001): (1) the company's market capitalization; (2) the security's bid-ask spread; and (3) the size of the public float. *Advance Auto Parts*, 2020 WL 6544637, at \*2. The efficiency analysis is ultimately holistic, with no single factor determinative. *See W. Palm Beach Police Pension Fund v. DCF Glob. Corp.*, 2016 WL 4138613, at \*13 (E.D. Pa. Aug. 4, 2016). Lead Plaintiffs "need only show that the stock traded in a 'generally efficient market' at the class certification stage, a burden that is not onerous." *Roofer's*, 333 F.R.D. at 81. Here, the report of Lead Plaintiffs' market

13

efficiency expert, Dr. Matthew Cain, Ph.D., establishes that GCE's common stock traded in an efficient market throughout the Class Period, and application of these factors supports this conclusion.

### a) First *Cammer* Factor: High Average Trading Volume

A high weekly trading volume is indicative of market efficiency because it "implies significant investor interest in the company" which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. An "[a]verage weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (citing *Cammer*, 711 F. Supp. at 1286). Throughout the Class Period, GCE's common stock traded actively, with an average weekly trading volume of 2.02 million shares on the NASDAQ, constituting 4.19% of GCE's common shares outstanding over the Class Period. Cain Rpt. ¶¶33-34; *see also In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at *5 (D.N.J. Sept. 25, 2012) (finding 2.8% average weekly trading volume entitled plaintiffs to a "strong presumption" of market efficiency). Additionally, GCE's average daily turnover rate of 0.84% during the Class Period placed it above the 50th percentile of all companies listed on the NASDAQ and NYSE from 2016-2018. Cain Rpt. ¶34. Consistent with *Cammer*, economic theory, and empirical research, GCE's high, active trading volume is strong evidence of the efficiency of the market for GCE's common stock over the course of the Class Period. *See id.*

### b) Second *Cammer* Factor: Securities Analyst Coverage

"Significant securities analyst coverage of a company's stock is 'persuasive' evidence of market efficiency." *Pope*, 2021 WL 926611, at *10 (citing *Cammer*, 711 F. Supp. at 1286). During

the Class Period, there were 136 reports issued on GCE by analysts at 14 separate firms, and this number includes firms that "conducted thorough and detailed research on Grand Canyon and its industry, such as Piper Sandler Companies and BMO Capital Markets." Cain Rpt. ¶36. This high level of analyst coverage placed Grand Canyon above the 75th percentile when compared to all companies listed on the NASDAQ and NYSE from 2016-2018. *Id.* ¶37. Investors also received information about GCE from widespread media coverage (over 600 articles throughout the Class Period) and from SEC filings, which were disseminated publicly through the SEC's online database, EDGAR. *Id.* ¶¶38-39. This extensive coverage compellingly supports market efficiency. *See Merck & Co. Vytorin/Zetia.*, 2012 WL 4482041, at *5 (finding analyst coverage supported an efficient market "given that analysts from a number of well known firms . . . published reports on [the] securities during the Class Period").

c)      **Third *Cammer* Factor: Listing and Market Makers**

The presence of market makers and arbitrageurs also supports a finding of market efficiency, as these market participants "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. Here, throughout the Class Period, GCE common stock was traded on NASDAQ, which "is frequently held to be a standalone basis for finding market efficiency." *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 481 (E.D. Pa. 2021); Cain Rpt. ¶¶42-44. GCE had at least 104 market makers and brokers providing similar activity over the Class Period, which further supports market efficiency. Cain Rpt. ¶44; *see also Roofer's*, 333 F.R.D. at 83-84 (17 market makers supported efficiency). Moreover, institutional investors provide similar benefits to market makers "by supplying trading liquidity and informationally efficient and informed trading," and

15

GCE's common stock was widely held by institutional investors (at least 669 institutions) throughout the Class Period. Cain Rpt. ¶¶43, 72. This factor strongly supports market efficiency.

