# Exhibit 7

**PUBLIC VERSION Filed January 12, 2024**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re Grand Canyon Education, Inc. Securities Litigation | Civ. Action No. 20-639-MN-CJB |
|  | <u>CLASS ACTION</u> |

EXPERT REPORT OF MATTHEW D. CAIN, PHD

January 5, 2024

**Table of Contents**

I.      **Scope of Report and Opinions** ................................................................................**2**

II.     **Qualifications**..................................................................................................................**3**

III.    **Case Background and Alleged Fraud Scheme** ..................................................**6**

IV.     **Bases for Opinions on Market Efficiency** .........................................................**9**

V.      **Evaluation of Market Efficiency Factors for GCE Common Stock**............**12**

   A. *Cammer* Factor 1: Average Weekly Trading Volume.........................................14

   B. *Cammer* Factor 2: Analyst Coverage.................................................................15

   C. *Cammer* Factor 3: Market Makers.....................................................................18

   D. *Cammer* Factor 4: SEC Form S-3 Filing Eligibility .........................................21

   E. *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices..........................................................................................................22

     i.    Event Study Methodology.............................................................................. 23

     ii.   Cause and Effect Analysis Comparing GCE Common Stock Price Behavior on News versus No News Days .......................................................................................... 26

   F. Additional Factor 1: Market Capitalization .......................................................30

   G. Additional Factor 2: Bid-Ask Spread ................................................................31

   H. Additional Factor 3: Public Float.......................................................................33

   I. Additional Factor 4: Institutional Ownership .....................................................34

   J. Additional Factor 5: Autocorrelation..................................................................35

   K. Additional Factor 6: Options Trading.................................................................37

   L. Summary of GCE Common Stock Market Efficiency .......................................37

VI.     **Ability to Calculate Damages on a Class-Wide Basis**....................................**38**

   A. Calculation of Damages for Violation of Sections 10(b) and 20(a) of the Exchange Act.38

   B. Damage Methodologies are Flexible and Can Incorporate Alternative Findings..............41

VII.    **Conclusion** ......................................................................................................**43**

**Appendix A**..............................................................................................................**44**

**Appendix B** ............................................................................................................**50**

**Exhibits** .................................................................................................................**53**

## I.    Scope of Report and Opinions

1.    Lead Plaintiffs, through their attorneys Bernstein Litowitz Berger & Grossmann LLP and Barrack Rodos & Bacine ("Plaintiffs' Counsel"), have asked me to determine whether the market for Grand Canyon Education, Inc. ("GCE" or the "Company") common stock ("Common Stock") was efficient during the period January 5, 2018 – January 27, 2020, inclusive (the "Class Period").

2.    In addition, Lead Plaintiffs have asked me to opine on whether damages for trading in GCE Common Stock during the Class Period can be calculated on a class-wide basis using a common methodology for all Class members that is consistent with Lead Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims") and Section 20(a) of the Exchange Act.[1]

3.    Based on my analysis to date and the evaluation of the factors described throughout this report, I have reached the opinion that the market for GCE Common Stock was efficient throughout the Class Period. Moreover, I have reached the opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology for Lead Plaintiffs' pending claims. Among other methodologies, the out-of-

---

[1] *See* Second Amended Consolidated Complaint For Violations of the Federal Securities Laws, in *re Grand Canyon Education, Inc. Securities Litigation*, Case 1:20-cv-00639-MN-CJB filed January 21, 2022 ("Complaint"). I understand the Defendants to include Grand Canyon Education, Inc., Brian E. Mueller and Daniel E. Bachus. *See id.*

pocket damages methodology, which is used in virtually all §10(b) class action securities cases, is appropriate and applicable here.

4.    The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** describes the case background and alleged fraud scheme. **Section IV** describes the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section VII** contains my conclusions.

## II.    Qualifications

5.    I am a Senior Fellow at the Berkeley Center for Law and Business at the University of California - Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

6.    Before my current roles, I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide

variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research for which I was awarded the Chairman's Award for Economic Research.

7. Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

8. Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

9. In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also

4

presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

10. I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the *Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

11. In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters. As an expert in financial economics, I have conducted analyses and/or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation / damages in over 60 cases on behalf of both plaintiffs and defendants. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

12. The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $950 per hour for my work on this matter. I have been assisted in this matter by staff at Peregrine Economics, LLC working under my direction. My compensation is in no way contingent on the outcome of this case. My work is ongoing and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

5

## III.    Case Background and Alleged Fraud Scheme

13.    Prior to July 2018, GCE was a publicly-traded company that operated Grand Canyon University, a comprehensive regionally accredited for-profit university that offered graduate and undergraduate degree programs, emphases and certificates across nine colleges, both online and in-person at its campus in Phoenix, Arizona.[2] On July 1, 2018, Grand Canyon Education completed an asset purchase agreement creating a new, purportedly non-profit Grand Canyon University ("New GCU"). In connection with the sale, GCE entered into a long-term service agreement with New GCU under which GCE would provide "identified" support services to New GCU in return for 60% of New GCU's "tuition and fee revenue."[3] Thus, after the July 1, 2018 transaction, the Company became an educational services company that provided management, back-office, and other services to New GCU.[4] During the Class Period, GCE's Common Stock traded in the U.S. on the NASDAQ, under the ticker symbol "LOPE."[5]

14.    The Complaint alleges that, throughout the Class Period, Defendants misrepresented facts about the plan to spin off Grand Canyon University as a new, non-profit university (*i.e.*, New GCU), as well as the resulting relationship between GCE and New GCU.[6] Defendants' alleged misrepresentations of fundamental facts about the

---

[2] Grand Canyon Education, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, at p. 5.

[3] Grand Canyon Education, Inc. SEC Form 8-K dated July 1, 2018.

[4] Complaint, at ¶ 28; Grand Canyon Education, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018, at p. 5; Grand Canyon Education, Inc. SEC Form 8-K dated July 1, 2018.

[5] Complaint, at ¶ 28.

