**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re Grand Canyon Education, Inc. Securities Litigation* | Civil Action No. 20-639-JLH-CJB |

**JOINT DECLARATION OF JEFFREY W. GOLAN AND KATHERINE M. SINDERSON IN SUPPORT OF: (1) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

## TABLE OF CONTENTS

**Page**

PART I – PROSECUTION OF THE ACTION ........................................................ 2

I.      INITIATION AND PROSECUTION OF THE ACTION................................... 2

    A.      The Filing of the Initial Complaint and Appointment of Lead
    Plaintiffs and Lead Counsel ........................................................ 2

    B.      Lead Counsel's Investigation and the Filing of the Complaints ................ 3

    C.      Briefing and the Court's Ruling on Defendants' Motion to Dismiss
    the Second Amended Complaint ................................................... 9

    D.      Prosecution of the Action through Fact Discovery ................................. 11

    E.      Class Motion Proceedings........................................................... 12

II.     THE PARTIES' MEDIATION EFFORTS AND PRELIMINARY
    APPROVAL OF THE SETTLEMENT............................................... 13

PART II – THE SETTLEMENT ....................................................................... 15

III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, AND
    SHOULD BE APPROVED .......................................................... 15

IV.     THE RISKS FACING LEAD PLAINTIFFS AND THE CLASS IN THE
    ACTION ............................................................................. 18

    A.      General Risks in Prosecuting Securities Class Actions ........................... 18

    B.      Specific Risks Concerning This Action............................................ 20

        1.      Liability...................................................................... 20

        2.      Loss Causation and Damages .......................................... 22

        3.      Developments in Outside Litigation .................................. 23

    C.      The Settlement Amount Compared to the Likely Maximum
    Damages That Could Be Proved at Trial. ....................................... 24

PART III – NOTICE.................................................................................. 26

i

V.      LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ................................................................................................ 26

PART IV – THE PLAN OF ALLOCATION .................................................................. 28

VI.      BACKGROUND OF THE PLAN OF ALLOCATION ....................................... 28

VII.     THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND SHOULD BE APPROVED ................................................................... 30

PART V – THE APPLICATION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES .................................................................................................... 31

THE FEE APPLICATION ............................................................................................ 34

VIII.    THE REQUESTED FEE IS FAIR AND REASONABLE .................................. 34

      A.     The Size of the Fund Created, the Number of Persons Benefitted, and Awards in Similar Cases .................................................... 36

      B.     The Absence of Objections ........................................................... 36

      C.     The Skill and Efficiency of the Attorneys Involved and the Time Devoted to the Litigation ............................................................ 37

      D.     The Complexities and Duration of the Litigation and the Risk of Non-Payment ............................................................................... 38

      E.     Lead Plaintiffs' Endorsement of the Fee Application.............................. 39

THE LITIGATION EXPENSE APPLICATION ......................................................... 40

CONCLUSION............................................................................................................. 41

**TABLE OF EXHIBITS**

| **Exhibit 1** | Declaration of Michelle Yoshida in Support of Lead Plaintiffs' Motion for Final Approval of Settlement |
| --- | --- |
| **Exhibit 2** | Declaration of Joseph Rozell, Board Chairperson of Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Trust, in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (C) Lead Plaintiffs' Request for Reimbursement of Costs and Expenses |
| **Exhibit 3** | Declaration of Adam Franklin, General Counsel of the Fire and Police Pension Association of Colorado, in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| **Exhibit 4** | Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date |
| **Exhibit 5** | Summary of Lead Counsel's Lodestar and Expenses |
| **Exhibit 5A** | Declaration of Jeffrey W. Golan for Barrack, Rodos & Bacine in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| **Exhibit 5B** | Declaration of Katherine M. Sinderson on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| **Exhibit 6** | Breakdown of Lead Counsel's Expenses by Category |
| **Exhibit 7** | Compendium of Unpublished Authority Cited in Fee Memorandum |

We, JEFFREY W. GOLAN and KATHERINE M. SINDERSON, declare as follows:

1.     Jeffrey W. Golan is a partner of the law firm of Barrack, Rodos & Bacine ("Barrack Rodos") and Katherine M. Sinderson is a partner of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"). Barrack Rodos and Bernstein Litowitz serve as Lead Counsel for Lead Plaintiffs Fire and Police Pension Association of Colorado ("Colorado FPPA"), Oakland County Employees' Retirement System ("Oakland ERS"), and Oakland County Voluntary Employees' Beneficiary Trust (collectively with Oakland ERS, "Oakland County," and together with Colorado FPPA, "Lead Plaintiffs") and the Settlement Class in the above-captioned action (the "Action"). We have personal knowledge of the matters set forth herein based on our active participation in the prosecution and settlement of this Action.

2.     The Settlement consists of a $25.5 million cash payment by or on behalf of Defendants Grand Canyon Education ("Grand Canyon" or the "Company") and Brian E. Mueller and Daniel E. Bachus (collectively, the "Individual Defendants," and together with Grand Canyon, "Defendants") for the benefit of the Settlement Class.[1] The Settlement was mediated before Michelle Yoshida of Phillips ADR Enterprises, who was furnished with extensive pre-mediation submissions by the Parties, conducted two in-person mediation sessions, and assisted the Parties to reach the proposed Settlement over a period of several months. The Court preliminarily approved the Settlement on May 1, 2024. (D.I. 144) (the "Preliminary Approval Order").

3.     This declaration describes: (a) the legal efforts overseen by Lead Plaintiffs and Lead Counsel, and the results of those efforts (PART I, ¶¶ 4-50); (b) the Settlement and the risks that Lead Plaintiffs and Lead Counsel considered in determining that the Settlement provides a

---

[1] All capitalized terms not otherwise defined herein have the same meaning as set forth in the Stipulation and Agreement of Settlement dated March 25, 2024 (D.I. 140-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) Defendants.

very favorable recovery for the Settlement Class (PART II, ¶¶ 51-76); (c) the dissemination of notice of the Settlement to members of the Settlement Class (PART III, ¶¶ 77-82); (d) the proposed Plan of Allocation and the basis for it (PART IV, ¶¶ 83-90); and (e) the fee and expense application of Lead Counsel submitted with the approval of Lead Plaintiffs (PART V, ¶¶ 91-116).

**PART I – PROSECUTION OF THE ACTION**

**I.    INITIATION AND PROSECUTION OF THE ACTION**

   **A.    The Filing of the Initial Complaint and Appointment of Lead Plaintiffs and Lead Counsel**

4.    This case was initiated on May 12, 2020 with the City of Hialeah Employees' Retirement System's filing of a class action complaint alleging violations of the federal securities laws. D.I. 1. A related action was filed on June 12, 2020. *See Walsh v. Grand Canyon Educ., Inc.*, Case No. 1:20-cv-00801.

5.    On May 20, 2020, the case was assigned to the Honorable Maryellen Noreika.

6.    On July 13, 2020, Colorado FPPA and Oakland County filed a motion seeking appointment as Lead Plaintiffs, approval of their selection of Barrack Rodos and Bernstein Litowitz as Lead Counsel, and consolidation of the two related actions. D.I. 13. Other applicants filed similar motions. D.I. 14, 16, & 22.

7.    The documents submitted on behalf of Colorado FPPA and Oakland County included: (a) initial motion papers, a brief, a declaration, and loss charts on July 13, 2020, D.I. 13, 15 & 21; (b) an answering brief submitted in opposition to a competing motion on July 27, 2020, D.I. 26; and (c) a reply brief in further support of the motion on August 3, 2020, D.I. 27.

8.    On August 13, 2020, the Court consolidated the actions, appointed Colorado FPPA and Oakland County as Lead Plaintiffs, and approved their selection of Barrack Rodos and Bernstein Litowitz as Lead Counsel. D.I. 28. Immediately thereafter, Lead Counsel and counsel

2

for Defendants consulted on a proposed schedule for the filing of a consolidated complaint and responses thereto.  On August 21, 2020, the Parties submitted a stipulation setting the schedule for Lead Plaintiffs to file a consolidated amended complaint and for briefing on any motion to dismiss filed by Defendants, D.I. 30, which was approved by the Court on August 24, 2020, D.I. 31.

9.    On October 15, 2020, the action was referred for certain purposes to Magistrate Judge Christopher J. Burke.  D.I. 32.

**B.    Lead Counsel's Investigation and the Filing of the Complaints**

10.    Following the Court's appointment of Lead Plaintiffs, Lead Counsel undertook an exhaustive investigation of both public and non-public sources to gather information regarding the claims to be asserted in a consolidated complaint.