### d)   Fourth *Cammer* Factor: Eligibility to File Form S-3

A company's eligibility to file a Form S-3 Registration Statement with the SEC is indicative of market efficiency because "the SEC permits it only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary." *Krogman*, 202 F.R.D. at 476; *see also Cammer*, 711 F. Supp. at 1284. A company is eligible to file a Form S-3 Registration Statement if it has filed SEC reports for 12 consecutive months and has at least $75 million of float. *See* 17 C.F.R. § 239.13. Throughout the Class Period, GCE met these requirements. Cain Rpt. ¶47. Thus, this factor also supports market efficiency. *See, e.g., Merck & Co. Vytorin/Zetia*, 2012 WL 4482041, at *5 (finding market efficient based in part on the defendant-company's eligibility to file Form S-3).

### e)   Fifth *Cammer* Factor: The Price of GCE's Common Stock Reacted Swiftly to Company-Specific News

While "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency," empirical evidence of a cause-and-effect relationship between corporate news events and a company's share-price movements supports a finding of market efficiency. *W. Palm Beach Police Pension Fund*, 2016 WL 4138613, at *12. To assess this factor, Dr. Cain "ran empirical tests using the results of an event study." Cain Rpt. ¶50. An event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010) (alteration omitted). Event studies are "widely accepted in the academic community and in the courts." *City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015); *see also, e.g., Teamsters Loc. 445 Freight Div. Pension Fund v.*

16

*Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008) (observing that an event study "has been considered prima facie evidence of existence of such a causal relationship").

Here, Dr. Cain's report establishes that "GCE's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that GCE Common Stock traded in an efficient market throughout the Class Period." Cain Rpt. ¶49. Using a well-established methodology, Dr. Cain first created regression models to control for market- and industry-wide factors that might influence the price of GCE common stock. *Id.* ¶¶51-53. These models allowed him to isolate the change in GCE's stock price that can be attributed to Company-specific news by finding the difference between the actual price movement on a given day and the movement predicted by the regression model (which, as noted above, controls for market and industry factors). *Id.* ¶54.

With this data in hand, Dr. Cain then compared the price changes in GCE common stock on days during the Class Period on which GCE made earnings announcements (8 total "News Days") to those on days that contained the least Company-related news during the Class Period (404 total "No News Days"). *Id.* ¶¶58-62. Showing that "a security's price is statistically significantly more volatile on news days than on no news days indicates that the security responds promptly to news" and supports a finding of efficiency. *Id.* ¶56. Dr. Cain's event study revealed that Grand Canyon's stock exhibited price movements that were statistically significant at the 95% level on 62.5% of the News Days and only 5% of No News Days, and that "[t]he difference between these two percentages is itself statistically significant at the 99% level." *Id.* ¶62. Additionally, the News Days had a higher average absolute abnormal return and greater trading volume relative to the No News Days, and these differences were also statistically significant at the 99% level. *Id.* These findings establish "a clear cause-and-effect relationship" between new

company-specific information and GCE common stock price movements, and therefore, the fifth *Cammer* factor supports a finding of market efficiency. *Id.* ¶63.

### f) Other Factors Also Support Efficiency

In addition to the *Cammer* factors, courts often consider a company's market capitalization, bid-ask spread, and float in evaluating market efficiency. *See, e.g.*, *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2020 WL 5026553, at *3 (D. Del. Aug. 25, 2020); *In re Celgene Corp. Sec. Litig.*, 2020 WL 8870665, at *9 n.8 (D.N.J. Nov. 29, 2020). GCE's market capitalization averaged $5.25 billion over the Class Period, placing it above the 75th percentile of all companies listed on the NASDAQ and NYSE from 2016-2018. Cain Rpt. ¶65; *see also In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *12 (E.D.N.Y. Aug. 8, 2023) (market capitalization of $1.33 billion supported efficiency). GCE also had a large public float during the Class Period, with insiders holding only 1.4% of the common stock, and between 47.9 and 49.3 million shares were available for trading. *See* Cain Rpt. ¶¶69-70. Finally, a "small bid-ask spread indicates that trading in the stock is inexpensive, which suggests efficiency," *Advance Auto Parts*, 2020 WL 6544637, at *2, and GCE's bid-ask spread averaged 0.07% over the Class Period, which was much narrower than the average bid-ask spread among NASDAQ/NYSE stocks, Cain Rpt. ¶¶66-68. Each of these factors supports the conclusion that GCE's common stock traded in an efficient market. Dr. Cain also considered three additional factors—institutional ownership, autocorrelation, and options trading—each of which further supported a finding of market efficiency. *Id.* ¶¶71-76. Therefore, Lead Plaintiffs and the Class can invoke the fraud-on-the-market presumption of reliance.