[6] Complaint, at ¶1. The following overview section summarizes the allegations in the Complaint as context for Lead Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of

relationship between GCE and the supposedly independent and non-profit New GCU allegedly harmed investors by, among other things, depriving them of their ability to assess the likelihood that the U.S. Department of Education ("DOE") would approve New GCU as a non-profit and misleading them about GCE's financial and operational results.[7]

15.     Specifically, the Complaint alleges that Defendants made false and misleading statements regarding a) New GCU's independence from GCE, b) GCE's financial results after New GCU was created, c) the similarity between the transaction and other non-profit conversions that had been approved by the DOE, and d) the status of the DOE's review of New GCU's application.[8] In reality but unbeknownst to the market, the Complaint alleges: New GCU would not and did not function as an independent non-profit after the transaction and, accordingly, GCE's post-transaction margins and profits were inflated by its failure to consolidate New GCU's results onto GCE's books; and Defendants knew that the terms of the conversion were highly dissimilar to other transactions that the DOE had approved, and that the DOE was critically scrutinizing the transaction.[9]

---

this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[7] Complaint, at ¶¶ 3, 22 – 23.

[8] Complaint, at ¶ 21.

[9] Complaint, at ¶¶ 8, 11, 17 – 18.

7

16.    The Complaint alleges that the relevant truth was revealed through two partial corrective disclosures on November 7, 2019[10] and January 28, 2020.[11] Specifically, the Complaint alleges that the truth was partially revealed after market close on November 6, 2019, when Defendants disclosed during a GCE earnings call that New GCU had received a letter from the DOE determining that New GCU failed to meet the DOE's definition of a non-profit entity and would continue to be treated as a for-profit institution for DOE purposes.[12] The following day, on November 7, 2019, GCE filed an 8-K discussing the news.[13]

17.    The truth was allegedly further revealed on January 28, 2020, when analyst firm Citron Research published a report detailing GCE's scheme to inflate its financial results by using GCU as an off-balance-sheet entity.[14] Specifically, the Complaint alleges that the Citron Report revealed numerous facts, including how GCE was able to inflate its margins by using New GCU as an off-balance-sheet entity, and how New GCU was financing that arrangement through loans.[15]

18.    The Complaint alleges that, as a result of Defendants' misstatements, omissions, and deceptive scheme, investors acquired GCE Common Stock at artificially

---

[10] Since the corrective information was announced on the Company's earnings conference call after-market hours on November 6, 2019, I refer to the market date of the corrective disclosure on November 7, 2019. *See* "Grand Canyon Education, Inc. Reports Third Quarter 2019 Results," *PR Newswire*, November 6, 2019, 4:05 PM ET ("Grand Canyon Education, Inc. will discuss its third quarter 2019 results and fourth quarter and full year 2019 outlook during a conference call scheduled for today, November 6, 2019 at 4:30 p.m. Eastern time (ET).").

[11] Complaint, at ¶¶ 19 – 20.

[12] Complaint, at ¶ 237.

[13] Complaint, at ¶ 238; Grand Canyon Education, Inc. SEC Form 8-K dated November 6, 2019.

[14] Complaint, at ¶ 250.

[15] Complaint, at ¶¶ 251 – 252.

8

inflated prices during the Class Period.[16] **Exhibit 1** graphs the closing stock price and trading volume for GCE's Common Stock shares throughout the Class Period.

## IV.  Bases for Opinions on Market Efficiency

19.     I understand that Lead Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, *i.e.*, that shareholders rely on the alleged misrepresentations or material omissions of fact through their effect on stock prices in an informationally efficient market.[17]

20.     As courts, including the Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that, when the market for a security is informationally efficient, investors in that security rely on any material misrepresentations or omissions of fact because those misrepresentations or omissions distort the security's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson,* 485 U.S. 224 (1988) decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[18]

21.     This theory was also reaffirmed by the Supreme Court in *Halliburton II*:

---

[16] Complaint, at ¶ 349.

[17] *Id.*, at ¶¶ 359 – 360.

[18] *Basic Inc. v. Levinson*, 485 U.S. 224, 241 – 42 (1988).

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[19]

22.      A market is defined as informationally efficient if prices of securities trading in that market reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs.[20] Economic research and literature support the concept of market efficiency for publicly traded securities. For example, Nobel Prize winner Eugene Fama has observed that "the evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[21] More recently, Professor Fama reiterated that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[22]

23.      Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are

---

[19] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).

[20] Eugene F. Fama, 1991, Efficient Capital Markets: II, *Journal of Finance* 46, at 1575.

[21] Eugene F. Fama, 1970, Efficient Capital Markets: A Review of Theory and Empirical Work, *Journal of Finance* 25, at 416.

[22] Eugene F. Fama, 1991, Efficient Capital Markets: II, *Journal of Finance* 46, at 1576.

more efficient than previously recognized."[23] Academic research thus provides ample support for the concept of market efficiency of public exchange-traded securities.

24.    Litigants and scholars have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them.[24] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges. The fact that GCE's Common Stock traded on the NASDAQ leads to a strong presumption of market efficiency.

25.    The U.S. Supreme Court has not set forth a definitive test for assessing market efficiency for securities. The district court in *Cammer v. Bloom* developed a widely cited five-factor test to evaluate whether a market is efficient for the purposes of establishing the presumption of investor reliance articulated by the Supreme Court in *Basic*.[25] In another widely cited opinion, the district court in *Krogman v. Sterritt* articulated several additional factors useful in evaluating market efficiency.[26] Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency. However, as explained below, it is important to understand that an

---

[23] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33, at 2071.

[24] See *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*"), citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[25] 711 F. Supp. 1264, 1286 – 1287 (D.N.J. 1989).

[26] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

11

assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient for relevant purposes.

26.    The following section presents my analyses and findings from the evaluation of various market efficiency factors for GCE Common Stock during the Class Period.

## V.    Evaluation of Market Efficiency Factors for GCE Common Stock

27.    In the following section, I discuss the *Cammer* and *Krogman* factors and evaluate them in relation to GCE Common Stock. In doing so, I compare the various factors for GCE's Common Stock to: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.  As discussed *infra*, my analyses and findings on the various market efficiency factors support the conclusion that GCE Common Stock traded in an efficient market throughout the Class Period.

28.    One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[27] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK

---

[27] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88, at 667 – 705. ("*MRK Study*").

Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[28] The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock...Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[29]

29.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[30] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

30.     Below, I compare several of GCE's market efficiency factors to the samples of firms in the MRK Study to assess whether GCE's characteristics are consistent with firms operating in efficient markets.

---

[28] MRK Study at 678, 681 – 682.

[29] MRK Study at 667.

[30] MRK Study at 681 (footnotes omitted).