11.    Lead Counsel's investigation included a thorough review and analysis of materials authored, issued, or presented by Grand Canyon, including: regulatory filings made by Grand Canyon with the U.S. Securities and Exchange Commission ("SEC"), conference call transcripts, press releases, investor presentations, and other communications issued publicly by Grand Canyon during the Class Period and beyond. Lead Counsel also reviewed countless news articles, research reports and advisories by securities and financial analysts, and other items of market commentary concerning Grand Canyon in order to, among other things, gauge the impact of Grand Canyon's statements on the marketplace. Additionally, Lead Counsel conducted a detailed review and analysis of industry-specific materials, such as reports and other materials issued by educational accreditation or regulatory bodies.  These materials included a November 6, 2019 letter from Michael J. Frola, the Director of Multi-Regional and Foreign Schools Participation Division of the Department of Education ("DOE"), which reported the DOE's denial of Grand Canyon University's ("GCU") application for non-profit status and quoted numerous confidential Company documents and analyses of the Conversion. Finally, Lead Counsel reviewed thousands

of pages of documents produced by the DOE in response to a Freedom of Information Act ("FOIA") request and other public information about Grand Canyon, including court filings in other lawsuits brought against Defendants.

12. Lead Counsel dedicated substantial time and resources to locating, interviewing, and memorializing the accounts of potential witnesses, including former Grand Canyon employees. Lead Counsel, through and in conjunction with their experienced in-house investigators, contacted more than 230 potential witnesses and conducted over 40 witness interviews. These interviews provided valuable insight and background that aided Lead Counsel in their investigation and in formulating their theory of the case.

13. In addition, Lead Counsel worked with several experts to analyze relevant facts and craft important technical allegations. Lead Counsel consulted with an economic expert to provide analyses relating to loss causation and damages, an accounting expert to analyze relevant accounting issues, and an expert on nonprofit organizations and tax law.

14. On October 20, 2020, Lead Plaintiffs filed a 94-page, 264-paragraph Consolidated Complaint for Violations of the Federal Securities Laws ("Consolidated Complaint"). D.I. 34. The Consolidated Complaint asserted claims on behalf of all persons and entities, other than Defendants and their affiliates, who purchased Grand Canyon common stock between January 5, 2018 and January 27, 2020, inclusive (the "Class Period"), and were injured thereby. The Consolidated Complaint alleged that Defendants made materially false and misleading statements or omissions regarding Grand Canyon's conversion (the "Conversion") of the for-profit university it owned and operated, GCU, into a purportedly independent and DOE approved "non-profit" university ("New GCU"). The DOE ultimately approved GCU's change in ownership, but the agency denied the request that GCU be recognized as a non-profit. The Consolidated Complaint

4

specifically alleged that Defendants made materially false and misleading statements or omissions concerning GCU's independence from Grand Canyon, the likelihood of DOE approval of the Conversion, the similarity of the Conversion to DOE-approved transactions, and Grand Canyon's accounting and compliance with Generally Accepted Accounting Principles ("GAAP"), among other topics. The Consolidated Complaint asserted claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against all Defendants, as well as claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.

15.     On December 21, 2020, Defendants moved to dismiss the Consolidated Complaint. Defendants argued in their 20-page memorandum in support that Lead Plaintiffs failed to sufficiently allege actionable misstatements or omissions, that Defendants acted with scienter, or loss causation. D.I. 36 & 37. For example, Defendants argued that the Consolidated Complaint failed to allege scienter because the alleged scheme lacked a coherent rational objective and did not allege how Defendants would have or should have known that the DOE would not approve GCU's non-profit status. D.I. 37. Defendants additionally argued that Lead Plaintiffs failed to allege falsity as to each misstatement. *Id.* For example, Defendants argued that it was indisputably true that GCU was a separate entity from GCE and that Lead Plaintiffs failed to allege that any member of GCU was also employed by GCE. *Id.*

16.     On February 19, 2021, Lead Plaintiffs filed a 20-page response in opposition to this motion. D.I. 43. In their response, Lead Plaintiffs argued that the Consolidated Complaint adequately alleged falsity and scienter, pointing to the nonpublic information that Defendants had directly contradicting their misleading statements. D.I. 43. On March 22, 2021, Defendants filed a 10-page reply in further support of their motion. D.I. 44.

17.     On May 26, 2021, Magistrate Judge Burke conducted a nearly two-hour oral argument on Defendants' motion to dismiss.  Following the hearing, each side submitted a letter concerning whether the Court could consider certain materials Defendants referenced in their motion to dismiss briefing in ruling on Defendants' motion.  D.I. 48, 49.

18.     On August 9, 2021, Judge Burke issued a 49-page Report and Recommendation recommending that the Court grant Defendants' motion to dismiss but permit Lead Plaintiffs to file an amended complaint within 14 days to correct the deficiencies identified.  D.I. 50.  The Report and Recommendation found that the Consolidated Complaint failed to adequately plead scienter.  Specifically, Lead Plaintiffs' theory of scienter in the Consolidated Complaint was that, when Defendants submitted their pre-acquisition application to the DOE, they hoped that the DOE would approve GCU's non-profit status and gambled that the DOE might do so, which the Court found was not a cogent theory.  *Id.* at 34-35.  Judge Burke questioned why the individual defendants, "two experienced executives in the education sector," would conduct such a "gamble" when, as Judge Burke read the Consolidated Complaint, "any thinking person with real experience in this sector would *know*, just as Mueller and Bachus are said to have *known*, that GCU clearly and unmistakably *did not qualify* as a non-profit?"  *Id.* at 38 (footnote omitted).

19.     Lead Plaintiffs did not seek District Court review of the Report and Recommendation.  Instead, they filed a joint motion with Defendants requesting that the Court adopt Judge Burke's Report and Recommendation and grant Lead Plaintiffs leave to amend the Consolidated Complaint.  D.I. 53.

20.     On August 23, 2021, District Judge Noreika adopted the Report and Recommendation and granted Lead Plaintiffs leave to file an Amended Complaint.  D.I. 54.

6

21.     On September 28, 2021, Lead Plaintiffs filed a 124-page, 365-paragraph Amended Consolidated Complaint for Violations of the Federal Securities Laws ("Amended Complaint"). D.I. 55.   Among other things, this complaint included new allegations based on information provided to Lead Counsel by Karen Solinski ("Solinski"), a former supervisory employee of the Higher Learning Commission ("HLC"), the regional accreditation body for GCU.

22.     On December 2, 2021, the Parties filed a Stipulation and Proposed Order stating that, since the filing of the Amended Complaint, Defendants had provided Lead Plaintiffs with "certain non-public documents that Defendants contend relate to the allegations in the Amended Complaint based on statements by [] Solinski," and requesting that Lead Plaintiffs be permitted to file a revised amended complaint to address those documents.  D.I. 58.  That same day, the Court granted leave to amend.

23.     On January 21, 2022, Lead Plaintiffs filed a 132-page, 379-paragraph Second Amended Consolidated Complaint for Violations of the Federal Securities Laws ("Second Amended Complaint" or "Complaint").  D.I. 60.  In addition to the investigation Lead Counsel undertook in drafting the earlier complaints, Lead Counsel also conducted additional interviews with confidential witnesses and reviewed the following materials: (i) the documents provided by Defendants' counsel, which included an internal document from Grand Canyon's files; and (ii) documents and electronically stored information provided by Solinski.

24.     The Second Amended Complaint alleged that Defendants made false and misleading statements throughout the Class Period concerning New GCU's purported independence from Grand Canyon, the risks that the DOE may deny the Conversion, the similarity of the Conversion to other DOE-approved transactions, and the Company's accounting and compliance with the GAAP.   In drafting the Second Amended Complaint, Lead Counsel

7

specifically addressed the deficiencies identified by Judge Burke with regard to Lead Plaintiffs' theory of scienter.  In particular, the Second Amended Complaint alleged that, once Betsy DeVos ("DeVos") was confirmed as Secretary of Education, the Trump Administration began installing veterans of for-profit education companies into DOE and White House leadership roles while simultaneously rolling back several DOE protections against student-abuses that had been unfavorable to for-profit institutions.  The Second Amended Complaint further alleged that for-profit institutions, on the advice of counsel, began delaying plans to submit conversion applications to the DOE until after President Trump was in office. Finally, the Second Amended Complaint alleged that after Trump assumed office, a number of for-profit institutions commenced conversions, with the DOE sending pre-acquisition review letters to two institutions stating that the DOE did not see any impediment to the conversions being approved.  As discussed in greater detail hereinafter, these allegations supported Lead Plaintiffs' theory of scienter because, although the Second Amended Complaint now alleged that Defendants had been told by the DOE at the time of their first conversion attempt in 2014 that it was unlikely to approve such a transaction in the future, Defendants might have reasonably believed that the Conversion could be approved by the DeVos administration and that it represented their best or only chance for success in this regard.