### C. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Rule 23(b)(3) directs courts to consider four factors in evaluating whether a class action is "superior" to other available methods of adjudication: (i) the interest of class members in

individually controlling separate actions; (ii) the extent and nature of any litigation already underway; (iii) the desirability of concentrating the litigation in the forum; and (iv) the manageability of a class action. FED. R. CIV. P. 23(b)(3)(A)- (D). Each favors certification here.

Superiority "is easily satisfied in securities fraud cases where there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant." *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *8 (D. Del. June 6, 2013). First, Lead Plaintiffs are unaware of any Class member who would prefer to prosecute his or her claims individually. Second, Lead Plaintiffs are not aware of any individual litigation seeking the same redress as the Complaint. Third, the geographical dispersion of Class members means that it is desirable for their claims to be litigated in a single forum to avoid inconsistent adjudications and promote fairness and efficiency. Finally, this case presents no management difficulties, since the claims of Lead Plaintiffs and the Class center on common issues. Judicial economy and the best interests of the Class thus favor class certification. *See In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 191 (E.D. Pa. 2001) (finding superiority where "the costs of maintaining individual actions . . . would be prohibitive," and the class would not be "inefficient or unmanageable," as the "claims center on common questions of law and fact" and "require the same sort of proof").

## III.   BLB&G AND BRB SHOULD BE APPOINTED CLASS COUNSEL

In appointing class counsel, courts consider counsel's work "in identifying or investigating potential claims," "experience in handling class actions," "knowledge of the applicable law," and "the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1). These factors favor appointing BLB&G and BRB as Class Counsel. *See also supra* § I.D.

The firms have worked together cooperatively to investigate and sustain Lead Plaintiffs' claims, pursue discovery from Defendants and third parties, and prepare and file the instant motion

for class certification. They are highly experienced in prosecuting securities class actions and have brought to bear significant resources on the efficient and zealous pursuit of Lead Plaintiffs' claims. In addition to their individual case achievements, these firms have worked together as co-lead counsel in achieving the largest recovery in a securities class action in this Circuit, in *Cendant* ($3.32 billion), as well as significant recoveries for investors in *WorldCom* (S.D.N.Y., $6.19 billion), *McKesson* (N.D. Cal., $1.05 billion), *DaimlerChrysler* (D. Del., $300 million), *Mills Corporation* (E.D. Va., $202.75 million), and *DFC Global* (E.D. Pa., $30 million), among others. *See* D.I. 15 at 18-20. BLB&G and BRB are eminently qualified to prosecute this action. *See* Exs. 8, 9.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully submit that the Class should be certified, Lead Plaintiffs should be appointed as Class Representatives, and BLB&G and BRB should be appointed as Class Counsel.

Dated: January 5, 2024

| | |
|---|---|
| **BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP** | **BARRACK, RODOS & BACINE**<br>Jeffrey W. Golan (*pro hac vice*)<br>Robert A. Hoffman<br>Chad A. Carder (*pro hac vice*)<br>Jordan R. Laporta<br>3300 Commerce Square<br>2001 Market Street<br>Philadelphia, PA 19103<br>Telephone: (215) 963-0600<br>Facsimile: (215) 963-0838 |

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ Gregory V. Varallo
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601

and

Hannah G. Ross
Katherine M. Sinderson (*pro hac vice*)
Robert F. Kravetz (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
Sarah Schmidt (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan (*pro hac vice*)
Robert A. Hoffman
Chad A. Carder (*pro hac vice*)
Jordan R. Laporta
3300 Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201

*Additional Counsel for Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trus*

21

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that, on January 5, 2024, true and correct copies of the foregoing and all accompanying declarations and exhibits were filed and served upon Defendants' counsel via email.

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

*/s/ Gregory V. Varallo*
Gregory V. Varallo (Bar No. 2242)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601