13

### A.    *Cammer* Factor 1: Average Weekly Trading Volume

31.    Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[31]

32.    The first *Cammer* factor was defined by the *Cammer* court as the average weekly trading volume relative to shares outstanding. In analyzing this factor, the court stated:

> Turnover measured by average weekly trading of 2% or more
> of the outstanding shares would justify a strong presumption
> that the market for the security is an efficient one; 1% would
> justify a substantial presumption.[32]

33.    **Exhibit 2** graphs GCE's Common Stock weekly trading volume as a percentage of shares outstanding throughout the Class Period.[33] The average weekly trading volume was 4.19% of GCE's common shares outstanding over the Class Period. This level of trading volume far exceeds both the 1% and 2% thresholds established by the

---

[31] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, at 108.

[32] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[33] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

*Cammer* court. As a result, GCE's level of stock trading volume throughout the Class Period supports the conclusion that GCE's Common Stock traded in an efficient market throughout the Class Period.

34.     I also note that the average weekly trading volume of GCE's Common Stock over the Class Period was 2.02 million shares on the Nasdaq Stock Exchange. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares.[34] GCE's average weekly trading volume during the Class Period exceeds that of both the median MRK Sample firms and the MRK Covered firms.[35] Additionally, GCE's average daily turnover rate of 0.84% during the Class Period placed it above the 50th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[36] This further supports the conclusion that GCE's Common Stock traded in an efficient market throughout the Class Period.

## B.    *Cammer* Factor 2: Analyst Coverage

35.     An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry.  Analysts typically publish reports in which they may

---

[34] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[35] *Id.*

[36] Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, Benchmarking Market Efficiency Indicators for Securities Litigation, *University of Illinois Law Review Online* (the "Bhole Study"), at 102. The 50th percentile of daily turnover for the 2016-2018 sample period is 0.71%. I note that the 2016-2018 subsample time period is the most recent period reported in this study.

assess recent company business developments, review historical financial performance, provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. Analyst coverage can be indicative of market efficiency since research analysts help to ensure that new, important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[37]

36.     In **Exhibit 3** I report the analyst coverage of GCE over the Class Period. I identified a total of 136 reports issued by analysts at 14 separate firms.[38] The list of analyst reports includes firms that conducted thorough and detailed research on GCE and its industry, such as Piper Sandler Companies and BMO Capital Markets. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

37.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms in the

---

[37] *Cammer*, 711 F. Supp. at 1286.

[38] These statistics represent a lower bound of the analyst coverage of GCE because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

I/B/E/S database received no analyst coverage in a given year.[39] GCE's analyst coverage is also consistent with the MRK Covered firms which elicited higher investor interest than the MRK Sample firms.[40] Separately, an academic study by Charles M.C. Lee and Eric So documented that many publicly traded firms were covered by only one or two analysts.[41] Moreover, GCE's high level of analyst coverage also placed it above the 75th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[42] The significant analyst coverage of GCE during the Class Period supports the conclusion that GCE's Common Stock traded in an efficient market throughout the Class Period.

38.    In addition to the analyst coverage documented above, investors could access information about GCE from a variety of other sources. For example, I conducted a search of press and news articles about GCE using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Newswires, Reuters News, PR Newswire, Associated Press Newswires, Business Wire, and numerous other outlets. This search produced over 600 articles throughout the Class Period.[43] Investors can also receive information from online research forums, such as Seeking Alpha, short sellers, and other investor research services, which offer both free

---

[39] MRK Study at 668.

[40] MRK Study at 678, Table 3.

[41] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, at 336 (see Table 1, Panel B – "COV").

[42] Bhole Study, at 104: 75th percentile defined as 12.2 analysts.

[43] The articles were identified through a Factiva search including GCE's company tag or a text search for "Grand Canyon Education" over major news and business sources. After excluding potential duplicates, 625 unique news articles were produced by the search.

17

and subscription-based research reports. Moreover, GCE produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about GCE from a variety of sources during the Class Period.

39.    As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about GCE supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

## C.    *Cammer* Factor 3: Market Makers

40.    The third *Cammer* factor relates to securities trading in over-the-counter markets – outside of major exchanges, and without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[44] While market makers are present on major exchanges as well as over-the-counter markets, they can facilitate market efficiency in an over-the-counter market because they are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[45]

---

[44] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[45] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporation Law* 19, at 291.

41.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[46]

42.     The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. However, GCE's Common Stock traded on the NASDAQ throughout the Class Period. Similar to other large, national exchanges, the NASDAQ reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient. The *Cammer* court thus stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[47]

---

[46] *Cammer*, 711 F. Supp. at 1293.

[47] *Cammer,* 711 F. Supp. at 1292.

19

43.    I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[48]) as being informationally efficient.[49] Moreover, I understand that courts view institutional investors as potentially providing similar benefits as market makers by supplying trading liquidity and informationally efficient and informed trading.[50] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss further in **Section V.I** below, GCE's Common Stock was widely held by institutional investors during the Class Period.[51]

---

[48] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." *See also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[49] *See*, *e.g.*, *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572 – 73 (C.D. Ca. 2012) ("One defendant in *Cammer* contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that 'the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.' But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker.") (citations omitted). *See* also *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016), at 6: "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."

[50] *See*, *e.g.*, *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[51] GCE Common Stock was held by at least 669 institutional investors at some point during the Class Period (see Exhibit 10).

44.     As a result, GCE's public listings on the NASDAQ, a well-developed and established national exchange, satisfies the intent of this *Cammer* factor. Moreover, GCE had at least 104 market makers and brokers providing similar activity over the Class Period.[52] In sum, GCE easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for GCE Common Stock throughout the Class Period.

### D.   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

45.     The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[53]

46.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Securities Exchange Act of 1934 ("Exchange Act"), the registrant has filed all necessary filings with the SEC in a

---

[52] Bloomberg "RANK" function.

[53] *Cammer*, 711 F. Supp. at 1287.

timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[54] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

47.     To the best of my knowledge, GCE made all required filings with the SEC in a timely manner during the Class Period and satisfied the other S-3 requirements.[55] As a result, this factor is consistent with the efficiency of the market for GCE Common Stock throughout the Class Period.

### E.   *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

48.     The fifth *Cammer* factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information. The *Cammer* court held:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[56]

49.     Below, I present empirical analysis that demonstrates GCE's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*.  I compare the behavior of GCE Common Stock on days when company-specific news is issued with its behavior on days when no

---

[54] https://www.sec.gov/files/forms-3.pdf.

[55] *See*: SEC EDGAR, Grand Canyon Education, Inc.:
https://www.sec.gov/edgar/browse/?CIK=1434588&owner=exclude.