25.    As with the previous complaints, the Second Amended Complaint asserted claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against all Defendants, as well as claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.  These claims were again asserted on behalf of all persons and entities, other than Defendants and their affiliates, who purchased Grand Canyon common stock during the Class Period and were damaged thereby.

8

**C.      Briefing and the Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint**

26.      On March 15, 2022, Defendants moved to dismiss the Second Amended Complaint, filing a 20-page brief in support in which they challenged virtually every element of Lead Plaintiffs' claims, including falsity, scienter, and loss causation. D.I. 61 & 62. Defendants also submitted seven exhibits in support of their motion. *See* D.I. 63. In their brief, Defendants argued that Lead Plaintiffs failed to allege any facts that remedied the deficiencies the Court had previously identified in the Consolidated Complaint regarding the theory that Defendants "gambled" with the transaction based on the allegedly favorable political landscape. Defendants also argued that Lead Plaintiffs failed to allege why Defendants would engage in a risky transaction that they knew would fail. Defendants further argued that their accounting treatment of GCU was proper based on the approval of their outside auditors and the SEC and that, therefore, Lead Plaintiffs' allegations that Defendants falsely claimed they were not required to consolidate GCU's financials failed. Defendants also contended that Lead Plaintiffs failed to allege loss causation as to the second alleged corrective disclosure—a report issued by Citron Research (the "Citron Report")—because the Citron Report revealed no new information to the market.

27.      On May 6, 2022, Lead Plaintiffs filed a 25-page opposition to Defendants' motion to dismiss. D.I. 66. Lead Plaintiffs also submitted a letter concerning Karen Solinski's employment and responsibilities with the HLC as an exhibit. *See* D.I. 67. In the responding brief, Lead Counsel provided a detailed fact section laying out the course of Defendants' alleged wrongful actions, as well as arguments supporting that Lead Plaintiffs had adequately alleged that Defendants had made false and misleading statements throughout the Class Period with scienter and had sufficiently pleaded loss causation.

9

28.    Defendants filed a 15-page reply in support of their motion to dismiss on June 3, 2022.  D.I. 68.

29.    Oral argument was held on the motion to dismiss before Judge Burke on October 25, 2022.   On February 17, 2023, Judge Burke entered a detailed, 68-page Report and Recommendation recommending that Defendants' motion to dismiss be denied in full.  D.I. 80. Judge Burke determined that Lead Plaintiffs adequately alleged material misrepresentations and omissions, loss causation, and scienter.  *See generally id.*  With regard to Lead Plaintiffs' theory of scienter, Judge Burke noted that the Second Amended Complaint "added numerous factual allegations meant to answer [the Court's] questions" and which "provided additional needed context and help articulate how Plaintiffs' theory of the fraud scheme is cogent."  *Id.* at 55.  In particular, Judge Burke found that the Second Amended Complaint included allegations that "better explain why, although Defendants are said to have understood that their [Master Services Agreement] with GCU violated the most basic tenet of non-profit status, they nevertheless thought that there was a reasonable chance that the DOE would approve GCU's non-profit request," *id.* (citation and internal marks omitted)—including "significant new detail about why, during the DeVos administration at the DOE, for-profit entities might initially have expected a more favorable outcome for proposals like the Conversion."  *Id.*

30.    Defendants filed objections to the Report and Recommendation on February 27, 2023.  D.I. 83.  On March 28, 2023, Judge Noreika heard oral argument regarding the objections and entered an oral order overruling Defendants' objections and adopting the Report and Recommendation.

31.    On April 11, 2023, Defendants filed their answer to the Second Amended Complaint, in which they denied the claims and asserted twelve affirmative defenses.  D.I. 90.

### D. Prosecution of the Action through Fact Discovery

32. On May 1, 2023, the Parties filed their proposed scheduling order, D.I. 94, and on May 3, 2023, it was approved by the Court, D.I. 95. The Scheduling Order set forth that fact discovery should close on May 14, 2024, and that Lead Plaintiffs' motion for class certification be filed by January 5, 2024. *Id.* The Scheduling Order also set the dates for document requests and expert discovery.

33. On July 11, 2023, the Court entered as an Order of the Court the Parties' Stipulation and Order Governing Discovery Matters and the Production of Electronically Stored Information ("ESI"). D.I. 108.

34. Lead Plaintiffs served on Defendants three extensive sets of requests for production of documents, comprising 70 individual document requests, as well as one set of interrogatories. Defendants served on Lead Plaintiffs two extensive sets of requests for the production of documents and interrogatories, and Defendants filed requests for admission. Over the course of several months, the Parties engaged in numerous intensive meet and confers, including written communications, concerning the appropriate scope of the Parties' reviews and productions, including negotiating appropriate custodians, search terms, and sources of ESI. As a result of these negotiations, Defendants produced 253,121 pages of documents and Lead Plaintiffs produced 13,110 pages of documents.

35. Given the importance of non-party GCU to the case, Lead Plaintiffs subpoenaed GCU and engaged in a numerous meet and confers concerning the scope of GCU's production over several months. GCU eventually produced 10,005 pages of documents in response to Lead Plaintiffs' subpoena, and were reviewing additional documents for production at the time this case was stayed.

36.   Lead Plaintiffs also served subpoenas upon other third parties, including Barclays Capital Inc., HLC, Deloitte Tax LLP, KPMG LLP, Citron Research, Cooley LLP, Nixon Peabody LLP, and Hogan Marren Babbo & Rose, Ltd., several of which began making document productions before the Settlement was reached.  Defendants likewise served subpoenas upon and received documents from Lead Plaintiffs' investment managers: Neumeier Poma Investment Counsel LLC, TimesSquare Capital Management, Victory Capital Management, and Loomis Sayles & Company, L.P.

37.   Ultimately, third parties produced more than 61,000 pages of documents.

**E.   Class Motion Proceedings**

38.   On January 5, 2024, Lead Plaintiffs filed their motion for class certification, appointment of class representatives, and appointment of class counsel.  D.I. 126.  Lead Plaintiffs specifically sought certification of a class consisting of all persons, other than Defendants and their affiliates, who purchased the common stock of Grand Canyon between January 5, 2018 and January 27, 2020, inclusive, and were injured thereby.  Lead Plaintiffs sought to have Oakland County and Colorado FPPA, which collectively purchased 48,311 shares of Grand Canyon common stock during the Class Period, certified as class representatives.

39.   In support of the motion for class certification, Lead Plaintiff submitted a 20-page memorandum of law and a declaration of counsel that provided factual support and exhibits, including the 43-page market efficiency expert report of Matthew D. Cain, Ph.D. ("Dr. Cain"), which itself had 11 exhibits.

40.   On January 9, 2024, the Action was re-assigned to District Judge Jennifer L. Hall.

## II.    THE PARTIES' MEDIATION EFFORTS AND PRELIMINARY APPROVAL OF THE SETTLEMENT

41.    The Parties began exploring the possibility of a settlement in the fall of 2023.  The Parties agreed to engage in private mediation and retained Michelle Yoshida of Phillips ADR Enterprises to act as mediator (the "Mediator").  Ms. Yoshida is a highly experienced mediator who has worked as a full-time mediator and arbitrator for 17 years and has been involved as a mediator for over 500 disputes, including numerous large, complex cases, including securities class actions.  *See* Yoshida Decl. (Ex. 1), at ¶¶ 3-4.

42.    In advance of the mediation, the Parties—through their counsel—prepared and exchanged extensive written submissions to the Mediator in an effort to inform the Mediator of the evidence, claims, and defenses of the Parties as well as the relative positions of the Parties on key issues in the case. The Parties and their counsel conducted two rounds of simultaneous submissions in connection with the first mediation session, exchanging opening submissions on October 20, 2023 and responding submissions on October 31, 2023.