[56] *Cammer,* 711 F. Supp. at 1291.

such news is issued. This analysis demonstrates that GCE's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that GCE Common Stock traded in an efficient market throughout the Class Period.

### i.    Event Study Methodology

50.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.  Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[57]  As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.

> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[58]

---

[57] *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35.

[58] Eugene F. Fama, 1991, Efficient Capital Markets: II, *Journal of Finance* 46, at 1607.

23

51.     To determine whether GCE stock price movements on any given date are statistically significant, I performed an event study. To perform an event study using generally accepted economic methods, an economist specifies a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the abnormal return on any given day is "statistically significant," *i.e.*, sufficiently large compared to the typical abnormal return such that simple random movement can be rejected as its cause.

52.     I applied these widely-used and generally-accepted econometric methodologies to perform the event study here.  Specifically, in order to isolate the impact of company-specific news on GCE's stock price during the Class Period, I performed regression analyses to measure the relationship between GCE's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in GCE's industry. Modeling how GCE's stock price returns moved relative to an overall market index and an industry index also allows me to measure the Company's response to company-specific news.

53.      The regression analysis is conducted over the Class Period (January 5, 2018 through January 27, 2020, inclusive). For each trading day, I constructed a regression model using data from the prior six months of trading days ("Estimation Window").[59] To study the relationship between GCE's stock price returns and overall market factors, I used the S&P 500 Total Return Index (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between GCE's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in GCE's particular industry, I used an equal weighted industry index (the "Industry Index").[60]

54.      I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[61] As shown in **Exhibit 4**, the event study model revealed a positive

---

[59] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. This allowed my regression approach to adapt to any changes in volatility throughout the Class Period. *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *Business Lawyer* 49; A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[60] The Industry Index is an equal weighted index using the returns of the peers identified by GCE in its 2018 and 2019 10-Ks. These include 2U, Inc., Wiley Education Services, Pearson plc., CHEGG, Inc., Instructure Inc., Pluralsight Inc., Laureate Education, Inc., Strategic Education, Inc., and Adtalem Global Education, Inc. Pluralsight becomes a member of the Industry Index on May 18, 2018 following its IPO. *See* "Pluralsight Announces Pricing of Initial Public Offering," *PR Newswire*, May 16, 2018, 7:27 PM ET. With respect to Wiley Education Services, the returns of the Class A Shares of its parent company, John Wiley & Sons, are used in the Industry Index. *See* Grand Canyon Education, Inc. SEC Form 10-K for the fiscal years ended December 31, 2018 at p. 43 and December 31, 2019 at p. 40.

[61] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35; Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, at 1597.

25

relation between the Company's daily returns and those of the overall stock market and industry throughout the Class Period. In other words, increases (decreases) of the Market Index and the Industry Index help explain increases (decreases) in GCE's stock price. Consistent with generally-accepted econometric methods, this allowed me to predict GCE's daily return using that day's market and industry returns. Again in accordance with standard event-study methodology, I then subtracted the predicted return from the actual return to determine the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

55.    Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in GCE's abnormal stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which provides a metric for how much idiosyncratic company-specific volatility or "randomness" remains in the price movement of GCE's Common Stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

### ii.    Cause and Effect Analysis Comparing GCE Common Stock Price Behavior on News versus No News Days

56.    A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on so-called "news" days, or days when a certain type or types of disclosures are made (such as earnings disclosures),

26

with its behavior on so-called "no-news" days, or days with relatively little or no news.[62] Showing that a security's price is statistically significantly more volatile on news days than on no-news days indicates that the security responds promptly to news and, therefore, supports a finding of efficiency.

57.    Importantly, research has shown that in an efficient market, a security can exhibit some large price movements despite the absence of news and, conversely, there can be news without large price movements.[63]    For instance, a company may announce earnings (or a lack of earnings in pre-revenue companies) that are in line with investor expectations; while such an announcement is clearly important to investors, it will not have altered the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information. Further, if a company's disclosure conceals important information, the effect of the concealment would generally not result in a significant stock price movement but would maintain the price at its then-current level. Accordingly, a generally accepted, peer-reviewed methodology accepted by numerous courts is to compare stock price behavior on a *group* of "news days" to stock price behavior on a *group* of "no-news days."

---

[62] Miguel O. Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57. This approach has been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.: In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.); *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.); *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.).

[63] *See* Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence From Firm-Specific News, *Review of Financial Studies* 32, at 1004; Ray Fair, 2002, Events That Shook the Market, *Journal of Business* 75, at 713, 714.

58.    Here, I performed an analysis comparing the behavior of GCE Common Stock on news versus no-news days.  My analysis demonstrates that the price of GCE stock was statistically significantly more volatile on news days than on no-news days.  This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in the stock price" for GCE Common Stock during the Class Period and, thus, further supports a finding of market efficiency.

59.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price" using the test described above, I defined news days to be GCE earnings announcements during the Class Period (the "News Days"). This is a common definition of news days, as earnings announcements represent a potential opportunity for the public release of new value-relevant Company information to investors, which can cause company stock prices to move in an efficient market. As noted above, one would not expect every such announcement to cause a significant stock price movement for a company, including because investors and analysts may anticipate the reported information, or because the information may contain a mix of both positive and negative information.

60.    I compared the stock returns and trading volume of GCE's Common Stock on News Days to those same metrics on trading days that contained the least news during the Class Period (the "No-News Trading Days").[64] The No-News Trading Days provide a

---

[64] No News Trading Days were identified as dates with no Factiva headlines or SEC filings. For purposes of considering news to identify No News Trading Days, I ignored headlines that merely identified stock price or volume movements on a given date without discussing any other information. As described above, Factiva is a well-known provider of access to business news across a comprehensive set of publications, including Dow Jones Newswires, Reuters News, PR Newswire, Associated Press Newswires, Business Wire, and numerous other outlets.

28

benchmark measurement of days in which relatively little Company-specific information was provided to the market. If GCE's stock prices tend to move more significantly following News Days than on the No-News Trading Days, this would support a conclusion of market efficiency.

61.     **Exhibit 6a** reports the list of 8 News Days – *i.e.*, their market impact dates and corresponding disclosure headlines. **Exhibit 6b** reports the results of the event study using GCE Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value corresponding to statistical significance. Overall, 5 out of 8 GCE earnings releases, or 62.5% of the GCE earnings releases, were associated with stock price movements that were statistically significant at the 95% level or higher.  I compare this rate with that on the No-News Trading Days in the following exhibit.