43.    The first full-day in-person mediation session took place on November 14, 2023. Counsel for the Parties and Defendants' insurance carriers attended the session, with representatives from Colorado FPPA also present in person and representatives of Oakland County participating by phone and email as needed.  The session ended without any agreement being reached, but settlement discussions continued through the Mediator thereafter.

44.    A second mediation session was scheduled for February 21, 2024.  On February 7, 2024, the Parties agreed to a stay of litigation deadlines and activity through the date of the mediation.  The Parties exchanged and submitted additional confidential mediation statements on February 13, 2024.

13

45.    On February 21, 2024, the second full-day session was again attended by counsel for the Parties and Defendants' insurance carriers, as well as a representative from Colorado FPPA, with Oakland County participating by phone and email as needed.  At the conclusion of the second mediation session, the Mediator made a mediator's proposal that the Action be settled for $25.5 million, which the Parties accepted.

46.    Ms. Yoshida has submitted a declaration describing the Parties' mediation process. *See* Ex. 1.  In the declaration, Ms. Yoshida observes that "the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith" and that she believes that "the proposed Settlement warrants final approval by the Court as a fair, well-reasoned resolution, taking into consideration the complexity, risks, costs and uncertainty of continued litigation."  Ex. 1, at ¶¶ 11-12.

47.    On February 23, 2024, counsel for Lead Plaintiffs and counsel for Defendants, on behalf of their respective clients, entered into a term sheet (the "Term Sheet") setting forth, among other things, the agreement to settle and release all claims asserted in the Action against Defendants in return for a cash payment by Defendants in an amount equal to $25.5 million for the benefit of the Settlement Class, subject to certain terms and conditions.

48.    The Parties' counsel thereafter undertook extensive discussions and drafting sessions to create and formalize the Settlement documents, including the: (a) Stipulation; (b) Notice of Pendency of Class Action and Proposed Settlement, Settlement Hearing, and Motion for Attorneys' Fees and Litigation Expenses ("Notice"); (c) Proof of Claim and Release Form ("Claim Form"); (d) [Proposed] Judgment Approving Class Action Settlement; (e) [Proposed] Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement; and (f) Summary Notice of Pendency of Class Action and Proposed Settlement,

14

Settlement Hearing, and Motion for Attorneys' Fees and Litigation Expenses ("Summary Notice"). The Settlement documents were executed as of March 25, 2024, and submitted to the Court for preliminary approval of the Settlement.

49.    By Order dated May 1, 2024, the Court granted preliminary approval of the Settlement.  D.I. 144.  In accordance with the Preliminary Approval Order, the Court-authorized claims administrator, JND Legal Administration ("JND"), began its notice campaign on May 22, 2024.  JND, Barrack Rodos, and Bernstein Litowitz also established webpages devoted to the proposed Settlement, which include downloadable copies of the Notice and Claim Form, as well as other relevant information: (www.GrandCanyonSecuritiesLitigation.com), (www.blbglaw.com/cases-investigations/grand-canyon-education-inc) and (www.barrack.com/newsroom/settlement-alert-25-5-million-proposed-settlement-reached-in-in-re-grand-canyon-education-inc-securities-litigation/).    In addition, the Summary Notice was published on June 3, 2024 on the *PR Newswire* and in *Investor's Business Daily*.

50.    On May 13, 2024, the Parties consented to the Magistrate Judge's disposition of all motions related to approval of the Settlement, including certification of the Settlement Class, approval of the Plan of Allocation, motions for attorneys' fees and expenses, entry of final Judgment pursuant to the Settlement, and any motions to distribute funds to class members.  D.I. 145.  Accordingly, on May 15, 2024, District Judge Hall ordered that all motions related to approval of the settlement be referred to Magistrate Judge Burke.  *Id.*

**PART II – THE SETTLEMENT**

**III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, AND SHOULD BE APPROVED**

51.    Subject to Court approval, Lead Plaintiffs, on behalf of the proposed Settlement Class, have agreed to settle all claims in the Action in exchange for a cash payment of $25.5 million

15

(the "Settlement Amount").  The Settlement Class will release as against Defendants all claims and causes of action of every nature and description, whether arising under federal, state, common, or foreign law, including known claims and unknown claims, that (i) Lead Plaintiffs or any other member of the Settlement Class asserted in the Second Amended Complaint or could have asserted in any other forum that arise out of or are based upon the allegations, transactions, facts, matters or occurrences, representations, or omissions involved, set forth, or referred to in the Second Amended Complaint and (ii) relate to the purchase of Grand Canyon common stock during the Class Period.[2]  *See* Stipulation ¶¶ 1(nn), 5.  Released parties include Defendants and their current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, partnerships, partners, trustees, trusts, employees, immediate family members, insurers, reinsurers, and attorneys.  *See* Stipulation ¶ 1(n).

52.    Pursuant to the terms of the Stipulation and the Preliminary Approval Order, the Settlement Amount has been deposited into an interest-bearing escrow account (the "Settlement Fund").

53.    The Settlement provides an immediate, certain recovery for the claims asserted in this Action.  If approved by the Court, it will dismiss all the claims of Lead Plaintiffs and all Settlement Class members against the Defendants in the Action and avoid the uncertainties and costs of further litigation.  Assuming the Settlement is approved, affected investors will be eligible to receive compensation once the claims made against the Net Settlement Fund are validated, calculated and presented to the Court for payment, rather than after the time it would take to resolve

---

[2] This release does not cover, include, or release (i) any ERISA claims, (ii) any shareholder derivative claims asserted on behalf of Grand Canyon; (iii) any claims by any governmental entity that arise out of any governmental investigation of Defendants relating to the conduct alleged in the Action; or (iv) any claims relating to the enforcement of the Settlement.  *See* Stipulation ¶ 1(nn).

the Action through further litigation, including adjudication of the filed but not-yet-briefed motion for class certification. Further proceedings in this Action would also have included the completion of the Parties' document discovery and fact witness discovery, third-party discovery, expert discovery, the potential filing and briefing of summary judgment motions and motions *in limine*, other necessary pre-trial proceedings, presenting the Action at a jury trial, and resolution of all potential appeals.

54.    As summarized above, Lead Plaintiffs, through Lead Counsel, conducted an extensive investigation of the claims and underlying events and transactions relating to the Action, including through the review and analysis of a multitude of public and non-public sources.

55.    In addition, Lead Counsel retained an economics expert in connection with the motion for class certification, as well as part of the mediation process, which helped to inform Lead Plaintiffs and Lead Counsel of the potential damages and loss causation issues in the Action.

56.    As further summarized above, Lead Plaintiffs and Lead Counsel participated in hard-fought arm's-length negotiations and mediation with Defendants, their insurers, and their counsel over a period of several months through an experienced and highly qualified mediator. The Settlement was the result of the Mediator's proposal at the conclusion of the second full-day mediation session.

57.    Defendants affirmatively deny, and have consistently denied, all allegations of liability contained in the Second Amended Complaint and deny that they are liable to the Settlement Class. Throughout the proceedings before this Court on Defendants' motions to dismiss, discovery, and the mediation process, the Parties aired their significant differences concerning the strengths and weaknesses of each side's claims and defenses, as well as the potential damages that might be presented by each side to a jury.

17

## IV.    THE RISKS FACING LEAD PLAINTIFFS AND THE CLASS IN THE ACTION

58.    The Settlement provides a certain and substantial benefit to the Settlement Class in the form of a $25.5 million cash payment.  Lead Plaintiffs and Lead Counsel believe that the proposed Settlement—which represents a significant portion of the realistically recoverable damages in the Action—is a very favorable result for the Settlement Class considering the risks of continuing the litigation.  As explained below, Lead Plaintiffs would face meaningful risks to proving liability, establishing loss causation, and securing damages at the several remaining stages of litigation, including class certification, summary judgment, and trial.  Even if Lead Plaintiffs defeated Defendants' motion for summary judgment and prevailed at trial, Lead Plaintiffs would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiffs from obtaining a recovery for the Settlement Class—or, at the very least, delayed recovery for years.

### A.    General Risks in Prosecuting Securities Class Actions

59.    In recent years, securities class actions have faced greater risks than in prior years, and it is not uncommon for district courts to dismiss securities class actions at the summary judgment stage.  *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (defendants prevailed at summary judgment in a securities class action against Mylan arising out of misstatements concerning the company's EpiPen product and other generic drugs), *aff'd sub nom. Menorah Mitvachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024); *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *1, 6 (D. Or. May 24, 2021) (granting defendants' renewed motion for summary judgment based on recent Ninth Circuit decision on forward-looking statements), *aff'd sub nom. AMF Pensionsforsakring AB v. Precision Castparts Corp.*, 2022 WL 2800825 (9th Cir. July 18, 2022); *see also Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017), *aff'd sub nom. Pompano Beach Police &*

18

*Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th. Cir. 2018); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd sub nom. Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014).