62.     **Exhibit 7** summarizes the statistical comparison of GCE's Common Stock returns and trading volume following the 8 News Days versus these metrics as measured on the 404 No-News Trading Days.[65] As shown in the **Exhibit 7**, 62.5% of the News Day disclosures were associated with stock price movements that were statistically significant at the 95% level.[66] By contrast, only 5.0% of the No-News Trading Days were associated with statistically significant stock price movements. The difference between these two percentages is itself statistically significant at the 99% level. These results provide strong

---

[65] The 8 News Days and 404 No News Trading Days combined cover 80% of the trading days (412 of 517) in the class period.

[66] All 5 stock price movements were also significant at the 99% level. *See* **Exhibit 6b**.

evidence of a cause-and-effect relationship between new information and GCE Common Stock price movements. Moreover, relative to the No-News Days, the News Days had a higher average absolute abnormal return and greater average trading volume, with each of these differences also being statistically significant at the 99% level.

63.     In summary, relative to the trading days with the least company-specific news in the Class Period, GCE's News Days were associated with a greater proportion of statistically significant stock price movements at the 95% level, higher absolute abnormal returns, and greater trading volumes, and these differences are all statistically significant. This finding establishes a clear cause-and-effect relationship between new company-specific information and GCE Common Stock price movements. As a result, this *Cammer* Factor Five analysis supports the conclusion that GCE Common Stock traded in an efficient market during the Class Period.

## F.    Additional Factor 1: Market Capitalization

64.     I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[67] Similarly, the *Krogman* court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to

---

[67] *Cammer*, 711 F. Supp. at 1287.

30

invest in more highly capitalized corporations."[68] As stated previously, the MRK Study found that firms lacking analyst coverage had other indicators of trading in less developed and efficient markets, including smaller market capitalizations. The median market capitalization of the MRK Sample firms was $27.91 million.[69] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[70] This study supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

65.      **Exhibit 8** reports GCE's market capitalization throughout the Class Period. This market capitalization averaged $5.25 billion over the Class Period. GCE's total market capitalization places it above the 75th percentile of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[71] GCE's market capitalization also exceeded the MRK Covered firms on an inflation-adjusted basis.[72] GCE's market capitalization supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

### G.   Additional Factor 2: Bid-Ask Spread

66.      The *Krogman* court considered the bid-ask spread - the difference between the price at which an investor could purchase a stock (the ask) and the price at which an

---

[68] *Krogman,* 202 F.R.D. at 478.

[69] MRK Study at 678 (Table 3).

[70] MRK Study at 678 (Table 3).

[71] Bhole Study, at 107: 75th percentile of market capitalization defined as $3.2 billion.

[72] Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm.

investor could sell the stock (the bid) – as another factor that can indicate market efficiency, explaining: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[73] The bid-ask spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

67.    **Exhibit 9** reports GCE's monthly time-weighted average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[74] This spread fluctuated between a minimum of approximately 0.03% and a maximum of approximately 0.15% from January 5, 2020 through January 27, 2020, and averaged 0.07% over the Class Period.[75]

---

[73] *Krogman*, 202 F.R.D. at 478.

[74] The bid-ask spread was calculated by taking the average of the difference between the ask price and the bid price during trading hours, weighted by the amount of time each quote prevailed in the market. I calculated the weighted average quote, with the weight being the number of seconds between a given quote and the next quote that was reported. The bid-ask spread is calculated as the difference between the ask price and bid price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang and Hans R. Stoll, 1996, Dealer Versus Auction Markets: A Paired Comparison of Execution Costs on NASDAQ and the NYSE, *Journal of Financial Economics* 41.

[75] I also examined the dates from January 2018 and January 2020 that were part of the Class Period, and report them in Exhibit 9. The Class Period dates from January 2018 had an average bid-ask spread of 0.11%, and the Class Period dates from January 2020 had an average bid-ask spread of 0.04%. I note, however, that neither of these figures was computed using a full month of data. Quote Data for GCE Common Stock was obtained from the TICK database. *See*, https://tickapi.tickdata.com

68.     By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%.[76] GCE's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade GCE's Common Stock at very low relative cost. Additionally, GCE's average bid-ask spread over the Class Period was smaller than the majority of the companies listed on NASDAQ and the NYSE from 2016-2018 (a lower ranking corresponds to a smaller bid-ask spread).[77] As a result, GCE's bid-ask spread supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

## H.    Additional Factor 3: Public Float

69.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[78] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

70.     **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for GCE Common Stock during the Class Period. As shown in the exhibit, GCE insiders held 1.4% of the Common Stock during the Class Period. Essentially all of GCE's

---

[76] MRK Study at 678 (Table 3).

[77] Bhole Study, at 105, 50th percentile of bid-ask spread defined as 0.14%.

[78] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

public float was held and traded by institutions and other large outside investors.[79] Overall, between 47.9 million and 49.3 million shares of Common Stock were available for trading in the public float during the Class Period. This large degree of public float for GCE's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

## I.    Additional Factor 4: Institutional Ownership

71.    Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

72.    I also report the total institutional ownership of GCE Common Stock in **Exhibit 10,** which shows that at least 669 institutions held the stock at some point during the Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only 9 institutional investors while the MRK Covered firms had a median of 40 institutional investors.[80] GCE's institutional ownership base greatly exceeds both of these levels. Moreover, GCE's institutional ownership as a percent of shares during the

---

[79] S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are only available every quarter; therefore, occasionally the time difference in data updates may cause institutional holdings to appear to exceed shares outstanding and the public float.

[80] MRK Study at 678 (Table 3).

Class Period placed it between the 90th and 95th percentile of NYSE and NASDAQ traded companies.[81] Thus, the significant institutional ownership base for GCE Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### J.    Additional Factor 5: Autocorrelation

73.    Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns, a potential phenomenon that has been widely studied in the academic literature.[82] Autocorrelation is frequently examined on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. Positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. Negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns

---

[81] Bhole Study, at 106: 90th percentile defined as institutional ownership of 98.68% of shares outstanding; 95th percentile defined as 103.98%.

[82] *See, e.g.*: Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61, at 2367 – 68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6, at 95 – 101.

persists over a sufficient time period such as several quarters, and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

74.     I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in GCE's Common Stock returns.[83] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[84] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

75.     **Exhibit 11** presents the results from the autocorrelation test for GCE's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant and the quarterly coefficients alternate between positive and negative over time. Thus, I find no evidence of persistent autocorrelation in

---

[83] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (V.E).

[84] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61, at 2367 – 68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6, at 95 – 101.