60.     Even cases that have survived summary judgment can be dismissed prior to trial in connection with *Daubert* motions, such as those likely to be filed by Defendants here.  *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 197-98 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of the defendants after finding that the event study offered by plaintiffs' expert was unreliable and that there was accordingly no evidence that the market reacted negatively to disclosures).

61.     Even when securities class action plaintiffs successfully overcome multiple substantive and procedural hurdles before trial, there remain significant risks that a jury will not find the defendants liable or award expected damages.  *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023) (defense verdict in securities class action even though the court had already found the statements were false and defendant had acted recklessly in issuing them, and the same conduct had resulted in SEC charges and a settlement).

62.     Further, post-trial motions, based on a complete record, also present substantial risks.  For example, in *In re BankAtlantic Bancorp, Inc.*, following a jury verdict in the plaintiffs' favor, the district court granted the defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims.  2011 WL 1585605, at *14-22 (S.D. Fla. Apr. 25, 2011), *aff'd* 688 F.3d 713 (11th Cir. 2012) (finding that there was insufficient trial evidence to support a finding of loss causation).  Intervening changes in the law may also impact a successful

trial verdict.  For example, a district court in Oregon reconsidered its order denying defendants' motion for summary judgment and granted the motion more than a year later based on a new decision by the Ninth Circuit.  *See Precision Castparts*, 2021 WL 2080016, at *6.

63.    Accordingly, securities class actions face serious risks of dismissal and non-recovery at all stages of litigation.

**B.    Specific Risks Concerning This Action**

64.    Lead Plaintiffs and Lead Counsel believe the claims asserted against Defendants in this Action are meritorious.  They recognize, however, that this Action presented meaningful risks to establishing liability. Lead Plaintiffs alleged that Defendants made materially false or misleading statements across four categories: (i) the DOE's review and approval of the Conversion; (ii) GCU's independence and non-profit status; (iii) the Conversion's similarity to other transactions; and (iv) the accounting for GCU as non-profit entity, independent from GCE, in violation of GAAP.  Each category of misstatements faced significant obstacles to establishing liability and damages at summary judgment and trial.  As discussed further below, Defendants vigorously argued that their challenged statements, specifically concerning the likelihood of the DOE's approval of the Conversion and their alleged violation of GAAP rules, were not false or misleading when made, and, in any event, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors.

**1.    Liability**

65.    The risks relating to falsity and scienter were particularly acute with respect to Defendants' accounting statements.  Lead Plaintiffs' accounting allegations were based on a technical requirement that GCE "consolidate" GCU's financials into its own financial statements based on accounting rules instituted in the wake of the Enron fraud to prevent companies from using off-balance-sheet entities to hide liabilities.  Those rules require a reporting entity like GCE

20

to consolidate another entity's results onto the reporting entity's financial statements if the reporting entity shares in the economic risks and rewards of the other entity and also controls it. Importantly, those rules have an explicit carve-out that exempts a reporting entity from having to consolidate the financials of any *bona fide* non-profit entity. GCE relied on this carve-out to avoid consolidating GCU's financial results. Lead Plaintiffs alleged that this reliance was improper because GCU was not a *bona fide* non-profit. Defendants, however, argued that their outside auditors and the SEC reviewed and approved the Company's accounting treatment of GCU and, therefore, that their misstatements regarding Grand Canyon's independence from GCU were not false or misleading when made. Thus, Defendants would have had a strong argument that, in light of auditor and SEC approval, their accounting was appropriate. Further, even if Lead Plaintiffs could establish that Defendants' accounting treatment was improper, Defendants could likely have relied on the approval of GCE's auditor and the SEC as even stronger evidence that, at minimum, they had a reasonable basis to believe that their treatment was appropriate and thus did not intend to deceive investors. Either of these arguments, if credited, would have eliminated the accounting statements from the case.

66.    As another example, Defendants had strong arguments that they believed their statements concerning the DOE's review of the Conversion to be true and that they had no intent to commit fraud. For example, Lead Plaintiffs alleged that Defendants misled investors when they claimed that any delay in the DOE's approval of the Conversion was due to "understaffing" when, in reality, the DOE's delays were due to its scrutiny of the structure of the conversion. Complaint ¶¶135, 336. Lead Plaintiffs would have therefore been required to prove that Defendants knew or were reckless in not knowing that DOE's delay in approving GCU's nonprofit status was, in fact, due to the DOE's scrutiny of structure of the Conversion. Defendants, however, argued that their

21

statement that the DOE's delay in approving the Conversion was due to "understaffing" was not false based on information provided to them by their advisors.  Although Lead Plaintiffs and Lead Counsel believed they had responses to Defendants' arguments, there was a meaningful risk that the Court or jury could find that Defendants lacked scienter on a complete record at summary judgment or trial.

### 2.   Loss Causation and Damages

67.   Even assuming that Lead Plaintiffs and Lead Counsel overcame Defendants' liability arguments, Lead Plaintiffs faced additional risks in establishing loss causation and damages.

68.   Lead Plaintiffs faced numerous significant risks in establishing loss causation in connection with the Citron Report published by short-selling research firm Citron Research on January 28, 2020—the final corrective disclosure in this case and the one that accounted for approximately $300 million of Lead Plaintiffs' maximum damages of $419 million.  First, multiple courts have held that short seller and analyst reports can only serve as corrective disclosures when they present new facts to the market.[3]  At the motion to dismiss stage, Defendants argued that the Citron Report could not serve as a corrective disclosure because it did not reveal any new facts to the market that were not previously made public by the DOE's decision.  At the time, Lead Plaintiffs and Lead Counsel pointed out that, even if new information was required, which it was

---

[3] *See, e.g.*, *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (analyst report was not a corrective disclosure because it "contained a disclaimer . . . stating that all of the information in the presentation was 'obtained from publicly available sources'"); *Bonanno v. Cellular Biomedicine Grp.*, 2016 WL 4585753, at *5 (N.D. Cal. Sept. 2, 2016) (a report which "only collected and opined on already public information . . . does not constitute a disclosure of 'the truth' as required for a corrective disclosure"); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 562 n.34 (D.N.J. 2010) (citation omitted) ("To the extent that some of these reports merely provided more details about the public disclosures, they are insufficient to establish loss causation.").

not, Citron itself had identified nonpublic documents and information as key sources for its analysis. Although the Court accepted that latter argument at the motion to dismiss stage, it nevertheless endorsed the premise that disclosure of nonpublic facts is necessary to establish a corrective disclosure. Thus, at class certification and summary judgment, Lead Plaintiffs could have been required to show specific facts in the Citron Report were sourced from nonpublic information.

69. In the event that Lead Plaintiffs and Lead Counsel were unable to identify nonpublic information, they would have argued that Citron's *analysis* of this public data provided new information to the market and properly served as a disclosure event. While another district court in the Third Circuit endorsed such an approach at the class certification stage in *Hall v. Johnson & Johnson*, 2023 WL 9017023 (D.N.J. Dec. 29, 2023), the Third Circuit recently granted the *Hall* defendants' petition to appeal that ruling pursuant to Rule 23(f)—an extraordinary and discretionary grant of review. The Third Circuit's ultimate ruling on that petition could have foreclosed entirely Lead Plaintiffs' reliance on the Citron Report as a loss causation event, thereby eviscerating the majority of potential damages that the class could recover.

### 3. Developments in Outside Litigation

70. In addition to the specific defenses raised, another notable risk stems from GCU's ongoing litigation against the DOE. In early 2021, GCU filed a lawsuit asserting that the DOE lacked statutory authority to deny GCU's request for nonprofit status and that GCU was legally entitled to nonprofit status. Specifically, GCU argued that, because the Internal Revenue Service ("IRS") had already determined that GCU qualified as a § 501(c)(3) entity, the DOE could not then deny GCU's request for nonprofit status under the Higher Education Act and therefore deny its eligibility for certain federal relief programs. This argument closely tracks Defendants' argument in this Action that they did not misrepresent GCU's status as a nonprofit entity because

23

they believed in good faith that the DOE would follow the IRS's determinations.  While the United States District Court for the District of Arizona granted summary judgment in favor of the DOE, GCU appealed that decision to the U.S. Court of Appeals for the Ninth Circuit.