GCE's Common Stock returns. This finding supports the conclusion that GCE's Common Stock traded in an efficient market throughout the Class Period.

### K.    Additional Factor 6: Options Trading

76.    Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[85] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading. According to Bloomberg, GCE Common Stock had 38,997 call option contracts and 74,778 put option contracts traded during the Class Period.[86] The presence of options trading supports the conclusion that GCE Common Stock traded in an efficient market throughout the Class Period.

### L.    Summary of GCE Common Stock Market Efficiency

77.    In summary, all 11 market efficiency factors support a conclusion of market efficiency for GCE Common Stock. Based on my analysis to date and my evaluation of the factors described throughout this report, I have reached the opinion that the market for GCE Common Stock was efficient throughout the Class Period.

---

[85] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53. *See also*: Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.

[86] Bloomberg "VOLUME_TOTAL_CALL" and "VOLUME_TOTAL_PUT" variables.

## VI.    Ability to Calculate Damages on a Class-Wide Basis

78.    I have been asked to evaluate whether per-share damages for traders of GCE Common Stock can be assessed for all Class members based upon a methodology common to all class members and consistent with Lead Plaintiffs' theories of liability. As discussed below, damages for Lead Plaintiffs' claims can be calculated on a class-wide basis through one or more common methodologies.

### A. Calculation of Damages for Violation of Sections 10(b) and 20(a) of the Exchange Act

79.    For the §10(b) claims, Lead Plaintiffs allege that Defendants' misrepresentations artificially inflated the market price of GCE Common Stock and caused Class members to purchase and hold GCE Common Stock at artificially inflated prices.[87] Lead Plaintiffs also claim certain Defendants are liable as control persons under §20(a).[88]

80.    The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology for calculating damages under §10(b) of the Exchange Act. This approach calculates damages formulaically as the difference between the artificial inflation in the share price at the time of purchase and the artificial inflation in the share price at the time of sale.[89] I understand that this out-of-pocket methodology has been widely accepted for use across §10(b) matters.

---

[87] Complaint, at ¶¶ 364-372.

[88] *Id.*, at ¶¶ 373-378. Section 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. *See* 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, Plaintiffs have instructed me to assume that §20(a) damages can be calculated using the same methodologies for assessing §10(b) damages.

[89] The Private Securities Litigation Reform Act ("PSLRA") also imposes a cap on damages for shares not sold prior to the full revelation of the fraud. The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for

81.    To calculate out-of-pocket damages for a Class Member, one needs to know when that Class Member transacted in GCE Common Stock during the Class Period, and the amount of artificial inflation in GCE Common Stock on those dates.  The claims process produces Class Member-specific information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions.

82.    The quantification of artificial inflation per share during the Class Period is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such an analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

83.    Event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.[90] To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of

---

the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748 – 49.

[90] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

39

GCE Common Stock can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process, and will be based on the specific set of facts and circumstances in a given case.

84.     A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation relating to each corrective disclosure equaled a constant dollar amount above the correct share price over the Class Period, and can be calculated according to one or multiple corrective disclosures which dissipated artificial inflation. Alternatively, one can measure "constant percentage inflation," which assumes that per share inflation relating to each corrective disclosure equaled a constant percentage above the correct stock price over the Class Period. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual class member identities or circumstances.

85.     As part of the §10(b) claims, Lead Plaintiffs allege that the disclosures "materialized the substantial and undisclosed risk of DOE disapproval that Defendants had concealed."[91] The out-of-pocket methodology described above is capable of incorporating this element of Plaintiffs' theory of liability. Fundamental principles of valuation analysis demonstrate that a company's stock price reflects the value of all future cash flows discounted to the present time at a rate that reflects the riskiness of the business and those cash flows.[92] The discount rate does not depend on the identities or differing risk preferences of individual investors.[93] To the extent that any portion of a stock price decline following a corrective disclosure is unrelated to Plaintiffs' allegations involving the materialization of concealed risk, this portion can be disaggregated for all Class Members using the same techniques described above.

86.     By combining the individual information obtained through the claims process with class-wide information concerning the amount of inflation in GCE Common Stock throughout the class period, it is possible to calculate damages in a formulaic manner for all Class Members.

**B. Damage Methodologies are Flexible and Can Incorporate Alternative Findings**

87.     The damages methodologies I have laid out above are flexible and able to incorporate alternative findings regarding the quantification and timing of artificial

---

[91] Complaint, at ¶ 244. *See also*, *id*., at ¶ 349.

[92] *See, e.g.*: Joshua Rosenbaum and Joshua Pearl, *Investment Banking*, 2009, Wiley Finance. At p. 109: "The projected [free cash flows] and terminal value are discounted to the present at the target's weighted average cost of capital (WACC), which is a discount rate commensurate with its business and financial risks."

[93] *Id*.

inflation and how it evolves over the Class Period. The methodologies I have described above can be modified based on alternative findings the finder of fact may reach, including, but not limited to any: (1) confounding information versus corrective information; and (2) how to back-cast inflation over the Class Period.

88.    For example, if the factfinder determines that some component of the abnormal return on the alleged corrective disclosure days is appropriately attributed to the release of confounding information rather than corrective information, or that artificial inflation evolved over the Class Period, these findings can be incorporated into the daily inflation input into the out-of-pocket damages model, and damages can still be calculated mechanically on a class-wide basis. Similarly, should the factfinder decide that the first actionable misstatement and/or omission happened after the beginning of the Class Period, or that the final alleged corrective disclosure occurred prior to the end of the Class Period, the daily inflation input to the out-of-pocket damages formula can be adjusted to reflect those determinations and damages can again still be calculated mechanically on a class-wide basis.

89.    To summarize, I have not been asked to calculate damages in this report. Such analysis would depend on information produced in discovery and development of the case record. Nonetheless, based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that Common Stock damages in this case can be calculated using a standard and well-established methodology, and can be applied formulaically on a class-wide basis.

## VII.    Conclusion

90.    In conclusion, based on the market efficiency factors considered by courts and in academia, it is my opinion that GCE's Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that Common Stock damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

91.    I declare under the penalty of perjury that the foregoing is true and correct.


Respectfully Submitted,


Matthew D. Cain

Appendix A

## Matthew D. Cain, Ph.D.                                        January 2024

E-mail: mdcain@outlook.com                                         Homepage
Mobile: 574-485-8065                                                   SSRN

**Education**

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                        Grove City College, Grove City, PA

**Professional and Academic Experience**

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

**Publications**

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden

45

- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies, Journal of Financial and Quantitative Analysis, Journal of Corporate Finance, Journal of Banking and Finance, European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics, Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023


University of Notre Dame, Mendoza College of Business

FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al*., Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

48

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al*., Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

Appendix B

# Documents Considered

**Court Documents:**

- Second Amended Consolidated Complaint For Violations of the Federal Securities Laws, in *re Grand Canyon Education, Inc. Securities Litigation*, Case 1:20-cv-00639-MN-CJB, filed January 21, 2022.