71.	At the time the Settlement was reached, the Ninth Circuit had heard oral argument but not yet issued its decision.  A favorable decision for GCU from the Ninth Circuit could have found that the DOE should not have denied GCU's request to be recognized as a non-profit institution or that the DOE lacked authority to make this determination in the first instance.  Such a decision—or even an unfavorable one that treated GCU's claims as colorable—could have been utilized by Defendants in this Action to challenge allegations that Defendants made false and misleading statements with scienter, including statements concerning GCU's status as a nonprofit, the likelihood of DOE approval, and GCE's accounting treatment of GCU.

C.	**The Settlement Amount Compared to the Likely Maximum Damages That Could Be Proved at Trial.**

72.	The Settlement Amount—$25.5 million in cash, plus interest—represents a significant recovery for the Settlement Class.

73.	The $25.5 million Settlement is a favorable result when it is considered in relation to the maximum amount of damages that realistically could be established at trial—even assuming that Lead Plaintiffs and the Settlement Class prevailed on all liability issues, including falsity and scienter.  Lead Plaintiffs' damages expert has calculated that the theoretical maximum damages for the Settlement Class would be approximately $419 million.  This amount assume that investors would prevail over all liability and loss causation challenges noted above for the entire Class Period. This amount further assumes that a uniform high level of artificial inflation applied throughout the Class Period, and assumes that the entire stock price declines on November 6-7, 2019, and January 28, 2020, were attributable to the alleged fraud and were foreseeable.

24

74.    However, as discussed above, Lead Plaintiffs faced real challenges in retaining the Citron Report as a corrective disclosure.  If Lead Plaintiffs were unable to retain the Citron Report, then, based on Lead Plaintiffs' expert's analysis, reasonably recoverable damages would have decreased by more than two-thirds, to approximately $116.5 million.  Even that $116.5 million amount assumes that Grand Canyon's stock price was inflated by the maximum amount from Day 1 of the Class Period—an assumption that would be difficult to credit given the changing events during the Class Period, including the spin-off of GCU, which did not occur until six months into the Class Period.  In addition, if GCU were to prevail on its Ninth Circuit appeal, Defendants would have had colorable arguments that the disclosure of the DOE's decision should not serve as a corrective disclosure either—thus risking eliminating damages entirely.  Moreover, all of these maximum damages estimates would have been still further reduced if Lead Plaintiff could not prove that all of GCE's price declines were attributable to the alleged misstatements, as opposed to other factors.

75.    In short, the maximum total damages that Lead Plaintiffs could establish at trial would range from $0 to a theoretical high of $419 million, with $116.5 million the absolute maximum if the Citron Report disclosure was not sustained. The $25.5 million recovery under the Settlement therefore represents approximately 6% to 22% of the maximum potential damages, which is a highly favorable result for the Settlement Class in this Action.

76.    In sum, the proposed Settlement, if approved, provides an immediate, certain recovery for the claims asserted in this Action, without incurring the risks that Defendants would succeed in defeating Lead Plaintiffs' motion for class certification or would prevail, in whole or in part, at summary judgment, trial, or in subsequent appeals, and that the class would recover nothing as a result.

## PART III – NOTICE

### V.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

77.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class. The Preliminary Approval Order also set an August 1, 2024 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the motion for attorneys' fees and expenses, or to request exclusion from the Settlement Class, and scheduled the Settlement Hearing for August 22, 2024.

78.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the motion for attorneys' fees and expenses, or exclude themselves from the Settlement Class. The Notice also informed Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 23% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $600,000. To disseminate the Notice, JND obtained information from Grand Canyon and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 4, at ¶¶ 5-9.

26

79.     JND began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on May 22, 2024.  *See* Segura Decl. ¶¶ 5-8.  As of July 17, 2024, JND had disseminated a total of 73,716 Notice Packets to potential Settlement Class Members and nominees.  *Id*. ¶ 12.

80.     On June 3, 2024, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR Newswire*.  *Id*. ¶ 15.

81.     Lead Counsel also caused JND to establish a dedicated settlement website, www.GrandCanyonSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and Complaint.  *See* Segura Decl. ¶ 16.  That website became operational on May 22, 2024.  *Id*.  Lead Counsel also made copies of the Notice and Claim Form and other documents available on their own websites, www.blbglaw.com and www.barrack.com.

82.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Motion, or to request exclusion from the Settlement Class is August 1, 2024.  To date, just one request for exclusion has been received.  *See* Segura Decl. ¶ 18.  In addition, no objections to the Settlement, Plan of Allocation, or Lead Counsel's motion for attorneys' fees and expenses have been received.  Lead Counsel will file reply papers on or before August 15, 2024 that will address all requests for exclusion and any objections that may be received.

PART IV – THE PLAN OF ALLOCATION

VI.    BACKGROUND OF THE PLAN OF ALLOCATION

83.    In addition to approval of the Settlement, Lead Plaintiffs are also seeking the Court's approval of a proposed plan for allocation of the Net Settlement Fund among Settlement Class Members (the "Plan of Allocation"). The proposed Plan of Allocation is set forth in the Notice. As stated in the Notice, the objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged misrepresentations and omissions of the Defendants, as opposed to losses caused by market or industry factors or other company-specific factors. *See generally* Notice, at 16-21.

84.    The Plan of Allocation was created with the assistance of Lead Plaintiffs' damages expert, Dr. Cain, and reflects the assumption that Defendants' alleged false and misleading statements and material omissions proximately caused the price of Grand Canyon common stock to be artificially inflated throughout the Class Period. In calculating the estimated artificial inflation caused by Defendants' alleged misrepresentations and omissions, Dr. Cain considered price changes in Grand Canyon common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces.

85.    In order to have recoverable damages, generally speaking, the corrective disclosures of the alleged misrepresentations or omissions must have been a cause of the declines in the prices of Grand Canyon common stock. Lead Plaintiffs allege that Defendants made false statements and omitted material facts during the period from January 5, 2018 through January 27, 2020, inclusive, which had the effect of artificially inflating the price of Grand Canyon common stock. Lead Plaintiffs further allege that corrective information was released to the market on

28

November 6, 2019, November 7, 2019, and January 28, 2020, which removed the artificial inflation from the price of Grand Canyon common stock on November 7, 2019 and January 28, 2020. To have a "Recognized Loss Amount" under the Plan of Allocation, the shares must have been purchased during the January 5, 2018 through January 27, 2020 time period and held through at least one of the corrective disclosure dates. Accordingly, shares sold prior to the close of trading on November 6, 2019, the first corrective disclosure date, will have a Recognized Loss Amount of $0.00.

86.    The Plan of Allocation is not a formal damage analysis, and the calculations made in accordance with the Plan of Allocation are not intended to be estimates or, or indicative of, the amounts that Class Members might have been able to recover after a trial. Nor are the calculations in accordance with the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants under the Settlement. The computations under the Plan of Allocation are only a method to weigh, in a fair and equitable way, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocations of the Net Settlement Fund.

87.    As stated in the Notice, the Net Settlement Fund will not be distributed to Authorized Claimants until the Court has approved the Settlement and a plan of allocation, all the Claim Forms are processed and claims are calculated, and the time for any petition for rehearing, appeal or review, whether by *certiorari* or otherwise, has expired. At that point, Lead Counsel will apply to the Court for an order authorizing a distribution of the Net Settlement Fund to the Authorized Claimants. As further explained in the Notice, the Plan of Allocation set forth therein is the Plan that is being proposed by Lead Plaintiffs and Lead Counsel to the Court for approval; provided, however, that the Court may approve this Plan as proposed or it may modify the Plan of Allocation without further notice to the Settlement Class.

29

## VII.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND SHOULD BE APPROVED

88.    We respectfully submit that the proposed Plan of Allocation is fair and reasonable. The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund. Lead Counsel worked closely with Lead Plaintiffs' damages expert in establishing the Plan of Allocation and believes that it is a fair and reasonable method to allocate the Net Settlement Fund among the Settlement Class Members. Lead Plaintiffs also believe that the Plan of Allocation represents a fair and reasonable method of valuing claims submitted by Settlement Class Members. *See* Declaration of Joseph Rozell, Board Chairperson of Oakland County, in Support of Final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement of Expenses of Lead Plaintiffs ("Rozell Decl."), attached as Exhibit 2, at ¶ 8; Declaration of Adam Franklin, General Counsel of the Fire and Police Pension Association of Colorado, in Support of (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Franklin Decl."), attached as Exhibit 3, at ¶ 8.