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).
- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Ca. 2009).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D.Ca. 2016).
- *In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260* (N.D. Ala. 2009*).*
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737.
- *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563 (C.D. Ca. 2012)*.*
- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.).
- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.).
- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.).
- *15 U.S.C. §78t(a).*

**Academic Literature:**

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61.
- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporation Law* 19.
- Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, Benchmarking Market Efficiency Indicators for Securities Litigation, *University of Illinois Law Review Online.*
- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50.

- Eugene F. Fama, 1970, Efficient Capital Markets: A Review of Theory and Empirical Work, *Journal of Finance* 25.

- Eugene F. Fama, 1991, Efficient Capital Markets: II, *Journal of Finance* 46.

- Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33.

- Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6.

- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124.

- A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35.

- Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *Business Lawyer* 49.

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88.

- Joshua Rosenbaum and Joshua Pearl, *Investment Banking*, 2009, Wiley Finance.

- Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.

- Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63.

- Miguel O. Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57.

- Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence From Firm-Specific News, *Review of Financial Studies* 32.

- Ray Fair, 2002, Events That Shook the Market, *Journal of Business* 75.

- Roger D. Huang and Hans R. Stoll, 1996, Dealer Versus Auction Markets: A Paired Comparison of Execution Costs on NASDAQ and the NYSE, *Journal of Financial Economics* 41.

**Data Sources:**

- Bloomberg Terminal

- Factiva News

- TICK Data for Stock Quotes

- Investext

- S&P Capital IQ

- SEC Edgar Online

- GCE Press Releases and SEC Filings

**Other:**

- "Pluralsight Announces Pricing of Initial Public Offering," *PR Newswire*, May 16, 2018, 7:27 PM ET.

- "Piper Jaffray and Sandler O'Neill Announce Merger; Combined Firm to be Named Piper Sandler Companies," *Business Wire*, July 9, 2019.

- https://www.bls.gov/data/inflation_calculator.htm

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers

- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess

- https://www.nyse.com/market-model

- https://www.sec.gov/files/forms-3.pdf

- https://www.sec.gov/edgar/browse/?CIK=1434588&owner=exclude

- All data and documents cited throughout this report.

**Exhibits**



## Exhibit 1
### Grand Canyon Education, Inc. Common Stock Price & Volume
### 1/5/2018 - 3/31/2020

**Class Period: 1/5/2018 - 1/27/2020**

Data Sources: Complaint and S&P Capital IQ.

53

**Exhibit 2**
**Grand Canyon Education, Inc. Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding**
**1/5/2018 - 1/27/2020**



Average Weekly Trading Volume over Class Period: 4.19%

■ Volume as a Percentage of Shares Outstanding

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on January 5, 2018 through January 27, 2020. The last week consists of two trading days (i.e., 1/24/2020 and 1/27/2020), and therefore, the average of the daily trading volume for these two days is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding. Data Sources: S&P Capital IQ and SEC filings.

54

**Exhibit 3**
**Research Analyst Coverage of Grand Canyon Education, Inc.**

| | Analyst Name | Reports Issued During the Class Period 1/5/2018 - 1/27/2020 |
|---|---|---|
| [1] | Barrington Research Associates, Inc. | 22 |
| [2] | BMO Capital Markets | 21 |
| [3] | Piper Sandler Companies[(1)] | 17 |
| [4] | Minkabu The Infonoid, Inc. | 12 |
| [5] | BuySellSignals Research | 11 |
| [6] | Wright Investors' Service | 10 |
| [7] | Corporate Watchdog Reports | 8 |
| [8] | Validea | 8 |
| [9] | ValuEngine, Inc. | 8 |
| [10] | Sadif Analytics | 7 |
| [11] | Crispidea | 5 |
| [12] | PriceTarget Research | 4 |
| [13] | Baird Equity Research | 2 |
| [14] | Smart Insider | 1 |
| | **Total** | **136** |

Data Sources: Counsel, Investext

Notes:

(1) On July 9, 2019, the definitive merger agreement between Piper Jaffray Companies and Sandler O'Neill + Partners, L.P. was announced, with the combined company named Piper Sandler Companies. *See*, "Piper Jaffray and Sandler O'Neill Announce Merger; Combined Firm to be Named Piper Sandler Companies," *Business Wire*, July 9, 2019.



**Exhibit 4**
**Coefficients from Rolling Event Study Regression for Grand Canyon Education, Inc. Common Stock**
**1/5/2018 – 1/27/2020**

Note: The event study methodology is described below Exhibit 7.

56

**Exhibit 5**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for Grand Canyon Education, Inc. Common Stock**
**1/5/2018 – 1/27/2020**

Note: The event study methodology is described below Exhibit 7.

57

# Exhibit 6a
# Grand Canyon Education, Inc. News Days

| | Date | Time | Market Date | Headline |
|---|---|---|---|---|
| 1 | 2/21/2018 | 4:05 PM | 2/22/2018 | Grand Canyon Education, Inc. Reports Fourth Quarter And Full Year 2017 Results - *PR Newswire* |
| 2 | 5/2/2018 | 4:05 PM | 5/3/2018 | Grand Canyon Education, Inc. Reports First Quarter 2018 Results - *PR Newswire* |
| 3 | 8/8/2018 | 4:05 PM | 8/9/2018 | Grand Canyon Education, Inc. Reports Second Quarter 2018 Results - *PR Newswire* |
| 4 | 11/8/2018 | 4:05 PM | 11/9/2018 | Grand Canyon Education, Inc. Reports Third Quarter 2018 Results - *PR Newswire* |
| 5 | 2/20/2019 | 4:05 PM | 2/21/2019 | Grand Canyon Education, Inc. Reports Fourth Quarter and Full Year 2018 Results - *PR Newswire* |
| 6 | 5/7/2019 | 4:05 PM | 5/8/2019 | Grand Canyon Education, Inc. Reports First Quarter 2019 Results - *PR Newswire* |
| 7 | 8/6/2019 | 4:05 PM | 8/7/2019 | Grand Canyon Education, Inc. Reports Second Quarter 2019 Results - *PR Newswire* |
| 8 | 11/6/2019 | 4:05 PM | 11/7/2019 | Grand Canyon Education, Inc. Reports Third Quarter 2019 Results - *PR Newswire* |