89.    In order to have a "Recognized Loss Amount" under the Plan of Allocation, a Settlement Class member must have purchased shares of Grand Canyon common stock during the Class Period—January 5, 2018 through January 27, 2020—and must have held those shares through at least one of the dates where new corrective information was released to the market and partially removed the artificial inflation from the price of Grand Canyon common stock. The amounts of the "Recognized Loss Amounts" are based primarily on the difference in the amount of alleged artificial inflation in the prices of Grand Canyon common stock at the time of purchase or acquisition and at the time of sale, or the difference between the actual purchase price and sale price. Thus, the proposed Plan takes into account the stock drops that resulted from each of the

alleged corrective disclosures and provides for an allocation that divides the Net Settlement Fund dependent upon the purchase and sales prices (or prices following the disclosures) for each Settlement Class Member. This treats all similarly situated Settlement Class Members equitably and should be approved.

90.     For these reasons, Lead Plaintiffs and Lead Counsel respectfully submit that the proposed Plan of Allocation is fair and reasonable, and that it should be approved by the Court.

**PART V – THE APPLICATION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

91.     In addition to seeking final approval of the Settlement and the Plan of Allocation, Lead Counsel are also applying to the Court for an award of attorneys' fees and payment of costs and expenses.

92.     The fee application is being submitted by Lead Counsel with the express approval of Lead Plaintiffs.

93.     Lead Counsel agreed to undertake this litigation on an entirely contingent basis, meaning that Lead Counsel would not be compensated at all, or reimbursed for any expenses we would incur on behalf of the class, unless there was a recovery achieved for the class.

94.     Throughout the course of the litigation after the Court's appointment of Colorado FPPA and Oakland County to lead and oversee the prosecution of the Action, Lead Counsel regularly provided case update reports to Lead Plaintiffs, which included summaries of significant developments and projected schedules in the Action. Lead Counsel also provided Lead Plaintiffs on a timely basis with drafts of proposed pleadings and briefs, the motion for class certification, and the submissions prepared for the two mediation sessions identified above. Lead Counsel communicated often with Lead Plaintiffs about all aspects of the case. As described above,

31

representatives from Colorado FPPA attended the mediation sessions in person and Oakland County participated as needed by phone and email throughout the sessions.

95.     Prior to submitting the present fee and expense application, Lead Plaintiffs provided Lead Counsel with reports of the time that representatives of Colorado FPPA and Oakland County spent on Lead Plaintiffs' production of documents and other information, and in supervising the prosecution and settlement of this Action.  That information is summarized in the Rozell and Franklin Declarations, attached hereto as Exhibits 2 and 3.  Based on our in-depth knowledge of the supervisory efforts undertaken by representatives and personnel of Lead Plaintiffs, we believe that the reimbursement for their time spent on this Action is eminently reasonable and appropriate under the PSLRA and the law in this Circuit.

96.     Accordingly, with Lead Plaintiffs' approval, Lead Counsel are applying for an attorneys' fee award for all Plaintiffs' Counsel of $5,865,000, which constitutes 23% of the Settlement Fund, together with interest at the same rate as earned by the Settlement Fund.  As shown in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum") being filed contemporaneously herewith, the fee sought is at the lower end of that which is customarily sought in federal securities law class actions in this Circuit.  Moreover, the fee being requested represents a negative multiplier of Lead Counsel's lodestar (*i.e.,* a discount of approximately 32% from Lead Counsel's collective lodestar).  Thus, the fee request lies well within the range of fees typically awarded in this Circuit.  The percentage fee being sought was provided in the Notice sent to potential Settlement Class members.

97.     As more fully set forth below, Lead Counsel are also applying for reimbursement of litigation expenses in the amount of $401,506.93, which is less than the $600,000 estimate

identified in the Notice.  This includes a request made on behalf of Lead Plaintiffs, pursuant to 15 U.S.C. § 78u-4(a)(4) of the PSLRA, of $6,533.52 in costs incurred by Oakland County and $36,283.75 in costs and expenses incurred by Colorado FPPA, which are directly related to their representation of the Settlement Class.

98.    When evaluating a proposed fee award percentage, the Third Circuit requires consideration of several factors, including:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000); *accord McDermid v. Inovio Pharms., Inc.*, 2023 WL 227355, at *11 (E.D. Pa. Jan. 18, 2023) (citation and internal marks omitted) ("These factors need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest."); *In re Reliance Sec. Litig.*, 2002 WL 35645209, at *15 (D. Del. Feb. 8, 2002).  "In common fund cases such as this one, the percentage-of-recovery method is generally favored because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."  *In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006) (citation and internal marks omitted).  However, the Third Circuit has "recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award," which is "performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier."  *Id.* (citations and footnote omitted) ("The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method.").  Based on consideration of these factors as further discussed below, and on the additional legal

authorities set forth in the accompanying Fee Memorandum, we respectfully submit that Lead Counsel's requested fee should be granted.

## THE FEE APPLICATION

### VIII.    THE REQUESTED FEE IS FAIR AND REASONABLE

99.    For Lead Counsel's extensive efforts on behalf of the Settlement Class, Lead Counsel are applying for a fee award from the Settlement Fund on a percentage basis.  The percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery under the circumstances, is supported by public policy, and has been recognized as appropriate by the Third Circuit for cases of this nature.  *See In re Schering-Plough Corp. Sec. Litig.*, 2009 WL 5218066, at *5 (D.N.J. Dec. 31, 2009).

100.    Based on the excellent result achieved for the Settlement Class, the extent and quality of work performed, the significant risks of the litigation and the fully contingent nature of the representation, Lead Counsel respectfully submit that a 23% fee award is reasonable and should be approved.  As discussed in the accompanying Fee Memorandum, a 23% fee is fair and reasonable for attorneys' fees in common fund case such as this, is at the low end of the range of percentages typically awarded in securities class actions in this Circuit, and is within the range of percentages often awarded by courts across the country in securities class actions with substantial settlements.  *See, e.g.*, *McDermid*, 2023 WL 227355, at *12 (citation and internal marks omitted) ("In common fund cases, fee awards generally range from 19% to 45% of the settlement fund.").

101.    Consideration of Lead Counsel's lodestar further confirms the reasonableness of the requested fee.

102.    Attached hereto as Exhibits 5A and 5B are declarations from Barrack Rodos and Bernstein Litowitz in support of the requested award of attorneys' fees and reimbursement of

34

litigation expenses.  Included within each supporting declaration is a schedule summarizing the hours spent on the litigation and/or settlement of the Action, the firm's lodestar, a description of the work performed by the firm, and a summary of expenses incurred by the firm by category.  The first page of Exhibit 5 is a chart that summarizes the information set forth in these supporting declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Lead Counsel firm and gives totals for the numbers provided.

103.    The significant amount of work undertaken by Lead Counsel has been time-consuming, challenging, and fraught with risk.  Experienced attorneys from Barrack Rodos and Bernstein Litowitz worked cooperatively throughout the litigation and we allocated work assignments among the attorneys to avoid unnecessary duplication of effort.

104.    As set forth in Exhibits 5A and 5B, Lead Counsel have collectively expended a total of 13,250 hours in the investigation, prosecution, and settlement of this Action.  Lead Counsel have excluded from their lodestar calculations time spent working on the motion for attorneys' fees and litigation expenses, and have not included any time for work incurred after June 30, 2024.  The resulting lodestar is $8,567,328.75.  The requested fee, therefore, yields a negative multiplier of 0.68.  Accordingly, we submit that the percentage award being sought is fair and reasonable based on the risks of the litigation, the quality of Lead Counsel's representation, and the excellent result obtained on behalf of the Settlement Class.  Indeed, as discussed in further detail in the Fee Memorandum, the requested fee is significantly below the fees—and lodestar multiples—that have been commonly awarded in securities cases in this Circuit and elsewhere.

105.    Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it for four years without any compensation or guarantee of success.  Based on the excellent result obtained, the quality of work performed, the risks of the Action, and

the contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and is amply supported by the fee awards courts have granted in other such cases.