Data Source: Factiva

# Exhibit 6b
## Event Study Results on Grand Canyon Education, Inc. News Days

|   | Market Date | Closing Price | Raw Return | Abn. Return | Abn. Dollar | t-Stat | P-Value | Sig Level |
|---|-------------|---------------|------------|-------------|-------------|--------|---------|-----------|
| 1 | 2/22/2018 | $99.72 | 8.49% | 8.54% | $7.85 | 8.03 | 0.00 | *** |
| 2 | 5/3/2018 | $108.98 | 6.03% | 5.91% | $6.08 | 6.05 | 0.00 | *** |
| 3 | 8/9/2018 | $114.41 | -3.30% | -4.25% | -$5.03 | -4.48 | 0.00 | *** |
| 4 | 11/9/2018 | $128.47 | -0.68% | -0.09% | -$0.11 | -0.09 | 0.92 | |
| 5 | 2/21/2019 | $117.95 | 21.40% | 21.12% | $20.52 | 19.29 | 0.00 | *** |
| 6 | 5/8/2019 | $114.96 | -3.98% | -2.15% | -$2.57 | -1.83 | 0.07 | * |
| 7 | 8/7/2019 | $122.54 | 2.05% | 1.74% | $2.09 | 1.33 | 0.19 | |
| 8 | 11/7/2019 | $88.08 | -4.14% | -4.93% | -$4.53 | -3.02 | 0.00 | *** |

Data Sources: S&P Capital IQ, and Factiva.

Notes:

(1) The event study methodology is described below Exhibit 7.

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 7**
**Statistical Comparison on News vs. No News Days**
**Class Period 1/5/2018 - 1/27/2020**

| | News Days | No News Days | P-Value for Differences | Significance Level |
|---|---|---|---|---|
| N | 8 | 404 | | |
| # of Significant Days at 95% Level | 5 | 20 | | |
| % of Significant Days at 95% Level | 62.5% | 5.0% | 0.00 | >99% |
| Average Absolute Abnormal Return | 6.1% | 0.9% | 0.00 | >99% |
| Average Volume (Millions) | 1.2 | 0.4 | 0.00 | >99% |

Data sources: S&P Capital IQ, SEC Filings, Factiva. Notes: No News Days are defined as dates without Factiva news or SEC filings. The results are based on a rolling regressions of the 120 trading days preceding each date of analysis. The regression model controls for a broad Market Index (S&P 500 Total Return Index) and an Industry Index, which is equal-weighted and consists of those companies Grand Canyon Education compares its performance to in its 2018 and 2019 10-Ks that trade on major US exchanges. Pluralsight becomes a member of the Industry Index on 5/18/2018 following its IPO. Grand Canyon Education lists Wiley Education Services as its competitor; the returns of its parent company, John Wiley & Sons' Class A Shares are used in the Industry Index. The returns of the Industry Index are net of the S&P 500 Total Return Index. The estimations exclude the alleged corrective disclosure dates, News Days identified in Exhibits 6a and 6b, and July 31, 2019 (Baird analyst report regarding potential negative impact from DOE guidance on Grand Canyon's upcoming earnings announcement).

60

**Exhibit 8**
**Grand Canyon Education, Inc. Common Stock Market Capitalization**
**1/5/2018 – 3/31/2020**



Data Sources: Complaint, SEC Filings, and S&P Capital IQ.

61

**Exhibit 9**

**Grand Canyon Education, Inc. Common Stock Average Monthly Bid-Ask Percentage Spread**

**1/5/2018 – 1/27/2020**

Data Source: TICK Data

Note: January 2018 and January 2020 data are limited to the Class Period.

62

**Exhibit 10**

**Grand Canyon Education, Inc. Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/18 | 48,292 | 364 | 668 | 685 | 48,310 | 1.4% | 48,141 | 99.7% | 99.7% |
| 6/30/18 | 48,224 | 403 | 666 | 337 | 47,895 | 1.4% | 47,389 | 98.3% | 98.9% |
| 9/30/18 | 48,227 | 404 | 699 | 748 | 48,277 | 1.4% | 47,772 | 99.1% | 99.0% |
| 12/31/18 | 48,201 | 390 | 680 | 837 | 48,358 | 1.4% | 49,031 | 101.7% | 101.4% |
| 3/31/19 | 48,238 | 370 | 630 | 913 | 48,522 | 1.3% | 48,289 | 100.1% | 99.5% |
| 6/30/19 | 48,248 | 367 | 628 | 1,427 | 49,047 | 1.3% | 49,351 | 102.3% | 100.6% |
| 9/30/19 | 48,303 | 372 | 634 | 1,432 | 49,100 | 1.3% | 49,474 | 102.4% | 100.8% |
| 12/31/19 | 48,105 | 371 | 626 | 1,455 | 48,934 | 1.3% | 52,038 | 108.2% | 106.3% |
| 3/31/20 | 47,413 | 361 | 647 | 2,495 | 49,261 | 1.4% | 49,628 | 104.7% | 100.7% |

| Total Institutions: | 669 | | Class Period Average: | 1.4% | | 101.8% | 100.8% |
|---|---|---|---|---|---|---|---|

Data Sources: S&P Capital IQ and SEC Filings.

Note: S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are quarterly; timing differences in data reporting may cause institutional holdings to appear to exceed shares outstanding and public float.

**Exhibit 11**

**Grand Canyon Education, Inc. Common Stock**

**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return | T-Statistic | P-Value |
|---|---|---|---|
| Q1 2018 | 0.15 | 1.15 | 0.26 |
| Q2 2018 | -0.31 | -2.53 | 0.01 |
| Q3 2018 | -0.02 | -0.16 | 0.88 |
| Q4 2018 | 0.39 | 3.41 | 0.00 |
| Q1 2019 | -0.04 | -0.27 | 0.79 |
| Q2 2019 | 0.01 | 0.08 | 0.93 |
| Q3 2019 | -0.15 | -1.22 | 0.23 |
| Q4 2019 | 0.03 | 0.26 | 0.80 |
| Q1 2020 | 0.39 | 1.71 | 0.11 |
| **Class Period** | **-0.01** | **-0.25** | **0.81** |

Data Source: S&P Capital IQ.

Note:

For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.