### A. The Size of the Fund Created, the Number of Persons Benefitted, and Awards in Similar Cases

106.    The first and seventh factors that the Third Circuit has said should be considered when awarding attorneys' fees from a common fund—the size of the fund, number of persons benefited, and the comparison to awards in similar cases—support the requested fee and expense award.  The $25.5 million Settlement represents an excellent recovery considering the potential damages and the significant risks in the Action.  In addition, while it cannot currently be known how many claims will be made by stockholders against the Settlement by the September 19, 2024 claims deadline, 73,716 Notices have thus far been mailed to Grand Canyon stockholders, and so far just one Settlement Class member has sought to be excluded.  The requested fee award is also comparable to fee awards granted in similar cases.  *See, e.g.*, *In re The Bancorp Inc. Sec. Litig.*, 2016 WL 7741727, at *1 (D. Del. Dec. 16, 2016) (approving 23% award of $17,500,000 settlement fund); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 513-14 (W.D. Pa. 2003) (finding a fee award of 25% of the $25 million settlement fund was "commensurate with the range commonly approved in cases involving comparable settlement funds," and collecting cases).

### B. The Absence of Objections

107.    The second factor—the presence or absence of substantial objections by members of the class either to the Settlement or to the fees requested by counsel—likewise supports the award of attorneys' fees and expenses here.  The deadline for filing objections is August 1, 2024.  As of the date of the present filing, no objections have been submitted to the Court or provided to Lead Counsel.

**C.      The Skill and Efficiency of the Attorneys Involved and the Time Devoted to the Litigation**

108.    The third and sixth factors—the skill and effort expended by counsel in the prosecution of this Action—also support the requested fee.  The Settlement in this Action was reached only after completion of Lead Counsel's: (1) extensive factual investigation, which included, among other things, analysis of Grand Canyon's public filings and statements, interviewing several witnesses, and review of analyst reports concerning Grand Canyon and various other materials including thousands of pages of FOIA documents; (2) briefing and argument on Defendants' two motions to dismiss; (3) procurement of substantial document productions by Defendants and third parties, including many meet and confers regarding the scope of productions; (4) review and analysis of over 250,000 pages of documents produced by Defendants, as well as the documents produced by numerous third parties; (5) preparation and filing of Lead Plaintiffs' motion for class certification; (6) consultations with an expert on market efficiency, loss causation, and damages; (7) preparation of pre-mediation submissions; (8) review and analysis of Defendants' pre-mediation submissions and the exhibits thereto; and (9) participation in two full-day mediation sessions and intervening communications facilitated by the Mediator.  Accordingly, the Settlement was achieved only after the Parties had sufficient familiarity with the issues in the case to properly evaluate its merits, strengths, and weaknesses, and the Parties agreed on a settlement figure that was fair, reasonable and adequate to the Settlement Class while also being acceptable to Defendants and their insurance carriers.  Furthermore, Barrack Rodos and Bernstein Litowitz are highly experienced in prosecuting securities class actions and drew upon their collective skill to achieve this Settlement.

109.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of their opposition.  Defendants were represented

37

by attorneys from Alston & Bird LLP and DLA Piper LLP (US)—both highly experienced firms that zealously represented their clients.  In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Settlement Class.

**D.     The Complexities and Duration of the Litigation and the Risk of Non-Payment**

110.    Finally, the fourth and fifth factors—the complexity and duration of the litigation and the risk of non-payment—support the requested fee and expense award.  This Action has been ongoing for over four years and given that the class certification motion has not been decided and the likelihood of summary judgment motions, this case had the potential to extend for another several years, including trial and appeals.

111.    This Action involves complex legal and factual issues and pursuing them would require great time and expense.  *Accord AT&T Corp. Sec. Litig.*, 2005 WL 6716404, at *3 (D.N.J. Apr. 25, 2005) ("[S]ecurities class actions are by their nature convoluted and complex.").  Absent the Settlement, there would have been significant additional necessary resources and costs expended to prosecute the claims against Defendants.  Trial on these issues would be both lengthy and costly and would require the testimony of multiple experts (on higher education, damages, and perhaps others), further adding to the expense and duration of the Action.  Even if the class were able to recover a judgment at trial, there would likely be additional delay caused by appeals of any judgments.  Thus, the Settlement provides a substantial immediate benefit for the Settlement Class without the expense and delay of further litigation.  To be sure, this is an appropriate stage for settling the Action because the Parties have already invested significant time into developing the case and understanding the strengths and weaknesses of their respective positions, but were the case to continue, the Parties would have to undertake considerably more time in briefing and

38

arguing the motion for class certification, continuing discovery, briefing and responding to any motions for summary judgment, and ultimately, trial and appeals.

112.   Despite the risks and uncertainties, Lead Counsel prosecuted this action for over four years on an entirely contingent basis, without receiving any reimbursement and knowing that they may never be compensated for the substantial time and expenses incurred in prosecuting the Action. "Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees." *Yedlowski v. Roka Bioscience, Inc.*, 2016 WL 6661336, at *21 (D.N.J. Nov. 10, 2016) (citation omitted) (noting that "Lead Counsel undertook this action on an entirely contingent fee basis, taking the risk that the litigation would yield no or very little recovery and leave it uncompensated for its time, as well as for its out-of-pocket expenses."). "The risk of non-payment is especially high in securities class actions, as they are notably difficulty and notoriously uncertain." *Id.* (citation and internal marks omitted). Accordingly, this factor weighs in favor of granting Lead Counsel's requested fee.

### E.   Lead Plaintiffs' Endorsement of the Fee Application

113.   Colorado FPPA and Oakland County are experienced lead plaintiffs. Colorado FPPA is Trustee for the Fire and Police Members' Benefit Investment Fund, which contains assets of governmental defined benefit pension plans for the purpose of providing benefits to Colorado firefighters and police officers and beneficiaries upon retirement, disability, or debt. Oakland County provides retirement benefits to employees of Oakland County, Michigan and their beneficiaries. As set forth in the Rozell and Franklin Declarations, Lead Plaintiffs closely supervised and monitored both the prosecution and settlement of the Action, and have concluded that Lead Counsel earned the requested fee based on their efforts and the excellent recovery obtained for the Settlement Class, considering the risks involved. *See* Rozell Decl. at ¶¶ 4-7, 10; Franklin Decl. at ¶¶ 4-7, 9. This too supports the reasonableness of the requested fee. *See Gunter*,

223 F.3d at 199 ("[A] client's views regarding her attorneys' performance and their request for fees should be considered when determining a fee award.").

### THE LITIGATION EXPENSE APPLICATION

114.    Lead Counsel seek payment from the Settlement Fund in the total aggregate amount of $401,506.93 for Litigation Expenses that were reasonably incurred in connection with commencing, litigating and settling the claims asserted in this Action.  That figure includes the costs and expenses incurred by Lead Counsel, as identified in their respective firm Declarations, and for PSLRA awards to Colorado FPPA in the amount of $36,283.75 and Oakland County in the amount of $6,533.52 directly related to their representation of the Settlement Class and careful oversight of the Action.

115.    Given the contingent nature of the representation, Lead Counsel have known from the outset of the Action that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenses until such time as the Action might be successfully resolved.  Accordingly, Lead Counsel were motivated to and did take reasonable and appropriate steps to avoid incurring unnecessary expenses and to minimize cost without compromising the vigorous and efficient prosecution of the case.

116.    As set forth in the declarations provided by attorneys at Barrack Rodos and Bernstein Litowitz (Exhibits 5A and 5B), these firms have incurred a total of $358,689.66 in unreimbursed litigation expenses in connection with prosecuting this Action.  These expenses, as attested to in the respective firm Declarations, are reflected on the books and records maintained by each of the law firms.  These books and records are prepared from expense vouchers, check records and other source materials, and provide an accurate accounting of the litigation expenses incurred in this matter.  Lead Counsel's expenses are set forth in detail in each firm's declaration, each of which identifies the specific category of expense, e.g., experts, on-line research, out-of-

town travel costs, photocopying, telephone, and postage expenses, and other costs actually incurred for which Lead Counsel seek payment. The expenses are summarized in Exhibit 6, which provides of total for both firms across each category of expenses.

## CONCLUSION

117.    For all of the reasons set forth above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate; that the requested fee in the amount of 23% of the Settlement Fund should be approved as fair and reasonable; and that the request for Litigation Expenses in the amount of $401,506.93—including the amount that would be paid directly to reimburse Lead Plaintiffs for the costs they incurred in their supervision of the litigation—should be approved.

In accordance with 28 U.S.C. § 1746, we hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of July 2024.

_____
Jeffrey W. Golan

_____
Katherine M. Sinderson

41